## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALI RAZAK, KENAN SABANI and KHALDOUN CHERDOUD, individually and on behalf of all others similarly situated, <br><br>         Plaintiffs, <br><br>     v. <br><br> UBER TECHNOLOGIES, INC. and GEGEN LLC, <br><br>         Defendants. | Hon. Michael M. Baylson, U.S.D.J. <br><br> Civil Action No. 16-0573 <br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED |

### FIRST AMENDED COMPLAINT

Ali Razak, Kenan Sabani and Khaldoun Cherdoud (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, bring this collective action under 29 U.S.C. § 216(b) and class action under Fed. R. Civ. P. 23 against Uber Technologies, Inc. and Gegen LLC (collectively "Defendants"), and allege the following:

### NATURE OF ACTION

1.      Defendants failed to pay Plaintiffs, and others similarly situated, compensation according to the requirements of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, the Pennsylvania Minimum Wage Act

("PMWA"), 43 P.S. §§ 333.101-333.115 and the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1-260.45.

2.      Plaintiffs are certified limousine drivers that perform on-demand transportation services for Defendants.

3.      Defendants misclassify their limousine drivers as independent contractors even though they are actually employees under federal and state law.

4.      By misclassifying their limousine drivers as independent contractors, Defendants unlawfully avoid paying hourly wages, overtime wages, business expenses, unemployment taxes, social security taxes, disability taxes, workers' compensation premiums and other mandatory employment benefits.

5.      By misclassifying their limousine drivers as independent contractors, Defendants wrongfully shift business expenses onto their limousine drivers.

6.       Plaintiffs bring this collective and class action, individually and on behalf of all others similarly situated, against Defendants for repeated violations of the FLSA, PMWA and WPCL.  Those violations include, but are not limited to: failing to pay Plaintiffs and other limousine drivers any wages, let alone the applicable hourly minimum wage; failing to pay Plaintiffs and other limousine drivers an overtime premium for every hour worked in excess of 40 hours in a work week; and, requiring Plaintiffs and other limousine drivers to cover their own business expenses, thereby further reducing and/or eliminating their earnings.

7.     Plaintiffs bring this collective and class action under the FLSA, PMWA and WPCL for damages and other relief, as set forth below.

## THE PARTIES

8.     Plaintiff **ALI RAZAK** (hereinafter "Razak") is a citizen of the Commonwealth of Pennsylvania, residing in Philadelphia, Pennsylvania.

9.     Plaintiff **KENAN SABANI** (hereinafter "Sabani") is a citizen of the Commonwealth of Pennsylvania, residing in Philadelphia, Pennsylvania.

10.    Plaintiff **KHALDOUN CHERDOUD** (hereinafter "Cherdoud") is a citizen of the Commonwealth of Pennsylvania, residing in Philadelphia, Pennsylvania.

11.    Defendant **UBER TECHNOLOGIES, INC.** (hereinafter "Uber") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 1455 Market Street, San Francisco, California.

12.    Defendant **GEGEN LLC** (hereinafter "Gegen") is a corporation organized and existing under the laws of Delaware, with its principal place of business at 7821 Bartram Avenue, Philadelphia, Pennsylvania.

13.    Gegen is a wholly owned subsidiary of Uber.

14.    Gegen is an alter ego of Uber, established to handle Uber's affairs in Philadelphia, Pennsylvania.

15.     Gegen is operated by Uber employees, and all of Gegen's operations are controlled by Uber.

16.     At all times material hereto, Plaintiffs were and continue to be "employees," as defined by the FLSA, 29 U.S.C. § 203(e)(1) and PMWA, 43 P.S. § 333.103, and as that word is used for purposes of the WPCL.

17.     At all times material hereto, Defendants, collectively and/or individually, were and continue to be "employers," as defined by the FLSA, 29 U.S.C. §203(d), PMWA, 43 P.S. § 333.103 and WPCL, 43 P.S. § 260.2a.

18.     At all times material hereto, Defendants were and continue to be engaged in interstate commerce, as defined by the FLSA, 29 U.S.C. §§ 206(a), 207(a).

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 29 U.S.C. § 216(b), which provides that a lawsuit under the FLSA "may be maintained against any employer… in any Federal or State court of competent jurisdiction."

20.     This Court has supplemental jurisdiction over Plaintiffs' state claims pursuant to 28 U.S.C. § 1367.

21.     Venue is appropriate under 28 U.S.C. § 1391 because the vast majority of Defendants' interactions with Plaintiffs and class members occurred or

arose out of Gegen's headquarters at 7821 Bartram Avenue in Philadelphia, Pennsylvania.

## FACTUAL BACKGROUND

A.     How Uber Works

22.     Uber is the developer of a mobile phone application (hereinafter "App" or "Uber App") that provides on-demand car services to the general public. The App can also be accessed through an internet browser.

23.     Uber's on-demand limousine service, which is accessed through the App, is marketed under the name "UberBLACK."

24.     Uber also refers to its on-demand limousine service as "UberBLACK – The Original," as it was the first service ever offered by Uber.

25.     Uber's App is essentially a personal dispatch service.

26.     The App is first downloaded onto a customer's mobile phone.

27.     Once downloaded, the App requests, among other things, the customer's debit or credit card information, which is held by Uber for future billing.

28.     In order to request a ride, the customer must log into the App.  The App then locates the customer through the Global Positioning System ("GPS") software on the customer's mobile phone.  The customer can either request a ride

at his or her current location, or can manually set another location for pickup. After requesting a ride, the customer has discretion to cancel his or her request.

29.     When the App receives the request, it is submitted to one of Uber's subsidiaries, which Uber refers to as a third-party "Transportation Company."

30.     Gegen is Uber's Transportation Company in Philadelphia, Pennsylvania.

31.     When Gegen receives the fare request from Uber, it forwards that request to a driver who is logged into the App.

32.     Gegen has discretion in deciding which driver receives the fare.

33.     After the driver accepts the fare, he or she is provided the customer's name and location through the App.

34.     When the ride is completed, Uber automatically charges the customer's previously supplied credit or debit card.  The customer does not directly pay the driver anything for the ride.

35.     Uber advises customers that gratuity is included in the fare and that there is no need to tip the driver, even though gratuity is not included in the fare. Uber requires drivers to decline tips if offered by the customer.

36.     After the customer is charged, at a rate dictated by Uber, Uber asks the customer to rate his or her driver using a five star system.

6

37.     When demand for Uber's services reaches a certain level, Uber

engages in "surge pricing."  During the "surge period" customers are charged

nearly ten times Uber's normal rate.  Uber has total control over its surge pricing.

**B.     How UberBLACK Drivers are Paid**

38.     At the end of each week, the driver receives an electronic earnings

statement from Uber and Gegen.

39.     The driver's "total payout" equals the "trip earnings" less

"miscellaneous" expenses.

40.     Trip earnings equal the driver's fares less Uber's fee.

41.     Uber takes a fee of at least 25% of the fare, which is taken before

other deductions are applied.

42.     In addition to its 25% fee, Uber automatically deducts various

expenses from the driver's earnings. These expenses include, but are not limited to:

(1) regulatory fees accessed by the Philadelphia Parking Authority (hereinafter

"PPA"); (2) vehicle payments; and, (3) insurance premium payments.

43.     As stated, Defendants automatically deduct vehicle payments from

their drivers' weekly earnings.  For reasons explained in greater detail below,

Defendants impose requirements on their drivers that restrict their ability to obtain

auto financing.  As a result, drivers are forced to use lenders that partner with

Defendants.  These lenders charge the drivers subprime interest rates regardless of

7

the driver's credit risk.  By automatically deducting loan payments from their drivers' weekly earnings, Defendants are acting as a debt collector for the lender.

44.     As stated, Defendants automatically deduct insurance premium payments from their drivers' weekly earnings.  This insurance is provided by Knightbrook Insurance Company (hereinafter "Knightbrook") and purports to cover the driver in the event of an accident.  Defendants require their drivers to submit to coverage under the Knightbrook policy.  However, Defendants refuse to release the terms of the policy to its drivers even though the drivers pay for the coverage.  The drivers are thus unable to select their own coverage and have no say in how much they are charged by Knightbrook.  By automatically deducting the premium payments from their drivers' weekly earnings, Defendants are acting as a debt collector for Knightbrook.  The deduction is referred to as "Gegen Insurance" on the driver's weekly statement.

45.     The aforesaid expenses are automatically deducted from the driver's earnings regardless of whether the driver earned enough money to cover the expenses.  If there is a net negative balance, the driver must go to the Gegen office and pay the balance in order to maintain access to his or her Uber account.  In some instances, the negative balance is rolled into the next week's statement.  Negative balances are often rolled-over, even if the driver submitted payment to Gegen, because of Defendants' delay in processing such payments.

8

46.     In addition to the miscellaneous expenses, drivers are responsible for other operating expenses, including, but not limited to: (1) PPA driver certification application fees; (2) PPA driver certification renewal fees; (3) vehicle inspection sticker fees; (4) gas; (5) vehicle maintenance; (6) mobile phone expenses; (7) tolls when not carrying a fare; (8) fees to wait in the PHL commercial vehicles lot; (9) expenses related to purchasing and maintaining proper driver attire; (10) and, collision and other supplemental insurance.

47.     The aforementioned expenses are incurred in the scope and course of Plaintiffs and class members' employment with Defendants, and for the benefit of Defendants' business.

**C.     UberBLACK Auto Financing and Liability Insurance**

48.     Individuals desiring to work as UberBLACK drivers, which was the only option available during Uber's launch and expansion in Philadelphia, are subject to PPA oversight.

49.     As an initial matter, these drivers must undergo PPA training, testing, examination, a criminal background check and driving history check.

50.     Once certified, the driver is only permitted to operate a registered limousine.

51.     In order to register a limousine with the PPA, the owner must first apply for a Certificate of Public Convenience, which currently costs $12,000.  The

9

certificate holder must also be able to show proof of commercial liability insurance for the vehicle.

52.     Even if a potential driver is willing to invest in a luxury vehicle and certification, very few can afford the upfront application cost of $12,000.

53.     Gegen thus applied for and obtained its own Certificate of Public Convenience under which it registers UberBLACK drivers in Philadelphia. Likewise, Gegen purchased a commercial liability insurance policy from Knightbrook under which UberBLACK drivers are covered.  Gegen simply passes these costs along to UberBLACK drivers through weekly automatic deductions.

54.     In order for Defendants' plan to be effective, drivers have to transfer their vehicle's title to Gegen.  This title transfer requirement creates another issue for drivers.  Most drivers who purchase a luxury vehicle require financing, and generally all lenders prohibit a title or loan transfer during the contract period.

55.     Defendants' scheme creates a second issue.  Gegen has its own commercial liability insurance policy in compliance with PPA regulations.  Gegen is the name insured on that policy and refuses to release the policy's terms to drivers.  Drivers, however, must show proof of commercial liability insurance when purchasing a luxury vehicle to be used as a limousine.

56.     Defendants' solution was to create a small network of auto dealers and lenders willing to accommodate these issues.  Gegen provides specific

dealerships with a copy of Gegen's insurance policy.  Uber selected Exeter

Financial Corp. (hereinafter "Exeter"), which it had used in other states, as the

primary lender for UberBLACK drivers in Philadelphia.

57.     Defendants thus directed potential drivers to these dealerships, which

would either self-finance the deal or use an Uber-friendly lender.

58.     Drivers sent to these dealers were systematically charged subprime

interest rates, twelve percent (12%) and higher, regardless of their actual credit

risk.

**D.     Uber in Philadelphia**

59.     Uber launched its operations in Philadelphia, Pennsylvania in June of

2012.  At the time, Uber was only offering limousine services.  Uber would later

brand its limousine service as "UberBLACK."

60.     Uber established Gegen as its Transportation Company for limousine

drivers operating in Philadelphia, Pennsylvania.

61.     As demand increased, Defendants solicited new drivers in various

ways, including, but not limited to: (1) asking new drivers for names and telephone

numbers of people who may be interested in driving for Uber; (2) advertising to

potential drivers that they could make upwards of $90,000 by driving for

UberBLACK; (3) advising potential drivers on how they could obtain a luxury

vehicle by going through Uber's partnered dealers and lenders; (4) for a limited

11

time, reimbursing vehicle down payments; and, (5) for a limited time, providing a ten percent (10%) discount on vehicle payments.

62.   Defendants induced hundreds of individuals to become UberBLACK drivers, including Plaintiffs and class members.

63.   As UberBLACK drivers, Plaintiffs and class members underwent PPA certification to obtain a limousine driver certificate.  In addition to having to pay application and renewal fees to the PPA, Plaintiffs and class members underwent a comprehensive criminal background check, a driving history check, a physical examination, testing, training and routine vehicle inspections pursuant to 53 Pa.C.S. § 5706.

64.   UberBLACK drivers are certified and comply with PPA regulations.

**E.   UberX's Illegal Operation in Philadelphia**

65.   Demand for Uber's limousine service, UberBLACK, exploded in Philadelphia.

66.   The number of UberBLACK drivers grew with demand.

67.   Customers were opting for UberBLACK over taxis, despite the higher costs, and Defendants saw this as a new opportunity.

68.   Uber launched UberX in Philadelphia in October of 2014.

69.   Uber set up a second Transportation Company called Raiser-PA LLC (hereinafter "Raiser") to handle its UberX operations in all of Pennsylvania.

70.     Like UberX, Raiser is merely an alter ego of Uber.

71.     Like UberBLACK, UberX is provided through the same Uber App.

72.     In order to take over Philadelphia's taxi transportation industry, Uber took a different approach with UberX.

73.     Uber does not require UberX drivers to comply with PPA regulations.

74.     Drivers who provide car services through UberX violate 53 Pa.C.S. § 5714(f), among other pertinent taxi regulations.

75.     PPA has declared that all car services provided through UberX are illegal because Uber refuses to subject itself and its UberX drivers to PPA's regulatory oversight.

76.     Unlike UberBLACK drivers, UberX drivers do not undergo criminal background and driving history checks by the PPA.

77.     Unlike UberBLACK drivers, UberX drivers do not receive PPA physical examinations, testing, vehicle inspections and training.

78.      Unlike UberBLACK drivers, there is no proof that UberX drivers are adequately insured for purposes of providing taxi services.  Indeed, many of these drivers have only personal auto insurance, which ordinarily excludes coverage if the driver uses his or her vehicle in a commercial capacity.

79.     In blatant disregard to taxi regulations, UberX illegally charges rates lower than those approved by the PPA.

13

80.     UberBLACK drivers are disadvantaged by UberX's anticompetitive rates.

81.     Upon information and belief, there are approximately 10,000 UberX drivers operating in Philadelphia.

82.     As a direct and proximate result of UberX's illegal operation in Philadelphia, UberBLACK drivers, such as Plaintiffs and class members, have been damaged.

83.     Uber has purposefully and unlawfully diverted business away from its UberBLACK drivers.

84.     Uber has shifted its marketing towards UberX.

85.     Uber has updated its App so that UberX is the default selection.

86.     Uber has told UberBLACK drivers to become UberX drivers, even though UberX is illegal and UberBLACK drivers have invested thousands of dollars in operating costs.

**F.    Uber and Gegen's Control over UberBLACK Drivers**

87.     Although Uber and Gegen call their limousine drivers independent contractors, they are actually employees under federal and state law.  Uber and Gegen are the limousine drivers' employers.

88.     This employer/employee relationship is evidenced by the level of control Uber and Gegen exert over UberBLACK drivers.

14

89.     UberBLACK drivers, including Plaintiffs and class members, are subject to stringent rules, requirements and conditions, which include, but are not limited to:

a.     Defendants control the number of fares each driver receives;

b.     Defendants have the authority to suspend or terminate a driver's access to the App;

c.     Defendants do not permit drivers to take emergency phone calls while carrying a fare;

d.     Drivers must submit to coverage under Gegen's liability insurance policy;

e.     Defendants automatically deduct Gegen's insurance premiums from their drivers' weekly earnings;

f.     Defendants refuse to release the Knightbrook insurance policy information, even though their drivers are purportedly covered under it;

g.     Defendants automatically deduct Gegen's PPA expenses from their drivers' total earnings;

h.     Defendants require their drivers to transfer their vehicle's title over to Gegen;

i.     Drivers are suspended or terminated from the App if their earnings are net negative and they do not pay Gegen the balance;

15

j.      Drivers are not permitted to ask for gratuity even though it is industry standard for customers to tip limousine drivers;

k.      Drivers must refuse gratuity even if offered by the customer;

l.      Drivers must submit to Uber's customer rating system;

m.      Drivers are subject to suspension or termination if they receive an unfavorable customer rating, even if that rating is unfounded or malicious;

n.      Defendants manipulate their drivers' rating in order to create a pretense for suspension or termination;

o.      Drivers who refuse a fare are subject to suspension and termination;

p.      Drivers are not permitted to see the customer's destination until they accept the fare request;

q.      Drivers are not permitted to provide estimates;

r.      Drivers are not permitted to promote their personal business to UberBLACK customers, even if the customer affirmatively solicits the driver's personal limousine services;

s.      Uber has absolute discretion in deciding how much customers are charged;

t.      Uber has absolute discretion in deciding what percentage it will deduct from their drivers' earnings;

16

u.     Uber has absolute discretion in deciding whether a customer will receive a surcharge on his or her fare, which negatively impacts the driver's customer rating and number of fares available;

v.     Uber is under no obligation to compensate drivers if their App malfunctions;

w.     UberBLACK drivers are subject to a queue controlled by Gegen when seeking fares at the airport;

x.     If a driver's rating falls below a certain level, that driver's access to the App is terminated;

y.     If a driver's rating falls below a certain level, that driver must take and pay for an instructional course set up through Gegen;

z.     Uber has the sole and absolute discretion in granting a rider's request for a fare adjustment, and if a fare is adjusted then the driver must accept a reduced payment;

aa.    Drivers must take a reduced payment in the event a customer disagrees with the route of travel, which is determined by Uber's navigation software;

bb.    If a customer uses false or fraudulent billing information, the driver must accept a reduced payment or no payment, even though Uber has total control over the customer's billing information;

17

cc.     Drivers have no control over how their services are marketed by Uber;

dd.     Drivers must wear certain business attire while working;

ee.     Drivers can only use certain luxury vehicles chosen by Uber;

ff.     Drivers must agree to allow Uber to automatically deduct vehicle loan payments from their earnings;

gg.     Defendants require UberBLACK drivers to be certified and licensed by the PPA; and,

hh.     Defendants require drivers to submit to Uber's surge pricing scheme, which Uber has absolute discretion.

90.     Defendants' employees enforce the aforementioned rules, requirements and conditions.

91.     Failure to abide by the aforementioned rules, requirements and conditions results in disciplinary action, such as suspending or terminating a driver's access to the Uber App or reducing the number of fares received by the driver.

## **COLLECTIVE ACTION ALLEGATIONS**

92.     Plaintiffs bring their FLSA claims on behalf of themselves and all similarly situated current and former employees of Defendants, who opt-in, as a collective action pursuant to 29 U.S.C. § 216(b).

18

93.     At all times material hereto, Plaintiffs and members of the collective action were employees of Defendants and, as such, were entitled to all the protections provided by the FLSA.

94.     Throughout the relevant time period, Defendants subjected Plaintiffs and similarly situated current and former employees to the same policies and procedures, including, but not limited to: (a) failing to pay employees the applicable hourly minimum wage; (b) failing to pay employees an overtime premium for every hour worked in excess of 40 hours in a work week; (c) requiring employees to pay a fee for the opportunity to work a shift; (d) requiring employees to wear, maintain, and pay for uniforms; (e) failing to meet recordkeeping requirements; and, (f) failing to meet posting requirements.

95.     Plaintiffs and members of the collective action were forced to incur business expenses for the benefit of Defendants, which cut into Plaintiffs' and collective action members' earnings.

96.     Upon information and belief, there are many similarly situated current and former employees of Defendants who have been damaged by its FLSA violations, as set forth herein. These similarly situated current and former employees would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join this collective action.

97.     Upon information and belief, there are many similarly situated current and former employees of Defendants who have been damaged by their FLSA violations.

98.     These similarly situated current and former employees would benefit from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join the collective action.

99.     These similarly situated current and former employees are known to Defendants, are readily identifiable and can be located using Defendants' records.

100.    Plaintiffs will request the Court to authorize notice to all situated current and former employees of Defendants, informing them of the pendency of this action and their right to "opt-in" to this lawsuit, pursuant to 29 U.S.C. § 216(b), for the purpose of seeking unpaid compensation, overtime compensation and liquidated damages under the FLSA.

101.    Defendants failed to make, keep, and preserve accurate records with respect to Plaintiff and members of the collective action, including hours worked each workday and total hours worked each workweek, as required by 29 U.S.C. § 211(c) and supporting federal regulations.

102.    Defendants failed to post and keep posted in a conspicuous place on their premises a notice explaining the FLSA, as prescribed by the Wage and Hour

Division of the U.S. Department of Labor, in violation of the FLSA and supporting federal regulations, including 29 C.F.R. § 516.4.

103.   Defendants' failure to make, keep and preserve accurate records was willful and, therefore, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255.

## CLASS ACTION ALLEGATIONS

104.   Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23.

105.   At all times material hereto, Plaintiff and class members were employees of Defendants and, as such, were entitled to the protections provided by the PMWA and WPCL.

106.   Plaintiffs seek certification of a class defined as follows:

> All persons who provided limousine services, now known as UberBLACK, through Defendants' App in Philadelphia, Pennsylvania.

107.   During the three-year period preceding the filing of this class action complaint, no other class action has been filed asserting the same or similar factual allegations against Defendants on behalf of the same or other persons.

108.   The class members are so numerous that joinder is impracticable, and the disposition of their claims in this case and as part of a single class action

21

lawsuit, rather than through numerous individual lawsuits, will benefit the parties and greatly reduce the aggregate judicial resources that would be spent.

109.   There are numerous and substantial questions of law and fact common to all members of the class, which predominate over any individual issues. These common questions of law and fact include, without limitation:

      a.     Whether the Plaintiffs and class members are employees of Defendants;

      b.     Whether Plaintiffs and class members are entitled to minimum wages;

      c.     Whether Plaintiffs and class members are entitled to overtime wages for hours worked in excess of forty hours in any given workweek;

      d.     Whether Plaintiff and class members were paid an hourly rate less than the prevailing minimum wage because Defendants required Plaintiffs and class members to pay for various business expenses; and,

      e.     Whether Plaintiff and class members were paid an overtime premium less than the required rate because Defendants required Plaintiffs and class members to pay for various business expenses.

110.   Plaintiffs' claims are typical of the claims of the class they seek to represent. Plaintiffs are members of the class they seek to represent. Class

members are ascertainable from Plaintiffs' records and/or from Defendants'
records and/or records from third parties.

111.   Plaintiffs will fairly and adequately represent the class and have no
interests that are antagonistic to the claims of the class. Plaintiffs will vigorously
pursue the claims of the class.

112.   Plaintiffs have retained counsel who are competent and experienced in
class action litigation.

113.   A class action is superior to other available methods of litigation for
the fair and efficient adjudication of this controversy. Trial of Plaintiffs and class
members' claims is manageable through this class action lawsuit. Unless a class is
certified, Defendants will be unjustly enriched at the expense of class members.

114.   There is no plain, speedy or adequate remedy other than by
maintenance of this class action because it is economically unfeasible for members
of the class to pursue remedies other than by way of class action.

115.   Plaintiffs know of no difficulty that will be encountered in the
management of this litigation, which would preclude maintenance of a class action.

116.   Defendants have acted on grounds generally applicable to the class,
thereby making final injunctive relief or corresponding declaratory relief
appropriate with respect to the class as a whole.

117.   Prosecution of separate actions by individual class members would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants.

118.   Without a class action, Defendants will likely retain the benefit of their wrongdoing and will continue a course of action that will result in further damages to Plaintiffs and the class.

**FIRST CAUSE OF ACTION**
**FLSA – Failure to Pay Minimum Wages**
**(Brought on behalf of Plaintiffs and members of the FLSA collective action)**

119.   Plaintiffs re-allege the preceding and subsequent paragraphs of this Complaint as though fully set forth herein.

120.   At all times material hereto, Plaintiffs and members of collective action were engaged in commerce within the meaning of 29 U.S.C. §§ 203(e), 203(m), and 206(a).

121.   At all times material hereto, Plaintiff and members of collective action were or have been employees within the meaning of 29 U.S.C. §§ 203(e), 203(m), and 206(a).

122.   At all times material hereto, Defendants were the employers of Plaintiffs and members of the collective action within the meaning of 29 U.S.C. §§ 203(e), 203(m), and 206(a).

123.   At all times material hereto, Defendants were employers in commerce within the meaning of 29 U.S.C. §§ 203(e), 203(m), and 206(a).

124.   Defendants failed to pay Plaintiffs and members of the collective action the minimum wages they were entitled to under the FLSA.

125.   Defendants were required to pay directly to Plaintiffs and members of the collective action the federal minimum wage rate of at least $7.25 per hour.

126.   Defendants were not and are not eligible to avail themselves of the federal tipped minimum wage rate because they did not permit Plaintiffs and members of the collective action collect and retain tips.

127.   Defendants were not and are not eligible to avail themselves of the federal tipped minimum wage rate because they failed to inform Plaintiffs and members of the collective action of the provisions of 29 U.S.C. § 203(m).

128.   Defendants failed to post and keep posted in a conspicuous place on the premises of their establishments a notice explaining the FLSA, as prescribed by the Wage and Hour Division of the U.S. Department of Labor, in violation of the FLSA and supporting federal regulations, including 29 C.F.R. § 516.4.

129.   As a direct and proximate result of Defendants' violations of the FLSA, Plaintiffs and members of the collective action have suffered damages in amounts to be determined at trial and are entitled to recovery of such amounts. Plaintiffs and members of the collective action are also entitled to liquidated

damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

130.   Defendants' unlawful conduct, as described herein, was willful and intentional. Defendants were aware or should have been aware that the practices described in this collective action were unlawful. Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiff and members of the collective action. Given Defendants' willful and intentional violations, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255.

## SECOND CAUSE OF ACTION
### FLSA – Failure to Pay Overtime Wages
**(Brought on behalf of Plaintiffs and members of the FLSA Collective Action)**

131.   Plaintiffs re-allege the preceding and subsequent paragraphs of this Complaint as though fully set forth herein.

132.   The overtime wage provisions set forth in the FLSA and supporting federal regulations apply to Defendants, Plaintiffs and members of the collective action.

133.   Defendants failed to pay Plaintiffs and members of the collective action an overtime premium for hours worked in excess of 40 hours in a work week.

26

134.   Specifically, Defendants failed to pay Plaintiffs overtime wages as follows:

a.      During the week of November 30, 2015 through December 7, 2015, Razak worked at least 84 hours for Defendants.  At the federal minimum wage rate of $7.25 hour, Defendants owed Razak $768.50 in total wages ($290 in minimum wages and $478.50 in overtime wages).  However, Defendants paid Razak a total $750.40 and did not reimburse him for any business expenses.  After accounting for such expenses, including his monthly vehicle payment, insurance premiums, and phone plan, Razak netted approximately $350 in wages for the aforesaid week.  *See Exhibit A.*

b.      During the week of November 9, 2015 through November 16, 2015, Sabani worked at least 87.1 hours for Defendants.  At the federal minimum wage rate of $7.25 hour, Defendants owed Sabani $802.21 in total wages ($290 in minimum wages and $512.21 in overtime wages).  Defendants did not pay Sabani any wages for the aforesaid week.  Indeed, Sabani was net negative $211.70 after Defendants automatically deducted certain business expenses from his weekly earnings.  That loss was even greater when accounting for other business expenses incurred by Sabani, such as his phone plan and gas.  *See Exhibit B.*

c.      During the week of December 21, 2015 through December 28, 2015, Cherdoud worked at least 84 hours for Defendants.  At the federal minimum

wage rate of $7.25 hour, Defendants owed Cherdoud $390.59 in total wages ($290 in minimum wages and $100.59 in overtime wages).  After Defendants automatically deducted certain expenses from his pay, however, Cherdoud received a total payout of $3.72 from Defendants for the aforesaid week. That pay was further reduced by other business expenses incurred by Cherdoud, such as his phone plan and gas.  *See Exhibit C.*

> d.   All members of the collective action worked more than 40 hours in at least one week during the class period, and were not paid overtime wages under the FLSA.

135.   As a direct and proximate result of Defendants' violations of the FLSA, Plaintiffs and members of the collective action have suffered damages in amounts to be determined at trial and are entitled to recovery of such amounts. Plaintiffs and members of the collective action are also entitled to liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

136.   Defendants' unlawful conduct, as described herein, was willful and intentional. Defendants were aware or should have been aware that the practices described in this collective action were unlawful. Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiffs and members of the collective action. Given Defendants' willful and

intentional violations, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255.

## THIRD CAUSE OF ACTION
### FLSA – Failure to Pay Free and Clear Wages
### (Brought on behalf of Plaintiffs and members of the FLSA Collective Action)

137.   Plaintiffs re-allege the preceding and subsequent paragraphs of this Complaint as though fully set forth herein.

138.   As set forth above, Defendants required Plaintiffs and members of the collective action to pay various expenses for the opportunity to obtain fares through the Uber App.

139.   Plaintiffs and members of the collective action did not earn any wages, let alone wages that were free and clear. The cost of having to pay various expenses cut into the wages and overtime pay that Plaintiffs and members of the collective action are entitled to.

140.   As a direct and proximate result of Defendants' violations of the FLSA, Plaintiff and members of the collective action have suffered damages in amounts to be determined at trial and are entitled to recovery of such amounts. Plaintiffs and members of the collective action are also entitled to liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

141.   Defendants' unlawful conduct, as described herein, was willful and intentional. Defendants were aware or should have been aware that the practices described in this collective action were unlawful. Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiffs and members of the collective action. Given Defendants' willful and intentional violations, a three-year statute of limitations applies pursuant to 29 U.S.C. § 255.

## FOURTH CAUSE OF ACTION
### PMWA Violations – Failure to Pay Minimum and Overtime Wages
### (Brought on behalf of Plaintiffs and class members)

142.   Plaintiffs re-allege the preceding and subsequent paragraphs of this Complaint as though fully set forth herein.

143.   The PMWA requires employers to pay employees wages for all hours worked at a rate not less than Pennsylvania or federal minimum wage rate pursuant to 43 P.S. § 333.104(a)-(b).

144.   The PMWA further provides that "employees shall be paid for overtime not less than one and one half times the employee's regular rate" for hours worked in excess of forty (40) hours in a workweek pursuant to 43 P.S. § 333.104(c).

145.   Defendants violated the PMWA by failing to pay Plaintiffs and the class members the Pennsylvania minimum wage rate of $7.25 per hour.

146.   Defendants violated the PMWA by failing to pay Plaintiffs and the class members in accordance with 43 P.S. § 333.104(c), which requires employers to pay an overtime wages at a rate not less than one and one-half times the employee's regular rate.  Discovery will reveal the total amount of overtime due to Plaintiffs and class members, but the examples below evince Defendants' failure to pay said wages:

a.      During the week of November 30, 2015 through December 7, 2015, Razak worked at least 84 hours for Defendants.  At the prevailing wage rate of $7.25 hour, Defendants owed Razak $768.50 in total wages ($290 in minimum wages and $478.50 in overtime wages).  However, Defendants paid Razak a total $750.40 and did not reimburse him for any business expenses.  After accounting for such expenses, including his monthly vehicle payment, insurance premiums, and phone plan, Razak netted approximately $350 in wages for the aforesaid week. *See Exhibit A.*

b.      During the week of November 9, 2015 through November 16, 2015, Sabani worked at least 87.1 hours for Defendants.  At the prevailing minimum wage rate of $7.25 hour, Defendants owed Sabani $802.21 in total wages ($290 in minimum wages and $512.21 in overtime wages).  Defendants did not pay Sabani any wages for the aforesaid week.  Indeed, Sabani was net negative $211.70 after Defendants automatically deducted certain business expenses from

his weekly earnings.  That loss was even greater when accounting for other business expenses incurred by Sabani, such as his phone plan and gas.  *See Exhibit B.*

    c.  During the week of December 21, 2015 through December 28, 2015, Cherdoud worked at least 84 hours for Defendants.  At the prevailing minimum wage rate of $7.25 hour, Defendants owed Cherdoud $390.59 in total wages ($290 in minimum wages and $100.59 in overtime wages).  After Defendants automatically deducted certain expenses from his pay, however, Cherdoud received a total payout of $3.72 from Defendants for the aforesaid week. That pay was further reduced by other business expenses incurred by Cherdoud, such as his phone plan and gas.  *See Exhibit C.*

    d.  All members of the class worked more than 40 hours in at least one week during the class period, and were not paid overtime wages under the PMWA.

  147. As a direct and proximate result of Defendants' violations of the PMWA, Plaintiffs and class members were deprived of wages and overtime compensation in amounts to be determined at trial, and are entitled to recovery of such amounts, together with interest, costs, and attorney's fees pursuant to 43 P.S. § 333.113.

## FIFTH CAUSE OF ACTION
### WPCL Violations – Failure to Designate Regular Paydays
### (Brought on behalf of Plaintiffs and class members)

148.   Plaintiffs re-allege the preceding and subsequent paragraphs of this Complaint as though fully set forth herein.

149.   The WPCL requires an employer to pay wages due to its employees on regular paydays designated in advance by the employer pursuant to 43 P.S. § 260.3.

150.   Subsection 4 of the WPCL, 43 P.S. § 260.4, requires an employer to notify each employee of when and where he or she will be paid and the rate of pay; or, alternatively, must conspicuously post the aforementioned facts at the employer's place of business.

151.   Defendants violated the regular payday and notification requirements of the WPCL.

152.   As a direct and proximate result of Defendants' violations of the WPCL, Plaintiffs and class members were damaged and deprived of compensation in amounts to be determined at trial. Plaintiffs and class members are entitled to such amounts of unpaid compensation, liquidated damages, costs and attorney's fees pursuant to  43 P.S. §§ 260.9-260.10.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves, members of the FLSA collective action and members of the class, respectfully request the following relief:

a.      An order certifying the class and collective action described above;

b.      An order requiring Defendants to provide Plaintiffs and members of collective action and class action with notice of Defendants' misconduct;

c.      Damages equal to the amount of unpaid wages withheld by Defendants plus liquidated damages or interest;

d.      Damages equal to the amount of all business expenses paid by Plaintiffs, class members that were for the benefit of Defendants' business, plus liquidated damages or interest;

e.      All forms of damages permitted under the FLSA, PMWA and WPCL, including liquidated damages, attorney's fees, costs;

f.      An award of prejudgment and post-judgment interest;

g.      All forms of damages attributable to Defendants' violations as alleged herein;

      h.     Injunctive relief requiring Defendants to compensate Plaintiffs, class members and members of the collective action in accordance with the FLSA, PMWA and WPCL; and,

      i.     All other relief the Court deems just and proper.


                     SACKS WESTON DIAMOND, LLC

                     JEREMY E. ABAY (Attorney # 316730)
                     JOHN K. WESTON (Attorney # 26314)
                     1845 Walnut Street, Suite 1600
                     Philadelphia, Pennsylvania 19103
                     Telephone: (215) 925-8200
                     Facsimile: (267) 639-5422
                     *jabay@sackslaw.com*
                     *jweston@sackslaw.com*

Date:  October 13, 2016

## **PLAINTIFF'S CONSENT PURSUANT TO 29 U.S.C. § 216(B)**

Pursuant to 29 U.S.C. § 216(b), I, Ali Razak, hereby provide my written consent to be a party plaintiff in the attached lawsuit against Uber Technologies, Inc. and Gegen LLC alleging, among other things, violations of the Fair Labor Standards Act.

_____
Signature

## PLAINTIFF'S CONSENT PURSUANT TO 29 U.S.C. § 216(B)

Pursuant to 29 U.S.C. § 216(b), I, Kenan Sabani, hereby provide my written consent to be a party plaintiff in the attached lawsuit against Uber Technologies, Inc. and Gegen LLC alleging, among other things, violations of the Fair Labor Standards Act.

_____

Signature

## **PLAINTIFF'S CONSENT PURSUANT TO 29 U.S.C. § 216(B)**

Pursuant to 29 U.S.C. § 216(b), I, Khaldoun Cherdoud, hereby provide my written

consent to be a party plaintiff in the attached lawsuit against Uber Technologies, Inc. and Gegen

LLC alleging, among other things, violations of the Fair Labor Standards Act.

_____

Signature

# Exhibit A



# Exhibit B-1

**Driver for Kenan Sabani**

| TRIP EARNINGS | INCENTIVES & MISCELLANEOUS | TOTAL PAYOUT |
|---|---|---|
| $1,035.72 – | $1,247.42 | = –$211.70 |

**Period Ending: November 16, 2015 4AM EST**

| TRIP EARNINGS | $1,035.72 |
|---|---|
| Fare | 1,358.61 |
| Base + Time + Distance. Fare details at **https://www.uber.com/cities/philadelphia** | |
| Surcharges & Tolls | 24.00 |
| Total tolls charged to riders related to their trips. Uber Fee Exempt | |
| Uber Fee | (346.89) |
| 28.0% of UberSUV Fare | |
| 25% of UberBLACK Fare | |
| 25% of VIP BLACK CAR Fare | |

| MISCELLANEOUS ITEMS (driver) | ($1,247.42) |
|---|---|
| 2016 PPA Sticker cost for LM28143 charged by PPA. Payment 2 of 8 (Total Cost $404) | (50.50) |
| 2016 PPA Sticker cost for LM28473 charged by PPA. Payment 2 of 8 (Total Cost $404) | (50.50) |
| 2016 PPA Sticker cost for LM28473 charged by PPA. Payment 3 of 8 (Total Cost $404) | (50.50) |
| 2016 PPA Sticker cost for LM28143 charged by PPA. Payment 3 of 8 (Total Cost $404) | (50.50) |
| Weekly vehicle payment - VIN# 8905 - LM28473. Payment 98 of 104 | (398.46) |
| Gegen Insurance (week of Nov 2): Plate #LM28473 | (125.00) |
| SUV Trip from PHL Airport on 11/10/2015 | 1.50 |
| Gegen Insurance (week of Nov 9): Plate #LM28473 | (125.00) |
| Weekly vehicle payment - VIN# 8905 - LM28473. Payment 99 of 104 | (398.46) |

# Exhibit B-2

| 2 | WHAT YOUR RIDERS SAID |
|---|---|

## 5.0★

**DRIVER RATING**

Nice work, your driver rating last week was **above average**.

---

### RIDER FEEDBACK

You received **20** five-star reviews out of 21 rated trips in the past two weeks. We wanted to share what some of these riders had to say.

> *"Great driver and no only a driver he teach me about culture and history of Philadelphia, great person"*

| 3 | YOUR WEEK IN REVIEW |
|---|---|

### TRIPS

| | | |
|---|---|---|
| Last Week | 17 | |
| 2 Weeks Ago | 15 | |
| Top Drivers | 48 | |

---

### HOURS ONLINE

| | | |
|---|---|---|
| Last Week | 87.1 | |
| 2 Weeks Ago | 36.4 | |
| Top Drivers | 73.2 | |

# Exhibit C

## UBER

‹  BACK TO ALL STATEMENTS

TOTAL EARNINGS
# $3.72

| 6 | 49h 15m | 100% | 0 |
|---|---|---|---|
| COMPLETED TRIPS | ONLINE HOURS | ACCEPTANCE RATE | DRIVER CANCELLATIONS |

## Weekly Earnings

| | |
|---|---|
| ›  Trip Earnings | $370.54 |
| ⌄  Deductions & Fees | - $241.82 |
| Exeter Payment 102 | - $241.82 |
| ⌄  Incentives & Other Payments | - $125.00 |
| Gegen Insurance (week of Dec 21): Plate #LM28431 | - $125.00 |
| **Total Payout** | **$3.72** |