**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALI RAZAK, KENAN SABANI, KHALDOUN CHERDOUD**<br><br>        **v.**<br><br>**UBER TECHNOLOGIES, INC., GEGAN, LLC** | **CIVIL ACTION**<br><br>**NO. 16-573** |

**Baylson, J.**                                                    **September 13, 2017**

## MEMORANDUM RE: DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.        INTRODUCTION

If apps be the food of the future, log on!

With apologies to Shakespeare—the opening line of <u>Twelfth Night</u>, "If music be the food of love, play on" providing inspiration—app based ride-sharing is a disruptive business model in search of a legal theory.[1]  The courts that have dealt with litigation arising out of ride-sharing technology have struggled to find an appropriate legal doctrine to fit these novel commercial relationships.  For this case, one challenge is determining what type of activity includes a driver being "on call" for an assignment, and whether this status is "compensable."

Plaintiffs Ali Razak ("Razak"), Kenan Sabani ("Sabani"), and Khaldoun Cherdoud ("Cherdoud" and, together with Razak and Sabani, "Plaintiffs") have brought individual and representative claims against Gegen, LLC and its sole member, Uber Technologies, Inc.

---

[1] The undersigned has previously written about the difficulty of applying longstanding legal doctrine to novel technologies in the context of reproductive technology, for which courts struggled over many years to find a hospitable and fair legal theory.  <u>See</u> Baylson, "A Medical Advancement in Search of a Legal Theory – Artificial Insemination by Donor and the Law." Semin Reprod Endocrinol 5 (1), 69-80. 2 1987, available at: https://www.ncbi.nlm.nih.gov/labs/articles/11658912/#

(collectively, "Uber") for violations of the federal minimum wage and overtime requirements under the Fair Labor Standards Act, 29 § U.S.C. 201 *et seq.* ("FLSA"), and parallel Pennsylvania state wage and labor laws.  Before the Court is Uber's Motion for Partial Summary Judgment (ECF 66, "Uber Mot.") on the limited question of whether—assuming, for purposes of this Motion only, that Plaintiffs qualify as "employees" and Uber as an "employer" under the FLSA[2]—the time they spent Online the Uber App is compensable work time under the FLSA, and by extension, the PMWA.[3]

As the Court has noted throughout this case, Plaintiffs' claims advocate for a novel application of the FLSA, particularly its requirements with respect to time spent "on call." Critically, while the FLSA's extension to "on call" time has heretofore been applied only to traditional, scheduled shift work, Plaintiffs here ask for its application in the context of the new "gig economy," as Plaintiffs refer to it, where individuals, such as Plaintiffs, work in accordance with their own personal schedules.  As explained more fully below, the Court decided to resolve this issue as a threshold matter, the subject of Uber's motion for partial summary judgment.

For the following reasons, Uber's Motion for Partial Summary Judgment will be DENIED, without prejudice, and with leave to refile at the completion of discovery.

## II.    PROCEDURAL HISTORY

---

[2]     The Court has already found that Plaintiffs' Amended Complaint adequately alleged that they were employees within the meaning of the FLSA, but has not—and will not presently decide—whether they have proved as much, by a preponderance of the evidence.

[3]     Because the PMWA "substantially parallels" the FLSA, see 43 Pa. Stat. Ann. § 333.104(a), (c), federal courts are directed to interpretation of the FLSA when analyzing claims under the PMWA.  See, e.g., Ford-Greene, 106 F. Supp. 3d at 610–13 (applying the Third Circuit's analysis in Davis to the plaintiff's claims under both the FLSA and PMWA); Philadelphia Metal Trades Council v. Konnerud Consulting W., A.S., 15-cv-5621, 2016 WL 1086709, at *5-6 (E.D. Pa. Mar. 21, 2016) (same).

Plaintiffs commenced this action on January 6, 2016, by filing a Complaint in the Court of Common Pleas of Philadelphia County.  (ECF 1, Ex. A).  On February 4, 2016, Defendants removed the action to this court, citing federal question and diversity jurisdiction.  (Id.)

A. *Prior Motion Practice*

On March 22, 2016, Uber moved for the first time to dismiss this case and compel arbitration, and, in a separate motion, to stay this action.  (See ECF 15, 18).  In those motions, Uber argued that an order issued by Judge Chen in the Northern District of California in related cases had "nullified" the arbitration provision in Uber's Service Agreement, thereby raising a "threshold question of arbitrability" that had to be decided by an arbitrator.  Finding that Judge Chen's order had no such effect, this court concluded that Plaintiffs had complied with the arbitration opt-out procedures allowed by the Service Agreement.  The Court denied both motions.  (ECF 37); Razak v. Uber Techs., Inc., No. 16-cv-573, 2016 WL 3960556, at *1 (E.D. Pa. July 21, 2016).

On August 19, 2016, Uber moved for Judgment on the Pleadings, (ECF 38), which, on October 7, 2016, this Court granted in part, and denied in part.  See Razak, 2016 WL 5874822, at *1.  Importantly, the Court found that Plaintiffs had alleged sufficient facts that they qualified as "employees" rather than "independent contractors," under the "economic realities" test, such that judgment on the pleadings was not warranted.  Id. at *4-5.  Accordingly, the Court permitted Plaintiffs' minimum wage claims to proceed as pled.  The Court dismissed Plaintiffs' breach of fiduciary duty claim with prejudice, but Plaintiffs' FLSA and PMWA overtime claims without prejudice, and with leave to file an amended complaint.  Plaintiffs then filed an Amended Complaint on October 13, 2016.  (ECF 47, "Compl.").

On October 31, 2016, Uber moved to dismiss Plaintiffs' Amended Complaint in its entirety, as well as to strike certain portions of it (ECF 48).  The Court denied the motion to dismiss.  (ECF 54; Razak v. Uber Techs., Inc., No. 16-cv-573, 2016 WL 7241795, at *6 (E.D. Pa. Dec. 14, 2016)).  Specifically, the Court found that Plaintiffs' allegations that they were Online the Uber App for more than 40 hours in a given week was sufficient—at the pleading stage—to state a claim for overtime pay under the FLSA.

However, the Court further found that the question of whether Plaintiffs' time spent Online the Uber App was actually compensable work time, within the meaning of the FLSA, was "an important, potentially dispositive one in this case."  Id.  Accordingly, "notwithstanding the Court's conclusion that Plaintiffs ha[d] sufficiently alleged FLSA overtime violations," the Court designated the issue of compensability of Plaintiffs' Online time for expedited discovery.  Id.

B.  *Uber's Instant Motion for Partial Summary Judgment*

After substantial discovery, including depositions of Plaintiffs and certain third parties, as well as other filings, Uber filed its Motion for Partial Summary Judgment on the limited issue of the compensability of Plaintiffs' Online time.  While maintaining its position that Plaintiffs are independent contractors rather than employees, Uber moves on the basis that even assuming that Plaintiffs did qualify as "employees" under the FLSA, Plaintiffs' time spent Online the Uber App, during which they are not actually transporting riders, is not compensable time under the FLSA.

Plaintiff filed a memorandum in opposition to Uber's Motion (ECF 68, "Pls.' Opp'n), to which they attached a statement of disputed facts (ECF 68-1).  However, Plaintiffs' submission failed to comply with F.R.C.P. 56(c), as well as this Court's practice order, in that it failed to provide record citations to support many of their contentions about disputed facts.  Accordingly,

the Court entered an Order requiring Plaintiffs to supplement their prior filings to comport with

the Federal Rules and this Court's practices.  (ECF 79).  In Plaintiffs' supplemental submission

(ECF 80, "PSOF2"), they did include record citations which Plaintiffs claim support their

contentions regarding disputed facts; however a close look at the underlying documents cited

reveals that many of them do not create a genuine dispute of fact.[4]  For instance, Plaintiffs rely

significantly on Uber's written regulations, without any evidence that Plaintiffs themselves

suffered any loss of compensation or other detriment on account of these regulations.  Plaintiffs

assert the following were disputed:

> (1) Whether the Uber App limits Plaintiffs' ability to ignore, reject, and cancel
>     UberBLACK requests (see PSOF2 ¶ 13).
>
>> Plaintiffs cite Uber regulations in support, which state, in pertinent part, Uber
>> "reserves the right to immediately deactivate" drivers' access to the software and
>> service in the event that they "refus[e] to fully complete a trip after acceptance of
>> a trip request, as described in the Software License and Online Service
>> Agreement, without waiver by the Uber or Uber."  (ECF 68-13, "Driver
>> Addendum").
>
> (2) Whether too many rejected trips affect a driver's "acceptance rate," which, at a
>     certain impermissibly low level, subjects drivers to termination or deactivation.
>     (PSOF2  ¶¶ 41-44).
>
>> Plaintiffs cite Uber regulations in support, which state, in pertinent part, "[h]igh
>> acceptance rates are a critical part of reliable, high quality service, but not
>> accepting trip requests does not lead to permanent loss of your account. . . But not
>> accepting dispatches causes delays and degrades the reliability of the system. If
>> you don't want to accept trips, just log off.  If you consistently decline trip
>> requests, we will assume you do not want to accept more trips and you may be
>> logged out of the app."  (ECF 68-6, "Uber Community Guidelines").

---

[4]        Plaintiff also substantially amended their responses, and included, at paragraphs 82
through 103, "Additional Facts" not included in their original statement of undisputed facts.  On
August 31, 2017, Uber moved to strike these additional facts (ECF 83), and Plaintiffs filed an
opposition on September 5, 2017 (ECF 86).  As the Court noted at Oral Argument, it will not
strike Plaintiffs' amendments, but will strike the additional facts included at paragraphs 82
through 103.

(3) Whether drivers can immediately go back Online if they decline three consecutive trips and are automatically switched offline. (PSOF2 ¶¶ 16, 29).

Plaintiffs cite Uber regulations in support, which state, in pertinent part, "[w]hat lead to deactivation? We will deactivate any account or accounts (including permanently) associated with fraudulent activity, which may include . . . accepting trips without intention to complete."). (ECF 68-8 at 9, "Driver Deactivation Policy").

(4) Whether cancelling a ride after accepting it subjects drivers to deactivation. (PSOF2 ¶ 19).

Plaintiffs again cite portions of Uber's Driver Addendum and Driver Deactivation Policy in support.

(5) Whether drivers' accounts may be suspended or terminated if their "cancellation rate" gets above a certain acceptable level. (PSOF2 ¶ 19).

Plaintiffs cite Uber's Driver Deactivation Policy in support, which states, in pertinent part, "[e]ach city has a maximum cancellation rate, based on the average cancellation rate of the drivers in that area. We will alert you multiple times if your cancellation rate is much higher than other drivers in your city, after which you may not be able to go online for a short period of time. If your cancellation rate continues to exceed the maximum limit, you may be deactivated." (ECF 68-8 at 7-8).

Since Plaintiffs failed to show that any of these issues affected them, the Court cannot accept these as "genuine" or as "material" to this case. In addition to the above examples in which Plaintiffs fail to cite record evidence that creates genuine disputes of fact, Uber more fully documented other deficiencies in its response to Plaintiffs' supplemental submission (ECF 85).

On September 6, 2017, the Court held Oral Argument on Uber's partial motion for summary judgment, at which the Court posed a number of questions to counsel regarding the compensability issue, to determine which facts in the record truly are or are not disputed. (See Transcript of 9/6 Oral Argument "Tr."). The Court will set forth below a summary of the undisputed facts in the record and developed further at Oral Argument, as they are relevant both to the issue of compensability, and to the issue of whether Plaintiffs are employees or

independent contractors, which will be decided promptly after a short extension for any relevant discovery.

## III.   UNDISPUTED FACTS

The following is a fair account of the factual assertions at issue in this case, as taken from, *inter alia*, Uber's Statement of Undisputed Facts (ECF 66-3), and not genuinely disputed by Plaintiffs.

### A. *Functionality of UberBLACK Platform*

Plaintiffs are Pennsylvania drivers participating in the Uber ride-sharing service who bring this action on behalf of a putative class of "[a]ll persons who provided limousine services, now known as UberBLACK, through Defendants' App in Philadelphia, Pennsylvania." (Compl. ¶ 106). Uber furnishes a mobile smartphone application (the "Uber App") "providing on-demand car services to the general public." (Id. ¶ 22). Gegen is a wholly-owned subsidiary of Uber that holds a certificate of public convenience from (and is licensed by) the Philadelphia Parking Authority ("PPA") to operate a limousine company. (ECF 66-3 Uber's Statement of Undisputed Facts ("SOF") ¶ 3; ECF 68-1, Plaintiffs' Statement of Disputed or Undisputed Facts ("PSOF") ¶ 3). Plaintiffs are certified limousine drivers who provide services as drivers through the Uber App's UberBLACK platform. (Compl. ¶¶ 2, 59). To access the Uber App, drivers open the App on their mobile device and log in using their usernames and passwords. (SOF ¶ 14). While being logged on permits drivers to, *inter alia*, check their account status, drivers are not eligible to receive trip requests from UberBLACK riders ("riders") simply by virtue of being logged on. Many drivers, in fact, remain logged on 24 hours per day. (Tr. at 5).

After logging on, to be eligible to receive a trip request from a prospective rider, drivers must tap a button to go online ("Online"). (Id. ¶ 15). Absent connectivity issues, there is

nothing else drivers need to do, other than go Online, to receive trip requests.  (Id. ¶ 16).  When a trip request comes in, absent connectivity issues, the driver's phone will beep and the screen will flash.  (Id. ¶ 20).  When a trip request appears on the driver's mobile device, the rider's (1) name, (2) star rating, and (3) pickup location will appear, along with (4) any surge fare in effect, (5) the time that the rider requested UberBLACK, UberX (a lower cost Uber "product"), or any other Uber product, providing the ride, and (6) the estimated amount of time for the driver to reach the rider.  (Id. ¶ 21).

The rider's destination, however, is not provided until the driver indicates that the trip has begun (which could be before the rider actually enters the driver's vehicle).  (PSOF ¶ 21; Tr. at 23, 29).  According to Uber's regulations, the rider's destination is not provided until that time to prevent any potential discrimination by a driver who, for instance, may not want to travel to certain neighborhoods.  (Tr. at 24)

### B.  *How UberBLACK Drivers get Paid*

While Uber sets the financial terms of all UberBLACK fares, and riders have their credit cards linked to the Uber App, the payment structure is such that riders pay an independent transportation carrier—either a limousine company or individual driver—licensed by the PPA. After the ride is completed, the carrier pays Uber a fee.  The carrier then pays the driver his compensation.  The driver's compensation is calculated based on some combination of factors, including, but not limited to, the time spent driving, the distance traveled, and the rider demand at the time of the trip.  (Tr. at 18-20).

### C.  *Accepting or Rejecting Trips*

If a driver chooses to accept a trip request, the driver taps "accept."  (SOF ¶ 25).  If a driver does not press the "accept" button within 15 seconds of the trip request, it will be deemed

rejected by the driver by default.  The Uber App will then automatically route the trip request to the next closest driver, until a driver accepts the request.  If, however, no other driver accepts the trip, the trip request goes unfulfilled, as Uber cannot require any driver to accept a trip.  (SOF ¶ 26; 28).

Drivers are free to reject trip requests for any reason.  (Id. ¶¶ 22, 24, 50-51).  If a driver ignores three trip requests in a row, however, the Uber App will automatically move the driver from Online to offline, such that he will not be eligible at that time to accept trip requests.  (SOF ¶ 29).  Uber refers to this as a system integrity measure since, as described above, a trip request is sent to only one Uber driver at any given time, and having drivers who do not intend to give rides Online slows down the process of connecting riders and drivers, and leads to a poorer user experience for riders.   Drivers who have been automatically transitioned offline, however, may go back Online at any point, including immediately after going offline, if they wish to do so.  (Id 30).

Uber also has regulations under which it reserves the right to penalize drivers for not accepting rides.  As one example, the driver may have an "acceptance rate" that is deemed unsatisfactory.  However, there is no dispute that Plaintiffs have not personally been penalized for their respective acceptance rates, or for failing to accept rides.  This court has not been presented with evidence that, in practice, Uber imposed any consequences for drivers' acceptance rates.

D. *Cancelling Trips*

Drivers are free to cancel trips even after they have accepted them, which Plaintiffs testified they have done on numerous occasions.  (SOF ¶ 41).  A driver may cancel a trip after he has accepted it but before the rider enters the vehicle if, for instance, the driver calls the rider and

asks the rider's destination, and the driver decides he does not want to travel there.  Additionally, if the driver indicates on the Uber App that the trip has begun prematurely, he will see the rider's destination on the Uber App, and may choose to cancel it at that time.

Uber has regulations under which it reserves the right to penalize drivers for cancelling trips, including if they have a "cancellation rate" that is deemed unsatisfactory.  (SOF ¶ 43). However, there is no dispute that Plaintiffs never suffered any consequences for cancelling trips. This court has not been presented with any evidence that, in practice, Uber imposed any consequences for drivers' cancellation rates.

E.  *Drivers' Physical Location*

Trip requests via the Uber App are automatically sent to the driver closest to the requesting rider.  (SOF ¶ 35).  For drivers registered with UberBLACK in Philadelphia, the requesting rider must be located within Philadelphia.  (Tr. at 9).  The driver, however, may be anywhere he chooses.  If he is far away, and there are other available drivers in closer proximity to a given rider, however, the driver will be unlikely to receive trip requests.  (Id. at 10).  Drivers have no way of knowing, from the Uber App, what the "demand" is at any given time; namely, whether or how many other drivers are Online.  (Id. at 6).

Uber may, from time to time, send drivers information about rider demand that may be of interest to them (e.g., a concert at the Wells Fargo Center, etc.), specifically dates or times of high rider demand.  (SOF ¶¶ 57, 58).  However, ultimately drivers independently decide where to go to offer rides while Online, and drivers are free to ignore any and all information conveyed to them by Uber.  (Id. ¶¶ 34, 59, 60).

One exception to drivers' ability to accept trip requests from anywhere, so long as they are Online, is at Philadelphia's major transportation hubs, namely 30th Street Train Station and

Philadelphia International Airport (the "Airport").  There is a "queue" system at both locations that routes trips to the next driver in the queue, (Id.  ¶ 36), and a driver can only enter, or advance in, the queue while inside a designated zone, (Id. ¶ 37).  Additionally, at the Airport, drivers can only receive trip requests if located inside the "west parking lot."  Drivers, including Plaintiffs, sometimes try to evade this requirement by Uber by, for instance, leaving their phones inside the designated zone at the Airport (but outside the west parking lot), such that they can advance in the queue without having to be physically with their phone.  (Id. ¶¶ 55-56).

      F.  *Drivers' Activities While Online*

Uber places no restrictions on drivers' ability to engage in personal activities while Online, and Plaintiffs here, in fact, engaged in a range of personal activities while Online.  The undisputed facts in the record reflect that, while Online, Plaintiffs, *inter alia*, accepted rides from private clients, slept, did personal errands, smoked cigarettes, took personal phone calls, rejected trips because they were tired, and conducted business for their independent transportation companies.  (SOF ¶¶ 45-54).  Drivers also sometimes forget to go offline, such that they remain in the Online mode on the Uber App despite having no intention of completing trips.  (SOF ¶ 46).

The Court accepts, for purposes of this motion, Plaintiffs' assertion that (1) Razak spent an average of 7 hours and 17 minutes Online each day, receiving an average of over 10 fare requests each day and completing more than 6 trips; (2) Sabani spent an average of 12 hours Online each day, receiving an average of more than 5 requests per day and completing 4 trips; and (3) Cherdoud spent an average of 9 hours, 16 minutes per day Online each day, receiving over 7 ride requests and completing over 5 trips.  (PSOF ¶ 68 (citing ECF 68-10, 11, 12)).  These

figures reveal that Plaintiffs spent a large portion of their time Online not actually completing trips, and engaged, for at least some of the time, in these various personal activities.

## IV.    LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A). "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty." Ridgewood Bd. of Educ. V. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999) (superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009)). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court

must view the evidence presented on the motion in the light most favorable to the opposing

party.  Anderson, 477 U.S. at 255.

## V.      DISCUSSION OF LEGAL FRAMEWORK

A. *Compensability of "On Call" Time Under FLSA*

### 1.      FLSA and DOL Regulations

Section 207(a) of the FLSA provides that employees receive at least one and a half times

pay for any overtime work in excess of 40 hours a week.  29 U.S.C. § 207(a).  The FLSA itself

provides no definition of the term "work," in general, or whether time spent "on call" is

compensable "work" within the meaning of the statute.

To help in the determining of whether on-call time is compensable, the Department of

Labor ("DOL") promulgated certain regulations.  These regulations provide, in pertinent part,

> (b) Compensable hours of work generally include all of the time during
> which an employee is on duty on the employer's premises or at a
> prescribed workplace, as well as all other time during which the employee
> is suffered or permitted to work for the employer.

> (c) Time spent away from the employer's premises under conditions that
> are so circumscribed that they restrict the employee from effectively using
> the time for personal pursuits also constitutes compensable hours of work.

> (d) An employee who is not required to remain on the employer's
> premises but is merely required to leave word at home or with company
> officials where he or she may be reached is not working while on call.
> Time spent at home on call may or may not be compensable depending on
> whether the restrictions placed on the employee preclude using the time
> for personal pursuits.   [W]here . . . the conditions placed on the
> employee's activities are so restrictive that they employee cannot use the
> time effectively for personal pursuits, such time spend on call is
> compensable.

> . . .

> (f) A police officer, who has completed his or her tour of duty and who is
> given a patrol car to drive home and use on personal business, is not
> working during the travel time even where the radio must be left on so that

the officer can respond to emergency calls.  Of course, the time spent in responding to such calls is compensable.

29 C.F.R. § 553.221(b)-(d); (f).

Essentially, these regulations indicate that on-call time is compensable if the employee is required to remain on the employer's premises, or if the employee, although not required to remain on the employer's premises, finds his time on call away from the employer's premises is so restricted that it interferes with personal pursuits.

### 2. Supreme Court Precedent Regarding Compensability of "On Call" Time Under the FLSA: <u>Armour</u> & <u>Skidmore</u>

While the FLSA does not provide a definition for the term "work," the Supreme Court has interpreted the word to mean "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." <u>Tennessee Coal Co. v. Muscoda Local</u>, 321 U.S. 590, 598 (1944).

The Supreme Court has further developed this definition into a method for determining whether on-call time is compensable "work" under the FLSA.  In <u>Armour & Co. v. Wantock</u>, 323 U.S. 126 (1944), the Court stated,

> [A]n employer . . . may hire a man to do nothing, or to do nothing but wait for something to happen . . . Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer.

<u>Id.</u> at 133.  That same year, in <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944), the Court held,

> [N]o principle of law found either in the statute or in Court decisions precludes waiting time from also being working time.  We have not attempted to, and we cannot, lay down a legal formula to resolve cases so varied in their facts.  Whether . . . such time falls within or without the Act is a question of fact to be resolved by appropriate findings of the trial court.

Id. at 136-7.

In both cases, the Supreme Court stressed that the facts and circumstances of each case should determine whether periods of waiting for work should be compensable under the FLSA. As the Court in Skidmore famously put it, the "facts may show that the employee was engaged to wait, or they may show that he waited to be engaged."  This is the critical, albeit fuzzy, line that it is a court's responsibility to draw.

### 3.     Third Circuit's Test for Compensability of "On Call" Time Under the FLSA: Ingram v. Cty. of Bucks, 144 F.3d 265 (3d Cir. 1998)

The leading case in the Third Circuit regarding the compensability of on-call time is Ingram v. Cty. of Bucks, 144 F.3d 265, 268 (3d Cir. 1998).  In Ingram, the Court outlined a four factor test (that many courts now utilize) to determine whether on-call time is compensable:

(1) "whether the employee may carry a beeper or leave home";

(2) "the frequency of calls and the nature of the employer's demands";

(3) "the employee's ability to maintain a flexible on-call schedule and switch on-call shifts"; and

(4) "whether the employee actually engaged in personal activities during on-call time."

Id. at 268.  The Ingram court cautioned that only if an analysis of these factors "reveal[s] onerous on-call policies and significant interference with the employee's personal life" is the on-call time compensable.  No single factor is deemed dispositive.

In Ingram, plaintiffs were deputy sheriffs who, when on night shifts, were required to be on call overnight (post shift) and all weekend.  They were not required to stay on the premises or in uniform while on call, but had to carry pagers and, if paged, report to work within a "reasonable time."  Applying the relevant factors, the court held that the plaintiffs' pursuits were not so restricted such that their time on call was compensable because (1)  they were able to wear

a beeper and leave word where they may be reached; (2) the frequency of calls was not that burdensome and they were not required to report in a fixed amount of time; (3) deputies were able to trade on-call shifts; and (4) the record reflected that the plaintiffs engaged in personal activities while on call, such as shopping, reading, watching TV, etc.

### 4.   Other Relevant Courts of Appeals Cases Analyzing Compensability of "On Call" Time Under the FLSA

Several other Courts of Appeals have addressed the compensability of on-call time, either applying the Ingram factors or a different, but substantially similar test.  These cases are instructive to the extent that they show how courts have weighed the relative importance of various factors, yet none of them deal with the unique facts present in the instant case.

For instance, in Brigham v. Eugene Water & Elec. Bd., 357 F.3d 931 (9th Cir. 2004), plaintiffs were employees at a power generation facility, tasked with monitoring the site, which required living on-site with their families in housing provided by the employer.  Plaintiffs alleged that their "duty shift" amounted to uncompensated work because they were only compensated for 10 out of their 24 hour on-call shift, excluding "call-out time lasting beyond a call's first 15 minutes."

Noting that "determining whether 'on call' or 'waiting' time constitutes compensable 'working' time for purposes of FLSA . . . is particularly challenging," the court stated that it nevertheless "must find a way to balance the [applicable] factors,"[5] and held that they weigh "at

---

[5]      The Ninth Circuit utilizes a 7-factor test, outlined in Owens v. Local No. 169, Ass'n of W. Pulp & Paper Workers, 971 F.2d 347, 350 (9th Cir. 1992), to gauge the extent to which employees can pursue personal activities during the course of on-call shifts such that their time is compensable.  These factors are: (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employees' movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5) whether the on-call employee could easily trade on-call responsibilities;

least narrowly" in favor of the employees.[6]  Id. at 937.  Of chief importance to the court was the fact that "the employees had to be able to hear their phones ring at all times and were required to respond instantaneously to alerts and calls while on their duty shifts," such that they were "effectively tethered to their homes."  In the event of a call, they would have to "reach the powerhouse and accompanying dam—which was half a mile away and most expeditiously reached on foot—as soon as humanly possible."

The court found these limitations sufficiently "severe," and compared them to those present in Ingram, where employees "were not required to report to [the] office within a fixed amount of time, and often took 15-45 minutes before leaving their location in response to a call." Id. at 937.  The court found the relatively low number of calls not particularly significant in this context because "[w]hile on call, these particular employees were responsible for the safety of thousands of people and, accordingly, had to be absolutely prepared to respond at all times (i.e. rested, sober, clothed, and otherwise able to race immediately to the trouble source if needed," which put the employees in a state of "constant pressure."  Also, importantly, the court did not find it significant that the employees were able to exchange their duty shifts in advance.  The court explained, "[a]fter all, our task ultimately is to determine how to characterize the time the employees spent on their duty shifts, and the employees' ability occasionally to avoid those

---

(6) whether the use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.

[6]      The Ninth Circuit's analysis of "on call" compensability, articulated in Berry, 30 F.3d at 1180 (9th Cir. 1994)—unlike the Third Circuit's—includes both an analysis of the degree to which the employee is free to engage in personal activities (the Owens factors), and an inquiry into the agreement between the parties and reasonableness thereof.  The court in Brigham ultimately remanded the case on the basis that the district court had not properly considered the effect of the parties' agreement that 10 hours of the 24 hour duty shift would be compensable (though suggested that the additional 14 hours of on-call time was not compensable because, even though the Owens factors weighed in favor of the employees, the agreement was reasonable).

shifts altogether does little to shape our view of the restrictions imposed on them during such shifts." Id. at 940.

In Whitten v. City of Easley, 62 Fed. App'x 477, 479–80 (4th Cir. 2003), the court applied a test identical to the Ingram factors to plaintiffs firefighters' allegations that their 48 hour on-call shift (which followed a 24 hour "on duty" shift) was compensable under the FLSA. The court held that "the 'on call' policy did not substantially impinge upon the firefighters' personal pursuits" such that they were not entitled to compensation for their on call hours under the FLSA.  Of chief importance to the outcome was the fact that (1) firefighters were equipped with pagers that they carried during on call shifts, "which enabled them to pursue personal activities during those days"; (2) they were "encouraged" but not "required" to respond to 80% of their calls while on call, which was deemed "not overly burdensome"; (3) the firefighters were able to trade on call shifts with other firefighters, enabling them to "maintain a flexible on call scheduled"; and (4) the record was replete with evidence of the firefighters' freedom to enjoy personal activities while on call.

In Rutlin v. Prime Succession, Inc., 220 F.3d 737, 743–44 (6th Cir. 2000), an employee who worked as a funeral director and embalmer alleged he was not properly compensated for time he was required to be on call; here, that meant answering phone calls that were transferred from the funeral home to his home phone line on certain nights and weekends.  The evidence showed he answered 15-20 calls per night which amounted to about an hour of his time.  In the event that one of the calls was a so-called "death call," which required him to leave his home and bring the body to the funeral home, he was compensated for that time.  The court held that plaintiff was entitled to compensation only for the time he spent actually on the phone, as it was not "typical on-call time; rather [plaintiff] was working, albeit from home."  The court was not

convinced that the true on-call time (the rest of the evening) was compensable, notwithstanding the fact that plaintiff was expected to remain at home while on call, and his call duties "prevented him from drinking alcohol, visiting his children, or boating, and [] his meals, evening activities, and sleep were disrupted by his on-call duties."

In Jonites v. Exelon Corp., 522 F.3d 721, 724 (7th Cir. 2008), Judge Posner had to consider whether the implementation of a "call out" program in a collective bargaining agreement violated the FLSA.  Pursuant to the program, off-duty employees were alerted to their home phone/beeper/cell phone when "manpower is needed on an emergency basis."  An employee is not required to be in any particular location; he just must respond within 2 hours if he accepts the call out.  An employee is also not required to accept a call out, but "if he fails to answer more than 50 percent of the calls or refuses to accept more than 35 percent of the call outs . . . he is disciplined.  And if he continues to fall below either minimum he may be fired, in which event he is forbidden to work on Com Ed property or projects even as the employee of an independent contractor."  Id. at 722.  The plaintiffs argued that the frequent calls and high required response rate disrupted their home lives.

The court held that while the call-out program "curtails a worker's freedom of action somewhat," it does not rise to the level of "a hardship that turns his waiting into working," and therefore does not render plaintiffs' off-duty time compensable under the FLSA.  While he may not be able to "leave town for the weekend," that "does not mean that he must stay in the house all weekend" given the 2-hour response window.[7]

_____

[7]     In Brand v. Comcast Corp., 135 F. Supp. 3d 713, 727 (N.D. Ill. 2015), the district judge applied Jonites in granting summary judgment against plaintiffs Comcast technicians' claims that they were entitled to compensation for on-call shifts where they were required to report to work within 30 minutes of being called by a company representative, and failure to respond to a communication within a few minute subjected them to "corrective action."  The court first

In <u>Bright v. Houston Nw. Med. Ctr. Survivor, Inc.</u>, 934 F.2d 671, 674–75 (5th Cir. 1991) (en banc), the court held that "the undisputed facts afford no basis for a finding that the employee's on-call time was working time for purposes of [the FLSA]." Here, plaintiff was a biomedical equipment repair technician, and in that role was required to wear a beeper and be on call to come to the hospital to make emergency repairs to equipment if necessary. The plaintiff was not compensated for on-call time, but if a call was made, he was compensated with 4 hours compensatory time at his hourly rate, and was required to work 4 fewer hours the following work day. The only 3 restrictions during his on-call time were (1) he could not be intoxicated; (2) he must always be reachable by beeper; and (3) while he need not be on the premises or at some specific location, he must be able to drive to the hospital within 20 minutes from the time he was paged. <u>Id.</u> at 678. The court held that these restrictions did not render his on-call time working time because the conditions were simply not restrictive enough.

In conclusion, the court noted, "Had the twenty to thirty minute 'leash' been longer, [plaintiff] would, of course, have been able to do *more* things, but that does not mean that within the applicable restrictions he could not effectively use the on-call time wholly for his own private purposes." <u>Id.</u> at 678.

The court was also not persuaded by the fact that the plaintiff never had "any reprieve" from his on-call duties. It explained, "[w]e do not deny the obvious truth that the long continued aspect of [plaintiff's] on-call status made his job highly undesirable and arguably somewhat

---

mentioned that, in <u>Jonites</u>, "despite the fact that the employer's policy kept employees tethered to their phones or beepers at all times, . . . the ensuing hardships [were] insufficient to turn their off time into working time." In this case, the court continued, "the plaintiffs only had travel restrictions during their one-week on-call shifts, which they rotated through approximately every six weeks. Accordingly, the frequency with which they were subject to the inconveniences inherent in being on call is insufficient to push their on-call claims beyond the summary judgment stage." <u>Id.</u> at 729.

oppressive. . . . But FLSA's overtime provisions are more narrowly focused than being simply directed at requiring extra compensation for oppressive or confining conditions of employment." Id.

The Bright court relied to some extent on Norton v. Worthen Van Service, Inc., 839 F.2d 653 (10th Cir. 1988). There, the plaintiffs were van drivers who transported railroad crews at irregular and unpredictable intervals. During the disputed on-call time, "drivers must be near enough to the employer's premises to be able to respond to calls within fifteen to twenty minutes." Id. 654. They were only compensated, however, in the event they were actually called. They argued "that the unpredictability of assignments and the short response time which they are allowed preclude their using this waiting period for their own purposes." Id. The district court judgment for the employer was affirmed, the Tenth Circuit noting that the "drivers spent their time between assignments at the homes of friends, at church, at laundromats, at restaurants, at pool halls, and at a local gymnasium" and that "a simple paging device, which the drivers are free to purchase and to use, would have allayed the necessity of remaining by a phone." Id. at 655-56.

In Renfro v. City of Emporia, Kan., 948 F.2d 1529, 1536–37 (10th Cir. 1991), firefighters alleged that they were entitled to overtime under the FLSA for time spent on 24-hour "on-call period[s]," during which they were not required to remain on the premises, but were required to carry a pager and return to work within 20 minutes if called. The uncontroverted facts in the record revealed that firefighters were called four to five times per day, the average duration of a call was an hour, being late or failing to respond to a call resulted in some discipline, and that while on call firefighters participated in all kinds of social and recreational activities. Id. at 1532.

The court held that based on those undisputed facts, the district court had not erred in holding that the firefighters' on-call time was compensable as a matter of law, and properly granted their motion for summary judgment.  The court also held that the district court had not erred in its application of the law to the facts, such it properly found (1) "the frequency of callbacks to be an important distinction" from case law holding on call time was not compensable, and (2) "the nature of the firefighters' employment [was] a relevant factor in determining that the on-call time was compensable.  Firefighters must be alert and ready to protect the community, and the time firefighters spend lying in wait for emergencies could be considered a benefit to the employer and thus compensable under [the] FLSA."  Id. at 1538.

### 5. Other District Courts' Discussion Regarding Applicability of "On Call" Legal Framework to Uber Drivers' claims

This decision may be the first to consider the compensability of time spent Online the Uber app in the Third Circuit, but is not the first to have considered and discussed it, albeit in other procedural postures.

In Yucesoy v. Uber Techs., Inc., No. 15-CV-00262-EMC, 2016 WL 493189, at *5–6 (N.D. Cal. Feb. 9, 2016), Uber moved to dismiss plaintiffs drivers' complaints for failure to state a claim.  While the district court granted the motion to dismiss plaintiffs' claims for violations of Massachusetts minimum wage laws—which, the court noted, looks to federal case law applying the FLSA—it did so on the basis that plaintiffs had failed to plead sufficient facts to show that their waiting time was compensable, not because the time was not compensable as a matter of law.  Citing Ninth and Tenth Circuit precedent applying tests for the compensability of on-call time, the court stated,

> The Court does not agree that waiting time is not compensable as a matter of law; instead, it is a fact-specific inquiry that looks the

degree to which an employee is free to engage in personal activities.

In the instant case, Plaintiffs have failed to plead specific facts to support their claim. Plaintiffs instead generally allege that they are required to accept "most" of the requests that they receive "in order not to risk being deactivated by Uber." They do not explain how often these requests came in, how many of the requests they must accept, and the magnitude of the risk of deactivation if requests are not accepted. Without such information, it is unclear what ability drivers have to conduct personal business while logged onto the app. While Plaintiffs argued at the hearing that they should be permitted to find such information in discovery, Plaintiffs at the very least should know generally how often they receive ride requests and what the stated risk of termination is for not accepting requests; although they have access to such information, they failed to allege specific facts. As this is Plaintiffs' Third Amended Complaint, the Court will dismiss Plaintiffs' minimum wage and overtime claims with prejudice.

Yucesoy v. Uber Techs., Inc., No. 15-CV-00262-EMC, 2016 WL 493189, at *5–6 (N.D. Cal. Feb. 9, 2016).

Similarly, in O'Connor v. Uber Techs., Inc., 201 F. Supp. 3d 1110, 1125 (N.D. Cal. Aug. 18, 2016), in which the court denied the parties' request for preliminarily approval of a class-wide settlement, the court noted that a "primary question" with respect to plaintiffs' minimum wage and overtime claims was "whether drivers would be entitled to compensation for time spent waiting to perform a task." Id. The court noted that these claims had been dismissed in Yucesoy for failure to plead specific facts to state the claim, and stated that,

the Court does not conclude that drivers could not prevail on this claim were sufficient allegations pleaded and evidence presented. . . Uber could be found liable for waiting time given their prior policy of deactivating drivers for low acceptance rates, and their present policy of suspending drivers for low acceptance rates. Again, the problem with the pleadings in Yucesoy was that Plaintiffs had failed to plead sufficient facts in their complaint, despite it being their fourth complaint in that action.

23

Id. at n.11 (internal citations omitted); see also Bradshaw v. Uber Techs., Inc., No. CIV-16-388-R, 2017 WL 2455151, at *9 (W.D. Okla. June 6, 2017) (denying Uber's motion for judgment on the pleadings where plaintiffs allege they were driving 1500 hours, and noting that "[a]lthough the Court has no doubt the issue of whether all . . . 1500 hours was compensable time will be litigated in this action at some point, Plaintiff's allegations are sufficient to avoid judgment on the pleadings on this issue," and "if Plaintiff's calculations included waiting time, such time is not per se excludable.  Rather, the inquiry on whether waiting time is compensable is based on the particular facts of a given case.") (citing Gilligan v. City of Emporia, Kan., 986 F.2d 410, 413 (10th Cir. 1993)).

These cases (1) suggest that the on-call framework is applicable to the unique facts present in these Uber driver cases, and (2) offer insight into the types of factual questions that will be most relevant when applying the on-call framework; namely what ability drivers have to conduct personal business while Online the Uber App.

The Court has located one recent case that has considered, on summary judgment, the compensability of on-call time in the "gig economy" context.  In Lawson v. Grubhub, Inc., No. 15-cv-5128, 2017 WL 2951608 (N.D. Cal. Jul. 10, 2017), the plaintiff was a delivery driver for GrubHub, which is an online and mobile food ordering company.  GrubHub users can place a food order for pick up or delivery through the GrubHub platform (website or app).

The facts of this case are distinct, but still instructive.  There, if the plaintiff wanted to deliver food to customers, he was required to:

> sign up for a 'block' that specifies the time period and the specific region. Approximately once a week, GrubHub creates a certain number of blocks and releases these block to drivers, who sign-up in advance for the blocks they want to work.  Managers determine the number of blocks that are released based off of the historical order volume and predictions of how much demand there will be at any given time. Drivers can also receive

orders when they are not signed up for a block by turning on the app and making themselves available. Drivers can choose what market or region they want to deliver in. Drivers can request to switch zones by asking a driver specialist. . . . Once a driver signs up for a block, he or she is expected to work that block of time. When a driver's block starts the driver turns on the GrubHub app and "toggle themselves available." At that point Grubhub sends the driver orders. . . Drivers are expected to be available to accept delivered during their blocks. . . [and] have had their contracts terminated for not making themselves available for blocks of time they had signed up for.

GrubHub, 2017 WL 2951608, at *2-3. Critically, in considering GrubHub's motion for summary judgment as to plaintiff's minimum wage and overtime claims (brought under California state law), the court applied the Owens factors (the Ninth Circuit's 7-factor test to determine compensability of on-call time, described *supra*, at 14 n.4) to determine whether plaintiff had raised a genuine issue of material fact as to whether GrubHub exerted sufficient control over plaintiff such that his on-call time was compensable. The court concluded that he had, and denied summary judgment, finding several facts in the Owens test of particular relevance:

(1) That a driver is required to advise a dispatch that he is on-call and must stay close to the geographic area to which he chose assignment, and should not be unavailable to receive incoming orders (favors plaintiff)

(2) That the frequency of calls was highly restrictive (evidence that plaintiff received up to 4 hours at the same time), and drivers cannot easily trade responsibilities or subcontract (favors plaintiff)

(3) That plaintiff could rest and sometimes deliver food for other companies when scheduled on a block. (favors GrubHub)

Id. at *8.

The court also found several factors in the test not relevant under the factual circumstances of the case, namely:

(1) "Factor one, the on-premises living requirement, is irrelevant because the nature of the work—driving—is inherently mobile and therefore cannot be decided in favor of either Plaintiff or Defendant."

(2) "A pager would not ease restrictions because Plaintiff's mobile phone, the modern day equivalent of a pager, is the mechanism that communicates the restrictions and is a work requirement—GrubHub's app is the means by which drivers receive orders";

(3) "Factor four is at best neutral. While there is no evidence that Grubhub required a set time limit for deliveries, given the nature of the service—delivering restaurant food—a reasonable trier of fact could find that deliveries had to be made rather quickly and that Grubhub monitored the performance of the drivers."

Id.  The court held that since most of the factors "weigh in favor of Grubhub control, the Court cannot conclude that no reasonable fact finder could find that the hours a driver is toggled on is compensable time, at least when it is during a scheduled block."  Id.

GrubHub adds some credence to the notion that the established frameworks for determining the compensability of on-call time may not be obsolete in the "gig economy" and app-driven employment context.

A key unifying theme of the foregoing case law, but distinct from these plaintiffs' facts, is the existence of a schedule, crafted by the employer, in which the employee was obligated to spend time working an expressly delineated shift or period of being on-call.  Additionally, the on-call time was not, as it is for Plaintiffs, the essence of their workload.  Rather, it was an ancillary, presumably unwelcome condition of the employee's employment, such as responding to unexpected emergencies.  Accordingly, the case law surveyed above is of limited use because the facts present in this case are so distinct.

### 6.   Parties' Arguments

Both parties seem to recognize that the factual circumstances of this case are novel, yet they each frame the "unique" aspects of the case differently.  Uber, for its part, argues that this is

not a typical on-call case because "in [the ordinary case], the nature of compensable waiting time and on-call scenarios presupposes an obligation to remain on call during the specified time and to complete a task for the employer upon the employer's command or call.  Here, however, Plaintiffs concede that they could go offline whenever they chose to do so, and were not required to respond in any way upon receiving a trip request."  (ECF 66, Uber Mot. at 21).

Plaintiffs, on the other hand, argue that Uber's interpretation of the novel facts here leads to a result that absolutely "**no** online time is compensable" because "even if their drivers are employees, they can refuse work."  (ECF 76, "Pls.' Supp. Br." at 2).  Plaintiffs contend that Uber's argument, in fact, ignores the key novel issue in this case, namely, the reality that the "gig economy" has ushered in a new "Gilded Age."  The proposition that online time is not compensable because 'transportation providers retain the sole right to determine when, where, and for how long they are online' is a modern version of the *Lochner*-era argument that repugnant workplace conditions are permissible because of the laborer's 'freedom of contract.'" (Id. at 3).  Plaintiffs contend that "[t]he premise of Uber's current motion is not only legally antiquated, it is factually false."  (Id.).  The Court rejects Plaintiffs' historical analogies as figures of speech unrelated to the undisputed facts summarized above.

Notwithstanding each party's acknowledgement of the unique nature of this case, they each proceed to apply the facts to Ingram, the existing precedent for compensability of on-call time.  It is not entirely clear whether this decision by each party was a concession that time Online the Uber App is most analogous to on-call time in other employment contexts, or a strategic decision, based on this Court's expressions at prior conferences, that Ingram may be relevant to this analysis.

27

## VI.    APPLICATION

As the factors themselves demonstrate (e.g., "whether the employee may carry a beeper or leave home"), <u>Ingram</u> is not readily applicable to an entirely new, app-centered technology in the new "gig economy."  A judge must tread carefully before establishing any broad rules relating to a highly successful and popular new technology like Uber, which has drastically changed the transportation landscape, particularly in large cities such as Philadelphia, where Uber (and its competitors, such as Lyft) have threatened the value and existence of taxicabs.[8] Legislation or regulatory agency action is better suited to govern the impact of new technology on daily life activities.

This Court is reluctant to make any definitive legal rulings regarding the compensability of time spent Online on Uber's unique technology.  This is particularly true given that, based on the evidence currently in the record, the compensability question may be inextricably intertwined with the threshold employee versus independent contractor question.

Nevertheless, as the above discussion of the relevant legal precedents reveals, a key inquiry bearing on compensability under the FLSA is to what extent the employee's ability to engage in personal activities is restricted, such that the time is considered "predominantly" for the benefit of the employer rather than the employee.

---

[8]     In <u>Checker Cab Philadelphia v. Philadelphia Parking Auth.</u>, No. CV 16-4669, 2017 WL 2461980, at *1 (E.D. Pa. June 6, 2017), the undersigned recently denied a motion to dismiss claims brought by over 300 Philadelphia medallion-holding taxi cab operators against the PPA, alleging, *inter alia*, that the entry of Uber and Lyft drivers into the for-hire transportation market, and the PPA's decision not to regulate them the same as taxicab drivers, amounts to equal protection and takings clause violations that have had severe economic consequences for taxicab drivers.

There are four undisputed factual issues which prevent the Court from finding as a matter of law that Plaintiffs' time is not compensable (if, and only if, Plaintiffs were found to qualify as employees under the FLSA):

(1) Drivers have at most 15 seconds to accept a trip request from a rider which, if not accepted, will be deemed rejected.  (Tr. at 11-12).

(2) If a driver does not accept three trip requests in a row, the Uber App automatically switches the driver from Online to offline.  While offline, drivers are not eligible to accept ride requests.  (SOF ¶ 29).

(3) The rider's destination is not disclosed to the driver until the rider's trip begins.  (SOF ¶ 21).  Thus, in considering whether to accept a request, the driver has no knowledge whether it will be a short ride or very long – which affects driver compensation and may also restrict personal activities.

(4) Drivers may only advance in the queue at the Airport or 30th Street Train Station if within a certain zone, and may only accept trip requests at the Airport if inside the west parking lot.  (SOF ¶¶ 36, 39).

The Court is aware that Plaintiffs contend that several additional facts—including almost all facts relating to the consequences Uber has reserved the right to impose on drivers for failing to accept, or for cancelling, trip requests—are disputed, and are material to the issue of whether drivers' time Online is predominantly for the drivers' or for Uber's benefit.  In their supplemental statement of disputed facts, Plaintiffs cite primarily to Uber regulations in which Uber reserves the right to suspend or deactivate drivers' accounts if they cancel too many, or accept too few, trips.[9]  However, as Uber points out in its response to Uber's supplemental statement of facts (ECF 85), Plaintiffs' record citations on these facts do not create genuine disputes of material fact.  Plaintiffs have failed to show any instances where these reservations of right are ever exercised in the Philadelphia area, much less that any reserved consequences have ever been imposed on Plaintiffs themselves.

---

[9]      See, *supra*, II.B. at 4-6.

Nonetheless, that drivers have only 15 seconds to respond to a given trip request may reasonably be considered a requirement that drivers are required by Uber to be tethered to their phones while Online.  Similarly, that drivers are automatically switched from Online to offline after ignoring three trip requests could reasonably be considered a severe restriction on their ability to engage in personal activities, particularly if drivers are Online during periods when trip requests are frequent, such that drivers must constantly engage with the Uber App to keep themselves Online and situated to accept a request.  A reasonable juror could also find that drivers are not meaningfully in control of their time if they are not told the rider's destination before accepting a trip.  This is particularly true given Uber's position that no Online time—other than time spent actually transporting riders—is compensable (Tr. at 18), since a rider's destination may take a driver far from where he would want to be for purposes of his personal activities.  Last, the physical restrictions imposed at transportation hubs in Philadelphia could, for obvious reasons, be considered a literal restriction on drivers' physical freedoms to pursue personal activities.

Accordingly, the Court cannot conclude that Plaintiffs' time Online is not compensable as a matter of law.  Rather, the Court finds, if this issue continues to trial, it should be articulated on a factual record, with cross-examination and subject to the Rules of Evidence, so that any final legal decisions can better rest on a trial record, rather than on the dueling papers that are inherently part of Rule 56 litigation.

The parties must now promptly embark on completing any appropriate discovery on the issue of whether Plaintiffs are employees or independent contractors under the FLSA.  Since there are many precedents on this issue, the Court anticipates it may be decided by cross-motions for summary judgment, after any relevant discovery has been completed.

For the foregoing reasons, Uber's Motion for Partial Summary Judgment (ECF 66) will be DENIED, without prejudice, and with leave to refile at the completion of discovery.  Uber's Motion to Strike the new portions of Plaintiffs' Amended Statement of Disputed and Undisputed Fact (ECF 83) will be GRANTED in part and DENIED in part.

An appropriate Order follows.

O:\CIVIL 16\16-573 Razak v Uber Technologies\Memo Re Partial MSJ.docx