## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALI RAZAK, KENAN SABANI, and KHALDOUN CHERDOUD, individually and on behalf of all others similarly situated,

               Plaintiffs,

      v.

UBER TECHNOLOGIES, INC. and GEGEN LLC,

               Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 16-0573

Judge Michael M. Baylson

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

PAGE

I.     INTRODUCTION ................................................................................................ 1

II.    PROCEDURAL HISTORY AND LEGAL STANDARD .................................. 3

       A.     Summary Judgment Standard .................................................................. 4

       B.     Plaintiffs Must Prove That They Are "Employees" Of Defendants ..................... 5

III.   ARGUMENT ...................................................................................................... 8

       C.     Plaintiffs Are In Business For Themselves, And That Business Is Separate
              And Distinct From Uber ......................................................................... 9

              1.     Plaintiffs Own And Operate Transportation Companies .......................... 9

              2.     Plaintiffs Entered Into And Accepted Agreements That Define
                     Their and Their Companies' Relationship With Defendants .................. 11

              3.     Uber Is A Technology Company That Develops, Markets, and
                     Licenses Technology That Enables Access To An Online
                     Marketplace Where Riders And Transportation Providers Meet ........... 13

       D.     Plaintiffs Made Significant Investments In Their Businesses For The
              Purpose Of Generating Profits And Avoiding Losses ......................................... 18

              1.     Plaintiffs Invested Significantly In Their Vehicles ............................... 19

              2.     Plaintiffs Were Permitted To (And Luxe and Freemo In Fact Did)
                     Engage Drivers To Work For Their Transportation Companies ............ 20

              3.     Plaintiffs Incurred All Expenses Related To Providing
                     Transportation Services And Operating Their Businesses ..................... 22

              4.     Plaintiffs Marketed And Advertised Their Businesses For Purposes
                     Of Generating Leads and Private Clients ............................................. 25

       E.     Plaintiffs And Their Companies Provide Transportation Services Procured
              From Multiple Lead Channels – Including From Private Clients Generated
              Through Plaintiffs' Skill And Initiative ............................................................ 28

       F.     Plaintiffs Determine When, Where, And How Regularly To Provide
              Transportation Services, Regardless Of Lead Generation Source ........................ 33

              1.     Plaintiffs Control When To Go Online And Offline, And Where
                     To Offer Their Services While Online On The Uber App ..................... 34

              2.     Plaintiffs Have The Right To Unilaterally Reject And Cancel Trip
                     Requests Without Penalty ................................................................... 37

              3.     Plaintiffs Set Their Own Schedule (Or No Schedule) And Took
                     Vacations Without Ever Communicating With Or Asking
                     Permission From Defendants ............................................................... 40

i

**TABLE OF CONTENTS**
(CONTINUED)

G.    Plaintiffs' Managerial Skill And Entrepreneurial Effort Directly Impacted,
And At Times Entirely Dictated, Their Opportunity For Profit Or Loss............ 42

IV.   CONCLUSION.............................................................................................................. 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adami v. Cardo Windows, Inc.*,
  No. 12-2804 (JBS/JS), 2016 WL 1241798 (D.N.J. Mar. 30, 2016) ............................. *passim*

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).........................................................................................................4

*Anderson v. Mt. Clemens Pottery Co.*,
  328 U.S. 680 (1946).........................................................................................................5

*Arena v. Plandome Taxi Inc.*,
  No. 12 CV 1078 DRH WDW, 2014 WL 1427907 (E.D.N.Y. Apr. 14, 2014)......................33

*Bartels v. Birmingham*,
  332 U.S. 126 (1947).........................................................................................................6

*Bayada Nurses, Inc. v. Com., Dep't of Labor & Indus.*,
  958 A.2d 1050 (Pa. Commw. Ct. 2008) ...........................................................................5

*Berger Transfer & Storage v. Cent. States, Se. & Sw. Areas Pension*,
  85 F.3d 1374 (8th Cir. 1996) ......................................................................................33, 39

*Bonet v. Now Courier, Inc.*,
  203 F. Supp. 3d 1195 (S.D. Fla. 2016) .............................................................................8

*Browning v. CEVA Freight, LLC*,
  885 F. Supp. 2d 590 (E.D.N.Y. 2012) .....................................................................*passim*

*Bui v. Minority Mobile Sys., Inc.*,
  No. 15-21317-CIV, 2016 WL 344969 (S.D. Fla. Jan. 28, 2016)......................................8, 28

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)......................................................................................................4, 5

*Chao v. Mid-Atlantic Installation Servs., Inc.*,
  16 Fed. App'x. 104 (4th Cir. 2001) ...............................................................................8, 19

*Commonwealth v. Stuber*,
  822 A.2d 870 (Pa. Commw. Ct. 2003), *aff'd*, 859 A.2d 1253 (Pa. 2004) ...............................5

*Crew One Prods., Inc. v. N.L.R.B.*,
  811 F.3d 1305 (11th Cir. 2016) .....................................................................................17

*Crump v. HF3 Constr., Inc.*,
  No. CV 14-4671, 2016 WL 6962532 (E.D. Pa. Nov. 29, 2016) ........................................5, 33

*Donovan v. DialAmerica Mktg., Inc.*,
  757 F.2d 1376 (3d Cir. 1985) ................................................................................. *passim*

*Doty v. Elias*,
  733 F.2d 720 (10th Cir. 1984) ........................................................................................41

*In Re Enterprise Rent-A-Car Wage & Hour Litig.*,
  683 F.3d 462 (3d Cir. 2012) .............................................................................................4

*Freund v. Hi-Tech Satellite, Inc.*,
  185 F. App'x 782 (11th Cir. 2006) ......................................................................... *passim*

*Galena v. Lone*,
  638 F.3d 186 (3d Cir. 2011) .............................................................................................4

*Gate Guard Servs., LP v. Solis*,
  No. V-10-91, 2013 WL 593418 (S.D. Tex. Feb. 13, 2013) .............................................37

*Haybarger v. Lawrence Cty. Adult Probation & Parole*,
  667 F.3d 408 (3d Cir. 2012) .............................................................................................6

*Heningburg v. CSS Corp.*,
  No. 13-cv-2184, 2015 WL 13081182 (N.D. Ga. Aug. 14, 2015) .................................28, 32

*Herman v. Express Sixty-Minutes Delivery Servs., Inc.*,
  161 F.3d 299 (5th Cir. 1998) .................................................................................. *passim*

*Herman v. Mid-Atl. Installation Servs., Inc.*,
  164 F. Supp. 2d 667 (D. Md. 2000) ...............................................................................18

*Hertz v. Woodbury County, Iowa*,
  566 F.3d 775 (8th Cir. 2009) ............................................................................................5

*Hodgson v. E. Falls Sand & Gravel Co.*,
  No. 69-407 CIVIL, 1972 WL 952 (M.D. Pa. Aug. 30, 1972) .................................35

*Kirsch v. Fleet Street, Ltd.*,
  148 F.3d 149 (2d Cir. 1998) ..............................................................................31, 40, 41

*Li v. Renewable Energy Solutions, Inc.*,
  No. 11-3589, 2012 WL 589567 (D.N.J. Feb. 22, 2012) ..................................................42

*Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. N. L. R. B.*,
  603 F.2d 862 (D.C. Cir. 1979) .......................................................................................17

*Lorenz Schneider Co., Inc. v. N.L.R.B.*,
   517 F.2d 445 (2d Cir. 1975)..................................................................17

*Luxama v. Ironbound Exp., Inc.*,
   No. 11-2224, 2012 WL 5973277 (D.N.J. June 28, 2012).................................28, 43

*N.L.R.B. v. Associated Diamond Cabs, Inc.*,
   702 F.2d 912 (11th Cir. 1983) ..............................................................17

*Rutherford Food Corp. v. McComb*,
   331 U.S. 722 (1947)..................................................................6, 7, 31

*Saleem v. Corp. Transportation Grp., Ltd.*,
   854 F.3d 131 (2d Cir. 2017)...........................................................*passim*

*Scantland v. Jeffry Knight, Inc.*,
   721 F.3d 1308 (11th Cir. 2013) .......................................................5, 37, 40, 41

*Schaar v. Lehigh Valley Health Servs., Inc.*,
   732 F. Supp. 2d 490 (E.D. Pa. 2010) .........................................................4

*Travelers Indem. Co. v. Stedman*,
   910 F. Supp. 203 (E.D. Pa. 1995) ...........................................................5

*United States v. Silk*,
   331 U.S. 704 (1947).....................................................................18, 20

*Walling v. Portland Terminal Co.*,
   330 U.S. 148 (1947)........................................................................7

*Weary v. Cochran*,
   377 F.3d 522 (6th Cir. 2004) ..............................................................25

**Statutes**

43 P.S. § 333.103 ..............................................................................6

43 P.S. § 333.104 ..............................................................................5

29 U.S.C. §203 ...............................................................................5-6

29 U.S.C. § 206 ................................................................................5

29 U.S.C. § 207 ................................................................................5

Fair Labor Standards Act (FLSA)........................................................*passim*

Pennsylvania Minimum Wage Act ........................................................3, 5

v

**Other Authorities**

Fed. R. Civ. P. 56(c) ...............................................................................................................4

Fed.R.Civ.P. 56(e) ...............................................................................................................5

## I.      INTRODUCTION

> "My goal was to run an independent business and maybe, five or
> six or 10 years from now, not have to drive - to live the American
> dream." –Plaintiff Kenan Sabani

SOF, ¶114. Mr. Sabani, like Plaintiffs Ali Razak and Khaldoun Cherdoud, pursued their versions

of the "American dream" by incorporating and operating their own black car limousine

companies in Philadelphia.

In starting their own companies, Plaintiffs staked a claim to total and exclusive control

over how they would run their businesses. Plaintiffs—not Defendants—independently

determined (1) how to generate customers and demand for their services; (2) the degree to which

they would invest in their business; (3) how to generate revenue and profit for their businesses;

and (4) whether to engage other drivers to work for their companies. Plaintiffs invested

substantially in their businesses by purchasing and leasing luxury vehicles, paying for all

expenses incurred (including, for example, vehicle insurance, repairs, maintenance, towing, tolls,

gasoline, cellular telephones), and marketing and advertising their businesses.

Perhaps the most compelling evidence of Plaintiffs' independence as businessmen is how

differently each of them behaved in the black car transportation services marketplace. Plaintiff

Razak's company purchased and maintains a fleet of more than a dozen vehicles, and generates

revenue by leasing those vehicles to other drivers. Plaintiff Sabani's company advertises on the

internet, negotiates with local hotels, obtains substantial business from his company's private

clients (including one who booked approximately 40 trips each week), and engages other drivers

to provide many of those private-client transportation services. Plaintiff Cherdoud admits that he

lacks the "courage" of the other Plaintiffs in terms of how aggressively to promote his business,

but even he provides black car transportation services for private clients through his initiative in

seeking referrals, including from another black car transportation company (specifically, and coincidentally, Sabani's company).

In addition, Plaintiffs—not Defendants—had the unfettered discretion to determine and control the manner and extent of their affiliation with Defendants, including all decisions related to whether, when, where, how, and for how long (if at all) they chose to get into their own cars, log onto the Uber App and go online on their own phones, and to accept (or not accept) trip requests in the territory they chose. In determining when to go online and offline and how long they would be online on the Uber App, Plaintiffs set their own schedule (or no schedule), worked at their own convenience, and worked only when it accommodated their personal and other professional endeavors. One of the Plaintiffs admitted that he provided transportation services using the Blacklane App and for his private company's clients while simultaneously accessing and using the Uber App. The undisputed facts of this case are clear that Plaintiffs have at all times made these decisions for their and their companies' advantage and without regard to the impact of their decisions on Defendants, and that Plaintiffs' business decisions and initiative determined their profits or losses.

Uber, on the other hand, creates and licenses its smartphone technology to many businesses, including Plaintiffs' businesses, which businesses in turn use Uber's technology and trip request leads to generate revenue. Companies like Uber and Blacklane (a black car reservation company that offers a marketplace lead-generation resource enabling drivers and riders to connect) merely have something that Plaintiffs have chosen to use for the benefit of their burgeoning businesses: a popular and efficient means to identify and connect with riders who need black car transportation services and an existing pool of potential customers. But Plaintiffs' business and Defendants' businesses are not one and the same. Uber is no more in the

business of giving rides than Plaintiffs Razak, Sabani, and Cherdoud are in the software development business.

When Plaintiffs chose to use the Uber App as a lead-generation resource to support their independent transportation businesses, they contractually agreed that they were independent contractors. Despite this, Plaintiffs now allege that they are Defendants' employees. While none of the facts in this case are individually determinative, considered as a whole with the goal of discerning the economic reality of their relationship with Defendants, the only reasonable conclusion to be drawn from the undisputed material facts is that Plaintiffs are, as a matter of law, in business for themselves: they provide a service materially and wholly different from the business that Defendants operate in; they acted at all times in their own interest and for their own advantage; they derived their revenue from multiple streams; and they are therefore properly classified as independent contractors.

Plaintiffs cannot carry their burden of establishing that they were Defendants' employees. It is not even a close call. Plaintiffs are independent contractors, in business for themselves. They are not, and never were, employed by Defendants. Defendants respectfully ask this Court to grant their Motion for Summary Judgment and dismiss Plaintiffs' claims with prejudice.

## II.    PROCEDURAL HISTORY AND LEGAL STANDARD[1]

In their First Amended Complaint, Plaintiffs Ali Razak, Kenan Sabani, and Khaldoun Cherdoud assert five causes of action: (1) failure to pay minimum wages pursuant to the Fair Labor Standards Act (FLSA); (2) failure to pay overtime wages pursuant to the FLSA; (3) failure to pay free and clear wages pursuant to the FLSA; (4) failure to pay minimum and overtime wages pursuant to the Pennsylvania Minimum Wage Act (PMWA); and (5) failure to designate

---

[1] Defendants incorporate by reference their Statement of Undisputed Material Facts ("SOF"), filed herewith.

regular paydays in violation of the Pennsylvania Wage Payment and Collection Law (WPCL). The central issue that unifies all five of Plaintiffs' claims in this case is whether Plaintiffs— independent black car transportation providers in Philadelphia—are (a) independent contractors who are in business for themselves and economically independent or (b) Defendants' employees. Plaintiffs' First Amended Complaint (FAC), Dkt. 47, ¶¶ 3, 4, 87. On that central issue, Defendants are entitled to summary judgment.

### A.    Summary Judgment Standard.

Summary judgment must be granted where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *In Re Enterprise Rent-A-Car Wage & Hour Litig.*, 683 F.3d 462, 467 (3d Cir. 2012). A disputed fact is not "material" unless its resolution could affect the outcome of the case, and a dispute is not "genuine" unless the evidence bearing on the disputed fact is such that a reasonable person could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Under Rule 56, the court must view evidence in the light most favorable to the nonmoving party. *Galena v. Lone*, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (*citing Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 461 (3d Cir. 1989)).

A party moving for summary judgment may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that the nonmoving party cannot make a sufficient evidentiary showing as to an essential element of her case. *Celotex Corp.*, 477 U.S. at 323. To survive a summary judgment motion, the plaintiff must come forward with specific admissible and credible evidence supporting each element essential to her case, and

4

"may not rest on conclusory allegations or bare assertions alone." *Travelers Indem. Co. v. Stedman*, 910 F. Supp. 203, 206 (E.D. Pa. 1995) (*citing Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). The party opposing summary judgment must go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial" through affidavits, depositions, answers to interrogatories, and admissions on file. Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

### B.    Plaintiffs Must Prove That They Are "Employees" Of Defendants.

The FLSA and PMWA apply only to employees. *See* 29 U.S.C. §§203, 206-207; 43 P.S. § 333.104; *see Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013); *Crump v. HF3 Constr., Inc.*, No. CV 14-4671, 2016 WL 6962532, at *2 (E.D. Pa. Nov. 29, 2016) ("Each of these claims depends on the determination that Plaintiffs were employees of Defendants: as Plaintiffs implicitly acknowledge, Defendants could not have violated the law if Plaintiffs were not their employees."); *compare* 29 U.S.C. § 203(r)(1) (clarifying that covered activities performed for an "enterprise" do not include "the related activities performed for such enterprise by an independent contractor").[2]

Plaintiffs bear the burden of proving that they were employees and they performed work for which they were not properly compensated. 29 U.S.C. §§ 206-207; 43 P.S. § 333.104; *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946); *Hertz v. Woodbury County, Iowa*, 566 F.3d 775, 783 (8th Cir. 2009); *see also Adami v. Cardo Windows, Inc.*, No. 12-2804

---

[2] "Pennsylvania courts use this same test to determine whether an individual is an employee for the purposes of the Minimum Wage Act." *Crump*, 2016 WL 6962532, at *3 (citing *Commonwealth v. Stuber*, 822 A.2d 870, 873-74 (Pa. Commw. Ct. 2003), *aff'd*, 859 A.2d 1253 (Pa. 2004)); *Bayada Nurses, Inc. v. Com., Dep't of Labor & Indus.*, 958 A.2d 1050, 1058 (Pa. Commw. Ct. 2008) ("[I]n *Stuber* the Court noted the virtually identical definitions for 'employ, employer and employee' in the MWA and the FLSA and that because of this identity of purpose the Court adopted the federal economic reality test used by federal courts as the standard for determining if an individual is an employee under the MWA or an independent contractor.").

(JBS/JS), 2016 WL 1241798, at *6 (D.N.J. Mar. 30, 2016) ("Plaintiff must ultimately show that all members of the class are all employees covered by the FLSA.").

The statutory definitions of "employee" and "employ" are somewhat circular,[3] and so courts asked to determine whether a plaintiff is an independent contractor for or an "employee" of the defendant look to the "economic reality" of the relationship between the parties. *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947); *see also Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382-83 (3d Cir. 1985); *Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131, 139 (2d Cir. 2017). In reviewing the facts in each specific situation, the "Supreme Court has instructed courts to look to the 'circumstances of the whole activity' to determine whether an employment relationship exists." *Adami*, 2014 WL 320048, at *6 (*quoting Rutherford*, 331 U.S. at 730); *Haybarger v. Lawrence Cty. Adult Probation & Parole*, 667 F.3d 408, 418 (3d Cir. 2012) ("As we recognized in applying the economic reality test in the context of the FLSA, whether a person functions as an employer depends on the totality of the circumstances rather than on 'technical concepts of the employment relationship.'") (citations omitted).

The Third Circuit has adopted six *non-exclusive* factors to be used in analyzing whether an individual is an employee or an independent contractor:

> (1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
>
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

---

[3] The statute defines an "employee" as "any individual employed by an employer" 29 U.S.C. § 203(e)(1), an "employer" as "any person acting ... in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and "to employ" as "to suffer or permit to work," 29 U.S.C. § 203(g). *See also* 43 P.S. § 333.103(h) (defining employee as "an individual employed by an employer").

> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanence of the working relationship; and
>
> (6) whether the service rendered is an integral part of the alleged employer's business.

*Donovan*, 757 F.2d at 1382-83. These factors are not to be applied mechanically as separate tests; ***they are intertwined and their weight depends often upon particular combinations***. Courts applying these factors are admonished that "[n]either the presence nor absence of any particular factor is dispositive" and instructed to consider whether, "as a matter of economic reality, the individuals are [in business for themselves or are] dependent upon the business to which they render service." *Id*. at 1382. The inquiry focuses on whether "the work done, in its essence, follows the usual path of an employee." *Rutherford*, 331 U.S. at 729.

Although the FLSA is to be applied broadly, it "does not transform every working relationship into an employer-employee relationship." *Adami*, 2016 WL 1241798, at *6. A person who works "for [his] own advantage on the premises of another" is not an employee within the meaning of the FLSA. *Walling v. Portland Terminal Co*., 330 U.S. 148, 152 (1947) (as broad as the FLSA's purposes, "they cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction").

The Third Circuit has not applied the economic reality factors to the specific question of whether black car transportation providers are independent contractors or employees of the entities that they use to generate leads. Numerous other courts throughout the United States, however, including the Second, Fourth, and Fifth Circuit Courts of Appeal, ***have held that various types of black car and other drivers are properly classified as independent contractors***

*under the FLSA*. *Saleem v. Corp. Transportation Grp., Ltd*., 854 F.3d 131, 139 (2d Cir. 2017) (black car drivers are independent contractors); *Chao v. Mid-Atlantic Installation Servs., Inc*., 16 Fed. App'x. 104, 106 (4th Cir. 2001) (cable installer drivers are independent contractors); *Herman v. Express Sixty-Minutes Delivery Servs., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (drivers are independent contractors); *Bui v. Minority Mobile Sys., Inc.*, No. 15-21317-CIV, 2016 WL 344969, at *6 (S.D. Fla. Jan. 28, 2016) (drivers are independent contractors); *Bonet v. Now Courier, Inc.*, 203 F. Supp. 3d 1195, 1207 (S.D. Fla. 2016) (driver is independent contractor).

## III.   ARGUMENT

Considering the economic realities of the relationship between Plaintiffs and Defendants, as evidenced by the undisputed material facts in the record, Plaintiffs cannot meet their burden of proving they are Defendants' employees rather than independent contractors. Even when viewed in the light most favorable to Plaintiffs, the record establishes that Plaintiffs were in business for themselves and have at all times worked for their own advantage. They incorporated, own, and operate independent limousine companies; market and advertise their businesses and black car transportation services to the general public; make substantial investments in their businesses; exercise business acumen and judgment in choosing the manner and extent of their use and affiliation with the lead generation sources available to them in the marketplace (such as the Uber App and Blacklane); offer their services to riders they meet through more than one lead generation source; cultivate their own private clients; generate profits (and risk losses) from operating their businesses; and determine when, where, and how regularly they offer their transportation services. While none of these facts is determinative on its own, when considered as a whole, the underlying economic reality of the relationship between Plaintiffs and Defendants demonstrates that Plaintiffs are, as a matter of law, properly classified as independent contractors.

### C.   Plaintiffs Are In Business For Themselves, And That Business Is Separate And Distinct From Uber.

An important economic reality factor is "whether the service rendered is an integral part of the alleged employer's business" (*Donovan*, 757 F.2d at 1382), and whether "workers are dependent on a particular business or organization *for their continued employment*." *Id*. at 1385. The critical consideration is not whether Plaintiffs were needed in order for Defendants to make a profit, nor the "percentage of the worker's total income" generated from their relationship with Defendants.[4] Instead, the critical consideration is on "*the nature of the work performed by the workers*" and whether Plaintiffs "performed the primary work of" Defendants. *See Donovan*, 757 F.2d at 1385 & n.11. Clearly, Plaintiffs here did not perform the primary work of Defendants.

### 1.   Plaintiffs Own And Operate Transportation Companies.

Plaintiffs own and operate their own black car limousine companies: Luxe Limousine Services, Inc. ("Luxe"), Freemo Limo, LLC ("Freemo"), and Milano Limo, Inc. ("Milano"). SOF, ¶1. These personal businesses are legally distinct entities that provide transportation services. *Id.*, ¶¶2, 4, 6, 12, 13, 16, 17.  Plaintiffs admit that transportation providers who use the Uber App to generate trip requests "are free to operate their own businesses outside of UberBLACK." *Id.*, ¶3.

---

[4] In fact, the Third Circuit has made clear that financial dependence, i.e., how much money did the worker make from the purported employer as a percentage of the worker's total income, does not determine independent contractor or employee status. *Donovan*, 757 F.2d at 1385, n. 11. In *Donovan*, the court explained that interpreting economic dependence in this way would lead to senseless results if carried to its logical conclusion where the personal financial and relationship circumstances of a worker would dictate their legal status as an employee or independent contractor. *Id*. Therefore, the Third Circuit held that the economic dependence aspect of the independent contractor analysis examines whether "workers are dependent on a particular business or organization *for their continued employment*," and not "whether the workers at issue depend on the money they earn for obtaining the necessities of life." *Id*.

9

Luxe was incorporated in 2012 by Plaintiff Razak and his brother, and has its own certificate from the Pennsylvania Public Utility Commission (PUC) to provide black car transportation services in the counties of Bucks, Chester, Delaware and Montgomery. *Id.*, ¶¶4-7. Luxe's PUC certificate contemplates that Luxe will provide hourly-rate services, as well as fixed-fee black car services for special events such as weddings and proms. *Id.*, ¶8. Plaintiff Razak and his brother manage the operations of Luxe, advertise and market Luxe's transportation services to the public, own a fleet of vehicles, recruit and engage drivers to lease those vehicles from the company, and provide black car transportation services for trips generated from multiple revenue sources. *Id.*, ¶¶49-54 (fleet of vehicles), 59-61 (drivers), 62 (operations), 68 (handling payroll), 81-91 (advertising and marketing), 124-135 (generates revenue from providing services for multiple sources), 127 and 130 (Plaintiff Razak and his brother dispatch trips to Luxe's drivers), 199-201 (leases), 209 (Luxe competes for drivers). As one of several lead generation sources, Plaintiff Razak signed up to use the Uber App to connect with riders using the UberBLACK product on July 8, 2014 (two years *after* Luxe was incorporated). *Id.*, ¶9.

In 2013, Plaintiff Sabani began performing transportation services with Barry Limo, LLC, another independent limousine company operating in Philadelphia. *Id.*, ¶¶10-11. Plaintiff Sabani signed up to use the Uber App to connect with riders using the UberBLACK product on November 26, 2013. *Id.*, ¶14. In 2015, Plaintiff Sabani formed Freemo, and he is the company's sole owner. *Id.*, ¶¶12, 15. Plaintiff Sabani advertises Freemo's transportation services to the public (*Id.*, ¶13), engages drivers to work for his company (*Id.*, ¶¶104-110), markets to hotels to provide black car transportation services for their guests (*Id.*, ¶148), negotiates contracts with

Freemo customers to provide high-volume discounts (*Id.*, ¶¶143-145), and provides black car transportation services for trips generated from multiple revenue sources. *Id.*, ¶¶142-147.

Plaintiff Cherdoud owns and operates Milano. *Id.*, ¶16. Although Milano has not done as much as Luxe and Freemo with regards to advertising and recruiting drivers (Cherdoud admits that he lacked the "courage" of the other Plaintiffs in terms of how aggressively to promote his business), it has provided black car transportation services for trips generated from multiple revenue sources. *Id.*, ¶¶136-141. Plaintiff Cherdoud signed up to use the Uber App to connect with riders using the UberBLACK product on December 26, 2013. *Id.*, ¶18.

### 2. Plaintiffs Entered Into And Accepted Agreements That Define Their and Their Companies' Relationship With Defendants.

Plaintiffs entered into and accepted agreements that define their and their companies' relationships with Defendants. "Though an employer's self-serving label of workers as independent contractors is not controlling," such a designation in an agreement with the worker is pertinent to "the parties' beliefs about the nature of the relationship." *Saleem*, 854 F.3d at 141 (internal citations omitted).

Here, independent transportation companies (such as Luxe, Freemo, and Milano) who desire to use the Uber App to obtain requests to provide limousine services on the UberBLACK product must first enter into a Software License and Online Services Agreement (or similar agreement such as a Technology Services Agreement, collectively referred to as a "Services Agreement") with Uber. SOF, ¶19. The Services Agreement sets forth the relationship between Defendants and companies that want to gain access to the Uber App, as well as terms for receiving leads from Uber's technology. *Id*. Services Agreements are entered into between "***an independent company in the business of providing transportation services*** ("Customer" or "You")" and Uber. *Id.*, ¶20 (emphasis added). For purposes of the Services Agreement,

companies like Luxe, Freemo, and Milano, are Uber's "Customer[s]," who contract for the opportunity to use Uber's technology. The Services Agreement expressly defines "Transportation Services" as "the provision of passenger transportation services to Users via the Uber Services in the Territory *by customer and its Drivers* using the Vehicles." *Id.*, ¶22 (emphasis added). A "Driver" is defined in the Services Agreement as "a principal, employee or contractor *of Customer*" who meets basic requirements and who enters into a Driver Addendum. *Id.* (emphasis added).

Once a transportation company has entered into an agreement with Uber, drivers engaged by that transportation company may also use the Uber App once they agree to the terms of a Driver Addendum to the Services Agreement. *Id.*, ¶23. Driver Addendums are agreements "between an independent company in the business of providing transportation services (*"Transportation Company"*) [e.g., Luxe, Freemo, and Milano] and an independent, for-hire transportation provider (*"Driver"* or *"You"*)." *Id.*, ¶¶24.[5] The Driver Addendum references the Services Agreement, and makes clear that any trip request a transportation provider may receive from the Uber App is "*[i]n addition to the transportation services it regularly performs pursuant to his or her contractual arrangement with the Transportation Company*." *Id.* (emphasis added). The definition of "Transportation Services" in the Driver Addendum and the Services Agreement are the same. *Compare Id.*, ¶¶22 and 24.

---

[5] Plaintiffs refer to themselves as a "drivers." *See, e.g.*, Dkt. 47, *passim*. While Plaintiffs do sometimes drive such that this term would be accurate, it is not always accurate and can be misleading. Defendants do not prohibit a transportation provider from engaging *another worker* to drive his or her vehicle and providing transportation services. In that instance, the transportation provider is not actually a driver. Here, for example, Plaintiff Sabani admits that he arranged hundreds of trips that were provided by other drivers who work for his company. For these trips, Plaintiff Sabani is a transportation provider, but is not the driver. It is therefore not accurate to refer to every transportation provider as a "driver" because he or she may not do any driving. As another example, Plaintiff Razak's brother is a transportation provider, but he is so busy operating his transportation company that he no longer drives very much. SOF, ¶62.

**3.     Uber Is A Technology Company That Develops, Markets, and Licenses Technology That Enables Access To An Online Marketplace Where Riders And Transportation Providers Meet.**

The Services Agreement expressly defines Uber's business, and states that "Customer acknowledges and agrees that ***Uber is a technology services provider that does not provide transportation services, function as a transportation carrier, nor operate as a broker for the transportation of passengers***." *Id.*, ¶22 (emphasis added). The Services Agreement also defines "Uber Services" as:

> Uber's on-demand lead generation and related services that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services; such Uber Services include access to the Driver App and Uber's software, websites, payment services as described in Section 4 below, and related support services systems, as may be updated or modified by Uber at its discretion from time to time.

*Id.*, ¶26[6] The Services Agreement also makes clear that:

> Uber ***does not, and shall not be deemed to, direct or control Customer or its Drivers*** generally or in their performance under this Agreement specifically, including ***in connection with the operation of Customer's business, the provision of Transportation Services, the acts or omissions of Drivers***, or the operation and maintenance of any Vehicles. Customer and its Drivers retain the sole right to determine when, where, and for how long each of them will utilize the Driver App or the Uber Services. Customer and its Drivers retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Uber's then-current cancellation policies. . . . ***Customer acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from Transportation Services***. For the sake of clarity, Customer understands that ***Customer retains the complete right to provide transportation services to its existing customers and to use other software application services*** in addition to the Uber Services.

---

[6] This term has a substantially similar definition in the Driver Addendum. *See*, *Id.*, ¶24.

*Id.*, ¶27. (emphasis added). The Driver Addendum similarly makes clear that "Uber does not, and shall not be deemed to, direct or control Driver generally or in Driver's performance of Transportation Services or maintenance of any Vehicles." *Id.*, ¶24.

Despite these clear agreements to the contrary, Plaintiffs seek to conflate Uber's massive engineering and software product creation and development business with their own small, but nevertheless very real, transportation businesses, and pretend they are one and the same. They are not. Uber is a technology company that invented, develops, markets, licenses, and seeks to constantly improve a revolutionary technology that allows people who need things to almost instantaneously connect with a business that can provide it. *Id.*, ¶25.[7]

Uber's most popular technology—commonly referred to as the Uber App[8]— enables riders and drivers to make a match with each other based on their location, the rider's transportation budget and needs, and the drivers' preferences. *Id.* ¶28. The core of Uber's business is its technology, which drives its business model. *Id.* ¶34. Uber has spent and continues to spend tens of millions of dollars on developing, expanding, and deploying its technology products. *Id.* ¶35. Uber employs thousands of people in technology-centric roles who design,

---

[7] Gegen is a wholly-owned subsidiary of Uber that holds a certificate of public convenience from the Philadelphia Parking Authority (PPA). SOF, ¶41. Transportation companies and individual transportation providers who wish to provide "black car" limousine services in Philadelphia are required by applicable regulation to hold a certificate of public convenience or to do so in connection with an entity that holds a certificate of public convenience from the PPA. *Id.* ¶42. The application fee for a PPA certificate of public convenience is $12,000. *Id.* ¶43. Qualified transportation companies who do not hold their own certificate of public convenience, such as Plaintiffs' companies, may affiliate with an entity that holds a certificate of public convenience in order to enable them to provide limousine services in Philadelphia. *Id.* ¶44. Some UberBLACK transportation providers operate under the certificate of public convenience held by Gegen, while others operate under a certificate held by other limousine companies licensed by the PPA. *Id.* ¶45. Plaintiff Sabani testified that one way to get into the transportation business without having to pay for a PPA license, is to incorporate and then affiliate with Gegen. *Id.* ¶46. There are "many" companies that provide black car services in Philadelphia without relying on the Uber App to generate trip requests. *Id.* ¶47.

[8] The Uber App as used herein refers to both the rider and driver versions of the app. *Id.* ¶31.

code, and maintain its software and technology, and Uber markets and promotes the services that users are able to access through its various technology products. *Id.* ¶36.

UberBLACK is just one of Uber's technology products accessible through the Uber App, and enables riders to connect with luxury black car sedans or town cars. *Id.* ¶29-32.[9] Defendants do not transport riders in Philadelphia. *Id.* ¶37. Defendants also do not hire, promote, or transfer transportation providers —like Plaintiffs—who actually provide black car transportation services in Philadelphia. *Id.* ¶38.

As the foregoing demonstrates, Plaintiffs and Defendants do entirely different things. Plaintiffs' provision of rides does not constitute an essential part or the primary work of Uber or Gegen. On the contrary, neither Uber nor Gegen provide any rides at all. And the fact that Uber's technology may enable Plaintiffs to connect their businesses with riders does not make Plaintiffs' businesses and Uber's business one and the same. Like AirBnb,[10] Handy,[11] TaskRabbit,[12] 3D Hubs,[13] Amazon's Mechanical Turk,[14] and many other on-demand platforms, the Uber App is a

---

[9] The Uber App is also not limited to connecting riders and drivers, and instead offers an array of marketplace products. SOF, ¶33.

[10] See, https://www.airbnb.com/about/about-us (last accessed January 26, 2017), which is a community marketplace connecting individuals with accommodations for rent with those looking for a place to stay.

[11] *See*, https://www.handy.com (last accessed January 26, 2017), which company connects individuals looking for household services (such as cleaning or handyman services) with top-quality, pre-screened independent service professionals.

[12] *See*, https://www.taskrabbit.com/about (last accessed January 26, 2017), which company provides an online "same-day service platform" that connects those seeking to have chores or tasks (such as home maintenance) completed with those willing to complete the task for the advertised price.

[13] *See*, https://www.3dhubs.com/about (last accessed January 26, 2017), which company connects individuals and companies with 3D printers with those seeking to complete a 3D printing job.

[14] *See*, https://www.mturk.com/worker/help (last accessed January 26, 2017), which is a marketplace for tasks that require human intelligence. The Mechanical Turk service gives

technology solution that allows individuals needing a service to connect with independent individuals and businesses offering those services. The unifying factor underlying each of these business models is that the individual providing the services—and not the company connecting the service provider to the individual requesting the service—dictates the means and manner of completing the services.

In some ways, the Uber App is a modern-day Yellow Pages and/or bulletin board on which riders can post flyers requesting rides and drivers can post flyers offering to provide transportation. The Uber App has eliminated the time consuming and cumbersome need to call (or at least check the websites for) different car service companies during business hours to ask about prices and availability, and to schedule a trip well in advance. Instead, customers can now merely open an app on their phone, enter their destination, and moments later see if an independent contractor transportation provider is willing to provide the requested service. Rather than booking in advance, customers are often able to submit a request and within minutes be picked up by a transportation provider. In this way, Uber has created a more efficient "bulletin board" in a two-sided marketplace transaction between those in need of a service and those offering that service. Defendants' role in creating a technology product that enables service providers to connect more easily with those in need of a service does not mean they are in the business of providing that service any more than the Yellow Pages or owners of bulletin boards were in the business of providing the services listed therein or posted.

Even if Plaintiffs argue that their work is important or essential to Uber's business, that fact is immaterial to whether the services Plaintiffs provide are part of the regular services provided by Uber. In a similar factual circumstance, the Eleventh Circuit held that a business

---

businesses access to a diverse, on-demand, scalable workforce and gives workers a selection of thousands of tasks to complete whenever it is convenient.

acting as a go-between to provide stagehands to touring event producers, was not in the same business as the stagehands (or producers). The court noted that,

> The relevant inquiry is "whether or not the work ***is a part of*** the regular business of the employer," Restatement (Second) of Agency § 220(2)(h), ***not whether the work is essential*** to the business of Crew One. ***That the stagehands perform essential work "proves nothing in regard to the inquiry before us as it is also true in many relationships which are undisputedly that of a company to independent contractors."*** Associated Diamond Cabs, 702 F.2d at 924. Crew One is in the business of referring stagehands to event producers, but Crew One does not perform stagehand work itself. Only the stagehands do. The undisputed facts about the work of the stagehands and the business of Crew One support a determination that the stagehands are independent contractors.

*Crew One Prods., Inc. v. N.L.R.B.*, 811 F.3d 1305, 1314 (11th Cir. 2016) (emphasis added); *see also N.L.R.B. v. Associated Diamond Cabs, Inc.*, 702 F.2d 912, 924 (11th Cir. 1983) (that the work performed by the drivers is an essential part of the employer's operation "proves nothing in regard to the inquiry before us as it is also true in many relationships which are undisputedly that of a company to independent contractors"); *Local 777, Democratic Union Org. Comm., Seafarers Int'l Union of N. Am., AFL-CIO v. N. L. R. B.*, 603 F.2d 862, 898-99 (D.C. Cir. 1979) (drivers' work is essential to companies' operations but this is true in many recognized independent contractor situations); *Lorenz Schneider Co., Inc. v. N.L.R.B.*, 517 F.2d 445, 451 (2d Cir. 1975) (activities of insurance agents is essential part of insurance company's business but agents are not thereby turned into employees). Here, Plaintiffs provide black car transportation services to passengers in Philadelphia. Uber does not.

As each of the foregoing courts have concluded, the mere fact that independent contracting parties are important—or even necessary—to one another's business ***is the reason they contract with each other***, but it says ***nothing*** about the parties' relationship. The fact that Defendants want individuals *seeking* black car transportation services and those *providing* such

services to use the Uber App to connect with one another makes this scenario much like other brokerage relationships that are not indicative of employment.

For instance, if a rider cannot secure a driver willing to provide the rider black car transportation services in Philadelphia, there are no Uber employee drivers standing by to fulfill the trip request. SOF, ¶39. Uber does not contractually or otherwise guarantee rides for riders seeking black car transportation services in Philadelphia, because it is not in the business of providing such transportation services. *Id.* ¶40. Here, the undisputed evidence in the record demonstrates that the nature of Plaintiffs' work—providing transportation services (*i.e.*, the ride)—is inherently and materially different than the primary work of Defendants—developing the technology that enables the rider and driver to connect.  As a matter of law, these businesses are distinct, and thus necessarily not integral to each other.

### D.     Plaintiffs Made Significant Investments In Their Businesses For The Purpose Of Generating Profits And Avoiding Losses.

Another economic reality factor considers "the alleged employee's investment in equipment or materials required for his task, or his employment of helpers." *Donovan*, 757 F.2d at 1382. Unlike employees, independent contractors tend to make substantial investments in their businesses. *United States v. Silk*, 331 U.S. 704, 719 (1947) ("where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors"); *Saleem*, 854 F.3d at 144-46 (noting that "large capital expenditures—as opposed to 'negligible items, or labor itself'—are highly" indicative of independent contractor status); *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 784-85 (11th Cir. 2006) (independent contractor status supported where cable installer "drove his own vehicle and provided his own tools and supplies" for each job); *Herman v. Mid-Atl. Installation Servs., Inc.*, 164 F. Supp. 2d 667, 675 (D. Md. 2000) ("The installers are responsible for providing their

18

own truck or van and specialty tools. . . . Because these costs are considerable, especially considering the expense of a truck or van, and are of a type not normally borne by employees, this factor indicates that the Installers are contractors.");[15] *Browning v. CEVA Freight, LLC*, 885 F. Supp. 2d 590, 608 (E.D.N.Y. 2012) ("Plaintiffs made substantial investments in their businesses. They utilized their own vehicles and . . . were responsible for the costs and expenses associated with the vehicle, including maintenance and repair. Thus, this factor weighs in favor of independent contractor status."); *Dole v. Amerilink Corp.*, 729 F. Supp. 73, 76 (E.D. Mo. 1990) (cable installers spent significant money on their trucks and tools, demonstrating they had made substantial investment in their businesses). In evaluating a worker's investment, courts consider whether the individual made financial commitments in an attempt to generate a "return on . . . investment." *Saleem*, 854 F.3d at 144.

Here, Plaintiffs indisputably invested substantial sums of money to provide all necessary tools, including their own vehicles, all expenses relating to providing transportation services, and marketing and advertising necessary to generate leads and private clients. Plaintiffs made these investments for the purposes of generating profits and avoiding losses. Defendants did not pay for or reimburse Plaintiffs for these expenditures, nor direct Plaintiffs in how they should be made. Plaintiffs' investments created the platform for their black car transportation service businesses, supporting the conclusion that Plaintiffs were independent contractors.

### 1.    Plaintiffs Invested Significantly In Their Vehicles.

Luxe (Plaintiff Razak and his brother's company) has had between 2 and 16 vehicles in its fleet that it assigns to transportation providers in exchange for weekly lease payments. SOF, ¶¶49-54. Luxe perceived that having multiple cars in its fleet was "good business." *Id.* ¶48. Luxe

---

[15] *Aff'd sub nom.*, *Chao v. Mid-Atl. Installation Servs., Inc.*, 16 F. App'x 104 (4th Cir. 2001).

financed the purchase of its vehicles. *Id.* ¶55. Luxe currently owns one of its vehicles (a Lincoln Navigator) outright, with no financing obligation, and will own the other vehicles in its fleet outright once its finance payments are completed. *Id.* ¶¶57-58.  It is expected that Luxe will see its return on its investment increase substantially as its finance obligations are satisfied and it continues to collect weekly lease payments from its drivers.



.

Plaintiff Cherdoud was free as an independent contractor to purchase or finance a vehicle from whoever he wanted, and he chose to purchase his vehicle from Fred Beans and finance it through Exeter. *Id.* ¶120. Plaintiff Sabani paid $500 per week to Barry Limo, LLC to purchase a Chevrolet Suburban, and he now owns it outright. *Id.* ¶¶101, 103.

Here, like in *Silk*, *Saleem*, *Freund*, *Herman*, *Browning*, and *Dole*, the economic reality demonstrates that Plaintiffs invested heavily in their own success, and made financial commitments in an attempt to generate a "return on . . . investment." *Saleem*, 854 F.3d at 144.

### 2.    Plaintiffs Were Permitted To (And Luxe and Freemo In Fact Did) Engage Drivers To Work For Their Transportation Companies.

The engagement of "helpers" is indicative of an independent contractor relationship. *Donovan*, 757 F.2d at 1382; *Adami*, 2016 WL 1241798, at *8 (installer's ability and discretion to hire helpers if he chose, to determine how many helpers, and to determine what each would be

paid are facts indicative of an independent contractor relationship). In *Donovan*, the Third Circuit determined that individuals who distributed materials to others for work purposes were independent contractors in part because these distributors recruited their own middlemen, were responsible for paying their middlemen's expenses, and "had the authority to set the rate at which its [middlemen] would be paid." 757 F.2d at 1386. The employment of "helpers" reflects an investment by the individual who retained their services. *Adami*, 2016 WL 1241798, at *9.

Here, Luxe and Freemo engaged independent contract drivers, whose earnings Luxe and Freemo reported on IRS 1099 Forms, to provide transportation services for their companies. SOF, ¶¶60, 61, 104. Luxe's goal is to have one driver assigned to each of its vehicles. *Id.* ¶59. The number of drivers on Luxe's active roster may vary from week to week and has been as high as 14-17 drivers. *Id.* ¶60. From its inception through May 12, 2017, Luxe has had more than 50 drivers. *Id.* ¶61. When one of Luxe's drivers provides transportation services (whether using the Uber App, Blacklane, or any other lead generation source), the revenue from those services is paid to Luxe. *Id.* ¶63.[16] Luxe pays its drivers from the revenues generated from those drivers providing transportation services (whether those drivers obtain their leads using the Uber App, Blacklane, or any other lead generation source). *Id.* ¶65. ██████████████████████████ ████████████████████████████████████████.

Plaintiff Sabani has engaged up to four drivers (including himself and at times Plaintiff Cherdoud) to provide transportation services for Freemo. *Id.* ¶104. One of those drivers, Plaintiff Sabani's brother, affiliated with Freemo instead of creating his own company because he did not want to go through the hassle of satisfying the PPA requirements on his own. *Id.* ¶105.

---

[16] Luxe drivers also at times earned cash tips from riders. SOF, ¶64.

Plaintiff Sabani determines how much to pay his drivers. *Id.* ¶106. █████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ Freemo could take a fee from the money earned by his drivers, but he chooses not to. *Id.* ¶107. One of Freemo's drivers in 2016 provided transportation services only for Freemo's private trips, and did not provide any services for trip requests from the Uber App. *Id.* ¶110.

In addition to drivers, Luxe also retained an IRS Form 1099 worker to perform payroll services in 2016. *Id.* ¶69. ████████████████████████████████████

███████████████████████████████

### 3. Plaintiffs Incurred All Expenses Related To Providing Transportation Services And Operating Their Businesses.

When a driver does not provide sufficient transportation services to generate enough revenue to cover his or her lease obligation, Luxe has to cover those expenses out of its own pocket. *Id.* ¶71. While Luxe will attempt to recoup the shortfall from the driver at a later time, that is not always possible. *Id.* ¶72. When Luxe's drivers incur costs associated with parking tickets, Luxe attempts to pass the costs of those tickets to its drivers; but if the driver is no longer active, Luxe incurs the expense. *Id.* ¶73.

Luxe chose to invest in its business by paying for repairs and maintenance on its vehicles and endeavoring to have its vehicles repaired quickly. *Id.* ¶74; *compare Id.*, ¶103 (Barry Limo, LLC passed along responsibility for repair and maintenance costs to Sabani). Luxe maintains a corporate account at a nearby Goodyear to provide automotive services on its fleet of vehicles. *Id.* ¶75. Luxe also incurs expenses for maintaining its fleet of vehicles, including finance

payments, insurance, oil changes and repairs, towing expenses, maintenance, car washes, and "all kinds of professional fees." *Id.* ¶76.



Luxe also incurs expenses associated with its internet presence (*e.g.*, Yelp and Google) and its advertising. *Id.* ¶¶81, 83 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛), 85 (created a Luxe website, Facebook account, and Twitter account), 91 (Luxe engaged an internet Search Engine Optimization company at the cost of approximately $300 per month to promote its online presence). Luxe has generated its own leads through advertising. *Id.* ¶91. Luxe also purchases supplies (*Id.* ¶92), and incurs travel expenses for its business. *Id.* ¶93.

Luxe sent Plaintiff Razak's brother to Buffalo, Orlando, Miami and Tampa for the purpose of investigating the transportation business in those cities to ascertain whether there would be a "better opportunity" for Luxe in those locations. *Id.*

Luxe can control some of its costs, *e.g.*, by delaying an expensive repair or oil change. *Id.* ¶94. Other costs, however, are fixed (*e.g.*, car payments and insurance) and will be incurred even if the driver does not generate sufficient revenues to cover his or her lease obligations. *Id.* ¶95.

In addition to Luxe incurring expenses, Razak also incurs expenses in pursuing his transportation business that he wrote off on his personal taxes. *Id.* ¶96. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████.

Similarly, Plaintiffs Cherdoud and Sabani incur expenses for their businesses. In addition to paying for his vehicle, Plaintiff Cherdoud pays for his own phone, is responsible for tolls if he is not transporting a passenger, and pays for the PPA vehicle inspection. *Id.* ¶¶121-122. Plaintiff Sabani noted he had been responsible for his driving expenses (including tires, brakes, oil changes, and tolls) when he drove for Barry Limo, LLC before starting Freemo. *Id.* ¶116. █

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████.

Like many independent contractors, Plaintiffs and their companies took advantage of a tax deduction by assuming financial responsibility for their business expenses. Each Plaintiff

deducted their expenses associated with their provision of transportation services on their U.S. Individual Income Tax Return Schedule C (Profit and Loss from Business) in at least one year in which they filed a U.S. Individual Income Tax Return. *Id.* ¶¶97-99; *see Weary v. Cochran*, 377 F.3d 522, 528 (6th Cir. 2004) (reflecting profits and losses as sole proprietor on tax return evidenced independent contractor status).

### 4. Plaintiffs Marketed And Advertised Their Businesses For Purposes Of Generating Leads and Private Clients.

Investment in paid advertisements in an effort to gain more workers or business is also indicative of independent contractor status. *Donovan*, 757 F.2d 1387-88. Here, Luxe advertised and developed an internet presence in order to promote its business and generate its own leads. SOF, ¶¶81-83. For example, Luxe operated a website (luxelimousineservices.com) to advertise its transportation services, created a Facebook account, and created a Twitter account. *Id.* ¶84. Indeed, Luxe even retained a company for approximately $300 per month to enhance its web presence in 2017 so that it could generate its own leads. *Id.* ¶90. According to the Luxe website:

> Our limo service was established back in 2012 **with a dream to become the best transportation option state-wide**. We set out to achieve this by offering **our clientele** the most luxurious, reliable and safe rides around town.

> We are happy to provide you with complimentary drinks whether you're traveling to the airport, or just 5 blocks up the road. Rest assured that we'll get you there in style, glitz and comfort. **We also believe in providing the safest rides around**.

*Id.* ¶85 (emphasis added). The Luxe website stated: "We are available around the clock and unlike most other limousine services we just need 30 min and the limousine will be ready, especially if you use our book now services." *Id.* ¶86. Potential customers could submit a booking request using the Luxe website. *Id.* ¶87. Potential customers also emailed Luxe to request bookings. *Id.* ¶88. Luxe maintained its website at its expense. *Id.* ¶89. Luxe has generated its own leads through advertising. *Id.* ¶91.

Freemo also created a website to advertise its business and to generate private trip requests. *Id.* ¶111. Freemo's website states:

> Freemo Limo, LLC is a privately held, full service chauffeured transportation company . . . .
>
> . . .
>
> We provide a full complement of ground transportation solutions ***for our various clientele***. Our fleet of vehicles and experienced chauffeurs can handle all of your transportation needs, whether you're with a Fortune 500 company or a family looking for airport transportation.
>
> . . .
>
> ***\*Freemo Limo has the best prices in town.\****
>
> We do not publish our prices on the web because ***we stay so competitive in our pricing.***
>
> . . .
>
> ***We Offer Full Corporate Contracted accounts***
>
> . . .
>
> Whether you need to transport one person or 500 people, Freemo Limo can take the headache out of planning corporate transportation.
>
> ***Our fleet of vehicles from executive sedans to luxury SUV's***, and we work with you to handle all of your special needs and requests. No matter where your business is going, Freemo Limo can take you there.
>
> . . .
>
> Freemo Limo is available 24 [hours] a day, 7 days a week, 365 days a year.
>
> . . .
>
> Before our chauffeurs are hired they must pass a drug & alcohol screening test . . . Random drug & alcohol screening is performed throughout a chauffeurs [sic] tenure with Freemo. ***We train our chauffeurs*** with over 40 hours of classroom training and then on the road experience. All chauffeurs are given a 90 day probationary period. Within that time they are ***required to attend a defensive driving course*** as well as hit certain milestones in real time performance. In addition ***drivers are monitored by GPS vehicle tracking systems***. Driving speeds, idling times and locations can be ***monitored by our 24-hour dispatch team***.

Our vehicles are maintained to specific factory specifications or better to keep them in safe running condition.

. . .

**We Have The Best Professional Chauffeurs Committed To <u>Safety</u>.**

*Id.* ¶112 (emphasis added). Freemo's website solicits customers to make reservations either "online by emailing us or by calling our 24-hour service contact number." *Id.* ¶113. Freemo has also advertised on Yelp, and created a Facebook profile. *Id.* ¶115.

*Employees* do not create websites, business Facebook and Twitter profiles, or invest in other marketing in order to advertise their services; *independent contractors* do. *Donovan*, 757 F.2d 1387-88. Therefore, the economic reality of the relationship between Defendants and Plaintiffs show that Plaintiffs made significant investments in their businesses, and engaged other drivers to further aid them in generating returns. *Id.* at 1382.

The Second Circuit ruled in a materially similar factual scenario that black car drivers were independent contractors under the FLSA. *Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131, 139 (2d Cir. 2017). In *Saleem*, the court held that, "Plaintiff black-car drivers exercised their business acumen in choosing the manner and extent of their affiliation with [the defendant dispatch companies]; were able to work for rival black-car services, cultivate their own clients, and pick up street hails; made substantial investments in their businesses; and determined when, where, and how regularly to work. They owned or operated enterprises which were flexible and adaptable to market conditions . . . these driver-owners were small businessmen." *Id.* There is no material difference between the Plaintiffs here and the drivers in the *Saleem* case.

E.     **Plaintiffs And Their Companies Provide Transportation Services Procured From Multiple Lead Channels – Including From Private Clients Generated Through Plaintiffs' Skill And Initiative.**

Another way to determine whether an individual is an employee or an independent contractor is to ask whether, if their relationship was terminated, the person could go out the next day with the same vehicle, helpers, equipment, and other supplies, and immediately work for another company. *Herman*, 161 F.3d at 303 (drivers were independent contractors in part because they could work for other courier delivery systems and that demonstrated the purported employer had minimal control over the drivers); *Freund*, 185 F. App'x at 784 (when addressing the "degree of permanence of the working relationship" factor, courts consider, among other factors, the plaintiff's ability to work for other companies); *Bui v. Minority Mobile Sys., Inc.*, No. 15-21317-CIV, 2016 WL 344969, at *6 (S.D. Fla. Jan. 28, 2016) (plaintiffs could perform special transportation services for any entity that provided special transportation services, and therefore were not economically dependent on the alleged employer); *Adami*, 2016 WL 1241798, at *9 (the portable nature of an individual's investments also suggests that the individual is not tied to one revenue source, but is instead "capable of working elsewhere"); *Luxama v. Ironbound Exp., Inc.*, No. 11-2224, 2012 WL 5973277, at *7 (D.N.J. June 28, 2012); *Heningburg v. CSS Corp.*, No. 13-cv-2184, 2015 WL 13081182 (N.D. Ga. Aug. 14, 2015); *Browning*, 885 F. Supp. 2d at 593, 608 (truckers' ability to provide trucking services to other companies indicative of independent contractors). If so, the person is likely properly classified as an independent contractor.

Defendants do not prohibit transportation providers from using software applications other than the Uber App or providing transportation services to others. SOF ¶123. As a party to a Services Agreement, each transportation company has "complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide

services at any time to any third party separate and apart from Transportation Services." *Id.* ¶¶22, 24. For the sake of clarity, the Services Agreement also states that the transportation company "retains the complete right to provide transportation services to its existing customers and to use other software application services in addition to the Uber Services." *Id.* ¶27. Here, Plaintiffs confirmed that their experiences matched the contractual arrangement between the parties.

Plaintiffs' testimony establishes not only that they could go out tomorrow with the same vehicle, insurance, and cell phone and immediately provide virtually identical transportation services, but that they have already done so by simultaneously providing transportation services generated through Blacklane (in the case of Razak), Barry Limo (in the case of Sabani), Freemo Limo (in the case of Cherdoud), and private clients (all of them). In addition, approximately five to seven of Luxe's drivers, including Plaintiff Razak, signed up to use Blacklane to generate additional revenue for Luxe's business. *Id.* ¶128.

Plaintiffs are also free to source trip requests from private clients and bookings. Plaintiff Cherdoud testified that he started providing black car services outside of the Uber App in 2016. *Id.* ¶136. At first, Plaintiff Cherdoud worked with Freemo (Plaintiff Sabani's company) to handle pre-arranged trips. *Id.* ¶137. In fact, Plaintiff Cherdoud testified that almost half of his personal income in 2016 was generated from trips performed for Freemo. *Id.* ¶139. Plaintiff Cherdoud testified that he also parks next to hotels and negotiates with the doormen to have them direct hotel guests to him, and he does so while he is online on the Uber App. *Id.*

¶140. Plaintiff Cherdoud has received trip requests from the hotel doormen, and uses a Square credit card reader to process payments from the riders. *Id.* ¶141. Plaintiff Cherdoud's provision of trips outside of the Uber App demonstrates not only the transitory nature of his relationship with Defendants (*Donovan*, 757 F.2d at 1384), but also that he has used managerial skill in an effort to make additional money to earn a profit. *Donovan*, 757 F.2d at 1382.

In a similar way, Freemo also offers its transportation services to the public and outside of the Uber App (SOF, ¶¶13, 142), and Plaintiff Sabani, on behalf of Freemo Limo, has corresponded with private customers about his company's pricing for airport and local rides. *Id.* ¶143. Plaintiff Sabani has personally provided over 100 trips through Freemo, admitted that Uber placed no restrictions on his right to receive Freemo trip requests while simultaneously online on the Uber App, and has distributed rides generated outside of the Uber App to his other drivers. *Id.* ¶144. ████████████████████████████████████████████████████████████ ████████████████. If Freemo performed more than 40 trips, Plaintiff Sabani would strike some sort of deal for what to charge the private client. *Id.* The trips provided by Freemo are pre-arranged trips. *Id.* ¶146. Freemo advertised its business in 2015 using pay per click on Google, and that advertising generated phone calls for trip requests. *Id.* ¶147. As recently as 2017, Freemo has also obtained rides by handing out business cards to hotels that say Freemo Limo Transportation Service. *Id.* ¶148. Freemo was paid in cash or using the Square payment processing tool for trips its drivers performed outside of the Uber App. *Id.* ¶149.[17] ████████

---

[17] As another example, Kevin Bryant is an independent transportation provider who has received leads from the UberBLACK product in Philadelphia. SOF ¶150. In addition to providing transportation services for riders he connects with using the Uber App, Mr. Bryant also provides transportation services using the Lyft software application (*Id.* ¶152), and has done so while online on the Uber App. *Id.* ¶¶151-155.

███████████████████████████████████████

███████████████████████████████████

As the plaintiffs were able to do in *Saleem*, Plaintiffs here operate transportation companies that could (and did) shift their services from one lead generation source to another without input or permission from Defendants, depending on what Plaintiffs felt would be most beneficial to their business interests. *Saleem*, 854 F.3d at 142. Plaintiffs merely accessed and leveraged the Uber App much like they did the Blacklane App, the Waze App, or MapQuest. Each piece of technology enabled them to offer their transportation services more efficiently to the riders they sought to transport. The fact that Plaintiffs could (and did) provide transportation to private clients and to clients identified through other lead generation sources (such as Blacklane), while simultaneously maintaining without penalty their ability to use the Uber App to generate leads, conclusively demonstrates that Defendants exercised minimal control over Plaintiffs. *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *Saleem*, 854 F.3d at 141 ("First, on its face, a company relinquishes control over its workers when it permits them to work for its competitors. Second, when an individual is able to draw income through work for others, he is less economically dependent on his putative employer."). This lack of control weighs in favor of independent contractor status. *Saleem*, 854 F.3d at 141-42 (citing *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015) ("If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor."); *Herman*, 161 F.3d at 303 (same); *Kirsch v. Fleet Street, Ltd*., 148 F.3d 149, 171 (2d Cir. 1998) (affirming finding of independent contractor status when, inter alia, the worker "was allowed to sell merchandise on behalf of other companies")).

Plaintiffs' efforts also show that whatever the "permanence" or duration of their affiliation with Defendants, both its length and the regularity of work was entirely of Plaintiffs' choosing. *Saleem*, 854 F.3d at 147. In *Heningburg v. CSS Corp.*, the court determined that the plaintiff sporadically accepted assignments of limited duration, could work for competing companies, could reject an assignment for any reason, had little contact with the alleged employer between assignments, and therefore the plaintiff lacked the "permanence of relationship" that is indicative of an employee. 2015 WL 13081182, at *10. As reflected above, Plaintiffs interact with Uber in precisely the same manner. Therefore, Plaintiffs, like the plaintiff in *Heningburg*, lacks the "permanence of relationship" that is indicative of an employee.

Plaintiffs' efforts to seek out trip requests, choose between options, and provide transportation services to riders from other lead sources also demonstrates Plaintiffs' skill, business judgment, and initiative. *Donovan*, 757 F.2d at 1382-83; *Adami*, 2016 WL 1241798, at *8 ("When workers can exercise 'initiative, business judgment, or foresight in their activities," they are more likely to be found independent contractors rather than employees."). "In ascertaining worker status, courts should consider whether, in the larger picture, workers have the skills necessary to locate and manage discrete work projects characteristic of independent contractors, or whether the skills are of the task-specific, specialized kind that form a piece of a larger enterprise, suggesting employee status." *Li*, 2012 WL 589567, at *8 (citation and quotations omitted). Here, Plaintiffs not only have the skills necessary to locate and manage multiple discrete work projects from multiple sources, but they have also successfully exercised those skills to generated revenues that would not otherwise be available to them if they limited their services to transporting riders through the Uber App.

**F.      Plaintiffs Determine When, Where, And How Regularly To Provide Transportation Services, Regardless Of Lead Generation Source.**

In addition to the freedom to use alternate lead-generation methods identified above, Plaintiffs' testimony shows they also wielded considerable independence and discretion during those times they chose to use the Uber App. A worker's ability to choose when, where, and how much to work weighs in favor of independent contractor status. *See Herman*, 161 F.3d at 304 ("Voluntarily adhering to one's own set schedule does not render one an employee," and plaintiffs' "complete freedom regarding the days and times that they would operate their vehicles for defendant is indicative of independent contractor status); *Arena v. Delux Transp. Servs.*, Inc., 3 F. Supp. 3d 1, 10-11 (E.D.N.Y. 2014) (noting fact "that Defendants had little control over when Plaintiff drove, how much he dr[o]ve, or how frequently" "very persuasive[ly]" supported independent contractor status); *Berger Transfer & Storage v. Cent. States, Se. & Sw. Areas Pension*, 85 F.3d 1374, 1378 (8th Cir. 1996) (affirming finding of independent contractor status based in part on "considerable autonomy regarding when and how long they would work" under common law agency test); *cf.*, *Arena v. Plandome Taxi Inc*., No. 12 CV 1078 DRH WDW, 2014 WL 1427907, at *5 (E.D.N.Y. Apr. 14, 2014) (noting fact that transportation company "dictated the hours the drivers worked, and required the drivers to work on holidays" supported employee status). "[E]vidence relevant to evaluate this factor includes the degree of supervision over the worker, control over the worker's schedule, and instruction as to how the worker is to perform his or her duties." *Crump*, 2016 WL 6962532 at *4 (citing *Bamgbose v. Delta-T Grp., Inc*., 684 F. Supp. 2d 660, 669 (E.D. Pa. 2010) (citation omitted).

Here, Plaintiffs had the unfettered right to choose when to go online and offline, could unilaterally reject and cancel trip requests without penalty, set their own schedules, and take vacations without communicating with or asking permission from Defendants.

### 1.  Plaintiffs Control When To Go Online And Offline, And Where To Offer Their Services While Online On The Uber App.

To access the Uber App, transportation providers open the app on their mobile device and log in using their username and password. SOF, ¶156. After logging on, transportation providers tap a button to go online and become eligible to receive trip requests. *Id.*, ¶157. Once online, there is no requirement that the driver be engaged with the Uber App in order to stay online. *Id.*, ¶162. Neither the Services Agreement nor Driver Addendum requires Plaintiffs to work a set schedule or certain number of hours, or contractually guarantees any number of trip requests will be offered to Plaintiffs. In fact, independent transportation companies acknowledge and agree in the Services Agreement that:

> (a) Customer and its Drivers are solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services; and (b) except for the Uber Services or any Uber Devices (if applicable), Customer shall provide all necessary equipment, tools and other materials, at Customer's own expense, necessary to perform Transportation Services.

*Id.*, ¶22. This freedom is indicative of an independent contractor relationship, and entirely inconsistent with being an employee. *See Browning*, 885 F. Supp. 2d at 593, 608 (drivers were independent contractors where, among other factors, contractual agreements entered into between plaintiff-drivers and defendant company guaranteed no certain amount of work to plaintiffs, and defendant company guaranteed no amounts of work).

Defendants do not require Plaintiffs to remain on Uber's premises, physically or virtually (*i.e.*, by being online on the Uber App). *Id.*, ¶158, 186, 188. Defendants do not control the number of trip requests that are generated by riders or the number of requests Plaintiffs will receive, schedule start or stop times for Plaintiffs, or require them to work for a set number of hours. *Id.* ¶163, 189.

Instead, trip requests are determined by the number of riders searching for rides, the number of other drivers who are available, and the location of the rider and driver. *Id.* ¶164. Plaintiffs may increase their earning opportunities if they are strategic about the frequency with which they make themselves available online, the times they go online, how long they remain online, the locations they position themselves while online, and which leads to accept and from which source. *Freund*, 185 F. App'x at 783 (independent contractor status supported where the workers had an ability to earn greater sums of money by accepting more jobs, performing more efficiently, and hiring employees); *Dole*, 729 F. Supp. at 77 (fact that installers could earn more or less money depending on their initiative in arriving at the cable company's offices early enough to get good routes, and their ability and willingness to work longer hours and complete jobs more quickly was an indicia of independent contractor status); *Hodgson v. E. Falls Sand & Gravel Co.*, No. 69-407 CIVIL, 1972 WL 952, at *4 (M.D. Pa. Aug. 30, 1972) (truck driver was an independent contractor where his opportunity for profit and loss depended to a large extent on size and number of trucks he owned and number of trips he was willing to take); *Browning*, 885 F. Supp. 2d at 608 (opportunity for profit or loss indicated independent contractor status where whether drivers "made more money or less money depended largely on their investment . . . [and] increas[ing] their efficiency and capacity").

Plaintiffs admit that they made themselves available to accept trip requests and actually accepted or rejected trip requests on their own schedule, working as many or as few hours and accepting or rejecting as many or as few trip requests as they believed would be most beneficial to them. Plaintiff Razak conceded that he was able to go offline whenever he wanted, that he could go offline forever, and that he can stay online as long as he wants. *Id.*, ¶¶158-161.

Plaintiffs' testimony is therefore consistent with the agreements they reached with Defendants, and further demonstrates that they operated independent of Defendants.

Perhaps most significantly, Plaintiffs have the right to unilaterally stop receiving trip requests by exercising their unilateral right to go offline. Here, Plaintiffs regularly exercised their right to go offline, thereby indirectly rejecting all trips that might have been offered to them through the Uber App. This Court has also previously identified as material and undisputed the fact that there is nothing Defendants can do to force additional transportation providers to go online on the Uber App, even if it means rides requested through the Uber App go unfulfilled. *Id*., ¶¶169-170.

This Court has also identified the following as undisputed material facts that demonstrate Plaintiffs, not Defendants, controlled where Plaintiffs could use the Uber App and what they could do while online:

- For drivers registered with UberBLACK in Philadelphia, the requesting rider must be located within Philadelphia. The driver, however, may be *anywhere he chooses*.

- Ultimately drivers *independently decide* where to go while Online, and drivers are *free to ignore* any and all information conveyed to them by Uber.

- Uber places *no restrictions on drivers' ability to engage in personal activities* while Online, and *Plaintiffs here, in fact, engaged in a range of personal activities while Online*.

*Id.* ¶175-177 (emphasis added).  While online waiting for a trip request, transportation providers are free to run their own personal transportation companies, distribute trips to other drivers, and send e-mails advertising their personal limousine companies. *Id.* ¶¶178-179.

As a matter of economic reality, Defendants exercise no material control over how Plaintiffs spend their time and how they provide transportation services. *Donovan*, 757 F.2d 1386.

### 2. Plaintiffs Have The Right To Unilaterally Reject And Cancel Trip Requests Without Penalty.

Courts have consistently held that workers with the ability to reject assignments without penalty are independent contractors under the economic realities test. *Gate Guard Servs., LP v. Solis*, No. V-10-91, 2013 WL 593418 (S.D. Tex. Feb. 13, 2013) (ability to reject assignments without penalty is relevant to the "control" factor in FLSA economic realities test); *Browning*, 885 F. Supp. 2d at 608; *Herman*, 161 F.3d at 303 (defendant did not have sufficient control over drivers because they can reject deliveries without retaliation). *Cf. Scantland*, 721 F.3d at 1313 ("while technician might consider a specific route or work order unprofitable, because, for example, it was low-paying or far away, plaintiffs had no power to decline the assignment"). Here, there is perhaps no more powerful right to reject work than Plaintiffs' ability to decide ***not to work at all***, which right Plaintiffs have regularly exercised.

Even when responding to trip requests received from the Uber App, this Court identified the following undisputed material facts that demonstrate that Plaintiffs' time is not controlled or required by Defendants:

- If a driver ***chooses*** to accept a trip request, the driver taps "accept." SOF, ¶180 (emphasis added).

- ***Uber cannot require any driver to accept a trip***. *Id*. at ¶166 (emphasis added).

- Drivers ***are free to reject*** trip requests ***for any reason***. *Id*. at ¶165 (emphasis added).

- If not accepted, the request will then be offered to another online transportation provider. *Id.* ¶167.

- A trip request is sent to only one Uber driver at any given time, and having drivers who do not intend to give rides being online slows down the process of connecting riders and drivers, and leads to a poorer user experience for riders. *Id.* ¶168.

- If no other transportation provider is available or accepts, the trip request goes unfulfilled. *Id.* ¶169.

- Plaintiffs have not personally been penalized for their respective acceptance rates, or for failing to accept rides. ***This court has not been presented with evidence that***, in practice, Uber imposed ***any consequences*** for drivers' acceptance rates. *Id*. at ¶171 (emphasis added).

- There is no dispute that Plaintiffs ***never suffered any consequences*** for cancelling trips. This court ***has not been presented with any evidence*** that, in practice, Uber imposed ***any consequences*** for drivers' cancellation rates. *Id*. at ¶171-174 (emphasis added).

- Drivers ***are free to cancel trips*** even after they have accepted them, which Plaintiffs testified ***they have done on numerous occasions***. *Id*. at ¶172 (emphasis added)

In fact, it has already been established in this case that "[w]hile online, Plaintiffs, inter alia, accepted rides from private clients, slept, did personal errands, smoked cigarettes, took personal phone calls, rejected trips because they were tired, and conducted business for their independent transportation companies." *Id*. ¶181. These are all personal pursuits that inured to Plaintiffs' interest and benefit.

All of this personal freedom was known to Plaintiffs at the time their companies signed up to access the Uber App, and nothing has changed. The agreements between Plaintiffs' companies and Defendants, as well as the agreements between Plaintiffs and their companies, expressly provide that Plaintiffs may accept, reject, cancel or even ignore trip requests as they saw fit, and that they had no obligation to accept any trip request. *Id*. ¶22, 24. As this Court has determined, Plaintiffs testified that their experiences are consistent with their agreements. *Id*. ¶165, 171, 172.[18]

---

[18] By way of another example, one transportation provider testified that he is a Certified Public Accountant (CPA), and he goes online while he is performing his CPA work. SOF ¶182. While online, he continues doing his CPA work such as tax returns and audits. *Id*. The transportation provider testified that Uber does not control him while he is online on the Uber App. *Id*. ¶183. If he receives a trip request, and he's not otherwise in a client meeting or busy with something, he decides whether accept the request. *Id*. ¶182. He said he has the right to reject and decline trip requests that he receives from the Uber App without penalty. *Id*. ¶183. Uber has never assigned or required him to work in a specific geographical area, and he is free to leave his house and to provide his services wherever and whenever he chooses to. *Id*. Although he works in King of

As a matter of economic reality, Plaintiffs' ability to accept or reject varying numbers of trip requests (or to avoid trip requests altogether by going offline) is "indicative of the discretion and independence associated with independent contractor status." *Saleem*, 854 F.3d at 147; *Berger Transfer & Storage*, 85 F.3d at 1378 (affirming district court finding that it was indicative of independent contractor status that long-distance truckers could and did refuse assignments without penalty); *Herman*, 161 F.3d at 303 (noting that couriers' ability to reject job offers "without retaliation" was indicative of independent contractor status). This power lies at the heart of what it means to be an independent contractor and demonstrates that Plaintiffs are not controlled by Defendants. A contractor can choose to take a job or not, to cancel a job after accepting, and to determine when and how they will complete that job. In contrast, employees do not have the right to decide whether they will work for an employer at all, for 5 minutes, 2 hours, or 12 hours during the day, to change their mind at any point and with no notice, to decide what activities they will do and not do while they are "working," and to decide when they have done enough work for the day that they can "log off" and go offline from their office or computer. The reason is because employees work based on the needs (and at the command) of the business, such that the time they spend at work – whether in an office or tethered to a computer – is not their own, but rather spent for the benefit of the employer. In contrast, there is no dispute that Plaintiffs had the unfettered ability to do what employees cannot—that is, to make their own schedule or to choose no schedule at all. Although Plaintiffs testified that they frequently chose to make themselves available by going online and monitoring the Uber App for trip requests, the determinative fact is that they had the power to choose – both before and after they went online on the Uber App. There is no dispute about this unilateral power to choose.

---

Prussia, Pennsylvania as a CPA, he chooses to make himself available to drive in the downtown Philadelphia area where he believes that there is a higher demand for limousine services. *Id*.

**3.      Plaintiffs Set Their Own Schedule (Or No Schedule) And Took Vacations Without Ever Communicating With Or Asking Permission From Defendants.**

Particularly relevant to the control factor is whether a worker is "free to set his own schedule and take vacations when he wished." *Kirsch v. Fleet Street, Ltd*., 148 F.3d 149, 171 (2d Cir. 1998); *Herman*, 161 F.3d at 303 ("The district court found that Express had minimal control over its drivers. We agree. The drivers set their own hours and days of work. . ."). In *Herman*, the district court found – and the appellate court affirmed – that the drivers ability to set their own hours and days of work demonstrated that the company had minimal control over its courier delivery drivers. 161 F.3d 299 (5th Cir. 1998).

By contrast, in *Alexander v. FedEx Ground Package Sys.*, the court found that the drivers had virtually no latitude regarding when or where they worked and what they did. 765 F.3d 981, 984-85 (9th Cir. 2014) (finding delivery drivers were employees). According to the court: (1) drivers were assigned packages for delivery and they had to deliver every assigned package within a specific time window that the company negotiated with its customers; (2) drivers had to deliver packages every day the company was open for business during daytime hours; and (3) managers scheduled drivers' workloads to require between 9.5 and 11 hours of work each working day. *Id*. at 984-85. The court found that the company even controlled the appearance of its drivers, "from their hats down to their shoes and socks." *Id*. at 989.

Similarly, in *Scantland*, the technicians had to report to work at a certain time each morning, worked five to seven days per week, had to notify their supervisors to request time off in advance, received a route detailing their assignments, might have to stay on the job until all others had completed work in their area, could be called back to jobs, could not work for other companies, were subject to meaningful supervision and monitoring by company managers, routinely communicated with company dispatch throughout the day, had to log in and out of a

work force management system, had their work reviewed and cite checked for quality control by the company, might receive counseling regarding his physical appearance or the appearance of his vehicle, and might be fined for not meeting work specifications. 721 F.3d 1308, 1313-15 (11th Cir. 2013).

In *Dole v. Snell*, the plaintiff cake-decorators' schedules were "totally controlled" by their employer: they were expected to arrive at the premises at a particular hour, prevented from leaving until they had decorated all the cakes to their bosses' satisfaction, and required to seek their employer's approval for vacation. 875 F.2d 802, 806 (10th Cir. 1989). In short, "[t]he demands of the business controlled the [workers' schedule]." *Dole*, 875 F.2d at 806.

The control and right of control exercised in *Alexander*, *Scantland*, and *Dole* approximates nothing in the relationship between Defendants and Plaintiffs. Here, Plaintiffs' schedules with regards to providing transportation services were not merely "relatively flexible," *Doty v. Elias*, 733 F.2d 720, 723 (10th Cir. 1984) (emphasis added), but rather were entirely of their making. This Court has already held that, as in *Kirsch* and *Herman*, Plaintiffs set their own schedules and worked different schedules for purely personal reasons. SOF, ¶189 (Plaintiffs did not have "a schedule, crafted by the [Defendants], in which the [Plaintiff] was obligated to spend time working an expressly delineated shift or period of being on-call."). Indeed, Plaintiff Cherdoud testified that it did not matter what his hours were using the Uber App. *Id*. ¶187. Plaintiff Razak testified that each driver "schedules himself" and that he left the country for two months in 2017, and he did not have to ask permission from Uber to go offline for that long. *Id*. ¶184, 190. *Of course* he did not have to ask permission from Uber to go offline and leave the country—as an independent contractor he is not beholden to Uber. The demands of Uber's business did not control when Plaintiffs worked. On the contrary, Plaintiffs used the Uber App

***when it was convenient for them*** and their business pursuits. *Id*. ¶191. The freedoms that indisputably exist for transportation providers who use the Uber App stand in stark contrast to the control exercised over workers in cases where an employment relationship was found.[19]

Plaintiffs' relationship was marked by choice and independence, rather than requirements and restrictions. Therefore, Plaintiffs' unfettered ability to choose whether and when to make themselves available for work (and to then choose how much to work to accept) weighs in favor of independent contractor status.[20]

### G.   Plaintiffs' Managerial Skill And Entrepreneurial Effort Directly Impacted, And At Times Entirely Dictated, Their Opportunity For Profit Or Loss.

One economic reality factor considered by courts is "the alleged employee's opportunity for profit or loss depending upon his managerial skill." *Donovan*, 757 F.2d at 1382. This factor centers on whether Plaintiffs had meaningful opportunities for profit or any significant risk of financial loss, depending upon his managerial skill. *Martin*, 949 F.2d at 1294; *Li v. Renewable Energy Solutions, Inc.*, No. 11-3589, 2012 WL 589567, at *8 (D.N.J. Feb. 22, 2012) (worker may have the opportunity for profit or loss if his earnings are tied to his performance, or if he makes a capital investment that may be lost if the business does not succeed). The receipt of a

---

[19] Plaintiffs' relationship with Defendants is similar to the delivery drivers' relationship with the delivery company the Fifth Circuit determined to be that of an independent contractor in *Herman*. The case that Plaintiffs are independent contractors is even stronger here, however, than in *Herman*, where the drivers were encouraged to wear uniforms or become notaries for the benefit of the company, and were also *required* to be on-call.

[20] Plaintiffs make much ado about the number of hours they made themselves available for trip requests. However, just because Plaintiffs made themselves available to provide services, does not mean they had to do so, or in any way demonstrate that they were controlled by Defendants during these periods of time. *See, e.g.*, *Freund*, 185 Fed. App'x at 784 ("Just because Freund worked six days a week does not mean that he had to"). Under Plaintiffs' argument, a worker could force himself into the role of an "employee" simply by showing up or being available for work. This would clearly lead to a perverse result that is not permitted by the FLSA. *See also id*. ("Under Freund's logic, we would be compelled to determine, in another type of case, that a firm did not give sick days if the employee never took them.").

regular salary of a set amount indicates an employer-employee relationship, whereas a worker who is paid per project may be considered an independent contractor. *See Luxama*, 2012 WL 5973277, at *5. In addition, Plaintiffs' investment in their business is also relevant to the economic reality factor related to Plaintiffs' opportunity for profit and loss. *Saleem*, 854 F.3d at 144, n.29. "Economic investment, by definition, creates the opportunity for loss, but investors take such a risk with an eye to profit." *Id.*

Here, Plaintiffs' managerial skill, entrepreneurial efforts, and investments in their businesses directly impact their opportunity for profit or loss. Plaintiffs understood that any profit they would ultimately realize depended on the earnings they generated from providing transportation services (and in the case of Luxe, the revenues generated from lease payments), less the expenses they incurred in operating their businesses.[21]

For example, Luxe generates revenue from charging its drivers (including Razak) a weekly lease payment amount for the use of one of the vehicles in its fleet (*Id.* ¶¶193-194, 204), and these lease payments are the primary source of profit for the company. *Id.* ¶195. In fact, "Luxe doesn't care if the driver just parks the vehicle in their garage and never does any trips at all, as long as they make their weekly lease payments." *Id.* ¶196. Luxe's business model contemplates that it will lease the vehicles in its fleet to other drivers at a weekly lease amount that will exceed the expenses associated with maintaining the vehicles (*e.g.*, finance payments, insurance payments, repairs and maintenance, oil changes, etc.), and that this excess amount will represent Luxe's profit from the operation of its business enterprise. *Id.* ¶197.

By acquiring more vehicles, it was Luxe's objective to generate more revenue by having more drivers pay more leases. *Id.* ¶198. In setting the lease amounts, Luxe seeks to strike the

---

[21] Plaintiffs' earnings were generated by the job. SOF, ¶192. They are not paid an hourly wage or on a salary basis. *Id.*

right balance between covering its expenses, attracting drivers, and making a profit. *Id.* ¶199. For example, the lease amount cannot be so low that Luxe is not making a profit (*Id.*), and it cannot be so high that drivers will not want to lease its vehicles. *Id.* Luxe also sets the amount of the weekly lease payments owed by its drivers based in part on market conditions. *Id.* ¶200. Luxe and its drivers discuss these issues with each other in an attempt to reach agreement on an appropriate weekly lease amount. *Id.* ¶201. ██████████████████████

████████████████████████████████████████████████████

███████████████████████ When other vehicles were being refinanced to lower rates (thereby leading to lower lease payments but extending the lease term), Plaintiff Razak elected to not refinance his vehicle, and to continue to make higher lease payments instead; this will result in his vehicle being paid off more quickly. *Id.* ¶205. Even though the Lincoln Navigator is owned outright by Luxe, the driver who uses it to provide transportation services (not one of Luxe's owners) continues to pay a weekly lease to Luxe. *Id.* ¶206. ██████████████████████

████████████████████████████████████████████████████

███████. Luxe's managerial skill and business judgment with regards to its lease payment charges are economic indicators of being an independent contractor rather than an employee. *Donovan*, 757 F.2d at 1381.

Luxe also "competes" against other corporations to attract drivers who may wish to lease vehicles from them to provide transportation services. SOF, ¶209. Luxe believes that a limousine company's ability to move more quickly to repair and maintain vehicles would be appealing to drivers. *Id.* ¶214. Luxe moves quickly in part because if one of its vehicles needs to be repaired, no one will lease it from Luxe and it will not generate any revenue for the company. *Id.* ¶215. Luxe also believes that other limousine companies may not generate enough revenue to cover the

expenses associated with operating the business, which might not be appealing to potential drivers. *Id.* ¶216.  Another reason Luxe believes that drivers will switch partner corporations is that they wish to lease a different vehicle that their current partner corporation does not have available in its fleet. *Id.* ¶210. For example, Plaintiff Razak testified that some drivers prefer SUVs, thinking they might obtain more trip requests. *Id.* ¶211. ████████████████████ ████████████████████████████████████████████████ . When Luxe acquired one of those SUVs, it negotiated with one of its existing drivers to change his lease from a sedan to the SUV, even though it meant that the driver's weekly lease payment would increase. *Id.* ¶213. Thus, Luxe's managerial decisions, and the skills and ability exercised in support of those decisions, directly and materially impact its profitability.

As noted above related to Freemo's and Milano's financial investment in vehicles and their methods of employing drivers and sourcing trip requests for transportation services, they also exercised managerial skill and business judgment in an effort to generate profits. *Saleem*, 854 F.3d at 145, n.29. ("a personal stake can create incentives for the exercise of 'independent initiative,' *see Superior Care, 840 F.2d at 1058–59*, so as to recover one's investment").

Because Plaintiffs were free under their agreements to branch out on their own, to drive for other companies, and to provide services to private customers, the degree to which Plaintiffs' expenditures yielded returns was a function of the business acumen and "courage" of each Plaintiff. Again, these facts demonstrate the economic reality that Plaintiffs invested heavily in their own success and had significant control over "essential determinants of profits in [their] business." *Saleem*, 854 F.3d at 145.

## IV.   CONCLUSION

The circumstances surrounding Plaintiffs' relationship with Defendants show they operated as independent business owners and not as Defendants' employees. Plaintiffs' FLSA

45

and PMWA claims against Defendants fail as a matter of law because they were not employed

by Defendants. Defendants respectfully request that the Court enter an order granting summary

judgment in Defendants' favor, dismissing this action in its entirety and with prejudice.


Dated: January 26, 2017

Respectfully submitted,

*/s/ Joshua C. Vaughn*

Paul C. Lantis (PA #309240)
Wendy Buckingham (PA #320259)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102-1321
Telephone: (267) 402-3073
Facsimile: (267) 402-3131
PLantis@littler.com

Robert W. Pritchard (PA #76979)
Joshua C. Vaughn (PA #203040)
**LITTLER MENDELSON, P.C.**
625 Liberty Avenue
26th Floor
Pittsburgh, PA 15222
Telephone: (412) 201-7628
Facsimile: (412) 774-1957
RPritchard@littler.com
JVaughn@littler.com

Andrew M. Spurchise (admitted *pro hac vice*)
**LITTLER MENDELSON, P.C.**
900 Third Avenue
8th Floor
New York, NY 10022
Telephone: (212) 583-2684
Facsimile: (212) 832-2719
ASpurchise@littler.com

Niloy Ray (admitted *pro hac vice*)
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136
Telephone: 612.630.1000
nray@littler.com

Sophia Behnia (admitted *pro hac vice*)
**LITTLER MENDELSON, P.C.**
333 Bush Street
34th Floor
San Francisco, CA 94104
Telephone: 415.276.2561
*sbehnia@littler.com*

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC and
GEGEN, LLC

## <u>CERTIFICATE OF SERVICE</u>

I, Joshua C. Vaughn, hereby certify that on this January 26, 2017, I caused the foregoing

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT to be filed using the Eastern District of Pennsylvania's ECF system, through which

this document is available for viewing and downloading, causing a notice of electronic filing to

be served upon the following counsel of record:

John K. Weston, Esquire
Jeremy E. Abay, Esquire
Sacks Weston Diamond, LLC
1845 Walnut Street, Suite 1600
Philadelphia, PA 19103

*Attorneys for Plaintiffs*

*/s/ Joshua C. Vaughn*

Firmwide:150226431.6 073208.1134