# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALI RAZAK, KENAN SABANI, and      :
KHALDOUN CHERDOUD, individually    :
and on behalf of all others similarly     :     Case No. 16-0573
situated,                            :
                                :     Judge Michael M. Baylson
           Plaintiffs,          :
                                :
    v.                               :
                                :
UBER TECHNOLOGIES, INC. and       :
GEGEN LLC,                        :
                                :
           Defendants.       :
                                :

## DEFENDANTS' REVISED REPLY TO PLAINTIFFS' STATEMENT OF FACTS OPPOSING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and this Court's Chamber Rules, Defendants Uber Technologies, Inc. and Gegen LLC ("Defendants"), by and through their undersigned attorneys, submitted Defendants' Statement of Undisputed Material Facts ("SOF") and record evidence in support of their SOF (Dkt. 115) on January 30, 2018. Plaintiffs filed their Answer in opposition, including Plaintiffs' Statement of Facts Opposing Defendants' Motion for Summary Judgment on February 26, 2018. (Dkt. 117-3). Defendants hereby file and serve the following Reply to Plaintiffs' Statement of Facts Opposing Defendants' Motion for Summary Judgment ("PSOF"). All admissions or denials herein are for the sole purposes of the present summary judgment motion only.

Here, Plaintiffs expressly identify the facts presented in the following paragraphs in Defendants' SOF as undisputed: ¶¶ 4, 5, 6, 7, 8, 10, 15, 16, 22, 24, 26, 27, 28, 29, 30, 31, 32, 33, 35, 36, 41, 42, 43, 47, 48, 49, 50, 51, 52, 54, 56, 57, 58, 68, 69, 70, 73, 75, 78, 79, 80, 81, 83, 84, 85, 86, 87, 88, 89, 90, 92, 93, 97, 98, 99, 100, 101, 102, 103, 104, 109, 111, 112, 113, 114, 115,

116, 117, 118, 119, 121, 122, 123, 125, 129, 132, 133, 134, 137, 140, 141, 142, 143, 145, 146, 147, 149, 156, 157, 161, 166, 167, 168, 169, 178, 179, 180, 181, 184, 185, 186, 193, 195, 198, 202, 203, 204, 205, 206, 207, 208, 210, 211, 212, 213, 214, 215, and 216. Thus, these facts are admitted for purposes of Defendants' Motion for Summary Judgment.

Most of Plaintiffs' other responses are comprised of mischaracterizations of the record and/or outright non sequiturs. For example, Defendants' first statement of fact consisted of the unremarkable assertion that Luxe, Freemo and Milano "are business entities owned and operated by the named Plaintiffs." Def. SOF ¶ 1. This statement of fact was a direct quote from a motion previously filed by Plaintiffs' counsel in this case. *See* Motion to Quash, ECF 100-1 at 3 n.2. Amazingly, Plaintiffs nonetheless disputed this statement by stating that "Uber requires all UberBLACK drivers to be associated with such a corporation in order to gain access to the Uber App." Plaintiffs' SOF Response, ECF 117-3 at ¶ 1. Of course, whether drivers need to be associated with a corporation in order to utilize the Uber App is not at all responsive to the straightforward statement that Luxe, Freemo and Milano "are business entities owned and operated by the named Plaintiffs." Def. SOF ¶ 1. Plaintiffs' response to Defendants' statement of facts is replete with similar examples of Plaintiffs' refusal to directly address Defendants' factual averments, as required by Rule 56(c); these are identified in detail in Defendants' accompanying reply to Plaintiffs' response to Defendants' statement of facts.[1] In any event, the new factual assertions and arguments interspersed among Plaintiffs' responses to Defendants' statement of facts (many of which lack supporting record evidence) do not change anything about the undisputed nature of the facts as set forth in Defendants' statement. Pursuant to Rule 56(e), the

---

[1] This is not the first time that Plaintiffs failed to adhere to the rules with respect to their response to a statement of facts. *See* Order, ECF 79 ("Plaintiffs have not provided record support for many of Plaintiffs' asserted disputed facts, as required by both Rule 56 and this Court's practice Order."); Opinion, ECF 93, at 5 n.4 (striking Plaintiffs' improper "additional facts").

averments in Defendants' statement of facts should be taken as undisputed for purposes of Defendants' motion.

For the Court's convenience, Defendants set forth their statement of facts below; each statement is followed immediately by Plaintiffs' response to that statement; and each such response (if anything other than an unqualified admission) is followed immediately thereafter by Defendants' reply.

1.      Luxe Limousine Services, Inc. ("Luxe"), Freemo Limo, LLC ("Freemo"), and Milano Limo, Inc. ("Milano") "are business entities owned and operated by the named Plaintiffs." Memorandum of Law in Support of Luxe Limousine Services, Inc., Freemo Limo, LLC, and Milano Limo, Inc.'s Consolidated Motion to Quash Defendants' Subpoenas ("Motion to Quash") (ECF 100-1) at 3 n.2; *see also* Exhibit 29, Transcript of Hearing (Oct. 18, 2017) at 4:20-23 (confirming that Luxe, Freemo and Milano are "owned by these Plaintiffs").

**Plaintiffs' Response:** Disputed. This statement, as worded by the Defendants, mischaracterizes material facts. These corporations were setup pursuant to Uber's rules and requirements; specifically, Uber requires all UberBLACK drivers to be associated with such a corporation in order to gain access to the Uber App. *See* Jan. 4, 2018 Cherdoud Dep. at 10:8-18, 20:2-5, 46:15-18; Jan. 4, 2018 Sabani Dep. at 9:23-10:7; Jan. 3, 2018 Umer Razak Dep. at 23:17-24:5; Jan. 3, 2018 Ali Razak Dep. at 112:6-18. In fact, Uber referred all three Plaintiffs to the same accounting firm – Amara & Associates – for this very reason. *See* Amara & Associates Correspondence.  According to Plaintiff Cherdoud, this accounting firm was paid by Uber to setup Milano Limo, Inc. *See* Jan. 4, 2018 Cherdoud Dep., Ex. 1 at 39:18-40:21.

**Defendants' Reply:** Plaintiffs' response fails to properly address the factual assertions in Paragraph 1 that plaintiffs own and operate their respective limousine companies, facts that are

beyond dispute in this case. *See*, Plaintiffs' responses to paragraphs 5 (undisputed that "Luxe is owned by Plaintiff Razak and his brother"), 15 (undisputed that "Plaintiff Sabani is the sole owner of Freemo"), and 16 (undisputed that "Milano is a 'sole proprietorship' that is 'owned by Mr. Cherdoud.'"). Instead, Plaintiffs seek to add facts related to the alleged reasons why their corporations were set up and who did their accounting. Plaintiffs' additional immaterial averments do not create a genuine dispute with regards to the facts set forth in Paragraph 1. As such, paragraph 1 is **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3).

2.      These "business pursuits" (which Plaintiffs refer to as "their personal businesses") are "outside of Uber." Motion to Quash (ECF 100-1) at 9 & 15.

**Plaintiffs' Response:** Disputed. These quotes are taken out of context. When the Plaintiffs work as UberBLACK drivers, they are incontrovertibly operating within Uber's system under Uber's rules. *See* Uber's Driver Deactivation Policy, ECF 68-8 ("soliciting payment of fares outside the Uber system" leads to deactivation) ("activities conducted outside of Uber's system – like anonymous pickups - are prohibited"); s*ee also* Uber's Community Guidelines, ECF Nos. 68-5, 68-6 and 68-7 ("collusion between rider or driver" results in account deactivation); *see also* Owner/Operator Agreement, ECF 15-2 at p. 62 ("you understand that you shall not, during the term of this Agreement, use your relationship with Gegen (or the information gained therefrom) to divert or attempt to divert any business from the Company to a competitive transportation broker, or any transportation provider"); *see also* Sept. 26, 2016 Uber Support Email to Sabani (notifying Sabani that he is subject to "permanent removal" from the App for messaging clients to "solicit rides outside of the platform").

Furthermore, whenever the Plaintiffs are working as UberBLACK drivers, they are

operating under Gegen's certificate of public convenience with the Philadelphia Parking Authority, and are covered by Gegen's insurance policy. *See, e.g.,* May 2, 2017 Holtzman-Conston Dep. at 30:10-34:11 and 20:15-21:5 (regarding Gegen insurance and automatic deductions for insurance premiums) (regarding PPA compliance). Furthermore, the driver's vehicle is registered to Gegen for this purpose. *See* Cherdoud and Gegen's Annual Vehicle Lease Agreement. Accordingly, Uber pays for the driver's insurance and vehicle then recoups that money by deducting it from the driver's weekly earnings with Uber. *See* Sample Pay Statements. Uber makes these deductions every week regardless of whether the driver earns enough money to cover the expenses. *Id.* (showing $3.72 in net weekly earnings for the driver after Uber paid, and thus deducted, $366.82 for the vehicle's lease and insurance).

 **Defendants' Reply:** Plaintiffs' response fails to properly address the factual assertions in Paragraph 2. For example, Plaintiffs' response is self-limited to when Plaintiffs "are working as UberBLACK drivers." It is undisputed that "drivers are free to operate their own businesses outside of UberBLACK." ECF 85 (Plaintiffs' Amended Statement of Disputed or Undisputed Facts), ¶13. It is also undisputed that Plaintiff Razak testified that his brother receives trip requests from a limousine service, Blacklane, that is outside of Uber. Razak I Dep., 45:3-18. Plaintiff Sabani also reported personally providing over 100 trips through his company, and outside of Uber, and that Uber placed no restrictions on his right to receive Freemo Limo trip requests while simultaneously online on the Uber App. Sabani I Dep., 16:15-20 (over 100 trips), 18:18-19:6 (permitted to provide driving service through his company, Freemo Limo, and never harassed by Uber) 19:2-6 (no restrictions while online). As such, paragraph 2 is **<u>undisputed and therefore admitted</u>**. Fed. R. Civ. P. 56 (e)(2), (3).

 In any event, Plaintiffs' arguments about Gegan, the certificate of public convenience and

insurance are immaterial and are not responsive to Defendants' statement of fact. The fact that Plaintiffs' use of the Uber App resulted in the lowering of the barriers they faced in their efforts to enter into the luxury transportation marketplace is immaterial to the question of whether, as a matter of economic reality, Plaintiffs are in business for themselves. Moreover, Plaintiffs' response is misleading. For example, Mr. Holtzman-Conston testified that Uber does not require anything above what the PPA requires with respect to insurance (Holtzman-Conston Dep., 30:6-9), approximately 75% of drivers use Gegen's automobile insurance (*Id.*, 30:10-18), transportation providers who avail themselves of insurance coverage through Gegen pay only what Gegen pays per vehicle for the policy (*Id.*, 30:10-18), the reason why a hundred percent of the insurance costs are passed on to the partner-owners is because "[t]hey own the vehicles and it's their responsibility for paying the insurance of their vehicles" (*Id.*, 32:4-9), and that drivers who choose to affiliate with another company that holds a certificate of public convenience are not covered by Gegen's automobile insurance policy. *Id.*, 23:11 – 25:17.

3.    Transportation providers who use the Uber App to generate trip requests (like Plaintiffs) "are free to operate their own businesses outside of UberBLACK." ECF 80.

**Plaintiffs' Response:** Disputed. The Plaintiffs are not permitted to use the Uber App to generate business outside of Uber. In fact, this is expressly prohibited by Uber. *See* citations in response to ¶ 2 *supra*. Furthermore, Plaintiffs cannot pursue business outside of Uber while working as UberBLACK drivers. *See* Owner/Operator Agreement, ECF 15-2 at p. 60 ("[Y]ou agree to only make yourself available to receive Requests during such times as you are generally able to accept Requests that are offered. Following acceptance of a Request, you shall be contractually obligated to perform the Request in accordance with the Customer's

specifications."); *see also* Uber's Driver Deactivation Policy, ECF 68-6 (providing that a driver will be deactivated for "accepting trips without the intention to complete, including provoking riders to cancel…"); *see also* July 25, 2017 George Clapps Dep. at 53:2-24 (describing how cancelling on a customer leads to deactivation). When Plaintiffs are working as UberBLACK drivers, moreover, they are operating exclusively within Uber's system under Uber's control. *See, e.g.*, Uber's Driver Deactivation Policy, ECF 68-6 ("activities conducted outside of Uber's system – like anonymous pickups - are prohibited").

**Defendants' Reply:** Plaintiffs' response fails to properly address the factual assertions in Paragraph 3 and completely disregards Plaintiffs' own testimony and prior admissions in this case. *See e.g.*, ECF 85 (Plaintiffs Amended Statement of Disputed or Undisputed Facts), ¶13; *see also* para. 2, *supra*. As such, paragraph 3 is **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3).

4.  Luxe was incorporated in 2012. Exhibit 1 (Deposition of Umer Razak as Corporate Representative of Luxe Limousine Services, Inc. (referred to herein as "Luxe 30(b)(6) Depo.")) at 42:6-11; 227:5-14; 230:9-11, 231:6-11; Exhibit 9 (Luxe Limousine Pennsylvania Articles of Incorporation).

**Plaintiffs' Response:** Undisputed.

5.  "Luxe is owned by Plaintiff Razak and his brother." Motion to Quash (ECF 100-1) at 15; *see also* Transcript of Hearing (Oct. 18, 2017) at 6:5-9 ("Luxe Limo is owned by Mr. Razak and his brother.").

**Plaintiffs' Response:** Undisputed.

6.      Luxe is in the transportation business. Luxe 30(b)(6) Dep., 248:1-5.

**Plaintiffs' Response:** Undisputed.


7.      Luxe has its own certificate from the Pennsylvania Public Utility Commission (PUC) to provide black car transportation services in the counties of Bucks, Chester, Delaware and Montgomery. Luxe 30(b)(6) Dep., 51:20 – 52:4, 335:18 – 336:24, 337:16-19; Exhibit 10 (Luxe's PUC Certificate).

**Plaintiffs' Response:** Undisputed.


8.      Luxe's PUC certificate contemplates that Luxe will provide hourly-rate services, as well as fixed-fee black car services for special events such as weddings and proms. Luxe 30(b)(6) Dep., 339:17-24; Exhibit 10 (Luxe's PUC Certificate), at RAZAK_UBER_PL0007501.

**Plaintiffs' Response:** Undisputed.


9.      Plaintiff Razak signed up to use the Uber App to connect with riders using the UberBLACK product on July 8, 2014 (two years *after* Luxe was incorporated). ECF 80 (Plaintiffs' Admitted Facts), at ¶ 10.

**Plaintiffs' Response:** Disputed. Plaintiff Razak signed up to use the Uber App to earn compensation from Uber as an UberBLACK driver. He did not, moreover, sign up to "connect with riders." Uber's statement implies that Plaintiff Razak could meet riders through the Uber App, and then independently contract with the riders to perform his own transportation services. Not so. *See* Uber's Driver Deactivation Policy, ECF 68-6 ("soliciting payment of fares outside

the Uber system" leads to deactivation) ("activities conducted outside of Uber's system – like anonymous pickups - are prohibited"); s*ee also* Uber's Community Guidelines, ECF Nos. 68-5, 68-6 and 68-7 ("collusion between rider or driver" results in account deactivation); *see also* Owner/Operator Agreement, ECF 15-2 at p. 62 ("you understand that you shall not during the term of this Agreement use your relationship with Gegen (or the information gained therefrom) to divert or attempt to divert any business from the Company to a competitive transportation broker, or any transportation provider"); *see also* Sept. 26, 2016, Uber Support Email to Sabani, Ex. 6 (notifying Sabani that he is subject to "permanent removal" from the App for messaging clients to "solicit rides outside of the platform").

**Defendants' Reply:** Plaintiffs' response fails to properly address the factual assertions in Paragraph 9 that Plaintiff Razak signed up to use the Uber App on July 8, 2014, which is two years *after* Luxe was incorporated. As such, these factual assertions in paragraph 9 are undisputed and therefore admitted. Fed. R. Civ. P. 56 (e)(2), (3). Plaintiffs' additional averments regarding the purported reasons why Plaintiff Razak signed up to use the Uber App are immaterial to the determination of whether Plaintiffs are independent contractors, and fail to cite record evidence to support their purported dispute. As such, Plaintiffs' unsupported assertions should be disregarded and the Court should deem the remainder of Paragraph 9 as **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3).


10.     Plaintiff Sabani began performing transportation services in Philadelphia at the end of 2013. Exhibit 2 (Deposition of Kenan Sabani taken January 4, 2018 (referred to herein as "Sabani II Dep.")), at 65:7-10.

**Plaintiffs' Response:** Undisputed.

9

11.     Plaintiff Sabani began performing transportation services with another limousine company—Barry Limo, LLC—in Philadelphia at the end of 2013. Sabani II Dep., 67:19-68:3. At that time, Mr. Sabani received dispatches for private trips (including some identified by Barry and some identified by King Limousine) and also provided transportation services to riders identified using the UberBLACK product. Exhibit 3 (Deposition of Kenan Sabani taken May 8, 2017 (referred to herein as "Sabani I Dep.")), at 93:9-22; Sabani II Dep., 198:10-24 & 201:6-18 (provided private trips identified by Barry, outside the Uber App), 200:3-12 (provided private trips for King Limousine, outside the Uber App).

**Plaintiffs' Response:** Disputed. Plaintiff Sabani was driving for Uber and gained access to the Uber App through Barry Limo, LLC. *See* Jan. 4, 2018 Sabani Dep., Ex. 2 at 92:24 – 93:5.

**Defendants' Reply:** Plaintiffs do not support their assertion that paragraph 11 is disputed with citation to record evidence that supports their denial. Plaintiffs' rhetoric that Plaintiff Sabani was "driving for Uber" is mere conclusory rhetoric. Plaintiffs' unsupported assertion should be disregarded and the Court should deem paragraph 11 as **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3).


12.     In August 2015, Plaintiff Sabani formed his own limousine company, Freemo Limo, LLC. Sabani II Dep., 9:9-22.

**Plaintiffs' Response:** Disputed. Freemo Limo, LLC was not a "limousine company" when it was formed in 2015, as it did not possess a requisite certificate of public convenience. Plaintiff Sabani instead performs transportation services under Gegen's certificate of public convenience as an UberBLACK driver. *See* Jan. 4, 2018 Sabani Dep., Ex. 2 at 23:17-24:4.

**Defendants' Reply:** Plaintiffs' response does not respond to or cite evidence that creates

a genuine dispute or that creates a material dispute that Plaintiff Sabani formed Freemo Limo, LLC in August 2015. Plaintiffs' response also fails to cite evidence to dispute that Freemo Limo, LLC is a "limousine company." The deposition testimony cited by Plaintiffs merely provides Plaintiff Sabani's belief that Freemo is authorized to provide black car transportation services in Philadelphia County by virtue of its relationship with Gegen. This testimony does not even address, let alone create a genuine and material dispute as to whether Freemo is a "limousine company." As such, that fact is **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3).

13.     Freemo offers its transportation services to the public. Sabani II Dep., 90:19 – 94:24.

**Plaintiffs' Response:** Disputed. The transportation services provided by Plaintiff Sabani as an UberBLACK driver are "offered" to the public by Uber, not Freemo. *See* Jan. 4, 2018 Sabani Dep., Ex. 2 at 23:17-24:4.

**Defendants' Reply:** Plaintiffs' response does not respond to or cite evidence that creates a genuine dispute that Freemo offers its transportation services to the public. The deposition testimony cited by Plaintiffs merely provides Plaintiff Sabani's belief that Freemo is authorized to provide black car transportation services in Philadelphia County by virtue of its relationship with Gegen. This testimony does not even address, let alone create a genuine and material dispute as to whether Freemo offers its transportation services to the public. The deposition testimony cited in paragraph 13 reflects Plaintiff Sabani authenticating a printout of Freemo's website (Sabani II Dep., 90:19 – 91:1), acknowledging that the website remains active (*Id*., 91:2 – 91:4), that someone who was online and looking for black car services could call the telephone

number listed on the top of the first page of the website (*Id*., 91:5 – 91:10), the telephone number listed on the top of the first page of the website is still an operating number (*Id*., 91:11 – 91:13), the telephone number listed on the top of the first page of the website is for Mr. Sabani's cell phone (*Id*., 91:14 – 91:3), that the services listed on Freemo's website is an accurate reflection of the services that Freemo offers to the public (*Id*., 92:7 – 94:24). The question was clearly posed to Mr. Sabani, "These are the services [reflected on Freemo's website] that Freemo Limo offers to the public?" *Id*., 94:17 – 18. To which Mr. Sabani responded unequivocally, "Yes." *Id*., 94:19. As such, Plaintiffs' unsupported assertion should be disregarded and the Court should deem paragraph 13 as such, that fact is **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3).

14.     In addition to owning and operating Freemo, Plaintiff Sabani signed up to use the Uber App to connect with riders using the UberBLACK product on November 26, 2013. ECF 80 (Plaintiffs' Admitted Facts), at ¶ 9.

**Plaintiffs' Response:** Disputed. Plaintiff Sabani signed up to use the Uber App to earn compensation from Uber as an UberBLACK driver. He did not, moreover, sign up to "connect with riders." Uber's statement implies that Plaintiff Sabani could meet riders through the Uber App, and then independently contract with the riders to perform his own transportation services. Not so. *See* Uber's Driver Deactivation Policy, ECF 68-6 ("soliciting payment of fares outside the Uber system" leads to deactivation) ("activities conducted outside of Uber's system – like anonymous pickups - are prohibited"); s*ee also* Uber's Community Guidelines, ECF Nos. 68-5, 68-6 and 68-7 ("collusion between rider or driver" results in account deactivation); *see also* Owner/Operator Agreement, ECF 15-2 at p. 62 ("you understand that you shall not, during the

term of this Agreement, use your relationship with Gegen (or the information gained therefrom) to divert or attempt to divert any business from the Company to a competitive transportation broker, or any transportation provider"); *see also* Sept. 26, 2016 Uber Support Email to Sabani, Ex. 6 (notifying Sabani that he is subject to "permanent removal" from the App for messaging clients to "solicit rides outside of the platform").

**Defendants' Reply:** Plaintiffs' response fails to properly address the factual assertions in Paragraph 14 that Plaintiff Sabani signed up to use the Uber App on November 26, 2013. Indeed, Plaintiffs already admitted this fact in a prior pleading. As such, these factual assertions in paragraph 9 are **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3). Plaintiffs' additional averments regarding the purported reasons why Plaintiff Sabani signed up to use the Uber App are immaterial to the determination of whether Plaintiffs are independent contractors, and fail to cite record evidence to support their purported dispute.


15.     Plaintiff Sabani is the sole owner of Freemo. Sabani II Dep., 9:9-22.

**Plaintiffs' Response:** Undisputed.


16.     Milano is a "sole proprietorship" that is "owned by Mr. Cherdoud." Motion to Quash (ECF 100-1) at 15; Transcript of Hearing (Oct. 18, 2017) at 6:5-9; Exhibit 7, Deposition of Khaldoun Cherdoud taken January 4, 2018 (referred to herein as "Cherdoud II Dep."), 30:12-15 (authenticating Articles of Incorporation for Milano Limo, Inc.); Exhibit 28 (Articles of Incorporation for Milano Limo, Inc.).

**Plaintiffs' Response:** Undisputed. However, Uber paid the fee to open the business account for Milano and paid the fee for the limousine certificate for Plaintiff Cherdoud to be able

to provide transportation services in Philadelphia. Plaintiff Cherdoud set up Milano because Uber required this set up for him to have access to the Uber App. No one else has driven under the Milano banner, which shows Plaintiff Cherdoud only formed Milano because of Uber's requirements and involvement. *See* Jan. 4, 2018 Cherdoud Dep., Ex. 1 at 40:5-15, 20:2-5 and 46:15-18.

**Defendants' Reply:** Plaintiffs' response admits as undisputed the facts asserted in paragraph 16 that "Milano is a 'sole proprietorship' that is 'owned by Mr. Cherdoud.'" With regards to Plaintiffs' additional averments, Plaintiffs' assertions are immaterial to the determination of whether Plaintiffs are independent contractors. With regards to Plaintiffs assertion regarding other Milano drivers and Plaintiff Cherdoud's intentions for forming Milano, Plaintiffs cite no record evidence to support their argument and assertion. As such, Plaintiffs' unsupported argument and assertion should be disregarded and the Court should deem paragraph 16 as such, that fact is **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3).

17.     Milano provides transportation services. Cherdoud II Dep., 10:8-18.

**Plaintiffs' Response:** Disputed. When Plaintiff Cherdoud provides UberBLACK services, he is operating under Gegen's certificate of public convenience, in a vehicle registered to Gegen, insured by Gegen, paid for by Gegen. *See, e.g.,* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 30:10-34:11 and 20:15-21:5 (regarding Gegen insurance and automatic deductions for insurance premiums) (regarding PPA compliance). Furthermore, the driver's vehicle is registered to Gegen for this purpose. *See* Cherdoud and Gegen's Annual Vehicle Lease Agreement, Ex. 8. Accordingly, Uber pays for the driver's insurance and vehicle then recoups that money by deducting it from the driver's weekly earnings with Uber. *See* Sample Pay Statements, Ex. 9.

Uber makes these deductions every week regardless of whether the driver earns enough money to cover the expenses. *Id.* (showing $3.72 in net weekly earnings for the driver after Uber paid, and thus deducted, $366.82 for the vehicle's lease and insurance).

**Defendants' Reply:** Plaintiffs' response does not respond to or cite evidence that creates a genuine dispute that Milano provides transportation services. As such, that fact is **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3). With regards to Plaintiffs' additional arguments and averments, Plaintiffs fail to support them in response to paragraph 17 with citation to record evidence.

18.    In addition to owning and operating Milano, Plaintiff Cherdoud signed up to use the Uber App to connect with riders using the UberBLACK product on December 26, 2013. Exhibit 8 (Declaration of Jordan Holtzman-Conston ("Holtzman-Conston Decl.")), ¶3.

**Plaintiffs' Response:** Disputed. Plaintiff Cherdoud signed up to use the Uber App to earn compensation from Uber as an UberBLACK driver. He did not, moreover, sign up to "connect with riders." Uber's statement implies that Plaintiff Cherdoud could meet riders through the Uber App, and then independently contract with the riders to perform his own transportation services. Not so. *See* Uber's Driver Deactivation Policy, ECF 68-6 ("soliciting payment of fares outside the Uber system" leads to deactivation) ("activities conducted outside of Uber's system – like anonymous pickups - are prohibited"); s*ee also* Uber's Community Guidelines, ECF Nos. 68-5, 68-6 and 68-7 ("collusion between rider or driver" results in account deactivation); s*ee also* Owner/Operator Agreement, ECF 15-2 at p. 62 ("you understand that you shall not during the term of this Agreement use your relationship with Gegen (or the information gained therefrom) to divert of attempt to divert any business from the Company to a competitive

transportation broker, or any transportation provider"); *see also* Sept. 26, 2016 Uber Support Email to Sabani, Ex. 6 (notifying Sabani that he is subject to "permanent removal" from the App for messaging clients to "solicit rides outside of the platform").

**Defendants' Reply:** Plaintiffs fail to cite to any record evidence that disputes the factual assertions set forth in paragraph 18. As such, the Court should deem the factual assertions in paragraph 18 as **undisputed and therefore admitted.**

19.    Independent transportation companies who desire to use the Uber App to obtain requests to provide limousine services on the UberBLACK product must first enter into a Software License and Online Services Agreement (or similar agreement such as a Technology Services Agreement, collectively referred to as the "Services Agreement") with Uber that sets forth the relationship between Defendants and companies that want to gain access to the Uber App, as well as terms for receiving leads from Uber's technology. Exhibit 8 (Holtzman-Conston Decl.), ¶4; Exhibit 11 (December 11, 2015 Technology Services Agreement).

**Plaintiffs' Response:** Disputed. This statement contradicts the sworn declaration of Michael Coleman (ECF 15-1) and Uber's Brief in Support of its Motion to Dismiss (ECF 15). In seeking to dismiss the Plaintiffs' claims into arbitration, Uber argued that the Plaintiffs – not their corporations – had contracted with Uber, thereby subjected the Plaintiffs to Uber's arbitration provision. *See* March 31, 2016 Coleman Decl. at ¶¶ 11-13, ECF 15-1 (declaring under oath that the three individual Plaintiffs accepted the "Uber Agreements"); *see also* Defs.' Br. in Support of Mot. to Dismiss at p. 3; *see also* Cherdoud and Gegen's Annual Vehicle Lease Agreement, Ex 8.

**Defendants' Reply:** Paragraph 19 does not actually contradict Mr. Coleman's testimony.

Mr. Coleman's statement is correct that Plaintiffs contracted with Uber, in the sense that they did so on behalf of their respective companies. Plaintiffs' purported dispute is also an immaterial red herring. Plaintiffs admit as undisputed that they each own their respective companies. *See*, Plaintiffs' responses to paragraphs 5 (undisputed that "Luxe is owned by Plaintiff Razak and his brother"), 15 (undisputed that "Plaintiff Sabani is the sole owner of Freemo"), and 16 (undisputed that "Milano is a 'sole proprietorship' that is 'owned by Mr. Cherdoud.'"). Whether Plaintiff, their companies, or both contracted with Uber does not change the fact that Luxe, Freemo, and Milano, and their respective owners, entered into agreements that set forth the relationship between Defendants and Plaintiffs and their companies. As such, the facts set forth in paragraph 19 are **undisputed and admitted**, and any purported dispute is immaterial.

20.     These agreements are between "an independent company in the business of providing transportation services ("Customer or "You")" and Uber. Exhibit 11 (December 11, 2015 Technology Services Agreement).

**Plaintiffs' Response:** Disputed. *See* response to ¶ 19 *supra*.

**Defendants' Reply:** Plaintiffs do not dispute the fact that Exhibit 11, the December 11, 2015 Technology Services Agreement expressly states that it is an agreement between "an independent company in the business of providing transportation services ("Customer or "You")" and Uber. Instead, Plaintiffs attempt to create a dispute by referencing Mr. Coleman's testimony and Defendants' Motion to Dismiss that Plaintiffs contracted with Uber. Paragraph 20, however, does not actually contradict Mr. Coleman's testimony. *See* Defendants' reply to ¶ 19 *supra*.    As such, the facts set forth in paragraph 20 are **undisputed and admitted**, and any purported dispute is immaterial.

21.     For purposes of the Services Agreement, companies like Luxe, Freemo, and Milano, are Uber's "Customer[s]" who contract for the opportunity to use Uber's technology. Exhibit 8 (Holtzman-Conston Decl.), ¶5.

**Plaintiffs' Response:** Disputed. *See* response to ¶ 19 *supra*.

**Defendants' Reply:** The record materials Plaintiffs cite in response to paragraph 19 do not contradict or create a dispute as to Mr. Holtzman-Conston's testimony cited in paragraph 21. *See* Defendants' reply to ¶ 19 *supra*. As such, the facts set forth in paragraph 21 are **undisputed and admitted**, and any purported dispute is immaterial.

22.     In relevant part, the Services Agreement provides:

Customer [defined by the agreement as "an independent company in the business of providing transportation services"] acknowledges and agrees that Uber is a technology services provider that does not provide transportation services, function as a transportation carrier, nor operate as a broker for the transportation of passengers.

"Driver" means a principal, employee or contractor of Customer: (a) who meets the then current Uber requirements to be an active driver using the Uber Services; (b) whom Uber authorizes to access the Uber Services to provide Transportation Services on behalf of Customer; and (c) who has entered into the Driver Addendum.

"Driver Addendum" means the terms and conditions that Customer is required to enter into with a Driver prior to such Driver providing Transportation Services on behalf of Customer (as may be updated by Uber from time to time).

"Transportation Services" means the provision of passenger transportation services to Users via the Uber Services in the Territory by customer and its Drivers using the Vehicles.

As between Uber and Customer, Customer acknowledges and agrees that: (a) Customer and its Drivers are solely responsible for determining the most effective, efficient and safe manner to perform each instance of Transportation Services; and (b) except for the Uber Services or any Uber Devices (if applicable), Customer shall provide all necessary equipment, tools and other materials, at Customer's own expense, necessary to perform Transportation Services.

Customer's Relationship with Users. Customer acknowledges and agrees that Customer's provision of Transportation Services to Users creates a direct business relationship between Customer and the User.

Customer's Relationship with Uber. Customer acknowledges and agrees that Uber's provision to Customer of the Driver App and the Uber Services creates a direct business relationship between Uber and Customer. Uber does not, and shall not be deemed to, direct or control Customer or its Drivers generally or in their performance under this Agreement specifically, including in connection with the operation of Customer's business, the provision of Transportation Services, the acts or omissions of Drivers, or the operation and maintenance of any Vehicles. Customer and its Drivers retain the sole right to determine when, where, and for how long each of them will utilize the Driver App or the Uber Services. Customer and its Drivers retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Uber's then-current cancellation policies. With the exception of any signage required by local law or permit/license requirements, Uber shall have no right to require Customer or any Driver to: (a) display Uber's or any of its Affiliates' names, logos or colors on any Vehicle(s); or (b) wear a uniform or any other clothing displaying Uber's or any of its Affiliates' names, logos or colors. . . .

Customer's Relationship with Drivers. Customer shall have the sole responsibility for any obligations or liabilities to Drivers that arise from its relationship with its Drivers (including provision of Transportation Services). Customer acknowledges and agrees that it exercises sole control over the Drivers and will comply with all applicable laws (including tax, social security and employment laws) governing or otherwise applicable to its relationship with its Drivers.

Customer shall require each Driver to enter into a Driver Addendum (as may be updated from time to time) and shall provide a copy of each executed Driver Addendum to Uber.

Fare Calculation and Customer Payment. Customer is entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services ("Fare"), where such Fare is calculated based upon a base fare amount plus distance (as determined by Uber using location-based services enabled through the Device) and/or time amounts, as detailed at www.uber.com/cities for the applicable Territory ("Fare Calculation").

Customer is also entitled to charge User for any Tolls, taxes or fees incurred during the provision of Transportation Services, and, if applicable. Customer: (i) appoints Uber as Customer's limited payment collection agent solely for the purpose of accepting the Fare, applicable Tolls and, depending on the region and/or if requested by Customer, applicable taxes and fees from the User on

behalf of the Customer via the payment processing functionality facilitated by the Uber Services; and (ii) agrees that payment made by User to Uber (or to an Affiliate of Uber acting as an agent of Uber) shall be considered the same as payment made directly by User to Customer. In addition, the parties acknowledge and agree that as between Customer and Uber, the Fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event Customer does not negotiate a different amount. Customer shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at Customer's request, a Fare that is lower than the pre-arranged Fare (each of (i) and (ii) herein, a "Negotiated Fore").

Service Fee. In consideration of Uber's provision of the Driver App and the Uber Services for the use and benefit of Customer and its Drivers hereunder, Customer agrees to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare), as provided to Customer and/or a Driver via email or otherwise made available electronically by Uber from time to time for the applicable Territory ("Service Fee").

Customer agrees to maintain during the term of this Agreement on all Vehicles operated by Customer or its Drivers commercial automobile liability insurance that provides protection against bodily injury and property damage to third parties at levels of coverage that satisfy all applicable laws in the Territory.

Customer agrees to maintain during the term of this Agreement commercial general liability insurance that provides protection against personal injury, advertising injury and property damage to third parties at levels of coverage required by all applicable laws in the Territory.
Customer agrees to maintain during the term of this Agreement workers' compensation insurance for itself and any of its subcontractors as required by all applicable laws in the Territory.

As between Customer and Uber, Customer is and shall be solely responsible for its Drivers' provision of Transportation Services.

Except as otherwise expressly provided herein with respect to Uber acting as the limited payment collection agent solely for the purpose of collecting payment from Users on behalf of Customer, the relationship between the parties under this Agreement is solely that of independent contracting parties. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Uber and Customer or Uber and any Driver; and (b) no joint venture, partnership, or agency relationship exists between Uber and Customer or Uber and any Driver.

Exhibit 11 (December 11, 2015 Technology Services Agreement) (emphasis in original); Exhibit 4, Deposition of Ali Razak taken May 8, 2018 (referred to herein as "Razak I Dep."), at 13:2-21 (authenticating December 11, 2015 Technology Services Agreement).

**Plaintiffs' Response:** Undisputed.

23.     Once a transportation company has entered into an agreement with Uber, drivers engaged by that transportation company may also use the Uber App once they agree to the terms of a Driver Addendum to the Services Agreement. Exhibit 8 (Holtzman-Conston Decl.), ¶6.

**Plaintiffs' Response:** Disputed. *See* response to ¶¶ 19 and 21 *supra*.

**Defendants' Reply:** Plaintiffs' response does not respond to or cite evidence that creates a genuine dispute about the facts set forth in paragraph 23. As such, the facts set forth in paragraph 23 are **undisputed and admitted**, and any purported dispute is immaterial.

24.     The Driver Addendum, in relevant part, provides:

This Driver Addendum to Technology Services Agreement (*"Addendum"*) constitutes a legal agreement between an independent company in the business of providing transportation services (*"Transportation Company"*) and an independent, for-hire transportation provider (*"Driver"* or *"You"*).

Driver maintains a contractual or employment arrangement with Transportation Company to perform passenger carriage services for the Transportation Company.

In addition to the transportation services it regularly performs pursuant to his or her contractual arrangement with Transportation Company, Driver is interested in receiving lead generation and related services through the Uber Services.

"Transportation Services" means the provision of passenger transportation services to Users via the Uber Services in the Territory by Transportation Company and its Drivers using the Vehicles.

"Uber Services" mean Uber's on-demand lead generation and related services that enable transportation providers to seek, receive and fulfill on-demand requests for

transportation services by Users seeking transportation services; such Uber Services include Uber's software, websites, payment services, and related support services systems, as may be updated or modified by Uber at its discretion from time to time.

"User" means an end user authorized by Uber to use Uber's mobile application for the purpose of obtaining Transportation Services.

Driver's Relationship With Uber. Uber does not, and shall not be deemed to, direct or control Driver generally or in Driver's performance of Transportation Services or maintenance of any Vehicles. Driver acknowledges that Uber does not control, or purport to control: (a) when, where, or for how long Driver will utilize the Driver App or the Uber Services; or (b) Driver's decision, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services, or to cancel an accepted request for Transportation Services, via the Driver App, subject to Uber's then-current cancellation policies.

Exhibit 8 (Holtzman-Conston Decl.), ¶7; Exhibit 5, Deposition of Ali Razak taken January 3, 2018 (referred to herein as "Razak II Dep."), at 46:11 – 47:22 (authenticating December 11, 2015 Driver Addendum), Exhibit 12 (December 11, 2015 Driver Addendum); Razak I Dep., 37:12-24 (acknowledging that a transportation company "has complete discretion to operate its independent business and direct its drivers at its own discretion.").

**Plaintiffs' Response:** Undisputed.

25.    Uber is a technology company that invented, develops, markets, licenses, and seeks to constantly improve a revolutionary technology that allows people who need things to almost instantaneously connect with a business that can provide it. Exhibit 8 (Holtzman-Conston Decl.), ¶9; Exhibit 6, Deposition of Jordan Holtzman-Conston (referred to herein as "Holtzman-Conston Dep."), 11:19-12:2, 12:8-10.

**Plaintiffs' Response:** Disputed. Uber, according to its Senior Regulatory Counsel, "is a certified limousine provider authorized to furnish limousine services." *See* Uber's Comments received by the Pennsylvania Public Utility Commission on Oct. 12, 2016 (PUC Docket No. L-

2016-2556432). Uber, according to its certificate of public convenience, is a common carrier licensed by the Philadelphia Parking Authority to "transport passengers in luxury vehicles… within the City." *See* Notice of Gegen Application (42 Pa.B. 7883, Dec. 29, 2012). Uber, according to its Owner/Operator Agreement, is a company "authorized and licensed to operate a limousine company to transport passengers in luxury vehicles between points within the City of Philadelphia…" *See* Owner/Operator Agreement, ECF 15-2 at p. 59. Uber, according to its Annual Vehicle Lease Agreement, is the lessee of Plaintiff Cherdoud's vehicle. *See* Cherdoud and Gegen Annual Vehicle Lease Agreement, Ex. 8. Uber, according to its payment processes, is a debt collector. *See* Sample Pay Statements, Ex. 9 (deducting the driver's PPA sticker fees, vehicle lease payments and insurance premiums); *see also* Feb. 14, 2014 Correspondence between Plaintiff Cherdoud and Uber Support (regarding late payments on Plaintiff Cherdoud's vehicle); *see also* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 34:8-24. Uber is an insurance agent that "negotiat[es] hard on behalf of [the Plaintiffs] to minimize the increase in [insurance] premiums." *See* Email re Gegen Insurance; *see also* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 32:14-33:5. Uber is likewise the primary policyholder on an auto insurance policy that provides the Plaintiffs with $1.5 million in liability coverage. *Id.* Uber is a manager that establishes and enforces driver rules and standards. *See, e.g.*, Uber's Driver Deactivation Policy, ECF 68-6; *see also* July 14, 2014 Email regarding Background Checks (stating that UberBLACK drivers are required to undergo Uber's own background check, which Uber claims is "more thorough" than the obligatory PPA background check); *see also* Feb. 9, 2015 Correspondence between Plaintiff Sabani and Uber Support (deactivating Plaintiff Sabani due to his driver rating and recommending that he undergo training from an approved Uber vendor); *see also* Sept. 26, 2016 Uber Support Email to Plaintiff Sabani, Ex. 6 (warning Plaintiff Sabani that soliciting

riders outside of the platform will result in his "permanent removal"). These are the characteristics of an employer, not a "technology company."

**Defendants' Reply:** Plaintiffs' response attempts to create the appearance of a material dispute, as dictated by their arguments made in their Opposition, which focuses in large part on whether Defendants are technology companies or part of the transportation industry. As set forth in Defendants' Reply, this distinction is of minimal import to the overall question of the economic realities test. Defendants unquestionably operate within the transportation ecosystem, but that takes nothing away from the obvious premise that Uber would not exist without the Uber App.  As a result, to the extent that there is any dispute about whether Uber is a technology company or in the transportation industry, the dispute is not material.

26.     The Services Agreement defines "Uber Services" as:

> Uber's on-demand lead generation and related services that enable transportation providers to seek, receive and fulfill on-demand requests for transportation services by Users seeking transportation services; such Uber Services include access to the Driver App and Uber's software, websites, payment services as described in Section 4 below, and related support services systems, as may be updated or modified by Uber at its discretion from time to time.

Exhibit 8 (Holtzman-Conston Decl.), ¶8; Exhibit 11 (December 11, 2015 Technology Services Agreement).

**Plaintiffs' Response:** Undisputed.

27.     The Services Agreement states that:

> Uber does not, and shall not be deemed to, direct or control Customer or its Drivers generally or in their performance under this Agreement specifically, including in connection with the operation of Customer's business, the provision of Transportation Services, the acts or omissions of Drivers, or the operation and maintenance of any Vehicles. Customer and its Drivers retain the sole right to determine when, where, and for how long each of them will utilize the Driver App or the Uber Services. Customer and its Drivers retain the option, via the Driver

App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Uber Services, or to cancel an accepted request for Transportation Services via the Driver App, subject to Uber's then- current cancellation policies. . . . Customer acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from Transportation Services. For the sake of clarity, Customer understands that Customer retains the complete right to provide transportation services to its existing customers and to use other software application services in addition to the Uber Services.

Exhibit 8 (Holtzman-Conston Decl.), ¶10; Exhibit 11 (December 11, 2015 Technology Services Agreement).

**Plaintiffs' Response:** Undisputed.

28.     Uber's most popular technology—commonly referred to as the Uber App—enables riders and drivers to make a match with each other based on their location, the rider's transportation budget and needs, and the drivers' preferences. Exhibit 8 (Holtzman-Conston Decl.), ¶11.

**Plaintiffs' Response:** Undisputed.

29.     The Uber App offers riders an opportunity to request a trip from a number of different transportation options, including, but not limited to, UberBLACK, UberSUV, uberXL, and uberX. *Id*., ¶12.

**Plaintiffs' Response:** Undisputed.

30.     These options vary in cost, vehicle size, and vehicle options. *Id*.

**Plaintiffs' Response:** Undisputed.

25

31.     UberBLACK is just one of Uber's technology products accessible through the Uber App, and enables riders to connect with luxury black car sedans or town cars. *Id*., ¶13. The Uber App, when that term is used in connection with UberBLACK, refers to both the rider and driver versions of the app. *Id.*

**Plaintiffs' Response:** Undisputed.

32.     UberSUV allows riders to connect with full-sized luxury SUVs, uberXL connects riders with drivers of cost-effective SUVs and other large vehicles, and uberX connects riders with drivers typically in more cost-effective vehicles. *Id*., ¶14.

**Plaintiffs' Response:** Undisputed.

33.     The Uber App is also not limited to connecting riders and drivers, and instead offers an array of marketplace products. *Id*., ¶15.

**Plaintiffs' Response:** Undisputed.

34.     The core of Uber's business is its technology, which drives its business model. *Id*., ¶16.

**Plaintiffs' Response:** Disputed. Uber is, at its core, a transportation company. Indeed, Uber's own Senior Regulatory Counsel characterized Uber/Gegen as "a certified limousine provider authorized to furnish limousine services." *See* Comments submitted to the Pennsylvania Public Utility on Oct. 12, 2016, Ex. 11 (PUC Docket No. L-2016-2556432). If Uber were merely a "technology company," then it would simply license its software to drivers and charge a monthly licensing fee (just like how Westlaw charges attorneys a monthly fee to use its

software). Uber instead takes a commission between 25-28% on every fare. *See* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 35:1-16. That means Uber is fundamentally dependent on its drivers to generate income, which is why Uber exerts such a high level of control over the drivers.

**Defendants' Reply:** Plaintiffs' Response does not dispute the obvious fact that technology is central to Uber's business. As described in the accompanying Reply Brief, the mere fact that Defendants operate within the transportation ecosystem does not render this fact in dispute. Plaintiffs' Response is simply not material to the instant motion. Additionally, Plaintiffs fail to cite record evidence to support the averment that Uber takes a "commission." It is undisputed that Uber has deducted a Service Fee from each fare of between 20% to 25% for using UberBLACK and up to 28% from UberSUV. Holtzman-Conston Dep., 35:1-20. Plaintiffs also fail to cite record evidence to support their argument that Uber is a transportation company, Uber "would simply license its software and charge a monthly licensing fee . . . ,"[2] that "Uber is fundamentally dependent on its drivers to generate income," or that "Uber exerts [] a high level of control over drivers." As such, Plaintiffs' unsupported argument and assertions should be disregarded and the Court should deem paragraph 34 as **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3).

35.    Uber has spent and continues to spend tens of millions of dollars on developing, expanding, and deploying its technology products. *Id*., ¶17.

**Plaintiffs' Response:** Undisputed.

---

[2] Although it is immaterial for purposes of resolving Defendants' Motion for Summary Judgement, Uber's Service Fee is the functional equivalent of the per search fee Westlaw charges attorneys and law firms. *See* Paragraph 22 (undisputed that the Services Agreement provides that Plaintiffs and their companies agree "to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare)").

36.     Uber employs thousands of people in technology-centric roles, and it markets and promotes the services that users are able to access through its various products. *Id.*, ¶18.

**Plaintiffs' Response:** Undisputed.

37.     Defendants do not transport riders in Philadelphia. *Id.*, ¶19.

**Plaintiffs' Response:** Disputed. When Plaintiffs provide UberBLACK transportation services, they do so on behalf of Uber. This agency is best evinced by Uber's insurance policy, which covers the drivers *and* Uber in the event the driver injures a third-party. *See* Email from Uber regarding Gegen Insurance, Ex. 14; *see also* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 32:14-33:5. If Uber was not in the business of transporting riders, then it would not need such an insurance policy.

**Defendants' Reply:** Plaintiffs' response fails to cite to any record evidence that creates a dispute about the fact that neither Uber nor Gegen have any drivers in Philadelphia to transport riders. Stated differently, if there were no transportation providers, like Plaintiffs, to accept a trip request from a rider, that trip request would go unfulfilled. ECF 80 (Plaintiffs' Admitted Facts), at ¶ 28; ECF 93, at p 9. As such, this Court should deem (as it has previously) the factual assertion in paragraph 37 **undisputed and therefore admitted**.

38.     Defendants do not hire, promote, or transfer transportation providers—like Plaintiffs—who actually provide black car transportation services in Philadelphia. *Id.*, ¶20.

**Plaintiffs' Response:** Disputed. UberBLACK drivers, such as the Plaintiffs, do undergo a hiring process conducted by Uber, which includes Uber's own background check. *See* July14, 2014 Email regarding Background Checks, Ex. 15 (stating that UberBLACK drivers are required

to undergo Uber's own background check, which Uber claims is "more thorough" than the obligatory PPA background check); *see also* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 26:5-27:14 (discussing Uber's background check).

Furthermore, when an UberBLACK driver is deactivated, the driver has to undergo a "Quality Improvement Course" in order to be eligible for reactivation. *See* Feb. 9, 2015 Correspondence between Plaintiff Sabani and Uber Support, Ex. 16 (deactivating Plaintiff Sabani due to his driver rating and recommending that he undergo training from an approved Uber vendor); *see also* Uber's Quality Improvement Policy ("If you have been deactivated for a low overall rating, your account may be eligible for reactivation upon successful completion of a quality improvement course.").

UberBLACK drivers cannot be "promoted" because there is no position to promote them into. They are, nevertheless, given incentive bonuses. *See* UberX Fare Guarantee Message (providing that UberBLACK drivers who agreed to accept UberX fares were, for a limited time, guaranteed $30 per hour); *see also* Jersey Shore Fare Message (advising that drivers accepting fares at the "Jersey Shore" would receive higher base rates); *see also* Referral Bonus Message (rewarding drivers $300 for referring friends and family).

**Defendants' Reply:** Defendants incorporate their Reply to Plaintiffs' response to paragraph 37.


39.     If a rider cannot secure a driver willing to provide the rider black car transportation services in Philadelphia, there are no Uber employee drivers standing by to fulfill the trip request. *Id.*, ¶21.

**Plaintiffs' Response:** Disputed. This statement may be literally true. Uber nevertheless

omits material facts. Since Uber takes a commission from each fare, as opposed to charging drivers a onetime or periodic fee to use the App, Uber is economically motivated to ensure that the supply of drivers is equal to or greater than demand. *See* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 35:1-16. Uber accomplishes that goal through various "system integrity" measures. *See* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 41:3-43:12 (explaining that drivers are given 15 seconds to accept a trip request before the request is automatically transferred to another driver); *see also* Uber's Article on Surge Pricing (explaining that Uber monitors each City's market in real time, and employs surge pricing – the "temporary" increase in fare rates – to manipulate rider demand and driver supply); *see also* Jersey Shore Fare Message, Ex. 19 (offering drivers larger base fares as an incentive to work at the "Jersey Shore").

**Defendants' Reply:** Plaintiffs' response that "[t]his statement may be literally true" admits that paragraph 39 is undisputed. The remainder of Plaintiffs' response is mere argument that must be disregarded by this Court and is immaterial to the instant Motion.

40.      Uber does not contractually or otherwise guarantee rides for riders seeking black car transportation services in Philadelphia, because it is not in the business of providing such transportation services. *Id.*, ¶22.

**Plaintiffs' Response:** Disputed. Under 53 Pa.S.C. § 57A11, Uber is legally required to guarantee access to a wheelchair-accessible vehicle, either by itself providing the vehicle or referring the rider to another transportation company.  Uber is in the business of providing transportation services, which it has previously admitted. *See* Defs.' Comments received by the Pennsylvania Public Utility Commission on Oct. 12, 2016, Ex. 11 (PUC Docket No. L-2016-2556432) (Gegen is a "certified limousine provider"); *See also* Notice of Gegen Application (42

Pa.B. 7883, Dec. 29, 2012), Ex. 12 (Gegen is a "common carrier").

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 40. As such, the factual assertions in Paragraph 40 are **undisputed and admitted**. With regards to Plaintiffs' additional averments, the statute and documents Plaintiffs cite speak for themselves, are mischaracterized by Plaintiffs, and do not properly address the factual assertions in Paragraph 40. Section 57A11 does not statutorily or contractually require Defendants to offer transportation network services or to guarantee rides for riders if a driver like one of the Plaintiffs is not available to *offer* a ride. In other words, section 57A11 would have no impact on Defendants if there were no drivers like Plaintiffs who were online and available to offer transportation services. Plaintiffs admit as true that "[i]f a rider cannot secure a driver willing to provide the rider black car transportation services in Philadelphia, there are no Uber employee drivers standing by to fulfill the trip request." *See*, Plaintiffs' response to Paragraph 39.   Defendants do not dispute that they are part of the limousine transportation service ecosystem in that they hold a certificate of public convenience from the PPA and contract with limousine companies like Luxe, Freemo, and Milano, who in turn actually provide the transportation services to riders they connect with through the Uber App.


41.    Gegen is a wholly-owned subsidiary of Uber that holds a certificate of public convenience from the Philadelphia Parking Authority (PPA). Holtzman-Conston Dep., 11:19-12:2, 12:8-10; 21:11-19.

**Plaintiffs' Response:** Undisputed.

42.     Transportation companies and individual transportation providers who wish to provide black car limousine services in Philadelphia are required by applicable regulation to hold a certificate of public convenience or to do so in connection with an entity that holds a certificate of public convenience from the PPA. *Id*., ¶23.

**Plaintiffs' Response:** Undisputed.


43.     The application fee for a PPA certificate of public convenience is $12,000. *Id*., ¶24.

**Plaintiffs' Response:** Undisputed.


44.     Qualified transportation companies who do not hold their own certificate of public convenience, such as Plaintiffs' companies, may affiliate with an entity that holds a certificate of public convenience in order to enable them to provide limousine services in Philadelphia. Exhibit 8 (Holtzman-Conston Decl.), ¶25.

**Plaintiffs' Response:** Disputed. Only a qualified common carrier, here Gegen, can hold a certificate of public convenience. *See* Notice of Gegen Application, Ex. 12 (42 Pa.B. 7883, Dec. 29, 2012) (Gegen is a "common carrier"). Each limousine vehicle purporting to operate on behalf of that common carrier is then registered under the common carrier's certificate of public convenience. *See* 53 Pa.C.S. § 5741. The alleged affiliation between the Plaintiffs' companies and Uber/Gegen is not relevant under the applicable regulations. What matters is that the UberBLACK vehicle is registered to Gegen's certificate of public convenience. This is why Gegen, and not the driver, pays the annual "limousine rights sticker" on behalf of each UberBLACK driver. *See* 52 Pa. Code § 1055.2.   Indeed, PPA regulations only permit three

categories of persons to operate under a certificate of public convenience: (1) the owner, if the owner is a limousine driver; (2) an employee of the certificate holder; or, (3) a limousine driver who leases the limousine directly from the certificate holder. 52 Pa. Code § 1051.8(a). Since Gegen is the owner of the certificate, and does not lease vehicles to the Plaintiffs, the Plaintiffs must be employees of Gegen.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 44. As such, the factual assertions in Paragraph 44 are **<u>undisputed and admitted</u>**. With regards to Plaintiffs' additional averments, Plaintiffs also fail to cite evidence to support their averments that "[o]nly a qualified common carrier, here Gegen, can hold a certificate of public convenience," and "[e]ach limousine vehicle purporting to operate on behalf of that common carrier is then registered under the common carrier's certificate of public convenience." The statute Plaintiffs cite – 53 Pa.C.S. § 5741 – speaks for itself and merely provides that a "limousine service" must have a certificate of public convenience in order to offer services within the city of Philadelphia. As such, these citations do not support Plaintiffs' averments and should be disregarded. Pennsylvania code section 1055.2 does not support Plaintiffs averment that "[t]his is why Gegen, and not the driver, pays the annual 'limousine rights sticker' on behalf of each UberBLACK driver."   Pennsylvania code section 1051.8 also speaks for itself, and is immaterial to the determination of whether Plaintiffs are independent contractors.


45.     Some UberBLACK transportation providers operate under the certificate of public convenience held by Gegen, while others operate under a certificate held by other limousine companies licensed by the PPA. *Id*., ¶26.

**Plaintiffs' Response:** Disputed. Anytime a driver provides UberBLACK services, that driver is covered by Gegen's insurance, and Gegen, by virtue of its common carrier status, is responsible for the driver. *See* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 30:10-34:11 (regarding Gegen insurance and automatic deductions for insurance premiums) and 20:15-21:5 (regarding PPA compliance); 52 Pa. Code § 1051.8(b).

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the factual assertions in Paragraph 45.  Since Plaintiffs have not responded to the facts stated in paragraph 45 or cited record evidence that would create a dispute with those facts, the Court should deem paragraph 45 as **<u>undisputed and therefore admitted</u>**. Fed. R. Civ. P. 56 (e)(2), (3).

46.     Plaintiff Sabani testified that one way to get into the transportation business without having to pay for a PPA license is to incorporate and then affiliate with Gegen. Sabani II Dep., 70:15-71:24.

**Plaintiffs' Response:** Disputed. The individual, assuming he/she is properly licensed, need only operate a qualified limousine registered under Gegen's certificate of public convenience. There is no incorporation or affiliation requirement. *See* response to ¶ 44 *supra*.

**Defendants' Reply:** Plaintiffs' alleged dispute does not respond to or address the facts asserted in paragraph 46. Plaintiffs do not actually dispute that Mr. Sabani testified that one way to get into the transportation business without having to pay for a PPA license is to incorporate and then affiliate with Gegen.  Since Plaintiffs have not responded to the facts stated in paragraph 45 or cited record evidence that would create a dispute with those facts, the Court should deem paragraph 46 as **<u>undisputed and therefore admitted</u>**. Fed. R. Civ. P. 56 (e)(2), (3).

47.     There are "many" companies that provide black car services in Philadelphia without relying on the Uber App to generate trip requests. Razak II Dep., 110:11-17.

**Plaintiffs' Response:** Undisputed, although the financial viability of such a company is unknown.

**Defendants' Reply:** Plaintiffs' additional commentary about the financial viability of other companies is nonresponsive and should be stricken. The Court should deem paragraph 47 as **<u>undisputed and therefore admitted</u>**. Fed. R. Civ. P. 56 (e)(2), (3).

48.     Luxe perceived that having multiple cars in its fleet was "good business." Luxe 30(b)(6) Dep., 109:11-19.

**Plaintiffs' Response:** Undisputed.

49.     At the beginning of 2015, Luxe had just two vehicles. Luxe 30(b)(6) Dep., 251:16-23.

**Plaintiffs' Response:** Undisputed.

50.     By the end of 2015, Luxe expanded its fleet to six vehicles. Luxe 30(b)(6) Dep., 249:23 – 250:1, 251:12-15, 251:20 – 252:1.

**Plaintiffs' Response:** Undisputed.

51.     Paragraph 51 of Defendants' Statement of Facts was filed under seal. The Court was previously provided with a courtesy copy of the unredacted version of the filing. In order to avoid another under seal filing, Defendants refer the Court to the previously produced,

unredacted Statement of Facts and will do so for those other paragraphs, below, that were filed under seal.

**Plaintiffs' Response:** Undisputed.

52.     In 2016, Luxe acquired additional vehicles, including five vehicles at one time from another black car business. Luxe 30(b)(6) Dep., 252:2-12, 303:17 – 304:18.

**Plaintiffs' Response:** Undisputed.

53.     In 2016, Luxe managed up to sixteen vehicles at one time. Luxe 30(b)(6) Dep., 250:2-7.

**Plaintiffs' Response:** Disputed. Luxe does not "manage" the vehicles. Luxe leased these vehicles on a weekly basis to individuals, who in turn provide transportation services under Gegen's certificate of public convenience. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 26:1-27:18 and 54:15-55:6 (testifying that the drivers provide services in Philadelphia "[b]y Uber. They are working under Uber['s] license… The sticker is under Uber, the certificate is under Uber, insurance by Uber [SIC].").

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute that Luxe had up to 16 vehicles at one time in 2016. As such, that fact is **<u>undisputed and admitted</u>**. It is undisputed that Luxe incurs expenses for repairs and maintenance on its vehicles and endeavoring to have its vehicles repaired quickly. Luxe 30(b)(6) Dep., 137:16 – 139:14. It is also undisputed that Luxe leased its vehicles on a weekly basis to individuals who provided transportation services, and that Luxe was affiliated with Gegen for purposes of Gegen's certificate of public convenience.

54.     Luxe currently has 14 vehicles in its fleet. Luxe 30(b)(6) Dep., 25:22-24.

**Plaintiffs' Response:** Undisputed.


55.     Luxe financed the purchase of its vehicles. Luxe 30(b)(6) Dep., 116:24 – 117:4, 187:4-8 ("Luxe is paying for the financing.").

**Plaintiffs' Response:** Disputed. The vehicles were purchased with financing obtained from Uber's vendors, including Exeter. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 116:15-117:11. These vendors are paid by Uber via automatic deductions from the driver's earnings. *See* Sample Pay Statements, Ex. 9.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute that Luxe financed the purchase of its vehicles. In fact, Plaintiffs' response admits that Luxe financed its vehicles. As such, the facts in Paragraph 55 are **undisputed and admitted**. Plaintiffs' assertion that vendors that provided financing for Luxe's vehicles are paid by Uber via automatic deductions from a driver's earnings is immaterial to the determination of whether Plaintiffs are independent contractors.


56.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.


57.     Luxe owns one of its vehicles (a Lincoln Navigator) outright, with no financing obligation. Luxe 30(b)(6) Dep., 117:5-13, 122:10-11.

**Plaintiffs' Response:** Undisputed.

58.     As for the other 13 vehicles Luxe financed, Luxe will own them outright once its finance payments are completed. Luxe 30(b)(6) Dep., 121:15-24.

**Plaintiffs' Response:** Undisputed.


59.     Luxe's goal is to have one driver assigned to each of its vehicles. Luxe 30(b)(6) Dep., 178:10-12.

**Plaintiffs' Response:** Disputed. Luxe does not "assign" a driver to a vehicle. The vehicles are leased on a weekly basis to individuals who operate under Gegen's certificate of public convenience. *See* response to ¶ 53 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute that Luxe's goal is to have one driver assigned to each of its vehicles. When asked, "[i]s the goal to have one driver for every car," Luxe's 30(b)(6) designee responded, "yeah." Luxe 30(b)(6) Dep., 178:10-12. Plaintiffs cite no record evidence that Luxe does not assign a driver to a vehicle. As such, the Court should deem paragraph 59 as **undisputed and therefore admitted**.


60.     The number of drivers on Luxe's active roster may vary from week to week and has been as high as 14-17 drivers. Luxe 30(b)(6) Dep., 26:8-14 (14 drivers on roster), 214:9-18 (had 17 active drivers on roster in May 2017).

**Plaintiffs' Response:** Disputed. Luxe does not have an "active roster" of drivers. Luxe does not have drivers.  It leases vehicles to individuals who in turn provide transportation services under Gegen's certificate of public convenience. *See* response to ¶ 53 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 60. When asked whether a list of drivers shows

whether the driver was "active or not active as of May 12, 2017," Luxe's corporate designee responded, "[t]hat's correct." Luxe 30(b)(6) Dep., 214:9-13. When asked subsequently whether "there are 17 active drivers as of May 12th, 2017," Luxe's corporate designee responded, "[t]hat's correct." Luxe 30(b)(6) Dep., 214:14-18. As such, the Court should deem paragraph 60 as **<u>undisputed and therefore admitted</u>**.


61.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Disputed. *See* response to ¶¶ 53 and 60 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 61. As such, the Court should deem paragraph 61 as **<u>undisputed and therefore admitted</u>**.

62.     Plaintiff Razak's brother used to provide transportation services "a lot" using the Uber App. Luxe 30(b)(6) Dep., 192:3-8. However, he is now so busy operating the Luxe business enterprise ("doing the payroll, fixing the cars") that he is not driving as much. Luxe 30(b)(6) Dep., 192:3-14.

**Plaintiffs' Response:** Disputed. "As much" as what? Umer Razak testified that he provided 40-50 trips in the month prior to his deposition, all of which were UberBLACK trips. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 13:12-20. Furthermore, the perceived decline was in part due to the fact that Umer Razak is spending more time with his family. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 192:10-14.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 62. Indeed, Plaintiffs' response only serves to confirm that Plaintiffs could operate their businesses as they pleased, including cutting back on

hours spent on their business when they decided to spend more time with their families. Certainly, an employee could not simply decide to devote less time to his employer because he wished to spend more time with his family. As such, the Court should deem paragraph 62 as **undisputed and therefore admitted**.

63.    When one of Luxe's drivers provides transportation services (whether using the Uber App, Blacklane, or any other lead generation source), the revenue from those services is paid to Luxe. Luxe 30(b)(6) Dep., 39:6:17.

**Plaintiffs' Response:** Disputed. The money, pursuant to Uber's rules, goes into Luxe's Uber account, and then is distributed to the individual who performed the fare. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 23:21-24. Furthermore, Luxe does not have "drivers." *See* response to ¶ 53 *supra*.

**Defendants' Reply:** Plaintiffs admit that the money earned through the use of the Uber App is paid directly to Luxe. As such, the Court should deem paragraph 63 as **undisputed and therefore admitted**.

64.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Disputed. Luxe does not have "drivers." *See* response to ¶ 53 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 64. When asked "[d]oes Luxe have any drivers," Luxe's corporate designee testified, "Luxe has drivers." Luxe 30(b)(6) Dep., 13:21-22. Plaintiffs cite no record evidence to the contrary. As such, the Court should deem paragraph 64 as

**undisputed and therefore admitted**.


65.     Luxe pays its drivers from the revenues generated from providing transportation

services. Luxe 30(b)(6) Dep., 26:8-14.

**Plaintiffs' Response:** Disputed. Luxe does not have "drivers." *See* response to ¶ 53

*supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a

dispute with the factual assertions in Paragraph 65. When asked "[d]oes Luxe have any drivers,"

Luxe's corporate designee testified, "Luxe has drivers." Luxe 30(b)(6) Dep., 13:21-22. Plaintiffs

cite no record evidence to the contrary. As such, the Court should deem paragraph 65 as

**undisputed and therefore admitted**.


66.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Disputed. Luxe does not have "drivers." *See* response to ¶ 53

*supra*. Furthermore, this was money earned by and distributed to the lessee, less the weekly lease

payments collected by Luxe. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 23:21-24.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a

dispute with the factual assertions in Paragraph 66. When asked "[d]oes Luxe have any drivers,"

Luxe's corporate designee testified, "Luxe has drivers." Luxe 30(b)(6) Dep., 13:21-22. In

discussing Luxe's 2015 tax returns, Luxe's corporate designee was asked about $137,633

reported on line 8, to which Luxe's corporate designee responded "[t]hat must be for the 1099

for the drivers." *Id*., 241:24-242:11. Later, when asked "[t]he next section talks about other

wages, and it's $137,632.90, drivers on 1099. So this is the amount that Luxe paid out to the

drivers in 2015," Luxe's corporate designee responded, "[a]s it's described, yes." *Id.*, 277:5-10. Plaintiffs have cited no evidence to the contrary. As such, the Court should deem paragraph 66 as **undisputed and therefore admitted**. With regards to Plaintiffs assertion that the money was distributed, less the weekly lease payments collected by Luxe, Plaintiffs fail to cite record evidence to support this assertion and this assertion should be disregarded.

67.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Disputed. *See* response to ¶ 66 *supra*.

**Defendants' Reply:** *See* Defendants' Reply to Plaintiffs' response to ¶ 66.

68.     Plaintiff Razak's brother handled the payroll for Luxe. Luxe 30(b)(6) Dep., 39:18-22.

**Plaintiffs' Response:** Undisputed.

69.     In 2016, Luxe retained Visha Umer to perform payroll services for Luxe. Luxe 30(b)(6) Dep., 315:3-13, 316:1 – 317:2.

**Plaintiffs' Response:** Undisputed.

70.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

71.     When a driver does not provide sufficient transportation services to generate enough revenue to cover his or her lease obligation, Luxe has to cover those expenses out of its own pocket. Luxe 30(b)(6) Dep., 101:2-10 & Ex 22.

**Plaintiffs' Response:** Disputed. Luxe does not have "drivers." *See* response to ¶ 53 *supra*. Furthermore, Umer Razak described a personal deficit because of a lack of business; he had not been paid in 7 months, but he does not state that Luxe as a business covers the expenses. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 102:1-103:7.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 71. As such, the Court should deem paragraph 71 as **undisputed and therefore admitted**. With regards to Plaintiffs' additional assertions, it is immaterial whether the expenses were covered by Luxe or were a personal deficit covered by Luxe's owner(s). Luxe or its owners – Umer and Ali – covered the expenses when the individuals who leased Luxe's vehicles were unable to generate enough revenue to cover his or her lease obligation. Luxe 30(b)(6) Dep., 101:2-10, 102:1-103:7 & Ex 22.

72.     While Luxe will then attempt to recoup the shortfall from the driver at a later time that is not always possible. Luxe 30(b)(6) Dep., 102:5-10, 102:19 – 103:7.

**Plaintiffs' Response:** Disputed. *See* response to ¶¶ 53 and 71 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 72. As such, the Court should deem paragraph 72 as **undisputed and therefore admitted**. Defendants incorporate their responses to paragraphs 53 and 71 into this response.

73.     When Luxe's drivers incur costs associated with parking tickets, Luxe attempts to pass the costs of those tickets to its drivers; but if the driver is no longer active, Luxe incurs the expense. Luxe 30(b)(6) Dep., 283:2-24.

**Plaintiffs' Response:** Undisputed. Luxe does not have "drivers." *See* response to ¶ 53 *supra*. Uber receives the ticket because the vehicle is operating under Gegen's certificate of public convenience. *See* response to ¶ 44 *supra*; *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 283:2-13. Instead of passing the ticket onto the individual UberBLACK driver, Uber palms it off on Luxe. *Id.*

74.    Luxe incurs expenses for repairs and maintenance on its vehicles and endeavoring to have its vehicles repaired quickly. Luxe 30(b)(6) Dep., 137:16 – 139:14.

**Plaintiffs' Response:** Disputed. Uber will cover some expenses if they are incurred while working as an UberBLACK driver. *See, e.g.*, Dec. 26, 2015 Email re Cleaning Fee.

**Defendants' Reply:** Plaintiffs do not respond to the facts set forth in paragraph 74 that Luxe incurs expenses for repairs and maintenance on its vehicles and endeavoring to have its vehicles repaired quickly.  As such, the Court should deem paragraph 74 as **<u>undisputed and therefore admitted</u>**. Fed. R. Civ. P. 56 (e)(2), (3). With regards to Plaintiffs' additional statement that Uber will cover some expenses, Plaintiffs cite to a Dec. 26, 2015 e-mail that expressly states that Uber "collected a cleaning fee *<u>from the rider</u>*." ECF 114 (Exhibit 22) (emphasis added). As such, Plaintiffs brazenly mischaracterize the e-mail and the assertion should be disregarded.

75.    Luxe maintains a corporate account at a nearby Goodyear to provide automotive services. Luxe 30(b)(6) Dep., 175:15 – 176:1.

**Plaintiffs' Response:** Undisputed.

76.     Luxe also incurs expenses in maintaining its fleet of vehicles, including finance payments, insurance, oil changes and repairs, towing expenses, maintenance, car washes, and "all kinds of professional fees." Luxe 30(b)(6) Dep., 131:17 – 132:19, 133:7-18, 142:18 – 144:4, 299:2-11, 301:7-13, 302:2-11.

**Plaintiffs' Response:** Disputed. Uber pays the Gegen insurance, financing, PPA fees and then reimburses itself via automatic deductions against the UberBLACK drivers' earnings. *See* response to ¶ 2 *supra*. Under certain circumstances Uber will also pay a cleaning fee. *See* response to ¶ 74.

**Defendants' Reply:** Plaintiffs do not respond to the facts set forth in paragraph 76 that Luxe incurs expenses in maintaining its fleet of vehicles, including finance payments, insurance, oil changes and repairs, towing expenses, maintenance, car washes, and "all kinds of professional fees."  As such, the Court should deem paragraph 76 as **undisputed and therefore admitted**. Fed. R. Civ. P. 56 (e)(2), (3). Defendants incorporate their replies to Plaintiffs' responses to paragraphs 2 and 74 with respect to Plaintiffs' remaining averments.


77.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Disputed. Certain expenses, including insurance premiums and PPA fees, are incurred by Uber and then passed onto UberBLACK drivers. *See* response to ¶ 2 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute as to the facts set forth in paragraph 77. As such, the Court should deem paragraph 77 as **undisputed and therefore admitted**. Indeed, Plaintiffs' tax returns are documents that speak for themselves and are representations made by Plaintiffs to the United States government.

78.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.


79.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.


80.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.


81.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.


82.     In order to promote its business and generate its own leads, Luxe advertised, developed an internet presence, and utilized Blacklane and the Uber App so that its drivers could receive trip requests. Luxe 30(b)(6) Dep., 49:20 – 50:14.

**Plaintiffs' Response:** Disputed. Uber prohibits its drivers from using the Uber App to generate trips that are conducted outside of the Uber system. *See* response to ¶ 9 *supra*.

**Defendants' Reply:** Plaintiffs do not respond to the facts set forth in paragraph 82. As such, the Court should deem paragraph 82 as **<u>undisputed and therefore admitted</u>**. Indeed, Plaintiffs' own undisputed testimony that they were able to operate their own limousine transportation service businesses, including providing trips generated through systems other than Uber, completely undermines their assertion here.

83. *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

84. Luxe also created a website – luxelimousineservices.com (Luxe 30(b)(6) Dep., 341:17-342:3), a Facebook account (*Id.*, 347:21-22, 350:1-16), and a Twitter account. *Id.*, 350:23-351:2. *See also* Luxe 30(b)(6) Dep., 47:15-18 (Luxe operated a website to advertise its transportation services).

**Plaintiffs' Response:** Undisputed.

85. According to the Luxe website:

Our limo service was established back in 2012 with a dream to become the best transportation option state-wide. We set out to achieve this by offering our clientele the most luxurious, reliable and safe rides around town.

We are happy to provide you with complimentary drinks whether you're traveling to the airport, or just 5 blocks up the road. Rest assured that we'll get you there in style, glitz and comfort. We also believe in providing the safest rides around.

Luxe 30(b)(6) Dep., 341:21-342:3 (authenticating printout of Luxe's website); Exhibit 17 (printout of Luxe's website), at RAZAK_UBER_PL007434.

**Plaintiffs' Response:** Undisputed.

86. According to the Luxe website: "We are available around the clock and unlike most other limousine services we just need 30 min and the limousine will be ready, especially if you use our book now services." Luxe 30(b)(6) Dep., Exhibit 17 (printout of Luxe's website), at RAZAK_UBER_PL007434.

**Plaintiffs' Response:** Undisputed.

87.     Potential customers could submit a booking request using the Luxe website. Luxe 30(b)(6) Dep., 47:19-22.

**Plaintiffs' Response:** Undisputed.

88.     Potential customers emailed Luxe to request bookings. Luxe 30(b)(6) Dep., 226:12-14.

**Plaintiffs' Response:** Undisputed.

89.     Luxe maintained its website at its expense. Luxe 30(b)(6) Dep., 341:21-24, 342:9-12 (Luxe paid fee to maintain website), 342:20 – 343:2 (Luxe paid third party to create website).

**Plaintiffs' Response:** Undisputed.

90.     In 2017, Luxe engaged an internet Search Engine Optimization company named QRG Direct to help Luxe improve its web presence and to help generate leads independently, outside of Uber and Blacklane. *Id.*, 357:4-358:4, 358:18-360:14. Luxe spent approximately $300 per month on QRG Direct's services. *Id.*, 360:15-20.

**Plaintiffs' Response:** Undisputed.

91.     Luxe has generated its own leads through advertising. Luxe 30(b)(6) Dep., 19:24 – 20:10, 30:19-21.

**Plaintiffs' Response:** Disputed. Umer Razak testified that he had "no" success generating leads. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 20:1-5.

**Defendants' Reply:** Plaintiffs alleged dispute is not supported by the testimony of Umer Razak, Luxe's 30(b)(6) representative. Although Mr. Umer Razak initially testified that he did not have any success in generating leads (Luxe 30(b)(6) Dep., 19:24 – 20:5), he responded to the next question by admitting that he generated "[m]aybe one or two rides maybe a month without leads. That's the most I have did." Luxe 30(b)(6) Dep., 20:6-10. Plaintiffs have therefore failed to cite evidence in the record that creates a material dispute with Luxe's ability to generate its own leads through advertising. As such, the Court should deem paragraph 91 as **<u>undisputed and therefore admitted</u>**.

92.     Luxe purchases supplies for its business. Luxe 30(b)(6) Dep., 284:1 – 285:1.

**Plaintiffs' Response:** Undisputed.

93.     Luxe incurs travel expenses for its business, including sending Plaintiff Razak's brother to Buffalo, Orlando, Miami and Tampa for the purpose of investigating the transportation business in those cities to ascertain whether there would be a "better opportunity" for Luxe in those locations. Luxe 30(b)(6) Dep., 286:1 – 288:5.

**Plaintiffs' Response:** Undisputed.

94.     Luxe can control some of its costs, e.g., by delaying an expensive repair or oil change. Luxe 30(b)(6) Dep., 150:7-15.

**Plaintiffs' Response:** Disputed. Uber decides when most major costs will be paid, including insurance, financing, and PPA payments, by making weekly deductions against earnings. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 150:3-23; s*ee also* response to ¶ 2 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute that Luxe can control *some* of its costs, e.g., by delaying an expensive repair or oil change. As such, the Court should deem paragraph 94 as **undisputed and therefore admitted**.

95.     Other costs are fixed (e.g., car payments and insurance) and will be incurred even if the driver does not generate sufficient revenues to cover his or her lease obligations. *Id.* at 150:7-15.

**Plaintiffs' Response:** Disputed. These costs are not truly "fixed," rather they are forced onto UberBLACK drivers by Uber via automatic weekly deductions against their earnings. *See* response to ¶ 2 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute as to the facts set forth in paragraph 95. As such, the Court should deem paragraph 95 as **undisputed and therefore admitted**. There is no dispute that Uber deducts vehicle and insurance payments from a driver's earnings on a weekly basis where such payments are appropriate (i.e., when a driver has financed a vehicle and is not on another insurance policy), but UberBLACK drivers are not required or forced to finance the purchase of their vehicles or to pay Gegen for automobile insurance. Holtzman-Conston Dep., 30:10-23. As such, these unsupported assertions should be disregarded.

96.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Disputed. Certain expenses, including insurance premiums and PPA fees, are incurred by Uber and then passed onto UberBLACK drivers. *See* response to ¶ 2 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute as to the facts set forth in paragraph 96. As such, the Court should deem paragraph 96 as **undisputed and therefore admitted**. With regards to the additional assertions in Plaintiffs' response, Plaintiffs' additional assertions are immaterial and fail to cite record evidence to support their assertion that certain expenses, including insurance premiums and PPA fees, are incurred by Uber. It is undisputed that Plaintiffs determine whether they want to be in the limousine business and whether they want to utilize Gegen's automobile insurance. *See*, *e.g.*, Holtzman-Conston Dep., 30:10-18 (approximately 75% of drivers use Gegen's automobile insurance). While Uber deducts insurance premiums and PPA fees from an UberBLACK driver's earnings, that does not mean Uber has incurred those costs. Plaintiff's description of the transaction expressly admits that the driver, not Uber, ultimately incurs and pays for those costs.

97.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

98.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

99.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

100.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

101.    On approximately December 15, 2013, Mr. Sabani entered into a partnership agreement with Barry Limo, LLC that entitled him to 50% ownership of a 2012 Chevrolet Suburban. Sabani I Dep., 92:18-93:4, 94:6-9; Exhibit 19 (Barry Limo, LLC Partnership Agreement).

**Plaintiffs' Response:** Undisputed.

102. Barry Limo, LLC passed along responsibility for repair and maintenance costs to Sabani. Sabani II Dep., 130:5-131:24.

**Plaintiffs' Response:** Undisputed.

103.    Plaintiff Sabani paid $500 per week to Barry Limo, LLC to purchase a Chevrolet Suburban, and now owns the vehicle outright. Sabani II Dep., 73:16-74:3, 78:1-20, 79:10-81:18.

**Plaintiffs' Response:** Undisputed.

104.    Plaintiff Sabani also engaged up to four independent contract drivers (including himself and at times Plaintiff Cherdoud), whose earnings Freemo reported on IRS 1099 Forms, to provide transportation services for Freemo. Sabani II Dep., 17:14-17.

**Plaintiffs' Response:** Undisputed.

105.    Plaintiff Sabani testified that his brother affiliates with Freemo instead of creating his own company because his brother did not want to go through the hassle of satisfying the PPA requirements. Sabani II Dep., 12:8-15.

**Plaintiffs' Response:** Disputed. Plaintiff Sabani and his brother can provide limousine

transportation services in Philadelphia County by virtue of the fact that their vehicles are registered under Gegen's certificate of public convenience. *See* Jan. 4, 2018 Sabani Dep., Ex. 2 at 84:10-14; *see also* response to ¶ 44 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute as to the facts set forth in paragraph 105. When asked, "[s]o why would your brother just affiliate with your company instead of form [sic] his own," Plaintiff Sabani responded, "[b]ecause some people, they don't want to go through the hassle and go through the PPA requirements, which you have to go and take a test, you know, pay all the PPA fees that are out there." As such, the Court should deem paragraph 105 as **undisputed and therefore admitted**.

106.    Plaintiff Sabani determines how much to pay his drivers. Sabani II Dep., 15:11-16.

**Plaintiffs' Response:** Disputed. Plaintiff Sabani does not have drivers. Neither Plaintiff Sabani nor Freemo hold a certificate of public convenience. S*ee also* response to ¶¶ 44 and 105 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute as to the facts set forth in paragraph 106. When asked, "[a]nd then you have – as Freemo, have the discretion on what to pay the people who provide transportation services that led to that money coming into Freemo's account," Plaintiff Sabani responded, "[c]orrect." Sabani II Dep., 15:11- 16. When asked later, "[s]o you have – so Freemo has the discretion on how to pay the drivers who are signed up under Freemo," Plaintiff Sabani responded, "[c]orrect." Sabani II Dep., 15:21- 24. Plaintiffs cite no record evidence to support their assertion that Plaintiff Sabani does not have drivers. As such, the Court should deem paragraph 106 as **undisputed and**

**therefore admitted**.

107.     Freemo could take a fee from the money earned by his drivers, but he chooses not

to. Sabani II Dep., 15:17-20, 16:1-4 (could pay drivers less than what Uber transfers to Freemo).

**Plaintiffs' Response:** Disputed. S*ee* response to ¶¶ 44 and 105 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a

dispute as to the facts set forth in paragraph 107. As such, the Court should deem paragraph 107

as **undisputed and therefore admitted**.

108.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Disputed. S*ee* response to ¶¶ 44 and 105 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a

dispute as to the facts set forth in paragraph 108. As such, the Court should deem paragraph 108

as **undisputed and therefore admitted**.

109.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

110.     One of Freemo's drivers in 2016 provided transportation services only for

Freemo's private trips, and did not provide any services for trip requests from the Uber App. *Id*.,

87:12-21.

**Plaintiffs' Response:** Disputed. The driver also uses the UberBLACK App and Plaintiff

Sabani did not know if the driver provided transportation services using other sources in 2016.

*See* Jan. 4, 2018 Sabani Dep., Ex. 2 at 88:3-10.

      **Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a

dispute as to the facts set forth in paragraph 110. Plaintiff Sabani testified that Akram Anissi was

a driver for Freemo, and provided transportation services only for Freemo's private trips in 2016.

Sabani II Dep., 87:12-18. When asked expressly whether Mr. Anissi "also provide[d] any trips

under Freemo using the Uber App," Plaintiff Sabani testified, "[n]o." *Id.*, 87:19-21. The

testimony that Plaintiffs cite only reflects that Plaintiff Sabani is not aware of whether Mr. Anissi

"also provided transportation in 2016 using other sources of lead generation *other than Freemo*

*Limo*," and Mr. Sabani's belief that Mr. Anissi uses UberBLACK outside of providing Freemo

trips. *Id.*, 88:2-10 (emphasis added). As such, the Court should deem paragraph 110 as

**undisputed and therefore admitted**.


      111.    Freemo also created a website to advertise its business and to generate private trip

requests. Sabani II Dep., 90:19-92:3 (authenticating printout of Freemo's website).

      **Plaintiffs' Response:** Undisputed.


      112.    Freemo's website states:

Freemo Limo, LLC is a privately held, full service chauffeured transportation
company…

We provide a full complement of ground transportation solutions for our various
clientele. Our fleet of vehicles and experienced chauffeurs can handle all of your
transportation needs, whether you're with a Fortune 500 company or a family
looking for airport transportation.

*Freemo Limo has the best prices in town.*

We do not publish our prices on the web because we stay so competitive in our
pricing.

We Offer Full Corporate Contracted accounts

Whether you need to transport one person or 500 people, Freemo Limo can take the headache out of planning corporate transportation.
Our fleet of vehicles from executive sedans to luxury SUV's, and we work with you to handle all of your special needs and requests. No matter where your business is going, Freemo Limo can take you there.

Freemo Limo is available 24 hours a day, 7 days a week, 365 days a year…

Before our chauffeurs are hired they must pass a drug & alcohol screening test… Random drug & alcohol screening is performed throughout a chauffeur's [sic] tenure with Freemo. We train our chauffeurs with over 40 hours of classroom training and then on the road experience. All chauffeurs are given a 90 day probationary period. Within that time they are required to attend a defensive driving course as well as hit certain milestones in real time performance. In addition, drivers are monitored by GPS vehicle tracking systems. Driving speeds, idling times and locations can be monitored by our 24-hour dispatch team.

Our vehicles are maintained to specific factory specifications or better to keep them in safe running condition.

We Have The Best Professional Chauffeurs Committed To Safety.

Sabani II Dep., 90:19-92:3 (authenticating printout of Freemo's website); Exhibit 26 (printout of Freemo's website).

**Plaintiffs' Response:** Undisputed.


113.    Freemo's website solicits customers to make reservations either "online by emailing us or by calling our 24-hour service contact number." Sabani II Dep., 90:19-92:3 (authenticating printout of Freemo's website); Exhibit 26 (printout of Freemo's website).

**Plaintiffs' Response:** Undisputed.


114.    When he formed Freemo, Plaintiff Sabani intended to form a company that would own vehicles and lease them out to other drivers, thereby becoming a businessman who would

make money by collecting lease payments from drivers. Sabani II Dep., 176:22-178:14 ("My goal was to run an independent business and maybe, five or six or 10 years from now, not have to drive - to live the American dream.").

**Plaintiffs' Response:** Undisputed.


115.   Freemo has advertised on Yelp, and has also created a Facebook profile. Sabani II Dep., 95:8-96:11 (authenticating printout of Freemo's Yelp advertisement), 97:15-98:12 (Facebook page); Exhibit 27 (printout of Freemo's Yelp advertisement).

**Plaintiffs' Response:** Undisputed.


116.   Plaintiff Sabani noted he had been responsible for his driving expenses (including tires, brakes, oil changes, and tolls) when he drove for Barry Limo, LLC before starting Freemo. Sabani II Dep., 76:4-15.

**Plaintiffs' Response:** Undisputed.


117.   *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.


118.   *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.


119.   *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

120.    Plaintiff Cherdoud was free as an independent contractor to purchase and finance a vehicle from whoever he wanted, and he chose to purchase his vehicle from Fred Beans and finance it through Exeter. Cherdoud II Dep., 94:19-95:17.

**Plaintiffs' Response:** Disputed. Uber gave a list of who Plaintiff Cherdoud would be able to purchase a vehicle from. *See* Jan. 4, 2018 Cherdoud Dep., Ex. 1 at 94:7-14. Furthermore, Exeter financed the purchase because Exeter is paid weekly by Uber from Plaintiff Cherdoud's earnings. *See* Sample Pay Statements, Ex. 9.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute as to the facts stated in Paragraph 120. Plaintiff Cherdoud testified that, "[t]he dealer, because they – in the office, they give me a list of dealers, I can get access to them, and – *but you had the choice to choose any one*, but only on the list, which is they have, like, you know, the software or whatever approval with Uber." Cherdoud II Dep., 94:19-7-13. When asked, "[n]ow, paragraph 4 states that you were free to choose any dealership and any financing sources available to you in order to finance the purchase of the equipment, in this case the vehicle, and that you had no obligation to either purchase from the dealer or to enter into a contract with the dealer," and "so does that mean that you actually could have purchased your vehicle from anyone you chose," Mr. Cherdoud responded, "I guess, yes." *Id.*, 95:13 – 96:2. Mr. Cherdoud was later asked, "[a]nd you could have even already owned a vehicle that qualified to provide black car services and – and brought that into the relationship, correct," to which he responded, "[y]es." *Id.*, 96:3-8. Mr. Cherdoud also agreed that he "chose to purchase from Fred Bean (sic) and finance through Exeter." Finally, Mr. Cherdoud answered in the affirmative when he was asked, "[a]nd that was your choice as the independent contractor or owner operator, as

referenced in this document, right?" *Id.*, 96:13-17. It is undisputed that Uber provided Mr.

Cherdoud a list of dealerships that he could use if he chose to do so for financing, but Plaintiffs

cite no record evidence to support their implication that Mr. Cherdoud was limited to the list or

that Uber in any way took away his free choice. Plaintiffs also fail to cite record evidence to

support their assertion that Exeter financed the purchase because Exeter is paid weekly by Uber

from Plaintiff Cherdoud's earnings. There is simply nothing in the record regarding Exeter's

intentions or reasons why they financed Mr. Cherdoud's purchase. As such, the Court should

deem paragraph 120 as **undisputed and therefore admitted**.


121.    Milano also incurs unreimbursed business expenses that it claims on its taxes.
Cherdoud II Dep., 74:16-75:12.

**Plaintiffs' Response:** Undisputed.


122.    Plaintiff Cherdoud pays for his own phone, is responsible for tolls if he is not

transporting a passenger, and pays for the PPA vehicle inspection. Cherdoud II Dep., 80:2-9,

91:5-18, 126:11-127:6.

**Plaintiffs' Response:** Undisputed as to these limited items.


123.    Defendants do not prohibit transportation providers from using software

applications other than the Uber App or providing transportation services to others. ECF 80

(Plaintiffs' Admitted Facts), at ¶ 47.

**Plaintiffs' Response:** Undisputed.

124.    Luxe's drivers can generate revenue by providing transportation services using lead generation sources other than the Uber App. Luxe 30(b)(6) Dep., 30:22 – 31:7, 55:7-13.

**Plaintiffs' Response:** Disputed. Luxe does not have drivers. *See* response to ¶¶ 2, 44 and 53 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 124. When asked whether a list of drivers shows whether the driver was "active or not active as of May 12, 2017," Luxe's corporate designee responded, "[t]hat's correct." Luxe 30(b)(6) Dep., 214:9-13. When asked subsequently whether "there are 17 active drivers as of May 12th, 2017," Luxe's corporate designee responded, "[t]hat's correct." Luxe 30(b)(6) Dep., 214:14-18. As such, the Court should deem paragraph 124 as **<u>undisputed and therefore admitted</u>**.

125.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

126.    Luxe informed its drivers of the opportunity to provide transportation services through a company known as Blacklane. Luxe 30(b)(6) Dep., 378:21 – 379:10.

**Plaintiffs' Response:** Disputed. Luxe does not have drivers. *See* response to ¶¶ 2, 44 and 53 *supra*.

**Defendants' Reply:** For the reasons set forth in  Defendants' reply to Plaintiffs' response to paragraphs 2, 44, 53 and 124, the Court should deem paragraph 126 as **<u>undisputed and therefore admitted</u>**.

127.   Plaintiff Razak and his brother, Umer Razak, dispatched Luxe drivers to handle Blacklane trips. Razak II Dep., 74:18-75:7.

**Plaintiffs' Response:** Disputed. Luxe does not have drivers. *See* response to ¶¶ 2, 44 and 53 *supra*. These "drivers," moreover, provide transportation services under Gegen's certificate of public convenience. *Id.*

**Defendants' Reply:** For the reasons set forth in Defendants' reply to Plaintiffs' response to paragraphs 2, 44, 53 and 124, the Court should deem paragraph 127 as **<u>undisputed and therefore admitted</u>**.


128.   Approximately five to seven of Luxe's drivers signed up to use Blacklane to generate additional revenue for Luxe's business. Luxe 30(b)(6) Dep., 62:21 – 63:3; Razak II Dep., 10:10 – 11:3.

**Plaintiffs' Response:** Disputed. These "drivers" do not work for Luxe, nor do they generate additional revenue for Luxe by using the Blacklane App. *See* response to ¶¶ 44 and 53 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 128. When asked whether a list of drivers shows whether the driver was "active or not active as of May 12, 2017," Luxe's corporate designee responded, "[t]hat's correct." Luxe 30(b)(6) Dep., 214:9-13. When asked subsequently whether "there are 17 active drivers as of May 12th, 2017," Luxe's corporate designee responded, "[t]hat's correct." Luxe 30(b)(6) Dep., 214:14-18. When asked, "[h]ow many of your drivers were with Blacklane," Luxe's corporate designee testified "six to seven." *Id.*, 62:21 – 63:3. As such, the Court should deem the facts in Paragraph 128 as **<u>undisputed and therefore admitted</u>**.

129.    In fact, Plaintiff Razak himself provided transportation services through Blacklane. ECF 80 (Plaintiffs' Admitted Facts), at ¶ 71; Razak I Dep., 40:21-41:7; Razak II Dep., 73:5-8.

**Plaintiffs' Response:** Undisputed.


130.    More frequently, however, Plaintiff Razak's job with respect to Blacklane trip requests submitted to Luxe was that of "dispatch" – assigning transportation requests to other drivers on Luxe's roster. Razak II Dep., 75:4-7.

**Plaintiffs' Response:** Disputed. *See* response to 127 and 128 *supra*.

**Defendants' Reply:** For the reasons set forth in Defendants' reply to Plaintiffs' response to paragraphs 2, 44, 53 and 124, the Court should deem paragraph 130 as **undisputed and therefore admitted**.


131.    When Luxe received transportation requests from Blacklane, Plaintiff Razak or his brother "accepted the Blacklane request" on behalf of Luxe and then "assigned the actual transportation job to another" on Luxe's active roster. Luxe 30(b)(6) Dep., 59:9-13 (Blacklane sent trip requests to Luxe); ECF 80 (Plaintiffs' Admitted Facts), at ¶ 72; Luxe 30(b)(6) Dep., 335:9-12 (Plaintiff Razak was authorized by Luxe to facilitate Blacklane transactions and trips); Razak II Dep., 10:10-22 ("I'm the one who will be accepting the jobs and distributing" them to the drivers); *id.* at 11:15 – 12:1 (Plaintiff Razak received requests from Blacklane and distributed them to Luxe's drivers).

**Plaintiffs' Response:** Disputed. *See* response to 127 and 128 *supra*. It is undisputed, however, that unlike Uber, Blacklane permits users to transfer prearranged trip requests.

**Defendants' Reply:** For the reasons set forth in Defendants' reply to Plaintiffs' response to paragraphs 2, 44, 53 and 124, the Court should deem paragraph 131 as **<u>undisputed and therefore admitted</u>**.

132.    If Luxe accepted the trip request from Blacklane, Luxe would then identify a driver to provide the transportation services. Luxe 30(b)(6) Dep., 59:14-16; Razak II Dep., 11:4-14.

**Plaintiffs' Response:** Undisputed.

133.    After the trip was completed, Blacklane would pay Luxe, and Luxe would pay the driver who performed the transportation services. Luxe 30(b)(6) Dep., 65:6-14; *id.* at 65:21-24; *id.* at 68:9-12.

**Plaintiffs' Response:** Undisputed.

134.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

135.    When Luxe's drivers provided transportation services to riders they connected using the Blacklane app or to private clients generated from Luxe's own advertising, the revenue from those trips did not benefit Uber in any way. Luxe 30(b)(6) Dep., 56:10-24.

**Plaintiffs' Response:** Disputed. The individuals who lease vehicles from Luxe are primarily UberBLACK drivers. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 26:1-27:18 and 54:15-55:6. Luxe connects these individuals to prearranged Blacklane requests in order to

supplement their UberBLACK incomes, thereby helping them pay for their vehicle leases. *Id.* at 58:11-17. This in turn maintains and/or increases the supply of UberBLACK drivers, which benefits Uber.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 135. Plaintiffs' cites confirm that Luxe arranges for its drivers to perform trips arranged through Blacklane. Plaintiffs do not offer any evidence to prove that Uber benefits from these trips. Plaintiffs' argument is not evidence and does not create a dispute of fact. As such, the Court should deem paragraph 135 as **undisputed and therefore admitted**.

136.    Plaintiff Cherdoud testified that he started providing black car services outside of the Uber App in 2016. Cherdoud II Dep., 12:7-18.

**Plaintiffs' Response:** Disputed. Some trips are performed "outside of the Uber App," but not necessarily outside of the Uber system. Plaintiff Cherdoud is able to provide limousine transportation services in Philadelphia County by virtue of the fact that his vehicle is registered under Gegen's certificate of public convenience with the PPA. *See* response to ¶¶ 2 and 44 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 136. Cherdoud's own testimony confirms that he provided transportation services outside of the Uber App. As such, the Court should deem paragraph 136 as **undisputed and therefore admitted**.

137.    At first, Plaintiff Cherdoud worked with Freemo (Plaintiff Sabani's company) to handle pre-arranged trips. Cherdoud II Dep., 12:19-22, 17:5-9.

**Plaintiffs' Response:** Undisputed.

138.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Disputed. The referenced trips are not necessarily "non-Uber." *See* response to ¶¶ 2, 44 and 136 *supra*.

**Defendants' Reply:** Defendants incorporate their reply to paragraphs 2, 44, and 136.

139.    Plaintiff Cherdoud testified that almost half of his personal income in 2016 was generated from trips performed for Freemo. Cherdoud II Dep., 112:1-4.

**Plaintiffs' Response:** Disputed. Paragraph 139 misconstrues the facts. Plaintiff Cherdoud is the sole proprietor of Milano, which he established pursuant to Uber's rules and with the help of Uber. *See* response to paragraph 16 *supra*. Consequently, Plaintiff Cherdoud's personal income is derived from the net income of Milano. In 2016, Uber accounted for over 85% of Milano's gross receipts. *See* Cherdoud 2016 Tax Records.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 139. Cherdoud's own testimony confirms and his tax returns confirm that *half* of his *personal income* was generated from trips he performed for Freemo. *See* Pltfs' Ex. 23. As such, the Court should deem the factual assertions in paragraph 139 and **<u>undisputed and therefore admitted</u>**.

140.    While Plaintiff Cherdoud admits that he lacked the "courage" of other transportation providers in terms of how aggressively to promote his business, even he has found ways to promote his independent business, such as by parking next to hotels and negotiating with the doormen to have them direct hotel guests to him, and he does so while he is online on the Uber App. Cherdoud II Dep., 20:22-21:21, 68:7 – 69:2.

**Plaintiffs' Response:** Undisputed.


141.    Plaintiff Cherdoud has received trip requests from the hotel doormen, and uses a Square reader to charge the riders. Cherdoud II Dep., 21:22-23:1.

**Plaintiffs' Response:** Undisputed.


142.    Freemo's drivers have provided rides outside of the Uber App. Sabani II Dep., 16:5-11.

**Plaintiffs' Response:** Undisputed.


143.    Mr. Sabani, on behalf of Freemo Limo, corresponded with private customers about his company's pricing for airport and local rides. Sabani II Dep., 107:23-109:14 (authenticating Sabani's correspondence with Freemo's private customer); Exhibit 21 (Sabani correspondence with Freemo's private customer), at RAZAK_UBER_PL0007541-7545.

**Plaintiffs' Response:** Undisputed.


144.    Sabani personally provided over 100 trips through his company, and admitted that Uber placed no restrictions on his right to receive Freemo trip requests while simultaneously

online on the Uber App. Sabani I Dep., 16:15-20 (over 100 trips), 18:18-19:6 (permitted to provide driving service through his company, Freemo Limo, and never harassed by Uber), 19:2-6 (no restrictions while online).

**Plaintiffs' Response:** Disputed. Plaintiff Sabani was asked how many trips he provided personally *since the inception* of Freemo Limo. He answered, "I will say like over a hundred. I don't know the exact number." *See* Defs.' Exhibit cited as Sabani I Dep., 16:15-20.

Furthermore, Uber does restrict an individual's ability to conduct business outside of Uber while working as an UberBLACK driver. *See* Uber's Driver Deactivation Policy, ECF 68-6 ("soliciting payment of fares outside the Uber system" leads to deactivation) ("activities conducted outside of Uber's system – like anonymous pickups - are prohibited"); s*ee also* Uber's Community Guidelines, ECF Nos. 68-5, 68-6 and 68-7 ("collusion between rider or driver" results in account deactivation); s*ee also* Owner/Operator Agreement, ECF 15-2 at p. 62 ("you understand that you shall not during the term of this Agreement use your relationship with Gegen (or the information gained therefrom) to divert or attempt to divert any business from the Company to a competitive transportation broker, or any transportation provider"); *see also* Sept. 26, 2016 Uber Support Email to Sabani, Ex. 6 (notifying Sabani that he is subject to "permanent removal" from the App for messaging clients to "solicit rides outside of the platform"); *see also* Sept. 13, 2017 Op. denying Defs.' Mot. for Partial Summ. J., ECF 93 (discussing the nature of Plaintiffs' online time and finding that such time may be compensable due to the restrictions that Uber imposes on drivers while online), available at *Razak v. Uber Techs., Inc.*, 2017 U.S. Dist. LEXIS 148087, 2017 WL 4052417 (E.D. Pa. Sept. 13, 2017).

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 144. In fact, Plaintiffs' response admits Plaintiff

Sabani so testified. As such, the Court should deem the facts in Paragraph 144 as **undisputed and therefore admitted**. With regards to the documents Plaintiffs cite, the Driver Deactivation Policy, Uber's Community Guidelines, and the Owner/Operator Agreement are documents that speak for themselves, are mischaracterized by Plaintiffs, and do not create a genuine dispute with the facts stated in paragraph 144. The Driver Deactivation Policy provides that "soliciting payment of fares outside the Uber system" will lead to action being taken against the transportation provider's account. The Uber Community Guidelines do not permit collusion – i.e., attempts to cheat the system – between riders and drivers. These are basic proprietary defense mechanisms that attempt to prevent a situation where a transportation provider receives a trip request from a rider using the Uber App, and then usurps the opportunity without paying a service fee for receiving the trip request from the Uber App. This is the policy Plaintiff Sabani was contacted about, and to which he responded, in the September 26, 2016 correspondence Plaintiffs cite as Exhibit 6. This Policy does not address or limit Plaintiffs' ability to solicit and accept trip requests via their personal limousine companies or other transportation companies. Plaintiffs' own undisputed testimony that they were able to operate their own limousine transportation service businesses highlights the impossibility and irrelevance of their flawed implication with regards to this Policy. Mr. Holtzman-Conston also testified, and Plaintiffs cite no evidence to the contrary, that "the PPA would prohibit a licensed limousine driver from soliciting business on the street the same way a taxi driver would." Holtzman-Conston Dep., 114:24-11. Therefore, it is the PPA's requirement – and not Defendants' requirement – that prevents transportation providers from soliciting business from the street, accepting street hails, or making anonymous pickups from the street. The PPA restriction does not prevent transportation providers – like Plaintiffs – from operating their independent business and

diverting *their drivers* at their discretion. Sabani Dep., 12:24-13:18 (testified that he was able to receive calls for personal Freemo Limo limousine company while online); 16:15-20 (Sabani reported personally providing over 100 trips through his company, and admitted that Uber placed no restrictions on his right to receive Freemo Limo trip requests while simultaneously online on the Uber App); 19:2-6 (testified there were no restrictions placed on him while online), 22:20-23:1 (testified he has provided rides to personal Freemo Limo customers while online on the Uber App). Plaintiffs fail to cite record evidence to support their additional assertions, and as such they should be disregarded.

145.     *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

146.     The trips provided by Freemo are pre-arranged trips. ECF 80 (Plaintiffs' Admitted Facts), at ¶ 13.

**Plaintiffs' Response:** Undisputed.

147.     Freemo advertised its business in 2015 using pay per click on Google, and that advertising generated phone calls for trip requests. Sabani II Dep., 16:12-17:4.

**Plaintiffs' Response:** Undisputed.

148.     As recently as 2017, Freemo has also obtained rides by handing out cards to hotels that say Freemo Limo Transportation Service. Sabani II Dep., 20:16-21:3, 49:11-20, 62:22-63:2 (100-150 business cards to hotels).

**Plaintiffs' Response:** Disputed. Plaintiff Sabani testified that he did not have any private jobs in 2017. *See* Jan. 4, 2018 Sabani Dep., Ex. 2 at 38:18-20.

**Defendants' Reply:** Plaintiffs' purported dispute regarding the date of 2017 is immaterial. While Plaintiffs are correct that Plaintiff Sabani testified that he did not have any private jobs in 2017, Plaintiff Sabani testified that the last time he provided a private ride was December of 2016. Plaintiffs do not cite record evidence to dispute that Freemo has obtained rides by handing out cards to hotels that say Freemo Limo Transportation Service. Therefore, it is undisputed that as recently as December 2016, Freemo has also obtained rides by handing out cards to hotels that say Freemo Limo Transportation Service. Sabani II Dep., 20:16-21:3, 49:11-20, 62:22-63:2 (100-150 business cards to hotels).

149.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

150.    Kevin Bryant is an independent transportation provider who has received leads from the UberBLACK product in Philadelphia. Exhibit 8 (Holtzman-Conston Decl.), ¶27.

**Plaintiffs' Response:** Objection. This statement is based on inadmissible hearsay and, therefore, should be disregarded. F.R.C.P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must ... set out facts that would be admissible in evidence ....").

The referenced Declaration does not sufficiently establish how the Declarant obtained personal knowledge of this alleged fact. To the extent that the Declarant obtained personal knowledge through his review of Uber's business records, then said records must be produced pursuant to F.R.E. 1002 in order for the declaration testimony to be admissible. *See Acumed LLC*

*v. Advanced Surgical Servs.*, 561 F.3d 199 (3d Cir. 2007); *United States v. Miller*, 248 Fed.Appx. 426, 429 (3d Cir. 2007) ("[A] party [must] produce original documents if a witness testifies to the actual content of a writing.").

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute as to the facts set forth in Paragraph 150. Mr. Holtzman-Conston's declaration is based on personal knowledge gained through review of Uber's business systems, and sets out facts that are admissible in evidence. In addition, Mr. Holtzman-Conston's declaration establishes that he is competent to testify on the facts set forth in the declaration. Mr. Holtzman-Conston's declaration states that he is a Sr. Operations & Logistics Manager for Uber, and he previously managed a team of Uber employees who assisted him in monitoring supply and demand patterns in Philadelphia to help ensure transportation provider driver-partners (like Mr. Bryant) and riders can match up as efficiently as possible, offering customer support of driver-partners, and creating outbound communications for driver-partners. ECF 114-12, ¶2. Mr. Holtzman-Conston's declaration meets the requirements of Fed. R. Civ. P. 56(c)(4). As such, the Court should deem the facts set forth in Paragraph 150 as **undisputed and therefore admitted**.


151.    On March 26, 2015, Mr. Bryant went online on the Uber App for the UberBLACK product at 6:40:19 p.m., went offline at 6:54:48 p.m., went online at 7:37:09 p.m., accepted a trip request at 7:43:09 p.m., picked up the rider at 7:51:14 p.m., and completed the trip at 8:01:42 p.m. *Id.*, ¶28.

**Plaintiffs' Response:** Objection. *See* response to ¶ 150 *supra*.

**Defendants' Reply:**   Defendants incorporate their reply to Plaintiffs' response to paragraph 150.

152.    Kevin Bryant also provides transportation services using the Lyft App. ECF 66-11 (Certificate of Counsel), ¶¶3-5, Exhibits 1 (subpoena to Lyft), 2 (Lyft letter responding to subpoena, including excerpts from Kevin Bryant's login and ride history records), 3 (Declaration of Custodian of Records).

**Plaintiffs' Response:** Objection. This statement is based on documents produced by Lyft in response to a subpoena issued by the Defendants on April 21, 2017. (ECF 66-11.) The subpoena, and Lyft's production, relied on unauthenticated, hearsay information – specifically, a list of names, email addresses, and telephone numbers – prepared by the Defendants' attorneys. (ECF 66-11 at 9.) Accordingly, the documents produced by Lyft are inadmissible and should be disregarded pursuant to F.R.C.P. 56(c)(4). This portion of the cited Declaration should be disregarded since the Declaration itself fails to establish that the Declarant is qualified to interpret the content of Lyft's records.

**Defendants' Reply:** Defendants incorporate their reply to Plaintiffs' response to paragraph 150.

153.    According to records produced by Lyft, on March 26, 2015, Mr. Bryant logged onto the Lyft App at 6:40 p.m., finished a ride request at 6:53 p.m., and logged off at 7:44 p.m. ECF 66-11 (Certificate of Counsel), ¶¶3-5, Exhibit 2 to Certificate of Counsel (excerpts from Kevin Bryant's login and ride history records).

**Plaintiffs' Response:** Objection. *See* response to ¶ 151 and 152 above.

**Defendants' Reply:** Defendants incorporate their reply to Plaintiffs' response to paragraph 150.

154.    On March 31, 2015, Mr. Bryant went online on the Uber App at 6:22:39 p.m., accepted a trip on the UberBLACK product at 6:35:14 p.m., began the trip at 6:38:15 p.m., and completed the trip at 6:47:44 p.m. Exhibit 8 (Holtzman-Conston Decl.), ¶29.

**Plaintiffs' Response:** Objection. *See* response to ¶ 151 above.

**Defendants' Reply:** Defendants incorporate their reply to Plaintiffs' response to paragraph 150.

155.    According to records produced by Lyft, on March 31, 2015, Mr. Bryant finished a Lyft trip at 6:39 p.m. ECF 66-11 (Certificate of Counsel), ¶¶3-5, Exhibit 2 to Certificate of Counsel (excerpts from Kevin Bryant's login and ride history records).

**Plaintiffs' Response:** Objection. *See* response to ¶ 151 and 152 above.

**Defendants' Reply:** Defendants incorporate their reply to Plaintiffs' response to paragraph 150.

156.    To access the Uber App, transportation providers open the app on their mobile device and log in using their username and password. ECF 80 (Plaintiffs' Admitted Facts), at ¶ 14.

**Plaintiffs' Response:** Undisputed.

157.    After logging on, transportation providers tap a button to go online to be eligible to receive trip requests. Exhibit 8 (Holtzman-Conston Decl.), ¶30.

**Plaintiffs' Response:** Undisputed.

158.    Transportation providers are not required to remain on Uber's premises, physically or virtually (*i.e.*, being online) at any time; they have complete control over when their time spent online on the Uber App ("Online Time") begins and when it ends. Exhibit 8 (Holtzman-Conston Decl.), ¶31; Razak I Dep., 144:8-11 (can decide when to go offline), 171:8-13 (can go offline anytime he chooses and can stay online as long as he wants).

**Plaintiffs' Response:** Disputed. Drivers are required to remain on virtual premises established by Uber. For example, UberBLACK divers "may only advance in the queue at the Airport or 30th Street Train Station if within a certain zone, and may only accept trip requests at the Airport if inside the west parking lot." Sept. 13, 2017 Op. denying Defs.' Mot. for Partial Summ. J., ECF 93. Uber even goes to the airport zone "[e]very night from 11pm to 5am" to make sure drivers are physically present "with their phones." *See* Uber's PHL Airport Policies.

Similarly, Uber establishes "territorial limitations" that Uber changes "[e]very day, every week." *See* May 8, 2017 Razak Dep. 26:4-13 (ECF 66-9). Drivers are not informed of these "territorial limitations" in advance, instead the App shuts down. *Id.*

Drivers are also required to meet face-to-face with Uber employees inside of Uber's physical offices at 7821 Bartram Avenue. *See, e.g.*, Jan. 4, 2018 Sabani Dep., Ex. 2 at 84:15-85:4 (describing how drivers have to talk with the "Uber staff in the Uber office" to get information regarding new rules); *see also* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 18:16-22 (confirming that the purpose of Uber's Office at 7821 Bartram Avenue is to provide support to drivers) and 77:20-78:2 (stating that drivers can "show up to our office during open hours" to have their questions answered) and 16:10-23 (testifying that Uber employees meet with drivers face-to-face to discuss "a wide array of things," including to "set up their accounts for the first time" and "address complaints"); *see also* July 25, 2017 Clapps Dep., Ex. 10 at 18:3-18

(testifying that you have to go to the Bartram office to resolve issues, and time spent at the Bartram office is not paid for).

Drivers do not have "complete control" over when their online time begins and ends. Uber, moreover, will unilaterally log off a driver for a variety of reasons. For example, "[i]f a driver ignores three trip requests in a row, however, the Uber App will automatically move the driver from Online to offline, such that he will not be eligible at that time to accept trip requests." Op. denying Defs.' Mot. for Partial Summ. J., ECF 93. Drivers can also be taken offline due to App malfunctions, and are usually compensated at an hourly rate by Uber for such malfunctions. *See* Email re Uber App Malfunction. Uber will also log off drivers for a period of six hours if the driver reaches Uber's 12-hour driving limit. *See* Uber's Drowsy Driving Policy. Drivers can also be taken offline for operating outside their defined territory. *See* May 8, 2017 Razak Dep. 26:4-13 (ECF 66-9).

**Defendants' Reply:** Plaintiffs' attempts to dispute this basic fact are spurious, at best. This Court has already determined that drivers are free to go online and go offline whenever they choose. *See* ECF 93 at p. 27 ("Plaintiffs concede that they could go offline whenever they chose to do so."). Additionally, the Court also held that a driver may be anywhere he chooses. *Id.* at p. 10. Thus, Plaintiffs attempt to dispute this fact should be disregarded and this Court should deem the facts set forth in paragraph 158 as **undisputed and therefore admitted**.

159.    Drivers choose when to go online on the Uber App, and when to go offline. Razak II Dep., 28:21-24, 29:1-3.

**Plaintiffs' Response:** Disputed. *See* response to ¶ 158 *supra*.

**Defendants' Reply:** Defendants incorporate their reply to Plaintiffs' response to paragraph 158.

160.    Drivers can go online and offline whenever they want. Razak I Dep., 30:20-23.

**Plaintiffs' Response:** Disputed. Uber can unilaterally deactivate drivers, thereby preventing them from going online. *See* Uber's Driver Deactivation Policy, ECF 68-6, *accord* Feb. 9, 2015 Correspondence between Plaintiff Sabani and Uber Support, Ex. 16 (deactivating Plaintiff Sabani due to his driver rating and recommending that he undergo training from an approved Uber vendor) *and* Feb. 18, 2016 Email from Uber to Cherdoud regarding Airport Block (advising Plaintiff Cherdoud that he is blocked from going online in the airport zone).

**Defendants' Reply:** Defendants incorporate their reply to Plaintiffs' response to paragraph 158.

161.    Drivers can stay offline for as long as they want. Razak I Dep., 30:24 – 31:3.

**Plaintiffs' Response:** Undisputed.

162.    Once online, there is no requirement that the driver be engaged with the Uber App in order to stay online. Exhibit 8 (Holtzman-Conston Decl.), ¶32.

**Plaintiffs' Response:** Disputed. Drivers are moved offline by Uber if they miss three trip requests in a row. *See* response to ¶¶ 3 and 158; *see also* Sept. 13, 2017 Op. denying Defs.' Mot. for Partial Summ. J., ECF 93 (taking notice of the fact that "drivers must constantly engage with the Uber App to keep themselves Online and situated to accept a request").

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 162. Instead, Plaintiffs' response merely adds assertions related to what happens if a driver receives and ignores three trip requests. As such, the Court should deem the facts set forth in Paragraph 162 as **undisputed and therefore admitted**. With regards to Plaintiffs' additional assertions, it is undisputed that if a transportation provider ignores three trip requests, the Uber App may automatically move the transportation provider offline as a system integrity protection and in an effort to avoid extended wait times for riders who are waiting for a transportation provider to accept the trip request. Holtzman-Conston Dep., 54:5-14; ECF 66-6 (Declaration of Jordan Holtzman-Conston), ¶16.

163.    Defendants do not control the number of trip requests that are generated by riders or the number of requests Plaintiffs will receive, schedule start or stop times for Plaintiffs, or require them to work for a set number of hours. Exhibit 8 (Holtzman-Conston Decl.), ¶33.

**Plaintiffs' Response:** Disputed. Uber's Owner/Operator Agreement expressly states: "[t]he frequency with which [Uber] offers Requests to [the driver] under this Agreement shall be in the sole discretion of the Company." Uber's Owner/Operator Agreement, ECF 15-2 at p. 59.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 163. Defendants' Owner/Operator Agreement merely references the *frequency* with which requests are offered to the driver. The Owner/Operator Agreement does not address the *number* of trip requests that are generated by riders or *the number* of requests Plaintiffs will receive, *schedule* start or stop times for Plaintiffs, or *require them to work for a set number of hours*. Therefore, Plaintiffs have failed to cite record evidence that creates a genuine dispute of material fact with regards to the factual assertions

contained in Paragraph 163. As such, the Court should deem the factual assertions contained in Paragraph 163 as **undisputed and therefore admitted**.

164.    Trip requests are determined by the number of riders searching for rides, the number of other transportation providers who are available, and the location of the rider and driver. Exhibit 8 (Holtzman-Conston Decl.), ¶34.

**Plaintiffs' Response:** Disputed. The number of trip requests available to Plaintiffs is largely driven by Uber. For example, "economy" – not UberBLACK – is the new default option for riders using the Uber App. *See* Uber's Selecting A Vehicle Option. Similarly, the illegal introduction of UberX into the Philadelphia marketplace has driven down UberBLACK business. *See* PPA Message to Gegen/UberBLACK drivers regarding UberX (Pls.' First Compl. at ¶ 178, ECF 1 at p. 42 of 43); *see also Checker Cab Phila. v. Phila. Parking Auth.*, No. 16-4669, 2018 U.S. Dist. LEXIS 13671, 2018 WL 587298 (E.D. Pa. Jan. 28, 2018).

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 164.  Neither the default setting in the app nor the introduction of UberX in Philadelphia renders the facts set forth in paragraph 164 as disputed. As such, the Court should deem the factual assertions in paragraph 164 as **undisputed and therefore admitted**.

165.    Drivers are free to reject trip requests for any reason. ECF 93 (Memorandum re: Defendants' Motion for Partial Summary Judgment (Sept. 13, 2017)), at p 9.

**Plaintiffs' Response:** Disputed. Rejecting a trip request due to a person's race, religion, national origin, disability, sexual orientation, sex, marital status, gender identity, or age "will result in permanent deactivation." *See* Uber's Driver Deactivation Policy, ECF 68-6.

**Defendants' Reply:** Plaintiffs' purported dispute is immaterial to the determination of whether Plaintiffs are independent contractors. Plaintiffs merely point out that drivers are not permitted to discriminate against passengers, which is undisputed. This does not create a genuine dispute of material fact where it remains undisputed that drivers are free to reject trip requests for any *lawful* reason. ECF 93 (Memorandum re: Defendants' Motion for Partial Summary Judgment (Sept. 13, 2017)), at p 9.

166.    Uber cannot require any driver to accept a trip. *Id.*, at p 9.

**Plaintiffs' Response:** Undisputed.

167.    If not accepted, the request will then be offered to another online transportation provider. ECF 80 (Plaintiffs' Admitted Facts), at ¶ 27; ECF 93, at p 9.

**Plaintiffs' Response:** Undisputed.

168.    A trip request is sent to only one Uber driver at any given time, and having drivers who do not intend to give rides being online slows down the process of connecting riders and drivers, and leads to a poorer user experience for riders. ECF 93, at p 9.

**Plaintiffs' Response:** Undisputed.

169.    If no other transportation provider is available or accepts, the trip request goes unfulfilled. ECF 80 (Plaintiffs' Admitted Facts), at ¶ 28; ECF 93, at p 9.

**Plaintiffs' Response:** Undisputed.

170.    If there are insufficient transportation providers to provide rides, there is nothing Defendants could do to force additional transportation providers to go online on the Uber App. ECF 80 (Plaintiffs' Admitted Facts), at ¶ 67.

**Plaintiffs' Response:** Disputed. Uber coerces UberBLACK drivers to go online and accept trips by making automatic weekly deductions against their account. *See* Sample Pay Statements, Ex. 9.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 170. It is undisputed that the Sample Pay Statements Plaintiffs cite reflect deductions taken from earnings. The Sample Pay Statements do not, however, support Plaintiffs' assertion that Uber coerces UberBLACK drivers in any way. As such, the Court should deem the facts set forth in Paragraph 170 as **undisputed and therefore admitted**.

171.    Plaintiffs never suffered any consequences for cancelling trips, and Plaintiffs have not personally been penalized for their respective acceptance rates, or for failing to accept rides. ECF 93, at p 9-10.

**Plaintiffs' Response:** Disputed. *See* response to ¶ 172 *infra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 171. As such, the Court should deem the facts set forth in Paragraph 171 as **undisputed and therefore admitted**.

172.    Drivers are free to cancel trips even after they have accepted them, which Plaintiffs testified they have done on numerous occasions. *Id.* ("This court has not been presented with evidence that, in practice, Uber imposed *any consequences* for drivers' acceptance rates."); Razak I Dep., 36:23 – 37:4.

**Plaintiffs' Response:** Disputed. *See* Uber's Driver Deactivation Policy, ECF 68-6 (providing that a driver will be deactivated for "accepting trips without the intention to complete, including provoking riders to cancel…"); *see also* July 25, 2017 Clapps Dep., Ex. 10 at 53:2-24 (describing how cancelling on a customer leads to deactivation).

Uber does punish drivers for cancelling trips. *See* Decl. of Rashid Sheikh (attaching a message from Uber notifying Rashid Sheikh, and UberBLACK driver in Philadelphia, that his "account was deactivated due to an excessively high cancellation rate."); *see also* Jan. 15, 2016 Email from Uber to Plaintiff Razak (notifying Plaintiff Razak that he has "canceled an abnormally high number of trips" and that "[f]uture instances of the same offense can be cause for permanent loss of access to both your Uber rider and Uber partner applications.").

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 172. The Driver Deactivation Policy is a document that speaks for itself, is mischaracterized by Plaintiffs, and does not create a genuine dispute with the facts stated in paragraph 172. The Driver Deactivation Policy provides that accepting trips *without the intention to complete them* is a type of fraud. It is undisputed that drivers are free to

cancel trips *in good faith* even after they have accepted them. Plaintiffs' citation to Mr. Clapps deposition testimony also does not create a genuine dispute as to the factual assertions in Paragraph 172. Mr. Clapps provided no admissible evidence or concrete examples of anyone's account actually being deactivated, and admits that he has never experienced deactivation himself.  Plaintiffs' citation to Mr. Sheikh's declaration does not support Plaintiffs' assertion that Uber punishes drivers for cancelling trips, or creates a genuine dispute as to the facts stated in Paragraph 172. At most, Mr. Sheikh's declaration merely states that his account was deactivated due to an excessively high cancellation rate. It remains undisputed that drivers are free to cancel trips even after they have accepted them in the normal course of providing transportation services. In addition, Mr. Sheikh's account was reactivated, which is exactly opposite of a step Uber would have taken if they sought to "punish" drivers for cancellation rates. The undisputed fact remains that Plaintiffs never suffered any consequences for cancelling trips, and Plaintiffs have not personally been penalized for their respective acceptance rates, or for failing to accept rides (ECF 93, at p 9-10). It also remains undisputed that Plaintiffs have not presented "evidence that, in practice, Uber imposed *any consequences* for drivers' acceptance rates." *Id*.; Razak I Dep., 36:23 – 37:4. Since Mr. Sheikh's account was reactivated, he did not ultimately experience any consequences for his excessive cancellations. The cited testimony also in no way creates a dispute as to Mr. Holtzman-Conston's, Mr. Sabani's, and Mr. Razak's testimony that transportation providers have a choice to either accept or decline trip requests, and the data summaries relied on by Plaintiffs regarding the number of trips they cancelled and rejected. See, Dkts. 68-10 – 68-12 (Exhibits F-H to Plaintiffs' Answer). Plaintiffs' unsupported assertions should be disregarded, and when properly disregarded, the facts set forth in Paragraph 172 are **undisputed and therefore admitted**.

173.   A driver may cancel a trip after he has accepted it but before the rider enters the vehicle if, for instance, the driver calls the rider and asks the rider's destination, and the driver decides he does not want to travel there. ECF 93, at p 9-10.

**Plaintiffs' Response:** Disputed. *See* response to ¶ 172 *supra*.

**Defendants' Reply:** Defendants incorporate their reply to Plaintiffs' response to paragraph 173.

174.   Additionally, if the driver indicates on the Uber App that the trip has begun prematurely, he will see the rider's destination on the Uber App, and may choose to cancel it at that time. *Id.*, at 10.

**Plaintiffs' Response:** Disputed. *See* response to ¶ 172 *supra*; *see also* May 2, 2017 Holtzman-Conston Dep., Ex. 7 at 57:16-58:5 (starting a trip before the rider is in the vehicle is fraudulent).

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 173. As such, the Court should deem the facts set forth in Paragraph 173 as **<u>undisputed and therefore admitted</u>**. Plaintiffs' citation to Mr. Holtzman-Conston's deposition testimony does not create a genuine dispute as to the facts set forth in Paragraph 174. Mr. Holtzman-Conston testified that time spent traveling to a customer after hitting start trip would be part of the fare, and would constitute fraudulent activity. That is materially different than the facts set forth in Paragraph 174 that a driver may choose to cancel a trip if the driver indicated on the Uber App that the trip has begun prematurely. The facts set forth in Paragraph 174 involve a driver who does the right thing and cancels the trip rather than run up the fare on a customer. As such, Plaintiffs' citation to Mr. Holtzman-Conston's testimony

does not create genuine dispute as to the facts set forth in Paragraph 174, and should be disregarded.

175.    For drivers registered with UberBLACK in Philadelphia, the requesting rider must be located within Philadelphia. The driver, however, may be *anywhere he chooses*. ECF 93, at p 10.

**Plaintiffs' Response:** Disputed. A driver's access to the Uber App is subject to territorial limitations. *See* May 8, 2017 Razak Dep. 26:4-13 (ECF 66-9).

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 175. Plaintiffs cite Plaintiff Razak's deposition testimony, but in response to the question, "[w]hat is the territorial limit of where you can pick up a ride," Mr. Razak responded, "Uber knows. I have no idea." Razak I Dep., 26:4-6. Indeed, this fact has *already been acknowledged by this Court* as undisputed. As such, the Court should deem the facts set forth in Paragraph 173 as **undisputed and therefore admitted**.

176.    Ultimately, drivers independently decide where to go to offer rides while Online, and drivers are free to ignore any and all information conveyed to them by Uber. *Id*.

**Plaintiffs' Response:** Disputed. *See* response to ¶¶ 158, 170 and 175 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 176. As such, the Court should deem the facts set forth in Paragraph 176 as **undisputed and therefore admitted**. Defendants incorporate their replies to Plaintiffs' responses to paragraphs 158, 170, and 175.

177.    Uber places no restrictions on drivers' ability to engage in personal activities while Online, and Plaintiffs here, in fact, engaged in a range of personal activities while Online. *Id.*, at p 11.

**Plaintiffs' Response:** Disputed. Drivers cannot, for example, solicit fares outside of Uber while using the Uber App. *See* Uber's Driver Deactivation Policy, ECF 68-6 ("soliciting payment of fares outside the Uber system" leads to deactivation) ("activities conducted outside of Uber's system – like anonymous pickups - are prohibited"); *see also* Sept. 26, 2016 Uber Support Email to Sabani, Ex. 6 (notifying Sabani that he is subject to "permanent removal" from the App for messaging clients to "solicit rides outside of the platform"). Drivers are also required to constantly engage the Uber App to stay online. *See* response to ¶¶ 3 and 158; *see also* Sept. 13, 2017 Op. denying Defs.' Mot. for Partial Summ. J., ECF 93 (taking notice of the fact that "drivers must constantly engage with the Uber App to keep themselves Online and situated to accept a request").

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 177. As such, the Court should deem the facts set forth in Paragraph 177 as **undisputed and therefore admitted**.    This Court observed that "that drivers are automatically switched from Online to offline after ignoring three trip requests *could* reasonably be considered a severe restriction on their ability to engage in personal activities, particularly *if drivers are Online during periods when trip requests are frequent*, such that drivers must constantly engage with the Uber App to keep themselves Online and situated to accept a request." ECF 93, p. 30. In other words, this Court merely speculated as to a hypothetical situation without citation to any record evidence. Similarly, Plaintiffs cite no other record evidence to support their factual assertion, and therefore Plaintiffs' assertion should be

disregarded. Defendants incorporate their replies to Plaintiffs' responses to paragraphs 3 and 158.

178.    While online, transportation providers are free to send e-mails advertising their personal limousine company. ECF 80 (Plaintiffs' Admitted Facts), at ¶ 52.

**Plaintiffs' Response:** Undisputed, subject to Uber's rules prohibiting drivers from using the Uber App to solicit business outside of Uber. *See* response to ¶ 2 *supra*.

179.    While online, transportation providers are free to run a personal transportation company and distribute trips to other drivers. ECF 80 (Plaintiffs' Admitted Facts), at ¶ 53.

**Plaintiffs' Response:** Undisputed, subject to Uber's rules prohibiting drivers from using the Uber App to solicit business outside of Uber. *See* response to ¶ 2 *supra*.

180.    If a driver chooses to accept a trip request, the driver taps "accept." ECF 93, at p 8.

**Plaintiffs' Response:** Undisputed.

181.    While online, Plaintiffs, inter alia, accepted rides from private clients, slept, did personal errands, smoked cigarettes, took personal phone calls, rejected trips because they were tired, and conducted business for their independent transportation companies. *Id*. at p 11.

**Plaintiffs' Response:** Undisputed. However, activities occurred while the Plaintiffs were engaged to wait.

182.     One transportation provider testified that he is a Certified Public Accountant (CPA), and he goes online while he is in his CPA offices, performing his CPA work. Clapp Decl., ¶5. While online, he continues doing his CPA work such as tax returns and audits. *Id*. If he receives a trip request, and he's not otherwise in a client meeting or busy with something, he may accept the request. *Id.*

**Plaintiffs' Response:** Disputed. The Declarant testified that his office was, in fact, a virtual office. *See* July 25, 2017 Clapps Dep., Ex. 10 at 69:1-22.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 182. As such, the Court should deem the facts set forth in Paragraph 182 as **<u>undisputed and therefore admitted</u>**. With regards to Plaintiffs' additional assertion that Mr. Clapp's office is a virtual office, Plaintiffs' assertion is immaterial and does not create a genuine dispute with the facts asserted in Paragraph 182.


183.     One transportation provider stated that Uber does not control him while he is online on the Uber App. ECF 66-10, ¶4. He said he has the right to reject and decline trip requests that he receives from the Uber App without penalty. *Id*. Uber has never assigned or required him to work in a specific geographical area, and he is free to leave his house and to provide his services wherever and whenever he chooses to. *Id*. Although he works in King of Prussia, Pennsylvania, he chooses to make himself available in the downtown Philadelphia area where he believes that there is a higher demand for limousine services. *Id*.

**Plaintiffs' Response:** Disputed. The Declarant testified that he would indeed be penalized for canceling a trip. *See* July 25, 2017 Clapps Dep., Ex. 10 at 14:3-13.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 183. As such, the Court should deem the facts set forth in Paragraph 183 as **undisputed and therefore admitted**. Plaintiffs' citation to Mr. Clapps deposition testimony also does not create a genuine dispute as to the factual assertions in Paragraph 183. Mr. Clapps provided no evidence or concrete examples of anyone's account actually being deactivated, and admits that he has never experienced deactivation himself. Mr. Clapps' speculation on this point, like that of the Plaintiffs, is insufficient to create a genuine dispute of material fact.

184.     Plaintiff Razak testified that he left on vacation for two months in 2017, but did not have to ask permission from Uber to go offline for that long. Razak II Dep., 129:20-130:7, 131:8-13.

**Plaintiffs' Response:** Undisputed.

185.     Plaintiffs did not have "a schedule, crafted by the [Defendants], in which the [Plaintiff] was obligated to spend time working an expressly delineated shift or period of being on-call." ECF 93 (Memorandum re: Defendants' Motion for Partial Summary Judgment (Sept. 13, 2017)), at p 26.

**Plaintiffs' Response:** Undisputed.

186.     Uber does not require drivers to be online on the Uber App at any time. Razak I Dep., 25:4-6.

**Plaintiffs' Response:** Undisputed.

187.    Plaintiff Cherdoud testified that it did not matter what his hours were using the Uber App. Cherdoud II Dep., 19:7-15.

**Plaintiffs' Response:** Disputed. Plaintiff Cherdoud testified that he does not have "normal hours" and that "when [he] wakes up, [he] want[s] to get access to any trip." *See* Jan. 4, 2018 Cherdoud Dep., Ex. 1 at 19:7-15. Uber also limits the number of hours that an UberBLACK drive can work. *See* Uber's Drowsy Driving Policy, Ex. 26. Furthermore, UberBLACK drivers have to continue to perform services once they have accepted a trip request. S*ee* Uber's Driver Deactivation Policy, ECF 68-6 (providing that a driver will be deactivated for "accepting trips without the intention to complete, including provoking riders to cancel…"); *see also* July 25, 2017 Clapps Dep., Ex. 10 at 53:2-24 (describing how cancelling on a customer leads to deactivation).

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 187. Plaintiffs' cite the exact same testimony as is cited in Paragraph 187, yet mischaracterize it. Plaintiff Cherdoud <u>*did not*</u> testify, as Plaintiffs represent, that "he does not have 'normal hours.'" Instead, Plaintiff Cherdoud was asked the question, "[d]id you have normal hours," and he responded, "[i]t doesn't matter." Cherdoud II Dep., 19:7-11. As such, the Court should deem the facts set forth in Paragraph 187 as **<u>undisputed and therefore admitted</u>**. It is undisputed that Plaintiff Cherdoud went on to testify that "Just when I wake up, I want to get access to <u>*any trip*</u> I find in my way. Uber <u>*or not*</u>, I want to get anything to work at least 14 hours."

188.    Drivers are free to choose when to drive. Razak II Dep., 27:8-10.

**Plaintiffs' Response:** Disputed. *See* response to ¶ 187 *supra*.

**Defendants' Reply:** Defendants incorporate their reply to Plaintiffs' response to paragraph 187.


189.    Drivers retain the sole right to determine when and for how long they will use the Uber App. Razak I Dep., 25:7-10 (drivers determine when), 30:15-19 (drivers determine for how long); Exhibit 8 (Holtzman-Conston Decl.), ¶35.

   **Plaintiffs' Response:** Disputed. *See* response to ¶ 187 *supra*.

   **Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 189. As such, the Court should deem the facts set forth in Paragraph 189 as **undisputed and therefore admitted**.


190.    Each driver "schedules himself." Razak II Dep., 28:14-15

   **Plaintiffs' Response:** Disputed. *See* response to ¶ 187 *supra*.

   **Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 190. This dispute utterly ignores Plaintiffs' own testimony and the Court's prior orders. As such, the Court should deem the facts set forth in Paragraph 190 as **undisputed and therefore admitted**.


191.    Drivers choose when to provide transportation services based on their own interest and motivations. Razak II Dep., 29:15 – 30:3 ("It's up to you.... [N]obody is forcing you."). For example, Plaintiff Razak is driving less now than before for personal reasons. Razak II Dep., 79:14 – 80:7 ("I will keep myself busy with family, my mom, and other things.").

   **Plaintiffs' Response:** Disputed. *See* response to ¶ 187 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 191. As such, the Court should deem the facts set forth in Paragraph 191 as **undisputed and therefore admitted**.

192.  Plaintiffs' earnings were generated by the job. They are not paid an hourly wage or on a salary basis. Exhibit 8 (Holtzman-Conston Decl.), ¶36.

**Plaintiffs' Response:** Disputed. Uber does, on occasion, pay UberBLACK drivers, including the Plaintiffs, on an hourly basis. *See* Email re App Malfunction, Ex. 25 (stating that drivers were paid $20 per hour for waiting in the airport queue).

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a genuine dispute as to the facts in Paragraph 192. Plaintiffs assert that there is an exception to the rule that Plaintiffs' earnings were generated by the job. Plaintiffs do not assert that the rule is that Plaintiffs' earnings were generated by the job. Plaintiffs' citation does not support their assertion that Uber paid Plaintiffs on an hourly basis. There is no name on the document they reference as Exhibit 25, nor any other indication on the document that it was received by one of the Plaintiffs, let alone that Plaintiffs were also actually paid based on the exception cited therein. As such, the facts set forth in Paragraph 192 are unsupported, undisputed, and admitted.

193.  Luxe charges its drivers a weekly lease payment amount for the use of its vehicles. Luxe 30(b)(6) Dep., 129:10-13, 130:7-10.

**Plaintiffs' Response:** Undisputed.

194.    Luxe generates revenues from the weekly lease payments paid by drivers. Luxe 30(b)(6) Dep., 196:18-21, 27:6-18 (Luxe leases its cars to its drivers).

**Plaintiffs' Response:** Disputed. Luxe does not have "drivers." *See* response to ¶ 53 *supra*.

**Defendants' Reply:** Defendants incorporate their reply to Plaintiffs' response to paragraph 60, which demonstrates that Luxe clearly acknowledged that it has drivers. As such, this Court should deem the factual assertion in paragraph 194 as **undisputed and therefore admitted**.

195.    These weekly lease payments are the primary source of revenue for Luxe. Luxe 30(b)(6) Dep., 212:4-10.

**Plaintiffs' Response:** Undisputed.

196.    In fact, "Luxe doesn't care if the driver just parks the vehicle in their garage and never does any trips at all, as long as they make their weekly lease payments." Luxe 30(b)(6) Dep., 189:19 – 190:1.

**Plaintiffs' Response:** Disputed. Umer Razak testified that "Uber should care" because the driver is working for Uber, not Luxe. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 189:12-18. The lease vehicles are, moreover, registered under Gegen's certificate of public convenience. *See* response to ¶ 44 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 196. Plaintiffs' observation that "*Uber* should care" has nothing to do with the testimony cited in Paragraph 196 that "*Luxe* doesn't care . . . ."

Luxe 30(b)(6) Dep., 189:19 – 190:1 (emphasis added). As such, the Court should deem the factual assertions set forth in Paragraph 196 as **<u>undisputed and therefore admitted</u>**. With regards to Plaintiffs' additional assertions, Umer Razak belief that "Uber should care" is immaterial and inconsistent with his subsequent testimony. *See*, Luxe 30(b)(6) Dep., 214:9-13, 214:14-18. It is also undisputed that Luxe leased its vehicles to individuals who are affiliated with Luxe, and that Luxe was affiliated with Gegen for purposes of Gegen's certificate of public convenience.


197.    Luxe's business model contemplates that it will lease the vehicles in its fleet to other drivers at a weekly lease amount that will exceed the expenses associated with maintaining the vehicles (*e.g.*, finance payments, insurance payments, repairs and maintenance, oil changes, etc.), and that this excess amount will represent Luxe's profit from the operation of its business enterprise. Luxe 30(b)(6) Dep., 145:22 – 147:2, 154:20 – 155:5.

**Plaintiffs' Response:** Disputed. Luxe's current business model is to break even with its leases. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 146:7-14 (testifying that lease amount is "hopefully" sufficient to cover the vehicle expenses).

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 197. Plaintiffs' parenthetical actually admits as undisputed the facts set forth in Paragraph 197, and Plaintiffs cite no record evidence that supports the assertion that Luxe's "current business model is to break even with its leases." As such, Plaintiffs' unsupported assertions should be disregarded, and the Court should deem the factual assertions in Paragraph 197 as **<u>undisputed and therefore admitted</u>**.

198.    By acquiring more vehicles, it was Luxe's objective to generate more revenue by having more drivers pay more leases. Luxe 30(b)(6) Dep., 250:8-17; *id.* at 294:10-21 (noting that by adding more cars to its fleet, Luxe tripled its gross receipts in one year).

**Plaintiffs' Response:** Undisputed.

199.    In setting the lease amounts, Luxe seeks to strike the right balance between covering its expenses, attracting drivers and making a profit. For example, the lease amount cannot be so low that Luxe is not making a profit. Luxe 30(b)(6) Dep., 149:23 – 150:6. And it cannot be so high that drivers will not want to lease its vehicles. Luxe 30(b)(6) Dep., 151:14-18.

**Plaintiffs' Response:** Disputed. *See* response to ¶ 197 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 199. As such, the Court should deem the factual assertions in Paragraph 199 as **<u>undisputed and therefore admitted</u>**. Defendants incorporate their reply to Plaintiffs' response to paragraphs 197.

200.    Luxe sets the lease payment obligations of its drivers based in part on market conditions. Luxe 30(b)(6) Dep., 106:8-21, 148:2 – 150:6 (describing situation in which Luxe reduced a driver's weekly lease payment).

**Plaintiffs' Response:** Disputed. *See* response to ¶ 197 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 200. As such, the Court should deem the factual assertions in Paragraph 200 as **<u>undisputed and therefore admitted</u>**. Defendants incorporate their reply to Plaintiffs' response to paragraphs 197.

201.   Luxe and its drivers discuss these issues with each other in an attempt to reach agreement on an appropriate weekly lease amount. Luxe 30(b)(6) Dep., 149:17 – 150:6.

**Plaintiffs' Response:** Disputed. Luxe does not have drivers. *See* response to ¶¶ 2, 44 and 53 *supra*.

**Defendants' Reply:** Plaintiffs' response fails to respond to or cite evidence that creates a dispute with the factual assertions in Paragraph 201. Defendants incorporate their reply to Plaintiffs' response to paragraph 60, which demonstrates that Luxe clearly acknowledged that it has drivers. As such, this Court should deem the factual assertion in paragraph 201 as **undisputed and therefore admitted**.

202.   *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

203.   *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

204.   *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

205.   When other vehicles were being refinanced to lower rates (thereby leading to lower lease payments but extending the lease term), Plaintiff Razak elected to not refinance his vehicle, and to continue to make higher lease payments instead; this will result in his vehicle being paid off more quickly. Razak II Dep., 31:17 – 32:22.

**Plaintiffs' Response:** Undisputed.

206.    Even though the Lincoln Navigator is owned outright by Luxe, the driver who uses it to provide transportation services (not one of Luxe's owners) continues to pay a weekly lease to Luxe. Luxe 30(b)(6) Dep., 117:14 – 118:5.

**Plaintiffs' Response:** Undisputed.

207.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

208.    *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.

209.    Luxe "competes" against other corporations to attract drivers who may wish to lease vehicles from them to provide transportation services. Luxe 30(b)(6) Depo.137:16 – 138:24, 140:4-14 (noting that sometimes drivers will switch partner corporations because of their better reputation), 141:2-11 (drivers "pick and choose" between partner corporations); *id.* (describing situation in which a driver talked to two different partner corporations before choosing Luxe), 141:5-10 (Luxe is "better than others" in part because it has never made an error in processing the payments to its drivers, an error that has occurred "with other partners"), 161:17-19 (drivers have complained about other partners, but not about Luxe).

**Plaintiffs' Response:** Disputed. Drivers are referred to Luxe by Uber. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 141:12-20.

**Defendants' Reply:** Plaintiffs' response fails to properly address the factual assertions and testimony provided by Luxe's corporate designee set forth in Paragraph 209. While Luxe's corporate designee, Mr. Umer Razak, testified as to his belief that Uber referred drivers to Luxe because Luxe was one of the best companies, he also testified that he has only "heard" that information, and that he does not know if Luxe has been identified as one of the better companies. Luxe 30(b)(6) Dep., 141:12 – 142:18 ("That's what I heard. I don't know."). Defendants also object to Plaintiffs' citation to this testimony – relating to what Mr. Umer Razak has heard but does not actually have reason to know – as inadmissible hearsay that should be disregarded. Fed. R. Civ. P. 56(c)(1)(B), (c)(2). As such, the Court should deem the factual assertions in Paragraph 209 as **undisputed and therefore admitted**.

210.    Another reason that drivers will switch partner corporations is that they wish to lease a different vehicle that their current partner corporation does not have available in its fleet. Luxe 30(b)(6) Dep., 217:12 – 218:8 & 220:12 – 221:1 (describing situation in which Luxe lost a driver to another partner corporation because the driver wanted to drive a bigger car, and Luxe was already leasing all of its SUVs to other drivers).

**Plaintiffs' Response:** Undisputed.

211.    For example, some drivers prefer SUVs, thinking they might obtain more trip requests. Razak II Dep. 33:12 – 34:13.

**Plaintiffs' Response:** Undisputed.

212.   *See* Defs.' Unredacted Statement of Facts.

**Plaintiffs' Response:** Undisputed.


213.   When Luxe acquired one of those SUVs, it negotiated with one of its existing drivers to change his lease from a sedan to the SUV, even though it meant that the driver's weekly lease payment would increase. Luxe 30(b)(6) Dep., 224:7-24.

**Plaintiffs' Response:** Undisputed.


214.   Luxe believes that a limousine company's ability to move more quickly to repair and maintain vehicles would be appealing to drivers. Luxe 30(b)(6) Dep., 137:16 – 138:24 (claiming that "there is no one better" than Luxe at maintaining its fleet of vehicles).

**Plaintiffs' Response:** Undisputed.


215.   Luxe also moves quickly in part because if one of its vehicles needs to be repaired, no one will lease it from Luxe and it will not generate any revenue for the company. Luxe 30(b)(6) Dep., 139:7-14.

**Plaintiffs' Response:** Undisputed.


216.   Other limousine companies may not generate enough revenue to cover the expenses associated with operating the business, which might not be appealing to potential drivers. Luxe 30(b)(6) Dep., 142:21 – 143:5.

**Plaintiffs' Response:** Undisputed.

## PLAINTIFFS' ADDITIONAL MATERIAL FACTS

217.    In 2014, *all* of Milano's income was derived from Uber. *See* 1099 Form for 2014 issued by Uber, Milano 1120 Form Excerpt from 2014 and Cherdoud 1040A Form Excerpt from 2014 filed herewith as Ex. 29.

**Defendants' Response:** Defendants do not dispute that Milano's 2014 income was derived from revenues generated by using the Uber App. Plaintiffs' implication that Milano's 2014 income derived from Uber, however, is a mischaracterization of the source of their income. Plaintiffs' income when providing UberBLACK services is derived from fares charged to riders, Uber facilitates payment from rider to Plaintiffs, and Uber deducts a Service Fee from fares for use of the Uber App before transmitting the rider's payment to Plaintiffs. *See* Paragraph 22 (undisputed that the Services Agreement provides that Plaintiffs and their companies agree "to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare)").

218.    In 2014, Milano's taxable income was net negative. *See* Milano 1120 Form Excerpt from 2014, Ex. 29.

**Defendants' Response:** Undisputed.

219.    In 2014, __all__ of Plaintiff Cherdoud's income was derived from Uber. *See* Cherdoud 1040A Form Excerpt from 2014 *and* Milano 1120 Form Excerpt from 2014, Ex. 29 (showing that Plaintiff Cherdoud's total income in 2014 – $14,850 – matched his Milano officer compensation).

**Defendants' Response:** Defendants do not dispute that Cherdoud's 2014 income was derived from revenues generated by using the Uber App. Plaintiffs' implication that Cherdoud's

2014 income derived from Uber, however, is a mischaracterization of the source of their income. Plaintiffs' income when providing UberBLACK services is derived from fares charged to riders, Uber facilitates payment from rider to Plaintiffs, and Uber deducts a Service Fee from fares for use of the Uber App before transmitting the rider's payment to Plaintiffs. *See* Paragraph 22 (undisputed that the Services Agreement provides that Plaintiffs and their companies agree "to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare)").

220.    In 2015, *all* of Milano's income was derived from Uber. *See* 1099 Form for 2015 issued by Uber, Milano 1120 Form Excerpt from 2015 and Cherdoud 1040A Form Excerpt from 2015 filed herewith as Ex. 30.

**Defendants' Response:**  Defendants do not dispute that Milano's 2015 income was derived from revenues generated by using the Uber App. Plaintiffs' implication that Milano's 2015 income derived from Uber, however, is a mischaracterization of the source of their income. Plaintiffs' income when providing UberBLACK services is derived from fares charged to riders, Uber facilitates payment from rider to Plaintiffs, and Uber deducts a Service Fee from fares for use of the Uber App before transmitting the rider's payment to Plaintiffs. *See* Paragraph 22 (undisputed that the Services Agreement provides that Plaintiffs and their companies agree "to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare)").

221.    In 2015, Milano's taxable income was net negative. *See* Milano 1120 Form Excerpt from 2015, Ex. 30.

**Defendants' Response:** Undisputed.

222.     In 2015, **all** of Plaintiff Cherdoud's income was derived from Uber. *See* Cherdoud 1040A Form Excerpt from 2015 *and* Milano 1120 Form Excerpt from 2015, Ex. 30 (showing that Plaintiff Cherdoud's total income in 2015 – $18,585 – matched his Milano officer compensation).

   **Defendants' Response:** Defendants do not dispute that Cherdoud's 2015 income was derived from revenues generated by using the Uber App. Plaintiffs' implication that Cherdoud's 2015 income derived from Uber, however, is a mischaracterization of the source of their income. Plaintiffs' income when providing UberBLACK services is derived from fares charged to riders, Uber facilitates payment from rider to Plaintiffs, and Uber deducts a Service Fee from fares for use of the Uber App before transmitting the rider's payment to Plaintiffs. *See* Paragraph 22 (undisputed that the Services Agreement provides that Plaintiffs and their companies agree "to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare)").

223.     In 2015, 88% of Luxe's gross receipts/sales were derived from Uber. *See* Luxe 1120 Form Work Page from 2015 filed herewith as Ex. 31. That money was earned by and distributed to individual UberBLACK drivers, including Plaintiff Ali Razak. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 23:21-24.

   **Defendants' Response:** Defendants do not dispute that 88% of Luxe's gross receipts/sales in 2015 were derived from revenues generated by using the Uber App. Plaintiffs' implication that Luxe's 2015 gross receipts/sales were derived from Uber itself, however, is a

mischaracterization of the source of their income. Plaintiffs' income when providing UberBLACK services is derived from fares charged to riders, Uber facilitates payment from rider to Plaintiffs, and Uber deducts a Service Fee from fares for use of the Uber App before transmitting the rider's payment to Plaintiffs. *See* Paragraph 22 (undisputed that the Services Agreement provides that Plaintiffs and their companies agree "to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare)").

224.    In 2016, 98% of Luxe's gross receipts/sales were derived from Uber. *See* Luxe 1120 Form Work Page from 2016 filed herewith as Ex. 32. That money was earned by and distributed to individual UberBLACK drivers, including Plaintiff Ali Razak. *See* Jan. 3, 2018 Umer Razak Dep., Ex. 3 at 23:21-24.

**Defendants' Response:** Defendants do not dispute that 88% of Luxe's gross receipts/sales in 2015 were derived from revenues generated by using the Uber App or that 88% of Luxe's gross receipts/sales in 2015 were earned by and distributed to individual UberBLACK drivers, including Plaintiff Ali Razak. Plaintiffs' implication that Luxe's 2015 gross receipts/sales were derived from Uber itself, however, is a mischaracterization of the source of their income. Plaintiffs' income when providing UberBLACK services is derived from fares charged to riders, Uber facilitates payment from rider to Plaintiffs, and Uber deducts a Service Fee from fares for use of the Uber App before transmitting the rider's payment to Plaintiffs. *See* Paragraph 22 (undisputed that the Services Agreement provides that Plaintiffs and their companies agree "to pay Uber a service fee on a per Transportation Services transaction basis

calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare)").

225. In 2014, **all** of Plaintiff Sabani's income was derived from Uber. *See* Sabani 1040 Form Excerpt from 2014 filed herewith as Ex. 33 *and* Jan. 4, 2018 Sabani Dep., Ex. 2 at 135:2-6 (confirming that all of the income was Uber-related).

**Defendants' Response:** Defendants do not dispute that Sabani's 2014 income was derived from revenues generated by using the Uber App. Plaintiffs' implication that Sabani's 2014 income derived from Uber, however, is a mischaracterization of the source of their income. Plaintiffs' income when providing UberBLACK services is derived from fares charged to riders, Uber facilitates payment from rider to Plaintiffs, and Uber deducts a Service Fee from fares for use of the Uber App before transmitting the rider's payment to Plaintiffs. *See* Paragraph 22 (undisputed that the Services Agreement provides that Plaintiffs and their companies agree "to pay Uber a service fee on a per Transportation Services transaction basis calculated as a percentage of the Fare determined by the Fare Calculation (regardless of any Negotiated Fare)").

226. "Gegen is a certificated limousine provider authorized to furnish limousine services…" *See* Uber's Comments to the Pennsylvania Public Utility Commission, Ex. 11.

**Defendants' Response:** Undisputed.

227. Gegen's right "to render [limousine] services as a common carrier in the City of Philadelphia" arises from its certificate of public convenience, which was granted by the Philadelphia Parking Authority ("PPA") on or about May 31, 2013. *See* Notice of Gegen

Application, Ex. 12 (42 Pa.B. 7883, Dec. 29, 2012) *and* May 13, 2013 Letter from the PPA

Granting Gegen a Certificate of Public Convenience filed herewith as Ex. 34 (PPA Certificate

No. 1029368-07).

    **Defendants' Response:** Undisputed.


228.    A certificate of public convenience permits a "common carrier operating a luxury

limousine service" to "transport persons on an exclusive basis between points as authorized by

the certificate, if the order for service is received in advance of the actual rendering of service

and not by street hail." 52 Pa. Code. § 1053.22(a).

    **Defendants' Response:** The code section Plaintiffs cite in Paragraph 228 speaks for

itself and does not constitute a "Statement of Fact."


229.    Only three categories of individuals may provide limousine services under

Gegen's certificate of public convenience: "(1) The owner, if the owner is a limousine driver[,]

(2) An employee of the certificate holder who is a limousine driver[, and] (3) A limousine driver

who leases the limousine directly from the certificate holder." *See* 52 Pa. Code § 1051.8(a).

    **Defendants' Response:** The code section Plaintiffs cite in Paragraph 229 speaks for

itself and does not constitute a "Statement of Fact."


230.    As a condition of its certificate of public convenience, Gegen must "continually

supervise its limousine to make certain that only those limousine drivers authorized by this

section provide limousine service. A limousine certificate holder is required to ensure that a

person holds a valid limousine driver's certificate issued by the [PPA] before permitting the person to drive a limousine." *See* 52 Pa. Code § 1051.8(b).

**Defendants' Response:** The code section Plaintiffs cite in Paragraph 230 speaks for itself and does not constitute a "Statement of Fact."


231.    Gegen [sic] "required to conduct or have a third party conduct annual criminal history and driver history checks for all limousine drivers operating a limousine vehicle under [Gegen]." *See* 52 Pa. Code § 1051.8(c)(1) *and* July 14, 2014 Email from Uber regarding Background Checks, Ex. 15 (explaining that, in order to remain an active, drivers must submit to Uber's background check, even if the PPA already ran a background check on the driver).

**Defendants' Response:** The code section Plaintiffs cite in Paragraph 231 speaks for itself and does not constitute a "Statement of Fact." Defendants do not dispute that drivers must undergo a background check.


232.    "The liability insurance maintained by [Gegen must] be in an amount at least $ 1,500,000 to cover liability for bodily injury, death or property damage incurred in an accident arising from authorized service." *See* 52 Pa. Code § 1065.1.

**Defendants' Response:** The code section Plaintiffs cite in Paragraph 232 speaks for itself and does not constitute a "Statement of Fact."


233.    A vehicle may not operate as a limousine unless a "valid limousine rights sticker" is filed herewith to the vehicle's windshield. *See* 52 Pa. Code §§ 1055.1-1055.2.

**Defendants' Response:** The code sections Plaintiffs cite in Paragraph 233 speak for themselves and do not constitute "Statements of Fact."

234.   The limousine rights sticker is "issued annually for each limousine by the [PPA] to a certificate holder." 52 Pa. Code § 1055.1.

**Defendants' Response:** The code section Plaintiffs cite in Paragraph 234 speaks for itself and does not constitute a "Statement of Fact."

235.   The certificate holder receives one limousine rights sticker for each vehicle registered under its certificate and listed in its "Annual Information Filing" with the PPA. *See* 52 Pa. Code § 1051.3(h).

**Defendants' Response:** The code section Plaintiffs cite in Paragraph 235 speaks for itself and does not constitute a "Statement of Fact."

236.   Uber pays for the fees associated with the limousine rights stickers, then passes all of the costs onto the Plaintiffs through **weekly** deductions from their Uber earnings, regardless of what the Plaintiffs earned that week. *See* Sample Pay Statements, Ex. 9 (showing a total payout of -$211.70 to Plaintiff Sabani after Uber deducted $346.89 in commission and $1,247.42 in weekly expenses, including "PPA Sticker Cost").

**Defendants' Response:** Plaintiffs only cite a single pay statement for Mr. Sabani for a single week, and therefore their cited evidence does not support their broad statement as to all Plaintiffs. It is undisputed, however, that Uber deducts the costs of annual PPA stickers for some transportation providers because the PPA requires the limousine company holding the certificate

of public convenience to pay for those stickers directly (but Uber does not deduct such costs for those who drive under their own certificate or the certificate of another limousine company). Holtzman-Conston Dep., 34:8-24.

237.    UberBLACK drivers, including Plaintiffs, must be licensed by the PPA; they are required – by Uber – to maintain particular standards of dress whenever they transport riders. *See* December 2013 Driver Addendum § 2.1, ECF 68-3. *See also* Razak Dep. 49:2-12, ECF 68-17. *See also* Holtzman-Conston Dep. 102:2-7, 117:20-118:5, ECF 76-2.

**Defendants' Response:** It is undisputed that UberBLACK drivers, including Plaintiffs, must be licensed by the PPA. Plaintiffs fail, however, to support the remaining assertions in Paragraph 237 with citations to record evidence. The 2013 Driver Addendum, for example, refers to maintaining "standards of appearance and service *required by the users* of the Uber Software," and does not support the assertion that Uber requires drivers to maintain particular standards of dress. ECF 68-3 (December 2013 Driver Addendum), § 2.1 (emphasis added). Similarly, Mr. Razak's testimony does not support this assertion. In response to questioning about what he does to start his day, Mr. Razak testified that he makes sure he is "properly dressed for the day," among a list of other tasks Mr. Razak completes before turning on his vehicle. Razak I Dep. 49:2-12. Mr. Razak did not testify and Plaintiffs have cited no evidence to support the assertion that Uber requires Plaintiffs to maintain particular standards of dress whenever they transport riders. Mr. Holtzman-Conston testified that UberBLACK drivers are required to comply with all laws and regulations (Holtzman-Conston Dep. 102:2-7), that the PPA (not Uber) "sets requirements for how any limousine driver in the city [of Philadelphia] has to dress," and that *Defendants do not have any requirements* above and beyond the PPA

requirements. *Id.*, 117:20-118:5. Therefore, Plaintiffs' record citations do not support their assertions and should be disregarded.

238.    UberBLACK drivers, including Plaintiffs, are required by Uber to drive particular makes and models of car when they transport the riders. *See* Holtzman-Conston Dep. at 28:3-29:13, ECF 76-2.

**Defendants' Response:** Plaintiffs fail to cite record evidence to support the assertions in Paragraph 238. Mr. Holtzman-Conston testified that there is one make and model of automobile – a Toyota Avalon – *that Uber restricts* UberBLACK drivers from using, and that *it is the PPA that sets a list of vehicles* that limousine drivers may use in the city of Philadelphia. Holtzman-Conston Dep., 27:15-28:16. Therefore, Plaintiffs fail to cite evidence to support their assertion that Uber requires UberBLACK drivers to drive particular makes and models of cars. As such, Plaintiffs' assertion should be disregarded.

239.    The vehicles that the Plaintiffs operate are registered under Gegen's certificate of public convenience from the PPA, thereby permitting the vehicles to operate as limousines in Philadelphia County. *See, e.g.*, Pennsylvania Fleet Registration filed herewith as Ex. 35 (showing that the vehicle operated by Plaintiff Cherdoud is registered to Gegen).

**Defendants' Response:** Plaintiffs fail to cite record evidence to support the assertions in Paragraph 239. The Pennsylvania Fleet Registration document Plaintiffs cite merely reflects that Gegen is listed on the registration form with the state of Pennsylvania. The document does not reflect that Plaintiff Cherdoud's vehicle, let alone the other vehicles that Plaintiffs operate as

limousines in Philadelphia County, are registered under Gegen's certificate of public convenience from the PPA. As such, Plaintiffs' unsupported assertion should be disregarded.

240.    Since the Plaintiffs' vehicles are registered to Gegen, Uber ensures that the finance payments are made by making **weekly** deductions from the Plaintiffs' Uber earnings. *See* Sample Pay Statements, Ex. 9 (showing a total payout of $3.72 to Plaintiff Cherdoud after deducting an "Exeter Payment" and "Gegen Insurance").

**Defendants' Response:** Plaintiffs fail to cite record evidence to support their assertion that Uber ensures that finance payments are made since the Plaintiffs' vehicles are registered to Gegen. Instead, Plaintiffs' Sample Pay Statement merely reflects deductions from Plaintiff Sabani's earnings. Therefore, Plaintiffs' unsupported assertions should be disregarded.

241.    According to their driver certificates, the Plaintiffs are drivers for Gegen, LLC, which is listed as a "Limo" Company. *See, e.g.*, Cherdoud Limousine Driver Certificate filed herewith as Ex. 36.

**Defendants' Response:**  Plaintiffs fail to cite record evidence to support their assertion that Plaintiffs are "drivers for Gegen."  Therefore, Plaintiffs' unsupported assertions should be disregarded. It is undisputed that Mr. Cherdoud's Limousine Driver Certification lists Gegen as a "Limo" Company.

242.    The Plaintiffs and Gegen are insured under the same commercial auto insurance policy. *See, e.g.*, Certificate of Liability Insurance filed herewith as Ex. 37 (naming Plaintiff

Cherdoud and Gegen as the insureds) *and* Pennsylvania Financial Responsibility Card filed herewith as Ex. 38 (naming Gegen as the insured for the vehicle operated by Plaintiff Cherdoud).

**Defendants' Response:** Undisputed that Exhibits 37 and 38 provide the evidence cited herein. Plaintiffs fail to cite record evidence to support their assertion that they all have the same insurance as Mr. Cherdoud. Therefore, Plaintiffs' unsupported assertions should be disregarded.

243.    Uber has sole discretion in selecting auto insurance, and negotiates on behalf of the Plaintiffs to "minimize the increase in premiums." *See* Message from Uber regarding Gegen's Insurance, Ex. 14 (explaining that, despite Uber's "hard" negotiating, only one insurance company "agreed to underwrite the policy").

**Defendants' Response:** Disputed. Plaintiffs are free to obtain their own insurance. Holtzman-Conston Dep., 30:10-23.

244.    Despite Uber's control over the insurance, Plaintiffs are responsible for the entire premium via **weekly** deductions from their Uber earnings. *Id.* (assuring drivers that "Gegen does not make money on insurance"); *see also* Sample Pay Statements, Ex. 9.

**Defendants' Response:** Undisputed that Plaintiffs are responsible for the insurance premiums. By way of further response, Plaintiffs are not required to obtain insurance through Gegen. Holtzman-Conston Dep., 30:10-23. The remaining averment in paragraph 244 is unsupported by the record evidence cited and therefore, should be disregarded.

245.     Uber has absolute control over the "financial terms of a trip," from calculating and adjusting fares, to processing payments. *See* Dec. 11, 2015 Technology Services Agreement at ¶ 4 (ECF 114-15).

**Defendants' Response:** Disputed. The Technology Services Agreement expressly allows transportation providers, like Plaintiffs, to negotiate fares. *Id.* at Section 4.

246.     Uber can unilaterally change, without notice, how it calculates fares. *Id.* at ¶ 4.2. *See also* Aug. 18, 2015 Email to Drivers from Uber regarding UberBLACK Updates filed herewith as Ex. 39 (providing a week's notice that UberBLACK fares and fees are increasing, the Airport Flat Fee is being removed, and rider surcharges will be applied at the airport).

**Defendants' Response:** This averment is not supported by the record evidence cited. Therefore, Plaintiffs' unsupported assertions should be disregarded.

247.     Since Uber controls the payment process, drivers have no recourse if Uber fails to obtain payment from the customer. *See, e.g.*, Sept. 10, 2014 Message from Uber to Plaintiff Sabani filed herewith as Ex. 40 (refusing to pay Plaintiff Sabani because "the customer used a stolen credit card and acknowledging "we know is [SIC] not your fault… we cannot adjust more because we cannot charge the customer."); *see also* Jan. 25, 2015 Message from Uber to Plaintiff Cherdoud filed herewith as Ex. 41 (refusing to pay Plaintiff Cherdoud because he "forget to hit being trip."); *see also* Jan. 19 Message from Uber to Plaintiff Cherdoud filed herewith as Ex. 42 (warning Plaintiff Cherdoud to "never speak to clients about pricing as that is all taken care of by Uber.").

**Defendants' Response:** Disputed. Drivers could end their relationship with Uber if Uber failed to provide payment from the riders. *See* Technology Services Agreement, ECF114-15.

248.    UberBLACK drivers, including Plaintiffs, are required by Uber to drive particular makes and models of car when they transport the riders. *See* Holtzman-Conston Dep. at 28:3-29:13, ECF 76-2.

**Defendants' Response:** Disputed. Mr. Holtzman-Conston testified that there is one make and model of automobile – a Toyota Avalon – *that Uber restricts* UberBLACK drivers from using, and that *it is the PPA that sets a list of vehicles* that limousine drivers may use in the city of Philadelphia. Holtzman-Conston Dep., 27:15-28:16. Therefore, Plaintiffs fail to cite evidence to support their assertion that Uber requires UberBLACK drivers to drive particular make and models of cars.

249.    Uber's written agreement with the drivers expressly provides that drivers who fail to complete a trip, once accepted, are subject to immediate deactivation of their accounts. See ¶ 16 supra. See also Deactivation Policy 5-8 (discussing deactivation from cancellations) and 8-9 (cancelling trips after accepting a fare, or provoking riders to cancel trips, results in permanent deactivation), ECF 68-8. *See also* June 2014 Driver Addendum § 5.1, ECF 68-13. This understanding was confirmed by Uber's Declarant, George Clapps. *See* Clapps. Dep. 12:6-14:18, ECF 76-1.

**Defendants' Response:** Undisputed that Uber reserves this right.

250.    Uber tracks every driver's cancellation rate, and warns drivers with a high cancellation rate that additional cancellations is "cause for permanent loss of access to both your Uber ride and Uber partner applications. *See* Jan. 15, 2016 Email from Uber to Plaintiff Razak filed herewith as Ex. 44. Plaintiff Razak has received such a warning. *Id.*

**Defendants' Response:** Undisputed. By way of further response, Plaintiffs have not cited any evidence that any of the Plaintiffs were ever deactivated for cancelling a trip. Plaintiffs may cancel a trip after they have accepted without suffering any negative consequences. *See* Defendants SOF 172, *supra. See also* ECF 93, at p 9-10See, Dkts. 68-10 – 68-12 (Exhibits F-H to Plaintiffs' Answer).

251.    Uber does indeed deactivate drivers because of their cancellation rate. *See* Decl. of Rashid Sheikh filed herewith as Ex. 43 (notifying Mr. Sheikh that his "account was deactivated due to an excessively high cancellation rate").

**Defendants' Response:** Undisputed that Mr. Sheikh's account was deactivated because of high cancellation rates. By way of further response, Mr. Sheikh was not deactivated for cancelling a trip, but because his cancellation rate was excessive. Additionally, when Mr. Shiekh was deactivated, it was not based on the use of his UberBLACK account, but the use of his peer-to-peer account. *See* Holzman-Conston Decl. at ¶¶ 4-6, attached as Exhibit F.

252.    Rashid Sheikh, an UberBLACK driver, was deactivated due to his cancellation rate. *Id.*

**Defendants' Response:** Undisputed that Mr. Sheikh has an UberBLACK account and that he was deactivated for an excessively high cancellation rate.  By way of further response,

Mr. Sheikh's deactivation was not based on his use of the UberBLACK product. Mr. Sheikh's UberBLACK account was never deactivated because of his cancellation rate. *See* Defendants' Response to Plaintiffs' SOF 252.

253.    Uber has many employee disciplinary penalties, such as deactivating drivers with higher cancellation rates, which it is free to impose at its discretion. *Id.* For example, with airport queue abuse is punishable by a one-week bar from the airport. *Id. See also* Holtzman-Conston Dep. 110, ECF 76-2.

**Defendants' Response:** Plaintiffs' averment in paragraph 253 is nothing more than argument and constitutes a legal conclusion. It is undisputed that Defendants retain the right to deactivate Plaintiffs if they violate the Community Guidelines or the terms of their agreements but Plaintiffs have cited to no evidence to support the characterization of "employee disciplinary penalties."

254.    Uber punished Plaintiff Cherdoud for allegedly violating Uber's "empty sleeper" policy by blocking him from "airport pickups for one week." *See* Feb. 18, 2016 Email from Uber to Plaintiff Cherdoud filed herewith as Ex. 27.

**Defendants' Response:** Defendants incorporate their response to Plaintiffs' SOF 253.

255.    Uber maintains a "driver rating" policy that requires the Plaintiffs to "maintain the 'Minimum Average Rating,'" which is "established by Uber" and "may be updated from time to time by Uber in its sole discretion." *See also* Nov. 10, 2014 Driver Addendum, ECF 68-4 at ¶ 2.4.2.

**Defendants' Response:** Undisputed.

256.    Uber's driver rating policy requires drivers to "accept a substantial portion of User requests" in order to prevent "a negative experience for Users of Uber's mobile application." *Id.*

**Defendants' Response:** Plaintiffs' citation is misleading in that it does not contain all of the material language in the Driver addendum.  Section 2.4.2 of the November 10, 2014 Driver Addendum states that drivers agree that "if they are logged in to the Driver App," they will "***strive*** to accept a substantial portion of User requests for Transportation Services."   *Id.* (emphasis added).  Agreeing to *strive* to accept requests is much different than being *required* to do so.  Thus, because Plaintiffs' citation does not support the proposition in paragraph 256, it should be disregarded by the Court.

257.    For UberBLACK drivers in Philadelphia, the "Minimum Average Rating" is 4.7 out of 5 stars.

**Defendants' Response:** Plaintiffs' averment does not cite to any record evidence. As such it violated Rule 56 and the Court's Chamber Rules.

258.    Uber punished Plaintiff Sabani for having a rating of 4.65 (.05 short of the mandate) by deactivating his account. *See* Feb. 9, 2015 Message from Uber to Plaintiff Sabani, Ex. 16.

**Defendants' Response:** Undisputed that Mr. Sabani's account was deactivated because of a low rider rating.  Plaintiffs' characterization of the deactivation being punishment, rather

than the parties meeting the obligations set forth in their respective agreements, constitutes nothing but argument and is not supported by the cited evidence. *See* November 10, 2014 Driver Addendum. (ECF 68-4 at §2.4.) Indeed, Mr. Sabani continued to perform transportation services using the UberBLACK product after February 9, 2015. *See e.g.*, SOF ¶¶ 110-119.

259.   Uber's background check policy subjects drivers "to certain background and driving record checks from time to time in order to qualify to provide, and remain eligible to provide, Transportation Services." *See* Nov. 10, 2014 Driver Addendum, ECF 68-4 at ¶ 3.

**Defendants' Response:** Undisputed.

260.   Even if a driver was cleared under PPA's background check, the driver must submit to Uber's background check as "a requirement to remain an active driver with Uber" because "Uber's background check is more thorough." *See* July 14, 2014 Email from Uber to Plaintiff Razak, Ex. 15.

**Defendants' Response:** Undisputed.

261.   Uber "deactivated (waitlisted)" Plaintiff Razak pursuant to Uber's background policy. *See* Aug. 18 Email Correspondence between Uber and Plaintiff Razak filed herewith as Ex. 45.

**Defendants' Response:** Undisputed.

262.   On November 10, 2017, the United Kingdom's Employment Appeal Tribunal issued a judgment affirming that, under English law, Uber drivers are employees. *See* Nov. 10,

2017 U.K. Employment Appeal Tribunal J. (Appeal No. UKEAT/0056/17/DA) filed herewith as

Ex. 46.

      **Defendants' Response:** Undisputed.

Dated: April 4, 2018

Respectfully submitted,

/s/ Paul C. Lantis

Paul C. Lantis (PA #309240)
Wendy Buckingham (PA #320259)
**LITTLER MENDELSON, P.C.**
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102-1321
Telephone: (267) 402-3073
Facsimile: (267) 402-3131
PLantis@littler.com

Robert W. Pritchard (PA #76979)
Joshua C. Vaughn (PA #203040)
**LITTLER MENDELSON, P.C.**
625 Liberty Avenue
26th Floor
Pittsburgh, PA 15222
Telephone: (412) 201-7628
Facsimile: (412) 774-1957
RPritchard@littler.com
JVaughn@littler.com

Andrew M. Spurchise (admitted *pro hac vice*)
**LITTLER MENDELSON, P.C.**
900 Third Avenue
8th Floor
New York, NY 10022
Telephone: (212) 583-2684
Facsimile: (212) 832-2719
ASpurchise@littler.com

Niloy Ray (admitted *pro hac vice*)
**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, MN 55402.2136

Telephone: 612.630.1000
*nray@littler.com*

Sophia Behnia (admitted *pro hac vice*)
**LITTLER MENDELSON, P.C.**
333 Bush Street
34th Floor
San Francisco, CA 94104
Telephone: 415.276.2561
*sbehnia@littler.com*

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC and
GEGEN, LLC

## CERTIFICATE OF SERVICE

I, Paul C. Lantis, hereby certify that on this April 4, 2018, I caused the foregoing Defendants' Amended Reply to Plaintiffs' Statement of Facts Opposing Defendants' Motion for Summary Judgment to be filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon the following counsel of record:

John K. Weston, Esquire
Jeremy E. Abay, Esquire
Sacks Weston Diamond, LLC
1845 Walnut Street, Suite 1600
Philadelphia, PA 19103

*Attorneys for Plaintiffs*

*/s/ Paul C. Lantis*