**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALI RAZAK, KENAN SABANI, and KHALDOUN CHERDOUD<br><br>v.<br><br>UBER TECHNOLOGIES, INC., and GEGAN, LLC | CIVIL ACTION<br><br>NO. 16-573 |

Baylson, J.                                                                       April 11, 2018

**MEMORANDUM RE: DEFENDANTS' MOTION**
**FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

This case is the first to grant summary judgment on the question of whether drivers for UberBLACK are employees or independent contractors within the meaning of the Fair Labor Standards Act ("FLSA") and similar Pennsylvania state laws.

More specifically, Plaintiffs Ali Razak ("Razak"), Kenan Sabani ("Sabani"), and Khaldoun Cherdoud ("Cherdoud" and, together with Razak and Sabani, "Plaintiffs") have brought individual and representative claims against Uber Technologies, Inc. and its wholly-owned subsidiary Gegen, LLC ("Gegen," and collectively, "Uber") for violations of the federal minimum wage and overtime requirements under the FLSA, 29 U.S.C. § 201 *et seq.*, the Pennsylvania Minimum Wage Act ("PMWA"), and the Pennsylvania Wage Payment and Collection Law ("WPCL").  Before the Court is Uber's Motion for Summary Judgment (ECF

144, "Uber Mot.") on the question of whether Plaintiffs, drivers for UberBLACK, qualify as "employees" of Uber under the FLSA and PMWA.[1]

In general, under the FLSA, employers must pay employees the applicable minimum wage for each hour worked, and, if an employee works more than forty hours in a given week, the employer must pay one and one half (1½) times the regular rate for each hour subsequently worked. 29 U.S.C. §§ 206-07. Thus, among other things, Plaintiffs seek back pay for their work driving passengers using the Uber app.

For the following reasons, Uber's Motion for Summary Judgment will be GRANTED. As a matter of law, Plaintiffs have not met their burden to show that they are employees and that Uber is their employer.

## II.   PROCEDURAL HISTORY

Plaintiffs commenced this action on January 6, 2016, by filing a Complaint in the Court of Common Pleas of Philadelphia County. (ECF 1, Ex. A). On February 4, 2016, Defendants removed the action to this court, citing federal question and diversity jurisdiction. (Id.).

### A.   *Prior Motion Practice*

On March 22, 2016, Uber moved for the first time to dismiss this case and compel arbitration, and, in a separate motion, to stay this action. (See ECF 15, 18). In those motions, Uber argued that an order issued by Judge Chen in the Northern District of California in related cases had "nullified" the arbitration provision in Uber's Service Agreement, thereby raising a "threshold question of arbitrability" that had to be decided by an arbitrator. Finding that Judge Chen's order had no such effect, this court concluded that Plaintiffs had complied with the arbitration opt-out procedures allowed by the Service Agreement. The Court denied both

---

[1] Unlike the FLSA and PMWA, "[t]he WPCL does not create a right to compensation . . . rather it provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages." De Asencio v. Tyson Foods, Inc., 342 F.3d 301, 309 (3d Cir. 2003).

motions.  (ECF 37); Razak v. Uber Techs., Inc., No. 16-cv-573, 2016 WL 3960556, at *1 (E.D. Pa. July 21, 2016).

On August 19, 2016, Uber moved for Judgment on the Pleadings, (ECF 38), which, on October 7, 2016, this Court granted in part, and denied in part.  See Razak, 2016 WL 5874822, at *1.  Importantly, the Court found that Plaintiffs had alleged sufficient facts that they qualified as "employees" rather than "independent contractors," under the "economic realities" test, such that judgment on the pleadings was not warranted.  Id. at *4-5.  Accordingly, the Court permitted Plaintiffs' minimum wage claims to proceed as pled.  The Court dismissed Plaintiffs' breach of fiduciary duty claim with prejudice, but Plaintiffs' FLSA and PMWA overtime claims without prejudice, and with leave to file an amended complaint.  Plaintiffs then filed an Amended Complaint on October 13, 2016.  (ECF 47, "AC").

On October 31, 2016, Uber moved to dismiss Plaintiffs' Amended Complaint in its entirety, as well as to strike certain portions of it.  (ECF 48).  The Court denied the motion to dismiss.  (ECF 54; Razak v. Uber Techs., Inc., 2016 WL 7241795, at *6 (E.D. Pa. Dec. 14, 2016)).  Specifically, the Court found that Plaintiffs' allegations that they were "Online"[2] the Uber App for more than 40 hours in a given week was sufficient—at the pleading stage—to state a claim for overtime pay under the FLSA.

However, the Court further found that the question of whether Plaintiffs' time spent Online the Uber App was actually compensable work time, within the meaning of the FLSA, was "an important, potentially dispositive one in this case."  Id.  Accordingly, "notwithstanding the Court's conclusion that Plaintiffs ha[d] sufficiently alleged FLSA overtime violations," the Court designated the issue of compensability of Plaintiffs' Online time for expedited discovery.  Id.

---

[2] Throughout this opinion, the capitalized term, "Online," refers to drivers who are logged into the Uber App and eligible to receive trip requests from prospective UberBLACK riders.

After substantial discovery, including depositions of Plaintiffs and certain third parties, as well as other filings, Uber filed its Motion for Partial Summary Judgment on the limited issue of the compensability of Plaintiffs' Online time.  While maintaining its position that Plaintiffs are independent contractors rather than employees, Uber moved "on the limited question of whether—assuming, for purposes of [that] Motion only, that Plaintiffs qualify as 'employees' and Uber as an 'employer' under the FLSA—the time they spent Online the Uber App is compensable work time under the FLSA, and by extension, the PWMA."

On September 6, 2017, the Court held Oral Argument.  (See Transcript of 9/6 Oral Argument ("Tr.") ECF 91.  The Court ultimately denied the Motion for Partial Summary Judgment, focusing especially on four undisputed factual issues which indicated that the time drivers spent logged into the Uber App could be considered "'predominantly' for the benefit of the employer rather than the employee":

> (1) Drivers have at most 15 seconds to accept a trip request from a rider which, if not accepted, will be deemed rejected.

> (2) If a driver does not accept three trip requests in a row, the Uber App automatically switches the driver from Online to offline. While offline, drivers are not eligible to accept ride requests.

> (3) The rider's destination is not disclosed to the driver until the rider's trip begins.  Thus, in considering whether to accept a request, the driver has no knowledge whether it will be a short ride or very long—which affects driver compensation and may also restrict personal activities.

> (4) Drivers may only advance in the queue at the Airport or 30th Street Train Station if within a certain zone, and may only accept trip requests at the Airport if inside the west parking lot.

Razak v. Uber Techs., Inc., No. 16-cv-573, 2017 WL 4052417 (E.D. Pa. Sept. 13, 2017).

The Court also surmised that "the compensability question" at issue in that motion "may be inextricably intertwined with the threshold employee versus independent contractor question." Id., at *15. Therefore, the Court's denial of partial summary judgment was without prejudice to refile at the completion of discovery. See id., at *16.

      B.     *The Present Motion for Summary Judgment*

After additional discovery, Uber filed its Motion for Summary Judgment on the present question of whether Plaintiffs are employees or independent contractors (ECF 114), to which it attached a statement of undisputed facts. (ECF 114-3, "Uber SOF"). Plaintiffs filed a Response on February 26, 2018 (ECF 117), together with a statement of facts (ECF 117-3, "SOF Response"). Uber then filed a Reply on March 12, 2018 (ECF 118), together with a "Reply to Statement of Facts" (ECF 118-3). Plaintiffs were previously granted leave to file a sur-reply (ECF 110), which they filed on March 19, 2018 (ECF 119).

Plaintiffs then filed a Motion to Strike the Defendants' Reply to Plaintiffs' Statement of Facts, on March 19, 2018 (ECF 120), asserting that the Plaintiffs' Reply Statement of Facts violated this Court's practice and procedural order. The Court granted the Motion to Strike (ECF 121) and Defendants' filed an amended Reply to Statement of Facts on April 4, 2018. (ECF 123, "Reply SOF").

## III.   STATEMENT OF FACTS

The following is a fair account of the factual assertions at issue in this case, as taken from, *inter alia*, Uber's Statement of Undisputed Facts in Support of Defendants' Motion for Summary Judgment (Uber SOF, ECF 114-3), and not genuinely disputed by Plaintiffs.

A.    *How UberBLACK Works*

Plaintiffs are Pennsylvania drivers participating in the Uber ride-sharing service who bring this action on behalf of a putative class of "[a]ll persons who provided limousine services, now known as UberBLACK, through Defendants' App in Philadelphia, Pennsylvania." (ECF 47, AC ¶ 106).  Plaintiffs are certified limousine drivers who provide services as drivers through a mobile smartphone application (the "Uber App") furnished by Uber.  (Id. ¶¶ 2, 22, 63).  The Uber App "provid[es] on-demand car services to the general public," including through the UberBLACK[3] platform.  (Id.).

Gegen is a wholly-owned subsidiary of Uber that holds a certificate of public convenience from (and is licensed by) the Philadelphia Parking Authority ("PPA")[4] to operate a limousine company. (Uber SOF ¶ 41).   Because transportation companies and individual transportation providers who wish to provide Black car services in Philadelphia are required to hold a PPA certificate of public convenience (or associate with an entity that holds such a certificate) (Id. ¶ 42), some UberBLACK transportation providers operate under the PPA certificate held by Gegen.  (Id. ¶ 45).   Approximately 75% of drivers also use Gegen's automobile insurance.  (Id. ¶ 96)  Plaintiffs each own and operate transportation companies Luxe

---

[3] This case only pertains to UberBLACK drivers, and therefore, the Court uses the term "Uber driver" only to mean "UberBLACK driver."   UberBLACK is one of several services (or what Uber calls "platforms") that Uber provides through the UberApp.  Drivers for UberBLACK provide "Black car" service, meaning that they exclusively drive vehicles approved by Philadelphia for limousine livery services.  (Reply SOF, ¶ 248).

[4] A certificate of public convenience permits a "common carrier operating a luxury limousine service" to "transport persons on an exclusive basis between points as authorized by the certificate, if the order for service is received in advance of the actual rendering of service and not by street hail." 52 Pa. Code § 1053.22(a).   Only three categories of individuals may provide limousine services under Gegen's certificate of public convenience: "(1) The owner, if the owner is a limousine driver[,] (2) An employee of the certificate holder who is a limousine driver[, and] (3) A limousine driver who leases the limousine directly from the certificate holder." See 52 Pa. Code § 1051.8(a).

Limousine Services, Inc. ("Luxe"), Freemo Limo, LLC ("Freemo"), and Milano Limo, Inc. ("Milano").  (Id. ¶ 1).

To access the Uber App, drivers open the App on their mobile device and log in using their usernames and passwords.  (SOF ¶ 156).  After logging on, to be eligible to receive a trip request from a prospective rider, drivers must tap a button , at which point the driver is online ("Online"). [5]  (Id. ¶ 157).  If a driver chooses to accept a trip request, the driver taps "accept." (Uber SOF to Motion for Partial SJ, ECF 66-3 ¶ 25).  If a driver does not press the "accept" button within 15 seconds of the trip request, it will be deemed rejected by the driver by default. The Uber App will then automatically route the trip request to the next closest driver, until a driver accepts the request.  If, however, no other driver accepts the trip, the trip request goes unfulfilled, as Uber cannot require any driver to accept a trip.  (Id. ¶ 26, 28).

Drivers are free to reject trip requests for any reason, aside from unlawful discrimination. (Id. ¶¶ 22, 24, 50-51).  If a driver ignores three trip requests in a row, however, the Uber App will automatically move the driver from Online to offline, such that he will not be eligible at that time to accept trip requests.  (Id. ¶ 29).  Uber refers to this as a system integrity measure since, as described above, a trip request is sent to only one UberBLACK driver at any given time, and having drivers who do not intend to give rides Online slows down the process of connecting riders and drivers, and leads to a poorer user experience for riders.  Drivers who have been automatically transitioned offline, however, may go back Online at any point, including immediately after going offline, if they wish to do so. (Id. ¶ 30).

Uber also has regulations under which it logs off drivers for a period of six hours if the driver reaches Uber's 12-hour driving limit.  (See Uber Drowsy Driving Policy, ECF 117-31).

---

[5] The driver exclusively determines when to go "Online" to seek trip requests, and Uber permits drivers to stay offline for as long as they want.  (SOF ¶ 161 (undisputed)).

Uber also has regulations under which it reserves the right to deactivate drivers for "accepting trips without the intention to complete, including provoking riders to cancel." (Uber's Driver Deactivation Policy, ECF 68-6).

B.      *Drivers' Physical Location*

Trip requests via the Uber App are generally sent to the driver closest to the requesting rider.  (Uber SOF to Motion for Partial SJ, ECF 66-3 ¶ 35).  Drivers have no way of knowing from the Uber App, what the "demand" is at any given time; namely, whether, or how many, other drivers are Online.  (Id. at 6).  Uber may, from time to time, send drivers information about rider demand that may be of interest to them (e.g., a concert at the Wells Fargo Center, etc.), specifically dates or times of high rider demand.  (Uber SOF to Motion for Partial SJ, ECF 66-3 ¶¶ 57, 58).  However, ultimately drivers independently decide where to go to offer rides while Online.  (Id. ¶¶ 34, 59, 60).

One exception to drivers' ability to accept trip requests from anywhere, so long as they are Online, is at Philadelphia's major transportation hubs, namely 30th Street Train Station and Philadelphia International Airport (the "Airport").  There is a "queue" system at both locations that routes trips to the next driver in the queue, (id. ¶ 36), and a driver can only enter, or advance in, the queue while inside a designated zone.  (Id. ¶ 37).  Additionally, at the Airport, drivers can only receive trip requests if located inside the "west parking lot."  Drivers, including Plaintiffs, sometimes try to evade this requirement by, for instance, leaving their phones inside the designated zone at the Airport (but outside the west parking lot), such that they can advance in the queue without having to be physically with their phone.  (Id. ¶¶ 55-56).

C.      *Drivers' Activities While Online*

Uber places no restrictions on drivers' ability to engage in personal activities while Online, and Plaintiffs here, in fact, engaged in a range of personal activities while Online.  The undisputed facts in the record reflect that, while Online, Plaintiffs, *inter alia*, accepted rides from private clients, slept, did personal errands, smoked cigarettes, took personal phone calls, rejected trips because they were tired, and conducted business for their independent transportation companies.  (Uber SOF ¶ 181).  Drivers also sometimes forget to go offline, such that they remain in the Online mode on the Uber App despite having no intention of completing trips. (Uber SOF to Motion for Partial SJ ¶ 46).  Drivers are allowed to use software applications other than the Uber App and to provide transportation services to others "outside of" the Uber App. (Uber SOF ¶¶ 123, 141-143).

The Court accepts, for purposes of this motion, Plaintiffs' assertion that (1) Razak spent an average of 7 hours and 17 minutes Online each day, receiving an average of over 10 fare requests each day and completing more than 6 trips; (2) Sabani spent an average of 12 hours Online each day, receiving an average of more than 5 requests per day and completing 4 trips; and (3) Cherdoud spent an average of 9 hours, 16 minutes Online each day, receiving over 7 ride requests and completing over 5 trips. (Plaintiffs' Response SOF to Motion for Partial SJ, ECF 68 ¶ 68 (citing ECF 68-10, 11, 12)). These figures reveal that Plaintiffs spent a large portion of their time Online not actually completing trips, and engaged, for at least some of the time, in these various personal activities.

D.      *Written Agreements Among the Relevant Parties*

Independent transportation companies ("ITC's") who wish to provide transportation services using the UberBLACK platform must first enter into a Software License and Online

Services Agreement, or similar agreement such as a Technology Services Agreement. (Uber SOF ¶ 19).[6] Then, drivers engaged by ITC's who have entered into such agreements may also use the Uber App, once they agree to the terms of the Driver Addendum to the Services Agreement. (Uber SOF ¶ 23).[7]

The Services Agreement setting forth the relationship between Uber and companies using the Uber App states, among other things:

- "Customer [defined by the agreement as "an independent company in the business of providing transportation services"] acknowledges and agrees that Uber is a technology services provider that does not provide transportation services, function as a transportation carrier, nor operate as a broker for the transportation of passengers."

- "Customer shall provide all necessary equipment, tools and other materials, at Customer's own expense, necessary to perform Transportation Services."

- "Uber does not, and shall not be deemed to, direct or control Customer or its Drivers generally or in their performance under this Agreement specifically, including in connection with the operation of Customer's business, the provision of Transportation Services, the acts or omissions of Drivers, or the operation and maintenance of any Vehicles."

- "Customer and its Drivers retain the sole right to determine when, where, and for how long each of them will utilize the Driver App or the Uber Services."

- "With the exception of any signage required by local law or permit/license requirements, Uber shall have no right to require Customer or any Driver to: (a) display Uber's or any of its Affiliates' names, logos or colors on any Vehicle(s); or (b) wear a uniform or any other clothing displaying Uber's or any of its Affiliates' names, logos or colors. . . ."

- "In consideration of Uber's provision of the Driver App and the Uber Services for the use and benefit of Customer and its Drivers hereunder, Customer agrees to pay Uber a service fee on a per Transportation Services transaction basis."

---

[6] Plaintiffs dispute this paragraph on the grounds that it runs contrary to two previously-filed items in this case: the sworn declaration of Michael Coleman (ECF 15-1) and Uber's Brief in Support of its Motion to Dismiss (ECF 15). Neither of the two filings contradicts paragraph 19 of Uber's Statement of Undisputed Facts, as neither states that individuals may gain access to UberBLACK without an ITC first entering into an agreement with Uber.

[7] Plaintiffs also claim this paragraph is disputed, on the same grounds as above. Again, neither of the filings cited by Plaintiffs contradicts Uber's Statement of Undisputed Facts and thus, there is no genuine dispute as to this sentence. Wherever this Opinion references a "fact" that Plaintiffs contended in their submissions was "disputed," the Court found that such dispute was either not "genuine," or not "material," or both.

- "Customer agrees to maintain during the term of this Agreement workers' compensation insurance for itself and any of its subcontractors as required by all applicable laws in the Territory."

- "Except as otherwise expressly provided herein with respect to Uber acting as the limited payment collection agent solely for the purpose of collecting payment from Users on behalf of Customer, the relationship between the parties under this Agreement is solely that of independent contracting parties."

- "The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Uber and Customer or Uber and any Driver; and (b) no joint venture, partnership, or agency relationship exists between Uber and Customer or Uber and any Driver."

(Id. ¶ 22).

The Driver Addendum setting forth the relationship between a transportation company and a driver engaged by the transportation company (and required by Uber before Uber will permit the driver to drive using the UberBLACK product) states, among other things:

- "This Driver Addendum to Technology Services Agreement [] constitutes a legal agreement between an independent company in the business of providing transportation services ("Transportation Company") and an independent, for-hire transportation provider ("Driver" []). Driver maintains a contractual or employment arrangement with Transportation Company to perform passenger carriage services for the Transportation Company."

- "Uber does not, and shall not be deemed to, direct or control Driver generally or in Driver's performance of Transportation Services or maintenance of any Vehicles."

- "Driver acknowledges that Uber does not control, or purport to control: (a) when, where, or for how long Driver will utilize the Driver App or the Uber Services; or (b) Driver's decision, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services, or to cancel an accepted request for Transportation Services, via the Driver App, subject to Uber's then-current cancellation policies."

(Id. ¶ 24).

E.    *How UberBLACK Drivers get Paid*

Uber sets the financial terms of all UberBLACK fares, and riders have their credit cards linked to the Uber App.  (AC ¶ 34).  Upon completion of the ride, charges the rider's credit card for the fare.  (Id.).  The money then (eventually) goes into the transportation company's Uber

account, with a commission taken out by Uber.   (Response SOF ¶ 63).   The transportation company may then distribute the proceeds, and, for example, in the case of Luxe, such money is distributed to the driver who provided the ride.   (Id.).

Although some expenses are borne by Uber, the transportation companies who contract with Uber incur many expenses in supplying and maintaining vehicles, including finance payments, insurance, oil changes and repairs, towing expenses, maintenance and car washes. (Id. ¶¶ 76, 92-93, 103, 121-122).   Plaintiffs' companies often went beyond these expenses to pay for advertising seeking private clients outside of the Uber App.   (See, e.g., id. ¶¶ 84, 89-90).

## IV.   PARTIES' CONTENTIONS

Stated briefly, Uber's principal contention on its motion for summary judgment is that Plaintiffs are not employees as a matter of law, and therefore their putative class action on behalf of all UberBLACK drivers must be dismissed.   In Uber's briefs, Plaintiffs are portrayed as entrepreneurial business-owners who use UberBLACK as a means of acquiring trip requests, with their primary competition coming from other limousine-for-hire companies.   Uber contends that Plaintiffs are not employees of Uber because Plaintiffs are not restricted from working for other companies, pay their own expenses (which are substantial), invest in their own companies, advertise and market for their own companies, engage workers for their own companies, work using UberBLACK as much or as little as they want, reject work from UberBLACK as much as they want, and use business acumen to attain their own profits (and losses).   In Uber's view, UberBLACK is simply a source of "lead generation," like a "modern-day Yellow Pages," rather than an "employer" under the FLSA.

In opposition to the motion, Plaintiffs contend that they are "employees" under the FLSA, and therefore entitled to overtime pay and other benefits, because they are extensively

controlled by Uber when they are online, they exercise stamina rather than managerial skill to determine profit or loss, they must provide certain types and colors of car to drive for Uber,[8] they do not have special skills requiring long training or apprenticeship, they have driven for Uber for years and for many hours per week, and they perform an integral role for Uber's business.

## V.      DISCUSSION OF LEGAL FRAMEWORK

A. *Determining Employee Versus Independent Contractor Status of Workers*

### 1.      FLSA and PMWA Statutory Language

The minimum wage, regular payday, payday notification, and overtime wage provisions at issue in this case all require that Plaintiffs prove they are "employees."  See 29 U.S.C. §§ 203, 206-07;  43 P.S. § 333.104.   On this, the parties wisely agree.   See, e.g., Tourscher v. McCullough, 184 F.3d 236, 242 (3d Cir. 1999) (The relevant portions "of the FLSA [] apply only to workers who are 'employees' within the meaning of the Act."); Crump v. HF3 Constr., Inc., 14-cv-4671, 2016 WL 6962532, at *2 (E.D. Pa. Nov. 29, 2016 ("Each of these claims depends on the determination that Plaintiffs were employees of Defendants: as Plaintiffs implicitly acknowledge, Defendants could not have violated the law if Plaintiffs were not their employees.").

Although Plaintiffs' claims go beyond the FLSA to include the PMWA, "Pennsylvania courts have looked to federal law regarding the FLSA for guidance in applying the PMWA." Itterly v. Family Dollar Stores, Inc., 606 F. App'x 643, 645 n. 4 (3d Cir. 2015); see also Mackereth v. Kooma, Inc., No. 14-cv-4824, 2015 WL 2337273, at *8 (E.D. Pa. May 14, 2015). Relevant to the present motion, "Pennsylvania courts look to federal case law and the tests

---

[8] This particular contention—that drivers are restricted to certain vehicle makes and models—will not be addressed in any detail, because the PPA sets the list of vehicles that limousine drivers may use in the City of Philadelphia, and Uber only restricts transportation providers from using a single model otherwise approved by the PPA (Toyota Avalon).  (Reply SOF, ¶ 248).

employed by the federal courts to determine if a defendant is an employer under the PMWA." Dep't of Labor & Industry v. Stuber, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003) aff'd 580 Pa. 66, 859 A.2d 1253 (Pa. 2004).

The FLSA itself is circular in its definitions of "employers" and "employees." "Employer" is defined as "includ[ing] any person acting directly or indirectly in the interest of an employer in relation to an employee," and an "employee" is defined as "any individual employed by an employer." 29 U.S.C. § 203(d), (e)(1). Thus, courts have been left to fashion standards for determining whether an individual is an employee.

### 2. Third Circuit Guidance in <u>Donovan</u>

The seminal case in this Circuit for determining whether a worker is an employee under the FLSA is <u>Donovan v. DialAmerica Marketing, Inc.</u>, 757 F.2d 1376 (3d Cir. 1985). <u>Donovan</u> makes clear that "Congress and the courts have both recognized that, of all the acts of social legislation, the Fair Labor Standards Act has the broadest definition of 'employee.'" <u>Id.</u> at 1382 (citing 81 Cong. Rec. 7657 (remarks of Senator Hugo L. Black) and <u>E.E.O.C. v. Zippo Mfg. Co.</u>, 713 F.2d 32, 37 (3d Cir. 1983)).

The <u>Donovan</u> court also set forth six factors for determining whether a worker is an employee:

> (1) the degree of the alleged employer's right to control the manner in which the work is to be performed;
>
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
>
> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanence of the working relationship; and
>
> (6) whether the service rendered is an integral part of the alleged employer's business.

Id.

Consistent with the Supreme Court's guidance in Rutherford Food Corp. v. McComb, 331 U.S. 722 (1947) (determining "employee" status under the FSLA), the Donovan court instructed that "neither the presence nor absence of any particular factor is dispositive," and thus, "courts should examine the circumstances of the whole activity" with a consideration, "as a matter of economic reality," of whether "the individuals are dependent upon the business to which they render service." Id. at 1382-83 (citations omitted). This "economic-dependence aspect" "examines whether the workers are dependent on a particular business or organization for their continued employment." Id. at 1385; see also Bartels v. Birmingham, 332 U.S. 126, 130 (1947).

Applying its standard, the Third Circuit considered two groups (the "home researchers," and the "distributors") of alleged employees working for the defendant, a telephone marking firm. A "major aspect" of the firm's business was the "sale of magazine renewal subscriptions by telephone to persons whose subscriptions have expired or are near expiration." Donovan, 757 F.2d at 1379. To locate subscribers' phone numbers, the marketing firm used at least three methods: (1) a computerized telephone-number search operation; (2) in-house researchers; and (3) a home research program. Id. The third method, at issue in Donovan, accounted for 4%-5% of all numbers sought, whereas the first two methods combined for a total of 70% of all numbers sought. Id. Roughly 25% of the numbers were never sought. Id.

The defendant sought researchers for the home research program through advertising in newspapers. Prospective "home researchers" then contacted the defendant, and those who remained interested in the work met with an officer of the defendant to learn how to properly do the required work, Also during that meeting, the researchers were asked to sign a document

labeled an "Independent Contractor's Agreement."  From that point forward, each home researcher was given 500 or more phone numbers to research, with periodic appointments at defendant's office to deliver their research results and retrieve more phone numbers to research. The defendant paid five cents for each successfully researched phone number.

Also as part of the home research program, the defendant hired six or seven "distributors" to pick up and deliver phone number cards of other home researchers.  In some cases, the distributors also recruited new home researchers and trained them.  By the end of the program, defendant paid distributors a flat fee per phone number, with distributors independently negotiating the payment per phone number for the home researchers to which they distributed number cards.

The Third Circuit initially noted that the trial court had correctly assessed three of the six factors as weighing in favor of "employee" status of the home researchers when it found "that, for the most part, the investment of these workers was not great, the opportunity for profit and loss was small and the skills required were few."  Id. at 1383.  As for the "right-to-control" factor, the Third Circuit found that the trial court had misapplied and overemphasized the factor, because working from home inherently involves some freedom from, among other things, direct supervision and strict working hours.  Lastly, the appellate court noted that the district court had not applied the remaining two factors, i.e., the degree of permanence of the working relationship and whether the service rendered is an integral part of the alleged employer's business.  Both of these also weighed in favor of employee status, according to the Third Circuit, because (1) "[t]he working relationship between the home researchers and [defendant] was, for the most part, not a transitory one," and (2) "the home researchers were engaged in the location of phone numbers[,] an integral part of the defendant's business" in light of the fact that "the primary work of the

defendant is locating phone numbers of various people and calling them to sell particular products." Id. at 1385. Therefore, because the factors on the whole weighed in favor of "employee" status, the Third Circuit reversed the district court and found that the home researchers were "employees" of the defendant under the FLSA.

As for the distributors, the Third Circuit agreed with the district court's holding that they were not employees for purposes of the FLSA because: (1) "the defendant exercised little control over the distributors' delivery of cards," and they "were permitted to recruit their own distributees," (2) "the distributors risked financial loss if they did not manage their distribution network properly," as they "were responsible for paying all of their expenses" and "had the authority to set the rate at which its distributes would be paid," (3) "had to make an investment in their business" and "used paid advertising in an effort to gain more distributes," (4) "needed to possess some degree of managerial skill to ensure that their revenues exceeded expenses," and, (5) merely delivered telephone-number search cards, which is "incident to defendant's business [of locating and calling numbers to sell products], rather than an integral part of it." Id. at 1386-87. Notably, despite all of the above factors weighing in favor of "independent contractor" status, the Third Circuit stated that they were providing "appropriate deference" to the district court's fact-finding in deciding the question, which they described as "admittedly close." Id. at 1387.

In applying the six-factor test, and parsing the differences between the employment status of the "home researchers" and the "distributors" under the FLSA, the Third Circuit provided substantial guidance to aid this Court's determination as to the employment status of Plaintiffs.

### 3.    Relevant Cases in Other Circuits

#### a.  Cases Involving Non-Uber Drivers For Hire

Although the test applied in other circuits differs somewhat from the <u>Donovan</u> test described above, a number of circuit courts have considered the employment status of Black car and other drivers under the FLSA.  Although these cases have not addressed the fact-specific circumstances applicable to the present dispute regarding Plaintiff UberBLACK drivers, their analysis is clearly relevant.

In <u>Saleem v. Corp. Transportation Grp., Ltd.</u>, 854 F.3d 131 (2d Cir. 2017), the closest analog to the present motion before this Court, the Second Circuit applied its five-factor FLSA test in concluding that the trial court had not erred in granting summary judgment for the defendants ("CTG") because the plaintiffs could not be considered "employees."   Judge Livingston, writing for a unanimous panel, stated:

> "the record here does not permit the conclusion that Plaintiffs were employees, but instead establishes that they were in business for themselves [because] Plaintiffs independently determined (1) the manner and extent of their affiliation with CTG; (2) whether to work exclusively for CTG accounts or provide rides for CTG's rivals' clients and/or develop business of their own; (3) the degree to which they would invest in their driving businesses; and (4) when, where, and how regularly to provide rides for CTG clients.

<u>Id.</u> at 140.

In the opinion's conclusion, Judge Livingston pointed to the "narrow compass" of the decision, finding that "[i]n a different case, and with a different record, an entity that exercised similar control over clients, fees, and rules enforcement in ways analogous to the Defendants here" might be an "employer" under the FLSA.  <u>Id.</u> at 149.  Indeed, the panel found it relevant, although insufficient to raise a material issue, that "the Defendants provided Plaintiffs with a client base, that Defendants charged fees when Plaintiffs utilized Defendants' referral system,

[and] that Defendants had some involvement [] in rule enforcement." Id.  Nonetheless, the Court affirmed the trial court's grant of summary judgment and found the plaintiffs "to be independent contractors as a matter of law." Id.

Although somewhat less analogous to the present motion, in Chao v. Mid-Atlantic Installation Servs., Inc., 16 Fed. App'x. 104 (4th Cir. 2001), the Fourth Circuit considered a lawsuit brought by the U.S. Department of Labor ("DOL") against M/A Telecommunications ("MAT"), alleging that MAT, a broker providing cable installment services for Comcast, improperly characterized cable installer drivers ("Installers") as "independent contractors" under the FLSA.  Again, the trial court had found that as a matter of law, the workers in question were independent contractors not covered by the FLSA, and the appellate court affirmed the finding. In Chao, however, the Fourth Circuit utilized the same six-factor test that courts in the Third Circuit use post-Donovan, finding that:

(1) defendants did "not exercise the type of control over the manner in which the work is to be performed necessary to characterize the relationship [] as one of employee/employer,"

(2) the Installers had "an opportunity for profit or loss that is indicative of independent contractor status."

(3) "the Installers' "investment in equipment and their right to employ workers weigh strongly in favor of concluding that they are independent contractors,"

(4) "the degree of skill required to install and repair cable equipment favors independent contractor status."

(5) "establish[ing] a long-term relationship [], implying employment [] is not necessarily the norm, nor is it required," such that the permanence of relationship "factor is neutral," and,

(6) "because MAT is in the business of brokering cable installation to cable providers, the Installers are integral to MAT's business," but "this factor, standing alone, does not create an employment relationship."

Id. at 106-107 (internal citations and quotation marks omitted).

Thus, although the sixth factor weighed in favor of employee status for the Installers, the Court concluded that, in light of the "totality of the circumstances" and the fact "that no single factor in the 'economic reality' test is dispositive," the Installers were independent contractors under the FLSA.  Id.

In Herman v. Express Sixty-Minutes Delivery Servs., Inc., 161 F.3d 299 (5th Cir. 1998), the Fifth Circuit considered a DOL lawsuit against a courier delivery service company alleging that the defendant ("Express") had improperly characterized the courier delivery drivers as "independent contractors" under the FLSA.  As with the two other circuit court opinions discussed above, in Herman, the appellate court affirmed the trial court's conclusion that the workers in question were independent contractors.[9]   In reaching its conclusion, the Fifth Circuit compared the courier driver plaintiffs to a group of four employee drivers who worked for Express and who, unlike the plaintiffs:

> (1) Report for work at a specified time;
>
> (2) Are paid by the hour;
>
> (3) Work a set number of hours that are determined by Express;
>
> (4) Are required to wear a uniform;
>
> (5) Are provided with a company vehicle and all of the necessary tools of the trade;
>
> (6) Are reimbursed for expenses;
>
> (7) Are not allowed to turn down deliveries; and
>
> (8) Are under the control and supervision of Express.

Id. at 302.

Ultimately the Court concluded that Express "had minimal control over its drivers," the drivers' "profit or loss [was] determined largely on his or her skill, initiative, ability to cut costs, and understanding of the courier business," "the majority of drivers work for Express for a short

---

[9] Like the Second Circuit, the Fifth Circuit also uses a five-factor test.

period of time," and "the Drivers are able to work for other courier delivery companies," which considered all together, demonstrated that the courier drivers were independent contractors rather than employees.

### b. Other Relevant Cases

In addition to "driver" cases, federal courts have also considered employment status of workers in other, closely-related fact patterns.

In Karlson v. Action Process Serv. & Private Investigations, LLC, 860 F.3d 1089 (8th Cir. 2017), a process server sued the company for which he worked under the FLSA, and the case proceeded to a jury verdict that plaintiff was an independent contractor. On appeal, the Eight Circuit affirmed the decision, finding that the evidence at trial supported the jury finding, because Plaintiff: (1) decided which assignments to accept; (2) was paid a flat rate per job completed; (3) used his own car, phone, and computer to complete service of process; (4) did not report for work, punch a time clock, or otherwise report his hours to the alleged employer; (5) was not told when to work; (6) left for vacation without permission; and (7) accepted assignments from other companies. Id. at 1094-95.

In Lawson v. GrubHub, Inc., 15-cv-05128, 2018 WL 776354 (N.D. Cal. Feb. 8, 2018), the plaintiff restaurant delivery driver alleged that he was improperly classified by Grubhub as an independent contractor under California employment laws. Following a bench trial, the district court applied California's common law test (called the Borello[10] test) to find that the defendant, "an internet food ordering service that connects diners to local restaurants," could not be considered an employee. Id. at *2. Unlike the present case, the California common law test places the burden on the defendant to prove that the plaintiff is an independent contractor rather than an employee. Id. at *10. Also unlike the present case, California's test has a "principal"

---

[10] See S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations, 48 Cal.3d 341 (1989)

factor—"whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired"—as well as "secondary factors."[11]   Id. at *11.  The court ultimately found that while:

> some secondary factors favor an employee/employer relationship[,] . . . [t]he other factors [] favor a finding that Mr. Lawson was an independent contractor.  Of primary significance, Grubhub did not control the manner or means of Mr. Lawson's work, including whether he worked at all or for how long or how often, or even whether he performed deliveries for Grubhub's competitors at the same time he had agreed to deliver for Grubhub.[12]  Grubhub also did not provide Mr. Lawson with any of the tools for his work (other than a downloadable mobile app) and neither Grubhub nor Mr. Lawson contemplated the work to be long term or regular, but rather episodic at Mr. Lawson's sole convenience.

Id. at *18.

Thus, even with the burden on the defendant (as opposed to the present case where the burden is on the plaintiff) (see supra), the court found after trial that Grubhub had met that burden and demonstrated that the plaintiff was an independent contractor, as opposed to an employee.

In O'Connor v. Uber Techs., Inc., 82 F. Supp. 3d 1133 (N.D. Cal. 2015), another case decided under California's Borello test, the court stated that, "because a number of facts material to the employee/independent contractor determination in this case remain in dispute, the Court

---

[11] The secondary factors are: (1) whether the one performing services is engaged in a distinct occupation or business; (2) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (3) the skill required in the particular occupation; 4) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (5) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (6) whether or not the work is a part of the regular business of the principal; and (7) whether or not the parties believe they are creating the relationship of employer-employee.  Lawson v. Grubhub, Inc., No. 15-cv-05128, 2018 WL 776354, at *11 (N.D. Cal. Feb. 8, 2018).

[12] According to the court's final opinion, "Mr. Lawson worked for other so-called 'gig economy' companies" prior to performing Grubhub deliveries, "including Lyft, Uber, Postmates, and Caviar," because "these companies, including Grubhub, [had] flexible scheduling [that] allowed him to pursue his acting career."  Id. at *2.

denied Uber's summary judgment motion."  Id. at 1135.  The court began by analyzing the "principal" factor under the Borello test, i.e., "whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired."  Id. at 1149.[13] The court found that this "critical fact" remained "in dispute" because Uber and the plaintiffs, drivers for UberX,[14] disputed, among other things, the extent to which: (1) Uber can fire drivers at will; (2) drivers not accepting trips is considered a "performance issue"; and (3) drivers must dress professionally, send text messages to riders, play certain types of music during trips, and otherwise conform to Uber's quality control "suggestions."[15]

## VI.   LEGAL STANDARD

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

---

[13] Unlike the present case, the question of whether a worker is an employee or independent contractor under California law is a mixed question of law and fact and thus a question "for the jury."  Hana Fin., Inc. v. Hana Bank, 135 S. Ct. 907, 910 (2015); compare Borello, 48 Cal. 3d at 349, with Verma, 2014 WL 2957453, at *5, and Martin v. Selker Bros., 949 F.2d 1286, 1292 (3d Cir. 1991) (Stating that, in the Third Circuit, "[t]he employment status of the station operators is a legal conclusion.").
[14] UberX is a separate service from UberBLACK, which requires all drivers to be associated with a corporation in order to gain access to the Uber App.  (SOF Response, ECF 117-3, ¶ 1; Plaintiffs' Response to Motion for Summary Judgment, at 11).
[15] Two last cases bear at least a brief mention.

On November 10, 2017, the United Kingdom's Employment Appeal Tribunal issued a judgment affirming that, under English law, Uber drivers are employees.  See Nov. 10, 2017 U.K. Employment Appeal Tribunal J. (Appeal No. UKEAT/0056/17/DA) (ECF 117-51).  However, the case was decided under four U.K. statutes, and the decision does not even mention UberBLACK drivers.  Instead, it discusses drivers for UberX, UberXL, UberEXEC, UberLUX, UberTAXI, and UberWAV.

Although not specifically relevant to the present case, less than two weeks ago, the Supreme Court decided a case regarding the "car dealership exemption" to the overtime provisions of the FLSA. Encino Motorcars, LLC v. Navarro, 138 S.Ct. 1134 (2018).

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial.  Fed. R. Civ. P. 56(c)(1)(A).  "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty."  Ridgewood Bd. of Educ. V. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999) (superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009)).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  Id.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.[16]

## VII.   PRELIMINARY ANALYSIS

The Court notes, before approaching the legal distinction between employees and independent contractors, that these two categories are not the only two types of business relationship that exist under law, even if they may be the only relationships relevant to the present motion.   Transportation network companies ("TNCs"), such as Uber and its most

---

[16] "The determination of 'employee' status under the FLSA is a question of law, although it depends on subsidiary factual determinations.  Employee status can be determined by the district court on a motion for summary judgment where there are no genuine disputes of material fact."  Verma v. 3001 Castor, Inc., No. 13-cv-3034, 2014 WL 2957453, at *5 (E.D. Pa. June 30, 2014) (citing Thompson v. Linda And A., Inc., 779 F.Supp.2d 139, 147 (D.D.C. 2011)).

frequent U.S. competitor, Lyft, present a novel form of business that did not exist at all ten years ago, available through the use of "apps" installed on smart phones.  With time, these businesses may give rise to new conceptions of employment status.[17]

Relatedly, the undersigned has recently adjudicated a dispute by several hundred Philadelphia taxicab companies against the Philadelphia Parking Authority ("PPA"), asserting that the taxicab companies were entitled to damages because the PPA, which is authorized under Pennsylvania law to license and regulate taxicabs and TNCs, failed to regulate TNCs for a substantial period of time, to the economic detriment of taxicabs.  Checker Cab Philadelphia v. Philadelphia Parking Auth., No. 16-cv-4669, 2018 WL 587298 (E.D. Pa. Jan. 29, 2018). Although the opinion does not specifically concern limousine services or UberBLACK, it extensively discusses the differences between taxicabs and TNCs.  Moreover, in the opinion, the Court had occasion to discuss the methodology by which TNCs operate, which can be briefly summarized as follows:

> TNCs are a business model through which customers must use a smartphone app to arrange transportation from a driver, who picks up and transports a passenger, usually in the driver's personal vehicle.  Compensation is handled by requiring the customer to "register" a credit card with the TNC's website, which then makes a charge for the ride on the customer's credit card.  No cash is

---

[17] In considering what business model Uber has presented, which has proven greatly popular with consumers, the Court notes that it shares some characteristics in common with a joint venture: Uber has provided the technology by which passengers can receive transportation, and drivers (or more precisely, the companies for which they work) can earn money from providing rides. For example, the Pennsylvania Supreme Court stated in McRoberts v. Phelps, 391 Pa. 591 (1958):

    To constitute a joint venture certain factors are essential:
        (1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill, knowledge, materials or money;
        (2) profits must be shared among the parties;
        (3) there must be a 'joint proprietary interest and right of mutual control over the subject matter' of the enterprise;
        (4) usually, there is a single business transaction rather than a general and continuous transaction.

Id. at 599.

> accepted unless the customer voluntarily gives the driver a
> gratuity.

Id. at *10.

## VIII.  ANALYSIS

In this case, we start with the fundamental proposition that, notwithstanding Plaintiffs'

argument based on New Jersey and California state law, the burden lies with Plaintiffs to prove

that they are employees.  See, e.g., Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686–87

(1946) (A plaintiff "who brings suit under the [FLSA] has the burden of proving that he

performed work for which he was not properly compensated."); Schaffer v. Weast, 546 U.S. 49,

56 (2005) ("[T]he ordinary default rule [is] that plaintiffs bear the risk of failing to prove their

claims." (citing C. Mueller & L. Kirkpatrick, Evidence § 3.1, p. 104 (3d ed. 2003) ("Perhaps the

broadest and most accepted idea is that the person who seeks court action should justify the

request, which means that the plaintiffs bear the burdens on the elements in their claims.")).

As mentioned above, the Donovan factors drive this Court's analysis.  Therefore, each of

the six Donovan factors is addressed in detail below.

### A.  *Employer Control – Factor  #1*

The first Donovan factor is "the degree of the alleged employer's right to control the

manner in which the work is to be performed."

At the outset, the Court notes that the written agreements entered into by the Plaintiffs

and their transportation companies point to a lack of control by Uber.[18]  For example, the

Services Agreement states, "Uber does not, and shall not be deemed to, direct or control

Customer or its Drivers generally or in their performance under this Agreement."  (Uber SOF ¶

---

[18] These agreements are not determinative, but they are clearly relevant.  "Though an employer's self-serving label of workers as independent contractors is not controlling, such a designation in the franchise agreement is pertinent to the parties' beliefs about the nature of the relationship."  Saleem, 854 F.3d at 141 (citations and parentheses omitted).

22).  These agreements, however, go beyond merely characterizing the extent to which Uber can control drivers.  They also specifically detail the many ways that Uber is **not** entitled to control UberBLACK drivers.  (See, e.g., id. ("Customer and its Drivers retain the sole right to determine when, where, and for how long each of them will utilize the Driver App or the Uber Services"; "Uber shall have no right to require Customer or any Driver to [] display Uber's or any of its Affiliates' names, logos or colors on any Vehicle(s)[,] or [] wear a uniform or any other clothing displaying Uber's or any of its Affiliates' names, logos or colors.")).  As Plaintiffs themselves point out, "[a]ctual control of the manner of work is not essential; rather it is the right to control which is determinative."  (ECF 117, "Response to MSJ," at 16).  See Drexel v. Union Prescription Ctrs., 582 F.2d 781, 785 (3d Cir. 1978); Williams v. Jani-King of Phila. Inc., 837 F.3d 314, 321 (3d Cir. 2016) ("It is the existence of the right to control that is significant, irrespective of whether the control is actually exercised.").

Nonetheless, Plaintiffs contend that, although the above-referenced agreements disclaim Uber's control, "Uber exercises extensive control over UberBLACK drivers when they are online with the Uber app."  (Plaintiffs' Response, at 12).  Specifically, Plaintiffs assert, among other things, that Uber has the right to exercise substantial control over drivers because Uber can, pursuant to its contracts: terminate a driver's access to the Uber App,[19] deactivate a driver for canceling trips,[20] "block" drivers manipulating lines at major transportation hubs,[21] deactivate

---

[19] This refers to the Services Agreement, at section 12 (see Def. MSJ, Ex. 11), which allows both parties to the contract (the transportation company and Uber – not any driver) to terminate the agreement with seven days' prior notice without cause, or without notice if there is, (1) material breach by the other party, (2) bankruptcy, insolvency, or suspension of payment, or (3) if the transportation company or its driver no longer qualifies under applicable law or the standards and policies of Uber to provide transportation services (e.g., if the driver could not pass Uber's background check or if the driver's license is suspended as a result of a serious moving violation or crime).

[20] Uber does not dispute that it reserves such a right.  (See Uber Reply SOF ¶¶ 249, 251-52).

[21] For support, Plaintiffs reference an email from Uber to Plaintiff Cherdoud on February 18, 2016 (see ECF 117-32), which states that Mr. Cherdoud would be "blocked from airport pickups for one week"

drivers for failing its background check policy,[22] deactivate drivers who fall short of the required 4.7-star driver rating,[23] make deductions against a driver's earnings,[24] deactivate drivers who solicit payments outside of the Uber App,[25] and limit the number of consecutive hours that a driver may work.[26]

On the other hand, there are significant indications in this case that Uber does not exercise substantial control over Plaintiffs.

For example, as business owners, Plaintiffs are permitted to hire sub-contractors or other "helpers" to drive for UberBLACK using their vehicles, and it is Plaintiffs' **businesses** that are paid as a result, not the "helpers."  (See, e.g., Response SOF ¶ 63 ("The money, pursuant to Uber's rules, goes into Luxe's Uber account, and then is distributed to the individual who performed the fare.").  See Chao, 16 F. App'x at 107 (affirming independent contractor status for cable television installers in part based on the fact that it was the "Installer's decision whether to hire his own employees or to work alone," to try to increase profits);

Additionally, Plaintiffs and their helpers are permitted to work for competing companies. This is well-established as a leading indicator that a worker is an independent contractor.  See Saleem, 854 F.3d at 141 ("The fact that Plaintiffs could (and did) work for [] business rivals and

---

because he violated Uber's "empty sleeper" policy, which states: "Partners are not permitted to leave their phones in the airport zone overnight if they are not present with their own phone."

[22] Uber does not dispute that Uber "deactivated" Plaintiff Razak pursuant to Uber's background policy. According to Plaintiffs, Plaintiff Razak was convicted of a "DWI" in New Jersey on February 26, 2008. (ECF 117-50).

[23] Uber does not dispute that Uber "deactivated" Plaintiff Sabani because of a low rider rating.  (Uber Reply SOF ¶ 258).

[24] Uber makes deductions from checks issued to transportation providers for various items, including insurance costs associated with Gegen, vehicle payments associated with financing arrangements, and PPA dues.  (ECF 117-14).

[25] "[S]oliciting payment of fares outside the Uber system" can lead to deactivation.  (See Uber's Driver Deactivation Policy, ECF 68-6).

[26] Pursuant to Uber's Drowsy Driving Policy, drivers who drive for Uber for twelve straight hours are automatically switched from Online to Offline for six straight hours, after which they may go Online again to receive trip requests.  (ECF 117-31)

transport personal clients while simultaneously maintaining their franchises without consequence suggests . . . that [Defendant] exercised minimal control over Plaintiffs."); Keller v. Miri Microsystems LLC, 781 F.3d 799, 807 (6th Cir. 2015) ("If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor."); Herman v. Express Sixty-Minutes Delivery Serv., Inc., 161 F.3d 299, 303 (5th Cir. 1998) (noting fact that "[t]he drivers can work for other courier delivery systems" supported independent contractor status); Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 171 (2d Cir. 1998) (affirming finding of independent contractor status when, *inter alia*, the worker "was allowed to sell merchandise on behalf of other companies").

Defendants also point out that Plaintiffs are basically completely free to determine their working hours.  (Uber SOF ¶ 186).  Plaintiffs do not have to report to work at specific places, at specific times, or on specific days to "punch the clock."  (Id. ¶ 185)  They are permitted to go Online as little or as much as they want, subject to some limitations for drivers who fail to meet quality or safety standards, who may be "blocked" or deactivated.  (Id.)  However, such limitations only apply while Plaintiffs are Online.  Plus, the limitations are generally geared towards ensuring safety and quality control, such as forcing a break upon drivers who have been driving without any rest for twelve straight hours.  (See Uber Drowsy Driving Policy, ECF 117-31).  See, e.g., Jacobson v. Comcast Corp., 740 F.Supp.2d 683, 690 (D. Md. 2010) ("[D]etailed instructions and a strict quality control mechanism will not, on their own, indicate an employment relationship."); Lepkowski v. Telatron Mktg. Grp., Inc., 766 F. Supp. 2d 572, 579–80 (W.D. Pa. 2011) ("[T]hese measures reflect precisely the type of quality control and customer service supervision that courts have consistently held to be 'qualitatively different' from the

control exercised by an employer over an employee.") (citing, among other cases, <u>Zheng v. Liberty Apparel Co. Inc.</u>, 355 F.3d 61 (9th Cir. 2003).

Moreover, Uber's decision to deactivate Plaintiff Razak as a result of his conviction for Driving While Intoxicated does not suggest "control" but rather, a sense of responsibility for the safety of passengers who use the Uber App, even if Mr. Razak were remained legally allowed to drive under state law.   See, e.g., <u>Moreau v. Air France</u>, 356 F.3d 942, 951 (9th Cir. 2004) ("Any airline that is concerned about its passengers' safety would be remiss to simply delegate a task to another party and not double-check to verify that the task was done properly."); <u>Jacobson</u>, 740 F.Supp.2d at 391 ("It is [] significant that the control Comcast does exercise is in part designed to protect Comcast customers.").[27]

Given the unique business model which TNCs, such as Uber, have created, and their applicability to Uber BLACK drivers, the fact that Uber does exercise some control when UberBLACK drivers are Online does not convert UberBLACK drivers into employees.   The Court likens this situation to a carpenter, or a plumber, who is engaged to complete a renovation project for a homeowner.   Very often, the exact date and time that the plumber/carpenter will come to the home is negotiated, but if the contractor is late or cancels, there is little the homeowner can do.    The homeowner may impose certain requirements while the carpenter/plumber is in the house, such as not permitting certain fumes, footwear, music, or other conditions — but all of these conditions apply only while the carpenter/plumber is in the home – – and they certainly do not suffice to conclude that the carpenter/plumber is an employee.

---

[27] Several of the cases in this paragraph arise under the question of "joint employment," to which courts apply a distinct but heavily related inquiry.   Such cases are particularly relevant here, because UberBLACK's written agreements are entered into by corporations for which individual drivers then work, which is precisely the relationship involved in each of the "joint employment" cases cited above.

Thus, the Court concludes that, on the whole, the first <u>Donovan</u> factor — "the degree of the alleged employer's right to control the manner in which the work is to be performed" — weighs heavily in favor of "independent contractor" status.

B. *Employee Opportunity for Profit or Loss – Factor #2*

The second <u>Donovan</u> factor is "the alleged employee's opportunity for profit or loss depending upon his managerial skill."

It is undisputed that UberBLACK drivers are permitted to work as much or as little as they would like, subject to certain limitations, discussed earlier.  (Uber SOF ¶ 186 ("Uber does not require drivers to be online on the Uber App at any time.").  They are also permitted to work during whichever hours they choose, and to drive (within territorial limits) wherever they choose.  They can concentrate their efforts around certain "high times" of the day, week, month, or year, in order to capitalize on "surge" pricing.   (<u>See, e.g.</u>, ECF 117-26 ("Surge Pricing Article") (In "cases of very high demand, fares may increase to help ensure those who need a ride can get one," thereby increasing the rates that drivers receive for each ride.)).  UberBLACK drivers can also—and indeed actually do—choose to work for competitors when they believe the opportunity for profit is greater by doing do.  (Reply SOF ¶ 181 ("While online, Plaintiffs [] accepted rides from private clients."); ¶ 179 ("While online, transportation providers are free to run a personal transportation company and distributed trips to other drivers.").

In fact, Plaintiffs themselves have taken advantage of such opportunities through their own respective companies, named Luxe, Freemo, and Milano.  (Reply SOF ¶ 1; <u>see</u> <u>id.</u> ¶ 147 ("Freemo advertised . . . and that advertising generated phone calls for trip requests,") ¶ 82 ("Luxe advertised [and] developed an internet presence . . . so that its drivers could receive trip requests," ¶ 181 ("While online, Plaintiffs, inter alia, accepted rides from private clients [and]

conducted business for their independent transportation companies.")).   In other words, where the opportunity for profit was greater by choosing **not** to accept trip requests, Plaintiffs were free to make money elsewhere (even while actively remaining Online the Uber app to assess whether, for example, there was any "surge" pricing).   These facts strongly indicate that Plaintiffs are independent contractors pursing their own entrepreneurial opportunities in search of profit.   See Saleem, 854 F.3d at 144 ("By toggling back and forth between different car companies and personal clients, and by deciding how best to obtain business from [Defendant]'s clients, drivers' profits increased through their initiative, judgment, or foresight—all attributes of the typical independent contractor.") (citations and quotation marks omitted); Donovan v. DialAmerica Mktg., Inc., 757 F.2d at 1387 (finding independent contractor status where workers exercised "managerial skill to ensure that their revenues exceeded expenses"); Brock v. Mr. W. Fireworks, Inc., 814 F.2d 1042, 1047 (5th Cir. 1987) (Under the economic reality test, "it is not what [Plaintiffs] *could* have done that counts, but as a matter of economic reality what they actually *do* that is dispositive.").

Plaintiffs contend that there remain disputed issues of material fact with respect to this "profit and loss" factor because, for example, Uber's app determines whether each driver receives any given trip request (based on proximity, among other factors), and because Uber retains the right to determine how much to charge passengers.   However, these assertions do not create any material dispute, because the "profit and loss" factor does not require that Plaintiffs be "*solely* in control of their profits or losses."   Chao, 16 F. App'x at 107 (holding that cable installers were "no less in control of their net profits . . . than typical independent contractors," where the installers contended they could not "unilaterally determine how many Comcast customers they will service on a given day or the rate at which they are paid for each job.").

32

The Court discussed some of the above issues in its opinion dated September 13, 2017 (ECF 93) denying summary judgment on the issue of compensability.  However, it bears emphasis that, unless the UberBLACK driver is Online, he or she will not be earning any money. It is only once the driver goes Online, which is completely in control of the driver, that the opportunity to earn profits begins.  See, e.g., Chao, 16 F. App'x at 107 (affirming the district court's holding, which held that cable television installers can control their own profits "by agreeing to work more or fewer hours"); Herman, 161 F.3d at 304 (affirming independent contractor status for courier drivers because, "[a]lthough [plaintiff] maintains that [defendant] controls customer volume and the amount charged to customers, the drivers had the ability to choose how much they wanted to work.").

In sum, this factor strongly favors a conclusion that Uber BLACK drivers are not employees.[28]

### C.  *Employee Investment – Factor #3*

The third Donovan factor is "the alleged employee's investment in equipment or materials required for his task, or his employment of helpers."

The major investment here is that UberBLACK drivers must purchase (or lease) their own expensive vehicles.  Plaintiffs basically concede that this factor is strong evidence that they are not employees, instead stating that the "control" factor "moots" this factor.  (see Response to MSJ, ECF 117-1, at 20 ("At first glance this is arguably the only Donovan factor favoring independent contractor status . . . [but] the legal significance of the Plaintiffs' investments is mooted by Uber's control over those investments.")).  Although Plaintiffs are correct insofar as

---

[28] Although the extent of Plaintiffs' investments in their own companies will be discussed infra, Plaintiffs' capital investments are also relevant to the "profit and loss" factor, and weigh heavily in favor of "independent contractor" status.  Herman, 161 F.3d at 308 ("If the workers have sizeable capital investments at stake, they are more akin to independent entrepreneurs seeking a return on their risky capital investments, than to employees.") (citations omitted).

they acknowledge that the Court is tasked with a holistic assessment of the "economic realities" of the alleged employment relationship, it remains unclear how Plaintiffs' extensive personal investments are "mooted" by the "control" factor.

For example, Plaintiffs contend—and Uber concedes—that "Uber deducts money" from Plaintiffs for "vehicle finance payments." (Reply SOF, ¶ 95). What Plaintiffs do not emphasize is that Plaintiffs have chosen to undertake this financing arrangement, which is not required of drivers for UberBLACK. (Id.) The fact that Uber presents this option, as well as insurance and incorporation referrals, (Id. ¶ 244), does not convert Uber into an employer under the FLSA.[29] Furthermore, the fact that Plaintiffs receive financing for some of their companies' vehicles does not somehow minimize that it was Plaintiffs, rather than Uber, that made significant capital investments which remain in their possession even if they choose to work for another company or individual. See United States v. Silk, 331 U.S. 704, 719 (1947) ("where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors"); Saleem, 854 F.3d at 144-46 ("large capital expenditures—as opposed to 'negligible items, or labor itself'—are highly" indicative of independent contractor status); Freund v. Hi-Tech Satellite, Inc., 185 F. App'x 782, 784-85 (11th Cir. 2006) (cable installer "drove his own vehicle and provided his own tools and supplies"); Browning v. CEVA Freight, LLC, 885 F. Supp. 2d 590, 608 (E.D.N.Y. 2012) ("Plaintiffs made substantial investments in their businesses. They utilized their own vehicles and . . . were responsible for the costs and expenses associated with the vehicle, [which] weighs in favor of independent contractor status.").

This factor strongly favors independent contractor status.

---

[29] Whether Uber's participation in such financing arrangements requires it to comply with other statutory or regulatory law is beyond the scope of the present case.

D.  *Special Skills – Factor #4*

The fourth <u>Donovan</u> factor is "whether the service rendered requires a special skill."

It is generally accepted that "driving" is not itself a "special skill."  <u>See, e.g.</u>, <u>Alexander</u> <u>v. FedEx Ground Package Sys., Inc.</u>, 765 F.3d 981, 995 (9th Cir. 2014).  However, this case does not involve solely the ability to drive.  UberBLACK drivers replicate the limousine experience, and drivers are expected to maintain a high level of customer service.  In fact, Plaintiffs themselves extensively emphasize the fact that drivers are subject to a number of "requirements" and "limitations" that they must navigate to start driving for UberBLACK as well as find success while doing so.  (<u>See, e.g.</u>, Response to MSJ, at 13 ("Uber requires all drivers to maintain a 'driver rating' of at least 4.7 out of 5 stars.")  Thus, although perhaps not strictly rising to the level of "special skills," UberBLACK drivers are not comparable to, for example, the delivery driver in <u>Grubhub</u>.  2018 WL 776354, at *16 ("[A]nyone with a means of delivery can contract to deliver for Grubhub—no special skills are needed.").  Instead, UberBLACK drivers bolster their earnings by managing when, where, and how to perform their task of transporting passengers.  (<u>See, e.g.</u>, ECF 117-26 (In "cases of very high demand, fares may increase to help ensure those who need a ride can get one," thereby increasing the rates that drivers receive for each ride.).

Thus, while this factor weighs in favor of finding that Plaintiffs are "employees," it does not carry much weight in establishing Plaintiffs' burden.

E.  *Relationship Permanence – Factor #5*

The fifth <u>Donovan</u> factor is "the degree of permanence of the working relationship" between the worker and the alleged employer.

Generally, independent contractors have variable or impermanent working relationships with the principal company because they "often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration." <u>Baker v. Flint Eng'g & Constr. Co.</u>, 137 F.3d 1436, 1442 (10th Cir.1998) (internal quotation marks omitted); <u>see also</u> <u>Keller v. Miri Microsystems LLC</u>, 781 F.3d 799, 807 (6th Cir. 2015) (same). This factor, once again, relates to the fact that UberBLACK drivers have basically complete freedom regarding how long they wish to serve in this capacity and the hours in which they serve. In other words, there is no permanence of the working relationship whatsoever, unless the driver wants it.

Plaintiffs contend that, because Plaintiffs have driven for Uber for years, and for "many hours per week" (Response to MSJ, at 21), there is "relationship permanence." Although facially persuasive, this "fact" reflects Plaintiffs' choices rather than Uber's necessity. It is also simply untrue. (Uber SOF ¶ 184 ("Plaintiff Razak testified that he left on vacation for two months in 2017, but did not have to ask permission from Uber to go offline for that long.")). Plaintiffs sought profits as they saw fit, during hours and on days that they chose with no advance notice as to when, where, or for how long they would work. In other words, just as in the case of the black-car drivers in <u>Saleem</u>, Plaintiffs used this freedom to, at times, work many hours per week, but this does not weigh in favor of "employee" status:

> [T]his case resembles those in which we and other Circuits have recognized independent contractor status. In <u>Kirsch v. Fleet Street</u>, for example, [the Second Circuit] upheld a jury finding that the plaintiff was an independent contractor when, *inter alia*, he "was

> not required to spend time in the company's offices [and] was free
> to set his own schedule and take vacations when he wished." 148
> F.3d at 171. Likewise, in <u>Herman v. Express Sixty-Minutes
> Delivery Service, Inc.</u>, the Fifth Circuit concluded that a courier
> service "had minimal control over its drivers" such that they were
> independent contractors because, *inter alia*, "[t]he drivers set their
> own hours and days of work." 161 F.3d at 303. Similarly here,
> Plaintiffs' freedom in choosing when, where, and with what
> regularity to drive CTG clients shows the extent of their economic
> independence—that they operated their "business organization[s]"
> on their own terms, and as they saw fit. <u>Rutherford</u>, 331 U.S. at
> 730, 67 S.Ct. 1473.

<u>Saleem</u>, 854 F.3d at 148.

Because UberBLACK drivers can work as little or as much as they want — the hallmark of a lack of "relationship permanence" with an alleged employer — this factor weighs heavily in favor of Plaintiffs' independent contractor status.

### F. *Integrality of Service – Factor #6*

The sixth <u>Donovan</u> factor is "whether the service rendered is an integral part of the alleged employer's business."

As noted elsewhere in this opinion, and in other cases, Uber drivers are an essential part of Uber's business as a transportation company.  <u>See, e.g.</u>, <u>O'Connor</u>, 82 F. Supp. 3d at 1141 ("Uber simply would not be a viable business entity without its drivers.").  Indeed, it seems beyond dispute that if Uber could not find drivers, Uber would not be able to function. Similarly, Uber's drivers depend on Uber's technology in getting jobs.  However, it is worth noting that UberBLACK is only one of the many services that Uber provides through its Uber app.[30]

---

[30] For example, Plaintiffs submitted a U.K Employment Appeal Tribunal Decision regarding the employment status of drivers for UberX, UberXL, UberEXEC, UberLUX, UberTAXI, and UberWAV. (ECF 117-51).

Nevertheless, the Court finds that this factor tends to support the Plaintiffs' burden of proof that they are employees.  This is only the second factor that supports such a conclusion, but only to a slight degree.

## IX.    CONCLUSION

Plaintiffs have had a full opportunity to present all relevant facts bearing on the question of whether they are employees under the FLSA.  Accepting that there are some disputes of fact, the Court viewed all evidence in the light most favorable to Plaintiffs, as required by <u>Anderson v. Liberty Lobby, Inc.</u>.  <u>See</u> 477 U.S. at 255.  Nonetheless, given the "totality of the circumstances" and the fact "that no single factor in the economic reality test is dispositive," <u>Chao</u>, 16 Fed. App'x. at 107, Plaintiffs have not brought to the record sufficient proof to meet their burden of showing that they are employees.

For the foregoing reasons, Uber's Motion for Summary Judgment (ECF 66) will be GRANTED.

An appropriate Order follows.