**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| ALI RAZAK, KENAN SABANI, AND KHALDOUN CHERDOUD,<br><br>*Plaintiffs,*<br><br>v.<br><br>UBER TECHNOLOGIES, INC. AND GEGEN LLC,<br>*Defendants* | Case No. 2:16-cv-00573-MMB<br><br><br>Judge Michael M. Baylson |

## PLAINTIFFS' PRE-TRIAL MEMORANDUM AND WITNESS LIST

### I.    INTRODUCTION

Plaintiffs submit this Pre-Trial Memorandum and Witness list pursuant to the Court's Order of January 4, 2024 (Dkt. 164).

The parties have stipulated that the upcoming trial will be limited to the threshold question of whether named Plaintiffs Ali Razak, Kenan Sabani, and Khaldoun Cherdoud were misclassified as independent contractors for the purposes of their claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101 *et seq.*, and the Pennsylvania Wage Payment Collection Law ("PWPCL"), 43 P.S. §§ 260.1 *et seq. See* Joint Scheduling Proposal, Dkt. 138.[1]  Trial will be limited to considering events between 2013 until January 11, 2018. *See* Stipulation Limiting Discovery and Issues at Trial, Dkt. 146.  At trial, Plaintiffs expect to show that they were employees, both under the FLSA and under Pennsylvania law.

---

[1]      The parties agreed to defer a number of issues pending this trial, including disputes regarding damages, hours worked, the reasonable cost of unreimbursed business expenses, and whether collective or class treatment is appropriate. *See* Joint Scheduling Proposal ¶ 5, Dkt. 138

## II.    LEGAL FRAMEWORK

Under the FLSA, the burden is on Plaintiffs to prove that they were employees. *See*

*Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 143 (3d Cir. 2020). Under the FLSA's

economic realities test, the Court considers the following factors:

1) the degree of the alleged employer's right to control the manner in which the work is to be performed;

2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers;

4) whether the service rendered required a special skill;

5) the degree of permanence of the working relationship; [and]

6) whether the service rendered is an integral part of the alleged employer's business.

*Id.*; *Donovan v. DialAmerica Marketing, Inc.*, 757 F.2d 1376, 1382-83 (3d Cir. 1985).  No single

factor is dispositive. *See id.* at 1382.

Pennsylvania law, on the other hand, is more protective of workers than the FLSA,

placing the burden on the **alleged employer** to prove that workers are independent contractors.

*See In re Amazon.com, Inc.*, 255 A.3d 191, 201-02, 202 n.5 (Pa. 2021) (rejecting Amazon's

efforts to import standards from the federal FLSA onto the PMWA and holding "[t]o the extent

that our *per curiam* affirmance of *Stuber* on the basis of the Commonwealth Court's opinion may

be read as an endorsement of the principle that the PMWA and federal FLSA mirror each other

in all respects and must always be interpreted similarly, we disavow such a reading."); *Lowman*

*v. Unemployment Comp. Bd. of Rev.*, 661 Pa. 29, 65 (Pa. 2020) (holding an Uber driver to be an

employee eligible for unemployment benefits).

As Plaintiffs explained in their Motion Requesting the Court to Include a Separate Jury Instruction and Question Regarding Pennsylvania Law (Dkt. 151), the Pennsylvania Supreme Court has not decided specifically what test applies to determine misclassification under the PMWA and the PWPCL. It is possible that the Pennsylvania Supreme Court will ultimately adopt the strict ABC test when presented with the issue as the California Supreme Court did in *Dynamex Operations West, Inc. v. Superior Court*, 416 P.3d 1, 30-36 (Cal. 2018), and the New Jersey Supreme Court did in *Hargrove v. Sleepy's LLC*, 106 A.3d 449, 464 (N.J. 2015).  Like Pennsylvania law, neither the New Jersey nor California wage statutes contained express language setting forth an ABC test for wage law purposes, yet the Supreme Courts of both states chose to adopt an ABC test, given their desire to ensure that workplace protections are broadly applicable. The ABC places the burden on the **alleged employer** to prove that the worker is an independent contractor and presumes an employment relationship unless the employer can demonstrate each of the following three factors:

> (A) that the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact; *and*

> (B) that the worker performs work that is outside the usual course of the hiring entity's business; *and*

> (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed.

*Dynamex*, 416 P.3d at 30-36.

Alternatively, the Pennsylvania Supreme Court may adopt the test used for Pennsylvania's unemployment statute, as set forth in *Lowman*, 661 Pa. at 65.[2] That test is similar

---

[2]     Indeed, courts have already looked to the Unemployment Compensation Act's standards when determining employment status under the WPCL.  *See Williams v. Jani-King of*

to the ABC test in that there is a presumption of employment, and the burden is on the employer to establish "that the individual in question is not subject to control and is customarily engaged in an independently established trade, occupation, profession or business." *Id.*[3]

Notably, the Court in *Lowman* addressed the classification of an Uber driver, holding that the driver was Uber's employee. *See id.* at 71-78. With respect to Prong A, whether the plaintiff was subject to Uber's control, the Court held that "[t]here is comfort in the conclusion Uber controlled and directed Lowman's performance for driving-for-hire services,' because "Uber, presenting itself as a transportation network company, invites a passenger without any personal contact with anyone, to request a ride from a driver (who will be a stranger), and "[v]etting, monitoring and supervising the provision of services by its drivers is implicit in Uber's services." *Id.* at 74. Regarding Prong C, the Court held that plaintiff was not engaged in an independently established business because (among other reasons) Uber required plaintiff to display the Uber decal on his car, Uber prohibited plaintiff from building his own client base "under the auspices of his Uber relationship because his contract limits his communications with customers to the Uber App and are permitted only for the purpose of providing rides through Uber," Uber determined which drivers would be offered an assignment, and the driver could not set or negotiate his remuneration. *Id.* at 76.

If the test for misclassification under the PMWA or the PWPCL is the same (or even more employee-friendly) as the Unemployment Compensation Act test (*see Williams*, 837 F.3d at 320, and *supra* note 2), then, Plaintiffs submit, issue preclusion should be applied here, since

---

*Philadelphia Inc.*, 837 F.3d 314, 320 (3d Cir. 2016) (citing *Morin v. Brassington*, 871 A.2d 844, 849 (Pa. Super. Ct. 2005)).

[3]     Essentially, the unemployment statute test in *Lowman* requires the employer to demonstrate prongs A and C of the ABC test.

Uber has already had a full and fair opportunity to litigate its drivers' employment status under

this standard, and the Pennsylvania Supreme Court held that the plaintiff was an employee. *See*

*id.* at 71-78.[4]  Plaintiffs thus intend to file a motion prior to trial seeking a ruling that they are

employees under state law on the basis of *Lowman* and issue preclusion.

### III.      SUMMARY OF PLAINTIFFS' FACTUAL PRESENTATION

> **A.      The Evidence Will Show that Plaintiffs Were Uber's Employees Under the FLSA Economic Realities Test**
>
> > **1.      Uber Had the Right to Control the Manner in Which the Work Was Performed**

As the evidence at trial will demonstrate, Uber enjoyed a substantial and meaningful right

control the manner that Plaintiffs performed their work for Uber and consistently exercised that

right.

For example, Uber exercised total control over the economic terms of its relationship

with Plaintiffs, unilaterally setting the fare charged to the driver, the percentage of the fare given

to the driver, and whether to refund fares if a ride gets cancelled. Uber also sets the specifics of

how the drivers operate. The evidence will show that through its app, Uber holds the only

meaningful ability to decide which rides a driver is assigned. Uber does not allow riders to

request or select a particular driver, Uber prevents drivers from picking up rides outside a limited

territory, and Uber prevents its drivers from competing against one another for rides at the two

major transportation hubs in Philadelphia. Nor does Uber allow drivers a meaningful ability to

decline rides since Uber will not disclose the rider's destination until after the trip is accepted,

---

[4]      As the Third Circuit has explained, "[i]ssue preclusion, or collateral estoppel, prevents
parties from relitigating an issue that has already been actually litigated," and "[t]he prerequisites
for the application of issue preclusion are satisfied when: '(1) the issue sought to be precluded
[is] the same as that involved in the prior action; (2) that issue [was] actually litigated; (3) it
[was] determined by a final and valid judgment; and (4) the determination [was] essential to the
prior judgment.'" <u>Peloro v. U.S.</u>, 488 F.3d 163, 175 (3d Cir. 2007).

and because repeated refusal to accept offered rides will lead to their app being turned off or even termination.

Moreover, Uber regularly sent emails to Plaintiffs reminding them of Uber's rules and policies. These policies included what cars the drivers could use, what the drivers had to wear, the procedures the drivers had to follow in order to pick up passengers at the airport, and many others. Additionally, Uber monitored the drivers' performance, using a rider rating system. If the drivers fell below a certain rating, their accounts would be deactivated, and the driver would be required to undergo quality improvement training from an approved Uber vendor to be reactivated. Uber also routinely offered "suggestions" to its drivers on how to obtain high ratings, which in effect were directives. Uber's customer service representatives were frequently in communication with Plaintiffs via a platform called Zendesk when issues arose – whether that was because of a rider complaint or Plaintiffs had pay disputes. Plaintiffs had to heed the directives of these customer service representatives or risk deactivation or suspension. Indeed, Uber had the right to terminate its drivers at-will and regularly did so.

Uber also exercised control over the drivers' vehicles. The drivers are required by Uber to drive particular makes and models of car when they transport riders. The vehicles are registered under Gegen's certificate of public convenience from the Philadelphia Parking Authority. Uber required the drivers to lease their vehicles and obtain vehicles through Uber-approved vendor. Uber made the lease and insurance payments itself and deducted those amounts from Plaintiffs' weekly earnings, regardless of what the Plaintiffs actually earned that week. As such, Uber required Plaintiffs to work enough to cover the lease and insurance payment, or else the drivers risked being deactivated for going into the red on insurance payments.

These are just a few of the many facts that Plaintiffs will adduce at trial, demonstrating that Uber controlled their work in exquisite detail.

> ## 2. Plaintiffs Lacked a Meaningful Opportunity for Profit or Loss Depending Upon their Managerial Skill

Plaintiffs will also offer evidence showing that they had no meaningful opportunity for profit or loss depending on their managerial skill. The evidence will show that Uber chose which drivers received rider fares, calculated the riders; fares, and collected the riders' money. Uber then determined what amount the driver should be paid out of the fare that Uber itself collected. Furthermore, Uber controls the marketing of its services and promoted its UberX service at the cost of UberBLACK drivers.  Plaintiffs had no meaningful ability to change any of this, other than to make themselves available to Uber as often as possible – this does not reflect managerial skill. The vast majority of Plaintiffs' income was derived from Uber, and they had practically no ability to influence their opportunity for profit or loss.

> ## 3. Plaintiffs' Investment in Equipment or Materials Required to Work for Uber Paled in Comparison to Uber's Investment in its Platform

Likewise, Plaintiffs expect the evidence to show that their investment in equipment was minor, when viewed in light of the many billions of dollars that Uber has invested in its platform. *See Keller v. Miri Microsystems LLC*, 781 F.3d 799, 810 (6th Cir. 2015) ("[I]nvestment of a vehicle is no small matter, [but] that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes") (quoting *Herman v. Express Sixty-Minutes Delivery Serv.*, Inc., 161 F.3d 299, 304 (5th Cir. 1998)); *Sakacsi v. Quicksilver Delivery System, Inc.*, 2007 WL 4218984 at *7 (M.D. Fla. Nov. 28, 2007) (holding relative investment weighed in favor of employee status where many courier drivers "used their own personal cars to make [] deliveries" and courier service's cost for purchasing and maintaining its software and

system far outweighed the costs to drivers); *see also Clincy v. Galardi S. Enterprises, Inc.*, 808 F. Supp. 2d 1326, 1346-47 (N.D. Ga. 2011) (relative investment weighed in favor of employee status where dancer's $50,000 annual investment related to her work did not exceed the nightclub's investment in its business).  While it is true that the drivers had to lease or purchase cars that met Uber's requirements to perform their services, certain clothing, and cell phones, Uber exercised significant control over those investments. Uber made the car and insurance payments and passed those costs on to the drivers. Uber's investment in its platform and its control over Plaintiffs' investments renders Plaintiffs' investments insignificant.

### 4. Plaintiffs' Work for Uber Did Not Require Special Skill

Plaintiffs will also show at trial that the only services they performed for Uber was driving, which did not require special skill. As the Third Circuit held, "[i]t is generally accepted that 'driving' itself is not a 'special skill,'" and thus this factor "certainly weighs in favor of finding that Plaintiffs are employees." *Razak*, 951 F.3d at 147 (quoting *Alexander v. FedEx Ground Package Sys, Inc.*, 765 F.3d 981, 995 (9th Cir. 2014)).

### 5. Plaintiffs' Working Relationship With Uber Had a High Degree of Permanence

The evidence will also show that Plaintiffs' relationships with Uber had a high degree of permanence. Plaintiffs all drove for Uber for years and for many hours per week. Plaintiffs' relationship with Uber was dissimilar from a contractor who is brought in for a specific project or term (like a plumber fixing a shower, for example). Uber was content to use Plaintiffs indefinitely, so long as they complied strictly with Uber's requirements. Further, Plaintiffs were so economically dependent on Uber that stopping their work for Uber would have been akin to losing their jobs.

6.      **Plaintiffs' Driving Services Were an Integral Part of Uber's Business**

Finally, Plaintiffs will offer evidence making abundantly clear that their driving services were an integral part of Uber's business, which is that of a transportation company. This Court has already held that "Uber drivers are an essential part of Uber's business as a transportation company. *Razak v. Uber Technologies, Inc.*, 2018 WL 1744467, at *19 (E.D. Pa. Apr. 11, 2018) (citing *O'Connor v. Uber Technologies, Inc.*, 82 F. Supp. 3d 1133, 1141 (N.D. Cal. Mar. 11, 2015)). The Court went on, "[i]ndeed, it seems beyond dispute that if Uber could not find drivers, Uber would not be able to function," and "[s]imilarly, Uber's drivers depend on Uber's technology in getting jobs." *Id.* Uber itself has repeatedly and publicly proclaimed that it is indeed in the business of providing transportation services, and as a matter of common sense the drivers are integral to that service.

B.      **The Evidence Will Show that Plaintiffs Were Uber's Employees Under Pennsylvania Law**

Under Pennsylvania law, under which Uber bears the burden of proof, it is even clearer that the evidence will support a finding that Plaintiffs were Uber's employees. If the Court were to analyze the claims under an ABC test akin to that adopted by New Jersey and California, *see Dynamex*, 416 P.3d at 30-36; *Hargrove*, 106 A.3d at 464, the claim could be resolved on the basis of Prong B alone.

Under Prong B, Uber would have to demonstrate that Plaintiffs' work was outside the usual course of Uber's business. *See Dynamex*, 416 P.3d at 30-36. As explained *supra*, this Court has already held that the driers were essential to Uber's business. *See Razak*, 2018 WL 1744467, at *19. The representations made publicly and repeatedly (including to the Philadelphia Parking Authority) confirm the Court's holding. This fact mandates a holding that the drivers were Uber's employees. *See Lawson v. Grubhub, Inc.*, 2023 WL 2746290, at *8-11 (N.D. Cal. Mar.

30, 2023) (holding that the plaintiff delivery driver was GrubHub's employee on the basis of Prong B alone).

Uber would also not be able to demonstrate that Plaintiffs were independent contractors under Prongs A and C. Thus, if the Court applies the test under the Unemployment Compensation Act as articulated in *Lowman*, 661 Pa. at 65, Uber cannot prevail. Prong A overlaps with the considerations at issue under the FLSA's right to control factor. Thus, the same evidence described in Section III.A.1 *supra* would show that Uber cannot satisfy Prong A.

In a similar vein, Uber would not be able to satisfy Prong C, which considers whether were engaged in an independently established trade, occupation, or business. Again, Prong C overlaps with the second (opportunity for profit and loss), third (investment in the business), and fifth (permanence of working relationship) factors of the FLSA described above. The evidence described in Sections III.A.2, 3, and 5 *supra* shows why Uber would not be able to establish Prong C.

## IV.    PLAINTIFFS' WITNESS LIST

### A.    Plaintiffs Expect to Call

Ali Razak – named Plaintiff

Kenan Sabani – named Plaintiff

Khaldoun Cherdoud – named Plaintiff

Tara Murray – Former UberBLACK manager

Uber Keeper of Records

### B.    Plaintiffs May Call

Jordan Holtzman-Conston – Uber Senior Operations and Logistics Manager

Brad Rosenthal – Uber Director

Rachel Perl – Uber Head of Northeast Rides Operations

Chad Dobbs – Uber Director, Head of US City Operations

Drew Holland – Former Uber Operations and Logistics Manager

Dimitry Cohen – Former Uber Operations and Logistics Manager

CJ Stavrakos – Former Uber Operations and Logistics Manager

Martin Rufo – Former Uber Operations and Logistics Manager

Other UberBLACK drivers who worked in the Philadelphia market between 2013 and 2018 and who were deactivated or suspended. *See* Hearing Tr. at p. 15, January 3, 2024 (Dkt. 162) (stating that Plaintiffs could call deactivated drivers as witnesses)

Plaintiffs reserve the right to supplement this list, to call witnesses who are listed on

Defendants' Witness list, and to call additional witnesses on rebuttal.

Dated: January 16, 2024

ALI RAZAK, KENAN SABANI, AND
KHALDOUN CHERDOUD,

By their attorneys,

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (*pro hac vice*)
Thomas Fowler (*pro hac vice*)
Krysten Connon (*pro hac vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
sliss@llrlaw.com; tfowler@llrlaw.com;
kconnon@llrlaw.com

Jeremy E. Abay (PA # 316730)
PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
Tel: (215) 988-1462
Fax: (215) 754-5195

11

jea@pietragallo.com

Bret Stanley (*pro hac vice*)
KHERKER GARCIA LLP
2925 Richmond Ave., Suite 1560
Houston, Texas 77098
(713) 333-1030
bstanley@kherkhergarcia.com

**CERTIFICATE OF SERVICE**

I, Shannon Liss-Riordan, certify that on January 16, 2024, a true and accurate copy of the

foregoing document was served on counsel for Defendants by filing via the Court's CM/ECF

system.

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan