## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALI RAZAK, KENAN SABANI, AND
KHALDOUN CHERDOUD,

*Plaintiffs,*

v.

UBER TECHNOLOGIES, INC. AND GEGEN
LLC,

*Defendants*

Case No. 2:16-cv-00573-MMB

Judge Michael M. Baylson

## PLAINTIFFS' MOTION FOR JUDGMENT AS A MATTER OF LAW

## I.     INTRODUCTION

Pursuant to Fed. R. Civ. P. 50(a), Plaintiffs move for judgment as a matter of law seeking a judgment that, under Pennsylvania law, Plaintiffs were Defendants' employees. As Plaintiffs have previously argued, Plaintiffs maintain that the Pennsylvania misclassification test for the purposes of their claims under the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101, *et seq.*, and the Wage Payment and Collections Act ("WPCL"), 43 P.S. § 260.1, *et seq.* is different from the economic realities test under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*[1]  The Commonwealth of Pennsylvania agrees that state and federal law is different in two ways. *See* Amicus Brief, Dkt. 193-1.

First, Pennsylvania law is clear that, unlike the FLSA, the burden of proof under Pennsylvania law is on Uber to rebut the presumption that Plaintiffs were employees. In *Commonwealth v. Stuber*, the court held that the burden of proof is on the defendant rather than

---

[1]     *See* Dkts. 151, 159. Plaintiffs hereby incorporate by reference their full arguments made in those memoranda.

the plaintiff: "Moreover, under both the [PMWA] and our state unemployment law, there is a statutory presumption of an employment relationship that the employer must overcome." 822 A.2d 870, 873 n.5 (Pa. Commw. Ct. 2003), *aff'd* 859 A.2d 1253 (Pa. 2004). There is simply no basis for concluding that the burden of proof is on Plaintiffs under Pennsylvania law.

Second, a review of recent caselaw makes clear that Pennsylvania law is more favorable to Plaintiffs than is the FLSA's economic realities test.[2] As the Commonwealth of Pennsylvania explained in its amicus brief, the Pennsylvania General Assembly "clearly thought that Pennsylvanians required greater protection than the FLSA provided," (Dkt. 193-1 at p. 7), and "Pennsylvania labor and employment laws generally offer more protective coverage of workers" than the FLSA (Dkt. 193-1 at p. 14). Plaintiffs thus reiterate that the Court should recognize that a separate (more employee-friendly) misclassification standard applies under Pennsylvania law.

Now that Uber has rested its case, Plaintiffs move for judgment as a matter of law seeking a holding that Plaintiffs were Uber's employees under Pennsylvania law. While the Pennsylvania Supreme Court has not directly addressed the standard for independent contractor misclassification under the PMWA and PWPCL, it is clear that Uber drivers should be considered employees under these laws, particularly in light of the Pennsylvania Supreme Court's decision in *Lowman v. Unemployment Compensation Board of Review*, 661 Pa. 29 (2020).  In *Lowman*, the state Supreme Court concluded that an Uber driver was an employee for purposes of unemployment benefits.  It would make no sense for Uber drivers to be employees under the unemployment statute, but not under the PMWA and PWPCL.  And as described

---

[2]     *See In re Amazon.com, Inc.*, 255 A.3d 191, 201-02 and n.11 (2021) (declining to hold that the FLSA standard was grafted onto the PMWA and explaining "To the extent that our *per curiam* affirmance of [*Commonwealth v. Stuber*, 822 A.2d 870 (Pa. Commw. 2003)] on the basis of the Commonwealth Court's opinion may be read as an endorsement of the principle that the PMWA and federal FLSA mirror each other in all respects and must always be interpreted similarly, we disavow such a reading.").

further below, the facts established at this trial include the same basic material facts upon which the Pennsylvania Supreme Court based its decision in *Lowman* -- and indeed, the evidence of Uber's control over Plaintiffs presented in this trial is even stronger than the evidence of control which the Court relied on in *Lowman* in reaching its conclusion.

The Third Circuit has also held that, when determining whether an individual is an "employee" and subject to the protections of the WPCL, Pennsylvania courts "have looked to similar statutes such as the Pennsylvania Unemployment Compensation Act and the Pennsylvania Workers' Compensation Act." *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 320 (3d Cir. 2016) (citing *Morin v. Brassington*, 871 A.2d 844, 849 (Pa. Super. Ct. 2005)); *see also, e.g., Deron v. SG Printing, Inc.*, No. 3:11CV1934, 2012 WL 3992960, at *8 (M.D. Pa. Sept. 4, 2012) (same); *Frank Burns, Inc. v. Interdigital Commc'ns Corp.*, 704 A.2d 678, 680 (Pa. Super. Ct. 1997) (applying Unemployment Compensation Act and Worker's Compensation Act to define "employee" under WPCL. Indeed, it would make little sense for Uber drivers to be employees for the purposes of unemployment benefits but independent contractors for the purposes of the PMWA and PWPCL.

In *Lowman*, an unemployment case, the Pennsylvania Supreme Court applied an "AC" test to an Uber driver who worked in Philadelphia beginning on July 1, 2015 (the same place and time frame at issue in this case).[3] *Lowman*, 661 Pa. at 38-39.  Under that test, there is "a

---

[3]     The *Lowman* decision concerned an "UberX" driver, whereas this case is about "UberBlack" drivers.  As made clear from the evidence at trial, Uber controlled UberBlack drivers even more than UberX drivers. For example, Uber imposed a dress code on its UberBlack drivers, provided a small list of cars the UberBlack drivers could use, imposed a training video requirement on UberBlack drivers, and required regular vehicle inspections for UberBlack drivers.  *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test.; Torres Test.; Ex. 208. Furthermore, UberBlack drivers were required to maintain a higher rating than UberX drivers, thus ensuring higher quality service for passengers. UberX drivers thus had greater freedom than UberBlack drivers. *See* Murray Test.; Holtzman-Conston Test.

presumption of employment: 'Services performed by an individual for wages shall be deemed to be employment subject to this act.'" *Id.* at 65 (quoting 43 P.S. § 753(l)(2)(B)). The presumption of employment remains until *the alleged employer shows* first "that the individual in question is not subject to control" ("Prong A") and second, that the individual in question is "customarily engaged in an independently established trade, occupation, profession or business" ("Prong C"). *Id.* These factors are *conjunctive*, meaning that the alleged employer must establish *both* prongs in order to establish the driver is an independent contractor; if the alleged employer fails to establish *either* prong, then the worker was an employee. *Id.* at 66.  In *Lowman*, the Pennsylvania Supreme Court held that Uber could not satisfy *either* prong of this test.  Thus, the Court concluded that the Uber driver was an employee.[4]

Here, too, the Court should enter judgment as a matter of law, holding that Plaintiffs were Uber's employees under Pennsylvania law. Practically every fact that led the Pennsylvania Supreme Court in *Lowman* to hold that an Uber driver was an employee was also presented as evidence in the trial in this case – nor did Uber materially dispute this evidence.  In fact, Plaintiffs have established in this trial a significantly *stronger* record than the record reviewed in *Lowman*, demonstrating that Uber retained a significant right to control their work (and indeed, *did* control their work).  Thus, like in *Lowman*, it cannot be concluded that Uber has established its burden under "Prong A."  Also as in *Lowman*, Uber has not established "Prong C," that

---

[4]      In *Lowman*, the Pennsylvania Supreme Court cited to the Court's decision in this matter but suggested the holding would be different under the "AC" test applied in *Lowman*.  661 Pa. at 55 n.17.  That statement was before the Pennsylvania Supreme Court decided in *Amazon* to disavow the notion that "PMWA and federal FLSA mirror each other in all respects and must always be interpreted similarly" and thus is no longer relevant to Pennsylvania law. *See In re Amazon*, 255 A.3d at 202 n.11.

Plaintiffs were customarily engaged in an independently established trade, occupation, profession, or business.[5]

Also, as Plaintiffs noted in their motion regarding Pennsylvania law (Dkt. 151 at p. 2), it is unclear what test the Pennsylvania Supreme Court will ultimately adopt to apply to the PMWA and PWPCL.  It is very possible that the Pennsylvania Supreme Court will follow the California Supreme Court in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (Cal. 2018), and the New Jersey Supreme Court in *Hargrove v. Sleepy's*, 106 A.3d 449 (N.J. 2015), in adopting an "ABC" test (as Plaintiffs contend is the proper test to apply, for the same reasons the *Dynamex* and *Hargrove* courts chose to adopt that test – because it is the strongest and most simple test to apply and it accomplishes the purpose of creating more predictability in the analysis and the most protection for employee status).

Under an "ABC" test, if an alleged employer cannot satisfy *all three prongs* of the test, then the individual is an employee.  *See Dynamex*, 4 Cal. 5th at 957; *Hargrove*, 106 A.3d at 305. Prong B requires the alleged employer to prove that the services provided by the plaintiffs are outside its usual course of business.  If the "ABC" test applies to the PMWA and PWPCL, then Uber cannot satisfy Prong B (and thus Plaintiffs are employees), both as a matter of law that has already been established in this case[6], as well as based on the evidence clearly established at trial.

---

[5]     Because the "AC" test in *Lowman* is conjunctive, Plaintiffs should prevail here under Pennsylvania law, even if Uber can establish "Prong C", if it cannot establish "Prong A".

[6]     In this Court's ruling on summary judgment, this Court held that "Uber drivers are an essential part of Uber's business as a transportation company" and that "it seems beyond dispute that if Uber could not find drivers, Uber would not be able to function." *Razak v. Uber Technologies, Inc.*, 2018 WL 1744467, at *19 (E.D. Pa. Apr. 11, 2018). Further, "drivers depend on Uber's technology in getting jobs." *Id.*

For these reasons, as described further below, under Pennsylvania law, and particularly in light of *Lowman*, judgment should be entered in Plaintiffs' favor.  Under Pennsylvania law, no reasonable jury could find that Uber met its burden to rebut the presumption of employment under the PMWA and PWPCL.

## II.    ARGUMENT

### A.    Legal Standard

Judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "The evidence will be considered legally insufficient where, viewing the evidence in the light most favorable to the non-moving party, 'the record is critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief.'" *Daniels v. School Dist. of Philadelphia*, 2014 WL 317882, at *1 (E.D. Pa. Jan. 29, 2014) (quoting *Williamson v. Piper Aircraft Corp.,* 968 F.2d 380, 384 (3d Cir.1992). Notably, the "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Eddy v. Virgin Islands Water and Power Authority*, 369 F.3d 227, 230 n.4 (3d Cir. 2004). Put differently, "a scintilla of evidence is not enough to sustain a verdict" in favor of the non-moving party. *Id.*

### B.    Plaintiffs Should Be Held to be Employees Under Pennsylvania Law

As described above, the Pennsylvania Supreme Court in *Lowman* applied an "AC" test, putting the burden on an alleged employer to prove both of these prongs in order to establish that an individual is an employee.  Given the evidence entered into at this trial, Uber has not

6

established these prongs.  No reasonable jury could find that it did.  Indeed, the evidence established at the trial in this case makes even more clear than the record reviewed by the Pennsylvania Supreme Court in *Lowman* that Uber cannot establish these prongs.

Also, should the Pennsylvania Supreme Court apply the "ABC" test under the PMWA and PWPCL, no reasonable jury could find that Uber proved "Prong B" (which by itself would compel a conclusion that Plaintiffs were Uber's employees).

      **1.**        **Based on the Evidence Entered at Trial, Uber Has Not Satisfied Its Burden to Show that Plaintiffs Were Free from Uber's Control ("Prong A")**

No reasonable jury could find that Uber met its burden to show that Plaintiffs were free from Uber's control. As the Court explained in *Lowman*, under "Prong A", Uber must show that Plaintiffs enjoyed freedom from control or direction both "under his contract of service and in fact . . . ." *Lowman*, 661 Pa. at 71 (quoting *CE Credits OnLine v. Unemployment Comp. Bd. of Review*, 946 A.2d 1162, 1169 (Pa. Commw. 2008)). Moreover, "[c]ontrol . . . is not a matter of approving or directing the final work product so much as it is a matter of controlling the means of its accomplishment." *Id.* (quoting *CE Credits OnLine*, 946 A.2d at 1169)).

In holding that Uber's drivers in Philadelphia "were not free from Uber's direction or control," the *Lowman* Court found that the most significant considerations included "the required application process; the inability to use a substitute to provide services; Uber's monitoring, review and supervision of Lowman's performance; pay structure; provision of tools and equipment." *Id.* at 71-72. The same facts that the Court relied on in *Lowman* that supported employment status were likewise established by the evidence in this trial. In fact, a review of the record shows that Plaintiffs here have demonstrated that Uber had *significantly more* control in this case than was reviewed and considered in *Lowman*.

### a.      Uber controlled drivers through its application process

Evidence entered at trial showed that Uber exerted control from the outset of its relationship with Plaintiffs. Uber sometimes required drivers to attend an information session at its office before they could start driving for Uber-Black. Holtzman-Conston Test.; Ex. 181. Like in *Lowman*, to begin driving for Uber, Plaintiffs were required to pass two background checks (one required by the PPA and one separately required by Uber). *See* JX-11; Ex. 111; Cherdoud Test; *see also Lowman*, 661 Pa. at 72 ("As part of the application process, Lowman had to undergo a background check . . . ."). Plaintiffs also had to submit to intermittent additional background checks.  *See* Ali Razak Test.

Plaintiffs had to form an LLC or affiliate with a "fleet" (which had its own LLC) through which they could work for Uber and receive payments for their services. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test. To form these LLC's, Uber referred drivers to accountant Said Amara, who also prepared Plaintiffs' taxes each year. *See* Cherdoud Test.; Sabani Test.; Ali Razak Test.; Torres Test.

Plaintiffs were required to obtain insurance that Uber dictated, obtain properly registered vehicles (and with financing facilitated by Uber), and obtain stickers from the Philadelphia Parking Authority to put on their windshields. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test; Holtzman-Conston Test.; JX-3; JX-4; JX-11; JX-12. *Compare Lowman*, 661 Pa. at 73. ("As part of the application process, Lowman had to . . . verify to Uber that he had a valid driver's license, automobile liability insurance, a properly registered vehicle, and workers' compensation insurance."). Uber obtained the Philadelphia Parking Authority stickers and provided them to the drivers. Holtzman-Conston Test.; Ex. 193.

For a time, Uber provided cell phones to get ride requests from Uber; later Uber required the drivers to provide their own cell phones that could run the Uber app. *See* Cherdoud Test. Likewise, Uber maintained strict requirements for the driver's vehicle – Uber had a list of makes and models that Plaintiffs could drive that was stricter than the list maintained by the Philadelphia Parking Authority, and the cars could not be more than five years old. *See* Murray Test.; *compare Lowman*, 661 Pa. at 73 ("Although Lowman provided his own vehicle and cellphone, which was necessary to access the Driver App, Uber required that Lowman's personal vehicle and cell phone meet its criteria regarding age and condition to be authorized for use."). Uber had to approve the drivers' cars before they were permitted to begin working as an UberBlack driver. *See* Holtzman-Conston Test.; Ex. 181.

Plaintiffs were required to watch a training video prior to driving, which explained Uber's expectations about how they were supposed to do their work and interact with passengers. *See* Cherdoud Test. The drivers went to Uber's Philadelphia office to watch this training video. *See* Cherdoud Test. No such evidence was presented in *Lowman*. 661 Pa. at 74.

> **b.**     **Uber prohibited UberBlack drivers from delegating rides to others**

Like in *Lowman*, "Uber exercised total control over the provision of service because Lowman personally had to fulfill the passenger assignment", and the drivers "could not hire a substitute driver to provide a ride to a passenger identified by Uber." *Lowman*, 661 Pa. at 73. Here, Uber told Plaintiffs that:

> It is against Uber policy for drivers to drive under someone else's account. This is cause for deactivation if you drive under a different driver's account OR if a driver drives under your account. Do not share logins and passwords to prevent this from happening. There is no second chance policy for this.

Ex. 192. *See also* Holtzman-Conston Test.

Nor were Uber drivers allowed to solicit passengers away from other Uber drivers:

> Drivers are not permitted to solicit trips off the street EVEN if the rider is waiting for a different Uber driver. This is cause for IMMEDIATE DEACTIVATION. If a rider is waiting for a different Uber driver you are not permitted to take that rider, even if you are closer.

Ex. 192. *See also* Holtzman-Conston Test.

Plaintiffs were not free to operate like they were businesses, which could delegate jobs to another employee. Instead, the drivers were required to perform all trips sent to them, and accepted by them, themselves. *See* Cherdoud Test.; Sabani Test.; Ali Razak Test. The drivers were not permitted to hand out personal business cards to Uber passengers. *See* Ex. 184. Indeed, Uber told the drivers:

> Drivers and partners are not allowed to give out personal business cards to riders taking trips through the Uber app. There are no exceptions to this policy and drivers will be deactivated permanently if they are caught doing this even once. Even if the customer wants to request you again through the Uber app this is still against policy. We do not want any confusion with this, please ask us if you are unclear in anyway about this policy.

Ex. 184.

### c. Uber monitored, reviewed, and supervised Plaintiffs' performance

As in *Lowman*, the evidence at trial established that Uber had the right to control (and indeed actually controlled) Plaintiffs' day-to-day work. As *Lowman* aptly described, "[i]n the virtual world in which Uber operates, it monitored and supervised [its drivers'] provision of driving services." *Lowman*, 661 Pa. at 73.

At all times while Plaintiffs were logged into the Uber app, Uber's employees could use GPS tracking to see where they were. *See* Murray Test.; Cherdoud Test.; Dobbs Test.; JX-3; JX-11. Former Uber manager (called a "Greenlight Specialist") Tara Murray testified that, at Uber's office, she was able to see the locations of any UberBlack driver who was online. *See* Murray

Test.; *compare Lowman*, 661 Pa. at 73 ("[]Uber could track [the driver's] location through its geolocation services, remaining involved in real-time in the actual driving assignment – it knew his location at all times when he was logged in, including when he was providing a ride to the Uber passenger.")

Uber used this GPS technology to track the progress of Plaintiffs' trips, ensuring that the drivers were taking the most direct routes. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Razak Test; Ex. 129 (Uber reached out to Plaintiff Cherdoud when he did not take the most direct route); *compare Lowman*, 661 Pa. at 73 ("The GPS tracking was used by Uber to retroactively adjust a fare based upon a driver's inefficient route.").

Drivers could not decide whether to accept a ride based on the passenger's destination. Indeed, the driver does not learn the passenger's location until after accepting a ride. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test.; Jx-3. Uber informed the drivers that:

> Drivers are not allowed to call riders and ask for their destination before picking them up. Drivers cannot reject a trip based on the end destination, do not accept the trip if you do not want to drive to the pickup location.

Ex. 195; *see also* Holtzman-Conston Test.; JX-11; JX-12; Ex. 158. *Compare Lowman*, 661 Pa. at 73 ("Nor could Lowman deviate from the destination provided by the passenger."). Plaintiffs were restricted from contacting any customer for any reason other than driving them through Uber. *See* JX-11; Ex. 195.

Uber also worked to ensure that riders had drivers to meet their demand by routinely making suggestions, including by sending out frequent email updates, about where the drivers should go to get rides; by providing this information, Ube wanted to ensure that there were sufficient drivers to meet demand in various areas and for times and events it expected high demand. *See* Holtzman-Conston Test.; Ex. 193. In its office, Uber monitored rider demand and

driver availability and took actions to try to ensure enough drivers would be where the demand

was.  *Id.*  Such actions were designed to help make the experience for riders better, so that they

would not have to wait very long for a ride.  *Id.*

Uber maintained a Code of Conduct, which it required Plaintiffs to adhere to. *See* Ex.

299.  The Code of Conduct contained a zero-tolerance policy for various conduct, including

discrimination, harassment, or abuse, aggressive behavior, making derogatory remarks about a

person or group, commenting on appearance, asking overly personal questions, making

unwanted physical contact, carrying firearms, violence. *See* Ex. 299.  The Code of Conduct also

prohibited illegal substances and open containers of alcohol in the drivers' vehicles. *See* Ex. 299.

The Code of Conduct required drivers to accommodate riders with disabilities and accommodate

service animals. *See* Ex. 299. The Code of Conduct also requires drivers to keep documents up to

date to remain active with Uber. *See* Ex. 299.

Under Uber's policy, if *Uber* determined that a driver had engaged in conduct that would

violate its zero-tolerance policy, the driver would be deactivated. *See* Murray Test.; Ex. 299. If a

driver was suspected of having violated one of Uber's rules that did not fall under the zero-

tolerance policy, Uber staff would have to make a judgment call about how to handle the

situation, including deciding whether the driver should be deactivated. *See* Murray Test.;

Holtzman-Conston Test.; *see also Sigui v. M+M Communications, Inc.*, 484 F. Supp. 3d 29, 37

(D.R.I. 2020) (finding control supported an employment relationship where management

"exercised discretion to back-charge Technicians for incomplete or nonconforming work.");

*Clincy v. Galardi South Enterprises, Inc.*, 808 F. Supp. 2d 1326 (N.D. Ga. Sept. 7, 2011)

(finding plaintiff was an employee under the FLSA where "[t]he rules are not always enforced as

written, but Club Management has discretion to enforce the rules as they see fit and fine entertainers for violations.").

These requirements were spelled out in Uber's Deactivation Policy (Ex. 301) and Community Guidelines that reflected these same general requirements.

Uber also created additional rules from time to time and transmitted them to the drivers through regular email blasts that included "Uber Policy Reminders." By contrast, the Supreme Court in *Lowman* did not even discuss the Code of Conduct, Deactivation Policy, or the policy reminders drivers received.

At its sole discretion, Uber could deactivate drivers if Uber determined they had violated Uber's agreement, disparaged Uber, or caused harm to Uber through their acts or omissions, or for any other reason at Uber's discretion. *See* JX-4; JX-12; Ex. 299; Ex. 301. Drivers who violated the rules that Uber included in its policies were in fact deactivated. *See* Murray Test.; Holtzman-Conston Test.; Ex. 227. Indeed, the evidence presented at trial showed that drivers tried to follow Uber's rules as much as they could for fear of getting deactivated. *See* Cherdoud Test.; Sabani Test.; Ali Razak Test.; Torres Test.

Uber supervised, or maintained the quality of, the drivers' work using passenger ratings. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test.; Torres Test.; Dobbs Test.; JX-19; Ex. 101; Ex. 299; Ex. 301; Ex. 304. *Compare Lowman*, 661 Pa. at 74 ("Uber supervised Lowman's work, using passenger ratings of his services.") Uber relied on these passenger ratings to assess the drivers' performance. *See* Murray Test. *Compare Lowman*, 661 Pa. at 74 ("Although the reviews of Lowman were conducted by passengers, Uber relied on them to assess Lowman's performance."). Indeed, Uber monitored these ratings regularly. *See* Murray Test.; Sabani Test.; Dobbs Test. UberBlack drivers in Philadelphia were required to maintain an

13

average rating of 4.3, and then later 4.7, and then later 4.8, out of 5 or else risk being deactivated;

Uber set the minimum rating in its discretion and continued to raise the rating in order to

increase driver quality and passenger satisfaction. *See* Murray Test.; Ex. 101. *Compare*

*Lowman*, 661 Pa. at 74 ("Lowman was required to maintain an average rating that exceeded the

minimum rating established by Uber.").  Uber's contract stated that drivers could be deactivated

if their passenger rating fell below the minimum. *See* JX-11. *Compare Lowman*, 661 Pa. at 74

("Contractually, Uber could deactivate the Driver App based on failure to maintain an

"acceptable rating as determined by Uber."). Sometimes, Uber would permit (in its discretion)

drivers whose accounts had been suspended for low ratings to be reactivated if they took a

quality improvement course that provided training on how to be a better UberBlack driver. *See*

Murray Test.; Sabani Test. "This type of constant assessment of performance is a strong indicia

of control by Uber." *Lowman*, 661 Pa. at 74.

Uber kept detailed records of the drivers in its files. *See* Murray Test.; JX-19; Ex. 226.

Uber marked some drivers (who had especially high ratings) as "VIPs", who would get better

rides.  It also tagged drivers who were critical of Uber.  *See* Ex. 226; Ex. 330. Uber managers

retained discretion to adjust the drivers' customer ratings. *See* Murray Test.; Dobbs Test.

Uber imposed other control over its UberBlack drivers that was not discussed in *Lowman*.

Uber maintained a physical office where drivers went to speak to Uber staff to address issues that

arose. *See* Cherdoud Test.; Sabani Test.; Ali Razak Test.; Torres Test.  Drivers would go to the

office for training, to pick up mints, water, and bagels that Uber would purchase to provide to

passengers, for vehicle inspections, as well as to address issues that arose such as when drivers

faced deactivation or allegations that they had engaged in misconduct.[7] *See* Cherdoud Test.;

---

[7]     This evidence of Uber's control over Plaintiffs was absent in *Lowman*, which explained:

Sabani Test.; Ali Razak Test.; Torres Test. Uber also supervised its drivers through customer service representatives ("CSRs") who were based at a "Center of Excellence" located in Arizona and in other cities. *See* Holtzman-Conston Test. When issues arose regarding drivers' conduct, the staff in the Philadelphia office would decide if an issue needed to be escalated to another Uber team, such as the incident response team or other teams at the Center of Excellence; the staff in the Philadelphia office would then communicate with the driver to get his side of the story and work with the other Uber team members to gather information to help with their investigation. *See* Murray Test.; Dobbs Test.  Sometimes staff in Philadelphia would "go to bat" for a driver with the other Uber team, and Murray even succeeded in persuading a team member to reactivate a driver who had been suspended (waitlisted) based on an accusation of not allowing a service animal to ride in his car.  *See* Murray Test.

Uber required the drivers to adhere to a dress code consisting of a solid color dark suit and tie. *See* Cherdoud Test.; Sabani Test.; Razak Test.; Ex. 208. Uber also enforced numerous standards for the drivers such as about hygiene, not having a personal odor, not having a smelly car, a prohibition on talking on the phone during rides, and others. *See* Holtzman-Conston Test.; Ex. 192; Ex. 250.

---

As is true with its customers, Uber's interaction with its drivers is through its technology. While there is no training in the more traditional mode of office or conference room meetings, regular emails and text messages advising on the manner in which rides and Lowman's earnings (and by definition, Uber's) could be maximized and approaches to providing positive experiences for customers were utilized by Uber in lieu of face-to-face encounters in brick and mortar meeting rooms.

*Lowman*, 661 Pa. at 74.

These Uber rules went beyond the requirements of the Philadelphia Parking Authority (including not allowing tipping, whereas the PPA rules simply prohibited drivers from *soliciting* tips). *See* Holtzman-Conston Test. The PPA also did not enforce the requirements as Uber did; it did not utilize a passenger rating system, nor was there evidence that it "deactivated" drivers whose quality was not maintained highly enough, as Uber did. *Id.*

Uber also required the drivers to submit their vehicles for regular inspections and to keep their cars clean. *See* Torres Test. Drivers were also prohibited from disparaging Uber to passengers. *See* Ex. 212.

Uber also imposed a significant of control on Plaintiffs through its airport queue system (which again went beyond the evidence of control discussed in *Lowman*). *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test.; Ex. 293; Ex. 294; Ex. 295; Ex. 296; Ex. 298; Ex. 302. Plaintiffs were only able to get rides at the airport by waiting in the queue in an airport lot set by Uber. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test.; Ex. 295; Ex. 296; Ex. 298; Ex. 302. Drivers would have to wait in the lot for hours on end if they wanted to get a ride. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test.; Ex. 295; Ex. 296; Ex. 298; Ex. 302. When some drivers figured out a way to avoid the airport queue rules (getting rides at the airport, without actually waiting for hours in line), Uber figured it out (after investigating) and without warning deactivated them. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test.; Ex. 295; Ex. 296; Ex. 298; Ex. 302. Uber also facilitated the process of setting up an "AVI" account, which was necessary to get into the parking lot where the drivers were required to wait for airport rides, rather than having the drivers go set up those accounts on their own. *See* Holtzman-Conston; Ex. 192.

The fact that Uber's contract described Plaintiffs as independent contractors is inapposite.

*See Lowman*, 661 Pa. at 74 ("For example, the Agreement identifies Lowman as an independent contractor and he received a 1099 tax form so that taxes were not withheld from his payments from Uber. Although sometimes relevant, we find them here to add little to the analysis."). Like in *Lowman*, Plaintiffs here considered themselves employees. *See* Cherdoud Test.; Sabani Test.; Ali Razak Test.

### d.      Uber unilaterally decided Plaintiffs' compensation

Uber unilaterally sets the fare charged to riders and decides how much of the fare to give to the drivers. *See* JX-11; Dobbs Test. Uber instructed drivers to "never speak to riders about pricing as that is all taken care of by Uber." *See* JX-15. Uber paid UberBlack drivers a fee per ride, which was set by Uber at Uber's sole discretion and was subject to change. *See* JX-3; JX-11.  Uber also decided what its fee would be for each ride.  *See* JX-3; JX-11.  Uber collected fares from riders and then paid the drivers what it determined they should be paid. *See* JX-3; JX-11. The drivers could not negotiate their pay with customers or with Uber. *See* JX-15; Murray Test.; Cherdoud Test.; Sabani Test; Ali Razak Test (although passengers may choose to pay drivers more through a tip, *see* Holtzman-Conston Test.). At times, Uber also paid its drivers by the hour. *See* Holtzman-Conston Test. Uber decided to compensate the drivers for their time when the Uber app had an outage. *See* Holtzman-Conston Test.; Ex. 225. Likewise, Uber could decide whether to charge a cancellation fee when a ride had been cancelled, or to provide a cleaning fee for a driver when a passenger had made a mess in a driver's car (based on Uber's evaluation of how bad the mess was). *See* Dobbs Test.; JX-3; JX-12.

### e.      Uber provided the most important tool that Plaintiffs used to perform their work – the Uber app

While Uber will undoubtedly highlight the fact that Plaintiffs provided their own vehicles and their own phones (at least after some time – initially Uber provided the drivers with their

phones, *see* Cherdoud Test.), Uber invested millions of dollars in the Uber app, which it provided to drivers, and which was the most essential tool for performing Plaintiffs' driving services. *See* Cherdoud Test.; Sabani Test.; Ali Razak Test.; Murray Test; Dobbs Test.; Ex. 246; Ex. 247. As the *Lowman* Court reasoned:

> While the vehicle and cell phone as specified were provided by Lowman, these "tools and equipment" were useless without the predicate tool necessary to provide driving services, Uber's Driver App. This fundamental tool for the provision of the service was provided by Uber – without it, Lowman could provide no service. It was the sole means by which he connected, met, or interfaced with a passenger.

This observation is equally true here.

In sum, the record entered into evidence in this case makes even more clear than the record in *Lowman* that Uber wielded significant control over its drivers.  Judgment should be entered in Plaintiffs' favor, as no reasonable jury could conclude that Uber did not retain the right to control the drivers (or did not exercise that control).

### 2.   Based on the Evidence Entered at Trial, Uber Has Not Satisfied Its Burden to Show that Plaintiffs Were Customarily Engaged in an Independently Established Trade, Occupation or Business" ("Prong C")

Because no reasonable jury could find that Uber has demonstrated that Plaintiffs were free from Uber's control, the Court need go no further. The conjunctive nature of the "AC" test in *Lowman* means that Uber has lost by failing to establish the control prong. *See Lowman*, 661 Pa. at 66 ("The two factors in Section 753(l)(2)(B) are in the conjunctive, and thus the party challenging a claimant's employment status must establish **both** parts of the test to demonstrate that a claimant's services are self-employment.") (emphasis in original) (internal citations omitted).

Nevertheless, particularly when compared to the facts in *Lowman*, it also the case that no reasonable jury could find that Plaintiffs were customarily engaged in an independently

18

established trade, occupation, or business. This factor "seeks to discern whether the worker is wearing the hat of an employee of the employing company, or is wearing the hat of his own independent enterprise." *Athol Daily News v. Bd. of Review of Div. of Emp't & Training*, 439 Mass. 171, 181 (2003) (internal quotation omitted). Importantly, in determining whether Plaintiffs were customarily engaged in an independent business, the question is not what Plaintiffs *could* do but what they actually did do. *Lowman*, 661 Pa. at 70.

When Plaintiffs were driving for Uber, they were wearing Uber's "hat" rather than their own. Customers could not request them personally, when they requested a ride with Uber. *See* Murray Test.; Dobbs Test.; Holtzman-Conston Test; Ex. 184.

Uber required that Plaintiffs either form an LLC or be paid through another driver or fleet owner who had established an LLC. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test.; Torres Test.  The fact that Plaintiffs thus set up an LLC (with respect to Plaintiffs Cherdoud and Sabani), or worked with another Uber driver who had set up an LLC through whom they could be paid (like Plaintiff Razak), does not show that Plaintiffs are engaged in their own "businesses." *See* Cherdoud Test.; Sabani Test.; Ali Razak Test.  Uber provided information to each driver individually regarding the fares they drove that week, even if their pay was funneled through an LLC.  *See* Holtzman-Conston Test.; Ex. 230; Ex. 233; Ex. 237; Ex. 240; Ex. 242.

The record established that the vast majority of driving work that Plaintiffs performed during the relevant time period was for Uber. *See* Cherdoud Test.; Sabani Test.; Ali Razak Test. Indeed, Uber required its drivers to only make themselves "available" through Uber's app (i.e. go "online") when they could perform rides; because they would need to accept trips within 15 seconds of receiving the request, the drivers lacked the freedom to work for other companies

while they were working for Uber. *See* JX-1; Holtzman-Conston Test.  Indeed, Plaintiffs all

testified that they typically worked full time for Uber and rarely took vacations. *See* Cherdoud

Test.; Sabani Test.; Ali Razak Test. *Compare Lowman*, 661 Pa. at 42 ("Lowman drove for Uber

most days at made approximately $350.00 per week.").

Further, it is significant that Plaintiffs were not free to subcontract out their jobs (or

delegate them to someone else), as Uber required each driver to perform the rides sent to him

personally. *See* JX-3; JX-11; Ex. 192. *Compare Lowman*, 661 Pa. at 75-76 ("This contractual

prohibition, likewise, divests Lowman of the ability to subcontract business. The ability to hire

other drivers to take their riders is a recognized indication of one who is independently engaged

in a business."). Nor did Uber permit drivers to build a client base through Uber, as Uber strictly

prohibited drivers from soliciting Uber clients, or even *accepting* requests for rides directly from

Uber clients.  *See* JX-11; Ex. 192.[8]  Uber also strictly prohibited Plaintiffs from handing out

personal business cards while driving for Uber; doing so was an offense that could subject them

to deactivation.  *See* Ex. 184.  Plaintiffs were also prohibited from contacting customers for

whom they had provided rides through Uber.  *See* JX-11. *Compare Lowman*, 661 Pa. at 76

("Further, Lowman could not build his own client base under the auspices of his Uber

relationship because his contract limits his communications with customers to the Uber App and

are permitted only for the purpose of providing rides through Uber.").

---

[8]      While Uber made much of the fact that Plaintiff Sabani had some private clients through his LLC, Freemo Limo, he testified that he obtained those clients – against Uber's rules – by agreeing to drive an Uber client outside the Uber app.  *See* Sabani Test.  It would seem difficult for Uber to contend that drivers were free to operate their own businesses, and that Sabani did so, when the work her performed outside of Uber violated Uber's rules.

Plaintiffs had no ability to set their own rates for rides, and it was the "luck of the draw" which rides they would get from Uber.[9] *See* JX-11; JX-15; Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test. Drivers risked negative consequences (deactivation) for not accepting rides, or cancelling rides. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test; Ex. 301; Ex. 302.

Finally, Plaintiffs' ability to set their own schedules does not indicate that they were independent businesses. *Lowman* rejected this same argument:

> However, the world in which Uber and Lowman operate is not the usual workforce. Traditionally, hours of work are set and required by an employer (or putative employer) because the operations of the enterprise are dependent on a set number of workers to accomplish a defined task. In contrast here, the fact that Uber allows all of its licensed drivers to work at their own discretion evidences a decision that there are a sufficient number of individuals with access to the Driver App to ensure that, despite erratic schedules, there will always be a driver available to service passengers requesting Uber's service. The fact that Uber's business model does not require regularly scheduled work hours from its workforce does not translate into an automatic independent contractor relationship.

*Lowman*, 661 Pa. at 77.

Because no reasonable jury could conclude that Plaintiffs were engaged in an independently established business, just as the Pennsylvania Supreme Court concluded in *Lowman*, the Court should enter judgment in Plaintiffs' favor under Pennsylvania law.

### 3. Based on the Evidence Entered at Trial, Uber Has Not Satisfied Its Burden to Show that Plaintiffs Performed Services Outside Uber's Usual Course of Business ("Prong B")

As Plaintiffs have explained, it is possible that the Pennsylvania Supreme Court will

---

[9]     *Lowman* noted that facts such as these were relevant to both Prong A and C, explaining that "[a]lthough the control and independence factors in Section 753(l)(2)(B) are articulated as separate considerations, it is apparent that certain indicia considered in the context of the control factor are also relevant in the analysis of the 'independently established' aspect of the independence factor." *Lowman*, 661 Pa. at 75.

adopt an "ABC" test, like the Supreme Courts of California and New Jersey did in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (Cal. 2018), and *Hargrove v. Sleepy's LLC*, 106 A.3d 449, 465 (N.J. 2015). The test in *Lowman* uses prongs "A" and "C" of the "ABC" test (but not Prong "B"). The inclusion of Prong "B" would create an even stricter test than the Pennsylvania Supreme Court applied in *Lowman* to find that an Uber driver was an employee. Thus, if an "ABC" test applies, there can be no question that Uber cannot meet its burden to establish that Plaintiffs were independent contractors.

Under Prong B of the ABC test, Uber must demonstrate that Plaintiffs "perform[ed] work that is outside the usual course of [Uber's] business." *Dynamex*, 4 Cal. 5th at 959. The purpose of Prong B "is to bring within the 'employee' category *all* individuals who can reasonably be viewed as working '*in the [hiring entity's] business*' . . . ." *Id.* (internal citation omitted) (emphasis in original).

Because of Prong B's simplicity and straightforward application, "Prong B of the ABC test may be the one most susceptible to summary judgment." *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125 (9th Cir. 2021) (cleaned up). The California Court of Appeal echoed this point in another case involving Uber -- *People v. Uber Technologies, Inc.*, 56 Cal. App. 5th 266, 302 (2020) -- affirming a preliminary injunction entered against Uber (finding the State likely to prevail in its claim that Uber misclassified drivers as independent contractors under state law), and explaining that "the simplicity of the ABC test ma[kes] it possible to decide at [an] early stage in [] litigation," without the need for extensive discovery or a robust record. *See also Carey v. Gatehouse Media Massachusetts I, Inc.*, 92 Mass. App. Ct. 801, 807-08 (2018) (affirming summary judgment for plaintiffs under Prong B and noting that Prong B is particularly amenable to resolution on summary judgment). A service "need not be the sole,

principal, or core product that a business offers its customers, or inherently essential to the

economic survival of that type of business, in order to be furnished in the usual course of that

business." *Id.* at 808; *see also Lawson v. Grubhub, Inc.*, 665 F. Supp. 3d 1108, 1120-21 (N.D.

Cal. 2023) (holding that GrubHub could not satisfy prong B where "the simple economics show

delivery services were 'necessary' to the business because Grubhub made more money if drivers

made more deliveries" and "Grubhub publicly advertised delivery services to diners," as "courts

have rejected attempts by hiring entities to categories their business as merely enabling,

facilitating, or coordinating services rather than providing those services.")

In this case, this Court already determined at the summary judgment stage that Plaintiffs'

services were integral to Uber's business for the purposes of the FLSA's economic realities test

(essentially the same test as Prong B of the ABC test).  This Court explained:

> As noted elsewhere in this opinion, and in other cases, Uber drivers are an essential part
> of Uber's business as a transportation company . . . . Indeed, it seems beyond dispute that
> if Uber could not find drivers, Uber would not be able to function. Similarly, Uber's
> drivers depend on Uber's technology in getting jobs.

*Razak*, 2018 WL 1744467, at *19.[10]

The evidence put into the record at trial here only further bolsters the Court's prior

conclusion on this point. Uber was a transportation company that held itself out as "Everyone's

Private Driver." (Ex. 203 at UBER_RAZAK_00001279; Ex. 208 at UBER_RAZAK_00007402).

Indeed, Uber operated UberBlack through its subsidiary Gegen, LLC, which represented to the

---

[10]     *Lawson v. GrubHub* addressed a similar circumstance. In its decisioning holding that
GrubHub could not satisfy Prong B, the court noted "Prong B is a "prominent factor[ ] already
listed in [the California common law test]." *Lawson*, 665 F. Supp. 3d at 118. The court in
*Lawson* had previously considered the California common law test after a bench trial (before
*Dynamex* was issued) and held that the delivery driver's work was a "part of GrubHub's regular
business." *See Lawson v. Grubhub, Inc.*, 302 F. Supp. 3d 1071, 1090 (N.D. Cal. 2018). Then,
once Prong B was implemented, the court likewise held that GrubHub could not satisfy Prong B.
*See Lawson*, 665 F.3d at 1120-24.

Philadelphia Parking Authority that it was a limousine services provider. *See* Ex. 108; 109. Ms. Murray testified that Gegen was Uber. *See* Murray Testimony.  Mr. Holtzman Holtzman-Conston acknowledged that Uber owned Gegen LLC.  Gegen's application for a certificate of public convenience from the Philadelphia Parking Authority was signed by Uber's CEO, Travis Kalanick. *See* Holtzman-Conston Test.; Ex. 109.

Uber operated as a certified limousine provider, and without the drivers, there would be no business. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test. Indeed, Uber's Head of US Operations Rachel Holt said in an email to UberBlack drivers that "simply put, Uber wouldn't exist without you." Ex. 216. Uber made more money when the drivers performed more trips for passengers. *See* Murray Test.; Cherdoud Test.; Sabani Test.; Ali Razak Test.

Other courts have reached the same conclusion that Uber is in the business of providing transportation; it is not merely a technology company.  *See People v. Uber Technologies, Inc.*, 56 Cal. App. 5th 266, 292 (2020) ("[a] number of cases have considered contentions that ride-sharing companies such as Lyft and Uber are in the business of creating technological platforms, not of transporting passengers, and have dismissed them out of hand"); *James v. Uber Technologies, Inc.*, 2021 WL 254303, at *10 (N.D. Cal. Jan. 26, 2021) ("This Court has repeatedly held that Uber and Uber's drivers are both in the business of transportation."); *Namisnak v. Uber Technologies, Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020) ("Uber's claim that it is 'not a transportation company' strains credulity, given the company *advertises itself* as a 'transportation system.'"); *O'Connor v. Uber Technologies, Inc.* 82 F. Supp. 3d 1133, 1141 (N.D. Cal. Mar. 11, 2015) ("Uber simply would not be a viable business entity without its drivers."); *see also Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 911 (N.D. Cal. 2020) ("Lyft drivers provide services that are squarely within the usual course of the company's business, and Lyft's

24

argument to the contrary is frivolous."); *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1067, 1078-79 (N.D. Cal. 2015) (concluding that "the work performed by the drivers is 'wholly integrated' into Lyft's business" and rejecting the notion that Lyft was "merely furnishing a platform that allows drivers and riders to connect, analogous perhaps to a company like eBay.").

Thus, there can be no question that, if an "ABC" test applies under Pennsylvania law, Uber cannot meet its burden to satisfy Prong B. Thus, the Court should issue judgment as a matter of law in Plaintiffs' favor.

## III.    CONCLUSION

For the foregoing reasons, the Court should enter judgment in Plaintiffs' favor as a matter of law and hold that they were Uber's employees under Pennsylvania law, the PMWA and the WPCL.

Dated: March 7, 2024                    Respectfully submitted,

ALI RAZAK, KENAN SABANI, AND
KHALDOUN CHERDOUD,

By their attorneys,

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan (*pro hac vice*)
Thomas Fowler (*pro hac vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
sliss@llrlaw.com; tfowler@llrlaw.com

Jeremy E. Abay (PA # 316730)
PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
1818 Market Street, Suite 3402
Philadelphia, Pennsylvania 19103
Tel: (215) 988-1462

Fax: (215) 754-5195
jea@pietragallo.com

Bret Stanley (*pro hac vice*)
THE STANLEY LAW FIRM, PLLC
1700 Richmond Ave.
Suite 1700
Houston, Texas 77079
(832) 856-6486
Bstanley@stanleypllc.com

**CERTIFICATE OF SERVICE**

I, Shannon Liss-Riordan, certify that on March 7, 2024, a true and accurate copy of the

foregoing document was served on counsel for Defendants by filing on the Court's CM/ECF

system.

/s/ Shannon Liss-Riordan
Shannon Liss-Riordan