# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALI RAZAK, KENAN SABANI, AND KHALDOUN CHERDOUD,

    Plaintiffs,

v.

UBER TECHNOLOGIES, INC. AND GEGEN LLC,

    Defendants.

Civil Action No. 2:16–CV–00573–MMB

Judge Michael M. Baylson

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendants Uber Technologies, Inc. and Gegen LLC move for judgment as a matter of law. Fed. R. Civ. P. 50(a).

## ARGUMENT

Judgment as a matter of law is appropriate under Rule 50(a) where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). That is the case here.

The sole question presented in this trial is whether Plaintiffs were Defendants' "employees" or whether they were instead "independent contractors" for purposes of the Fair Labor Standards Labor Act (FLSA), the Pennsylvania Minimum Wage Act (PMWA), and the Pennsylvania Wage Payment and Collection Law (WPCL). ECF 138, 148. Plaintiffs bore the burden of proving their employee status, *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 143 (3d Cir. 2020); *see also* ECF 157 at 3–4, 8–9, yet their own witnesses demonstrate that they cannot, as a matter of law, meet that burden.

For all of Plaintiffs' claims set for this trial, the standard is the same[1]: "[W]hether, as a matter of economic reality, the individuals 'are dependent upon the business to which they render service.'" *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985) (quoting *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981)). As the Court knows, the economic realities test consists of a holistic assessment of various factors, with no single factor being determinative or dispositive. *Razak*, 951 F.3d at 142–43 (quoting *DialAmerica*, 757 F.2d at 1382)). Rather, the economic reality between the parties must take account of "the circumstances of the whole activity." *DialAmerica*, 757 F.2d at 1382, 1387.

Under the economic realities test, "a court may decide the employee/independent contractor question as a matter of law if the factors point so favorably in one direction that a fact finder could not reasonably reach the opposite conclusion." *Alberty–Velez v. Corporacion de Puerto Rico Para La Difusion Publica*, 361 F.3d 1, 7 (1st Cir. 2004); *see also Yu v. McGrath*, 597 F. App'x 62, 66 (3d Cir. 2014); *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 632–33 (1st Cir. 1996; *cf. Castillo v. Givens*, 704 F.2d 181, 185 & n. 9, 188 (5th Cir. 1983) (district court erred in submitting the issue to the jury where the undisputed facts established employment status), *overruled on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134 (1988)).

Judgment as a matter of law is appropriate because Plaintiffs' own witnesses and evidence establish that every factor weighs in favor of their independent contractor status, such that no reasonable jury could find them to be employees on the evidence presented at trial.

1.  **Degree of Uber's Right to Control the Manner in Which the Work is to Be Performed**

The first, and most important, factor is the degree of the alleged employer's right to control

---

[1] Uber continues to dispute Plaintiffs' untimely argument that the standard under state law differs. ECF 157.

the manner in which the work is to be performed. *Razak*, 951 F.3d at 145 (noting that the "right to control" factor is "highly relevant to the FLSA analysis"). Plaintiffs have utterly failed to show that Defendants "controlled" them in any meaningful sense.

### A. Uber Lacked the Control Typical of an Employer.

Plaintiffs' relationship with Uber bears the hallmark characteristics of independent contracting. When workers set their own hours,[2] get paid on a "per job" basis rather than hourly,[3] are free to accept or reject jobs,[4] and are not "directly supervised,"[5] then they are independent contractors, not employees. Period. Plaintiffs openly conceded that they in fact operated entirely free of Uber's control insofar as they (a) had complete freedom to choose their own hours (3/5 Trial Tr. 17:2–15, 30:25–31:3; 3/6 Trial Tr. 227:8–10, 228:11–229:15);[6] (b) could go online and

---

[2] *See Razak*, 951 F.3d at 146 (noting factual disputes about whether Uber "control[s] the 'schedule start or stop times' for drivers or 'require[s] them to work for a set number of hours'"); *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 379, 380 (7th Cir. 1991) (holding that district court did not err in relying on the fact, among others, that plaintiff "set her own hours" to determine alleged employer lacked the control required for employee status); *Herman v. Express Sixty–Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (finding alleged employer "had minimal control over its drivers" where the drivers "set their own hours and days of work"); *Arena v. Delux Transp. Servs., Inc.*, 3 F. Supp. 3d 1, 10–11 (E.D.N.Y. 2014) (fact that defendants had little control over when plaintiff drove or how much he drove supported independent contractor status); *cf. Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1294 (3d Cir. 1991) (finding employee status where, among other things, the alleged employer "controlled the hours of operation").

[3] *Luxama v. Ironbound Express, Inc.*, 2012 WL 5973277, at *4, *5 (D.N.J. June 28, 2012) (finding that alleged employers had little control over plaintiffs where, among other things, the plaintiffs "retain[ed] the authority to . . . determine the working hours it will observe" and were "paid on a 'per–trip basis'"). Even Plaintiffs' own evidence established as much. One of Plaintiffs' witnesses testified that, when he was employed by a taxi company as an employee before transitioning to using the Uber app, he was paid hourly. 3/5 Trial Tr. 118:15–23.

[4] *Herman*, 161 F.3d at 303 (ability to reject jobs was indicative of independent contractor status); *cf. Sigui v. M + M Commc'ns, Inc.*, 484 F. Supp. 3d 29, 39 (D.R.I. 2020) (the fact that plaintiffs "could not refuse jobs" favored employee status).

[5] *DialAmerica*, 757 F.2d at 1384.

[6] Defendants have attached transcripts of Day 1 through 3 of trial, which covers the entirety of Plaintiffs' case-in-chief.

3

offline as they pleased (3/5 Trial Tr. 17:2–15, 30:25–31:3; 3/6 Trial Tr. 87:6–7, 227:11–17, 229:24–230:17); (c) could engage in other activities while online and waiting for a ride, such as taking a smoke break or grabbing a cup of coffee (3/5 Trial Tr. 40:8–19, 45:3–9; 3/6 Trial Tr. 207:6–7); (d) could choose where to work (3/6 Trial Tr. 232:2–20); (e) could (and in fact did) reject trips sent to them by Uber (3/5 Trial Tr. 30:25–31:16; 3/6 Trial Tr. 87:8–10); (f) could (and in fact did) cancel individual rides after accepting a trip (3/5 Trial Tr. 37:10–13, 299:10–19; 3/6 Trial Tr. 13:22–14:5, 92:15–22, 148:21–25, 248:1–3, 249:25–250:5); (g) were paid on a "per–trip," rather than hourly basis (3/4 Trial Tr. 107:10–11; 3/5 Trial Tr. 135:20–22); and (f) had control over what route to take to get a passenger to her destination (3/5 Trial 66:9–13, 67:9–68:5; 3/6 Trial Tr. 22:3–7).

For example, Cherdoud acknowledged that he "had the sole right to determine when, where and for how long [he] would utilize the [Uber] app to provide transaction services," and that he chose "when to go online, "when to go offline," and "to reject trip requests." 3/5 Trial Tr. 17:3–15, 30:25–31:3. In 2017, Razak chose to remain offline for two months because he went overseas, and he did not ask Uber for permission to do so (nor did he need to). 3/6 Trial Tr. 229:24–230:17. In contrast, as one of Plaintiff's own witnesses acknowledged, when black car drivers are *employees* of various limousine companies (rather than engaging in independent contracting work with Uber), they work set shifts and cannot refuse a job assigned to them. 3/5 Trial Tr. 116:24–118:2.

Furthermore, Plaintiffs all admitted that they could and *did* work for others during their relationship with Uber. "[O]n its face, a company relinquishes control over its workers when it permits them to work for its competitors." *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 141 (2d Cir. 2017). Cherdoud admitted to working for another limousine company—Freemo Limo—

and also to soliciting private trips (usually by parking near hotels) at the same time he was using the Uber app. 3/5 Trial Tr. 57:1–6, 59:12–23. Indeed, almost half of Cherdoud's personal income in 2016 came from Freemo, rather than through the Uber app. 3/5 Trial Tr. 83:16–84:12. Sabani provided up to three hundred trips outside of the Uber app through his independent company, Freemo Limo. 3/5 Trial Tr. 277:18–278:9, 279:5–13, 280:21–25. Indeed, over the course of approximately two years, Freemo Limo earned a gross amount of $139,724.22 from private rides. 3/5 Trial Tr. 285:20–286:9. Razak and his brother incorporated Luxe more than a year *before* Razak signed up to use Uber's app. 3/6 Trial Tr. 223:14–20. While contracting with Uber, both Razak personally and Luxe generally provided services to Blacklane, a German international limousine company. 3/6 Trial Tr. 205:4–11, 261:9–17, 262:8–263:7.

The agreements between Plaintiffs and Uber reflected this economic reality. All three Plaintiffs acknowledged signing "technology services agreements" in order to use Uber's app. 3/4 Trial Tr. 83:8–18; 3/5 Trial Tr. 73:7–14, 267:9–12; 3/6 Trial Tr. 225:25–226:10. Those agreements said that "the relationship between the parties under this agreement is solely that of independent contracting parties" and that "the parties expressly agree that this agreement is not an employment agreement, nor does it create an employment relationship between Uber and Customer." 3/5 Trial Tr. 15:2–5, 15:21–16:5; *see also id.* at 221:1–8. Although Uber collected payments from riders and then passed them along to the limousine companies, the technology services agreements made it clear that Uber was only acting as a limited payment collection agent, offering their technology to facilitate payment between riders and the limousine companies easier. 3/5 Trial Tr. 14:20–15:1. These contracts plainly reflect what the parties understood their relationship to be at the time. *See Saleem*, 854 F.3d at 141; *see also Williams v. Jani–King of*

*Philadelphia Inc.*, 837 F.3d 314, 323 (3d Cir. 2016); *Holder v. Bingnear*, 1991 WL 7381, at *4 (E.D. Pa. Jan. 18, 1991).

Finally, the fact that Plaintiffs all owned and operated their own LLCs strongly suggests independent contractor status.[7] *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 846 (5th Cir. 2010); *Freund v. Hi–Tech Satellite, Inc.*, 185 F. App'x 782, 783 (11th Cir. 2006); *see also Frankel v. Bally, Inc.*, 987 F.2d 86, 91 (2d Cir. 1993).

### B. The Facts That Plaintiffs Focused on Do Not Establish Control.

Ignoring the facts above, Plaintiffs at trial purported to show sufficient control by pointing to various policies or practices utilized by Uber. As explained below, none of these facts actually demonstrate the control required for an employer–employee relationship to exist.

Some of Plaintiffs' promised evidence of control simply never materialized. For example, Plaintiffs claimed in their opening statement that "[t]he passengers who [Plaintiffs] drove were not their customers," but rather were "Uber's customers." 3/4 Trial Tr. 55:5–7. But Cherdoud repeatedly referred to passengers as "my customers" or "our customers." 3/4 Trial Tr. 106:6–7, 128:24–25; *see also id.* at 97:5, 104:21. Similarly, Plaintiffs attempted to show that Uber controlled them through the threat of deactivation. But, although the Plaintiffs claimed they were *afraid* of being deactivated, *e.g.*, 3/4 Trial Tr. 57:8–10, Plaintiffs never brought forward any evidence that they were in fact deactivated. For example, Sabani testified that could not "recall" ever being deactivated, 3/5 Trial Tr. 276:12–15, and that too many cancellations only "might" result in deactivation. 3/6 Trial Tr. 14:24–15:3; *see also* 3/5 Trial Tr. 211:5–15.

Even where Plaintiffs did actually manage to introduce evidence, upon examination, it becomes quickly obvious that the facts to which Plaintiffs pointed do not actually show control

---

[7] 3/4 Trial Tr. 90:6–8; 3/5 Trial Tr. 264:1–5; 3/6 Trial Tr. 204:2–4, 210:18–211:9.

6

by Uber. For one, individuals or entities who employ independent contractors are allowed to engage in some amount of "control." Specifically, they can "control" independent contractors in ways to "verify that the task was done properly" or to "supervis[e]" the terms of the independent contract. *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 148 (4th Cir. 2017) (applying this reasoning to the joint employment context). Indeed, "specifications and quality control inhere in any subcontractor relationship." *Chao v. Mid–Atlantic Installation Servs., Inc.*, 16 F. App'x 104, 106 (4th Cir. 2001) (cleaned up). Most of the policies and procedures of Uber on which Plaintiffs relied demonstrate *this* sort of non–employment control.[8] For example, unable to show that Uber "directly supervised" them, *see DialAmerica*, 757 F.2d at 1384, Plaintiffs pointed out that Uber "monitor[ed]" them by collecting data. 3/6 Trial Tr. 140:12–19; *see* 3/5 Trial Tr. 214:24–215:23, 228:5–20. But data collection was necessary for Uber to ensure that its technology was working properly and also to make sure that all the customers that utilized it (drivers and passengers alike) were satisfied with the product. *See* 3/5 Trial Tr. 242:14–21, 246:22–247:4.

Additionally, Plaintiffs pointed to various rules that Uber purportedly imposed on them, for example, that they wear "suits and ties" and maintain a certain level of hygiene. 3/4 Trial Tr. 52:20–25; 3/5 Trial Tr. 219:24–220:16. But many of those purported demands were legal

---

[8] Furthermore, as Uber objected at trial, any evidence Plaintiffs provided about what an "unidentified" person, purportedly an Uber employee, told them is inadmissible hearsay that cannot be considered when deciding whether Plaintiffs have met their burden of providing sufficient evidence. *See Carden v. Westinghouse Elec. Corp.*, 850 F.2d 996, 1002–03 (3d Cir. 1988) (testimony that "they wanted a younger person" in an age discrimination case was inadmissible where nothing in the record "identified" the "they" referenced in the statement); *see also Canton v. Kmart Corp.*, 470 F. App'x 79, 84 (3d Cir. 2012) (testimony that someone overheard a person who looked like a Kmart employee talking about a spill on the floor was inadmissible as a party–opponent admission); *Hughey v. Home Depot USA, Inc.*, 2009 WL 2230717, at *1–*2 (E.D. Pa. July 23, 2009) (testimony in a slip–in–fall case that several Home Depot employees talked about a "leak from the ceiling" was inadmissible as a party–opponent admission because "there is no indication that the presence of a leak is in the scope of the declarants' employment").

requirements imposed by the Philadelphia Parking Authority (PPA), not Uber. For example, the PPA required that black car drivers adhere to a certain dress code, maintain hygiene standards, and drive a particular type of car. 3/5 Trial Tr. 66:14–16, 69:10–70:22, 119:12–16, 138:16–139:24, 291:17–20; Ex. D–402.

Finally, Plaintiffs relied on Uber's practices of offering tips to drivers via email or economic incentives to become independent contractors. For example, Plaintiffs established that Uber would send out information about situations in which they expected high demand for drivers (for example, a baseball game) or tips on how drivers could increase their rating. 3/5 Trial Tr. 209:23–210:3, 286:22–287:8. But far from being "direct instructions," these emails were just "pro tips." 3/5 Trial Tr. 205:1–16, 256:4–16; 3/6 Trial Tr. 228:25–229:15 (Uber was "just suggesting that this might be a place to get some opportunities to get rides"), 232:2–19 (drivers could "choose to ignore" Uber's messages and Razak "sometime[s]" did so); Ex. P–204. Similarly, Plaintiffs asserted that Uber "controlled" them by providing referrals for the various services a black limousine driver would need, for example, recommending a car dealership, an accountant to help with incorporation and taxes, and an insurance company, with Uber fronting the costs and then Plaintiffs paying them back in installments. *See* 3/4 Trial Tr. 87:25–88:16, 160:23–24; 3/5 Trial Tr. 49:18–25. But Plaintiffs did not *have* to use Uber's recommendations, but rather *could* have found their own dealerships, accountants, or insurance and *could* have paid for those items themselves. 3/4 Trial Tr. 172:12–173:1, 175:8–12; 3/5 Trial Tr. 138:16–24. In the end, Plaintiffs chose to utilize Uber's recommendations because it was easier, and because it gave them an opportunity to become independent black car drivers without needing substantial savings to cover the upfront costs. 3/5 Trial Tr. 137:19–138:3.

4887-6415-4284.1 / 073208-1134

2.    **Plaintiffs' Opportunity for Profit/Loss Depending on Managerial Skill**

As to the next factor, Plaintiffs' own evidence established their "opportunity for profit or loss depending upon his managerial skill." *Razak*, 951 F.3d at 142 (quoting *DialAmerica*, 757 F.2d at 1382). Plaintiffs were able to utilize their managerial skills both within and outside of Uber.[9]

Outside of Uber, Plaintiffs all owned and operated their own businesses, and thus could generate profits (or incur losses) based on the decisions they made in investing and operating their independent businesses. Freemo, owned and operated by Sabani, created a website and engaged in other online advertising (such as using a Yelp or Facebook page) to procure private clients. D–436 (Screenshots of Freemo Limo's website); 3/6 Trial Tr. 57:5–8, 60:5–6, 60:24–61:8, 100:13–19.[10] Similarly, Cherdoud developed the strategy of lingering near hotels in order to drum up

---

[9] The Third Circuit suggested that it was an open question whether "this factor looks only toward opportunity for profit or loss within the alleged employment relationship or whether it also contemplates one's ability to make money elsewhere—as such, external factors, such as the ability to earn outside revenue without terminating the Uber–driver relationship." *Razak*, 951 F.3d at 146 n. 9. Uber maintains that Plaintiffs' ability to earn outside revenue from other companies is highly relevant. *See Smith v. Effluent Retrieval Servs., Inc.*, 2016 WL 6135573, at *5 (E.D. Pa. Oct. 21, 2016) ("Smith's freedom to work elsewhere and his limited actual work for Effluent demonstrates Smith was not economically dependent on Effluent."); *Brennan v. Sand Prods., Inc.*, 371 F. Supp. 236, 237, 239 (W.D. Okla. 1973) (truck drivers were independent contractors where they used their own trucks and could work for other companies); *Goldberg v. Warren Bros. Roads Co.*, 207 F. Supp. 99, 100, 103–04 (D. Me. 1962) (holding that truck drivers were independent contractors where they were free to use their trucks elsewhere). Indeed, the entire premise of an independent contractor is that they can offer their services to multiple different companies. 3C Fed. Jury Prac. & Instr. § 171:47 (6th ed.) ("Independent contractors generally offer their services to the public or others in a particular industry[.]"). But even if it were not, as explained below, Plaintiffs also had an opportunity for profit or loss based on their managerial skills *within* the Uber relationship.

[10] *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 231 (3d Cir. 2019) (citing the determining of "hours," setting prices, and managing the "atmosphere, operations, and advertising" as examples of "'managerial skills' that can weigh in favor of independent–contractor status"); *see also Yilmaz v. Mann*, 2014 WL 1018006, at *5 (S.D. Fla. Mar. 17, 2014) (noting that managerial skills include "the choice of location, advertising, and services provided" (citations omitted)); *cf. Landaeta v. N.Y. & Presbyterian Hosp., Inc.*, 2014 WL 836991, *6 (S.D.N.Y. Mar. 4, 2014) (holding there was a genuine issue of material fact as to whether plaintiffs constituted employees in part because they

business, and he admitted that, if he had the "courage," he could have tried to generate more work like Sabani had. 3/5 Trial Tr. 63:8–21.

Even within Uber, Plaintiffs also exercised managerial skills by choosing when and where to use the app in order to generate the most profit. As Plaintiffs' witness Tara Murray testified, drivers (rather than Uber employees like her) made the "decisions" about how to increase their profits, as they knew "where the best places to drive are and where to get trips and stuff." 3/5 Trial Tr. 259:16–22. They "could be at an airport during a snowstorm" or "wait outside of a concert," for example. 3/5 Trial Tr. 134:15–17. As she summarized, "these guys" and "these . . . professionals" "knew a lot better than I did how to get good trips and how to make money." 3/5 Trial Tr. 134:18–20; *see also id.* 260:8–9; 3/6 Trial Tr. 201:10–12 (Razak testifying about the ability to take advantage of "surge" pricing).

**3. Plaintiffs' Investment in Equipment or Materials and Employment of Helpers**

Plaintiffs made significant investments in support of their independent business endeavors. For one, they all purchased their own luxury "black car" vehicles.[11] *Green v. Golla Ctr. for Plastic Surgery, P.C.*, 2019 WL 1083688, *6 (W.D. Pa. Mar. 7, 2019) (noting that the fact that an alleged employee "supplied his own truck and many of his own tools" favored independent contractor status (citing *Safarian v. Am. DG Energy, Inc.*, 729 F. App'x 168, 173–74 (3d Cir. 2018)). It was Plaintiffs or their independent companies, and not Uber or Gegen, who owned these vehicles. 3/4 Trial Tr. 177:18–19; 3/5 Trial Tr. 136:23–137:1; 3/6 Trial Tr. 231:2–231:11.[12] Furthermore,

---

"did not form corporate entities to take on additional business, let alone maintain business websites, procure business stationery, or carry liability insurance").

[11] 3/4 Trial Tr. 175:13–23, 176:3–9; 3/5 Trial Tr. 104:12–19; 3/6 Trial Tr. 43:17–44:8, 272:7–10.

[12] Although Cherdoud protested that Defendants owned his car because they helped him obtain financing for it, he eventually admitted that he owned the vehicle. 3/4 Trial Tr. 175:13–23; *see also* 3/5 Trial Tr. 136:23–137:1.

4887-6415-4284.1 / 073208-1134

Plaintiffs made other substantial investments in their businesses and vehicles; for example, on their tax forms, Plaintiffs deducted significant business expenses, including vehicle maintenance, fuel, insurance, phone bills, and professional association fees. 3/5 Trial Tr. 78:5–9, 80:14–33; 3/6 Trial Tr. 44:9–11, 25–26, 45:1–46:12, 280:4–20; *cf. Blan v. Classic Limousine Transp., LLC*, 2021 WL 1176063, at *4 (W.D. Pa. Mar. 29, 2021) (this factor favored employee status where the alleged employer was the one that "paid for car insurance, car maintenance, fuel, carwashes, tolls, alcohol, soft drinks, and car seats"). Sabani and Razak also had several drivers operating under their LLCs. 3/5 Trial Tr. 129:24–130:5, 281:13–18.

### 4. Whether the Service Rendered Requires a Special Skill

Although Plaintiffs promised in their opening statement that "[t]here's no special skill needed to drive a black car," 3/4 Trial Tr. 55:15, their own testimony revealed otherwise.[13] When Uber initially launched in Philadelphia, Uber specifically recruited individuals who were black car drivers for taxi companies *because* of their special skills. Uber wanted people "who had been driving for a long time," who "have much more experience," and who "know the city very well."

---

[13] The Third Circuit's previous finding that "driving" is not a "special skill" based on the summary judgment record, *Razak*, 951 F.3d at 147, is not binding for purposes of this Rule 50(a) motion. When the Third Circuit issued its ruling, it was reviewing the discovery record developed for summary judgment. *Id.* at 148. But "courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731–32 (2023). Because "[t]rials wholly supplant pretrial factual rulings," a "court's factual rulings based on the obsolete summary-judgment record are useless." *Id.* at 735–36. In the summary judgment appeal, the Third Circuit simply made a tentative pretrial determination that—based on the summary judgment record, read in the light most favorable to Plaintiffs—driving a limousine is not a special skill because driving *generally* is not a special skill. *Razak*, 951 F.3d at 147. The Third Circuit explicitly acknowledged the possibility that "there may be a distinction between 'driving' and 'replicat[ing] the limousine experience,'" but found that possibility "not enough to overcome the presumption that driving is not a special skill." *Id.* But that determination is now "supersede[d]" by the factual development at trial, *Dupree*, 598 U.S. at 734 (quoting *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011)), which establishes that black car chauffeuring *does* require a special skill. *See also Speen*, 102 F.3d at 628 n.2 (noting that a district court had denied summary judgment on an employee/independent contractor issue but then granted a Rule 50(a) motion on that issue).

11

3/4 Trial Tr. 81:23–24; 3/5 Trial Tr. 66:22–23, 137:23–24; *see also* 3/5 Trial Tr. 148:17–18 (professional drivers know "how to drive . . . on side streets" to provide a better customer experience). Uber depended on the professional experience because the drivers were the ones to "determin[e] the most effective, efficient, and safe manner to perform [their] trips[.]" 3/5 Trial Tr. 66:9–13. Indeed, one must be *commercially licensed* and pass a test to do it—strongly suggesting not just anyone is capable of providing black car services. 3/4 Trial Tr. 168:12–169:15; 3/5 Trial Tr. 68:22–25; Ex. D-402 at RAZAK_UBER_PL0001239 ("All drivers that pass the … Driver certification exam will be issued a Driver Certificate."); *see also* 3/6 Trial Tr. 59:10–13 (Freemo required its chauffeurs to have on-the-road and classroom training). As Plaintiffs themselves and Uber employee Tara Murray testified, they were "professionals." 3/4 Trial Tr. 114:6–7, 132:3; 3/5 Trial Tr. 107:10–11, 134:19–20, 263:17–18.

### 5. Degree of Permanence of the Working Relationship

Plaintiffs had no real permanence with Uber. They freely admitted that they can provide transportation services outside of Uber, including providing services to private clients and Blacklane.[14] *See Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 231–32 (3d Cir. 2019) (agreeing with district court's finding that the permanence factor weighed in favor of independent contractor status where the workers were "free to work at other venues"). Further, Plaintiffs acknowledged that they had complete control of their schedules—they decided when to work, how long to work, and whether to keep using Uber's app. 3/5 Trial Tr. 17:2–6, 29:22–30:3, 30:16–24, 255:14–15, 255:23–25; 3/6 Trial Tr. 87:2–7, 88:15–22, 227:7–14, 229:12–15. The only evidence of permanency Plaintiffs presented was the fact that they worked with Uber for several years. *See, e.g.*, 3/4 Trial Tr. 147:10–12. But that was *Plaintiffs'* choice, and they remained free to pursue

---

[14] 3/5 Trial Tr. 59:3–11; 3/6 Trial Tr. 46:23–25; 3/6 Trial Tr. 205:4–11.

other transportation leads or even leave the industry entirely. *E.g.*, 3/4 Trial Tr. 159:9–12 ("Q: Before you connected with Uber through Milano, you could have just decided to stay being a taxi driver? A: Yes.").

### 6. Whether the Service Rendered is an Integral Part of Uber's Business

Finally, Plaintiffs have not proven that their services are "an integral part of" Uber's business. *Razak*, 951 F.3d at 143 (quoting *DialAmerica*, 757 F.2d at 1382). As reflected in the technology services agreements that Plaintiffs admitted to signing, Defendants have always maintained, and continue to maintain, that it provides *technology* services. 3/5 Trial Tr. 11:7–14; 3/6 Trial Tr. 86:22–87:1, 225:17–226:5; Joint Ex. 11 ("Uber is a technology services provider that does not provide transportation services."). It uses its technology platform to connect to independent parties—black car drivers and passengers—who have a mutual desire to work together. Plaintiffs provided *zero* evidence to rebut this characterization of Uber's business. The evidence showed that Plaintiffs are only "integral" to Uber in the same way riders are; both are customers of Uber who utilize Uber's technology services for a fee.[15]

## CONCLUSION

At the end of the day, although courts have tried to flesh out this area of the law with multiple factors, the legal standard that applies to this case comes down to a single question: whether Plaintiffs were, as a matter of economic reality, dependent on Uber. Even if a few facts or even a few factors weigh in Plaintiffs' favor, that does not overcome the overwhelmingly

---

[15] But even assuming arguendo that Uber is in the business of transportation rather than technology, Plaintiffs did not present any evidence that they were integral to that business either.

4887-6415-4284.1 / 073208-1134

evidence contrary to Plaintiffs' position.[16]  No reasonable jury could find in favor of Plaintiffs on this record, and the Court should grant judgment as a matter of law to Defendants.

Dated: March 8, 2024                                              Respectfully submitted,

*/s/ Robert W. Pritchard*
Robert W. Pritchard, Bar No. 76979
rpritchard@littler.com
LITTLER MENDELSON, P.C.
625 Liberty Avenue, 26th Floor
Pittsburgh, PA 15222
Telephone: 412.201.7628
Facsimile: 412.774.1957

Paul C. Lantis, Bar No. 309240
plantis@littler.com
LITTLER MENDELSON, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102
Telephone: 267.402.3073
Facsimile: 267.402.3131

*Attorneys for Defendants*
UBER TECHNOLOGIES, INC and
GEGEN LLC

---

[16] *See, e.g.*, *Yoder v. Fla. Farm Bureau*, 2023 WL 3151107, at *3 (11th Cir. Apr. 28, 2023) (per curiam) (affirming the grant of summary judgment that found independent contractor status, even though permanence of the relationship and integral factors supported employee status); *7–Eleven, Inc. v. Sodhi*, 2016 WL 3085897, at *6–7 (D.N.J. May 31, 2016) (granting summary judgment and determining that a worker was not an employee, even though the court found one of the factors "neutral" on this point).

# CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of March 2024, **Defendants' Memorandum Of Law In Support Of Defendants' Rule 50(a) Motion For Judgment As A Matter Of Law** was filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon all counsel and parties of record.

*/s/ Robert W. Pritchard*
Robert W. Pritchard