**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| ALI RAZAK, KENAN SABANI, and KHALDOUN CHERDOUD, <br><br>           Plaintiffs, <br><br>     v. <br><br> UBER TECHNOLOGIES, INC. and GEGEN LLC, <br><br>           Defendants. | Civil Action No. 2:16-CV-00573-MMB <br><br> Judge Michael M. Baylson |

## DEFENDANTS' BRIEF REGARDING POST-TRIAL PROCEEDINGS

*I shall be telling this with a sigh*
*Somewhere ages and ages hence:*
*Two roads diverged in a wood, and I—*
*I took the one less traveled by,*
*And that has made all the difference.*

Robert Frost, "The Road Not Taken"

## <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     PROCEDURAL HISTORY................................................................................. 2

III.    ARGUMENT ...................................................................................................... 7

      A.    Plaintiffs Encouraged the Court to Decide the Ultimate Question of Whether They Were Defendants' Employees Based on the Poll Results.............. 7

      B.    The Poll Results from the Jury—and the Testimony and Evidence Presented at Trial—Overwhelmingly Support a Finding that Plaintiffs Failed to Prove by a Preponderance of the Evidence that They Were Defendants' Employees............................................................................................ 10

          1.    The FLSA and PMWA "economic realities" factors favor independent contractor status.................................................... 12

              a.    Degree of Defendants' right to control the manner in which Plaintiffs' work is to be performed. ............................... 12

              b.    Plaintiffs' opportunity for profit or loss depending upon their managerial skill.................................................... 16

              c.    Plaintiffs' investment in equipment or materials and use of helpers. ....................................................... 18

              d.    Whether the service rendered by Plaintiffs required a special skill........................................................ 18

              e.    Degree of permanence of the working relationship. .................... 19

              f.    Whether the service rendered is an integral part of Defendants' business. ..................................................... 20

              g.    The totality of the circumstances. .................................. 21

          2.    The WPCL factors favor independent contractor status. ......................... 22

IV.    CONCLUSION................................................................................................ 24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Arellano v. Davis*,
    No. 19-1001, 2022 WL 819601 (D.N.J. Mar. 18, 2022) ...........................................................9

*Arena v. Delux Transp. Servs., Inc.*,
    3 F. Supp.3d 1 (E.D.N.Y. 2014) ...................................................................................13, 14

*Carpenter v. Pepperidge Farm, Inc.*,
    2023 U.S. Dist. LEXIS 121210 (E.D. Pa. July 14, 2023).......................................................22

*In re City of Philadelphia Litig.*,
    158 F.3d 723 (3d Cir. 1998) ....................................................................................................8

*Donovan v. DialAmerica Mktg., Inc.*,
    757 F.2d 1376 (3d Cir. 1985)...........................................................................................21, 22

*Estate of Accurso v. Infra-Red Servs., Inc.*,
    805 Fed. App'x 95 (3d Cir. 2020)..........................................................................................22

*Fleck v. KDI Sylvan Pools, Inc.*
    981 F.2d 107 (3d Cir. 1992)................................................................................................8, 9

*Harvis v. Roadway Exp. Inc.*,
    923 F.2d 59 (6th Cir. 1991) .....................................................................................................9

*Herman v. Express Sixty–Minutes Delivery Serv., Inc.*,
    161 F.3d 299 (5th Cir. 1998) .................................................................................................13

*Holder v. Bingnear*,
    1991 WL 7381 (E.D. Pa. Jan. 18, 1991)................................................................................12

*Houlk v. Seaboard Fuel Corp.*
    278 F. 686 (E.D. Pa. 1922) ......................................................................................................7

*IDI Logistics, Inc. v. Clayton*,
    284 A.3d 248 (Pa. Super. Ct. 2022).......................................................................................23

*Lesende v. Borrero*,
    752 F.3d 324 (3d Cir. 2014)....................................................................................................8

*Morrow v. May*,
    735 F.3d 639 (7th Cir. 2013) ..................................................................................................8

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)...............................................................................................8

*Pendleton v. JEVS Human Servs., Inc.*,
    463 F. Supp.3d 548 (E.D. Pa. 2020) ............................................................15, 20

*Powell v. PS Bank*,
    No. 4:23-cv-1755, 2023 WL 7302061 (M.D. Pa. Nov. 6, 2023)............................9

*Razak v. Uber Techs., Inc.*,
    951 F.3d 137 (3d Cir. 2020).....................................................................12, 13, 22

*Safarian v. Am. DG Energy, Inc.*,
    729 F. App'x 168 (3d Cir. 2018) .........................................................................18

*Saleem v. Corp. Transp. Grp., Ltd.*,
    854 F.3d 131 (2d Cir. 2017)................................................................................14

*Sattler v. Great Atl. & Pac. Tea Co.*,
    18 F.R.D. 271 (W.D. La. 1955) ...........................................................................11

*Smith v. Effluent Retrieval Servs., Inc.*,
    2016 WL 6135573 (E.D. Pa. Oct. 21, 2016)........................................................17

*Spina v. Quality Asset Recovery, LLC*,
    No. 8:15-cv-2155, 2017 WL 2799440 (M.D. Fla. May 26, 2017) .........................11

*Talarico v. Pub. P'ships, LLC*,
    837 F. App'x 81 (3d Cir. 2020)...........................................................................22

*United States v. Akridge*,
    62 F.4th 258 (6th Cir. 2023) .................................................................................8

*Universal Am-Can, Ltd. v. W.C.A.B. (Minteer)*,
    762 A.2d 328 (Pa. 2000).....................................................................................23

*Webb-Edwards v. Orange County Sheriff's Office*,
    525 F.3d 1013 (11th Cir. 2008) ...........................................................................11

*Weinstein v. Studebaker Corp.*
    238 F. 963 (E.D. Pa. 1916) ...................................................................................7

*Williams v. Jani-King of Philadelphia Inc.*,
    837 F.3d 314 (3d Cir. 2016).........................................................................12, 23

## Other Authorities

29 C.F.R. § 795.110(b)(4)....................................................................................15

## I.      INTRODUCTION

For more than a month before trial, Plaintiffs repeatedly urged this Court to take the road of deciding the ultimate question of whether Plaintiffs were employees or independent contractors as a matter of law. During jury deliberations, Plaintiffs even guided the Court down the path of conducting a non-unanimous poll of the jury on the economic realities factors and then making the ultimate decision on Plaintiffs' status based upon those poll results. Over Defendants' objections, the Court took the course charted by Plaintiffs. Based on the jury's "consideration of all testimony and evidence at trial," the jury overwhelmingly found that the factors (and the totality of the circumstances) weighed in favor of a conclusion that Plaintiffs were independent contractors under the FLSA, the PMWA, and the WPCL. Having steered the Court onto the route of deciding Plaintiffs' status based on the results of a non-unanimous jury poll, Plaintiffs cannot now be heard to complain that the Court took a wrong turn and should reverse course. The Court should enter judgment as a matter of law in favor of Defendants and dismiss this action with prejudice.

Even if the Court were to choose a more well-traveled road, it will inevitably reach the same destination. As an alternative (or in addition) to relying on the poll results, the Court should grant Defendants' still-pending motion for judgment as a matter of law under Rule 50(a). (ECF 259). The poll results undeniably aligned with the testimony and evidence presented at trial, overwhelmingly favoring the conclusion that Plaintiffs were independent contractors. Plaintiffs were fully heard during their case in chief, and a reasonable jury would not have had a legally sufficient evidentiary basis to find in their favor on the question of whether Plaintiffs met their burden to prove that they were Defendants' employees under the FLSA, PMWA, and/or WPCL. Judgment as a matter of law is therefore appropriate under Rule 50(a).

No matter what road the Court chooses, there can be only one destination: the Court should enter judgment as a matter of law in favor of Defendants and dismiss this action with prejudice.

1

## II.      PROCEDURAL HISTORY

Plaintiffs began plotting their journey at the status conference on February 1, 2024, when they insisted that even if the Court were to empanel a jury, "it is for the Court to make the ultimate decision" as to Plaintiffs' status as employees or independent contractors. (Feb. 1, 2024, Hearing Transcript, at 11:5-17). Plaintiffs rationalized that "it's possible that there aren't really any disputed facts" and that "[t]he only dispute in the case may very well be the ultimate legal issues which we believe are appropriate for the Court to decide." (*Id.* at 13:15-22).

In their status report on February 6, 2024, Plaintiffs reaffirmed their chosen path, insisting that "the ultimate decision of whether Plaintiffs were misclassified is a question of law for the Court under both the FLSA and Pennsylvania law." (Plaintiffs' Status Report, ECF 190, at 2). Acknowledging that "the Court may find it appropriate to empanel an advisory jury to address [factual] disputes," Plaintiffs proclaimed that "at the end of the day, the Court will be responsible for making the ultimate determination of whether Plaintiffs were misclassified." (*Id.* at 3).

In their letter to the Court on February 21, 2024, Plaintiffs repeated "that there are not really any material disputed facts that need to be tried." (Plaintiffs' Letter, ECF 224, at 1). Instead, Plaintiffs argued, "the Court should be able to determine the plaintiffs' employment status." (*Id.* at 2; *see id.* ("the ultimate decision of the plaintiffs' employment status is for the Court to decide").

At the status conference on February 22, 2024, Plaintiffs again insisted that "the ultimate decision is actually one for the Court." (Feb. 22, 2024, Hearing Transcript, at 11:20-24).

In their proposed jury instructions filed on February 27, 2024, Plaintiffs once again persisted in contending that "the ultimate question of employment status is for the Court to decide, with a jury responsible only for resolving factual disputes." (Plaintiffs' Proposed Jury Instructions, ECF 238, at 1). Consistent with that position, Plaintiffs submitted a proposed Special Verdict Form which would have asked the jury to make a decision as to each "factor" of the FLSA's "economic

realities" test, while reserving the ultimate question of employment status for the Court. (*Id.*; *see also* Plaintiffs' Proposed Special Verdict Form, ECF 239, at 1-3).

On March 8, 2024, soon after the Court received a note that the jury was unable to come to a unanimous decision on the ultimate question of Plaintiffs' employment status, Plaintiffs reminded the Court of their pre-trial suggestion "of this jury being an advisory jury." (Trial Transcript Day ("TTD") V, 153:10-14; *id.* at 154:18-21). The Court encouraged the parties to "do some checking about Rule 48 and also about the advisory jury concept." (*Id.* at 159:5-6). The Court explained that it was considering giving the jury a "questionnaire" and having them vote on each of the economic realities factors. (*Id.* at 159:14-20, adding "I think that would be better than trying the case over again"). Plaintiffs encouraged that direction, adding that "[a]sking for their vote on the current questions might also be informative." (*Id.* at 159:25 – 160:2).

Later that afternoon, when the jury reported that they were still not able to come to a unanimous verdict, the Court suggested that it might "go back to the questionnaire" and "have a vote [on each of the six factors] and take an advisory verdict." (TTD V, 160:13-14; *id.* at 162:8-19; *id.* at 163:5-10; *id.* at 163:23 – 164:7 ("I think under Rule 49, I have the discretion to give them the questionnaire, as you wanted me to.... [T]hey'll give a vote on each of the six factors. And I would take that as an advisory verdict.")). In response, Plaintiffs urged that even "knowing the split of the jury may be sufficient for the Court to make a decision as to an advisory verdict." (*Id.* at 166:3-7). The Court responded that it might "do the questionnaire with the six factors and have them vote on each one but not vote on the [ultimate] question." (*Id.* at 166:9-11).

On Sunday, March 10, Plaintiffs filed a "Memorandum of Law Regarding Next Steps in Jury Deliberations." (ECF 262). In their memorandum, Plaintiffs provided their final roadmap for how they wanted the Court to proceed:

Plaintiffs suggest that the Court follow the inclination it expressed on Friday afternoon, which is to accept an advisory result from the jury, pursuant to Fed. R. Civ. P. 39(c)(1). **Plaintiffs would agree to the Court providing the jury with a polling form, asking for a vote from the jury on each of the six economic realities factors**. As Plaintiffs urged prior to trial, **the Court can then make the ultimate decision on employment status and consider the jurors' answers as it finds appropriate**.

(*Id*. at 2, emphasis added). Plaintiffs repeated their argument that "the ultimate question of employment status is for the Court to decide." (*Id.*).

Leaving no doubt about the direction they wanted the Court to take, Plaintiffs encouraged the Court to conduct a non-unanimous poll of the jury about the economic realities factors:

The parties have a jury to advise the Court on the disputed facts (even if it does not reach a full unanimous verdict).... Given that the employment classification is an issue of law for the Court to decide, **the Court would be well within its right to use the advisory jury mechanism and submit a poll to the jury on the various economic reality factors at issue**.

(*Id*. at 3, emphasis added; *id*. at 2 n.2). Plaintiffs insisted that the path they suggested was well traveled, noting that "[o]ther courts have taken that approach on employment misclassification questions." (*Id*. at 3). Plaintiffs maintained that their proposed "advisory jury" route "is not only proper, but would be far more efficient than retrying the entire case before a different jury." (*Id*.). Plaintiffs concluded their roadmap by stating that after the jury returned their poll results, the parties would submit briefs articulating "how the Court should rule, **based upon the poll results from the jury**." (*Id*., emphasis added). Defendants objected to Plaintiffs' proposal. (ECF 263).

On March 11, the Court shared its proposed supplemental verdict form with the parties. (TTD VI, 3:1-17). The Court proposed that the jury would be polled as to each of the economic realities factors (as well as the "totality of the circumstances"), indicating for each factor whether it favored independent contractor status, favored employment status, or was neutral. (*Id.*). Rather than requiring unanimity, the foreperson would "take a vote and write down the tally." (*Id.*). The

Court explained, "I believe under Rule 49 that I have the discretion to do this, but I'm supplying it to you for your review and comments before I give it to the jury." (*Id.* at 3:14-17).

In response, Plaintiffs endorsed the Court's approach, confirming that they "don't have an objection to this general [non-unanimous polling] process" outlined by the Court. (TTD VI 5:1-10). In contrast, Defendants objected to the use of a non-unanimous poll instead of a verdict. (*Id.* at 9:11-15; *see also id.* at 15:16-24, citing Rule 48 in support of an objection to the polling proposal to the extent it would allow anything other than a unanimous verdict as to individual factors).[1] The Court overruled Defendants' objection, emphasizing that its proposed questionnaire "is not a verdict. This is a questionnaire under Rule 49.... I think that's in my discretion." (TTD VI, 9:16-25; *id.* at 10:20 – 11:2 (clarifying that questionnaire would not, strictly speaking, be considered an "advisory" verdict); *id.* at 16:2-3 ("in my view, under Rule 49, I have discretion to do this")).

After the jury reported that they remained deadlocked, Plaintiffs once again urged the Court to conduct the poll and to treat the jury's vote "as an advisory verdict." (TTD VI, 17:4-14 & 18:3-17). The Court responded that it would proceed with the questionnaire and that it would "not require unanimity." (*Id.* at 18:24 – 19:5). Plaintiffs had no objection. (*Id.* at 19:14-15). The Court informed the parties they would be given the ability to submit post-trial briefs on how to proceed "based on what the votes may be." (TTD VI, 15:2-12; *id.* at 40:20 – 41:6; *see also* ECF 270).

After the jury announced that they remained deadlocked at 6-2, Defendants moved for a mistrial. (TTD VI 23:3-9). In contrast, Plaintiffs repeated that "as we've said before, Your Honor, we're fine with your sending this [supplemental] verdict form" to the jury to conduct a non-

---

[1] Throughout these proceedings, Defendants were consistent in their objection to any procedure that would deprive them of their right to have a jury decide the ultimate question of Plaintiffs' status as independent contractors or employees. (*See, e.g.*, Defendants' Status Report in Support of Right to Jury Trial, ECF 189; Defendants' Objection to Advisory Jury Proposal, ECF 263). Defendants reserve all such objections.

unanimous poll. (*Id.* at 22:23-24). The Court took the course recommended by Plaintiffs, giving the jury the supplemental verdict form with instructions to vote on each of the factors, clarifying that "this will no longer require unanimity or any particular number." (*Id.* at 24:3 – 26:18). The results were overwhelming. For each Plaintiff, a clear majority of the jury found that all six of the FLSA/PMWA economic realities factors (as well as the "totality of the circumstances" factor) favored independent contractor status. (*Id.* at 41:18 – 47:3; *see also* Completed Supplemental Verdict Form, ECF 269). With respect to the WPCL, a clear majority of the jury found that eight of the nine factors (as well as the "totality of the circumstances" factor) favored independent contractor status as to each Plaintiff. (*Id.*).

In summary, each time the Court needed to choose which route to take, Plaintiffs urged the Court along the road of deciding Plaintiffs' status as independent contractors or employees as a matter of law, and to do so "based upon the poll results from the jury." The Court took the path suggested by Plaintiffs by having the jury complete the questionnaire, and the poll results point overwhelmingly in a single direction. The destination is clear: this Court should enter judgment as a matter of law in favor of Defendants and dismiss this action with prejudice.

Incredibly, after urging this Court to rule on Plaintiffs' status as a matter of law based upon the jury poll (which poll can only support a finding that Plaintiffs were independent contractors), Plaintiffs' counsel is now unabashedly urging *another* court to misinterpret the poll results from this case as supporting their efforts to solicit other drivers to pursue FLSA claims against Uber in another case. *Agha v. Uber Tech., Inc.*, No. 1:23-cv-17182, ECF 35 at 7 n.4 (N.D. Ill. Mar. 29, 2024) (citing *Razak* poll at end of string cite of cases they claim support a "finding [that] Uber has misclassified drivers and that they are in fact employees"). This Court should put an end to such mischief by ruling, once and for all, that Plaintiffs were independent contractors.

III.    ARGUMENT

A.    **Plaintiffs Encouraged the Court to Decide the Ultimate Question of Whether They Were Defendants' Employees Based on the Poll Results.**

For more than a century, this Court has recognized that when a party persuades a court to journey down a particular path, that party cannot later complain when the destination is not to the party's liking. In the 1916 case of *Weinstein v. Studebaker Corp.*, for example, this Court instructed the jury as requested by the plaintiff and in a manner consistent with the plaintiff's theory of the case. 238 F. 963, 967 (E.D. Pa. 1916). After the jury returned a verdict in favor of the defendant, the plaintiff moved for a new trial. *Id.* The court denied the plaintiff's motion: "[T]he trial judge accepted and presented [the plaintiff's] theory to the jury.... If this was error (as it may be that it was), it is an error of which the plaintiff cannot now complain....  After taking the position which was taken, it was too late to return to the other...." *Id.*

Six years later, in *Houlk v. Seaboard Fuel Corp.*, counsel for the defendant "expressly stated his willingness that [a] question should be passed on by the jury." 278 F. 686, 687 (E.D. Pa. 1922). After the jury returned a verdict for the plaintiff, "it [was] too late for [the defendant] to shift his ground" and complain that the question should never have been submitted to the jury. *Id.* As the court explained, "the defendant cannot complain if the jury found against it upon an issue to which its counsel expressly agreed" could be submitted to the jury. *Id.*

Over the next century, the principles described in *Weinstein* and *Houlk* evolved to become known as the doctrine of "invited error," as summarized by the Third Circuit in 2014:

> The doctrine of "invited error" refers to "[a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling.... That is to say, "[w]hen a litigant takes an unequivocal position at trial, he cannot on appeal assume a contrary position simply because the decision in retrospect was a tactical mistake, or perhaps a candid but regretted concession."

*Lesende v. Borrero*, 752 F.3d 324, 337 (3d Cir. 2014); *see also id.* at 338 (rejecting appeal where party "assumed a tactical stance" and "concocted the very procedural scheme of which it now complains"); *Morrow v. May*, 735 F.3d 639, 644 (7th Cir. 2013) (equating invited error "with the adage that turnabout is fair play").

Plaintiffs waived their right to a jury trial and encouraged this Court to conduct a non-unanimous poll of the jury and to then issue a ruling based upon the poll results. Whether Plaintiffs' conduct is characterized as invited error, waiver, forfeiture, or judicial estoppel, the result is the same: Plaintiffs cannot now insist that the Court chart a different course merely because the results of that poll were overwhelmingly against them. *See New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (noting that courts have "uniformly recognized" the importance of "protect[ing] the integrity of the judicial process, by prohibiting parties from deliberately changing positions according to the exigencies of the moment"); *United States v. Akridge*, 62 F.4th 258, 263 (6th Cir. 2023) (describing the "hazy border between invited error and waiver"); *see also In re City of Philadelphia Litig.*, 158 F.3d 723, 726 (3d Cir. 1998) (noting that the Seventh Amendment jury trial right can be waived).

In *Fleck v. KDI Sylvan Pools, Inc*., for example, defendant Nichols Swim Pools, Inc. filed a third-party complaint for indemnification against Hoffinger Industries, Inc. 981 F.2d 107, 112 (3d Cir. 1992). At trial, counsel for Nichols requested that the court direct a verdict in its favor on the indemnification claim. *Id.* Counsel for Hoffinger responded by unequivocally acknowledging that the court "can ... direct a verdict" on the indemnification claim because "it's not a jury question." *Id.* The court then directed a verdict for Nichols on its claim against Hoffinger. *Id.* On appeal, the Third Circuit refused to consider Hoffinger's objection to the entry of a directed verdict: "When a litigant takes an unequivocal position at trial, he cannot on appeal assume a contrary

position simply because the decision in retrospect was a tactical mistake, or perhaps a candid but regretted concession." *Id.*; *see also Powell v. PS Bank*, No. 4:23-cv-1755, 2023 WL 7302061, at *1 (M.D. Pa. Nov. 6, 2023) (where a party agreed that the "clear and convincing evidence" standard applied but the party was later found to not meet that standard, the party cannot thereafter assert that the "preponderance of the evidence" standard should have applied); *Arellano v. Davis*, No. 19-1001, 2022 WL 819601, at *6-7 (D.N.J. Mar. 18, 2022) (party cannot ask the court to take a certain course then condemn the very action the party urged); *Harvis v. Roadway Exp. Inc.*, 923 F.2d 59, 60-61 (6th Cir. 1991) (concluding that plaintiff who insisted upon jury trial was "bound by the so-called 'error' he induced the District Court to make" when he later argued that case should not have gone to the jury).

Beginning on February 1, 2024, and continuing through the last day of trial, Plaintiffs repeatedly encouraged this Court to make the ultimate decision as to Plaintiffs' status as independent contractors or employees. Once it appeared that the jury would not be able to reach a unanimous (or even a 7-1) verdict, Plaintiffs went one step further, urging the Court to accept an "advisory" result from the jury by: (a) providing the jury with a polling form; (b) asking for a (non-unanimous) vote on each of the economic realities factors; and (c) making the ultimate decision on Plaintiffs' status "based upon the poll results from the jury."

The Court took the course charted by Plaintiffs. The jury poll overwhelmingly favored that Plaintiffs were independent contractors under the FLSA, the PMWA, and the WPCL. Having encouraged the Court to journey down the path of conducting a non-unanimous poll of the jury and then making the ultimate decision as to Plaintiffs' status based on those poll results, Plaintiffs cannot now reverse course and assume a contrary position simply because they are disappointed by the outcome of the polling exercise.

To be sure, if the Court was somehow inclined to *reject* the results of the jury poll (and ignore the overwhelming weight of the evidence, as described below), then the only path forward would be to declare a mistrial and schedule a new trial. Throughout these proceedings, Defendants preserved their objection to any procedure that would deprive them of their right to have a jury decide the ultimate question of Plaintiffs' status as independent contractors or employees. (*See*, *e.g.*, Defendants' Status Report in Support of Right to Jury Trial (ECF 189); Defendants' Objection to Advisory Jury Proposal (ECF 263); TTD VI, 15:16-24). In contrast, it was *Plaintiffs* who repeatedly encouraged the Court to conduct a non-unanimous poll of the jury and to then decide the question of Plaintiffs' status as a matter of law based upon those poll results. Thus, notwithstanding Defendants' objections, the Court would be justified in considering those poll results (along with the evidence at trial) and: (a) holding that Plaintiffs did not meet their burden to prove by a preponderance of the evidence that they were Defendants' employees; (b) entering judgment as a matter of law in favor of Defendants; and (c) dismissing this action with prejudice.

> **B.**   **The Poll Results from the Jury—and the Testimony and Evidence Presented at Trial—Overwhelmingly Support a Finding that Plaintiffs Failed to Prove by a Preponderance of the Evidence that They Were Defendants' Employees.**

The jury was asked to vote, "based on [their] consideration of all testimony and evidence at trial, whether each factor (1) weighs in favor of an independent contractor relationship between Plaintiff[s] and Defendants, (2) is neutral as to the nature of the relationship between the parties, or (3) weighs in favor of an employee relationship Plaintiff[s] and Defendants." (Special Verdict Form, ECF 269). The jury's responses to the supplemental polling questions overwhelmingly support a finding that Plaintiffs failed to meet their burden to prove they were Defendants' employees. The poll results were clearly supported by the weight of the (often undisputed) evidence.

Indeed, the evidence was so overwhelming that the Court should grant Defendants' still-pending motion for judgment as a matter of law under Rule 50(a) (in addition to, or in lieu of, entering judgment in favor of Defendants "based upon the poll results from the jury" as Plaintiffs urged). (ECF 259).[2] Plaintiffs were fully heard during their case in chief, and a reasonable jury would not have had a legally sufficient evidentiary basis to find in their favor on the question of whether Plaintiffs met their burden to prove that they were Defendants' employees under the FLSA, PMWA, and/or WPCL. Plainly, Plaintiffs did not meet their burden.[3]

In the following sections of this memorandum, Defendants will recount some of the testimony and evidence presented at trial. Whether viewed as supporting the Court's ultimate decision that Plaintiffs were independent contractors (taking into account the poll results), and/or

---

[2] The Court took Defendants' Rule 50(a) motion (which was presented verbally at TTD III, 304:17 – 315:6, and in writing at ECF 259) under advisement (TTD III, 315:7-8), and it remains pending. The Court therefore retains the authority to grant Defendants' Rule 50(a) motion at this time. *Webb-Edwards v. Orange County Sheriff's Office*, 525 F.3d 1013, 1025 (11th Cir. 2008) (affirming district court's order granting defendant's Rule 50(a) motion where defendant made motion at close of plaintiff's case in chief but district court reserved ruling and issued decision at later time); *Spina v. Quality Asset Recovery, LLC*, No. 8:15-cv-2155, 2017 WL 2799440, *1-2 & n.5 (M.D. Fla. May 26, 2017) (granting defendant's Rule 50(a) motion made at close of plaintiff's case in chief despite reserving ruling until after jury returned verdict); *Sattler v. Great Atl. & Pac. Tea Co.*, 18 F.R.D. 271, 274 (W.D. La. 1955) (where defendant moved for judgment as matter of law under Rule 50(a) at close of plaintiff's case and court reserved ruling, court retained jurisdiction to decide motion even after jury was discharged).

[3] Notably, six of the eight jurors found that Plaintiffs were independent contractors *despite* errors in the Court's jury instructions which prejudiced Defendants. Defendants reserve all objections to the Court's instructions. *See, e.g.*, TTD V, 114:6 – 126:4 (noting Defendants' objections to jury instructions, including objections to: (a) not providing copy of instructions in advance; (b) instruction that there could be different results as to FLSA and PMWA claims; (c) instruction that compliance with laws and regulations can be evidence of control; (d) instruction regarding the contracts since those contracts limited Defendants' right to control; (e) instruction regarding the opportunity for profit or loss; (f) instruction regarding the negotiation of fares and the ability to be strategic in profiting from the use of the Uber App; (g) instruction regarding the "hustle" concept and the failure to instruct regarding the Plaintiffs' ability to use other lead generation sources; and (h) instruction regarding Plaintiffs' investment (including its emphasis on "relative" investment)); *see also id.* at 131:25 – 132:14 (objection regarding instruction regarding dress code); *id.* at 137:24 – 138:10 (reiterating objection regarding opportunity for profit or loss); *id.* at 146:5 – 147:8 (same).

as requiring judgment as a matter of law under Rule 50(a), the evidence all points in the same direction. Whichever road is taken, the Court should reach the same destination: Plaintiffs did not meet their burden to prove that they were Defendants' employees.

### 1. The FLSA and PMWA "economic realities" factors favor independent contractor status.

For each Plaintiff, a clear majority of the jury found that all six of the FLSA/PMWA economic realities factors (as well as the "totality of the circumstances") favored independent contractor status. (Supplemental Verdict Form, ECF 269). The evidence at trial unequivocally supported the jury majority's conclusion.

#### a. Degree of Defendants' right to control the manner in which Plaintiffs' work is to be performed.

The "right to control" factor is "highly relevant to the FLSA analysis." *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 145 (3d Cir. 2020). Six of the eight jurors found that the degree of Defendants' right to control the manner in which Plaintiffs' work is to be performed weighed in favor of an independent contractor relationship. (ECF 269). The evidence at trial unequivocally supported the jury majority's finding.

As an initial matter, it is undisputed that the parties' contracts explicitly disavow Uber's right to control Plaintiffs in the performance of their services providing transportation using the Uber App. (*See, e.g.*, Exhibit 11 at § 2.4 ("Uber does not, and shall not be deemed to, direct or control ... Drivers ..."); TTD II, 15:2-5, 15:21-16:5, 221:1-8; *cf.* TTD IV, 134:9-12). Thus, as a matter of contract, it was undisputed that Defendants did not have any right to control the manner in which the work was to be performed. Plaintiffs confirmed that the actual practice was consistent with the contracts—they in fact operated entirely free of Defendants' control. *See Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 323 (3d Cir. 2016) ("The provisions of an agreement may be evidence of what the actual practice or working relationship is."); *Holder v. Bingnear*, 1991

WL 7381, at *4 (E.D. Pa. Jan. 18, 1991) (noting that the language of the agreement is a factor to be considered in determining the relationship of the parties).

For example, Plaintiffs (a) had complete freedom to choose their own hours (TTD II, 17:2-15, 30:25-31:3; TTD III, 227:8-10, 228:11-229:15); (b) could (and in fact did) go online and offline as they pleased (TTD II 17:2–15, 30:25–31:3; TTD III 87:6–7, 227:11–17, 229:24–230:17 (Razak acknowledged that he chose to remain offline for two months when he went overseas, without asking Uber for permission)); (c) could (and in fact did) engage in other activities while online on the Uber App (TTD II, 40:8-19, 45:3-9; TTD III 206:24-207:7); (d) could (and in fact did) choose where to work (TTD III, 232:2-20, *see e.g.*, Exhibits 193, 197); (e) could (and in fact did) reject trip requests (Exhibits 500-505; TTD II, 30:25-31:16; TTD III, 87:8-10; *see also* TTD IV, 33:9-23, 34:14-19); (f) could (and in fact did) cancel trip requests after initially accepting them (Exhibits 500-505; TTD II, 37:10-13, 299:10-19; TTD III, 13:22-14:5, 92:15-22, 148:21-25, 248:1-3, 249:23; *see also* TTD IV, 33:22-34:3); and (g) had control over what routes to take (TTD II, 66:9-13, 67:9-68:5; TTD III, 22:3-7). The evidence of Plaintiffs' freedom from control as independent contractors contrasted sharply with the evidence from Arturo Torres (one of Plaintiffs' own witnesses) about his experience as an employee of another limousine company, when he was scheduled to work set shifts and could not refuse jobs assigned to him. (TTD II, 116:24–118:2). Plaintiffs' autonomy over their working hours and their sole discretion regarding time off weigh heavily in favor of independent contractor status. *See*, *e.g.*, *Razak*, 951 F.3d at 146 ("UberBLACK drivers exercise a high level of control, as they can drive as little or as much as they desire, without losing their ability to drive for UberBLACK."); *Herman v. Express Sixty–Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (stating that defendant's minimal control over drivers who set their own hours and days of work points toward independent contract status); *Arena v. Delux*

*Transp. Servs., Inc.*, 3 F. Supp.3d 1, 10–11 (E.D.N.Y. 2014) ("Concerning the degree of control by the putative employer, the Court finds it very persuasive that Defendants had little control over when Plaintiff drove, how much he drive, or how frequently.").

One particularly compelling example of the lack of control exerted over Plaintiffs was Plaintiffs' admission that they could (and in fact did) provide transportation services outside the Uber App, at times doing so *even while online* on the Uber App. "[A] company relinquishes control over its workers when it permits them to work for its competitors." *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 141 (2d Cir. 2017). The applicable contracts expressly permitted Plaintiffs to provide transportation services arranged through other lead generation sources. (*See*, *e.g.*, Exhibit 11 at § 2.4 (each Plaintiff could "operate its independent business" and "provide services at any time to any third party separate and apart" from the Uber App); *see also* TTD IV 28:16–21, 125:23–126:6, 129:14–10). Each Plaintiff took advantage of such opportunities. Cherdoud admitted to working for another limousine company (Freemo Limo, Sabani's company) and also to soliciting private trips outside the Uber App (usually by parking near hotels) while simultaneously online on the Uber App. (TTD II, 57:1-6, 59:12-23). Sabani advertised his Freemo Limo business and performed hundreds of trips outside the Uber App (including for a customer he met as a result of a trip generated using the Uber App). (TTD II, 277:18-278:9, 279:5-13, 280:21-25; *see e.g.*, Exhibits 436 (Freemo Limo website), 437 (Freemo Limo Yelp page), 438 (Freemo Limo Facebook page), 442 (email outside of the Uber App seeking Freemo Limo services), 443 (emails with customer he met as a result of a trip generated using the Uber App regarding private rides)). Razak personally provided transportation services through another company (Blacklane) while contracted with Uber. (TTD III, 205:4-11, 263:8-16; Exhibits 426, 428).

At trial, Plaintiffs asserted that Uber "controlled" them by imposing various mandates on black limousine drivers and "punishing" them for declining or cancelling trips on the Uber App. The evidence did not support Plaintiffs' rhetoric. For example, while Plaintiffs complained that Uber required that they wear ties and maintain a certain level of hygiene (TTD I, 52:20-25; TTD II, 219:24–220:16), those mandates were largely imposed by the Philadelphia Parking Authority (PPA), not Uber.[4] "Actions taken by the potential employer for the sole purpose of complying with a specific, applicable Federal, State, Tribal, or local law or regulation are not indicative of control." 29 C.F.R. § 795.110(b)(4); *see also Pendleton v. JEVS Human Servs., Inc.*, 463 F. Supp.3d 548, 553–56, 561–63 (E.D. Pa. 2020).

Additionally, Plaintiffs claimed that Uber "controlled" them by punishing them for not accepting trip requests, but the evidence showed otherwise. Plaintiffs were free to *reject* any trip requests they received, and all three Plaintiffs did so regularly. (Exhibit 11; TTD II, 30:25–31:16; 48:3–5, 255:20–22; TTD III, 87:8–10; *see also* TTD IV, 135:14–20, 204:14–16). Indeed, while using the Uber App, Cherdoud rejected 994 trips (Exhibits 504-505), Sabani rejected 474 trips (Exhibits 502-503), and Razak rejected 177 trips (Exhibits 500-501). Plaintiffs even retained discretion to *cancel* trips even after they accepted a request. (TTD II, 37:10–13, 256:1–3, 299:10–19; TTD III, 13:22–14:5, 92:15–22, 148:21–25, 248:1–3, 249:18–250:5; *see also* TTD IV, 27:18–

---

[4] The PPA set forth a multitude of requirements, including: (1) a dress code and hygiene requirements (Exhibits 401-402; TTD II, 66:14–16, 69:10–70:22, 119:12–16, 138:16–139:24, 291:17–20; TTD IV, 139:24–140:25); (2) vehicle standards (Exhibit 402); (3) customer service expectations (Exhibits 401-402; TTD IV, 138:22–25); (4) vehicle safety inspections (Exhibit 402); (5) background checks (TTD IV, 193:24–194:2); (6) a prohibition on driving under the influence of drugs or alcohol (Exhibit 401; TTD IV, 138:15–18); (7) a requirement to take the most direct route to a rider's destination (Exhibit 401; TTD IV, 138:19–21); (8) a rule to adhere to a rider's radio preferences (Exhibit 401; TTD IV, 139:1–6); (9) a prohibition on insisting on or soliciting tips (Exhibit 401; TTD IV, 139:7–12); (10) a prohibition on discriminating based on protected characteristics (Exhibits 401-402; TTD IV, 139:14–18, 233:20–25); and (11) a requirement that drivers wait in the west lot to receive airport requests (TTD IV, 146:6–147:2, 198:8–199:3).

20, 35:10–36:2, 136:6–8). All three Plaintiffs routinely exercised such discretion—Cherdoud canceled 206 trips (Exhibits 504-505), Sabani canceled 495 trips (Exhibits 502-503), and Razak canceled 1,874 trips (Exhibits 500-501). Plaintiffs presented no evidence suggesting they faced any meaningful threat of account deactivation based on their rejection rates, cancellation rates, or star ratings. (TTD II, 211:5-15, 276:12–15; TTD IV 44:4-20).[5]

A reasonable jury would not have had a legally sufficient evidentiary basis to find that the "right to control" factor favored employment status. The jury majority was correct: The degree of Defendants' right to control the manner in which Plaintiffs performed their work weighed in favor of an independent contractor relationship.

> **b.     Plaintiffs' opportunity for profit or loss depending upon their managerial skill.**

Six of the eight jurors found that Plaintiffs' opportunity for profit or loss depending upon their managerial skill weighed in favor of an independent contractor relationship. (ECF 269). The evidence at trial unequivocally supported the jury majority's finding.

Within their use of the Uber App, Plaintiffs exercised managerial skills by choosing when and where to use the Uber App in order to generate the most profit. As Plaintiffs' witness Tara Murray testified, drivers (rather than Uber employees like her) made the decisions about how to increase their profits, as they knew "where the best places to drive are and where to get trips." (TTD II, 259:16-22). For example, they "could be at an airport during a snowstorm" or "wait outside of a concert." (TTD II, 134:15-17). As she summarized, Plaintiffs were "professionals" who knew "how to get good trips and how to make money." (TTD II, 134:17–20; *see also id.*

---

[5] It is true that as a system integrity measure, a driver could be moved to offline status on the Uber App if they rejected three trips in a row; but it is undisputed that the driver could then go back online if they chose to do so. (Exhibit 301; TTD IV, 41:3–5, 74:3–11, 74:25–75:7, 135:18–136:3).

260:8–9). For example, Cherdoud would decide to look for business away from more crowded events. (TTD II, 18:6-10). In contrast, Sabani relied on his experience to determine that rides from the airport would be the best use of his time. (TTD III, 88:12-22). Finally, Razak testified that he tried to capitalize on "surge" pricing to maximize his profits. (TTD III, 201:10-12; Exhibit 170).

Outside the Uber App, Plaintiffs owned and operated their own businesses and were able to generate profits (or incur losses) based on the decisions they made about how to operate their independent businesses in the marketplace.[6] Plaintiffs made decisions about whether, when, and how to use the Uber App as just one of many other revenue-generating leads. (*See*, *e.g.*, TTD II, 52:4–7; TTD III, 64:17–20, 68:2–5; TTD IV, 123:20–21). For example, Sabani created a website to promote his Freemo Limo business. (Exhibit 436; TTD III, 57:5–8, 60:5–6, 60:24–61:8, 100:13–19). Similarly, Cherdoud developed the strategy of building relationships with hotel doormen to obtain private referrals. (TTD II, 63:8–21). Razak decided to provide transportation services through Blacklane (and even to spend time dispatching other Luxe drivers to take Blacklane trips). (TTD III, 205:4-11, 263:8-16; *see e.g.,* Exhibits 426, 427, 428). Each Plaintiff had the opportunity to generate profit or loss (both within and outside their relationship with Uber) depending upon their managerial skill, and they were each able to utilize the Uber App as just one of several tools to generate revenue for their independent transportation businesses.

A reasonable jury would not have had a legally sufficient evidentiary basis to find that the "opportunity for profit or loss" factor favored employment status. The jury majority was correct:

---

[6] Plaintiffs' choice to license access to the Uber App as just one of many tools used to identify leads and earn revenue, in connection with their ability to generate revenue for their businesses from sources outside the Uber App, is highly relevant to their status as independent contractors. *See*, *e.g.*, *Smith v. Effluent Retrieval Servs., Inc.*, 2016 WL 6135573, at *5 (E.D. Pa. Oct. 21, 2016) ("Smith's freedom to work elsewhere and his limited actual work for Effluent demonstrates Smith was not economically dependent on Effluent.").

Plaintiffs' opportunity for profit or loss depending upon their managerial skill weighed in favor of an independent contractor relationship.

**c.**      **Plaintiffs' investment in equipment or materials and use of helpers.**

Five of the eight jurors found that Plaintiffs' investment in equipment or materials, or their use of helpers, weighed in favor of an independent contractor relationship. (ECF 269). The evidence at trial unequivocally supported the jury majority's finding.

The evidence revealed that Plaintiffs made significant investments in support of their business endeavors. For example, they all purchased their own luxury vehicles. (TTD I, 175:13-23, 176:3-9; TTD II, 104:12-19, 136:23-137:1; TTD III, 43:17-44:8; *see also* TTD IV, 125:20–22); *see Safarian v. Am. DG Energy, Inc.*, 729 F. App'x 168, 173–74 (3d Cir. 2018) (noting evidence that alleged employee owned many of his own tools and his truck supported conclusion that he was an independent contractor). Moreover, Plaintiffs made other substantial investments, including related to vehicle maintenance, advertising, fuel, insurance, communications, and professional association fees. (TTD II, 78:5-9, 80:14-22; TTD III, 44:9-11, 44:25-26, 45:1-46:12, 280:4-20). Sabani and Razak also used helpers, as they had several drivers operating in support of their business endeavors. (TTD II, 129:24–130:5, 281:13–18).

A reasonable jury would not have had a legally sufficient evidentiary basis to find that the "investment" factor favored employment status. The jury majority was correct: Plaintiffs' investment in their transportation business (and Sabani's and Razak's use of helpers) weighed in favor of an independent contractor relationship.

**d.**      **Whether the service rendered by Plaintiffs required a special skill.**

Five of the eight jurors found that whether the service rendered by Plaintiffs (which was far more than "mere driving") required a special skill weighed in favor of an independent

contractor relationship. (ECF 269). The evidence at trial unequivocally supported the jury majority's finding.

The evidence at trial illustrated that providing black car limousine services required a special skill. The industry is heavily regulated, requiring adherence to complex rules, completing examinations, and understanding the heightened customer service expectations and legal compliance considerations associated with providing black car transportation services.[7] Plaintiffs also demonstrated specialized skills related to how they best generate revenue (including but not limited to how to utilize the Uber App to identify profitable trip requests, while simultaneously using other lead generation sources to support their businesses). (Exhibits 401 (PPA Taxicab and Limousine Regulations Overview), 402 (PPA Limousine Driver Certification Handbook), 472 (letter to Cherdoud regarding the PPA examination for limousine drivers); TTD II, 18:6-18, 68:22-69:25, 70:20:72:11, 72:20-73:4; TTD III, 88:12-22, 201:10-12).

A reasonable jury would not have had a legally sufficient evidentiary basis to find that the "special skills" factor favored employment status. The jury majority was correct: The special skills needed to provide black car transportation services weighed in favor of an independent contractor relationship.

### e.    Degree of permanence of the working relationship.

Seven of the eight jurors found that the degree of permanence of the working relationship weighed in favor of an independent contractor relationship. (ECF 269). The evidence at trial unequivocally supported the jury majority's finding.

---

[7] Indeed, one must be commercially licensed and pass a test to be a black car limousine driver—strongly suggesting not just anyone is capable of providing those services. (TTD I, 168:12–169:15; TTD II, 68:22–25; Exhibit 402 (describing driver certification exam); *see also* TTD III, 59:10–13 (Freemo required its drivers to have on-the-road and classroom training)).

Plainly, the evidence illustrated that Plaintiffs had no real permanence with Uber. They freely admitted that they could provide transportation services outside of Uber, including providing services to private clients and through Blacklane. (TTD II, 59:3-11; TTD III, 46:23-25, 205:4-11; Exhibits 426, 428). Further, Plaintiffs acknowledged that they had complete control of their schedules—they decided when to work, how long to work, and whether to keep using the Uber App. (TTD II, 17:2-6, 29:22-30:3, 30:16-24, 255:14-15, 255:23-25; TTD III, 87:2-7, 88:15-22, 227:7-14, 229:12-15); *Pendleton*, 463 F. Supp.3d at 568 (noting this factor turned on "whether the employee had a set term with the employer" and "whether the employee also took outside work"). Razak acknowledged that he chose to remain offline for two months when he went overseas, and he did not ask Uber for permission to do so (nor did he need to). (TTD III, 229:24–230:17).

A reasonable jury would not have had a legally sufficient evidentiary basis to find that the "degree of permanence" factor favored employment status. The jury majority was correct: The lack of permanence of the working relationship weighed in favor of an independent contractor relationship.

### f.     Whether the service rendered is an integral part of Defendants' business.

Five of the eight jurors found that whether the service rendered by Plaintiffs is an integral part of Defendants' business weighed in favor of an independent contractor relationship. (ECF 269). The evidence at trial unequivocally supported the jury majority's finding.

The testimony established that Uber is a technology company, while Plaintiffs were in the transportation business. (Exhibit 11 at p.1 (contracts signed by Plaintiffs acknowledge that "Uber is a technology services provider that does not provide transportation services"); *see also* TTD IV, 16:1–4 ("Uber is a technology company" that built "an app that riders can use to connect with the driver to get from point A to point B."); *id.* at 16:10–11 ("The technology is the business. You

know, that's really the innovation that Uber has provided."); *id.* at 120:1–7 ("Uber[] [is] a technology company that builds technology to build marketplaces to match someone looking for a service with someone looking to provide a service."); *id.* at 16:1–17:10 (describing why Uber has hired "many thousands of technical experts, software engineers, data scientists, product managers"). Uber's contribution to the marketplace was not, strictly speaking, in the direct provision of transportation services; rather, it was the technological innovation known as the Uber App that enabled riders and drivers to connect on demand. (*See* TTD IV, 16:9-16).

Of course, like any business, Uber's customers are important to Uber. However, the evidence at trial illustrated that both drivers *and riders* are Uber's customers. (*See, e.g.*, TTD IV, 18:8-10). The evidence at trial established that the drivers provided a service to the riders, and the Uber App technology connected the rider with the drivers. (*See id.* at 17:21-25, 22:5-13). Just as hosts and guests are important to Airbnb, and buyers and sellers are important to eBay, riders and drivers are important to Uber. But that does not make hosts and guests an integral part (or employees) of Airbnb, it does not make buyers and sellers an integral part (or employees) of eBay, and it does not make riders and drivers an integral part (or employees) of Uber. Plaintiffs are only "integral" to Uber in the same way riders are; both are customers of Uber who utilize Uber's technology services for a fee.

A reasonable jury would not have had a legally sufficient evidentiary basis to find that the "integral part" factor favored employment status. The jury majority was correct: Consideration of whether the service rendered is an integral part of Defendants' business weighed in favor of an independent contractor relationship.

### g.     The totality of the circumstances.

In addition to asking the jury about each of the six economic realities factors individually, the Court asked the jury to consider the totality of the circumstances. *Donovan v. DialAmerica*

*Mktg., Inc.*, 757 F.2d 1376, 1382-83 (3d Cir. 1985); *Razak*, 951 F.3d at 143. Six of the eight jurors found that the economic realities of the relationship weighed in favor of an independent contractor relationship. The evidence was overwhelming. As summarized above and as the Court saw firsthand at trial, a reasonable jury would not have had a legally sufficient evidentiary basis to find that the "totality of the circumstances" favored employment status. The jury majority was correct: The totality of the circumstances weighed in favor of an independent contractor relationship under the FLSA and PMWA.

### 2.    The WPCL factors favor independent contractor status.

For each Plaintiff, a clear majority of the jury found that all but one of the WPCL economic realities factors (as well as the "totality of the circumstances" factor) favored independent contractor status. (ECF 269).

Because the WPCL is analyzed using a similar multi-factor classification test to the FLSA's economic realities test, courts have consistently applied the same basic analysis in evaluating WPCL and FLSA claims together. *See, e.g.*, *Talarico v. Pub. P'ships, LLC*, 837 F. App'x 81, 84 n.1 (3d Cir. 2020) ("Our analysis with respect to the FLSA thus also applies to whether [defendant] is a joint employer under the … Pennsylvania Wage Payment and Collection Law."); *Carpenter v. Pepperidge Farm, Inc.*, 2023 U.S. Dist. LEXIS 121210, at *8 (E.D. Pa. July 14, 2023) ("although the employee/independent contractor analysis under the [FLSA] 'differs somewhat' from the WPCL analysis, FLSA cases are 'informative' in this area") (quoting *Estate of Accurso v. Infra-Red Servs., Inc.*, 805 Fed. App'x 95, 101 n.3 (3d Cir. 2020)).

Not surprisingly, the jury's findings as to the nine WPCL factors identified by the Court aligned closely with the jury's findings as to the six economic realities factors under the FLSA and PMWA. As is true under the FLSA, control is arguably the most important factor for determining a worker's status under the WPCL. *Williams*, 837 F.3d at 320 (noting that "paramount" factor

under WPCL "is the right to control the manner in which the work is accomplished"). Here, six of the eight jurors found that the WPCL's "control" factor and "responsibility for result only" factor weighed in favor of independent contractor status (matching the "right to control" factor under the FLSA and PMWA).[8]

The other factors similarly support a finding that Plaintiffs are independent contractors under WPCL. Five of the eight jurors found that the WPCL's "skill" factor weighed in favor of independent contractor status (matching the "special skills" factor under the FLSA and PMWA). Six of the eight jurors found that the WPCL's "nature of the work" and "distinct occupation" factors weighed in favor of independent contractor status (matching the "opportunity for profit or loss" factor under the FLSA and PMWA). Seven of the eight jurors found that the "supplies the tools" and "payment by the job" factors weighed in favor of independent contractor status. All eight jurors agreed that the terms of the agreement between the parties weighed in favor of independent contractor status. Only one WPCL factor (right to terminate at any time) did not weigh in favor of independent contractor status (and even then, four of the eight jurors found that factor to be neutral). (ECF 269). In the end, six of the eight jurors found that the "totality of the circumstances of the economic realities of the relationship" weighed in favor of a finding that Plaintiffs were independent contractors under the WPCL. (*Id.*).

---

[8] As under the FLSA, requiring a worker to adhere to certain specifications and follow certain rules does not amount to control over or responsibility for the work performed. *See, e.g.*, *Universal Am-Can, Ltd. v. W.C.A.B. (Minteer)*, 762 A.2d 328, 492-93 (Pa. 2000) ("Because a motor carrier has no ability to negotiate aspects of the operation of leased equipment that are regulated, these factors may not be considered in resolving whether an owner-operator is an independent contractor or employee."); *see also IDI Logistics, Inc. v. Clayton*, 284 A.3d 248, 256 (Pa. Super. Ct. 2022) ("A trucking company's requirement that drivers comply with federal trucking regulations is not dispositive of employment status.").

Defendants will not repeat its overview of the evidence as it pertains to Plaintiffs' WPCL claim, since it aligns with the evidence that supported Plaintiffs' status as independent contractors under the FLSA and PMWA. Suffice it to say that the evidence of Plaintiffs' status as independent contractors under the WPCL was overwhelming. A reasonable jury would not have had a legally sufficient evidentiary basis to find that Plaintiffs were employees under the WPCL. The jury majority was correct: Consideration of each of the WPCL factors, as well as the totality of the circumstances of the overall relationship, weighed in favor of a finding that Plaintiffs were independent contractors.

## IV.    CONCLUSION

Plaintiffs cannot deny that they urged the Court to accept an "advisory" result from the jury and to make the ultimate decision as to Plaintiffs' status as independent contractors or employees based upon the results of a (non-unanimous) jury poll as to each of the economic realities factors and the totality of the circumstances. Based on the jury's "consideration of all testimony and evidence at trial," the jury overwhelmingly found that the relevant factors (and the totality of the circumstances) weighed in favor of a conclusion that Plaintiffs were independent contractors under the FLSA, the PMWA, and the WPCL. The jury's findings are undeniably aligned with the testimony and evidence presented at trial. Having encouraged the Court to take the path of conducting a non-unanimous jury poll and making the ultimate decision based upon those poll results, Plaintiffs cannot now be heard to object that the Court journeyed down the wrong path.

Judgment as a matter of law is also appropriate under Rule 50(a). Plaintiffs were fully heard during the trial, and a reasonable jury would not have a legally sufficient evidentiary basis to find in their favor on the question of whether Plaintiffs met their burden to prove that they were Defendants' employees under the FLSA, PMWA, and/or WPCL.

Whichever road the Court takes, the destination will be the same. The Court should enter judgment as a matter of law in favor of Defendants and dismiss this action with prejudice.

Dated: April 1, 2024                              Respectfully submitted,

                                                  */s/Robert W. Pritchard*
                                                  Robert W. Pritchard, Bar No. 76979
                                                  rpritchard@littler.com
                                                  LITTLER MENDELSON, P.C.
                                                  625 Liberty Avenue, 26th Floor
                                                  Pittsburgh, PA 15222
                                                  Telephone:   412.201.7600
                                                  Facsimile:   412.456.2377

                                                  Paul C. Lantis, Bar No. 309240
                                                  plantis@littler.com
                                                  LITTLER MENDELSON, P.C.
                                                  Three Parkway
                                                  1601 Cherry Street, Suite 1400
                                                  Philadelphia, PA 19102
                                                  Telephone: 267.402.3073
                                                  Facsimile: 267.402.3131

                                                  Attorneys for Defendants
                                                  UBER TECHNOLOGIES, INC. and
                                                  GEGEN LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of April 2024, Defendants' Brief Regarding Post-Trial Proceedings was filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon all counsel and parties of record.

*/s/Robert W. Pritchard*