## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALI RAZAK, KENAN SABANI, and KHALDOUN CHERDOUD, | Case No. 2:16-cv-00573-MMB |
| Plaintiffs, | Judge Michael M. Baylson |
| v. | |
| UBER TECHNOLOGIES, INC. and GEGEN LLC, | |
| Defendants. | |

## PLAINTIFFS' MOTION FOR JUDGMENT AS A
## MATTER OF LAW UNDER FED. R. CIV. P. 50(A)

Plaintiffs Ali Razak, Kenan Sabani, and Khaldoun Cherdoud move under Rule 50(a) of the

Federal Rules of Civil Procedure for judgment as a matter of law against Defendants Uber Tech-

nologies, Inc. and Gegen LLC on all claims.

## I.    INTRODUCTION

No reasonable jury could find that Plaintiffs were "independent contractors" under the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, Pennsylvania's Minimum Wage Act

("PMWA"), 43 P.S. §§ 333.101–333.115, and Pennsylvania's Wage Payment and Collection Law

("WPCL"), 43 P.S. §§ 260.1–260.45.

As Plaintiffs have repeatedly argued, the worker classification test under Pennsylvania

law is different from the FLSA's economic realities test.[1] Pennsylvania's chief law enforcement

officer, the Attorney General, agrees with Plaintiffs.[2] Indeed, if given the chance, Plaintiffs

---

[1]    *See* ECF Nos. 151, 159, 169, 212, 238, and 280, which Plaintiffs incorporate by reference.

[2]    *See* Amicus Brief, ECF No. 193-1.

expect that the Pennsylvania Supreme Court may well follow the lead of California and New Jersey's Supreme Courts and adopt an ABC test for claims under the PMWA and WPCL. *See Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (Cal. 2018); *Hargrove v. Sleepy's*, 106 A.3d 449 (N.J. 2015).

The Pennsylvania legislature enacted the PMWA in 1968, 30 years after President Roosevelt signed the FLSA into law. The PMWA's "overarching purpose is to address the evils of unreasonable and unfair wages and to ameliorate employer practices which serve to artificially depress those wages." *In re Amazon.com, Inc.*, 255 A.3d 191, 202 (Pa. 2021) (quoting 43 P.S. § 333.101). If the Pennsylvania legislature thought that the FLSA adequately addressed these concerns, then there would have been no reason to enact the PMWA. Thus, using the FLSA's economic realities test to determine a worker's entitlement to wages under the PMWA is incongruous with the PMWA's stated purpose and legislative history. For similar reasons, the WPCL requires a more worker friendly test than the one referenced in *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 321 (3d Cir. 2016), which follows the economic realities test.

But even under the economic realities test (for the FLSA and PMWA) and the *Williams* multifactor test (for the WPCL), the Court should grant judgment in as a matter of law under Rule 50(a) in Plaintiffs' favor, as Uber has failed to show that Plaintiffs were independent contractors (or rebut Plaintiffs' evidence that they were employees).[3]

---

[3]      As Plaintiffs noted in their Supplemental Proposed Jury Instruction Regarding the Burden of Proof Under the FLSA (ECF 316) and argued at the trial, Defendants' argument that Plaintiffs are not eligible for wages under the FLSA on the ground that they were independent contractors is a defense to that claim and, as such, Defendants bear the burden of proving that Plaintiffs were independent contractors.  *See Corning Glass Works v. Brennan*, 417 U.S. 188 (1974) (the "general rule" is that "the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense under which the employer has the burden of proof"); Defendants' Answer to First Amended Complaint, ECF No. 57 (asserting as an affirmative defense, "Federal and state wage and hour laws do not apply to Defendants with respect to Plaintiffs and the putative class and/or collective

## II.   LEGAL STANDARD

Judgment as a matter of law is appropriate when there is no "legally sufficient evidentiary basis" to rule for the non-moving party. *Goodman v. Pennsylvania Tpk. Com'n*, 293 F.3d 655, 665 (3d Cir. 2002); *see also* Fed. R. Civ. P. 50(a)(1). A "scintilla of evidence" supporting Defendants' case is not enough to survive a judgment as a matter of law. *Galena v. Leone*, 638 F.3d 186, 206 (3d Cir. 2011). Instead, "a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Id.* at 196 (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991)).

## III.   ARGUMENT

As the only disinterested witness who worked for Uber, Tara Murray's testimony warrants the most consideration under Rule 50. And her testimony, along with Uber's own documents and admissions, confirm that Plaintiffs were Uber's employees under the FLSA, PMWA, and WPCL.

In assessing whether Plaintiffs were employees, the Third Circuit weighed the six factors outlined in *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376 (3d Cir. 1985):

> 1)   the degree of Uber's right to control the manner in which the Plaintiffs performed services as Uber drivers;
>
> 2)   Plaintiffs' opportunity for profit or loss when rendering services on behalf of Uber depending upon their managerial skill;

---

action members because they were at all relevant times independent contractors and/or otherwise excluded from coverage under those laws.").

Likewise, as Plaintiffs have argued before, Defendants bear the burden of proof under the Pennsylvania state law claims (PMWA and WPCL) as well.  *See* ECF No. 305, page 8.

Nevertheless, Plaintiffs maintain that they are entitled to a directed verdict because this question should be decided as a matter of law under federal and state law and because no reasonable jury could find in Defendants' favor.

3)      Plaintiffs' investment in equipment or materials required for
        being Uber drivers, as compared to Uber's investment;

4)      whether the service Plaintiffs rendered required a special
        skill;

5)      the degree of permanence of the working relationship
        between Plaintiffs and Uber; and

6)      whether services rendered by Plaintiffs were an integral part
        of Uber's business.

*Razak v. Uber Techs., Inc.*, 951 F.3d 137, 142–43 (3d Cir.), *amended*, 979 F.3d 192 (3d Cir. 2020).

The Third Circuit emphasized that "neither the presence nor absence of any particular factor is dispositive." *Id.* at 143 (internal citation and quotation marks omitted). With that in mind, the Third Circuit examined the "circumstances of the whole activity" to determine whether, "as a matter of economic reality," Plaintiffs depended on Uber. *Id.* As a guiding principle, the Third Circuit has underscored "that, of all the acts of social legislation, the Fair Labor Standards Act has the broadest definition of 'employee.'" *DialAmerica*, 757 F.2d at 1382. The inquiry "is not governed by the 'label' put on the relationship . . . or the contract controlling that relationship[.]" *Safarian v. Am. DG Energy Inc.*, 622 F. App'x 149, 152 (3d Cir. 2015) (internal citation and quotation marks omitted); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947).

Viewing the trial record through this legal framework reveals that Plaintiffs were employees under the FLSA (and state law). In fact, the record supports Plaintiffs' employee status across every *DialAmerica* factor. The Court should thus enter judgment as a matter of law for Plaintiffs.

## A.    First Factor: Uber had the right to control, and did control, how Plaintiffs performed their services as UberBLACK drivers.

The first economic realities factor considers "the degree of the alleged employer's right to control the manner in which the work is to be performed." 757 F.2d at 1382. While not dispositive, this factor is highly relevant to the FLSA analysis. *Razak*, 951 F.3d at 145. On appeal, the Third

Circuit clarified that "[a]ctual control of the manner of work is not essential; rather, it is the right to control which is determinative." *Id.*

The Supreme Court has also recognized that a worker who decides when, where, and for how long to work may be an employee under the FLSA. For example, in *Goldberg v. Whitaker House Coop.*, the Supreme Court held that members of a cooperative who made knitted goods at home for piece-rate pay were employees under the FLSA:

> The members are not self-employed; nor are they independent, selling their products on the market for whatever price they can command. They are regimented under one organization, manufacturing what the organization desires and receiving the compensation the organization dictates. Apart from formal differences, they are engaged in the same work they would be doing whatever the outlet for their products. The management fixes the piece rates at which they work; the management can expel them for substandard work or for failure to obey the regulations. The management, in other words, can hire or fire the homeworkers.

366 U.S. 28, 30–32 (1961).

Applying this reasoning, the Third Circuit in *DialAmerica* concluded that home researchers who could "work any time and for as many hours as they desired" were also employees:

> The home researchers in this case were not in a position to offer their services to many different businesses and organizations. They worked on a continuous basis with DialAmerica and were able to work only when and if DialAmerica was in need of their services. Consequently, the home researchers were economically dependent on DialAmerica, indicating that they were indeed "employees" of the defendant under the FLSA.

757 F.2d at 1385–86. This binding precedent dictates that Plaintiffs were employees.

Like the knitters in *Goldberg* and the researchers in *DialAmerica*, Plaintiffs and other black car drivers were regimented under one organization—Gegen, Uber's wholly owned subsidiary. (PX-109, PX-119, PX-120). Plaintiffs worked for Uber only when and if their services were needed. (JX-001-002) ("The frequency in which the Company offers Requests to you . . . shall be

in the sole discretion of the Company. Nothing . . . shall be . . . a guarantee that you shall be offered any particular number of requests during any particular time period.").  And like the employers in *Goldberg* and *DialAmerica*, Uber could expel drivers for substandard work. (PX-250; PX-350).

### 1. Uber had the right to terminate Plaintiffs (in its discretion) for substandard service.

Courts have recognized that the right to terminate is strong evidence of control. *See, e.g.*, *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 789 (3d Cir. 1978) ("the right to terminate the relationship for breach of any [contract] provision . . . can very effectively control the day to day operation"); *Razak*, 951 F.3d at 146; *Goldberg*, 366 U.S. at 32–33; *Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 485 (N.D. Cal. 2017). Uber's contracts with Plaintiffs memorialized the company's right to terminate them for substandard service:

> Uber reserves the right, at all times and at Uber's sole discretion, to reclaim, prohibit, suspend, limit or otherwise restrict the Subcontractor from accessing or using the Driver App or the Device if the Transportation Company or its Drivers fail to maintain the standards of appearance and service required by the users of the Uber Software.

(JX-004-002; JX-005-002; JX-006-002; JX-009-004). But it was Uber, not riders, that established these "standards of appearance and service." And it was Uber that decided whether to terminate a driver for failing to meet these standards. (PX-302-001–02).

### 2. Uber's rating system demanded near perfection from drivers.

After every trip, Uber invited riders to rate their driver on a five-star scale. (PX-250-006; PX-302-001). Drivers had to maintain a minimum average rating or face "deactivation"—that is, termination. (PX-101-006). Uber originally set the minimum average rating for black car drivers at 4.6. (JX-001-008). Uber later increased the minimum rating to 4.7 to "help grow demand for UberBLACK."  (PX-145-002; *see also* PX-253-013). In other words, Plaintiffs had to be nearly perfect to help grow Uber's business.

Drivers that fell below this threshold received multiple warnings that they would soon be deactivated unless they improved their performance. (PX-101). If a driver failed to improve, Uber would use its "judgment in deciding whether to take the partner offline." (PX-101-006; PX-302-001–02).

After deactivating a driver for poor performance, Uber told the driver that he *might* be reactivated if he completed a "quality training course" at his own expense. (PX-101-007). These courses were offered by "exemplary Uber partners"—that is, other drivers that Uber approved of. (PX-101-007). After completing the course, the driver had to return a certificate of completion to the Uber office. (*See* A. Torres Testimony). Uber then decided whether to "reactivate" (rehire) the driver. (PX-304-004) ("We ***may*** allow you to regain access to your account") (emphasis added).

### 3. To keep drivers engaged with their ratings, each week Uber warned and deactivated drivers with low ratings.

Uber's internal "Philly Quality Playbook" explained that "bad drivers . . . make Uber look bad" and "also cost Uber money." (PX-101-001). Because "every star [was] sacred," Uber developed a system to keep drivers "engaged in their ratings." (PX-101-001–2).

<div style="border:1px solid">

## Uber Philly Quality Playbook

*"...because every star is sacred."*

Bad drivers make good drivers look bad, and they make Uber look bad. They also cost Uber money. Riders who receive 1-star service are less likely to use Uber in the future than riders who received better service.

</div>

As part of its quality control system, Uber "warn[ed]/deactivate[d] bad drivers often (daily, at least weekly)." (PX-101-001; *see also* PX-253-008). Uber also "[p]ut the burden on the driver to get certified, get back online." (PX-101-001). Uber would "flex thresholds up over time (i.e. from min driver rating of 4.4 to 4.7)." (PX-101-001). This "ongoing process" kept Uber in touch

with drivers who needed "encouragement, or training, and either encourage them to improve, or *manage* them out of the fleet." (PX-101-001) (emphasis added).

In "weekly summary reports," Uber notified drivers of their average rating over the last week. (PX-253-011). These reports would praise drivers for being "above average." (PX-253-011). The reports also instructed drivers on how to improve their ratings. (PX-253-011).

Uber's quality control system had its intended effect on drivers. According to Murray, Plaintiffs and other drivers considered driving for UberBLACK to be their "full-time" job. To avoid losing that job (and going into debt with Uber), Plaintiffs worked to ensure that their driver ratings never fell below the threshold that Uber unilaterally set, increased, and increased again.

### 4. Uber could terminate drivers for 71 different "infractions."

Besides deactivating drivers for low ratings, Uber had the right to terminate drivers for committing any one of a number of specific "infractions," including "talking too much" or "too little":

| No. | Infraction | Record Citation |
|---|---|---|
| 1. | Accepting a tip | PX-250-011; PX-333-015 |
| 2. | Refusing a trip based on the end destination | PX-250-011; PX-195-007 |
| 3. | Calling riders in advance to ask for their destination | PX-195-007 |
| 4. | Giving out personal business cards to riders | PX-184-003 |
| 5. | Accepting a trip outside the app from an Uber customer | PX-184-003 |
| 6. | Altercations | PX-250-011 |
| 7. | Mistiming a trip | PX-253-009 |
| 8. | Talking too much | PX-253-009 |
| 9. | Talking too little | PX-253-009 |
| 10. | Asking for a rating | PX-250-011 |
| 11. | Attitude complaints | PX-250-011 |
| 12. | Taking a bad route | PX-250-011 |
| 13. | Lacking city knowledge | PX-250-011 |
| 14. | Failing to tap the begin trip button | PX-250-011 |
| 15. | Failing to tap the end trip button | PX-250-011 |
| 16. | Cancelling on a rider | PX-250-011 |
| 17. | Not answering the phone | PX-250-011 |
| 18. | Not opening the door | PX-250-011 |
| 19. | Tapping the "arriving now" button too soon | PX-250-011 |

| | | |
|---|---|---|
| 20. | Calling a customer too often | PX-250-011 |
| 21. | Inappropriate behavior | PX-250-011 |
| 22. | Mistiming a trip | PX-250-011 |
| 23. | Not having a toll pass | PX-250-011 |
| 24. | Poor communication | PX-250-011 |
| 25. | Poor driving | PX-250-011 |
| 26. | Having a "smelly" car | PX-250-011 |
| 27. | Too much cologne | PX-250-011 |
| 28. | Smelling of cigarettes | PX-250-011 |
| 29. | Body odor | PX-250-011 |
| 30. | Poor personal hygiene | PX-250-011 |
| 31. | Generally smelly | PX-250-011 |
| 32. | Soliciting payment outside the Uber system | PX-250-011; PX-302-004 |
| 33. | Soliciting trips outside the app | PX-250-011; PX-302-004 |
| 34. | Manipulating surge pricing | PX-250-011 |
| 35. | Talking too much | PX-250-011 |
| 36. | Talking too little | PX-250-011 |
| 37. | Trouble with picking up customers | PX-250-011 |
| 38. | Unprofessional attire | PX-250-011 |
| 39. | Poor vehicle quality | PX-250-011 |
| 40. | Poor vehicle appearance | PX-250-011 |
| 41. | Mechanical issues | PX-250-011 |
| 42. | Not having air conditioning | PX-250-011 |
| 43. | Not having heat | PX-250-011 |
| 44. | Wrong driver (not the driver that Uber assigned) | PX-250-011, PX-192-008 |
| 45. | Wrong vehicle (not the vehicle that Uber assigned) | PX-250-011, PX-192-008 |
| 46. | Disparaging Uber during rides | PX-212-001 |
| 47. | Inactivity | PX-333-033 |
| 48. | Missing documents | PX-333-033 |
| 49. | Accepting trips without the intention of completing them | PX-302-003 |
| 50. | Provoking riders to cancel a trip | PX-302-003 |
| 51. | Unwanted contact | PX-302-003 |
| 52. | Abusive language | PX-302-003 |
| 53. | Carrying firearms of any kind | PX-302-004 |
| 54. | Allowing another driver to drive under his account | PX-302-004, PX-192-008 |
| 55. | Taking a trip using an approved vehicle | PX-302-004 |
| 56. | Providing inaccurate information to Uber | PX-302-004 |
| 57. | Refusing Uber's background checks | PX-302-004 |
| 58. | Accepting street hails | PX-302-004, PX-192-008 |
| 59. | Harming Uber's business or brand | PX-302-004; PX-212-001 |
| 60. | Leaving one's phone in the airport zone | PX-295-001; PX-298-001 |
| 61. | Serious feedback from customers | PX-253-007 |
| 62. | Repeated negative feedback from customers | PX-253-007 |
| 63. | Falling below Uber's minimum average driver rating | PX-302-001 |
| 64. | Exceeding Uber's maximum cancellation rate | PX-302-002 |

| 65. | Getting into an accident during a trip | PX-250-011 |
| 66. | Violent behavior | PX-302-003 |
| 67. | Denying a service animal | PX-250-011 |
| 68. | Increasing the time or distance of a trip | PX-302-002 |
| 69. | Traffic violations and citations | PX-250-011 |
| 70. | Distracted driving | PX-250-011 |
| 71. | Dangerous driving | PX-250-011 |

That a handful of these infractions—six or seven—overlapped with Philadelphia Parking Authority regulations should be irrelevant to the analysis.[4] And, regardless, many of these infractions were not rules that Uber enacted to comply with governmental regulation. Nor did Uber present any evidence that it notified the PPA of driver infractions.

### 5. Uber logged infractions and kept notes in driver personnel files.

Like a traditional employer, Uber kept personnel files on each driver. (PX-250-008–010; PX-251-012). If a driver violated one of Uber's rules, Uber's representatives would log the infraction in the driver's file on Zendesk. (PX-250-010; PX-251-012). For example, if a driver took a bad route, Uber would apply the "driver_quality_bad_route_city_knowledge" tag to the driver's personnel file. (PX-250-010; PX-251-012).

---

[4] As the Eleventh Circuit has explained, the "economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1316 (11th Cir. 2013). If "the nature of a business requires a company to exert control over workers to the extent that [the employer] has allegedly done, then that company must hire employees, not independent contractors." *Id.*; *see also Schultz v. Mistletoe Express Serv., Inc.*, 434 F.2d 1267, 1271 (10th Cir. 1970) (noting that "arguments that an independent contractor relationship is shown by . . . the need to comply with the regulations of federal and state agencies do not persuade us" before affirming the conclusion that workers were employees under the FLSA).



Uber also included notes and other information about drivers in their personnel files. (PX-250-014; *see also* PX-227-001–13). These notes included information on whether drivers were especially "good" or "bad", including "VIP" drivers, "detractor" drivers (who Uber believed disparaged Uber), etc. (PX-226-007). As Tara Murray testified, drivers could be given special perks for being considered "good" drivers (such as being able to receive preference on higher paid requests for SUV rides, participating in promotions like delivering flowers on Valentine's Day, and most significantly being matched with "better" [higher rated] customers).



### 6. *Uber constantly surveilled Plaintiffs.*

Murray and Razak also testified that Uber tracked drivers by logging their every move and interaction with the App. Uber, in turn, sent notifications to Plaintiffs about the quality of their driving. This constant surveillance also allowed Uber to amass troves of data on each driver. (*See* PX-243, PX-244, PX-245, PX-251, PX-334).

Using this data, Uber decided when to turn on "surge pricing," which temporarily increased the prices of fares in a certain area. (*See, e.g.*, PX-170-001–00002). Uber used "surge pricing" to lure drivers into these areas. But drivers who went to these areas did not always receive higher fares. (PX-170). In other words, Uber decided whether drivers benefitted from surge pricing.

Uber also used its surveillance system for disciplinary purposes. For instance, Murray testified that Uber had tracked 17 drivers who were jumping the airport queue by locking their location in the App. Uber deactivated these drivers without warning.

### 7. *Uber controlled where drivers could work.*

As discussed above, Uber deactivated drivers for locking their location at the airport. Murray testified that Uber later reactivated these drivers but blocked them from working at the airport. Razak also testified that he performed UberBLACK services in New Jersey, but only when Uber allowed him to work there. (*See also* PX-195-011). In other words, Uber did control where drivers could work.

### 8. *Drivers could not exceed Uber's maximum cancellation rate.*

According to the "Driver Deactivation Policy" that Uber shared with drivers, each city had a "maximum cancellation rate" based on "the average cancellation rate of drivers in that area." (PX-302-001). Uber would "alert [drivers] multiple times if [their] cancellation rate [was] much higher or if [they were] consistently cancelling more often than other drivers." (PX-302-001). If a driver's cancellation rate continued to "exceed the maximum limit," their "account would be deactivated." (PX-302-001). Drivers were also contractually obligated to "fully complete a Request after acceptance" unless cancelled by Uber or the rider (meaning that their contract did not actually allow them to cancel a ride). (JX-001-011).

Holtzman-Conston disputed whether Uber had a maximum cancellation rate in Philadelphia during the relevant period, but his testimony was contradicted by Chad Dobbs, Uber's other

witness, who admitted that Philadelphia had a maximum cancellation rate (like other cities).[5] Dobbs also admitted that Uber deactivated drivers for their cancellation rate. Uber's national deactivation policy also informed drivers that they could be deactivated for cancellation rates that were too high. (PX-302-002). Moreover, the fact that drivers were told that they could be deactivated for cancelling too many rides, but not told specifically what the exact limit was, kept them in the dark and thus motivated *not* to cancel rides, lest they be deactivated.[6]

### 9. *Drivers could be deactivated for not accepting trips.*

During the relevant period, drivers were contractually obligated to accept "at least 80% of the Customer Requests/Requests Gegen . . . provided to [a driver] in a thirty (30) day period, provided that Gegen [had] presented at least 60 Customer Requests . . . in that same period." (JX-001-012). Failure to adhere to Uber's minimum acceptance rate was a "material breach" of a driver's contract, and thus entitled Uber to terminate the contract. (JX-001-011).

Later on, Uber softened its acceptance rate policy so that if a driver was "consistently not accepting trip requests" or "declining more trips than other drivers," the driver would be suspended for "a short period of time." (PX-302-002). Still, drivers had to agree "to only make [themselves] available to receive Requests during such times as [they were] generally able to accept Requests that [were] offered." (JX-001-002).

---

[5]     And, in any event, it is Uber's *right* to terminate drivers that is determinative under the FLSA. *Razak*, 951 F.3d at 145.

[6]     As Plaintiff Khaldoun Cherdoud testified, he tried not to cancel rides because he was afraid that Uber would deactivate him. While Uber later tried to show that the named Plaintiffs had cancelled many rides without being deactivated, Tara Murray testified that the named Plaintiffs were treated "with kid gloves" by Uber staff because they had filed this lawsuit.

Tara Murray also testified that if drivers left the country or went on vacation without informing Uber that they would be away, they could be deactivated while they were gone based on not logging on and accepting trip requests.

### 10. Uber required drivers to use luxury vehicles that were no more than five years old.

Uber maintained a list of acceptable black cars that Plaintiffs were allowed to use. Uber's vehicle list was narrower than the Philadelphia Parking Authority' list. Uber also had more restrictive vehicle age and mileage limits.

### 11. Uber subjected drivers to its own background checks.

Uber subjected drivers to its own background checks, separate from the background check that the Philadelphia Parking Authority conducted. (PX-111-001). Uber told drivers that its "background check [was] more thorough and [was] a requirement to remain an active driver with Uber." (PX-111-001). Uber explained that, because of its more thorough background check, riders were "more likely to use Uber again, and again." (PX-111-001).

### 12. Uber imposed a dress code for black car drivers.

Uber imposed a "Dress Code" on Plaintiffs and other black car drivers. (PX-204-005). In a weekly message, Uber reminded drivers that "[j]acket and/or tie are **required by Uber**." (PX-204-005) (emphasis added). Uber explained to drivers that "[c]lients will appreciate the presentation and recognize the five-star service you are offering them." (PX-204-005).

## B. Second Factor: Uber controlled Plaintiffs' opportunity for profit or loss when performing services as UberBLACK drivers.

The second economic realities factor considers Plaintiffs' control over their profit or loss as UberBLACK drivers. As Murray testified, that opportunity boiled down to Plaintiffs working more hours. But as the Court recognized in its prior jury instructions, courts have uniformly rejected that a worker's ability to "hustle" or work more amounts to an opportunity for profit or loss.

*See, e.g.*, *McFeely v. Jackson St. Ent., LLC*, 825 F.3d 235, 243 (4th Cir. 2016); *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993); *Scantland*, 721 F.3d at 1316.

The evidence also confirmed that Uber unilaterally introduced and promoted UberX in Philadelphia. Plaintiffs had no say in this decision, even though it decimated their earnings as UberBLACK drivers. Where, as here, a defendant controls prices, operations, and advertising, a worker has little opportunity for profit or loss based on managerial skill. *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 231 (3d Cir. 2019).

### 1. *Uber unilaterally set fares and rates.*

As Dobbs confirmed, Uber determined how much drivers earned for each trip. Drivers could not negotiate fares. (*See, e.g.*, JX-11-008 at ¶¶ 4.1–4.3). Nor could drivers negotiate Uber's commission on each fare. (*See, e.g.*, JX-11-008 at ¶ 4.4).

Dobbs also confirmed that when customers used a stolen credit card or chargebacks to avoid paying for a ride, Uber would decide whether to still pay the driver. Whether the driver was paid in such instances would depend on whether Uber thought the driver was complicit in the fraud.

Uber also decided whether to pay a driver during App outages. (*See, e.g.*, PX-225). For example, Uber compensated drivers who were "knocked out of the airport queue" because of a technical issue. (PX-225).

There were also times when Uber paid black car drivers a guaranteed wage. (*See, e.g.*, PX-195, PX-197, PX-204). To qualify for these guaranteed wages, a driver would have to have a certain acceptance rate and be driving in a particular location or a certain time (for instance after 2:30 a.m.). (*See, e.g.*, PX-195-002). For example, a driver might qualify for a guaranteed hourly rate by accepting eight out of every ten trips. (PX-195-002). Cancelling too many trips might disqualify a driver from receiving a guaranteed hourly rate.

### 2. Uber controlled trip assignments and precluded drivers from making informed business decisions.

Uber controlled trip assignments through the App. Uber also hid the rider's destination until after the driver accepted and started a trip, with the passenger already in the car. (*See* PX-330). And, regardless, drivers had only about 15 seconds to accept a trip request by tapping the screen. (PX-330-004–005). Thus, drivers had no way to select only long, profitable trips.

Uber policy also barred drivers from rejecting a trip based on the end destination. (PX-195-007). Uber also prohibited drivers from calling a rider to ask for their destination before picking them up:

> ### Uber Policy:
> Drivers are not allowed to call riders and ask for their destination before picking them up. Drivers cannot reject a trip based on the end destination, do not accept the trip if you do not want to drive to the pickup location

(PX-195-007).

Nor could drivers attract more profitable riders by providing higher-quality service, as customers could not select a particular driver through the app. Uber likewise barred drivers from giving out their personal business cards. (PX-184-003). There were "no exceptions to this policy and drivers [would] be deactivated permanently if . . . caught doing this even once." (PX-184-003). Uber also precluded drivers from delegating trips to other drivers. (PX-192).

### 3. Uber decided what fees to charge customers.

Uber also decided whether to charge a cleaning fee to customers. Murray explained that to obtain a cleaning fee, drivers had to "take a picture of the mess and submit it via the Uber app." Uber's representatives would then decide whether the driver deserved a cleaning fee.

Uber also decided whether to charge customers a cancellation fee. For instance, if a customer cancelled a trip request after five minutes, Uber would charge the customer and pay the

driver for waiting. If a driver was wrongfully denied a cancellation fee, the driver would have to visit the Uber office to resolve the issue with an Uber representative.

### 4. *Uber controlled business expenses through automatic deductions.*

Uber deducted pay from the drivers' weekly earnings to cover business expenses, including Gegen's liability insurance, Philadelphia Parking Authority stickers, and vehicle finance payments. (*See, e.g.*, PX-237; PX-242; PX-233). For this reason, drivers could not decide when and whether to pay for these expenses. If a driver did not earn enough income from fares to cover these deductions, they would go into debt with Uber. As the evidence showed, this debt trap compelled drivers to provide five-star service over longer hours.

### C. Third Factor: Uber's investment dwarfed Plaintiffs' investment.

The third economic realities factor considers the *relative* investment that Plaintiffs made, as compared to the investment of Uber in building and maintaining its platform and business. *Verma*, 937 F.3d at 231 ("a dancer's investment is minor when compared to the club's investment"); *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) ("it is appropriate to compare the worker's individual investment to the employer's investment in the overall operation"); *Flores*, 250 F. Supp. at 488-89 (holding that drivers' investment in their vehicles were "minimal compared to the total capital investment necessary to operate" the defendant's business).

Uber has spent billions of dollars building and operating its platform. (PX-246-003). This investment towers over what Plaintiffs spent on their vehicles and other business expenses, which Uber otherwise controlled through weekly deductions. This factor, therefore, favors Plaintiffs.

### D. Fourth Factor: Driving a black car does not require a special skill.

The fourth economic realities factor considers whether the services that Plaintiffs rendered for Uber required a special skill. The Third Circuit has already decided that driving a black car does not involve a special skill. *Razak*, 951 F.3d at 147 ("Although there may be a distinction

between 'driving' and 'replicat[ing] the limousine experience,' . . . this is not enough to overcome the presumption that driving is not a special skill."); *see also Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014) ("FedEx drivers need no experience to get the job in the first place and [the] only required skill is the ability to drive."). This factor supports Plaintiffs.

### E. Fifth Factor: Plaintiffs worked long hours over extended periods.

The fifth economic realities factor is the degree of permanency of Plaintiffs' relationship with Uber. This factor considers whether Plaintiffs' relationship with Uber was "a transitory one." *DialAmerica*, 757 F.2d at 1384-85; *Verma*, 937 F.3d at 231 ("the average dancer in the class worked for the Club in only 14 of the 109 workweeks"). The record establishes a continuous and intense working relationship between Plaintiffs and Uber, reflecting an employment relationship.

Sabani and Cherdoud began working for Uber in December 2013, and Razak started in July 2014. (PX-243; PX-245; PX-245). Trial covered events before January 11, 2018, which amounts to less than 1,500 potential workdays for all three Plaintiffs. (ECF No. 148).

Over that period, Razak completed 5,602 trips, Sabani completed 4,854 trips, and Cherdoud completed 6,518 trips. (DX-501; DX-503; DX-505). Plaintiffs worked almost every week and logged at least 40 hours online in each week they worked. (PX-243, PX-244, PX-245; PX-334; DX-502; DX-504). Plaintiffs also derived nearly all their income from Uber.

For example, Cherdoud, whose tax returns detailed what he earned from Uber versus other sources, showed that 100% of his income came from Uber in 2014 and 2015. (D466-015; DX-467-027). Driving for Uber accounted for 85% of his income in 2016 and 91% of his income in 2017. (DX-468-015; DX-470-007). These figures confirm that Cherdoud spent most of his time working for Uber, not other companies.

### F. Sixth Factor: Uber's own statements and actions confirm that Plaintiffs' services were integral to Uber's business.

The sixth economic realities factor considers whether Plaintiffs' services were integral to Uber's business. To that end, this Court has already held that "Uber drivers are an essential part of Uber's business as a transportation company." *Razak v. Uber Techs., Inc.*, No. 16-cv-573, 2018 WL 1744467, at *19 (E.D. Pa. Apr. 11, 2018) ("Indeed, it seems beyond dispute that if Uber could not find drivers, Uber would not be able to function.").

Other courts have reached the same conclusion. *See, e.g.*, *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1142 (N.D. Cal. 2015) ("Uber simply would not be a viable business entity without its drivers."); *People v. Uber Technologies, Inc.*, 56 Cal. App. 5th 266, 292 (2020) ("[a] number of cases have considered contentions that ride-sharing companies such as Lyft and Uber are in the business of creating technological platforms, not of transporting passengers, and have dismissed them out of hand"); *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 911 (N.D. Cal. 2020).

Uber's own statements—at least those outside the courtroom—also affirm the integral role of drivers in Uber's business. For example, Uber told Plaintiffs and other drivers that they deserved a better "driving . . . experience, because simply put, Uber wouldn't exist without [them]." (PX-216-001). In another email to Plaintiffs, Uber said it was "focus[ing] on providing awesome resources to help [drivers] grow ***our*** business." (PX-330-001) (emphasis added). And when Uber dealt with regulatory agencies, it called itself a "limousine company." (PX-109, PX-120). In fact, Uber used the trademark, "everyone's private driver." (PX-208). *See also* USPTO No. 85816634.

Uber also understood that its reputation turned on the quality of its drivers. (PX-250-005) ("Deactivating the accounts of the partners who provide consistently poor experiences ensures that Uber continues to be known for quality."). In the same vein, Uber attributed its revenue to drivers. (PX-330-001) ("We've had a great 2013 in Philadelphia thanks to you, our Uber Partners."). Or as

one court put it, "Uber's revenues [did] not depend on the distribution of its software, but on the generation of rides by its drivers." *O'Connor*, 82 F. Supp. 3d at 1142.

Uber's own head of operations in the United States and Canada described the centrality of drivers to its business: "Drivers are at the center of the Uber experience." (PX-229). Simply put, drivers depended on Uber, and Uber depended on drivers. And with billions of dollars invested into its business, Uber, as matter of economic reality, needed to control its drivers, so as to provide the best service possible to its customers. (PX-246-003).

**G.      Uber willfully misclassified Plaintiffs.**

Although not necessary for Plaintiffs to prevail on their claims, the trial record shows that Uber willfully misclassified Plaintiffs and other drivers. Uber's Philly Quality Playbook, for example, joked, "**Hello, Legal!**," when providing a reminder to staff to refer to drivers as independent contractors.[7] (PX-101-007). Similarly, Uber trained its staff to avoid language connotating an employment relationship. For instance, Uber's internal deactivation manual told staff to say "deactivate" instead of "terminate":

> **Do NOT use any language to imply they have been fired, let go, or terminated.**
>
> DO NOT imply that a driver has been terminated. We've ended the partnership or deactivated the account. We haven't fired anyone.

(PX-250-017, 34) (emphasis in original).

In fact, Uber failed to explain why it required Plaintiffs and other black car drivers to form their own business entities. Nor did Uber explain why it referred Plaintiffs to the same accountant

---

[7]      Of course, if the drivers were clearly independent contractors, there would have been no reason to keep providing these reminders. Tara Murray testified that Uber frequently reminded staff to refer to drivers as independent contractors and not use terminology to suggest they were employees.

to create their business entities. The Court should thus infer that Uber imposed this requirement to try to give itself a defense to misclassification and wage claims.

Other courts have made the same inference. *See, e,g.*, *Maranzano v. S-L Distribution Co., 2020* WL 7974332, at \*4 (M.D. Pa. Dec. 18, 2020) ("Indeed, if any business could avoid [wage and hour laws] by simply classifying their workers as independent contractors and compensating them through corporations rather than paying them directly, [wage laws] would be rendered useless."); *Cummings v. Cenergy Intl. Services, LLC*, 2017 WL 4180972, at \*6 (E.D. Cal. Sept. 20, 2017) ("[C]orporate entities were formed by Plaintiffs as a specific requirement of Cenergy . . . These allegations create a reasonable inference that the corporate entities were created for no purpose of Plaintiffs and solely for the benefit of Cenergy . . . as a corporate fiction[.]"); *see also Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) ("individuals who form corporate entities and enter franchise agreements as required by Jani-King 'nonetheless personally perform the janitorial work on behalf of Jani-King' and, based on the economic realities of this relationship, are Jani-King's employees under the FLSA").

## IV. CONCLUSION

The trial record is vastly different from what the parties presented to the Court on summary judgment. Indeed, Uber produced most of its internal policies and records *after* the Third Circuit reversed summary judgment. That evidence, along with the trial testimony, establishes that Plaintiffs were Uber's employees under federal and state law. The Court should grant this motion because, as a matter of law, Plaintiffs were Uber's employees. No reasonable jury could find otherwise.

Dated: June 14, 2024

Respectfully submitted,

s/ Shannon Liss-Riordan
Shannon Liss-Riordan (*pro hac vice*)
Thomas Fowler (*pro hac vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
sliss@llrlaw.com
tfowler@llrlaw.com

Jeremy E. Abay (PA # 316730)
LICHTEN & LISS-RIORDAN, P.C.
76 E. Euclid Avenue, Suite 101
Haddonfield, NJ 08033
(856) 509-5346
jabay@llrlaw.com

Bret Stanley (*pro hac vice*)
THE STANLEY LAW FIRM, PLLC
1700 Richmond Avenue, Suite 1700
Houston, TX 77079
(832) 856-6486
bstanley@stanleypllc.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Shannon Liss-Riordan, certify that on June 14, 2024, a true and accurate copy of the foregoing document was served on counsel for Defendants by filing on the Court's CM/ECF system.

_s/ Shannon Liss-Riordan_____
Shannon Liss-Riordan