IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALI RAZAK, KENAN SABANI, and KHALDOUN CHERDOUD,<br><br>  Plaintiffs,<br><br>  v.<br><br>UBER TECHNOLOGIES, INC. and GEGEN LLC,<br><br>  Defendants. | Civil Action No. 2:16–CV–00573–MMB<br><br>Judge Michael M. Baylson |

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW

Defendants Uber Technologies, Inc. and Gegen LLC move for judgment as a matter of law. Fed. R. Civ. P. 50(a).

### ARGUMENT

Judgment as a matter of law is appropriate under Rule 50(a) where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). That is the case here.

The sole question presented in this trial is whether Plaintiffs were Defendants' "employees" or whether they were instead "independent contractors" for purposes of the Fair Labor Standards Act (FLSA), the Pennsylvania Minimum Wage Act (PMWA), and the Pennsylvania Wage Payment and Collection Law (WPCL). ECF 138, 148. Plaintiffs bore the burden of proving their employee status, *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 143 (3d Cir. 2020); *see also* ECF 157 at 3–4, 8–9, yet their own witnesses demonstrate that they cannot, as a matter of law, meet that burden.

For all of Plaintiffs' claims set for this trial, the standard is effectively the same: "[W]hether, as a matter of economic reality, the individuals 'are dependent upon the business to which they render service.'" *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985) (quoting *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981)); *see also* ECF 313 at 13–27, 34 (holding that the classification standards under FLSA, PMWA, and WPCL operate the same way, despite the WPCL test having additional, related factors). As the Court knows, the economic realities test consists of a holistic assessment of various factors, with no single factor being determinative or dispositive. *Razak*, 951 F.3d at 142–43 (quoting *DialAmerica*, 757 F.2d at 1382)). Rather, the economic reality between the parties must take account of "the circumstances of the whole activity." *DialAmerica*, 757 F.2d at 1382, 1387.

Under the economic realities test, "a court may decide the employee/independent contractor question as a matter of law if the factors point so favorably in one direction that a fact finder could not reasonably reach the opposite conclusion." *Alberty–Velez v. Corporacion de Puerto Rico Para La Difusion Publica*, 361 F.3d 1, 7 (1st Cir. 2004); *see also Yu v. McGrath*, 597 F. App'x 62, 66 (3d Cir. 2014); *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 632–33 (1st Cir. 1996); *cf. Castillo v. Givens*, 704 F.2d 181, 185 & n.9, 188 (5th Cir. 1983) (district court erred in submitting the issue to the jury where the undisputed facts established employment status), *overruled on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134 (1988)).

Judgment as a matter of law is appropriate because Plaintiffs' own witnesses and evidence establish that every factor weighs in favor of their independent contractor status, such that no reasonable jury could find them to be employees on the evidence presented at trial.

**1. Degree of Uber's Right to Control the Manner in Which the Work is to Be Performed**

The first, and most important, factor is the degree of the alleged employer's right to control

the manner in which the work is to be performed. *Razak*, 951 F.3d at 145 (noting that the "right to control" factor is "highly relevant to the FLSA analysis"). Plaintiffs have utterly failed to show that Defendants "controlled" them in any meaningful sense.

### A. Uber Lacked the Control Typical of an Employer.

Plaintiffs' relationship with Uber bears the hallmark characteristics of independent contracting. When workers set their own hours,[1] get paid on a "per job" basis rather than hourly,[2] are free to accept or reject jobs,[3] and are not "directly supervised,"[4] then they are independent contractors, not employees. Period. Plaintiffs openly conceded that they in fact operated entirely free of Uber's control insofar as they (a) had complete freedom to choose their own hours, 6/10 Trial Tr. 148:24–149:1 (Cherdoud); 6/12 Trial Tr. 75:6–10 (Murray), 124:13–16 (Sabani); 6/13

---

[1] *See Razak*, 951 F.3d at 146 (noting that whether Uber "control[s] the 'schedule start or stop times' for drivers or 'require[s] them to work for a set number of hours'" is relevant "to whether Uber retains the right to control the Plaintiffs' work"); *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 379, 380 (7th Cir. 1991) (holding that district court did not err in relying on the fact, among others, that plaintiff "set her own hours" to determine alleged employer lacked the control required for employee status); *Herman v. Express Sixty–Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998) (finding alleged employer "had minimal control over its drivers" where the drivers "set their own hours and days of work"); *Arena v. Delux Transp. Servs., Inc.*, 3 F. Supp. 3d 1, 10–11 (E.D.N.Y. 2014) (fact that defendants had little control over when plaintiff drove or how much he drove supported independent contractor status); *cf. Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1294 (3d Cir. 1991) (finding employee status where, among other things, the alleged employer "controlled the hours of operation").

[2] *Luxama v. Ironbound Express, Inc.*, 2012 WL 5973277, at *4, *5 (D.N.J. June 28, 2012) (finding that alleged employers had little control over plaintiffs where, among other things, the plaintiffs "retain[ed] the authority to … determine the working hours it will observe" and were "paid on a 'per–trip basis'"). Even Plaintiffs' own evidence established as much. One of Plaintiffs' witnesses testified that, when he was employed by a taxi company as an employee before transitioning to using the Uber app, he was paid hourly. 6/11 Trial Tr. 114:13–16 (Torres).

[3] *Herman*, 161 F.3d at 303 (ability to reject jobs was indicative of independent contractor status); *contra Sigui v. M + M Commc'ns, Inc.*, 484 F. Supp. 3d 29, 39 (D.R.I. 2020) (the fact that plaintiffs "could not refuse jobs" favored employee status).

[4] *DialAmerica*, 757 F.2d at 1384.

Trial Tr. 10:8–23 (Razak);[5] (b) could go online and offline as they pleased, 6/10 Trial Tr. 178:20–179:13, 180:21–25, 196:21–197:2 (Cherdoud); 6/11 Trial Tr. 51:17–52:1 (Cherdoud); 6/12 Trial Tr. 76:12–22 (Murray), 124:17–19 (Sabani); 6/13 Trial Tr. 11:10–13, 30:6–9 (Razak); (c) could engage in other activities while online and waiting for a ride, such as taking a smoke break or grabbing a cup of coffee, 6/11 Trial Tr. 54:7–55:10 (Cherdoud); 6/13 Trial Tr. 36:1–6 (Razak); Def. Exs. 424, 425; (d) could choose where to drive, 6/10 Trial Tr. 181:3–14, 189:9–190:7, 195:8–196:5, 196:6–20 (Cherdoud); 6/12 Trial Tr. 76:20–76:1 (Murray), 124:20–22 (Sabani); 6/13 Trial Tr. 14:1–20, 15:12–18 (Razak); (e) could (and in fact did) reject trips sent to them by Uber, 6/10 Trial Tr. 202:3–9, 202:24–205:9, 206:14–208:23 (Cherdoud); 6/11 Trial Tr. 115:23–116:14 (Torres), 134:12–16 (Murray); 6/12 Trial Tr. 76:2–8 (Murray), 124:23–25, 125:4–9 (Sabani); 6/13 Trial Tr. 26:21–24, 28:7–16 (Razak); Def. Ex. 505 (showing that Cherdoud rejected 994 trip requests during a particular time period); (f) could (and in fact did) cancel individual rides after accepting a trip, 6/10 Trial Tr. 123:19–25 (Cherdoud); 6/12 Trial Tr. 76:9–11 (Murray), 125:1–3, 131:9–132:7 (Sabani), 234:25–235:3 (Razak); 6/13 Trial Tr. 32:10–13, 33:7–15 (Razak); (g) were paid on a "per–trip," rather than hourly basis, Pl. Ex. 240; 6/11 Trial Tr. 138:8–11; and (f) had control over what route to take to get a passenger to her destination, 6/11 Trial Tr. 47:23–48:2 (Cherdoud).

For example, Cherdoud acknowledged that he had "the sole right to determine when, where and for how long [he] would utilize the [Uber] app," and that he chose "when to go online" and "when to go offline." 6/10 Trial Tr. 178:20–179:13. In 2017, Razak chose to remain offline for two months because he went overseas, and he did not ask Uber for permission to do so (nor did he

---

[5] Defendants have attached transcripts of Day 1 through 4 of trial, which covers the entirety of Plaintiffs' case-in-chief.

4

need to). 6/13 Trial Tr. 11:17–19, 12:2–14, 13:17–21. In contrast, as one of Plaintiffs' own witnesses acknowledged, when black car drivers are *employees* of various limousine companies (rather than engaging in independent contracting work with Uber), they work set shifts and cannot refuse a job assigned to them. 6/11 Trial Tr. 82:25–84:5, 113:16–18, 114:5–115:5 (Torres).

Furthermore, Plaintiffs all admitted that they could and *did* work with others during their relationship with Uber. "[O]n its face, a company relinquishes control over its workers when it permits them to work for its competitors." *Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 141 (2d Cir. 2017). Cherdoud admitted to contracting with another limousine company—Freemo Limo—and also to soliciting private trips (usually by parking near hotels) at the same time he was using the Uber app. 6/10 Trial Tr. 127:17–20, 133:20–22, 134:12–22, 148:8–11; 6/11 Trial Tr. 18:2–20, 19:14–23:6, 34:19–35:11, 56:22–57:6, 64:6–8. Indeed, almost half of Cherdoud's personal income in 2016 came from rides sourced through Freemo, rather than through the Uber app. 6/11 Trial Tr. 18:17–20, 39:12–41:7, 42:1–12; *see also* 6/12 Trial Tr. 115:15–18, 180:1–4 (Sabani). Sabani provided up to two hundred trips outside of the Uber app through his independent company, Freemo Limo. 6/12 Trial Tr. 115:7–14, 172:3–17, 183:24–184:8; Def. Ex. 442. Indeed, over the course of approximately two years, Freemo earned a gross amount of $139,724.22 from private rides. Def. Ex. 444; 6/12 Trial Tr. 181:5–20, 185:16–22 (Sabani). Razak and his brother formed their limousine company, Luxe Limousine, over a year *before* signing up to use Uber's app. Def. Ex. 403; 6/12 Trial Tr. 269:2–19, 271:5–12. While contracting with Uber, both Razak personally and Luxe generally provided services to customers sourced through Blacklane, a German international limousine company. 6/12 Trial Tr. 261:13–262:7, 262:11–15; 6/13 Trial Tr. 44:17–45:4, 46:5–13, 47:1–10; Def. Ex. 428.

The agreements between Plaintiffs and Uber reflected this economic reality. All three Plaintiffs acknowledged signing "technology services agreements" in order to use Uber's app. 6/10 Trial Tr. 169:18–24, 170:13–171:17, 173:22–174:11 (Cherdoud); 6/12 Trial Tr. 121:9–122:5 (Sabani); 6/13 Trial Tr. 6:11–25, 7:10–13, 8:14–9:22, 22:24–25 (Razak). Those agreements said that "the relationship between the parties under this Agreement is solely that of independent contracting parties" and that "the parties expressly agree that … this Agreement is not an employment agreement, nor does it create an employment relationship, between Uber and Customer." Joint Ex. 11; *see also* 6/10 Trial Tr. 173:15–174:24, 176:7–21, 177:15–178:1 (Cherdoud); 6/12 Trial Tr. 121:9–122:5 (Sabani). Further, the contracts stated that each plaintiff "acknowledges and agrees that it has complete discretion to operate its independent business and direct its drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from the transportation services that you obtained through access to the Uber app." Joint Ex. 11; 6/11 Trial Tr. 13:20–14:5 (Cherdoud); 6/13 Trial Tr. 40:13–21 (Razak). Although Uber collected payments from riders and then passed them along to the limousine companies, the technology services agreements made it clear that Uber was only acting as a "limited payment collection agent, offering their technology to facilitate payment between riders and the limousine companies easier. Joint Ex. 11, § 4.1; 6/10 Trial Tr. 175:14–176:6 (Cherdoud). These contracts plainly reflect what the parties understood their relationship to be at the time. *See Saleem*, 854 F.3d at 141; *see also Williams v. Jani–King of Philadelphia Inc.*, 837 F.3d 314, 323 (3d Cir. 2016); *Holder v. Bingnear*, 1991 WL 7381, at *4 (E.D. Pa. Jan. 18, 1991).

Finally, the fact that Plaintiffs all owned and operated their own LLCs strongly suggests independent contractor status.[6] *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 846 (5th Cir. 2010); *Freund v. Hi–Tech Satellite, Inc.*, 185 F. App'x 782, 783 (11th Cir. 2006); *see also Frankel v. Bally, Inc.*, 987 F.2d 86, 91 (2d Cir. 1993).

### B. The Facts That Plaintiffs Focused on Do Not Establish Control.

Ignoring the facts above, Plaintiffs at trial purported to show sufficient control by pointing to various policies or practices utilized by Uber. As explained below, none of these facts actually demonstrate the control required for an employer–employee relationship to exist.

Plaintiffs attempted to show that Uber controlled them through the threat of deactivation. But, although the Plaintiffs claimed they were *afraid* of being deactivated, *e.g.*, 6/10 Trial Tr. 84:8–10; 6/12 Trial Tr. 243:4–7, Plaintiffs never brought forward any evidence that they were in fact permanently deactivated, *see* 6/10 Trial Tr. 205:17–22 (Cherdoud testifying that he never actually got into trouble with Uber for a low rating); 6/12 Trial Tr. 192:12–14; 198:22–199:15 (Sabani testifying that he was never permanently deactivated). And Razak only speculated that he "could" be deactivated for canceling too many trips—he did not testify that he had been deactivated for canceling trips. 6/12 Trial Tr. 243:8–11; 6/13 Trial Tr. 31:17–32:2, 34:6–15 (testifying that he did not recall whether he had been deactivated for canceling trips).

---

[6] 6/10 Trial Tr. 119:6–10, 119:21–120:6, 157:5–158:13, 168:11–14 (Cherdoud); Def. Ex. 465 (Articles of Incorporation for Milano Limo Inc. showing Cherdoud's name and address); Def. Ex. 463 (Notice of Corporate Registration for Milano Limo Inc. showing Cherdoud's name and address); 6/12 Trial Tr. 83:24–84:3, 84:18–19, 163:5–19, 165:10–14, 168:12–20 (Sabani); Def. Ex. 433 (Freemo's Certification of Organization for the State of Pennsylvania, signed by Sabani); Def. Ex. 434 (IRS letter addressed to Sabani providing Freemo an Employer Identification Number); 6/12 Trial Tr. 227:23–228:10, 269:20–270:15, 273:10–277:14 (Razak); Def. Ex. 403 (Articles of Incorporation for Luxe Limousine showing Razak's name and signature); Def. Ex. 405 (Luxe's application to PUC, stating "We both Umer Razak and Ali Razak work with Gegen LLC" and "We are planning to use 2-6 vehicles in our business"); *see also* 6/11 Trial Tr. 88:16–18, 113:9–15 (Torres).

Even where Plaintiffs introduced evidence, upon examination, those facts do not actually show control by Uber. For one, individuals or entities who employ independent contractors are allowed to engage in some amount of "control." Specifically, they can "control" independent contractors in ways to "verify that the task was done properly" or to "supervis[e]" the terms of the independent contract. *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 148 (4th Cir. 2017) (applying this reasoning to the joint employment context). Indeed, "specifications and quality control inhere in any subcontractor relationship." *Chao v. Mid–Atlantic Installation Servs., Inc.*, 16 F. App'x 104, 106 (4th Cir. 2001) (cleaned up). Most of the policies and procedures of Uber on which Plaintiffs relied demonstrate *this* sort of non–employment control. For example, unable to show that Uber "directly supervised" them, *see DialAmerica*, 757 F.2d at 1383–84, Plaintiffs insinuated that Uber "monitor[ed]" them through its technology and by collecting data, 6/10 Trial Tr. 135:5–13 (Cherdoud); 6/12 Trial Tr. 6:17–19 (Murray), 197:20–21 (Sabani); 6/13 Trial Tr. 28:14–16, 90:19–91:7 (Razak). But data collection was necessary for Uber to ensure that its technology was working properly, to ensure the safety of all involved, and also to make sure that all the customers that utilized it (drivers and passengers alike) were satisfied with the product. *See* Joint Ex. 11; Pl. Ex. 301 at PX-301-014–015. Tara Murray further acknowledged that Uber lacks information about "issues with drivers" unless riders *reported* those issues. 6/12 Trial Tr. 73:24–74:1.

Additionally, Plaintiffs pointed to various rules that Uber purportedly imposed on them, for example, that they wear "suits and ties" and maintain a certain level of hygiene. *Id.* 9:17–25, 21:17–22:10 (Murray). But those purported demands were legal requirements imposed by the Philadelphia Parking Authority (PPA), not Uber. For example, the PPA required that black car drivers adhere to a certain dress code, maintain hygiene standards, and drive a particular type of

car. *See*, *e.g.*, 6/11 Trial Tr. 46:1–47:17, 48:7–24 (Cherdoud), 115:14–22 (Torres), 131:20–132:3, 138:8–11 (Murray); 6/12 Trial Tr. 48:25–49:8, 64:3–10, 76:12–22 (Murray), 137:14–139:2, 139:9–11, 139:21–140:3, 140:8–18, 142:5–8, 142:19–143:3, 143:21–144:12 (Sabani); Def. Exs. 401, 402. And other so-called Uber requirements Plaintiffs identified were mandated by federal or state law. *See*, *e.g.*, 6/12 Trial Tr. 17:18–18:4 (ADA requirement that drivers accept service animals), 19:17–20:4 (illegal to "solicit trips off the street"), 64:21–24 (airport imposed waiting lot requirement), 69:19–25 (illegal to drive drunk).

Finally, Plaintiffs claimed Uber's practices of offering tips to drivers via email and economic incentives are evidence of control. For example, Plaintiffs established that Uber would send out information about situations in which they expected high demand for drivers (for example, a baseball game) or tips on how drivers could increase their rating. 6/10 Trial Tr. 131:19–132:4, 182:23–183:20 (Cherdoud); 6/12 Trial Tr. 20:10–21 (Murray), 134:4–9 (Sabani); 6/13 Trial Tr. 16:8–13 (Razak). But far from being "direct instructions," these emails were just "pro tips" that drivers were free to reject without consequence. 6/10 Trial Tr. 183:21–184:6, 184:19–25, 186:15–21 (Cherdoud); 6/12 Trial Tr. 21:22–22:10 (Murray testifying that she "saw a lot of drivers who didn't [wear a suit and tie]" despite Uber's pro tip suggesting they do so), 77:17–25 (Murray testifying that Uber "could not tell [drivers] what to do"), 134:4–14 (Sabani testifying that he could "ignore the emails" if he wanted to); 6/13 Trial Tr. 16:14–17:5 (Razak testifying that he "d[idn't] have to read" the emails). Further, Plaintiffs highlighted Uber's various incentive offers, including pay guarantees, that allowed drivers to earn more money in areas of higher demand. 6/11 Trial Tr. 144:17–25, 146:19–23, 153:16–154:11 (Murray). But as Tara Murray acknowledged, such incentives were used because Uber "couldn't tell drivers when to drive." 6/12 Trial Tr. 75:12–19; *see also* 6/10 Trial Tr. 186:15–21 (Cherdoud testifying that

9

he avoided areas with "surge" pricing); 6/13 Trial Tr. 17:6–16 (Razak testifying that he did not have to drive in places with high demand).

Similarly, Plaintiffs asserted that Uber "controlled" them by providing referrals for the various services a black car driver would need, for example, recommending a car dealership, an accountant to help with incorporation and taxes, and an insurance company, with Uber fronting the costs and then Plaintiffs paying them back in installments. *See* 6/10 Trial Tr. 112:24–114:14, 115:10–116:3, 125:6–11, 159:13–160:25 (Cherdoud). But Plaintiffs did not *have* to use Uber's recommendations, but rather *could* have found their own dealerships, accountants, or insurance and *could* have paid for those items themselves. *Id.* 164:5–11, 166:21–167:18 (Cherdoud); 6/12 Trial Tr. 67:12–20, 68:8–14 (Murray). In the end, Plaintiffs chose to utilize Uber's recommendations because it was easier, and because it gave them an opportunity to become independent black car drivers without needing substantial savings to cover the upfront costs. *See* 6/12 Trial Tr. 67:7–68:7.

### 2. Plaintiffs' Opportunity for Profit/Loss Depending on Managerial Skill

As to the next factor, Plaintiffs' own evidence established their "opportunity for profit or loss depending upon [their] managerial skill." *Razak*, 951 F.3d at 142 (quoting *DialAmerica*, 757 F.2d at 1382). Plaintiffs were able to utilize their managerial skills both within and outside of Uber.[7]

Outside of Uber, Plaintiffs all owned and operated their own businesses, and thus could generate profits (or incur losses) based on the decisions they made in investing and operating their

---

[7] The Third Circuit suggested that it was an open question whether "this factor looks only toward opportunity for profit or loss *within* the alleged employment relationship or whether it also contemplates one's ability to make money elsewhere—as such, external factors, such as the ability to earn outside revenue without terminating the Uber–driver relationship." *Razak*, 951 F.3d at 146 n.9. Uber maintains that Plaintiffs' ability to earn outside revenue from other companies is highly

independent businesses. Freemo, owned and operated by Sabani, created a website and engaged in other online advertising (such as using a Yelp and Facebook page) to procure private clients. Def. Ex. 436 (Screenshots of Freemo Limo's website), Def. Ex. 437 (Freemo Limo's Yelp page); Def. Ex. 438 (Freemo Limo's Facebook page); 6/12 Trial Tr. 113:14–18, 169:7–19, 171:6–11, 171:24–172:17, 187:4–15.[8] Through Sabani's efforts and service while driving, Freemo entered into a contract with a corporate client for 40 trips and $1,700 per week. 6/12 Trial Tr. 174:5–175:10; Def. Ex. 443. Cherdoud developed a different strategy, where he would linger near hotels in order to drum up business, and he admitted that, if he had the "courage," he could have tried to generate more work like Sabani had. 6/11 Trial Tr. 19:14–23:6, 33:20–34:18, 41:18–22.

Even within Uber, Plaintiffs also exercised managerial skills by choosing when and where to use the app in order to generate the most profit. As Plaintiffs' witness Tara Murray testified, Plaintiffs were "professional drivers" who had "different strategies for how they pursued their

---

relevant. *See Smith v. Effluent Retrieval Servs., Inc.*, 2016 WL 6135573, at *5 (E.D. Pa. Oct. 21, 2016) ("Smith's freedom to work elsewhere and his limited actual work for Effluent demonstrates Smith was not economically dependent on Effluent."); *Brennan v. Sand Prods., Inc.*, 371 F. Supp. 236, 237, 239 (W.D. Okla. 1973) (truck drivers were independent contractors where they used their own trucks and could work for other companies); *Goldberg v. Warren Bros. Roads Co.*, 207 F. Supp. 99, 100, 103–04 (D. Me. 1962) (holding that truck drivers were independent contractors where they were free to use their trucks elsewhere). Indeed, the entire premise of an independent contractor is that they can offer their services to multiple different companies. 3C Fed. Jury Prac. & Instr. § 171:47 (6th ed.) ("Independent contractors generally offer their services to the public or others in a particular industry[.]"). But even if it were not, as explained below, Plaintiffs also had an opportunity for profit or loss based on their managerial skills *within* the Uber relationship.

[8]*Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 231 (3d Cir. 2019) (citing the determining of "hours," setting prices, and managing the "atmosphere, operations, and advertising" as examples of "'managerial skills' that can weigh in favor of independent–contractor status"); *see also Yilmaz v. Mann*, 2014 WL 1018006, at *5 (S.D. Fla. Mar. 17, 2014) (noting that managerial skills include "the choice of location, advertising, and services provided" (citations omitted)); *cf. Landaeta v. N.Y. & Presbyterian Hosp., Inc.*, 2014 WL 836991, *6 (S.D.N.Y. Mar. 4, 2014) (holding there was a genuine issue of material fact as to whether plaintiffs constituted employees in part because they "did not form corporate entities to take on additional business, let alone maintain business websites, procure business stationery, or carry liability insurance").

businesses." *Id.* 154:17–23; 6/12 Trial Tr. 76:24–77:2. For Sabani, one of his strategies was choosing to spend the majority of his time doing airport trips. 6/12 Trial Tr. 126:8–16. Razak, however, made the opposite decision and avoided the airport altogether. 6/13 Trial Tr. 18:5–7. Drivers, not Uber employees, made decisions about how to increase their profits, including where to drive to get specific kinds of trips. *See*, *e.g.*, 6/10 Trial Tr. 181:3–14, 181:18–22 (Cherdoud); 6/12 Trial Tr. 126:8–16 (95 percent of Sabani's trips were from the airport); 6/13 Trial Tr. 16:8–17:16 (Razak testifying about the ability to drive in areas with higher demand).

### 3. Plaintiffs' Investment in Equipment or Materials and Employment of Helpers

Plaintiffs made significant investments in support of their independent business endeavors. For one, they all purchased their own luxury "black car" vehicles. *Green v. Golla Ctr. for Plastic Surgery, P.C.*, 2019 WL 1083688, *6 (W.D. Pa. Mar. 7, 2019) (noting that the fact that an alleged employee "supplied his own truck and many of his own tools" favored independent contractor status (citing *Safarian v. Am. DG Energy, Inc.*, 729 F. App'x 168, 173–74 (3d Cir. 2018))). It was Plaintiffs or their independent companies, and not Uber or Gegen, who owned these vehicles. 6/10 Trial Tr. 162:10–14, 163:19–24, 167:19–168:3 (Cherdoud); 6/12 Trial Tr. 61:10–19 (Murray), 112:20–23, 163:1–4 (Sabani), 280:3–18, 281:6–9, 281:22–282:8 (Razak); 6/13 Trial Tr. 27:13–16 (Razak); Def. Ex. 471. In contrast, Plaintiffs' evidence established that, where a black car service actually hired drivers as employees, the employer provided the car. *See* 6/11 Trial Tr. 82:25–83:2, 84:4–5 (Torres).

Furthermore, Plaintiffs made other substantial investments in their businesses and vehicles; for example, on their tax forms, Plaintiffs deducted significant business expenses, including vehicle maintenance, fuel, insurance, phone bills, and professional association fees. 6/10 Trial Tr. 121:8–10, 125:15–20, 140:4–6 (Cherdoud); 6/11 Trial Tr. 37:21–38:5, 60:25–61:10 (Cherdoud);

6/12 Trial Tr. 160:19–161:25, 184:21–185:12, 186:12–187:15 (Sabani); 6/13 Trial Tr. 64:24–65:1, 66:20–67:4, 73:7–11 (Razak); Def. Exs. 417, 419, 421, 445, 446, 447; *cf. Blan v. Classic Limousine Transp., LLC*, 2021 WL 1176063, at *4 (W.D. Pa. Mar. 29, 2021) (this factor favored employee status where the alleged employer was the one that "paid for car insurance, car maintenance, fuel, carwashes, tolls, alcohol, soft drinks, and car seats"). Sabani and Razak also had several drivers operating under their LLCs. 6/12 Trial Tr. 61:10–19 (Murray), 170:16–171:5, 177:7–178:3 (Sabani), 261:7–262:7 (Razak).

### 4. Whether the Service Rendered Requires a Special Skill

Although Plaintiffs promised in their opening statement that "they did not require a special skill" to drive a black car, 6/10 Trial Tr. 75:17–24, their own testimony revealed otherwise.[9] When Uber initially launched in Philadelphia, it specifically recruited individuals who were black car drivers for taxi companies *because* of their special skills. Uber wanted people who were "qualified drivers who have … city knowledge." 6/12 Trial Tr. 210:14–22 (Razak); *see also* 6/11 Trial Tr. 47:23–48:2 (Cherdoud had experience and knowledge to identify better routes). For example,

---

[9] The Third Circuit's previous finding that "driving" is not a "special skill" based on the summary judgment record, *Razak*, 951 F.3d at 147, is not binding for purposes of this Rule 50(a) motion. When the Third Circuit issued its ruling, it was reviewing the discovery record developed for summary judgment. *Id.* at 148. But "courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record." *Dupree v. Younger*, 598 U.S. 729, 731–32 (2023). Because "[t]rials wholly supplant pretrial factual rulings," a "court's factual rulings based on the obsolete summary-judgment record are useless." *Id.* at 735–36. In the summary judgment appeal, the Third Circuit simply made a tentative pretrial determination that—based on the summary judgment record, read in the light most favorable to Plaintiffs—driving a limousine is not a special skill because driving *generally* is not a special skill. *Razak*, 951 F.3d at 147. The Third Circuit explicitly acknowledged the possibility that "there may be a distinction between 'driving' and 'replicat[ing] the limousine experience,'" but found that possibility "not enough to overcome the presumption that driving is not a special skill." *Id.* But that determination is now "supersede[d]" by the factual development at trial, *Dupree*, 598 U.S. at 734 (quoting *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011)), which establishes that black car chauffeuring *does* require a special skill. *See also Speen*, 102 F.3d at 628 n.2 (noting that a district court had denied summary judgment on an employee/independent contractor issue but then granted a Rule 50(a) motion on that issue).

Cherdoud had previous experience as a taxi driver (6/10 Trial Tr. 111:16–25), and Razak had experience both as a taxi driver and as a driver in the Army National Guard (6/12 Trial Tr. 207:22–209:18, 266:23–25). Further, one must be *commercially licensed* and pass a test to drive a black car—strongly suggesting not just anyone is capable of providing black car services. 6/10 Trial Tr. 165:10–166:11, 166:19–20 (Cherdoud); 6/11 Trial Tr. 44:15–22 (Cherdoud); 6/12 Trial Tr. 120:11–17 (Sabani), 208:21–209:1, 266:3–11 (Razak); Def. Ex. 402 at RAZAK_UBER_PL0001239 ("All drivers that pass the … Driver Certification exam will be issued a Driver Certificate."); *see also* Def. Ex. 436 at D436-0009; 6/12 Trial Tr. 170:16–171:5 (Freemo required its chauffeurs to have on-the-road and classroom training). As Plaintiffs themselves and former Uber employee Tara Murray testified, they were "professional drivers." 6/11 Trial Tr. 154:17–23 (Murray).

### 5.  Degree of Permanence of the Working Relationship

Plaintiffs had no real permanence with Uber. They freely admitted that they could provide transportation services outside of Uber, including providing services to private clients and Blacklane.[10] *See Verma*, 937 F.3d at 231–32 (agreeing with district court's finding that the permanence factor weighed in favor of independent contractor status where the workers were "free to work at other venues"). In fact, Sabani acknowledged that he would sometimes be "online on the Uber app" while "providing a trip for Freemo." 6/12 Trial Tr. 187:21–188:7. Further, Plaintiffs acknowledged that they had complete control of their schedules—they decided when to work, how long to work, and whether to keep using Uber's app. 6/10 Trial Tr. 148:24–149:1, 178:20–179:13, 180:21–25, 196:21–197:2 (Cherdoud); 6/11 Trial Tr. 51:17–52:1 (Cherdoud); 6/12 Trial Tr. 75:6–

---

[10] 6/12 Trial Tr. 77:3–16 (Murray), 111:14–16, 113:22–5, 115:7–14, 159:14–19 (Sabani), 261:13–262:7, 262:11–15 (Razak); 6/13 Trial Tr. 41:5–9, 42:21–43:5, 44:17–45:4, 46:5–13, 47:1–10 (Razak).

14

10, 76:12–22 (Murray), 124:13–16, 124:17–19 (Sabani); 6/13 Trial Tr. 10:8–23, 11:10–13, 30:6–9 (Razak). Indeed, Plaintiffs' contract with Uber was simply a license to access Uber's technology, not a working relationship of any kind. *See* Joint Ex. 11. The only evidence of permanency Plaintiffs presented was the fact that they worked with Uber for several years. *See*, *e.g.*, 6/10 Trial Tr. 147:24–25 (Cherdoud); 6/12 Trial Tr. 83:22–83:5 (Sabani), 211:19–21, 214:3–7 (Razak). But that was *Plaintiffs'* choice, and they remained free to pursue other transportation leads or even leave the industry entirely. *E.g.*, 6/11 Trial Tr. 18:2–9 ("Q. And in fact, Milano Limousine did, in fact, provide transportation services outside the Uber app, including for Freemo Limo, Kenan Sabani's company, correct? A. Yes."); 6/12 Trial Tr. 165:5–14 (Sabani testifying that "Freemo is an existing limousine company" even though he is not "doing Uber anymore").

### 6. Whether the Service Rendered is an Integral Part of Uber's Business

Finally, Plaintiffs have not proven that their services are "an integral part of" Uber's business. *Razak*, 951 F.3d at 143 (quoting *DialAmerica*, 757 F.2d at 1382). In fact, at *no point* in Plaintiffs' case in chief did they ever present *any* evidence from which a jury could make a conclusion about the nature of Uber's actual business or the role that drivers play in that business.

As reflected in the technology services agreements that Plaintiffs admitted to signing, Uber has always maintained, and continues to maintain, that it provides *technology* services. 6/10 Trial Tr. 173:22–174:11 (Cherdoud); 6/12 Trial Tr. 121:9–122:5 (Sabani); 6/13 Trial Tr. 7:10–13, 8:14–9:22, 22:24–25 (Razak); Joint Ex. 11 ("Uber is a technology services provider that does not provide transportation services."); *see also* Pl. Ex. 333. It uses its technology platform to connect to independent parties—black car drivers and passengers—who have a mutual desire to work together. Plaintiffs provided *zero* evidence to rebut this characterization of Uber's business. And Razak even referred to Uber as "one of the richest technology companies in the world." 6/13 Trial

Tr. 84:21–22. The evidence showed that Plaintiffs are only "integral" to Uber in the same way riders are; both are customers of Uber who utilize Uber's technology services for a fee.[11]

## CONCLUSION

At the end of the day, the legal standard that applies to this case comes down to a single question: whether Plaintiffs were, as a matter of economic reality, dependent on Uber. Even if a few facts or even a few factors weigh in Plaintiffs' favor, that does not overcome the overwhelming evidence contrary to Plaintiffs' position.[12] No reasonable jury could find in favor of Plaintiffs on this record, and the Court should grant judgment as a matter of law to Defendants.

---

[11] Even assuming arguendo that Uber is in the business of transportation rather than technology, Plaintiffs did not present any evidence that they were integral to that business either.

[12] *See, e.g.*, *Yoder v. Fla. Farm Bureau*, 2023 WL 3151107, at *3 (11th Cir. Apr. 28, 2023) (per curiam) (affirming the grant of summary judgment that found independent contractor status, even though permanence of the relationship and integral factors supported employee status); *7–Eleven, Inc. v. Sodhi*, 2016 WL 3085897, at *6–7 (D.N.J. May 31, 2016) (granting summary judgment and determining that a worker was not an employee, even though the court found one of the factors "neutral" on this point).

Dated: June 16, 2024

Respectfully submitted,

/s/ Robert W. Pritchard
Robert W. Pritchard, Bar No. 76979
rpritchard@littler.com
Littler Mendelson, P.C.
625 Liberty Avenue
26th Floor
Pittsburgh, PA 15222
Telephone: 412.201.7600
Facsimile: 412.456.2377

Paul C. Lantis, Bar No. 309240
plantis@littler.com
LITTLER MENDELSON, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, PA 19102
Telephone: 267.402.3073
Facsimile: 267.402.3131

Michele L. Maryott (pro hac vice)
mmaryott@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612
Telephone: (949) 451-3800
Facsimile: (949) 451-4220


Attorneys for Defendants
UBER TECHNOLOGIES, INC. AND
GEGEN LLC

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of June 2024, **Defendants' Memorandum Of Law In Support Of Defendants' Rule 50(a) Motion For Judgment As A Matter Of Law** was filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon all counsel and parties of record.

*s/ Robert W. Pritchard*
Robert W. Pritchard