# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALI RAZAK, KENAN SABANI, and
KHALDOUN CHERDOUD,

               Plaintiffs,

      v.

UBER TECHNOLOGIES, INC. and
GEGEN LLC,

            Defendants.

Case No. 2:16-cv-00573-MMB

Judge Michael M. Baylson

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR JUDGMENT UNDER RULE 50(b), JUDGMENT UNDER RULE 52(a)(1), CERTIFICATION FOR INTERLOCUTORY APPEAL UNDER  28 U.S.C. § 1292(b), AND FOR A NEW TRIAL UNDER RULE 59

Plaintiffs Ali Razak, Kenan Sabani, and Khaldoun Cherdoud submit this brief in support of their motion for miscellaneous relief, including the following alternatives:

1. Judgment in Plaintiffs' favor under Rule 50(b);

2. An order adopting Plaintiffs' proposed findings of facts and conclusions of law, filed herewith, under Rule 52(a)(1), along with judgment in Plaintiffs' favor under Rule 58;

3. An order certifying this case (including the Court's June 4, 2024, Memorandum Re: Motions for Judgment as a Matter of Law, ECF 314) for interlocutory appeal under 28 U.S.C. § 1292(b); or

4. A new trial under Rule 59, given that the prior jury was not able to reach a verdict, and that protects Plaintiffs' right to a jury reflecting a fair cross section of this District and limits the jury's role to determining only historical facts.

<u>**TABLE OF CONTENTS**</u>

I. Introduction .......................................................................................................... 1

II. Background ........................................................................................................... 2

III. Motion for Judgment under Rule 50(b) ............................................................. 6

    A. First Factor: Uber had the right to control, and did control, how Plaintiffs performed their services as UberBLACK drivers. ................................. 8

        1. Uber had the right to terminate Plaintiffs for substandard service. ........... 9

        2. Uber's rating system demanded near perfection from drivers. ................. 10

        3. To keep drivers engaged with their ratings, each week Uber warned and deactivated drivers with low ratings. .................................... 11

        4. Uber terminated drivers for more than 60 different infractions, 42 of which were specific to Uber's platform and exceeded local regulations.. 11

        5. Uber logged infractions and kept notes in driver personnel files. ........... 13

        6. Uber constantly surveilled Plaintiffs. ...................................................... 14

        7. Uber controlled where drivers could work. ............................................. 14

        8. Drivers could not exceed Uber's maximum cancellation rate. ................. 15

        9. Drivers had to accept a minimum number of trips. .................................. 15

        10. Uber required drivers to use luxury vehicles that were no more than eight years old. ........................................................................... 16

        11. Uber subjected drivers to its own background checks. ............................ 16

        12. Uber had its own dress code for UberBLACK drivers. ........................... 16

        13. Plaintiffs' control over their schedules was illusory. .............................. 17

    B. Second Factor: Uber controlled Plaintiffs' opportunity for profit or loss when performing services as UberBLACK drivers. ............................. 17

        1. Uber unilaterally set fares and rates and decided when and whether to charge customers. ................................................................ 18

        2. Uber controlled trip assignments and therefore Plaintiffs' earnings. ....... 19

3.   Uber deliberately prevented Plaintiffs from making informed business decisions. ................................................................ 19

4.   Uber unilaterally introduced UberX, a cheaper service, thus decimating Plaintiffs' earnings. ...................................................... 20

5.   Uber controlled Plaintiffs' business expenses through automatic deductions. ......................................................................... 20

C.   Third Factor: Uber's investment dwarfed Plaintiffs' investment. ....................... 21

D.   Fourth Factor: Driving a black car does not require a special skill. .................... 21

E.   Fifth Factor: Plaintiffs worked long hours over extended periods. ..................... 22

F.   Sixth Factor: Uber's own statements and actions confirm that Plaintiffs' services were integral to Uber's business. ................................................ 22

G.   Uber willfully misclassified Plaintiffs. ................................................. 24

H.   Plaintiffs were also employees under the WPCL. ...................................... 25

I.   The hung jury does not preclude entering judgment in Plaintiffs' favor. ............ 26

IV.   Motion to Adopt Proposed Findings under Rule 52(a)(1) ................................. 26

A.   Rule 52 allows the Court to adopt Plaintiffs' proposed findings of fact and conclusions of law. .................................................................... 27

B.   The Court should disregard the Supplemental Verdict Form. ............................ 28

C.   Third Circuit precedent allows this Court to decide Plaintiffs' employment status through a Rule 52 proceeding. ................................................... 29

V.   Motion for Certification under 28 U.S.C. § 1292 ........................................... 32

A.   There are two controlling questions of law. .............................................. 33

B.   There are substantial grounds for a difference of opinion. ............................. 33

C.   Interlocutory appeal would advance the ultimate termination of this litigation. .. 36

VI.   Motion for New Trial under Rule 59 ......................................................... 37

VII.   Defendants are Not Entitled to Judgment Based on a Hung Jury ...................... 38

VIII.   Conclusion ........................................................................................... 39

## I.    INTRODUCTION

At Uber's request, and against Plaintiffs' objection, the Court empaneled another jury to make a legal determination using two multifactor balancing tests. Predictably, this exercise yielded the same outcome—another hung jury. The two hung juries in this case reflect not on Plaintiffs' ability to satisfy their burden of proof, assuming they even carry the burden[1], but on the futility of asking laypersons to decide a complicated legal question that is appropriately for a Court to decide.

Indeed, the Court anticipated the possibility that it may need to reach the final legal conclusion in this case. *See* Order Re: New Trial, ECF 294 at ¶ 3 (notifying the parties that the Court may treat the jury as advisory and itself enter judgment). To that end, the Court should now enter judgment in Plaintiffs' favor under Rule 50(b) because the trial record supports Plaintiffs' contention that they were employees under federal and state law. Alternatively, the Court should enter judgment in Plaintiffs' favor after adopting their proposed findings of fact and conclusions of law, all of which are supported by the evidentiary record, under Rule 52(a)(1).

In the alternative, Plaintiffs request that the Court certify this case–including its June 4, 2024, Memorandum Re: Motions for Judgment as a Matter of Law, ECF 314–for interlocutory appeal under 28 U.S.C. § 1292(b). Plaintiffs would then seek clarity on the threshold legal issues of which standards apply to their state law claims and which party carries the burden of proof (for both the federal and state claims).  In fact, in 2015, the Third Circuit certified to the New Jersey Supreme Court the question of what standard applies to misclassification claims under New Jersey law, leading New Jersey's high court to adopt the ABC test. *See Hargrove v. Sleepy's*, LLC, 106 A.3d 449, 464 (N.J. 2015).

---

[1] As Plaintiffs raised repeatedly during the trial (and reiterate here, *see infra* at Section V) the burden of proof under both federal and state law to show that Defendants are exempt from these wage statutes on the grounds that Plaintiffs are independent contractors should be on Uber.

If this Court declines to enter judgment for Plaintiffs, or allow an interlocutory appeal, then it should schedule another jury trial.  In a new trial, however, the Court should employ safeguards to ensure that the jury pool represents a fair cross section of this District. The Court should also limit the jury's role to deciding historical facts, to the extent any are disputed. Using the jury's factual determinations, the Court could then decide whether Plaintiffs were employees or independent contractors.

In any event, the Court should not enter judgment for Uber simply because trial has resulted in another hung jury. Supreme Court precedent instructs against penalizing Plaintiffs for a hung jury, which may have resulted from issues outside their control, such as confusion over the economic realities test. The more appropriate result calls for entering judgment in Plaintiffs' favor under Rule 50(b), adopting Plaintiffs' proposed findings under Rule 52(a)(1), allowing Plaintiffs to pursue an interlocutory appeal, or scheduling another trial.

## II.   BACKGROUND

Plaintiffs are three UberBLACK drivers who worked in the Philadelphia area between 2013 and 2018.  Plaintiffs assert that Defendants misclassified Plaintiffs and other similarly situated drivers as independent contractors, rather than employees, thus precluding them from compensation to which they are entitled under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101–333.115, and the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1–260.45. (ECF 299 at ¶ 1–5). Plaintiffs have brought individual and representative claims against Uber Technologies, Inc. and its wholly owned subsidiary Gegen, LLC ("Gegen," and collectively, "Uber"). (*Id.* at ¶¶ 11–13).

After this case was filed in the Court of Common Pleas of Philadelphia County and removed to this Court, ECF 1, extensive discovery took place. After discovery, the Court denied

2

several pretrial motions. (*See, e.g.*, ECF 94). Defendants then moved for summary judgment. (ECF 114).

The Court granted Defendants' Motion for Summary Judgment in April 2018. (ECFs 124, 125). The Third Circuit reversed, vacated, and remanded the case, finding that there were a number of material factual disputes that prevented summary judgment. *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 145 (3d Cir.), *amended*, 979 F.3d 192 (3d Cir. 2020). The Third Circuit's Opinion contemplated that this Court might use a Rule 52 proceeding to resolve this case. *Id.* at 148 ("We do not opine on whether the disputed facts should be resolved by a jury or the District Court through a Rule 52 proceeding, as was the case in *DialAmerica*").

Following extensive but unsuccessful settlement discussions, a jury trial began on March 4, 2024. (ECF 243). As stipulated by the Parties, the trial was limited to "the threshold liability question of whether the three individual Plaintiffs were Defendants' employees under the FLSA, PMWA, and/or WPCL." (ECF 146). Likewise, the Parties limited the relevant period to "only events occurring . . . prior to January 11, 2018." (*Id.*).

After a five-day trial, the jury could not unanimously agree on whether Plaintiffs had proved—by a preponderance of the evidence—that Plaintiffs were employees of Defendants. (ECF 269). Following the jury's report of a deadlock on this ultimate issue, the Court submitted specific questions to the jury on: (1) the six "economic reality" factors that guide the "misclassification" determination under the FLSA and PMWA, as set forth by the Third Circuit in *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376 (3d Cir. 1985); and (2) the ten factors that the Court concluded guide a similar holistic analysis under Pennsylvania's WPCL, as set forth by the Third Circuit in *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314 (3d Cir. 2016). (ECF 269).

When the Court proposed use of this supplemental form, both parties initially objected. Defendants maintained that objection throughout trial, while Plaintiffs ultimately informed the Court that Plaintiffs did not "have an objection to this general process." (Trial Tr. at 5, Mar. 11, 2024, ECF 277). Although the Court went ahead with the poll, the Court ultimately determined that—even if it had been permissible to use an advisory jury for Plaintiffs' damages claim under the FLSA—the poll could not have had any legal significance at that time and place in this case. (Trial Tr. at 10, Mar. 11, 2024, ECF 277). *See Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 52 (3d Cir. 1989). But the potential insights gleaned from this more granular polling led the Court to require each party to submit proposed jury interrogatories before the second trial. (*See* ECFs 301, 304).

After the Court denied the Parties' Rule 50(a) and Rule 50(b) Motions (ECF 314), the Court empaneled a jury for a second trial beginning on June 10, 2024 (ECF 294). In its Order Re: New Jury Trial, the Court gave "notice that it may, in the event of a jury unable to reach a unanimous verdict once again, decide to take the jury's answers to the jury interrogatories, along with the trial record and undisputed facts, and then 'mold' a verdict and judgment for review upon appeal by either or both parties to the Third Circuit." (ECF 294 at ¶ 5).

After another five-day trial, the jury again could not unanimously agree on whether Plaintiffs were employees of Defendants. (ECF 338). Following the jury's report of a deadlock on this ultimate issue, the Court once again submitted specific questions to the jury via a supplemental verdict form. (ECF 338). Plaintiffs objected to the form of the questions[2], and Defendants objected to the entire procedure. (Trial Tr. at 155–66, June 17, 2024).

---

[2] Pursuant to the Court's order (ECF 294), Plaintiffs had proposed a special verdict form containing interrogatories about historical facts (ECF 304) (which Defendants did not submit as requested). Despite Plaintiffs' repeated requests, the Court did not send these factual questions to the jury.

The Supplemental Verdict Form asked the jury to unanimously decide, for each Plaintiff, whether each individual factor: (1) strongly favored independent contractor status; (2) somewhat favored independent contractor status; (3) was neutral; (4) somewhat favored employee status; or (5) strongly favored employee status. (ECF 338). The Supplemental Verdict Form also asked the jury to unanimously answer "yes" or "no" to the question of whether each Plaintiff had proved by a preponderance of the evidence that he was Defendants' employee during the relevant period under the FLSA, PMWA, and WPCL. (*Id.*).

The jury was unable to unanimously answer "yes" or "no" as to whether any Plaintiff had proved by a preponderance of the evidence that they were Defendants' employee during the relevant period under the FLSA, PMWA, and WPCL. (*Id.*). The jury reached a unanimous decision on only a handful of the individual factors under the FLSA, PMWA, and WPCL, but the results were inconclusive and unreliable. (*Id.*). For example, the parties did not dispute that each Plaintiff rendered the same service as UberBLACK drivers. (*See, e.g.*, Trial Tr. at 237, June 13, 2024) (describing the UberBLACK product). Yet the jury interpreted the FLSA's special skill factor differently for each Plaintiff, finding that this factor somewhat favored employee status for Khaldoun Cherdoud, somewhat favored independent contractor status for Ali Razak, and was inconclusive for Kenan Sabani. (ECF 388).

Plaintiffs now move the Court for judgment as a matter of law under Rule 50(b). Alternatively, Plaintiffs move the Court to enter judgment in their favor by adopting their proposed findings of fact and conclusions of law, filed herewith, under Rule 52(a)(1). If the Court declines to enter judgment, then Plaintiffs ask the Court to certify this case–including its June 4, 2024, Memorandum Re: Motions for Judgment as a Matter of Law, ECF 314–for interlocutory appeal under 28 U.S.C. § 1292(b). As a final option, Plaintiffs move this Court for a new trial.

### III.   MOTION FOR JUDGMENT UNDER RULE 50(b)

Plaintiffs' Proposed Findings of Fact and Conclusions of Law, filed herewith and incorporated by reference, outline the evidentiary record established at trial. This record supports only one conclusion: Plaintiffs were Uber's employees under the FLSA, PMWA, and WPCL. Plaintiffs are thus entitled to judgment as a matter of law under Rule 50(b).

Rule 50(b) allows a party to file a renewed motion for judgment as a matter of law after a jury trial. Fed. R. Civ. P. 50(b). Courts apply the same legal standard to post-verdict motions under Rule 50(b) as pre-verdict motions under Rule 50(a). *Garrison v. Mollers N. Am., Inc.*, 820 F. Supp. 814, 818 n.3 (D. Del. 1993) (citing *Keith v. Truck Stops Corp. of Am.*, 909 F.2d 743, 744–45 (3d Cir. 1990)). "As such, in ruling on a post-trial motion, the court should not base its conclusions, in whole or in part, on the jury's determinations or attempt to apply or refute particular findings of the jury." *Eisenberry v. Shaw Bros.*, No. 3:08-cv-1337, 2010 WL 3191845 (M.D. Pa. Aug. 11, 2010), *aff'd*, 421 F. App'x 239 (3d Cir. 2011); 9B Fed. Prac. & Proc. Civ. § 2524 (3d ed.).

Rather, the Court should conduct its own review of the trial record. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000). In conducting its review, the Court should place special emphasis on "uncontradicted and unimpeached" evidence and testimony from "disinterested witnesses." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 150 (2000).

Judgment as a matter of law is appropriate when there is no "legally sufficient evidentiary basis" to rule for the non-moving party. *Goodman v. Pennsylvania Tpk. Com'n*, 293 F.3d 655, 665 (3d Cir. 2002); *see also* Fed. R. Civ. P. 50(a)(1). A "scintilla of evidence" supporting the non-moving party's case is not enough to survive judgment as a matter of law. *Galena v. Leone*, 638 F.3d 186, 206 (3d Cir. 2011). Instead, "a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." *Id.* at 196 (quoting *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356 (1991)).

As the only disinterested witness who worked for Uber, Tara Murray's testimony warrants the most consideration under Rule 50. And her testimony, along with Uber's own documents and admissions, confirm that Plaintiffs were Uber's employees under the FLSA, PMWA, and WPCL.

In determining whether Plaintiffs were employees under the FLSA and PMWA, the Third Circuit in this case considered the six factors outlined in *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376 (3d Cir. 1985):

1) the degree of Uber's right to control the manner in which the Plaintiffs performed services as Uber drivers;

2) Plaintiffs' opportunity for profit or loss when rendering services on behalf of Uber depending upon their managerial skill;

3) Plaintiffs' investment in equipment or materials required for being Uber drivers, as compared to Uber's investment;

4) whether the service Plaintiffs rendered required a special skill;

5) the degree of permanence of the working relationship between Plaintiffs and Uber; and

6) whether services rendered by Plaintiffs were an integral part of Uber's business.

*Razak v. Uber Techs., Inc.*, 951 F.3d 137, 142–43 (3d Cir.), *amended*, 979 F.3d 192 (3d Cir. 2020).[3]

The Third Circuit emphasized that "neither the presence nor absence of any particular factor is dispositive." *Id.* at 143 (internal citation and quotation marks omitted). With that in mind, the Third Circuit examined the "circumstances of the whole activity" to determine whether, "as a matter of economic reality," Plaintiffs depended on Uber. *Id.*

---

[3] Although Plaintiffs urge this Court to apply the ABC test to their PMWA and WPCL claims, and to place the burden of proof on Defendants, Plaintiffs acknowledge this Court's prior ruling on these issues. (*See* ECF 314). Thus, Plaintiffs brief these issues consistent with the Court's prior ruling while reserving their objections. (*See* ECFs. 151, 159, 169, 212, 238, 280, 305, 316).

As a guiding principle, the Third Circuit has underscored "that, of all the acts of social legislation, the Fair Labor Standards Act has the broadest definition of 'employee.'" *DialAmerica*, 757 F.2d at 1382. This inquiry "is not governed by the 'label' put on the relationship . . . or the contract controlling that relationship[.]" *Safarian v. Am. DG Energy Inc.*, 622 F. App'x 149, 152 (3d Cir. 2015) (internal citation and quotation marks omitted); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947).

The undisputed facts set forth in Plaintiffs' Proposed Findings reveal that Plaintiffs were employees under the FLSA (and state law). In fact, the record supports Plaintiffs' employee status across every *DialAmerica* factor. The Court should thus enter judgment as a matter of law for Plaintiffs.

### A.   First Factor: Uber had the right to control, and did control, how Plaintiffs performed their services as UberBLACK drivers.

The first economic realities factor considers "the degree of the alleged employer's right to control the manner in which the work is to be performed." 757 F.2d at 1382. While not dispositive, this factor is highly relevant to the FLSA analysis. *Razak*, 951 F.3d at 145. On appeal, the Third Circuit clarified that "[a]ctual control of the manner of work is not essential; rather, it is the right to control which is determinative." *Id.*

The Supreme Court has also recognized that a worker who decides when, where, and for how long to work may be an employee under the FLSA. For example, in *Goldberg v. Whitaker House Coop.*, the Supreme Court held that members of a cooperative who made knitted goods at home for piece-rate pay were employees under the FLSA:

> The members are not self-employed; nor are they independent, selling their products on the market for whatever price they can command. They are regimented under one organization, manufacturing what the organization desires and receiving the compensation the organization dictates. Apart from formal differences, they are engaged in the same work they would be doing

> whatever the outlet for their products. The management fixes the
> piece rates at which they work; the management can expel them for
> substandard work or for failure to obey the regulations. The
> management, in other words, can hire or fire the homeworkers.

366 U.S. 28, 30–32 (1961).

Applying this reasoning, the Third Circuit in *DialAmerica* concluded that home researchers

who could "work any time and for as many hours as they desired" were also employees:

> The home researchers in this case were not in a position to offer their
> services to many different businesses and organizations. They
> worked on a continuous basis with DialAmerica and were able to
> work only when and if DialAmerica was in need of their services.
> Consequently, the home researchers were economically dependent
> on DialAmerica, indicating that they were indeed "employees" of
> the defendant under the FLSA.

757 F.2d at 1385–86.   Under this binding precedent, Plaintiffs' illusory ability to choose their

hours is not determinative.

Like the knitters in *Goldberg* and the researchers in *DialAmerica*, Plaintiffs and other black

car drivers were regimented under one organization—Gegen, Uber's wholly owned subsidiary.

(PX-109, PX-119, PX-120).  Plaintiffs worked for Uber only when and if their services were

needed. (JX-001-002) ("The frequency in which the Company offers Requests to you . . . shall be

in the sole discretion of the Company. Nothing . . . shall be . . . a guarantee that you shall be offered

any particular number of requests during any particular time period.").  And like the employers in

*Goldberg* and *DialAmerica*, Uber could expel drivers for substandard work. (PX-250; PX-350).

### *1.* ***Uber had the right to terminate Plaintiffs for substandard service.***

Courts have recognized that the right to terminate is strong evidence of control. *See, e.g.*,

*Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 789 (3d Cir. 1978) ("the right to termi-

nate the relationship for breach of any [contract] provision . . . can very effectively control the day

to day operation"); *Razak*, 951 F.3d at 146; *Goldberg*, 366 U.S. at 32–33; *Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 485 (N.D. Cal. 2017).

Uber's contracts with Plaintiffs memorialized the company's right to terminate them for substandard service. (*See* JX-001; JX-003; JX-004; JX-005-002; JX-006; JX-007; JX-008; JX-009; JX-010; JX-011; JX-012). After receiving a customer complaint, Uber would, in its sole discretion, decide whether to deactivate a driver. (Trial Tr. 218, June 13, 2024). Uber's Deactivation Policy also reflected Uber's right to terminate Plaintiffs based on their "driver ratings." (PX-301; PX-302).

### 2.     *Uber's rating system demanded near perfection from drivers.*

After every trip, Uber invited riders to rate their driver on a five-star scale. (PX-250; PX-302). But Uber, not riders, had the right to terminate Plaintiffs for failing to maintain a minimum average driver rating. (PX-301; PX-302; PX-101). And Uber, not riders, set the minimum average driver rating for black car drivers in Philadelphia at 4.6, later increased to 4.7 to "help grow demand for UberBLACK."  (JX-001; PX-145; *see also* PX-253). In other words, Uber required near perfection from Plaintiffs to help grow Uber's business.

Drivers that fell below this threshold received multiple warnings that they would soon be deactivated unless they improved their performance. (PX-101). If a driver failed to improve, Uber would use its "judgment in deciding whether to take the partner offline." (PX-101; PX-301; PX-302). After deactivating a driver for poor performance, Uber reserved the right reactivate (rehire) the driver if the driver completed a "quality training course." (PX-101; PX-304) ("We ***may*** allow you to regain access to your account") (emphasis added). These quality training courses were offered by "exemplary Uber partners." (PX-101).

### 3. To keep drivers engaged with their ratings, each week Uber warned and deactivated drivers with low ratings.

Uber's internal "Philly Quality Playbook" explained that "bad drivers . . . make Uber look bad" and "also cost Uber money." (PX-101). Because "every star [was] sacred," Uber developed a quality control system to keep drivers "engaged in their ratings." (PX-101).

As part of its quality control system, Uber "warn[ed]/deactivate[d] bad drivers often (daily, at least weekly)." (PX-101; *see also* PX-253; PX-250). Uber's quality control system "[p]ut the burden on the driver to get certified, get back online." (PX-101). Uber's quality control system also "flex[ed] thresholds up over time (i.e. from min driver rating of 4.4 to 4.7)." (PX-101). This "ongoing process" regularly engaged drivers who needed "encouragement, or training, and either encourage[d] them to improve, or manage[d] them out of the fleet." (PX-101).

In "weekly summary reports," Uber notified drivers of their average rating over the last week. (PX-253). These reports praised drivers for being "above average." (PX-253). These reports also instructed drivers on how to improve their ratings. (PX-253).

Uber's quality control system had its intended effect on drivers. According to Murray, Plaintiffs and other drivers considered driving for UberBLACK to be their "full-time" job. To avoid losing that job and going into debt with Uber (because of weekly pay deductions), Plaintiffs worked to ensure that their driver ratings never fell below the threshold that Uber unilaterally set, increased, and increased again.

### 4. Uber terminated drivers for more than 60 different infractions, 42 of which were specific to Uber's platform and exceeded local regulations.

Uber also had the right to terminate drivers for committing "infractions" that were specific to Uber's platform and exceeded local limousine regulations, including:

1. Accepting a tip. (PX-250; PX-333).
2. Refusing a trip based on the end destination. (PX-250; PX-195).
3. Calling riders in advance to ask for their destination. (PX-195).

11

4.    Giving out personal business cards to riders. (PX-184).
5.    Accepting a trip outside the app from an Uber customer. (PX-184).
6.    Talking too much. (PX-253).
7.    Talking too little. (PX-253).
8.    Asking for a rating. (PX-250).
9.    Failing to tap the begin trip button. (PX-250).
10.   Failing to tap the end trip button. (PX-250).
11.   Cancelling on a rider. (PX-250).
12.   Not answering the phone. (PX-250).
13.   Tapping the "arriving now" button too soon. (PX-250).
14.   Calling a customer too often. (PX-250).
15.   Not having a toll pass. (PX-250).
16.   Soliciting payment outside the Uber system. (PX-250; PX-301; PX-302).
17.   Soliciting trips outside the app. (PX-250; PX-301; PX-302).
18.   Manipulating surge pricing. (PX-250).
19.   Not wearing a suit and tie. (PX-204; PX-196).
20.   Too much cologne. (PX-250).
21.   Generally smelly. (PX-250).
22.   Wrong driver (not the driver that Uber assigned). (PX-250; PX-192).
23.   Wrong vehicle (not the vehicle that Uber assigned). (PX-250; PX-192).
24.   Disparaging Uber during rides. (PX-212).
25.   Inactivity on Uber App. (PX-333).
26.   Uber profile missing documents. (PX-333).
27.   Accepting trips without the intention of completing them. (PX-302).
28.   Provoking riders to cancel a trip. (PX-302).
29.   Carrying firearms of any kind. (PX-302).
30.   Taking a trip using vehicle not approved by Uber. (PX-302).
31.   Providing inaccurate information to Uber. (PX-302).
32.   Refusing Uber's background checks. (PX-302).
33.   Accepting street hails. (PX-302; PX-192).
34.   Harming Uber's business or brand. (PX-302; PX-212).
35.   Leaving one's phone in the airport zone. (PX-295; PX-298).
36.   Serious feedback from customers to Uber. (PX-253).
37.   Repeated negative feedback from customers to Uber. (PX-253).
38.   Falling below Uber's minimum average driver rating. (PX-302).
39.   Exceeding Uber's maximum cancellation rate. (PX-302).
40.   Getting into an accident during a trip. (PX-250).
41.   Trouble with picking up customers. (PX-250).
42.   Allowing another driver to drive under your account. (PX-302; PX-192).

Uber also maintained a list of infractions that overlapped with local limousine regulations,

including:

1.    Altercations. (PX-250; D-402).
2.    Attitude complaints. (PX-250; D-402).

3.      Taking a bad route. (PX-250; D-402).
4.      Lacking city knowledge. (PX-250; D-402).
5.      Not opening the door. (PX-250; D-402).
6.      Inappropriate behavior. (PX-250; D-402).
7.      Mistiming a trip. (PX-250; D-402).
8.      Poor communication. (PX-250; D-402).
9.      Poor driving. (PX-250; D-402).
10.     Having a "smelly" car. (PX-250; D-402).
11.     Smelling of cigarettes. (PX-250; D-402).
12.     Body odor. (PX-250; D-402).
13.     Poor personal hygiene. (PX-250; D-402).
14.     Unprofessional attire. (PX-250; D-402).
15.     Poor vehicle appearance. (PX-250; D-402).
16.     Mechanical issues. (PX-250; D-402).
17.     Unwanted contact. (PX-302; D-402).
18.     Abusive language. (PX-302; D-402).
19.     Violent behavior. (PX-302; D-402).
20.     Denying a service animal. (PX-302; D-402).
21.     Increasing the time or distance of a trip. (PX-302; D-402).

That 21 of 63 infractions overlapped with Philadelphia Parking Authority regulations is irrelevant to the Court's analysis.[4] Indeed, Uber failed to present any evidence that it notified the Parking Authority of driver infractions. In other words, these infractions were designed to benefit Uber, not to ensure compliance with local regulations.

### 5.      Uber logged infractions and kept notes in driver personnel files.

Like a traditional employer, Uber kept personnel files on each driver. (PX-250; PX-251). If a driver committed one of the foregoing infractions, Uber's representatives would log that infraction in the driver's personnel file. (PX-250; PX-251). For example, if a driver took a bad route,

---

[4] As the Eleventh Circuit has explained, the "economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1316 (11th Cir. 2013). If "the nature of a business requires a company to exert control over workers to the extent that [the employer] has allegedly done, then that company must hire employees, not independent contractors." *Id.*; *see also Schultz v. Mistletoe Express Serv., Inc.*, 434 F.2d 1267, 1271 (10th Cir. 1970) (noting that "arguments that an independent contractor relationship is shown by . . . the need to comply with the regulations of federal and state agencies do not persuade us" before affirming the conclusion that workers were employees under the FLSA).

Uber would tag the driver's file with "driver_quality_bad_route_city_knowledge." (PX-250; PX-251).

Uber also included other notes and information about drivers in their personnel files. (PX-250; *see also* PX-227). For example, Uber tagged drivers who had "a low opinion of driving with Uber" as a "Driver detractor." (PX-226; Trial Tr. 48, June 12, 2024; *see also* PX-212, 253). Uber likewise tagged drivers that Uber favored as "VIP drivers." (*Id.*).

### 6.    *Uber constantly surveilled Plaintiffs.*

Tara Murray, who managed UberBLACK drivers during the relevant period, testified that Uber tracked drivers by logging "every moment, every touch, everything in the app[.]" (Trial Tr. at 190, Mar. 5, 2024, ECF 273). This surveillance allowed Uber to amass troves of driver data that Uber used to monitor performance. (*See* PX-243; PX-244; PX-245; PX-251; PX-334).

Using this data, Uber unilaterally decided when to turn on "surge pricing," which temporarily increased the price of fares in certain areas. (*See, e.g.*, PX-170). Uber used "surge pricing" to lure drivers into these areas. But drivers who went to these areas did not always receive higher fares. (PX-170).

Uber also used its surveillance system for disciplinary purposes. For instance, Murray testified that Uber had tracked 17 drivers who were jumping the airport queue by locking their location in the App. (Trial Tr. 190:17–23, 191:19–20, March 5, 2024). Uber deactivated these drivers without warning. (Trial Tr. 191:19–192:1, March 5, 2024).

### 7.    *Uber controlled where drivers could work.*

Uber also had the ability to block drivers from working in certain areas. For example, Murray testified that "drivers could be blocked from receiving airport requests" and from receiving fares in Philadelphia County. (Trial Tr. 48–49, June 12, 2024; *see also* PX-226). In other words,

Uber placed geographical limitations on where drivers could receive fares. (*See* Trial Tr. 102, June 13, 2024; PX-195).

### 8.     *Drivers could not exceed Uber's maximum cancellation rate.*

According to Uber's "Driver Deactivation Policy," each city had a "maximum cancellation rate" based on "the average cancellation rate of drivers in that area." (PX-302). Uber's Policy warned drivers that they would be deactivated for exceeding their city's "maximum cancellation rate." (PX-302; *see also* Trial Tr. 155, June 13, 2024). Uber would "alert [drivers] multiple times if [their] cancellation rate [was] much higher or if [they were] consistently cancelling more often than other drivers." (PX-302). If a driver's cancellation rate continued to "exceed the maximum limit," their "account would be deactivated," according to Uber's Driver Deactivation Policy. (PX-302).

Drivers were also contractually obligated to "fully complete a Request after acceptance," unless cancelled by Uber or the rider. (JX-001 at 2). Uber's contracts, for example, gave the company the right to terminate a driver for refusing "to fully complete a trip after acceptance of a trip." (JX-006 at ¶ 5.1). Uber's witnesses testified that this policy was not enforced in Philadelphia, but "it is the right to control which is determinative." *Razak*, 951 F.3d at 145.

### 9.     *Drivers had to accept a minimum number of trips.*

During the relevant period, drivers were contractually obligated to accept "at least 80% of the Customer Requests/Requests Gegen . . . provided to [a driver] in a thirty (30) day period, provided that Gegen [had] presented at least 60 Customer Requests . . . in that same period." (JX-001). Failure to adhere to Uber's minimum acceptance rate was a "material breach" of a driver's contract, and thus subjected drivers to termination. (JX-001).

Uber later modified its acceptance rate policy so that if a driver was "consistently not accepting trip requests" or "declining more trips than other drivers," the driver would be suspended

for "a short period of time." (PX-302). Still, drivers had to agree "to only make [themselves] available to receive Requests during such times as [they were] generally able to accept Requests that [were] offered." (JX-001).

>   **10.    Uber required drivers to use luxury vehicles that were no more than eight years old.**

Both Uber and the Parking Authority maintained a list of acceptable vehicles to provide black car services in Philadelphia. (*See* Trial Tr. 227, June 11, 2024). But Uber's vehicle criteria were more restrictive than the Parking Authority's. For example, Uber's vehicle age limit was eight years, while the Parking Authority's was ten years. (Trial Tr. 227, June 11, 2024).

>   **11.    Uber subjected drivers to its own background checks.**

Uber subjected drivers to its own background checks, separate from the background check that the Philadelphia Parking Authority conducted. (PX-111-001). Uber told drivers that its "background check [was] more thorough and [was] a requirement to remain an active driver with Uber." (PX-111). Uber explained that, because of its more thorough background check, riders were "more likely to use Uber again, and again." (PX-111).

Uber also subjected drivers to multiple background checks.  For example, Ali Razak testified that in one year, Uber conducted around 10 background checks on him. (Trial Tr. 216, June 12, 2024). Razak also testified that he was not able to work as an UberBLACK driver while his background checks with Uber were pending. (Trial Tr. 217, June 11, 2024)..

>   **12.    Uber had its own dress code for UberBLACK drivers.**

Uber imposed its own dress code on UberBLACK drivers. "Uber Black required attire calls for all drivers to be wearing a suit and tie at all times when operating on the Uber system." (PX-196; *see also* PX-204). Uber told drivers, "Customers appreciate this, and it helps differentiate

Uber from taxis. Drivers not dressed properly are hurting the Uber system and hurting 5-star drivers who always dress properly before driving." (*Id.*).

### 13. *Plaintiffs' control over their schedules was illusory.*

Uber contends that Plaintiffs are independent contractors because they control their own schedules. The argument is legally and factually baseless. As discussed above, both the Supreme Court and Third Circuit have held that a worker's ability to decide when, where, and for how long to work is not determinative under the FLSA. *See, e.g.*, *Goldberg, DialAmerica*, *supra*. And, regardless, Plaintiffs' control over their schedule was illusory.

Uber deducted pay from the drivers' weekly earnings to cover business expenses, including Gegen's liability insurance, Philadelphia Parking Authority stickers, and vehicle finance payments. (*See, e.g.*, PX-237; PX-242; PX-233). For this reason, drivers could not decide when and whether to pay for these expenses. If a driver did not earn enough income from fares to cover these deductions, they would go into debt with Uber. (Trial Tr. 103–04, 217–18, June 11, 2024). The evidence showed that this debt trap compelled drivers to provide five-star service over longer hours. (*See, e.g.*, PX-243, PX-244, PX-245; PX-334; DX-502; DX-504).

### B. Second Factor: Uber controlled Plaintiffs' opportunity for profit or loss when performing services as UberBLACK drivers.

The second economic realities factor considers Plaintiffs' control over their profit or loss as UberBLACK drivers. As Murray testified, that opportunity boiled down to Plaintiffs working more hours. (Trial Tr. 260:4–13, March 5, 2024). But as the Court recognized in its jury instructions, courts have uniformly rejected that a worker's ability to "hustle" or work more amounts to an opportunity for profit or loss. *See, e.g.*, *McFeely v. Jackson St. Ent., LLC*, 825 F.3d 235, 243 (4th Cir. 2016); *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993); *Scantland*, 721 F.3d at 1316. Where, as here, a defendant controls prices, operations, and advertising, a worker

has little opportunity for profit or loss based on managerial skill. *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 231 (3d Cir. 2019).

### 1. *Uber unilaterally set fares and rates and decided when and whether to charge customers.*

Uber determined how much drivers earned for each trip. (*See* Trial Tr. 212, June 13, 2024) (admitting that "Uber set the fare structure, yes."). For example, Uber controlled how much to charge customers. (*See, e.g.*, JX-007 at ¶ 5.1). Drivers could not negotiate fares. (*See, e.g.*, JX-11 at ¶¶ 4.1–4.3). Nor could drivers negotiate Uber's commission on each fare. (*See, e.g.*, JX-11 at ¶ 4.4).

Uber decided also when to charge for disputed fares. For instance, if a customer used a stolen credit card or chargebacks to avoid paying for a ride, Uber would decide whether to still pay the driver. (Trial Tr. 214, June 13, 2024). Whether the driver was paid in such instances would depend on whether Uber thought the driver was complicit. (*Id.*).

Similarly, whether to charge a customer a cancellation fee was in Uber's sole discretion. (JX-007 at ¶ 5.2.1; Trial Tr. 217, June 13, 2024). Uber likewise decided whether to charge a cleaning fee to a customer for damaging a driver's vehicle. (Trial Tr. 147, June 11, 2024). Uber also decided whether to pay a driver during App outages. (*See, e.g.*, PX-225). For example, Uber once compensated drivers who were "knocked out the airport queue" because of a technical issue. (PX-225).

There were also times when Uber paid black car drivers a guaranteed wage. (*See, e.g.*, PX-195, PX-197, PX-204). To qualify for these guaranteed wages, a driver would have to have a certain acceptance rate. (*See, e.g.*, PX-195-002). For example, a driver might qualify for a guaranteed hourly rate by accepting eight out of every ten trips. (PX-195-002). Cancelling too many trips might disqualify a driver from receiving a guaranteed hourly rate.

### 2. *Uber controlled trip assignments and therefore Plaintiffs' earnings.*

Uber controlled trip assignments through its proprietary algorithm. (Trial Tr. 137–38, June 11, 2024). For this reason, customers could not select a particular driver through the Uber App. And so drivers could not attract more profitable riders by providing higher-quality service. (*Id.*; *see also* Trial Tr. 12–13, June 11, 2024). Nor could Plaintiffs delegate less profitable trip assignments to other drivers. (PX-192).

Uber also barred drivers from contacting customers after a ride to solicit additional business. (Trial Tr. 12–13, June 11, 2024). Uber likewise prohibited drivers from giving out their personal business cards. (PX-184-003). There were "no exceptions to this policy and drivers [would] be deactivated permanently if . . . caught doing this even once." (PX-184-003).

Uber also made it impossible for Plaintiffs to select trip assignments based on their anticipated profitability. Chad Dobbs, Uber's witness and regional manager, testified that after receiving an alert, drivers had "roughly 15 seconds to accept or reject" the incoming trip request. (Trial Tr. 186, June 13, 2024). Besides providing a prohibitive amount of time to make an informed decision, Uber withheld the rider's destination until after the driver accepted and started the trip. (PX-330; Trial Tr. 21, June 11, 2024). Uber likewise barred drivers from calling riders to ask for their destination before picking them up. (PX-195; Trial Tr. 21, June 11, 2024). And, regardless, Uber prohibited drivers from rejecting a trip based on the end destination. (PX-195).

### 3. *Uber deliberately prevented Plaintiffs from making informed business decisions.*

Uber designed a system that made it impossible for drivers to select trip assignments based on their anticipated profitability. Chad Dobbs, Uber's witness and regional manager, testified that after receiving an alert, drivers had "roughly 15 seconds to accept or reject" the incoming trip request. (Trial Tr. 186, June 13, 2024). Besides being a prohibitive amount of time to make an

informed decision, Uber withheld the rider's destination until after the driver accepted and started

the trip. (PX-330; Trial Tr. 21, June 11, 2024). Uber likewise prohibited drivers from calling riders

to ask for their destination before picking them up. (PX-195; Trial Tr. 21, June 11, 2024). And,

regardless, Uber prohibited drivers from rejecting a trip based on the end destination. (PX-195).

### 4. *Uber unilaterally introduced UberX, a cheaper service, thus decimating Plaintiffs' earnings.*

It is undisputed that Uber's introduction of UberX, a cheaper service, into the Philadelphia

market negatively impacted Plaintiffs' earnings. On the effects of UberX, Murray testified that

drivers "were not making as much money as they were before. . . . They couldn't make those car

payments. They were working longer hours, more hours. And essentially they just weren't able to

pay their bills and survive." (Trial Tr. 56:6–10, June 12, 2024).

Murray also confirmed that Plaintiffs and other UberBLACK drivers had no "say over

UberX being introduced in Philadelphia." (Trial Tr. 56:6–10, June 12, 2024). When asked whether

there was "anything that Uber Black drivers could do about Uber advertising a new service that

was lower," Murray answered, "No."

Indeed, Uber controlled every aspect of the business. Plaintiffs had no say over what ser-

vices Uber offered or promoted. So, in the end, Uber unilaterally decided to cannibalize its pre-

mium black car service over the objections of Plaintiffs and other UberBLACK drivers. There is

no greater form of control.

### 5. *Uber controlled Plaintiffs' business expenses through automatic deductions.*

Uber paid Plaintiffs and other drivers on a weekly basis. (*See, e.g.*, PX-237; PX-242; PX-

233). From those earnings, Uber deducted pay to cover business expenses like Gegen's liability

insurance premiums, Philadelphia Parking Authority sticker fees, and vehicle finance payments.

(*See, e.g.*, PX-237; PX-242; PX-233). For this reason, drivers could not decide when and whether

to pay for these expenses. If a driver did not earn enough income from fares to cover these deductions, they would go into debt with Uber, thus forcing them back to work with Uber. (*See* Trial Tr. 103–04, 217–18, June 11, 2024).

### C.    Third Factor: Uber's investment dwarfed Plaintiffs' investment.

The third economic realities factor considers the *relative* investment that Plaintiffs made, as compared to the investment of Uber in building and maintaining its platform and business. *Verma*, 937 F.3d at 231 ("a dancer's investment is minor when compared to the club's investment"); *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) ("it is appropriate to compare the worker's individual investment to the employer's investment in the overall operation"); *Flores*, 250 F. Supp. at 488-89 (holding that drivers' investment in their vehicles were "minimal compared to the total capital investment necessary to operate" the defendant's business).

Uber has spent billions of dollars building and operating its platform. (PX-246). Uber's investment in its business is exponentially greater than Plaintiffs' business expenses. (*Id.*). The Parties' relative investment therefore supports an employment relationship.

### D.    Fourth Factor: Driving a black car does not require a special skill.

The fourth economic realities factor considers whether the services that Plaintiffs rendered for Uber required a special skill. The Third Circuit has already decided that driving a black car does not involve a special skill. *Razak*, 951 F.3d at 147 (Although there may be a distinction between 'driving' and 'replicat[ing] the limousine experience,' . . . this is not enough to overcome the presumption that driving is not a special skill."); *see also Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014) ("FedEx drivers need no experience to get the job in the first place and [the] only required skill is the ability to drive."). This factor supports Plaintiffs.

Nor should this factor be in dispute. In its Summary Judgment Opinion, the Court determined that the "special skills" factor weighs in favor of finding that Plaintiffs were employees

under federal and state law. *Razak*, 2018 WL 1744467, at *18. Although the Third Circuit reversed

entry of summary judgment, it affirmed this portion of the Court's ruling. *Razak*, 951 F.3d at 147.

As a result, the Court's determination that the special skill factor supports an employment rela-

tionship is law of the case. *Coca-Cola Bottling Co. of Shreveport v. Coca-Cola Co.*, 988 F.2d 414,

429 (3d Cir. 1993) (holding that when an appellate court reverses in part, rulings that are affirmed

become law of the case); *Laborers' Int'l Union of N. Am., AFL-CIO v. Foster Wheeler Energy

Corp.*, 26 F.3d 375, 396 (3d Cir. 1994).

### E.      Fifth Factor: Plaintiffs worked long hours over extended periods.

The fifth economic realities factor is the degree of permanency of Plaintiffs' relationship

with Uber. This factor considers whether Plaintiffs' relationship with Uber was "a transitory one."

*DialAmerica*, 757 F.2d at 1384-85; *Verma*, 937 F.3d at 231 ("the average dancer in the class

worked for the Club in only 14 of the 109 workweeks"). The record establishes a continuous and

intense working relationship between Plaintiffs and Uber, reflecting an employment relationship.

Sabani and Cherdoud began working for Uber in December 2013, and Razak started in

July 2014. (PX-243; PX-245; PX-245). Trial covered events before January 11, 2018, which

amounts to less than 1,500 potential workdays for all three Plaintiffs. (ECF 148). Over that period,

Razak completed 5,602 trips, Sabani completed 4,854 trips, and Cherdoud completed 6,518 trips.

(DX-501, DX-503, DX-505). Plaintiffs worked almost every week and logged at least 40 hours

online in each week they worked. (PX-243; PX-244; PX-245; PX-334, DX-502, DX-504). The

intensity and permanence of this relationship supports Plaintiffs' employee status.

### F.      Sixth Factor: Uber's own statements and actions confirm that Plaintiffs' services were integral to Uber's business.

The sixth economic realities factor considers whether Plaintiffs' services were integral to

Uber's business. To that end, this Court has already held that "Uber drivers are an essential part of

Uber's business as a transportation company." *Razak v. Uber Techs., Inc.*, No. 16-cv-573, 2018 WL 1744467, at *19 (E.D. Pa. Apr. 11, 2018) ("Indeed, it seems beyond dispute that if Uber could not find drivers, Uber would not be able to function."). Other courts have reached the same conclusion. *See, e.g.*, *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1142 (N.D. Cal. 2015) ("Uber simply would not be a viable business entity without its drivers."); *People v. Uber Technologies, Inc.*, 56 Cal. App. 5th 266, 292 (2020) ("[a] number of cases have considered contentions that ride-sharing companies such as Lyft and Uber are in the business of creating technological platforms, not of transporting passengers, and have dismissed them out of hand"); *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 911 (N.D. Cal. 2020).

It is beyond dispute that Uber's business could not function without drivers. Uber's own statements—at least those outside the courtroom—confirm this. For example, Uber told Plaintiffs and other drivers that they deserved a better "driving . . . experience, because simply put, Uber wouldn't exist without [them]." (PX-216-001). In another email to Plaintiffs, Uber said it was "focus[ing] on providing awesome resources to help [drivers] grow ***our*** business." (PX-330-001) (emphasis added). And when Uber dealt with regulatory agencies, it called itself a "limousine company." (PX-109, PX-120). In fact, Uber used the trademark, "everyone's private driver." (PX-208). *See also* USPTO No. 85816634.

Uber also understood that its reputation turned on the quality of its drivers. (PX-250) ("Deactivating the accounts of the partners who provide consistently poor experiences ensures that Uber continues to be known for quality."). In the same vein, Uber attributed its revenue to drivers. (PX-330) ("We've had a great 2013 in Philadelphia thanks to you, our Uber Partners."). Uber's own head of operations in the United States and Canada summed up its relationship with drivers

as symbiotic: "Drivers are at the center of the Uber experience, and the app they use to go online and earn money is at the center of theirs."  (PX-229).

Simply put, drivers depended on Uber, and Uber depended on drivers. And with billions of dollars invested into its business, Uber, as matter of economic reality, needed to control its drivers. (PX-246-003). This factor, moreover, should not be in dispute.

In its Summary Judgment Opinion, the Court determined that was "beyond dispute that if Uber could not find drivers, Uber would not be able to function." *Razak*, 2018 WL 1744467, at *19. The Third Circuit did not reverse this portion of the Court's summary judgment ruling. *Razak*, 951 F.3d at 147, n.12. As a result, the Court's ruling that drivers were integral to Uber's business remains law the case. *Coca-Cola*, 988 F.2d at 429; *Foster Wheeler*, 26 F.3d at 396.

### G.  Uber willfully misclassified Plaintiffs.

The trial record shows that Uber willfully misclassified Plaintiffs and other drivers. Uber's Philly Quality Playbook, for example, joked, "**Hello, Legal!**," in reference to its classification of drivers. (PX-101-007). Similarly, Uber trained its representatives to avoid language connotating an employment relationship.  For instance, Uber's internal deactivation manual told representatives to say "deactivate" instead of "terminate":

> **Do NOT use any language to imply they have been fired, let go, or terminated.**
>
> DO NOT imply that a driver has been terminated.  We've ended the partnership or deactivated the account.  We haven't fired anyone.

(PX-250-017, 34) (emphasis in original).

Uber also failed to explain why it required Plaintiffs and other black car drivers to form their own business entities. Nor did Uber explain why it referred Plaintiffs to the same accountant to create their business entities. The Court should thus infer that Uber imposed this requirement to try to give itself a defense to wage claims. *See, e,g.*, *Maranzano v. S-L Distribution Co.*, *2020* WL

7974332, at *4 (M.D. Pa. Dec. 18, 2020) ("Indeed, if any business could avoid [wage and hour laws] by simply classifying their workers as independent contractors and compensating them through corporations rather than paying them directly, [wage laws] would be rendered useless."); *Cummings v. Cenergy Intl. Services, LLC*, 2017 WL 4180972, at *6 (E.D. Cal. Sept. 20, 2017) ("[C]orporate entities were formed by Plaintiffs as a specific requirement of Cenergy . . . These allegations create a reasonable inference that the corporate entities were created for no purpose of Plaintiffs and solely for the benefit of Cenergy . . . as a corporate fiction[.]"); *see also Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) ("individuals who form corporate entities and enter franchise agreements as required by Jani-King 'nonetheless personally perform the janitorial work on behalf of Jani-King' and, based on the economic realities of this relationship, are Jani-King's employees under the FLSA").

### H.      Plaintiffs were also employees under the WPCL.

This Court has held that WPCL's classification test involves a slightly different set of factors, including:

1)      Control of the manner that work is to be done;

2)      Responsibility for result only;

3)      Terms of agreement between the Parties;

4)      The nature of the work or occupation;

5)      The skill required for performance;

6)      Whether one employed is engaged in a distinct occupation or business;

7)      Which party supplies the tools;

8)      Whether payment is by the time or by the job;

9)      Whether the work is part of the regular business of the employer; and

10)     The right to terminate the employment at any time.

(ECF 314) (citing *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 321 (3d Cir. 2016)).[5]

Under the WPCL, a defendants' control over the work to be completed and the manner in which

that work was to be performed are the primary considerations determining employee status. *Id.*

For reasons discussed above, the WPCL's first, second, third, fourth, fifth, sixth, seventh,

ninth, and tenth factors favor an employment relationship between Plaintiffs and Uber. And, at

times, Plaintiffs were paid by the hour, thus supporting employee status under the WPCL's eighth

factor. (*See, e.g.*, PX-195; PX-197; PX-204). With every factor in their favor, Plaintiffs were em-

ployees of Uber under the WPCL.

## I.     The hung jury does not preclude entering judgment in Plaintiffs' favor.

As shown above, every factor supports Plaintiffs' employee status under the FLSA,

PMWA, and WPCL. A hung jury does not change this outcome. Indeed, "[a] host of reasons—

sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few—

could work alone or in tandem to cause a jury to hang." *Yeager v. United States*, 557 U.S. 110,

121 (2009). Because "there is no way to decipher what a hung count represents," this Court should

not hesitate to grant judgment as a matter of law in favor of Plaintiffs. *Id.*

## IV.    MOTION TO ADOPT PROPOSED FINDINGS UNDER RULE 52(a)(1)

A second hung jury was foreseeable. That is why the Court's Order Re: New Trial ex-

plained that it would enter "final judgment" "whether there [was] or [was] not a unanimous ver-

dict." (ECF No. 294 at ¶ 3). That is also why the Court notified the parties that it would treat the

---

[5] As stated in footnote three, Plaintiffs object to the Court applying this ten-factor test to their
claims under the WPCL. (*See* ECFs. 151, 159, 169, 212, 238, 280, 305, 316).

26

jury as advisory if it failed to reach a unanimous decision.[6] (*Id.*). The Court should now follow through on this plan by adopting Plaintiffs' proposed findings of fact and conclusions of law and enter judgment in Plaintiffs' favor. *See* Fed. R. Civ. P. 52(a)(1).

### A.   Rule 52 allows the Court to adopt Plaintiffs' proposed findings of fact and conclusions of law.

Rule 52(a)(1) provides that "[i]n an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). "The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court." *Id.* "Judgment must [then] be entered [separately] under Rule 58." *Id.*

A party may assist in this process by submitting proposed findings of fact and conclusions of law. *Lansford-Coaldale Joint Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1215 (3d Cir. 1993). The Third Circuit has "squarely held that a district court's findings, when adopted verbatim from a party's proposed findings, do not demand more stringent scrutiny on appeal." *Id.* (citing other precedent). The only requirement is that a court's findings must be "supported by the evidence in the record." *Id.*

Plaintiffs' proposed findings include citations to trial testimony and exhibits. In fact, Plaintiff relied almost exclusively on Uber's own internal documents and employee testimony in preparing their proposed findings. Consistent with its discretion under Rule 52, the Court should now adopt those proposed findings then enter judgment in Plaintiffs' favor. *See* Fed. R. Civ. P. 52(a)(1).

---

[6] Accord *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 53 (3d Cir. 1989) ("a district court must notify both sides of a jury's advisory status no later than the time at which the jury selection has begun").

**B.    The Court should disregard the Supplemental Verdict Form.**

The Court should disregard the results of the Supplemental Verdict Form, ECF 338, as unreliable and uninformative. For example, the Parties did not dispute that each Plaintiff rendered the same service as UberBLACK drivers. (*See, e.g.*, Trial Tr. at 237, June 13, 2024) (describing the UberBLACK product). Yet the jury interpreted the special skill factor differently for each Plaintiff, finding that this factor somewhat favored employee status for Khaldoun Cherdoud, somewhat favored independent contractor status for Ali Razak, and was inconclusive for Kenan Sabani. (ECF 388). Similarly, it was uncontested that the Parties' written agreements afforded Uber the right to terminate Plaintiffs for any reason at any time. (*See, e.g.*, JX-004-002; JX-005-002; JX-006-002; JX-009-004). Yet the jury found that the WPCL's right to terminate factor was neutral as to each Plaintiff's employment status. (ECF 338).

Similarly, this Court's Summary Judgment Opinion, ECF 124, held that it was "beyond dispute that if Uber could not find drivers, Uber would not be able to function." *Razak*, 2018 WL 1744467, at *19. Contrary to this holding, the jury was unable to reach a unanimous decision on "[w]hether the service rendered by Plaintiffs [was] an integral part of Defendants' business." (ECF 338). These illogical results do not speak to Plaintiffs' ability to meet their burden of proof, if they even carry the burden.

Rather, the Supplemental Verdict Form confirms that the economic realities test is too confusing—and too much seeking a legal conclusion—for laypersons to apply. That is why state supreme courts continue to reject this federal common law test. *See Hargrove*, 106 A.3d at 464 (describing the economic realities test as "a qualitative rather than a quantitative analysis," prone to yielding "a different result from case to case"); *Dynamex Operations W. v. Superior Ct.*, 416 P.3d 1, 34 (Cal. 2018) (recognizing that a multifactor balancing test like the economic realities test

"affords hiring business greater opportunity to evade its fundamental responsibilities under a wage and hour law").

Rule 52 allows this Court to disregard the results of the Supplemental Verdict Form. *See Wilson v. Prasse*, 463 F.2d 109, 116 (3d Cir. 1972) ("findings by an advisory jury are not binding"); *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 249 (3d Cir. 2013) ("District courts are free to use advisory juries, even absent the parties' consent. . . . District courts are also free to reject their verdicts[.]") The Court should thus adopt Plaintiffs' proposed findings of fact and conclusions of law, all of which are supported by evidence in the record.

### C.    Third Circuit precedent allows this Court to decide Plaintiffs' employment status through a Rule 52 proceeding.

The Third Circuit has recognized that judges, not jurors, should decide a worker's employment status through a Rule 52 proceeding. For example, in *Donovan v. DialAmerica Mktg., Inc.*, the district court granted summary judgment after holding a two-day evidentiary hearing with 17 witnesses. 757 F.2d 1376, 1381 (3d Cir. 1985). The Third Circuit held that the district court had mislabeled its judgment as "summary judgment" but had taken the correct "course of action" by holding an evidentiary hearing "to find the relevant facts." *Id.* So, in the end, the Third Circuit treated the district "court's letter opinions as the findings of fact and conclusions of law required by [Rule] 52, and its orders as judgments entered after trial pursuant to [Rule] 58." *Id.* at 1381–82.

*DialAmerica* thus contemplates a three-step process for district courts—not jurors—to decide whether a worker is an employee or independent contractor under the FLSA. First, the district court holds an evidentiary hearing to establish a record and resolve factual disputes. Second, "the court must find the facts specially and state its conclusions of law separately" under Rule 52(a)(1). Finally, the district court enters judgment under Rule 58.

The Third Circuit addressed the standard of review for this procedure in *Martin v. Selker Bros.*, 949 F.2d 1286, 1292 (3d Cir. 1991), a case involving gas station operators. The Secretary of Labor had brought the action to enjoin a gasoline distributor from violating the FLSA's minimum wage and overtime provisions. *Id.* at 1290. After a bench hearing, the district court concluded that the station operators were employees, rather than independent contractors, under the FLSA. *Id.* at 1289–90.

On appeal, the Third Circuit recognized that a worker's "employment status" was a "legal determination" warranting plenary review. *Id.* at 1292. "However, the district court's findings of fact and the reasonable inferences in which it engaged are subject to the clearly erroneous standard." *Id.* For these dual standards to apply, the district court would have to "find the facts specially" then separately "state its conclusions of law" regarding the worker's employment status. Fed. R. Civ. P. 52(a)(1).

The Third Circuit reaffirmed this approach two years later in *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207, 213 (3d Cir. 1993), a Jones Act case. Citing its *Martin* decision and Rule 52(a), the Third Circuit in *Evans* held "that employer-employee status is sometimes, as here, a mixed question of law and fact." 4 F.3d 207, 213 (3d Cir. 1993). "Once the underlying facts are established, and the rule of law is undisputed, the issue of whether the facts meet the statutory standard is an issue of law." *Id.* Put differently, the district court decides whether the factual record satisfies the legal standard.

In *Verma v. 3001 Castor, Inc.*, the Third Circuit clarified that "[w]hether a worker is an employee or an independent contractor under the FLSA or PMWA is [also] a mixed question of fact and law." 937 F.3d 221, 229 (3d Cir. 2019). "The fact component is the combination of disputed and undisputed facts that comprise the economic relations between the worker and the

alleged employer." *Id.* "The law component is the conclusion of whether those facts make a worker an 'employee' or 'independent contractor.'" *Id.*

The *Verma* decision also recognized that, "[i]n some cases, one or more genuine issues of fact concerning the relevant economic relations may preclude a trial court from drawing a conclusion as a matter of law on the 'employee' or 'independent contractor' issue." *Id.* The Third Circuit suggested that such cases "would go to trial, with the jury resolving it through either special interrogatories or by deciding the classification issue." *Id.* This suggestion, however, was mere dicta because there were no genuine factual disputes in *Verma*. *Id.* ("as here, the district court may resolve the issue before trial based on undisputed facts in the record."). In other words, the *Verma* decision did not disturb the three-step procedure that the Third Circuit approved in *DialAmerica*, *Martin*, and *Evans*.

Even here, the Third Circuit contemplated that this Court, and not a jury, might decide Plaintiffs' employment status through a Rule 52 proceeding. *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 148 (3d Cir.) ("We do not opine on whether the disputed facts should be resolved by a jury or the District Court through a Rule 52 proceeding, as was the case in *DialAmerica*"), *amended*, 979 F.3d 192 (3d Cir. 2020). Indeed, by refusing to require a jury trial, the Third Circuit intentionally left open the possibility for the Court to decide Plaintiffs' employment under Rule 52.

And, more recently, the Third Circuit held that judges, not jurors, should decide a worker's employment status under the WPCL:

> The factual component addresses the underlying facts reflecting "economic relations" between the parties, while the legal component addresses whether those facts make a worker an "employee" or "independent contractor." **The court then considers the legal question as applied to this factual record**.

*Carpenter v. Pepperidge Farm*, No. 23-2372, 2024 WL 2103257, *2 (3d Cir. May 10, 2024) (internal quotation marks and citation omitted; emphasis added).

In sum, forty years of precedent confirms the Court's ability to determine Plaintiffs' employment status under Rule 52. Having already developed a trial record with an advisory jury, the Court should now adopt Plaintiffs' proposed findings of fact and conclusions of law, filed herewith and incorporated by reference. *See* Fed. R. Civ. P. 52(a)(1). The Court should then enter judgment in Plaintiffs' favor under Rule 58. *Id.*

## V.    MOTION FOR CERTIFICATION UNDER 28 U.S.C. § 1292

As the Court has already acknowledged, there is no explicit authority from the Pennsylvania Supreme Court on which classification test applies to the PMWA and WPCL. *See* ECF 314. Nor has the Pennsylvania Supreme Court opined on which party carries the burden of proof under the PMWA and WPCL. That said, Pennsylvania's high court has uniformly rejected repeated attempts to apply federal standards to the PMWA and WPCL. Thus, a decision from the Pennsylvania Supreme Court resolving these threshold questions of state law would materially advance this litigation to a final decision. The Third Circuit should also weigh in on whether a defendant carries the burden of proving independent contractor status as an exemption under the FLSA. This case is therefore primed for appellate intervention.

The three factors governing whether to grant an interlocutory appeal are outlined in 28 U.S.C. § 1292(b). First, the appeal must involve a "controlling question of law."  Second, there must be "substantial ground for difference of opinion" regarding the controlling question of law. Third, the appeal should "materially advance the ultimate termination of the litigation." All three factors support certifying for interlocutory appeal the question of what standards govern Plaintiffs' employment status under the PMWA and WPCL. These factors also support certifying the question of which party carries the burden of proof under the PMWA and WPCL.

### A.        There are two controlling questions of law.

The first prong of Section 1292(b) is satisfied because there are two controlling questions of law. "A controlling question of law must encompass at the very least every order which, if erroneous, would be reversible error on final appeal." *Katz v. Carte Blanche Corp.*, 496 F.2d 747, 755 (3d Cir. 1974). "Controlling" means "serious to the conduct of the litigation, either practically or legally." *Id*.

The Court's jury instructions (Trial Tr. 104–34, June 11, 2024) implicated three controlling questions of law: (1) what standards govern a worker's classification under the PMWA and WPCL; (2) whether the worker or purported employer carries the burden of proof under Pennsylvania law; and (3) whether the purported employer carries the burden of proving independent contractor status as an exemption to the FLSA.

These are controlling questions of law. After all, reversal of the Court's analysis of either question would represent reversible error on appeal, requiring judgment in Plaintiffs favor or another jury trial with new instructions. In both a practical and legal sense, these questions are serious to the conduct of this action. *See Katz*, 496 F.2d at 755 (finding relevant the "saving of time of the district court and of expense to the litigants"); *Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, 657 F.Supp.2d 504, 508 (D.N.J.2009) (finding a "controlling question of law" because, "[i]f, for example, the Third Circuit rules contrary to this Court's decision ... then this Court would have necessarily committed reversible error."). The first Section 1292(b) factor is met.

### B.        There are substantial grounds for a difference of opinion.

The second prong of Section 1292(b) is also satisfied. "Substantial ground for difference of opinion exists when the matter involves one or more difficult and pivotal questions of law not settled by controlling authority." *Cuttic v. Crozer-Chester Med. Ctr.*, 806 F. Supp. 2d 796, 804 (E.D. Pa. 2011) (internal quotation marks and citation omitted). "In other words, substantial

grounds for difference of opinion exist where there is genuine doubt or conflicting precedent as to the correct legal standard." *Id.* (cleaned up). "Additionally, the absence of controlling law on a particular issue can constitute substantial grounds." *Id.*

Here, there are substantial grounds for differing opinions on what standards control the classification of workers under the PMWA and WPCL. In fact, the difference of opinion is so substantial that Pennsylvania's chief law enforcement officer, the Attorney General, took the extraordinary step of filing an amicus brief on the matter. (ECF 193-1). The Attorney General's brief cautioned this Court against applying federal standards to the PMWA and WPCL, reasoning that the Pennsylvania Supreme Court would likely adopt a more employee-friendly standard, if given the opportunity. (*Id.*). The Attorney General explained that these statutes were enacted decades after the FLSA because the General Assembly believed that workers in Pennsylvania needed greater protection than what the FLSA afforded. (*Id.*).

Indeed, in enacting the PMWA, the General Assembly did not mince words in stating that the "[t]he evils of unreasonable and unfair wages" had proliferated "[i]n the absence of effective" laws:

> Employe[e]s are employed in some occupations in the Commonwealth of Pennsylvania for wages unreasonably low and not fairly commensurate with the value of the services rendered. Such a condition is contrary to public interest and public policy commands its regulation. Employe[e]s employed in such occupations are not as a class on a level of equality in bargaining with their employers in regard to minimum fair wage standards, and "freedom of contract" as applied to their relations with their employers is illusory. Judged by any reasonable standard, wages in such occupations are often found to bear no relation to the fair value of the services rendered. In the absence of effective minimum fair wage rates for employe[e]s, the depression of wages by some employers constitutes a serious form of unfair competition against other employers, reduces the purchasing power of the workers and threatens the stability of the economy. The evils of unreasonable and unfair wages as they affect some employe[e]s employed in the

> Commonwealth of Pennsylvania are such as to render imperative the exercise of the police power of the Commonwealth for the protection of industry and of the employe[e]s employed therein and of the public interest of the community at large.

43 P.S. § 333.101.

Contrary to this declaration, the Court instructed the jury that the economic realities test—federal precedent—controlled Plaintiffs' claims under the PMWA. The Court based its decision on *Com., Dep't of Lab. & Indus., Bureau of Lab. L. Compliance v. Stuber*, 822 A.2d 870, 875 (Pa. Commw. Ct. 2003), which held that "because [the PMWA and FLSA] have identity of purpose . . . federal case law, and the 'economic reality' test employed by the federal courts, is the appropriate standard to use." (ECF 314). At the same time, this Court rejected *Stuber's* presumption of employment as dicta. (*Id.*)

To be clear, the Commonwealth Court's opinion in *Stuber* is neither binding nor persuasive. *See Comm'r v. Bosch's Est.*, 387 U.S. 456, 465 (1967); *United States v. Warren*, 723 F. App'x 155, 164 (3d Cir. 2018). Although Pennsylvania's Supreme Court affirmed *Stuber*, without an opinion, it has since uniformly rejected attempts to apply federal standards to the PMWA. *See, e.g.*, *Bayada Nurses, Inc. v. Com., Dep't of Lab. & Indus.*, 8 A.3d 866 (2010) (enforcing PMWA's more narrow exemption for domestic service employees even though federal exemption was narrower); *Chevalier v. Gen. Nutrition Centers, Inc.*, 220 A.3d 1038, 1055 (2019) (rejecting the federally approved fluctuating work week method for calculating overtime); *In re Amazon.com, Inc.*, 255 A.3d 191, 201 (2021) (disavowing *Stuber* and rejecting federal standard for compensable time because the PMWA was meant to provide greater protections than the FLSA).

Similarly, the Pennsylvania Supreme Court has yet to adopt a classification test for the WPCL. As a result, the Third Circuit has "predict[ed]" that Pennsylvania's high court would employ a ten-factor test that parallels the economic realities test. *Williams v. Jani-King of*

*Philadelphia Inc.*, 837 F.3d 314, 321 (3d Cir. 2016). The Pennsylvania Supreme Court adopted these ten factors in the workers' compensation context but has never applied them to the WPCL. *Universal Am-Can, Ltd. v. W.C.A.B. (Minteer)*, 762 A.2d 328, 333 (2000). Rather, the Third Circuit based its prediction on the Pennsylvania Superior Court having grafted these workers' compensation factors onto the WPCL. *See Jani-King*, 837 F.3d at 320 (citing *Morin v. Brassington*, 871 A.2d 844, 850 (Pa. Sup. Ct. 2005)).

In sum, the Pennsylvania Supreme Court has yet to adopt any classification test for the PMWA or WPCL. Nor has the Pennsylvania Court opined on which party carries the burden of proof under these statutes. Thus, while the Court may disagree with Plaintiffs and the Pennsylvania Attorney General on these issues, there remains substantial ground for difference of opinion. Section 1292(b)'s second prong is thus satisfied.

It also appears that the Third Circuit has never addressed whether the purported employer carries the burden of proving independent contractor status as an exemption to the FLSA. Indeed, Congress intended the FLSA to cover as many workers as possible. *See DialAmerica*, 757 F.2d at 1382. Placing the burden on a worker to prove their employment status contradicts the FLSA's legislative intent. Placing the burden on the purported employer, by contrast, also helps level the playing field when considering that workers often have no say in what contractual label applies to their employment. In short, there are substantial grounds for a difference of opinion on whether Uber carries the burden of proving independent contract status under the FLSA.

### C.    Interlocutory appeal would advance the ultimate termination of this litigation.

If this Court declines to decide Plaintiffs employment status under Rule 52(a)(1), then it should certify an interlocutory appeal before scheduling another trial. Were this Court to certify an interlocutory appeal, Plaintiffs would then ask the Third Circuit to certify these questions to the

Pennsylvania Supreme Court under Local Appellate Rule 110.1 and Pennsylvania Rule of Appellate Procedure 3341.

This Court previously expressed reservations about the Third Circuit's willingness to certify interlocutory appeals. But in 2013, the Third Circuit petitioned the New Jersey Supreme Court to decide "which test should a court apply to determine a plaintiff's employment status" for purposes of New Jersey's wage statutes. *See Hargrove v. Sleepy's LLC*, 612 F. App'x 116, 118 (3d Cir. 2015). In turn, the New Jersey Supreme Court adopted the ABC test and a presumption of employment. *Hargrove v. Sleepy's, LLC*, 106 A.3d 449 (2015). In other words, the Third Circuit has already shown a desire to resolve this very issue. The two hung juries merely emphasis the need for appellate intervention.

In fact, there would be no need for another trial if the Pennsylvania Supreme Court adopted an ABC test because the Court could enter judgment as a matter of law under prongs A and B. Under these prongs, Uber would need to prove that Plaintiffs were "free from control" in performing services as UberBLACK drivers and that driving is "outside the usual course of the [UberBLACK] business." *See Hargrove*, 612 F. App'x at 118. Uber cannot genuinely dispute these prongs, so Plaintiffs would be entitled to judgment as a matter of law. In other words, an interlocutory appeal would facilitate the termination of this litigation, thus satisfying Section 1292(b)'s third prong.

## VI.   MOTION FOR NEW TRIAL UNDER RULE 59

If the Court declines to enter judgment in Plaintiffs' favor, and refuses to permit an interlocutory appeal, then the Court should schedule another trial.  At this new trial, the jury's role should be limited to determining historical facts. *See, e.g.*, Plaintiffs' Proposed Jury Interrogatories, ECF 304. Limiting the jury's role to resolving only factual disputes, to the extent any exist, would be consistent with the Third Circuit precedent discussed above in Section IV. Using these

factual determinations, the Court could then render its legal determination on whether Plaintiffs were employees or independent contractors under federal and state law.

The Court should also ensure that the jury pool reflects a "fair cross section of the community in [this District]," as mandated by the Jury Selection and Service Act of 1968. *See Fleming v. Chi. Transit Auth.*, 397 F. App'x 249, 249-50 (7th Cir. 2010) (quoting Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861-74, 1861 (2006)). As discussed in Plaintiffs' prior objection to the jury pool, ECF 329, which Plaintiffs incorporate by reference, the last two jury pools included a statistically improbable number of jurors from Philadelphia County.

Had the jury pools reflected a true cross-section of this District, as required by law, each pool would have included about seven potential jurors from Philadelphia County in each pool. But the last pool included only two potential jurors from Philadelphia County, and the first pool had only one or two. The Court can safeguard Plaintiffs' rights by enforcing its jury summons or by sending additional summons to jurors in Philadelphia County.

## VII.   DEFENDANTS ARE NOT ENTITLED TO JUDGMENT BASED ON A HUNG JURY

In any event, the Court should not enter judgment for Uber because trial has yielded two hung juries. No precedent establishes a numerical limit on the number of trials that a plaintiff is entitled to in a civil case. Nor is there any precedent connecting a hung jury to a plaintiff's ability to meet his burden of proof. To the contrary, the Supreme Court has instructed against drawing a "negative implication" from a hung jury:

> A host of reasons—sharp disagreement, confusion about the issues, exhaustion after a long trial, to name but a few—could work alone or in tandem to cause a jury to hang. To ascribe meaning to a hung count would presume an ability to identify which factor was at play in the jury room. But that is not reasoned analysis; it is guesswork. Such conjecture about possible reasons for a jury's failure to reach a decision should play no part in assessing the legal consequences of a unanimous verdict that the jurors did return.

*Yeager*, 557 U.S. at 121–22; *Bravo-Fernandez v. United States*, 580 U.S. 5 (2016); *see also Rivera v. La Porte*, 896 F.2d 691, 693 (2d Cir. 1990) ("A jury's inability to reach a verdict cannot be taken as a finding against a plaintiff."). For these reasons, penalizing Plaintiffs for a hung jury would be an error.

## VIII. CONCLUSION

Whether Plaintiffs were employees or independent contractors under the FLSA, PMWA, and WPCL is a question of law for this Court to decide. Having already developed an adequate evidentiary record, this Court should now enter judgment as a matter of law in Plaintiffs' favor under Rule 50(b). Alternatively, the Court should proceed with adopting Plaintiffs' proposed findings of fact and conclusions of law under Rule 52(a)(1). If the Court declines to enter judgment, then it should either allow Plaintiffs to pursue an interlocutory appeal or schedule a new trial.

Dated: July 1, 2024

Respectfully submitted,

*s/ Shannon Liss-Riordan*
Shannon Liss-Riordan (*pro hac vice*)
Thomas Fowler (*pro hac vice*)
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
sliss@llrlaw.com
tfowler@llrlaw.com

Jeremy E. Abay (PA # 316730)
LICHTEN & LISS-RIORDAN, P.C.
76 E. Euclid Avenue, Suite 101
Haddonfield, NJ 08033
jabay@llrlaw.com

Bret Stanley (*pro hac vice*)
THE STANLEY LAW FIRM, PLLC
1700 Richmond Avenue, Suite 1700
Houston, TX 77079
bstanley@stanleypllc.com

*Attorneys for Plaintiffs*

39

## **CERTIFICATE OF SERVICE**

I, Shannon Liss-Riordan, certify that on July 1, 2024, a true and accurate copy of the foregoing document was served on counsel for Defendants by filing on the Court's CM/ECF system.

_s/ Shannon Liss-Riordan_
Shannon Liss-Riordan