## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALI RAZAK, KENAN SABANI, and KHALDOUN CHERDOUD, | Case No. 2:16-cv-00573-MMB |
| Plaintiffs, | Judge Michael M. Baylson |
| v. | |
| UBER TECHNOLOGIES, INC. and GEGEN LLC, | |
| Defendants. | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, Plaintiffs Ali Razak, Kenan Sabani, and Khaldoun Cherdoud submit this these proposed findings of facts and conclusions of law in support of their request for judgment against Defendants Uber Technologies, Inc. and Gegen LLC.

### I.     INTRODUCTION AND PROCEDURAL HISTORY

1.      Plaintiffs are three UberBLACK drivers that operated in the Philadelphia area between 2013 and 2018.

2.      Plaintiffs assert that Defendants "misclassified" Plaintiffs and other similarly situated drivers as independent contractors, rather than employees, thus precluding Plaintiffs from certain benefits and compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201–219, the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101–333.115, and the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1–260.45. (ECF 299 at ¶ 1–5).

3.       Plaintiffs have brought individual and representative claims against Uber Technologies, Inc. and its wholly-owned subsidiary Gegen, LLC ("Gegen," and collectively, "Uber").  (*Id.* at ¶¶ 11–13).

4.       After this case was filed in Court of Common Pleas of Philadelphia County and removed to this Court, ECF 1, extensive discovery took place.

5.       After this Court denied of a number of pretrial motions (*see, e.g.*, ECF 94), Defendants moved for summary judgment on January 26, 2018 (ECF 114).

6.       The Court granted summary judgment on April 11, 2018. (ECFs 124, 125).

7.       The Third Circuit reversed, vacated, and remanded the case, finding that there were a number of material factual disputes that prevented summary judgment. *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 145 (3d Cir.), *amended*, 979 F.3d 192 (3d Cir. 2020).

8.       The Third Circuit contemplated that this Court might use a Rule 52 proceeding to resolve this case. *Id.* at 148.

9.       Following what the Parties reported were extensive but unsuccessful settlement discussions, a jury trial took place in this Court beginning on March 4, 2024. (ECF 243).

10.      As stipulated by the Parties, the trial was limited to "the threshold liability question of whether the three individual Plaintiffs were Defendants' employees under the FLSA, PMWA, and/or WPCL." (ECF 146). Likewise, the Parties limited the relevant time period to "only events occurring . . . prior to January 11, 2018." (*Id.*).

11.      After a five-day trial, the jury could not unanimously agree on whether Plaintiffs had proved—by a preponderance of the evidence—that Plaintiffs were employees of Defendants. (ECF 269). Following the jury's report of a deadlock on this ultimate issue, the Court decided to submit specific questions to the jury on (1) the six "economic reality" factors that guide the

"misclassification" determination under the FLSA and PMWA, as set forth by the Third Circuit in *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376 (3d Cir. 1985), and (2) the ten factors that guide a similar holistic analysis under Pennsylvania's WPCL, as endorsed by the Third Circuit in *Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314 (3d Cir. 2016). (ECF 269).

12.     When the Court proposed use of this supplemental form, both parties initially objected. Defendants maintained that objection throughout trial, whereas Plaintiffs ultimately informed the Court that Plaintiffs did not "have an objection to this general process." (Trial Tr. at 5, Mar. 11, 2024, ECF 277).

13.     Although the Court went ahead with the poll, the Court ultimately determined that—even if it had been permissible to use an advisory jury for Plaintiffs' damages claim under the FLSA—the poll could not have had any legal significance at that time and place in this case. (Trial Tr. at 10, Mar. 11, 2024, ECF 277). *See Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 52 (3d Cir. 1989).

14.     The potential insights gleaned from this more granular polling led the Court to require each party to submit proposed jury interrogatories in advance of the second trial. (*See* ECFs 301, 304).

15.     After the Court denied the Parties' Rule 50(a) and Rule 50(b) Motions (ECF 314), the Court decided to empanel a jury for a second trial beginning on June 10, 2024 (ECF 294).

16.     In its Order Re: New Jury Trial, the Court gave "notice that it may, in the event of a jury unable to reach a unanimous verdict once again, decide to take the jury's answers to the jury interrogatories, along with the trial record and undisputed facts, and then 'mold' a verdict and judgment for review upon appeal by either or both parties to the Third Circuit." (ECF 294 at ¶ 5).

17.     After another five-day trial, the jury could not unanimously agree on whether Plaintiffs had proved—by a preponderance of the evidence—that Plaintiffs were employees of Defendants. (ECF 338).

18.     Following the jury's report of a deadlock on this ultimate issue, the Court once again submitted specific questions to the jury on (1) the six "economic reality" factors that guide the "misclassification" determination under the FLSA and PMWA, and (2) the ten factors that guide a similar holistic analysis under Pennsylvania's WPCL. (ECF 338). Plaintiffs objected to the form of the questions, and Defendants objected to the entire procedure. (Trial Tr. at 155–66, June 17, 2024).

19.     The Supplemental Verdict Form asked the jury to unanimously decide, for each Plaintiff, whether each individual factor: (1) strongly favored independent contractor status; (2) somewhat favored independent contractor status; (3) was neutral; (4) somewhat favored employee status; or (5) strongly favored employee status. (ECF 338). The Supplemental Verdict Form also asked the jury to unanimously answer "yes" or "no" to the question of whether each Plaintiff had proved by a preponderance of the evidence that he was Defendants' employee during the relevant period under the FLSA, PMWA, and WPCL. (*Id.*).

20.     The jury was unable to unanimously answer "yes" or "no" as to whether any Plaintiff had proved by a preponderance of the evidence that they were Defendants' employee during the relevant period under the FLSA, PMWA, and WPCL. (*Id.*). The jury reached a unanimous decision on only a handful of the individual factors under the FLSA, PMWA, and WPCL, but the results were inconclusive. (*Id.*). The results are summarized in the following tables (no answer means that the jury could not reach a unanimous decision on the factor or question). (*Id.*).

| FLSA and PMWA Factor | Khaldoun Cherdoud | Kenan Sabani | Ali Razak |
|---|---|---|---|
| Degree of Defendants' right to control the manner in which Plaintiffs' work is to be performed | | | |
| Plaintiffs' opportunity for profit or loss depending upon Plaintiffs' managerial skill | | | |
| Plaintiffs' investment m equipment or materials required for Plaintiffs' task, or Plaintiffs' use of helpers | | | |
| Whether the service rendered by Plaintiffs required a special skill | Somewhat in Favor of Employee | | Somewhat in Favor of Independent Contractor |
| Degree of permanence of the working relationship | | | |
| Whether the service rendered by Plaintiffs is an integral part of Defendants' business | | | |
| Based on your consideration of the foregoing factors and the totality-of-the circumstances of the economic realities of the relationship between Plaintiff, has Plaintiff proved by a preponderance of the evidence that Plaintiff was Defendants' employee during the relevant time period under the FLSA and the PMWA? | | | |

| WPCL Factor | Khaldoun Cherdoud | Kenan Sabani | Ali Razak |
|---|---|---|---|
| Control of the manner that work is to be done | | | |
| Responsibility for result only | | | |

| | | | |
|---|---|---|---|
| Terms of agreement between the Parties | | | |
| The nature of the work or occupation | Neutral | Neutral | Neutral |
| The skill required for performance | Somewhat in Favor of Employee | | Somewhat in Favor of Independent Contractor |
| Whether one employed is engaged in a distinct occupation or business | Neutral | Neutral | Neutral |
| Which party supplies the tools | | | |
| Whether payment is by the time or by the job | Somewhat in Favor of Independent Contractor | Somewhat in Favor of Independent Contractor | Somewhat in Favor of Independent Contractor |
| Whether the work is part of the regular business of the employer | | | |
| The right to terminate the employment at any time. | Neutral | Neutral | Neutral |
| For the purposes of Plaintiff's claim under the WPCL, has Plaintiff proved by a preponderance of the evidence, based on the totality-of-the circumstances of the nature of the relationship between Plaintiff and Defendants, that Plaintiff was Defendants' employee during the relevant time period? | | | |

21.     The Court finds that the results of the Supplemental Verdict Form, ECF 338, are unreliable and, therefore, will be disregarded. *See Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 249 (3d Cir. 2013). For example, the Parties do not dispute that each Plaintiff rendered the same service as UberBLACK drivers. (*See, e.g.*, Trial Tr. at 237, June 13, 2024) (describing the UberBLACK product). Yet the jury interpreted the special skill factor differently for each Plaintiff,

finding that this factor somewhat favored employee status for Khaldoun Cherdoud, somewhat favored independent contractor status for Ali Razak, and was inconclusive for Kenan Sabani. (ECF 388). Similarly, it is uncontested that the Parties' written agreements afforded Uber the right to terminate Plaintiffs for any reason at any time. (*See, e.g.*, JX-004-002; JX-005-002; JX-006-002; JX-009-004). Yet the jury found that the WPCL's right to terminate factor was neutral as to each Plaintiff's employment status. (ECF 338).

22.    Consistent with the notice provided in the Order Re: New Jury Trial (ECF 2940), the Court will now find the facts specially and state its conclusions of law separately pursuant to Rule 52(a)(1).

## II.   FACTUAL FINDINGS

23.    The Parties' written agreements memorialized Uber's right to terminate Plaintiffs for substandard service and for other reasons. (*See* JX-001; JX-003; JX-004; JX-005-002; JX-006; JX-007; JX-008; JX-009; JX-010; JX-011; JX-012).

24.    After receiving a customer complaint, Uber would, in its sole discretion, decide whether to deactivate a driver. (Trial Tr. 218, June 13, 2024).

25.    Uber's Deactivation Policy also reflected Uber's right to terminate Plaintiffs based on standards that Uber established. (PX-301; PX-302).

26.    After every trip, Uber invited riders to rate their driver on a five-star scale. (PX-250; PX-302).

27.    Uber reserved the right to terminate Plaintiffs for failing to maintain a minimum average driver rating. (PX-301; PX-302; PX-101).

28.    Uber originally set the minimum average driver rating for black car drivers in Philadelphia at 4.6. (JX-001).

29.     Uber later increased the minimum driver rating to 4.7 to "help grow demand for UberBLACK."  (PX-145; *see also* PX-253).

30.     Drivers that fell below this threshold received multiple warnings that they would soon be deactivated unless they improved their performance. (PX-101).

31.     If a driver failed to improve, Uber would use its "judgment in deciding whether to take the partner offline." (PX-101; PX-301; PX-302).

32.     After deactivating a driver for poor performance, Uber reserved the right reactivate the driver if the driver completed a "quality training course." (PX-101; PX-304).

33.     These quality training courses were offered by "exemplary Uber partners." (PX-101).

34.     Uber employed a quality control system designed to keep UberBLACK drivers in Philadelphia "engaged in their rating." (PX-101).

35.     As part of its quality control system, Uber "warn[ed]/deactivate[d] bad drivers often (daily, at least weekly)." (PX-101; *see also* PX-253; PX-250).

36.     Uber's quality control system "[p]ut the burden on the driver to get certified, get back online." (PX-101).

37.     Uber's quality control system also "flex[ed] thresholds up over time (i.e. from min driver rating of 4.4 to 4.7)." (PX-101).

38.     This "ongoing process" regularly engaged drivers who needed "encouragement, or training, and either encourage[d] them to improve, or manage[d] them out of the fleet." (PX-101).

39.     In "weekly summary reports," Uber notified drivers of their average rating over the last week. (PX-253). These reports praised drivers for being "above average" and instructed drivers on how to improve their ratings. (PX-253).

40.     Uber also had the right to terminate drivers for committing Uber-specific "infractions," including:

- Accepting a tip. (PX-250; PX-333).
- Refusing a trip based on the end destination. (PX-250; PX-195).
- Calling riders in advance to ask for their destination. (PX-195).
- Giving out personal business cards to riders. (PX-184).
- Accepting a trip outside the app from an Uber customer. (PX-184).
- Talking too much. (PX-253).
- Talking too little. (PX-253).
- Asking for a rating. (PX-250).
- Failing to tap the begin trip button. (PX-250).
- Failing to tap the end trip button. (PX-250).
- Cancelling on a rider. (PX-250).
- Not answering the phone. (PX-250).
- Tapping the "arriving now" button too soon. (PX-250).
- Calling a customer too often. (PX-250).
- Not having a toll pass. (PX-250).
- Soliciting payment outside the Uber system. (PX-250; PX-301; PX-302).
- Soliciting trips outside the app. (PX-250; PX-301; PX-302).
- Manipulating surge pricing. (PX-250).
- Not wearing a suit and tie. (PX-204; PX-196).
- Too much cologne. (PX-250).
- Generally smelly. (PX-250).
- Wrong driver (not the driver that Uber assigned). (PX-250; PX-192).
- Wrong vehicle (not the vehicle that Uber assigned). (PX-250; PX-192).
- Disparaging Uber during rides. (PX-212).
- Inactivity on Uber App. (PX-333).
- Uber profile missing documents. (PX-333).
- Accepting trips without the intention of completing them. (PX-302).
- Provoking riders to cancel a trip. (PX-302).
- Carrying firearms of any kind. (PX-302).
- Taking a trip using vehicle not approved by Uber. (PX-302).
- Providing inaccurate information to Uber. (PX-302).
- Refusing Uber's background checks. (PX-302).
- Accepting street hails. (PX-302; PX-192).
- Harming Uber's business or brand. (PX-302; PX-212).
- Leaving one's phone in the airport zone. (PX-295; PX-298).
- Serious feedback from customers to Uber. (PX-253).
- Repeated negative feedback from customers to Uber. (PX-253).
- Falling below Uber's minimum average driver rating. (PX-302).
- Exceeding Uber's maximum cancellation rate. (PX-302).
- Getting into an accident during a trip. (PX-250).

- Trouble with picking up customers. (PX-250).
- Allowing another driver to drive under your account. (PX-302; PX-192).

41.     Uber also reserved the right to terminate drivers for infractions that overlapped with local limousine regulations, including:

- Altercations. (PX-250; D-402).
- Attitude complaints. (PX-250; D-402).
- Taking a bad route. (PX-250; D-402).
- Lacking city knowledge. (PX-250; D-402).
- Not opening the door. (PX-250; D-402).
- Inappropriate behavior. (PX-250; D-402).
- Mistiming a trip. (PX-250; D-402).
- Poor communication. (PX-250; D-402).
- Poor driving. (PX-250; D-402).
- Having a "smelly" car. (PX-250; D-402).
- Smelling of cigarettes. (PX-250; D-402).
- Body odor. (PX-250; D-402).
- Poor personal hygiene. (PX-250; D-402).
- Unprofessional attire. (PX-250; D-402).
- Poor vehicle appearance. (PX-250; D-402).
- Mechanical issues. (PX-250; D-402).
- Unwanted contact. (PX-302; D-402).
- Abusive language. (PX-302; D-402).
- Violent behavior. (PX-302; D-402).
- Denying a service animal. (PX-302; D-402).
- Increasing the time or distance of a trip. (PX-302; D-402).

42.     Like a traditional employer, Uber kept personnel files on each driver. (PX-250; PX-251).

43.     If a driver committed one of the foregoing infractions, Uber's representatives would log that infraction in the driver's personnel file. (PX-250; PX-251). For example, if a driver took a bad route, Uber would tag the driver's file with "driver_quality_bad_route_city_knowledge." (PX-250; PX-251).

44.     Uber also included notes and other information about drivers in their personnel files. (PX-250; *see also* PX-227). For example, Uber tagged drivers who had "a low opinion of

driving with Uber" as a "Driver detractor." (PX-226; Trial Tr. 48, June 12, 2024; *see also* PX-212, 253). Uber likewise tagged drivers that Uber favored as "VIP drivers." (*Id.*).

45.     Tara Murray, who managed UberBLACK drivers during the relevant period, testified that Uber tracked drivers by logging "every moment, every touch, everything in the app[.]" (Trial Tr. at 190, Mar. 5, 2024, ECF 273). This surveillance allowed Uber to amass troves of driver data that Uber used to monitor performance. (*See* PX-243; PX-244; PX-245; PX-251; PX-334).

46.     Using this data, Uber unilaterally decided when to turn on "surge pricing," which temporarily increased the price of fares in certain areas. (*See, e.g.*, PX-170).

47.     Uber also had the ability to block drivers from working in certain areas. For example, Murray testified that "drivers could be blocked from receiving airport requests" and from receiving fares in Philadelphia County. (Trial Tr. 48–49, June 12, 2024; *see also* PX-226). In other words, Uber placed geographical limitations on where drivers would receive fares. (*See* Trial Tr. 102, June 13, 2024; PX-195).

48.     Uber's Driver Deactivation Policy also warned drivers that they would be deactivated for exceeding their city's "maximum cancellation rate," which was purportedly based on "the average cancellation rate of drivers in that area." (PX-302; *see also* Trial Tr. 155, June 13, 2024).

49.     Uber would "alert [drivers] multiple times if [their] cancellation rate [was] much higher or if [they were] consistently cancelling more often than other drivers." (PX-302).

50.     If a driver's cancellation rate continued to "exceed the maximum limit," their "account would be deactivated," according to Uber's Driver Deactivation Policy. (PX-302).

51.     Drivers were also contractually obligated to "fully complete a Request after acceptance" unless cancelled by Uber or the rider. (JX-001 at 2).

52.     Uber had the discretion to terminate a driver for refusing "to fully complete a trip after acceptance of a trip." (JX-006 at ¶ 5.1).

53.     During the relevant period, drivers were contractually obligated to accept "at least 80% of the Customer Requests/Requests Gegen . . . provided to [a driver] in a thirty (30) day period, provided that Gegen [had] presented at least 60 Customer Requests . . . in that same period." (JX-001).

54.     Failure to adhere to Uber's minimum acceptance rate was a "material breach" of a driver's contract, and thus entitled Uber to terminate the contract. (JX-001).

55.     Later, Uber modified its acceptance rate policy so that if a driver was "consistently not accepting trip requests" or "declining more trips than other drivers," the driver would be suspended for "a short period of time." (PX-302).

56.     Still, drivers had to agree "to only make [themselves] available to receive Requests during such times as [they were] generally able to accept Requests that [were] offered." (JX-001).

57.     Uber also had more restrictive vehicle requirements for UberBLACK compared to the Philadelphia Parking Authority. For example, the Uber's vehicle age limit was eight years, while the PPA's vehicle age limit was ten years. (Trial Tr. 227, June 11, 2024).

58.     Uber subjected drivers to its own background checks, separate from the background check that the Philadelphia Parking Authority conducted. (PX-111-001). Uber told drivers that its "background check [was] more thorough and [was] a requirement to remain an active driver with Uber." (PX-111). Uber explained that, because of its more thorough background check, riders were "more likely to use Uber again, and again." (PX-111).

59.     Uber also subjected drivers to multiple background checks.  For example, Ali Razak testified that in one year, Uber conducted approximately 10 background checks on him. (Trial Tr. 216, June 12, 2024). Razak also testified that he was not able to work as an UberBLACK driver while his background checks with Uber were pending. (Trial Tr. 217, June 11, 2024).

60.     Uber also had a dress code for UberBLACK drivers. "Uber Black required attire calls for all drivers to be wearing a suit and tie at all times when operating on the Uber system." (PX-196; *see also* PX-204). Uber told drivers, "Customers appreciate this, and it helps differentiate Uber from taxis. Drivers not dressed properly are hurting the Uber system and hurting 5-star drivers who always dress properly before driving." (*Id.*).

61.     Uber determined how much drivers earned for each trip. (*See* Trial Tr. 212, June 13, 2024) (admitting that "Uber set the fare structure, yes.").

62.     Uber controlled how much to charge customers. (*See, e.g.*, JX-007 at ¶ 5.1).

63.     Drivers could not negotiate fares. (*See, e.g.*, JX-11 at ¶¶ 4.1–4.3). Nor could drivers negotiate Uber's commission on each fare. (*See, e.g.*, JX-11 at ¶ 4.4).

64.     If a customer used a stolen credit card or chargebacks to avoid paying for a ride, Uber would decide whether to still pay the driver. (Trial Tr. 214, June 13, 2024). Whether the driver was paid in such instances would depend on whether Uber thought the driver was complicit. (*Id.*).

65.     Similarly, whether to charge a customer a cancellation fee was in Uber's sole discretion. (JX-007 at ¶ 5.2.1; Trial Tr. 217, June 13, 2024).

66.     Uber likewise decided whether to charge a cleaning fee to a customer for damaging a driver's vehicle. (Trial Tr. 147, June 11, 2024).

67.     Uber also decided whether to pay a driver during App outages. (*See, e.g.*, PX-225). For example, Uber once compensated drivers who were "knocked out the airport queue" because of a technical issue. (PX-225).

68.     There were also times when Uber paid black car drivers a guaranteed wage. (*See, e.g.*, PX-195; PX-197; PX-204). To qualify for these guaranteed wages, a driver would have to have a certain acceptance rate. (*See, e.g.*, PX-195-002). For example, a driver might qualify for a guaranteed hourly rate by accepting eight out of every ten trips. (PX-195-002).

69.     Uber controlled trip assignments through its algorithm. (Trial Tr. 137–38, June 11, 2024). For this reason, drivers could not attract more profitable riders by providing higher-quality service, as customers could not select a particular driver through the Uber App. (*Id.*; *see also* Trial Tr. 12–13, June 11, 2024).

70.     When a driver received a potential trip assignment from Uber, the driver was alerted through Uber's Driver App. (Trial Tr. 135, June 11, 2024).

71.     Chad Dobbs, Uber's witness and regional manager, testified that drivers had "roughly 15 seconds to accept or reject" an incoming trip request. (Trial Tr. 186, June 13, 2024).

72.     Uber did not provide a rider's destination until after the driver accepted and started a trip, with the passenger already in the vehicle. (PX-330; Trial Tr. 21, June 11, 2024).

73.     Uber likewise prohibited drivers from calling riders to ask for their destination before picking them up. (PX-195; Trial Tr. 21, June 11, 2024). Drivers were also prohibited from rejecting a trip based on the end destination. (*Id.*).

74.     Uber also barred drivers from contacting customers after a ride to solicit additional business. (Trial Tr. 12–13, June 11, 2024).

75.     Uber policy also prohibited drivers from giving out their personal business cards. (PX-184-003). There were "no exceptions to this policy and drivers [would] be deactivated permanently if . . . caught doing this even once." (PX-184-003).

76.     Uber also precluded drivers from delegating trips to other drivers. (PX-192).

77.     Uber unilaterally decided to offer and promote UberX, a cheaper alternative to UberBLACK, in the Philadelphia market at Plaintiffs' expense. (Trial Tr. 56:6–10, June 12, 2024).

78.     Uber paid Plaintiffs and other drivers on a weekly basis. (*See, e.g.*, PX-237; PX-242; PX-233).

79.     Uber deducted money from Plaintiffs' weekly earnings to cover business expenses, including liability insurance, Philadelphia Parking Authority stickers, and vehicle finance payments. (*Id.*). For this reason, drivers could not decide when and whether to pay for these expenses.

80.     If a driver did not earn enough income from fares to cover these deductions, they would go into debt with Uber, which compelled the driver to work more. (Trial Tr. 103–04, 217–18, June 11, 2024).

81.     Uber has spent billions of dollars building and operating its platform. (PX-246).

82.     Uber's investment in its business is exponentially greater than Plaintiffs' individual business expenses. (*Id.*).

83.     Driving for UberBLACK does not require a special skill.

84.     The record establishes a continuous and intense working relationship between each Plaintiff and Uber, reflecting an employment relationship.

85.     Sabani and Cherdoud began working for Uber in December 2013, and Razak started in July 2014. (PX-243; PX-245; PX-245).

86.     Trial covered events before January 11, 2018, which amounts to less than 1,500 potential workdays for all three Plaintiffs. (ECF 148). Over that period, Razak completed 5,602 trips, Sabani completed 4,854 trips, and Cherdoud completed 6,518 trips. (DX-501, DX-503, DX-505). Plaintiffs worked almost every week and logged at least 40 hours online in each week they worked. (PX-243; PX-244; PX-245; PX-334, DX-502, DX-504).

87.     Uber drivers are essential to Uber's business.

88.     It is beyond dispute that if Uber could not find drivers, Uber would not be able to function.

89.     Uber also recognized that drivers were integral to its business. For example, Uber told Plaintiffs and other drivers that they deserved a better "driving . . . experience, because simply put, Uber wouldn't exist without [them]." (PX-216).  In another email to Plaintiffs, Uber said it was "focus[ing] on providing awesome resources to help [drivers] grow ***our*** business." (PX-330). When Uber dealt with regulatory agencies, it called itself a "limousine company." (PX-109; PX-120). Uber also used the trademark, "everyone's private driver." (PX-208).

90.     Uber also understood that its reputation turned on the quality of its drivers. (PX-250) ("Deactivating the accounts of the partners who provide consistently poor experiences ensures that Uber continues to be known for quality.").

91.     In the same vein, Uber attributed its revenue to drivers. (PX-330) ("We've had a great 2013 in Philadelphia thanks to you, our Uber Partners.").

92.     Uber's own head of operations in the United States and Canada described its relationship with drivers as symbiotic: "Drivers are at the center of the Uber experience, and the app they use to go online and earn money is at the center of theirs."  (PX-229).

93.     The trial record also revealed that Uber knew that its classification of drivers as independent contractors exposed it to legal risk. For example, Uber's Philly Quality Playbook remarked, "**Hello, Legal!**," in reference to its classification of drivers. (PX-101).

94.     Uber also trained its employees to avoid language connotating an employment relationship with drivers. (*See, e.g.*, PX-333) ("they should never be referred to as 'our drivers,' 'Uber drivers,' or anything else similar"). For instance, Uber's internal deactivation manual told representatives to say "deactivate" instead of "terminate":

> **Do NOT use any language to imply they have been fired, let go, or terminated.**
>
> DO NOT imply that a driver has been terminated.  We've ended the partnership or deactivated the account.  We haven't fired anyone.

(PX-250-017, 34) (emphasis in original).

95.     Although Uber required Plaintiffs to form their own business entities, Uber failed to explain why it imposed this requirement. The Court thus infers that this requirement was meant to serve as an anticipatory legal defense. *See, e.g.*, *Cummings v. Cenergy Int'l Servs., LLC*, 271 F. Supp. 3d 1182, 1190 (E.D. Cal. 2017) ("[C]orporate entities were formed by Plaintiffs as a specific requirement of Cenergy. . . . These allegations create a reasonable inference that the corporate entities were created for no purpose of Plaintiffs and solely for the benefit of Cenergy . . . as a corporate fiction[.]"); *Acosta v. Jani-King of Oklahoma, Inc.*, 905 F.3d 1156, 1158 (10th Cir. 2018) ("individuals who form corporate entities and enter franchise agreements as required by Jani-King 'nonetheless personally perform the janitorial work on behalf of Jani-King' and, based on the economic realities of this relationship, are Jani-King's employees under the FLSA").

III.   LEGAL CONCLUSIONS

A.   **Plaintiffs were Uber's employees under the FLSA and PMWA.**

96.   In determining whether Plaintiffs were employees under the FLSA and PMWA, the

Third Circuit in this case considered the six factors outlined in *Donovan v. DialAmerica Mktg.,*

*Inc.*, 757 F.2d 1376 (3d Cir. 1985):

> 1)   the degree of Uber's right to control the manner in which the Plaintiffs performed services as Uber drivers;
>
> 2)   Plaintiffs' opportunity for profit or loss when rendering services on behalf of Uber depending upon their managerial skill;
>
> 3)   Plaintiffs' investment in equipment or materials required for being Uber drivers, as compared to Uber's investment;
>
> 4)   whether the service Plaintiffs rendered required a special skill;
>
> 5)   the degree of permanence of the working relationship between Plaintiffs and Uber; and
>
> 6)   whether services rendered by Plaintiffs were an integral part of Uber's business.

*Razak*, 951 F.3d at 142–43.

97.   The Third Circuit emphasized that "neither the presence nor absence of any

particular factor is dispositive." *Id.* at 143 (internal citation and quotation marks omitted). With

that in mind, the Third Circuit examined the "circumstances of the whole activity" to determine

whether, "as a matter of economic reality," Plaintiffs depended on Uber. *Id.*

98.   As a guiding principle, the Third Circuit has underscored "that, of all the acts of

social legislation, the Fair Labor Standards Act has the broadest definition of 'employee.'"

*DialAmerica*, 757 F.2d at 1382.

99.   This inquiry "is not governed by the 'label' put on the relationship . . . or the

contract controlling that relationship[.]" *Safarian v. Am. DG Energy Inc.*, 622 F. App'x 149, 152

(3d Cir. 2015) (internal citation and quotation marks omitted); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947).

### 1.   First Factor: Right to Control

100.    The first economic realities factor considers "the degree of the alleged employer's right to control the manner in which the work is to be performed." 757 F.2d at 1382. While not dispositive, this factor is highly relevant to the FLSA analysis. *Razak*, 951 F.3d at 145. On appeal, the Third Circuit clarified that "[a]ctual control of the manner of work is not essential; rather, it is the right to control which is determinative." *Id.*

101.    The Supreme Court has also recognized that a worker who decides when, where, and for how long to work may be an employee under the FLSA. For example, in *Goldberg v. Whitaker House Coop.*, the Supreme Court held that members of a cooperative who made knitted goods at home for piece-rate pay were employees under the FLSA:

> The members are not self-employed; nor are they independent, selling their products on the market for whatever price they can command. They are regimented under one organization, manufacturing what the organization desires and receiving the compensation the organization dictates. Apart from formal differences, they are engaged in the same work they would be doing whatever the outlet for their products. The management fixes the piece rates at which they work; the management can expel them for substandard work or for failure to obey the regulations. The management, in other words, can hire or fire the homeworkers.

366 U.S. 28, 30–32 (1961).

102.    Applying this reasoning, the Third Circuit in *DialAmerica* also concluded that home researchers who could "work any time and for as many hours as they desired" were employees under the FLSA. 757 F.2d at 1385–86.

103.    Courts have also recognized that the right to terminate is strong evidence of control. *See, e.g.*, *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 789 (3d Cir. 1978) ("the right

to terminate the relationship for breach of any [contract] provision . . . can very effectively control the day-to-day operation"); *Razak*, 951 F.3d at 146.

104.    After considering the record, this Court finds that Uber had the right to exert, and did exert, a high degree of control over the manner in which Plaintiffs work was to be performed.

105.    The first factor under the economic realities thus favors Plaintiffs' employee status under the FLSA and PMWA. The second economic realities factor considers Plaintiffs' control over their profit or loss as UberBLACK drivers.

### 2. Second Factor: Opportunity for Profit or Loss Depending Upon Managerial Skill

106.    Courts have uniformly rejected that a worker's ability to "hustle" or work more amounts to an opportunity for profit or loss. *See, e.g.*, *McFeely v. Jackson St. Ent., LLC*, 825 F.3d 235, 243 (4th Cir. 2016); *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 328 (5th Cir. 1993).

107.    Where, as here, a defendant controls prices, operations, and advertising, a worker has little opportunity for profit or loss based on managerial skill. *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 231 (3d Cir. 2019).

108.    This Court finds that Plaintiffs' managerial skills did not materially affect their opportunity for profit or loss as UberBLACK drivers. Thus, the second economic realities factor favors an employment relationship between Plaintiffs and Uber.

### 3. Third Factor: Relative Investment in Equipment or Materials

109.    The third economic realities factor considers the *relative* investment that Plaintiffs made, as compared to the investment of Uber in building and maintaining its platform and business. *Verma*, 937 F.3d at 231 ("a dancer's investment is minor when compared to the club's investment"); *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998).

110.     This third factor supports an employment relationship between Uber and Plaintiffs, as Uber's investment in its business far exceeded Plaintiffs' investments.

### 4.     Fourth Factor: Special Skill

111.     The fourth economic realities factor considers whether the services that Plaintiffs rendered for Uber required a special skill.

112.     The Third Circuit has already decided that driving a black car does not involve a special skill. *Razak*, 951 F.3d at 147 ("Although there may be a distinction between 'driving' and 'replicat[ing] the limousine experience,' . . . this is not enough to overcome the presumption that driving is not a special skill."); *see also Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 995 (9th Cir. 2014) ("FedEx drivers need no experience to get the job in the first place and [the] only required skill is the ability to drive.").

113.     This fourth factor thus supports that Plaintiffs were employees of Uber.

### 5.     Fifth Factor: Degree of Permanence of the Working Relationship

114.     The fifth economic realities factor is the degree of permanency of Plaintiffs' relationship with Uber. This factor considers whether Plaintiffs' relationship with Uber was "a transitory one." *DialAmerica*, 757 F.2d at 1384–85; *Verma*, 937 F.3d at 231 ("the average dancer in the class worked for the Club in only 14 of the 109 workweeks").

115.     Although Plaintiffs had the right to choose when they worked, the reality is that Plaintiffs worked continuously and for long periods over the relevant years.

116.     This fifth factor also supports an employment relationship between Plaintiffs and Uber.

### 6.     Sixth Factor: Whether the Services were Integral

117.     The sixth economic realities factor considers whether Plaintiffs' services were integral to Uber's business. To that end, this Court has already held that "Uber drivers are an

essential part of Uber's business as a transportation company." *Razak v. Uber Techs., Inc.*, No. 16-cv-573, 2018 WL 1744467, at *19 (E.D. Pa. Apr. 11, 2018) ("Indeed, it seems beyond dispute that if Uber could not find drivers, Uber would not be able to function.").

118.    Although Uber insists that it is merely a "technology company," Uber cannot genuinely dispute that it needs drivers like Plaintiffs to function. Indeed, Uber has offered no evidence that it derives revenue from leasing its technology. Rather, the evidence shows that Uber makes money by transporting customers.

119.    This sixth factor thus weighs heavily in favor of an employment relationship.

120.    Having found that all six factors of the economic realities test favor an employment relationship, this Court holds that Plaintiffs were employees of Uber under the FLSA and PMWA during the relevant period.

**B.    Plaintiffs were Uber's employees under the WPCL.**

121.    The WPCL requires this Court to consider a slightly different set of factors, including:

1)    Control of the manner that work is to be done;

2)    Responsibility for result only;

3)    Terms of agreement between the Parties;

4)    The nature of the work or occupation;

5)    The skill required for performance;

6)    Whether one employed is engaged in a distinct occupation or business;

7)    Which party supplies the tools;

8)    Whether payment is by the time or by the job;

9)    Whether the work is part of the regular business of the employer; and

10)     The right to terminate the employment at any time.

*Williams v. Jani-King of Philadelphia Inc.*, 837 F.3d 314, 321 (3d Cir. 2016).

122.    Under the WPCL, a defendants' control over the work to be completed and the manner in which that work is to be performed are the primary considerations determining employee status. *Id.*

123.    For reasons discussed above, this Court finds that the WPCL's first, second, third, fourth, fifth, sixth, seventh, ninth, and tenth factors favor an employment relationship between Plaintiffs and Uber.

124.    Although Plaintiffs were primarily paid by the job, the evidence also shows that, in some instances, Uber paid Plaintiffs and other drivers by the hour. (*See, e.g.*, PX-195; PX-197; PX-204). Thus, the eighth WPCL factor also favors Plaintiffs' employee status.

125.    Because all ten factors favor employment, this Court holds that Plaintiffs were employees of Uber under the WPCL during the relevant period.

126.    Having found the facts specially and having stated its conclusions of law separately, judgment shall be entered in Plaintiffs' favor and against Defendants on all counts.[1]

127.    Plaintiffs' award of damages and other relief shall be determined separately.

**SO ORDERED**, this                    day of                              , 2024.

**BY THE COURT:**

_____
**MICHAEL M. BAYLSON**
**United States District Court Judge**

---

[1] The Court acknowledges Plaintiffs' ongoing objection to applying the foregoing standards to their PMWA and WPCL claims. (*See* ECF 314). The Court also acknowledges Plaintiffs' objection to placing the burden of proof on them, rather than Uber, under the FLSA, PMWA, and WPCL. (*See* ECF 316). Having now ruled in Plaintiffs' favor on all counts, the Court considers Plaintiffs' objections to be moot.