**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALI RAZAK, KENAN SABANI, and KHALDOUN CHERDOUD, <br><br>          Plaintiffs, <br><br>     v. <br><br> UBER TECHNOLOGIES, INC. and GEGEN LLC, <br><br>          Defendants. | Civil Action No. 2:16-CV-00573-MMB <br><br> Judge Michael M. Baylson |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION FOR JUDGMENT UNDER RULE 50(b), JUDGMENT UNDER
RULE 52(a)(1), CERTIFICATION FOR INTERLOCUTORY APPEAL
UNDER 28 U.S.C. § 1292(b), AND A NEW TRIAL UNDER RULE 59**

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    ARGUMENT ....................................................................................................... 3

    A.    The Court Should Deny Plaintiffs' Motion for Judgment Under Rule 50(b). .......................................................................................................... 3

        1.    Plaintiffs seek an improper credibility determination from the Court. ..................................................................................................... 3

        2.    Plaintiffs are not entitled to judgment as a matter of law on their FLSA and PMWA claims. .......................................................... 4

            a.    Degree of Uber's right to control the manner in which the work is to be performed ................................................... 4

                i.    The record does not support Plaintiffs' arguments regarding "right to control.".............................................. 4

                ii.    Plaintiffs' legal arguments as to "control" also lack merit. ................................................................. 14

            b.    Opportunity for profit or loss ...................................................... 16

            c.    Investment in equipment or materials .......................................... 18

            d.    Whether the service rendered requires special skill ...................... 19

            e.    Degree of permanence of the working relationship ...................... 20

            f.    Whether the service rendered is an integral part of Uber's business ..................................................................................... 21

        3.    Plaintiffs are not entitled to judgment as a matter of law on their WPCL claims. .......................................................................... 22

        4.    The Court should deny Plaintiffs' Rule 50(b) motion. ............................ 23

    B.    The Court Should Deny Plaintiffs' Motion for Judgment Under Rule 52............ 23

        1.    Defendants' right to a jury trial is inviolate. ............................................. 23

        2.    Defendants have not stipulated to non-jury or advisory jury proceedings; Rule 52 is inapplicable. ......................................................... 24

        3.    Plaintiffs' assertions that Third Circuit precedent allows the Court to invoke Rule 52 are belied by the cases they cite in support. ............... 24

        4.    There was no "advisory jury" and the Supplemental Verdict Form should be disregarded. .................................................................... 28

    C.    The Court Should Deny Plaintiffs' Motion for Certification of Issues for Interlocutory Appeal Under 28 U.S.C. § 1292(b)................................................. 29

1.   There are not substantial grounds for difference of opinion on the standards and burdens under the FLSA, PMWA, and WPCL. ................ 30

    a.   The 6-factor PMWA test and 10-factor WPCL test are well established. ..................................................................................... 31

    b.   It is well established that Plaintiffs bear the burden of proving that they were Defendants' employees under the FLSA, PWMA, and WPCL. ........................................................ 32

2.   Immediate appeal would not materially advance the litigation. ............... 33

D.   The Court Should Deny Plaintiffs' Motion for a New Trial Under Rule 59. ....... 34

1.   Plaintiffs are not entitled to a "third bite at the apple." ........................... 35

2.   Plaintiffs are not entitled to limit the jury's role. ...................................... 36

3.   Plaintiffs are not entitled to shape the composition of the jury pool. ....... 38

III.   CONCLUSION ................................................................................................. 39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acosta v. Heart II Heart, LLC,*
2019 WL 5197329 (W.D. Pa. Oct. 15, 2019) ........................................................24

*Ambrose v. Twp. of Robinson, Pa.,*
303 F.3d 488 (3d Cir. 2002).................................................................................3

*Barna v. City of Perth Amboy,*
42 F.3d 809 (3d Cir. 1994)..................................................................................4

*Braxton v. El Dorado Lounge, Inc.,*
No. BPG-15-3661, 2018 WL 4643535 (D. Md.) (Defendants' Status Report in
Support of Right to Jury Trial, ECF 189 ) ..............................................................32

*Bridge v. U.S. Parole Comm'n,*
981 F.2d 97 (3d Cir. 1992)..................................................................................19

*Carpenter v. Pepperidge Farm, Inc.*
2024 WL 2103257, at *2 (3d Cir. May 10, 2024) ............................................1, 15

*Carr v. Flowers Foods, Inc.,*
2019 WL 2027299 (E.D. Pa. May 7, 2019) ...........................................................31

*Cartee-Haring v. Cent. Bucks Sch. Dist.,*
No. 20-1995, 2022 U.S. Dist. LEXIS 197324 (E.D. Pa. Oct. 31, 2022)
(Baylson, J.) .............................................................................................30, 31

*Corning Glass Works v. Brennan,*
417 U.S. 188 (1974)..........................................................................................33

*Crump v. HF3 Constr., Inc.,*
2016 U.S. Dist. LEXIS 164027 (E.D. Pa. Nov. 29, 2016)......................................31

*DeMarco v. FarmaceuticalRX, LLC,*
2023 U.S. Dist. LEXIS 40216 (W.D. Pa. Mar. 7, 2023) ........................................31

*Dockery v. Heretick,*
No. 17-4114, 2019 U.S. Dist. LEXIS 129375 (E.D. Pa. Aug. 1, 2019) ..................31

*Donovan v. DialAmerica Mktg., Inc.,*
757 F.2d 1376 (3d Cir. 1985)....................................................................... *passim*

*Dupree v. Younger*,
   598 U.S. 729 (2023)........................................................................................................20

*Evans v. United Arab Shipping Co. S.A.G.*,
   4 F.3d 207 (3d Cir. 1993) ..............................................................................................26

*Freund v. Hi-Tech Satellite, Inc.*,
   185 F. App'x 782 (11th Cir. 2006) .................................................................................16

*Goldberg v. Whitaker House Co-op., Inc.*
   366 U.S. 28 (1961).........................................................................................................15

*Hamilton v. Leavy*,
   322 F.3d 776 (3d Cir. 2003)...........................................................................................19

*Jackson v. State of Ala. State Tenure Comm'n*,
   405 F.3d 1276 (11th Cir. 2005) ................................................................................19, 20

*Kutner Buick v. Am. Motors Corp.*,
   868 F.2d 614 (3d Cir. 1989)...........................................................................................20

*Lorillard v. Pons*,
   434 U.S. 575 (1978)........................................................................................................24

*Martin v. Selker Bros.*,
   949 F.2d 1286 (3d Cir. 1991).....................................................................................25, 26

*Max Daetwyler Corp. v. Meyer*,
   575 F. Supp. 280 (E.D. Pa. 1983) *certified question answered sub nom., Max
   Daetwyler Corp. v. R. Meyer*, 762 F.2d 290 (3d Cir. 1985) ....................................30

*McDermott Int'l, Inc. v. Wilander*,
   498 U.S. 337 (1991).............................................................................................26, 27, 37

*McLaughlin v. DialAmerica Mktg., Inc.*,
   716 F. Supp. 812 (D.N.J. 1989) .....................................................................................25

*Mullen v. Norfolk S. Ry. Co.*,
   No. 13-6348, 2014 U.S. Dist. LEXIS 78647 (E.D. Pa. June 9, 2014).................30, 31, 34

*Orson, Inc. v. Miramax Film Corp.*,
   867 F. Supp. 319 (E.D. Pa. 1994) ..............................................................................33, 34

*P. Schoenfeld Asset Management LLC v. Cendant Corp.*,
   161 F. Supp.2d 355 (D.N.J. 2001) .................................................................................30

*Pease v. Ford Motor Co.*,
   2012 WL 1537655 (D. Del. Jan. 6, 2012).......................................................................19

*Pendleton v. JEVS Human Servs., Inc.*,
   463 F. Supp.3d 548 (E.D. Pa. 2020) ........................................................13, 21, 31

*In re Powell*,
   No. 06-4085, 2006 U.S. Dist. LEXIS 80598 (E.D. Pa. Nov. 2, 2006) ....................................30

*Reeves v. Sanderson Plumbing Products, Inc.*,
   530 U.S. 133, 151 (2000) ................................................................................3, 4

*Razak v. Uber Techs., Inc.*,
   951 F.3d 137 (3d Cir.), amended, 979 F.3d 192 (3d Cir. 2020) ..................................... *passim*

*Roberts v. Ferman*,
   826 F.3d 117 (3d Cir. 2016) ................................................................................19

*Saleem v. Corp. Transp. Grp., Ltd.*,
   854 F.3d 131 (2d Cir. 2017) ........................................................................13, 16

*Santiago Pineda v. JTCH Apartments, LLC*,
   No. 3:13-cv-588, 2015 WL 1387725 (N.D. Tex.) (ECF 189 ) ................................................32

*Schulmerich Bells, LLC v. Jeffers Handbell Supply, Inc.*,
   No. 17-0275, 2017 U.S. Dist. LEXIS 44068 (E.D. Pa. Mar. 27, 2017) ..................................34

*Talarico v. Pub. P'ships, LLC*,
   837 F. App'x 81 (3d Cir. 2020) ........................................................................31, 32

*Torralba v. Little India Grocery, Inc.*,
   No. 14Civ595, 2016 WL 4409232 (S.D.N.Y.) (ECF 189 ) ................................................32

*United States v. Conant*,
   116 F. Supp.2d 1015 (E.D. Wis. 2000) ................................................................39

*United States v. Dyer*,
   2023 U.S. Dist. LEXIS 23753 (W.D. Okla. Feb. 13, 2023) ............................................38

*United States v. Green*,
   435 F.3d 1265 (10th Cir. 2006) ........................................................................38

*United States v. Traficant*,
   209 F. Supp.2d 764 (N.D. Ohio 2002) ................................................................39

*United States v. Weaver*,
   267 F.3d 231 (3d Cir. 2001) ............................................................................38

*Verma v. 3001 Castor, Inc.*,
   937 F.3d 221 (3d Cir. 2019) ........................................................................24, 27, 31, 37

*Walsh v. Alpha & Omega USA, Inc.*,
    39 F.4th 1078 (8th Cir. 2022) ............................................................................16

*Zuzel v. Cardinal Health, Inc.*,
    No. 19-268, 2022 U.S. Dist. LEXIS 245935 (E.D. Pa. Aug. 24, 2022) ................................30

**Statutes**

28 U.S.C. § 1292(b) ............................................................................2, 29, 30

**Other Authorities**

29 C.F.R. § 795.110(b)(4) ............................................................................13

89 Fed. Reg. 1638 (Jan. 10, 2024) ............................................................18, 19, 37

FED.R.CIV.P. 38 ............................................................................1, 23, 28

FED.R.CIV.P. 39 ............................................................................2, 23, 28

FED.R.CIV.P. 49 ............................................................................37

FED.R.CIV.P. 50 ............................................................................ *passim*

FED.R.CIV.P. 52 ............................................................................ *passim*

FED.R.CIV.P. 59 ............................................................................2, 34

## I.     INTRODUCTION

Defying established precedent, the law of the case, the record evidence, and common sense, Plaintiffs filed an omnibus post-trial motion (ECF 344) requesting an assortment of miscellaneous relief to which they are manifestly not entitled.

***First***, Plaintiffs request judgment in their favor pursuant to Rule 50(b). As outlined in detail in Defendants' Motion for Judgment as a Matter of Law (ECF 342), however, it is ***Defendants***—not Plaintiffs—who are entitled to judgment as a matter of law. A reasonable jury would have much more than a legally sufficient evidentiary basis to find for Defendants. Indeed, the trial evidence overwhelmingly (and decisively) supports the conclusion that Plaintiffs failed to meet their burden to prove that they were Defendants' employees under the FLSA, PMWA, and/or WPCL. *See* ECF 342-1 at 7-18. Plaintiffs' arguments to the contrary would not only require the Court to ignore the record evidence, but also cases like *Carpenter v. Pepperidge Farm, Inc.*, in which the Third Circuit held that a client *can* set "parameters and expectations" for an independent contractor's performance. 2024 WL 2103257, at *2 (3d Cir. May 10, 2024).

***Second***, Plaintiffs request judgment in their favor under Rule 52(a)(1). In addition to being utterly without merit based on the record evidence, however, Plaintiffs' request is procedurally improper. The Third Circuit has already held—in this case—that the disputed evidence "must go to a fact-finder" for resolution. *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 145 (3d Cir.), amended, 979 F.3d 192 (3d Cir. 2020). Unlike the parties in *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376 (3d Cir. 1985), Defendants in this case steadfastly maintained their constitutional right to have a jury serve as that fact-finder. *See, e.g.*, ECF 189, 263; *see also* FED.R.CIV.P. 38. A Rule 52 proceeding is only appropriate in an action "tried on the facts without a jury or with an advisory jury," and an advisory jury is only permitted in "an action not

triable of right by a jury." Fed.R.Civ.P. 39(c) & 52(a)(1). This Court should reject Plaintiffs'
request to abrogate Defendants' constitutional rights to a trial by jury.

*Third*, Plaintiffs ask the Court to certify an interlocutory appeal on the issues of: (a) the
appropriate standards for evaluating their claims under the PMWA and WPCL, and (b) which
party bears the burden of proof under the FLSA, PMWA, and WPCL. Contrary to Plaintiffs'
assertions, however, there is not "substantial ground for difference of opinion" on these issues,
and the requested appeal would not "materially advance the ultimate termination of the
litigation." 28 U.S.C. § 1292(b). Instead, the precedent setting forth the appropriate standards for
evaluating claims under the PMWA and WPCL, and allocating the burden of proof under the
FLSA, PMWA, and WPCL, has been well-developed, reasoned, and consistent. Moreover, the
proposed interlocutory appeal would not materially advance the ultimate disposition of the case.
Without a doubt, the surest way to dispose of this case and allow Plaintiffs to take the appeal
they have been clamoring for would be for the Court to grant Defendants' motion for judgment
as a matter of law (ECF 342) and motion for declaration of mistrial and to dismiss (ECF 343).

*Fourth*, Plaintiffs request a new trial pursuant to Rule 59. As set forth in Defendants'
Motion for Declaration of Mistrial and to Dismiss (ECF 343), however, Plaintiffs are not entitled
to a "third bite at the apple" where it is readily apparent that they cannot meet their burden of
proving by a preponderance of the evidence, and to a unanimous jury, that they were
Defendants' employees. *See* ECF 343-1 at 9-17. Even Plaintiffs now admit that "[a] second hung
jury was foreseeable" all along. ECF 344-1 at 26. To be sure, if the Court were to grant
Plaintiffs' motion and convene a third trial, a third hung jury would be just as foreseeable (and
then a fourth, and then a fifth ...). Plaintiffs are not entitled to an infinite number of retrials when
it is foreseeable that each of them would result in a hung jury, just like the first two.

In sum, Plaintiffs' entire wish list of requested relief is inappropriate and should be rejected outright. Instead, for the reasons outlined in Defendants' Motion for Judgment as a Matter of Law (ECF 342) and Motion for Declaration of Mistrial and to Dismiss (ECF 343), the Court should enter judgment in Defendants' favor and dismiss this action with prejudice.

## II.    ARGUMENT

### A.    The Court Should Deny Plaintiffs' Motion for Judgment Under Rule 50(b).

Plaintiffs purport to seek judgment as a matter of law under Rule 50(b), but their motion requests impermissible credibility determinations, misconstrues the applicable law, and misrepresents the facts established at trial. When applying the proper legal framework and viewing the record as a whole, Plaintiffs failed to prove, as a matter of law, that they were employees under the FLSA, PMWA, and WPCL. The Court should deny Plaintiffs' Rule 50(b) motion.

#### 1.    Plaintiffs seek an improper credibility determination from the Court.

As they did in their Rule 50(a) motion, Plaintiffs ask this Court to make credibility determinations in ruling on their motion for judgment as a matter of law. *See* ECF 328 at 3; ECF 344-1 at 7. Specifically, Plaintiffs contend that "Tara Murray's testimony warrants the most consideration under Rule 50" because she is "the only disinterested witness who worked for Uber." ECF 344-1 at 7. But this is improper under Rule 50. When ruling on a motion for judgment as a matter of law, "the court may not weigh the evidence" or "determine the credibility of witnesses." *Ambrose v. Twp. of Robinson, Pa.*, 303 F.3d 488, 492 (3d Cir. 2002). Plaintiffs attempt to justify their request by relying on *Reeves v. Sanderson Plumbing Products, Inc.*, which states that "the court should give credence to … 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" 530 U.S. 133, 151 (2000). But, as detailed below, portions of Ms.

Murray's testimony relied upon by Plaintiffs are contradicted by evidence in the trial record, such that *Reeves* does not apply. In those instances, crediting Ms. Murray's testimony would be inappropriate. *See Barna v. City of Perth Amboy*, 42 F.3d 809, 813 n.5 (3d Cir. 1994) (when ruling on a motion for judgment as a matter of law, the Court must "view the facts in the light most favorable to [Uber] as the party opposing the motion").

> **2.    Plaintiffs are not entitled to judgment as a matter of law on their FLSA and PMWA claims.**

The sole issue presented is "whether, as a matter of economic reality, [drivers] 'are dependent upon [Uber].'" *DialAmerica*, 757 F.2d at 1382; *see* ECF 330-1 at 1–2; ECF 340 at 3. To answer that question, the Third Circuit has set forth six factors for courts to consider. *See Razak*, 951 F.3d at 142–43. Plaintiffs argue that each of the six factors supports a finding that drivers were employees of Uber, but their arguments misapply the law, distort the record, and disregard contradictory evidence.

> **a.    Degree of Uber's right to control the manner in which the work is to be performed**

On the "right to control" factor, Plaintiffs' factual assertions and their legal arguments cannot withstand scrutiny.

> **i.    The record does not support Plaintiffs' arguments regarding "right to control."**

As they did in their Rule 50(a) motion (*see* ECF 328 at 4–14), Plaintiffs list a variety of ways Uber purportedly exercised control over drivers (*see* ECF 344-1 at 8–17). But once again, Plaintiffs disregard the portions of the record demonstrating that Uber did not control the manner of drivers' work. As an initial matter, the contracts between drivers and Uber expressly state that each Plaintiff "acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide

services at any time to any third party separate and apart from the Transportation Services"
obtained through access to the Uber App. Joint Ex. 11 at JX11-0004; 6/11 Trial Tr. 13:20–14:5
(Cherdoud); 6/13 Trial Tr. 40:13–21 (Razak). The evidence presented at trial confirms that this
freedom existed in practice, as drivers were free to choose whether to drive, where to drive,
when to go online and offline, whether to provide transportation services outside of Uber Black,
whether to reject or cancel rides, and which route to take to passengers' destinations. *See* ECF
330-1 at 3–7; ECF 340 at 4. Drivers, not Uber, determined the manner of their driving, including
whether to drive at all.

Plaintiffs' arguments to the contrary rely on misrepresentations of the factual record and
thus do not warrant judgment as a matter of law. When viewed in its entirety, the evidence
cannot support the conclusion that Uber exercised sufficient control over the manner of drivers'
work for them to be classified as employees.

***Gegen.*** By claiming that they "and other black car drivers were regimented under one
organization—Gegen" (ECF 344-1 at 9), Plaintiffs imply that Uber required drivers to affiliate
with Gegen. Not so. Drivers could choose to "affiliate with any company they wanted to" (6/13
Trial Tr. 241:17–25 (Holtzman-Conston); *see id* at 136:15–23 (Dobbs), 241:1–12 (Holtzman-
Conston)), and their choice did not impact their ability to receive trip requests through Uber
Black (*id.* at 244:15–20, 245:20–246:6, 247:24–248:1 (Holtzman-Conston)).

***Deactivation.*** As they argued previously, Plaintiffs assert that Uber controlled drivers by
setting performance standards and deactivating drivers who failed to meet those standards. *See*
ECF 344-1 at 9–10; ECF 328 at 6. This argument, however, fails to acknowledge that the PPA,
not Uber, set many of the requirements applicable to black car drivers. *See infra* at pp. 13-14.
And it also ignores that Plaintiffs were never permanently deactivated based on any of Uber's

5

purported performance standards. *See* 6/10 Trial Tr. 205:17–25 (Cherdoud); 6/12 Trial Tr. 192:12–14 (Sabani), 198:22–199:15 (Sabani); 6/13 Trial Tr. 31:17–32:2 (Razak), 34:6–15 (Razak). Moreover, Uber only became aware of issues severe enough to warrant deactivation— *i.e.*, safety issues—through rider or driver complaints or reports from law enforcement. 6/13 Trial Tr. 156:20–157:5 (Dobbs), 265:2–6 (Holtzman-Conston); *see also* 6/12 Trial Tr. 73:4–74:1 (Murray).

*Rating system.* The evidence does not support Plaintiffs' far-fetched claim that "Uber's rating system demanded near perfection from drivers." ECF 344-1 at 10. Plaintiffs rely entirely on the fact that the rating threshold in Philadelphia was 4.7 out of 5 stars, but they omit critical context. Mr. Holtzman-Conston explained that "[t]he vast majority of drivers"—"[s]omewhere in [the] high 90 percent" range—"were able to pretty easily exceed a 4.7." 6/13 Trial Tr. 257:18– 258:9. He further testified that even though 4.7 "sound[s] high[,] … it's really not." *Id.* Indeed, when Uber ran its biweekly query for drivers with low ratings, "[v]ery frequently, no drivers show[ed] up" in the results, and no action was taken. *Id.* at 262:18–263:7 (Holtzman-Conston).

In the event that a driver fell below the threshold, they would be informed of their rating and provided with "a period of additional trips … to figure out how to improve it." 6/13 Trial Tr. 260:12–18, 261:13–23 (Holtzman-Conston); *see* 6/11 Trial Tr. 149:3–15 (Murray). If a driver did not improve their rating, however, Uber did not "terminate" them. *Contra* ECF 344-1 at 10. Instead, the driver's account would be temporarily deactivated and the driver would be offered the opportunity to take a course to regain access to the Uber platform. 6/13 Trial Tr. 263:8–21, 303:13–20 (Holtzman-Conston); *see also* 6/11 Trial Tr. 149:3–15 (Murray). Plaintiffs emphasize that reactivation was not automatic, but in practice, the only drivers who did not regain access were those whose "rating continued to slide" (6/11 Trial Tr. 180:11–22 (Murray)), or who "were

deactivated for … a serious incident" (6/12 Trial Tr. 40:17–41:6 (Murray)). And critically, Plaintiffs were never permanently deactivated based on any so-called performance standards, *see* 6/10 Trial Tr. 205:17–25 (Cherdoud); 6/12 Trial Tr. 192:12–14, 198:22–199:15 (Sabani); 6/13 Trial Tr. 31:17–32:2, 34:6–15 (Razak).

More fundamentally, Plaintiffs misunderstand the purpose of Uber's rating system. It was not a mechanism of control; rather, it was a service provided to both riders and drivers that "help[ed] to promote more positive interactions on the Uber platform." 6/13 Trial Tr. 158:10–159:2 (Dobbs). And only platform users—riders and drivers—could submit ratings and provide feedback on their rides; Uber did not rate drivers. *Id.* at 159:3–4 (Dobbs). Moreover, because the rating system served to encourage positive interactions between users, both riders and drivers alike could lose access to the platform if they consistently received low ratings. 6/13 Trial Tr. 178:24–179:12 (Dobbs), 264:15–23 (Holtzman-Conston).

Separately, Plaintiffs suggest that Uber's "weekly summary reports" were a method of control used to "keep drivers engaged in their ratings." ECF 344-1 at 11. But the summaries, which included rating information and tips for receiving high ratings, were simply a tool Uber provided to drivers to use as they saw fit. Ms. Murray testified that the summaries were sent to "make [drivers] aware" of their ratings. 6/11 Trial Tr. 177:9–15. As for the "pro tips," they were suggestions that drivers were free to ignore without consequence. *See* 6/10 Trial Tr. 183:21–184:6, 184:19–25, 186:15–21 (Cherdoud); 6/12 Trial Tr. 21:22–22:10 (Murray testifying that she "saw a lot of drivers who didn't [wear a suit and tie]" despite Uber's pro tip suggesting they do so), 77:17–25 (Murray testifying that Uber "could not tell [drivers] what to do"), 134:4–14 (Sabani testifying that he could "ignore the emails" if he wanted to); 6/13 Trial Tr. 16:14–17:5 (Razak testifying that he "d[idn't] have to read" the e mails). If Uber actually controlled drivers,

as Plaintiffs argue, then it would not need to send weekly summary reports or pro tips to encourage drivers to take certain actions. Incentives and services instead demonstrate Uber's *inability* to control drivers.

   ***Insurance, PPA sticker, and other payments.*** Throughout their motion, Plaintiffs contend that Uber controlled drivers by instilling a fear of "going into debt with Uber" if they stopped driving or were deactivated. ECF 344-1 at 11, 17, 21. But, as Defendants have repeatedly pointed out, there is no evidence to support this claim, as drivers were not required to go through Uber to obtain insurance, vehicle financing, or PPA stickers. *See* ECF 340 at 6–7; ECF 330-1 at 10.

   For drivers who did choose to go through Uber, there were a variety of options available to avoid going into debt. As Mr. Holtzman-Conston testified, insurance or PPA sticker payments were "associated to a vehicle, not a driver, and the vehicle could have many, many drivers." 6/13 Trial Tr. 248:2–249:21, 301:20–302:1. Because of that, drivers who chose to take time away or stop driving could "hire somebody to drive their car for them" and thus take on the associated payments. *Id.* at 248:2–249:21 (Holtzman-Conston). In practice, many drivers chose to do that. *Id.* Another option drivers had was to "stop affiliating with Gegen" while they were not using the Uber App and only reaffiliate if and when they decided to start using it again. *Id.* A third option was for drivers to add their vehicles to another driver's account, thereby transferring the payments to that driver as well. *Id.* Given these options, the record flatly contradicts Plaintiffs' claim that drivers were forced to keep driving to avoid going into debt with Uber. *See id.* (Holtzman-Conston testifying that there were "plenty of ways to avoid" going into a negative balance and that it was "really common" to have another driver take over a vehicle and its payments). And even if a driver chose not to use any of those options, stopped using the Uber

App, and ceased making payments, Uber would not pursue that driver for any money owed. *See* 6/11 Trial Tr. 142:2–7 (Murray).

    ***Data collection and monitoring.*** Plaintiffs next point to Uber's data collection practices as evidence of control, arguing that Uber used data to "monitor [drivers'] performance." ECF 344-1 at 13–14. But the record does not support that characterization. To the contrary, the data Uber collected was either necessary for Uber's technology to function properly (*see* ECF 330-1 at 8; ECF 340 at 7–8; 6/13 Trial Tr. 207:8–208:1 (Dobbs)), or reflected feedback provided by riders, not Uber (6/12 Trial Tr. 72:3–15 (Murray)). Uber primarily collected trip data—*i.e.*, where a trip started and ended, the fare amount, and who the driver was—so that it could provide trip summaries to drivers and receipts to riders. 6/13 Trial Tr. 143:21–144:5 (Dobbs). Additionally, Uber collected GPS data on riders and drivers to provide matching services, but it did not "actively monitor[]" users' locations. *Id.* at 207:1–7, 207:8–208:1, 230:10–15 (Dobbs); *see id.* at 280:12–20 ("We're not monitoring where the drivers are at any moment, we're not monitoring where the riders are at any moment.") (Holtzman-Conston); 6/12 Trial Tr. 74:18–75:3 (Murray). Further highlighting Uber's lack of "surveillance" (ECF 344-1 at 14), when Mr. Sabani was asked whether Uber had ever deactivated him for providing independent trips to riders he met through Uber, he responded, "Uber didn't know … how would they know?" 6/12 Trial Tr. 199:9–15. And as far as the data Uber did have access to, Plaintiffs failed to identify any evidence indicating that Uber used it to control drivers in any way.

    Plaintiffs also reassert the same unsupported claim that Uber "tracked 17 drivers" and found out they were spoofing their location at the airport. ECF 344-1 at 14; ECF 328 at 12; *see also* 6/13 Trial Tr. 268:25–269:16 (Holtzman-Conston). But Uber did not discover this issue by monitoring or tracking drivers. To the contrary, it was only after Mr. Cherdoud and several other

drivers all reported the same issue with their airport fares that Ms. Murray "started to dig deeper" and discovered that drivers were locking their location to avoid the airport queue. 6/12 Trial Tr. 65:4–23. Until Mr. Cherdoud and other drivers approached Uber about the issue and Ms. Murray reported it, Uber had no knowledge of it. *Id.* at 66:2–13.

***Where drivers drove.*** Plaintiffs contend that Uber controlled drivers by "block[ing] drivers from working in certain areas," specifically, the airport and Philadelphia County. ECF 344-1 at 14–15. But neither of these examples indicates that Uber controlled drivers' locations. With respect to the airport, a small group of drivers lost access to airport trips because they violated the applicable terms and conditions by "spoofing" their location and "cheating" other drivers. 6/12 Trial Tr. 65:24–66:13 (Murray); 6/13 Trial Tr. 270:7–11 (Holtzman-Conston). And as for Philadelphia County, Ms. Murray testified that "if [drivers] didn't have the PPA limo license, they would have to be blocked from Philadelphia County." 6/12 Trial Tr. 48:25–49:11. In other words, the PPA, not Uber, controlled whether drivers could drive in that county. Even if these specific examples showed control (and they do not), the weight of the evidence demonstrates that drivers were free to choose where to drive. *See* 6/10 Trial Tr. 181:3–14 (Cherdoud), 189:9–190:7 (Cherdoud), 195:8–196:20 (Cherdoud); 6/12 Trial Tr. 75:20–76:1 (Murray), 124:20–22 (Sabani), 126:8–16 (Sabani), 131:9–132:7 (Sabani); 6/13 Trial Tr. 14:1–20 (Razak), 15:12–18 (Razak).

Further, Plaintiffs suggest that Uber controlled where drivers drove by using surge pricing to "lure" them into specific areas. ECF 344-1 at 14. But Uber used surge pricing and other incentives because it *lacked* control over drivers and "couldn't tell [them] when [or where] to drive." 6/12 Trial Tr. 75:12–76:1 (Murray); 6/13 Trial Tr. 142:3–12 (Dobbs). When an area experienced high demand, or surge, Uber communicated that information to drivers, who could

then choose whether to go there. 6/12 Trial Tr. 20:10–13 (Murray); 6/13 Trial Tr. 143:5–8 (Dobbs). Plaintiffs' own testimony demonstrates drivers' freedom to choose, as Mr. Razak said he did not have to drive in high demand areas (6/13 Trial Tr. 17:6–16), and Mr. Cherdoud explained that he generally avoided locations with surge pricing (6/10 Trial Tr. 186:15–21).

**Cancellation rates.** Contrary to Plaintiffs' claims, there was no requirement that drivers using Uber Black in Philadelphia complete every trip they accepted. While Plaintiffs cite generalized language about Uber maintaining maximum cancellation rates in different cities (*see* ECF 344-1 at 15 (citing Pl. Ex. 302)), Mr. Holtzman-Conston testified that Philadelphia did not have a maximum cancellation rate and that no action was taken based on drivers' cancellation rates (6/13 Trial Tr. 252:20–253:8, 282:3–16; *see also id.* at 155:12–21 ("Philadelphia would have its own policy on [cancellations].") (Dobbs)). As the evidence presented at trial establishes, drivers were free to cancel rides they previously accepted, and they often did so. *Id.* at 158:6–9 ("Q. And would a driver be deactivated for pulling over, canceling a trip, and asking a rider to get out of the car? A. No, definitely not.") (Dobbs), 252:20–253:8 (Holtzman-Conston); *see also* 6/12 Trial Tr. 76:9–11 (Murray), 125:1–3, 131:9–132:7 (Sabani), 234:25–235:3 (Razak).

Each of the three Plaintiffs routinely exercised their ability to cancel rides. *See* Def. Exs. 500, 501, 502, 504. In fact, Mr. Razak canceled approximately 22 percent of his trips between 2014 and 2018, and over half of the trips he received in October 2015. *See* Def. Exs. 500, 501; 6/13 Trial Tr. 146:9–22 (Dobbs testifying that in October 2015, Razak canceled more trips than he completed). And despite Plaintiffs' assertion that drivers faced deactivation for canceling rides, none of the Plaintiffs was ever deactivated for doing so. *See, e.g.*, 6/12 Trial Tr. 192:12–14 (Sabani); 6/13 Trial Tr. 31:17–32:2 (Razak), 34:6–15 (Razak), 146:23–147:5 (Dobbs).

11

*Acceptance rates.* Nor did Uber control Plaintiffs through acceptance rates. In their motion, Plaintiffs quote the agreement between Gegen and drivers to argue that drivers were "contractually obligated" to accept 80 percent of the ride requests they received. ECF 344-1 at 15 (quoting Joint Ex. 1 at JX-01-0012). But that argument is misleading, as the Gegen agreement did not apply to all drivers, and critically, Mr. Holtzman-Conston testified that "that [provision] wasn't enforced ever" (6/13 Trial Tr. 284:11–20). Mr. Dobbs confirmed that drivers could not be deactivated for rejecting too many trips. *Id.* at 155:3–5; *see also id.* at 138:20–22, 194:4–14 (Dobbs). Plaintiffs also cite to contractual language stating that drivers agreed "to only make [themselves] available to receive Requests during such times as [they were] generally able to accept Requests that [were] offered." ECF 344-1 at 16 (quoting Joint Ex. 1 at JX-01-0002). But this provision does not equate to a requirement that drivers accept every trip request, and every witness who testified on the issue confirmed that drivers could, and in fact did, regularly reject trip requests. *See* 6/10 Trial Tr. 202:3–9 (Cherdoud), 202:24–205:9 (Cherdoud), 206:14–208:23 (Cherdoud); 6/11 Trial Tr. 115:23–116:11 (Torres), 134:12–16 (Murray); 6/12 Trial Tr. 76:2–8 (Murray), 124:23–25, 125:4–9 (Sabani); 6/13 Trial Tr. 26:21–24 (Razak), 28:7–13 (Razak), 251:19–252:7 (Holtzman-Conston); *see also* Def. Exs. 505 (Cherdoud rejected 994 trip requests), 501 (Razak completed 67 percent of the trip requests he received).

Plaintiffs also misconstrue the consequence of "consistently not accepting trip requests." ECF 344-1 at 15–16. Drivers were not "suspended" in any sense for declining multiple trips in a row; rather, if a driver rejected three consecutive trip requests, the Uber App would simply log them off. 6/13 Trial Tr. 252:8–17 (Holtzman-Conston). The reason for this was the "assumption that [the driver] didn't want to accept trips" or that the driver "might not even be at [their] phone at that time." *Id.* If that assumption was wrong, and the driver did want to accept trip requests,

being logged off did not prohibit that—the driver could "just swipe that button and go right back online" without issue. *Id.*

*PPA requirements.* Plaintiffs cannot demonstrate that Uber controlled drivers by relying on requirements that are based on governing laws and regulations. *See* 29 C.F.R. § 795.110(b)(4); *see also Saleem v. Corp. Transp. Grp., Ltd.*, 854 F.3d 131, 149 (2d Cir. 2017); *Pendleton v. JEVS Human Servs., Inc.*, 463 F. Supp.3d 548, 553–56, 561–63 (E.D. Pa. 2020). Recognizing this, Plaintiffs previously argued that Uber controlled drivers because only a "handful" of its policies overlapped with PPA regulations. ECF 328 at 10. Now, Plaintiffs concede that one-third of the Uber policies they cite overlap with the PPA regulations. ECF 344-1 at 11–13. But even that underestimates the overlap between Uber's policies and the PPA regulations, ignores policies required by applicable laws, and disregards evidence that certain policies were not enforced in Philadelphia.

Plaintiffs list 42 "infractions" that they claim "exceeded local limousine regulations." ECF 344-1 at 11–12. But the trial record proves otherwise. For example, Plaintiffs list "[p]roviding inaccurate information to Uber," "[n]ot wearing a suit and tie," and "[g]enerally smelly," as being Uber-specific, but the PPA had specific rules addressing each of those topics. *See* Def. Exs. 401 at D401-0001, D401-0005 (requirements on accurate and up-to-date personal information); 402 at D402-0008 (suit and tie requirement), D402-0010 ("smelling clean is required at all times"). Other so-called Uber requirements were based on state or local laws, such as the prohibition on street hails (*see* Pl. Ex. 302 at PX-302-004 (drivers cannot "[a]ccept[] illegal street hails"); 6/12 Trial Tr. 19:17–20:4 (Murray)) and the restriction on carrying firearms

(*see* Pl. Ex. 302 at PX-302-004–05 (limiting the carrying of firearms "[t]o the extent permitted by applicable law")). None of these legal requirements demonstrate that Uber controlled drivers.[1]

Other policies that Plaintiffs highlight, including "[c]ancelling on a rider," "[e]xceeding Uber's maximum cancellation rate," "[c]alling riders in advance to ask for their destination," "[i]nactivity on [the] Uber App," "[a]ccepting a trip outside the app from an Uber customer," and "[s]oliciting trips outside the app" (ECF 344-1 at 11–12) were either inapplicable to Philadelphia (*see supra* at pp. 6-12), or otherwise not enforced in practice (*see supra* at pp. 11-12). Indeed, Plaintiffs themselves engaged in these practices numerous times and were never deactivated. *See*, *e.g.*, Def. Exs. 500, 501, 502, 504 (showing rides Plaintiffs canceled); 6/10 Trial Tr. 133:20–22 (Cherdoud gave rides outside the Uber App); 6/11 Trial Tr. 19:14–23:6 (Cherdoud solicited rides by parking near hotels and chatting with doormen); 6/12 Trial Tr. 173:25–174:25 (Sabani independently provided rides for a client who he met through the Uber App); 6/13 Trial Tr. 11:17–12:14 (Razak did not log on to the Uber App for two months and was not deactivated), 32:17–34:9 (Razak called riders to ask for their destination).

### ii. Plaintiffs' legal arguments as to "control" also lack merit.

Plaintiffs' legal arguments on the "right to control" factor fare no better than their factual arguments. They once again fail to respond to the many authorities Defendants have cited which

---

[1] Plaintiffs point to Uber's vehicle requirements and background check policies to argue that Uber's requirements exceeded those of the PPA. ECF 344-1 at 16. On the vehicle requirements, there is conflicting evidence as to whether Uber's vehicle age requirements differed from the PPA's (*compare* 6/13 Trial Tr. 256:23–257:13 (Holtzman-Conston) *with* 6/12 Trial Tr. 226:11–24 (Razak)), such that a reasonable jury could find for Uber. As for background checks, Uber did have an additional background check requirement, but that was implemented for safety reasons, and once drivers were initially approved, they maintained access to Uber when the check was rerun. 6/13 Trial Tr. 240:8–25, 285:15–21 (Holtzman-Conston); *contra* ECF 344-1 at 16. Regardless, even if a small number of Uber's policies exceeded the PPA regulations, the requirements were relatively minor and do not preclude a finding that Uber lacked control over drivers.

establish that workers are properly classified as independent contractors where they set their own hours, are paid on a per-job basis, can choose to accept or reject jobs, and are not directly supervised. *See* ECF 330-1 at 3; ECF 340 at 14. Plaintiffs also continue to rely almost exclusively on *Goldberg v. Whitaker House Co-op., Inc.¸* 366 U.S. 28 (1961), and *DialAmerica*, both of which are distinguishable in critical ways. *See* ECF 340 at 14–16. As Defendants explained in their opposition to Plaintiffs' Rule 50(a) motion, *Goldberg* and *DialAmerica* both concerned at-home workers and thus applied a different "right to control" analysis that is inapplicable to Plaintiffs. *See id.* And even if the same analysis applied, both cases are factually distinguishable, specifically with respect to drivers' ability to provide transportation services outside the Uber App. *See id.* at 15–16 (explaining that the workers in *Goldberg* and *DialAmerica* could not perform services for other businesses or organizations). Given these differences, neither *Goldberg* nor *DialAmerica* controls the result here.

Furthermore, even if Plaintiffs demonstrate that drivers were subject to some "parameters and expectations" while using the Uber App, that does not warrant judgment as a matter of law. *See id.* at 16; *Carpenter*, 2024 WL 2103257, at *2. As the Third Circuit explained, "parameters and expectations" are inherent in every job, but "only an employer can both set parameters and expectations *and* direct the time, place, and manner in which an employee accomplishes them." *Carpenter*, 2024 WL 2103257, at *2. Plaintiffs did not prove that Uber controlled the time, place, or manner of drivers' work. To the contrary, the trial record demonstrates that drivers, not Uber, controlled when, where, and how drivers performed their services. *See supra* at pp. 4-6, 10-14; ECF 340 at 4; ECF 330-1 at 3–7. A reasonable jury could therefore find in Uber's favor on the right to control factor.

    **b.**   **Opportunity for profit or loss**

  With respect to their opportunity for profit or loss, Plaintiffs advance arguments that misrepresent the applicable legal standard and ignore contrary evidence. They claim that drivers' ability to "hustle" or "work more" does not show an opportunity for profit or loss. ECF 344-1 at 17–18. But numerous courts have held otherwise, concluding that "initiative" and "hustle" can demonstrate managerial skill.[2] And regardless, "work[ing] more" was not the only way that drivers could pursue opportunities for profit. As Plaintiffs themselves testified, drivers developed different strategies for when, where, and how they drove. *See* 6/10 Trial Tr. 187:9–21 (Cherdoud); 6/11 Trial Tr. 153:16–154:11 (Murray). Some drivers, like Mr. Sabani, chose to primarily take airport trips (6/12 Trial Tr. 126:8–16), while others, like Mr. Razak, considered demand and surge pricing when deciding where to drive and which trips to take (6/13 Trial Tr. 16:8–17:16).

  Plaintiffs also emphasize that Uber "set fares" and "controlled trip assignments" (ECF 344-1 at 18–20), but those were both services Uber provided to drivers to help facilitate their transactions with riders. *See* 6/12 Trial Tr. 134:4–14 (Sabani); 6/13 Trial Tr. 229:15–21 (Dobbs), 232:8–13 (Dobbs). For pricing, both Mr. Dobbs and Mr. Holtzman-Conston testified that Uber proposed prices for rides, but drivers were free to reject those prices if they wanted. 6/13 Trial Tr. 133:21–134:11 (Dobbs), 251:19–25 (Holtzman-Conston). And as for ride "assignments,"

---

[2] *See, e.g.*, *Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1084 (8th Cir. 2022) (explaining that whether a worker has the ability "to earn additional income through his own initiatives" favors independent contractor status); *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 783 (11th Cir. 2006) (affirming finding of independent contractor status where the worker "was almost entirely compensated by the job and not the hour; therefore, by accepting more jobs, performing more efficiently and hiring employees, he could earn greater sums of money"); *Saleem*, 854 F.3d at 144 ("By toggling back and forth between different car companies and personal clients, and by deciding how best to obtain business from [Defendant]'s clients, drivers' profits increased through their initiative, judgment, or foresight—all attributes of the typical independent contractor.") (citations and quotation marks omitted)).

Uber only proposed matches between riders and drivers, and drivers could easily reject or cancel any ride they did not wish to complete. *See supra* at pp. 11-12; ECF 330-1 at 4; ECF 340 at 9–11. Plaintiffs' own experiences bear this out, as Mr. Razak canceled and rejected more rides in October 2015 than he completed during that month (Def. Ex. 500), and Mr. Cherdoud and Mr. Sabani also rejected or canceled many rides during the periods they used the Uber App (*see* Def. Exs. 502, 504). Plaintiffs make a host of other claims about practices Uber "prohibited"—such as calling riders to ask for their destination and providing rides to customers drivers met through Uber (ECF 344-1 at 19)—but Plaintiffs testified to doing those things without consequence (*see*, *e.g.*, 6/12 Trial Tr. 133:22–25 (Sabani), 173:25–174:25 (Sabani explaining that he independently provided rides for a client who he met through the Uber App); 6/13 Trial Tr. 32:17–34:9 (Razak)).

Plaintiffs further claim that they lacked opportunities for profit or loss because of Uber's decision to introduce UberX in Philadelphia. ECF 344-1 at 20. But Uber's launch of UberX has no bearing on Plaintiffs' proper classification and is wholly irrelevant to this case. *See* 6/13 Trial Tr. 223:9–23. In any event, it is not "undisputed" that UberX "negatively impacted Plaintiffs' earnings." ECF 344-1 at 20. Plaintiffs and other drivers were free to use UberX in addition to Uber Black (*see* 6/11 Trial Tr. 117:21–118:12 (Torres noting that he "rejected the UberX trips")), undermining any claim that UberX inhibited their ability to make a profit. Plaintiffs were also free to pursue business independently or work with other companies to provide rides, and they often did so. *See* ECF 330-1 at 5, 10–11; ECF 342-1 at 13–14; *supra* at pp. 5-6.

Finally, Plaintiffs argue that they lacked an opportunity for profit or loss based on Uber's automatic deductions for expenses such as insurance, PPA stickers, and vehicle payments. ECF 344-1 at 20–21. But this argument makes no sense. Whether Plaintiffs chose to use Uber, work

17

with a different lead-generation company, or provide their own independent black car services, they would have had those same expenses. Put differently, regardless of the managerial skill drivers put into their work, those expenses would have still been present. Drivers' manner of paying those expenses—whether through Uber or otherwise—is therefore irrelevant to assessing their opportunity for profit or loss. Even if the expenses were relevant, Plaintiffs once again fail to acknowledge that they chose to use Uber's services to obtain insurance, PPA stickers, and vehicle financing. *E.g.*, 6/10 Trial Tr. 164:5–11 (Cherdoud), 166:21–167:18 (Cherdoud); 6/12 Trial Tr. 67:12–20 (Murray), 68:8–14 (Murray); ECF 330-1 at 10. Instead of making that choice, and incurring the weekly deductions, they could have done everything independently. *Id.* Uber simply offered assistance as an optional service to help facilitate drivers' entry into the black car industry. *See* 6/12 Trial Tr. 67:7–68:10 (Murray).

### c.      Investment in equipment or materials

As to drivers' "investment in equipment or materials" (*DialAmerica*, 757 F.2d at 1382), Plaintiffs rely entirely on the fact that Uber—a public company that operates across the United States and around the world—invested more money in its business than Plaintiffs invested in their businesses. ECF 344-1 at 21. But a mere comparison of the dollar amounts invested by each party is not the right way to analyze this prong. Rather, as Defendants pointed out in their opposition to Plaintiffs' Rule 50(a) motion (*see* ECF 340 at 19), the Department of Labor has stated that:

> "[C]onsideration of the relative investments of the worker and the potential employer should be compared not only in terms of dollar value or size of the investments, but should focus on whether the worker is making similar types of investments as the employer (albeit on a smaller scale) that would suggest that the worker is operating independently."

Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 89 Fed. Reg. 1638, 1639 (Jan. 10, 2024). The proper inquiry, therefore, examines the *type* of investments

being made, not just the dollar value of those investments. Here, both Uber and drivers made similar kinds of investments in their respective businesses—technology and transportation. As a technology company, Uber made significant investments in its platform and the technology needed to improve and maintain it. 6/13 Trial Tr. 126:11–127:20 (Dobbs explaining that technology "is the business"), 219:9–16 (Dobbs). And as transportation providers, drivers made substantial investments in their vehicles, vehicle insurance, state-mandated registration, and fuel. *See* 6/11 Trial Tr. 60:25–61:10 (Cherdoud); 6/12 Trial Tr. 113:2–4 (Sabani); 6/13 Trial Tr. 66:23–67:4 (Razak); ECF 342-1 at 14–15. Given that drivers made investments in their specific field, separate and apart from Uber's investments in its specific field, drivers were plainly "operating independently" with respect to those investments. 89 Fed. Reg. at 1639. That drivers' investments were smaller in scale than Uber's investments does not alter that conclusion.

### d.     Whether the service rendered requires special skill

For the "special skill" factor, Plaintiffs rely on the Third Circuit's prior opinion, which was based on the summary judgment record. ECF 344-1 at 21. They also claim that the ruling is law of the case. *Id.* at 21–22. But as Defendants previously explained, the Third Circuit's finding that "driving" is not a "special skill" is not binding for purposes of judgment as a matter of law. *See* ECF 330-1 at 13 n.9. Furthermore, the law of the case doctrine does not apply when "new evidence is available" (*Roberts v. Ferman*, 826 F.3d 117, 126 (3d Cir. 2016)), because "the law of the case is the law made on a given set of facts, not law yet to be made on different facts" (*Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1283 (11th Cir. 2005)).[3] "When

---

[3] *See also Bridge v. U.S. Parole Comm'n*, 981 F.2d 97, 103–04 (3d Cir. 1992) ("When new evidence is available, 'the question has not really been decided earlier and is posed for the first time."); *Hamilton v. Leavy*, 322 F.3d 776, 786–87 (3d Cir. 2003) ("Reconsideration of a previously decided issue may, however, be appropriate in certain circumstances, including when the record contains new evidence."); *Pease v. Ford Motor Co.*, 2012 WL 1537655, at *4 n.3 (D. Del. Jan. 6, 2012) ("Any legal rulings or opinions stated by [the predecessor judge] during the

the record changes, which is to say when the evidence and the inferences that may be drawn from it change, the issue presented changes as well." *Id.* That is the case here, as new facts were developed at trial that were not part of the summary judgment record. *See Dupree v. Younger*, 598 U.S. 729, 735–36 (2023) (explaining that "[t]rials wholly supplant pretrial factual rulings" and render the summary judgment record "obsolete"); *Kutner Buick v. Am. Motors Corp.*, 868 F.2d 614, 619 (3d Cir. 1989) ("Since the record at a trial may be different, such a preliminary ruling [on summary judgment] does not determine what issues should be submitted to the jury."); *see also* ECF 311 at 2–4. Plaintiffs even acknowledged this in their Rule 50(a) motion, stating that "[t]he trial record is vastly different from what the parties presented to the Court on summary judgment." ECF 328 at 21. Because the summary judgment record has been superseded, the Third Circuit's prior discussion of the "special skill" factor does not apply.

As the evidence from trial demonstrates, driving a black car requires special skill. Drivers must be commercially licensed, and to obtain that license, they have to take classes and pass an exam. ECF 330-1 at 13–14. Additionally, when Uber Black launched in Philadelphia, Uber specifically recruited individuals, like Plaintiffs, who had prior experience as black car or taxi drivers because of their knowledge and special skills. *See*, *e.g.*, 6/12 Trial Tr. 210:14–22 (Razak); *see also* 6/11 Trial Tr. 47:23–48:2 (Cherdoud had experience and knowledge to identify better routes). As Ms. Murray put it, Plaintiffs were "professional drivers." 6/11 Trial Tr. 154:17–23.

### e.    Degree of permanence of the working relationship

Plaintiffs assert that they had "a continuous and intense working relationship" with Uber, consistent with an employment relationship. ECF 344-1 at 22. To support this claim, Plaintiffs

---

course of denying [a motion] for summary judgment … are understood not to be binding a[s] the law of the case." (citations and quotation marks omitted)).

rely on evidence that they drove most weeks and were logged onto the Uber App for at least 40 hours during those weeks. *Id.* But Uber did not require that commitment from Plaintiffs, nor was a "continuous and intense" relationship inherent in the nature of Uber's relationship with drivers. In fact, the opposite was true. Plaintiffs were free to drive whenever they wanted, and they could choose to stop using the Uber App—either temporarily or permanently—at any time. *See* ECF 330-1 at 14–15; ECF 342-1 at 8–10, 17. In short, Plaintiffs did not have a "set term" for their work; whether they had a "continuous" or "intense" relationship with Uber was entirely up to them. *Pendleton*, 463 F. Supp. 3d at 568.

### f. Whether the service rendered is an integral part of Uber's business

Plaintiffs misconstrue the Third Circuit's comments to argue that the district court's summary judgment ruling on the "integral" factor is law of the case. ECF 344-1 at 24. Plaintiffs fail to mention that the Third Circuit clearly stated that this factor "could be a disputed material fact that should be resolved by a fact-finder." *Razak*, 951 F.3d at 147 n.12. For this reason and those stated above, law of the case does not apply.

On the merits, Plaintiffs argue that drivers are integral to Uber's business because Uber is a transportation company. ECF 344-1 at 22–24. But as noted, the Third Circuit has acknowledged that this is a contested factual issue, and this Court has agreed. *See Razak*, 951 F.3d at 147 n.12; ECF 313 at 32. Uber has consistently held the position that it is a technology company operating in the transportation ecosystem; it is not a transportation provider. 6/13 Trial Tr. 125:19–126:17, 128:13–129:2, 171:19–24 (Dobbs). Put differently, Uber's business is providing a technological service that allows drivers and riders to connect and transact for transportation services. *E.g.*, *id.* at 125:19–126:17, 171:19–24 (Dobbs). Drivers have no role in Uber's technological pursuits, as they provide transportation to riders. *Id.*; *see also id.* at 133:21–

21

134:11 (Dobbs).[4] A reasonable jury would therefore have a legally sufficient basis for finding in favor of Uber on this factor.

### 3. Plaintiffs are not entitled to judgment as a matter of law on their WPCL claims.

Plaintiffs rely on all the same arguments in support of their WPCL claim (*see* ECF 344-1 at 25–26), therefore judgment as a matter of law is unwarranted for all the reasons discussed above. The one new argument Plaintiffs raise is that "at times, Plaintiffs were paid by the hour," which supports employee status under the eighth factor of the WPCL's classification test. *Id.* at 26. But the evidence Plaintiffs rely on to support this argument shows only that, from time to time, Uber offered hourly guarantees as an incentive to try to attract drivers to areas with high demand. *See* Pl. Exs. 195 at PX-195-002 (hourly guarantee listed under "Incentives"), 197 at PX-197-002 (hourly guarantee listed under "Weekend Bonus!"), 204 at PX-204-002 (similar). These guarantees were limited time offers to earn extra money that allowed Uber to address high demand and "promote engagement on the platform for drivers." 6/13 Trial Tr. 141:17–25 (Dobbs); *see also id.* at 281:16–19 (Holtzman-Conston); 6/11 Trial Tr. 144:17–25 (Murray), 146:19–23 (Murray); 6/12 Trial Tr. 75:12–19 (Murray). Put differently, the hourly guarantees were optional incentives that could be earned in addition to drivers' regular fares paid by riders. And the record is clear that drivers were regularly paid per-trip, not on an hourly basis. *See* Pl. Exs. 230, 233, 237, 240, 242; 6/11 Trial Tr. 138:8–11 (Murray explaining that drivers were paid a standard rate set by the PPA regulations, which were "per mile and per minute"). A reasonable jury could therefore find that this factor supports independent contractor status.

---

[4] As they argued in their Rule 50(a) motion, Plaintiffs claim that Uber "willfully" misclassified drivers. ECF 344-1 at 24–25. Not only does Uber dispute this as a factual matter, but Plaintiffs have previously recognized that willfulness is "not necessary for Plaintiffs to prevail on their claims." ECF 328 at 20. The Court need not address this irrelevant issue to decide the legal question presented by Plaintiffs' Rule 50(b) motion.

      **4.**      **The Court should deny Plaintiffs' Rule 50(b) motion.**

Plaintiffs failed to demonstrate that "a reasonable jury would not have a legally sufficient evidentiary basis to find" that drivers were properly classified as independent contractors under the FLSA, PMWA, and WPCL. FED.R.CIV.P. 50(a)(1). The Court should deny Plaintiffs' motion for judgment as a matter of law.

**B.**      **The Court Should Deny Plaintiffs' Motion for Judgment Under Rule 52.**

Ignoring established precedent and the law of the case, Plaintiffs once again attempt to coax the Court into disregarding Defendants' constitutional right to a jury trial. This time, Plaintiffs ask the Court to treat the June 10 jury trial as a non-jury proceeding under Rule 52 of the Federal Rules of Civil Procedure. This Court should reject Plaintiffs' latest disingenuous attempt to deprive Defendants of their right to a jury trial.

      **1.**      **Defendants' right to a jury trial is inviolate.**

"The right of trial by jury as declared by the Seventh Amendment to the Constitution ... is preserved to the parties inviolate." FED.R.CIV.P. 38. Once a jury trial has been demanded, as here, a trial by jury must take place unless: (a) all parties stipulate; or (b) the Court finds there is no federal right to a jury trial. *See* FED.R.CIV.P. 39. Defendants have already submitted exhaustive briefing on their right to a jury trial in this action, and they will not repeat those arguments here. *See*, *e.g.*, Defendants' Status Report in Support of Right to Jury Trial, at ECF 189; Defendants' Objection to Plaintiffs' Advisory Jury Proposal, at ECF 263. Suffice it to say that this Court has already held that Defendants are entitled to a jury trial. *See* June 4, 2024 Memorandum and Order, ECF 314 at 33 ("Defendants have repeatedly asserted they are entitled to a jury trial here under the Seventh Amendment.... The Court agrees with that position....").

Plaintiffs' latest attempt to undermine the Seventh Amendment and circumvent the law of the case requires them to misconstrue Third Circuit precedent invoking Rule 52. *See* Plaintiffs'

Brief, ECF 344-1, at 29-32. A non-jury proceeding under Rule 52 may be appropriate in an action not triable of right by a jury, or when the parties consent. However, it is not appropriate in an action (such as this) that is triable of right by a jury where the parties do not consent.

> **2.    Defendants have not stipulated to non-jury or advisory jury proceedings; Rule 52 is inapplicable.**

Rule 52 is only applicable "[i]n an action tried on the facts **without a jury or with an advisory jury**." FED.R.CIV.P. 52(a) (emphasis added). Plainly, Rule 52 cannot be invoked here. Defendants have not stipulated to a nonjury proceeding on the question of whether Plaintiffs were Defendants' employees. Moreover, it is well established that there is a right to a jury trial in a private action under the FLSA. *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). The threshold question—whether the worker is an employee entitled to the protections of the FLSA—presents a mixed question of fact and law. *Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 229 (3d Cir. 2019); *Acosta v. Heart II Heart, LLC*, 2019 WL 5197329, at *5 n.3 (W.D. Pa. Oct. 15, 2019). The fact component is the combination of disputed and undisputed facts that comprise the economic relations between the worker and the alleged employer. *Verma*, 937 F.3d at 229. The law component is the ultimate conclusion of whether those facts make a worker an "employee" or "independent contractor." *Id.* When "one or more genuine issues of fact concerning the relevant economic relations ... preclude a trial court from drawing a conclusion as a matter of law on the 'employee' or 'independent contractor' issue [, ...] the issue would go to trial, **with the jury resolving it** through either special interrogatories or by deciding the classification issue." *Verma*, 937 F.3d at 229 (emphasis added); *see also Acosta*, 2019 WL 5197329, at *5 n.3.

> **3.    Plaintiffs' assertions that Third Circuit precedent allows the Court to invoke Rule 52 are belied by the cases they cite in support.**

Plaintiffs' contention that the Third Circuit has blessed a district court depriving a party of their asserted right to a jury trial in favor of invoking Rule 52 (or other non-jury proceedings)

is wholly meritless. Plaintiffs' Brief, ECF 344-1, at 29-30 (arguing that "[t]he Third Circuit has recognized that judges, not jurors, should decide a worker's employment status through a Rule 52 proceeding"). The cases upon which Plaintiffs rely wholly undermine their argument.

First, Plaintiffs argue that *DialAmerica* "contemplates a three-step process for district courts—not jurors—to decide whether a worker is an employee or independent contractor under the FLSA." Plaintiffs' Brief, ECF 344-1, at 29. Plaintiffs are wrong. The Third Circuit in *DialAmerica* did not hold that a district court may usurp the role of the jury when a party demands a jury trial. In that case, there is no indication that either party requested a jury trial. Instead, the parties ***agreed*** that "the court would determine whether the workers in question were 'employees' under the FLSA." *DialAmerica*, 757 F.2d at 1381 n.2; *see also McLaughlin v. DialAmerica Mktg., Inc.*, 716 F. Supp. 812, 815 (D.N.J. 1989) (noting that on remand, a "bench trial" was held on the remaining issues). Stated differently, the Third Circuit was able to characterize the district court's evidentiary hearing as a Rule 52 proceeding because the parties agreed to a non-jury proceeding.

Second, Plaintiffs cite *Martin v. Selker Bros.*, 949 F.2d 1286 (3d Cir. 1991), as an example of the Third Circuit endorsing the right of a district court to make "findings of fact" in support of its "conclusions of law" regarding a worker's employment status. Plaintiffs' Brief, ECF 344-1, at 30. Plaintiffs fail to inform the Court, however, that *Martin* was an injunction proceeding brought by the Secretary of Labor, and there is no indication that any party requested a jury trial as to any claim or defense asserted in the action. *Martin*, 949 F.2d at 1290. If anything, *Martin* supports Defendants' position that the Court was obligated to submit the ultimate question of Plaintiffs' status as employees or independent contractors to the jury. While the Third Circuit noted that employment status is a legal conclusion (subject to a plenary

standard of review), it held that "the district court's findings of fact **and the reasonable inferences in which it engaged** are subject to the clearly erroneous standard." *Id.* at 1292 (emphasis added). In other words, engaging in "reasonable inferences" is within the province of the finder of fact. Where that finder of fact is a jury (as in this case), then the jury not only resolves disputes regarding historical facts, but the jury must also resolve disputes regarding the inferences that should be drawn from those facts—including how they weigh in the overall assessment of the economic realities of the relationship between the parties.

Third, Plaintiffs cite *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207 (3d Cir. 1993), a case arising under the Jones Act (not the FLSA). Plaintiffs' Brief, ECF 344-1, at 30. Once again, Plaintiffs fail to notify the Court that there is no indication that any party requested a trial by jury. *See Evans*, 4 F.3d at 209 n.1 (noting this was an appeal following a "bench trial"). Plaintiffs cite *Evans* for the proposition that "[o]nce the underlying facts are established, and the rule of law is undisputed, the issue of whether the facts meet the statutory standard is an issue of law." Plaintiffs' Brief, ECF 344-1, at 30. Tellingly, Plaintiffs neglect to inform the Court that the foregoing passage from *Evans* is based on the Third Circuit's citation to *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337 (1991). In *McDermott*, the Supreme Court provided unequivocal support for Defendants' position in this case, explaining,

> [T]he question of who is a "member of a crew" ... is better characterized as a mixed question of law and fact.... It is for the court to define the statutory standard.... **The jury finds the facts and, in these cases, applies the legal standard**.... If reasonable persons, applying the proper legal standard, could differ as to whether the employee was a "member of a crew," it is a question for the jury.

*McDermott*, 498 U.S. at 356 (emphasis added). Similarly, the question of who is an "employee" under the FLSA presents a mixed question of fact and law. *Verma*, 937 F.3d at 229.[5] In such cases, the district court should define the legal standard (*i.e.*, instruct the jury as to the applicable standard), and the jury should find the facts, apply the legal standard, and determine if the plaintiff was an employee.

Fourth, Plaintiffs point to the Third Circuit's decision in this case as contemplating the possibility that this Court might conduct a Rule 52 proceeding on remand. Plaintiffs' Brief, ECF 344-1, at 31, citing *Razak*, 951 F.3d at 148. Plaintiffs disingenuously argue that "by refusing to require a jury trial, the Third Circuit intentionally left open the possibility for the Court to decide Plaintiffs' employment [status] under Rule 52." *Id.* To be sure, if the parties agreed to a non-jury proceeding to resolve the questions of Plaintiffs' status, such a proceeding would be subject to the requirements of Rule 52. But the parties did not agree to a non-jury proceeding. Nothing in the Third Circuit's opinion can be reasonably construed as allowing this Court to decide Plaintiffs' status under Rule 52 where the parties did not agree to a non-jury proceeding.

Finally, Plaintiffs cite *Carpenter* for the proposition that "judges, not jurors, should decide a worker's employment status under the WPCL." Plaintiffs' Brief, ECF 344-1, at 31. That is not what the Third Circuit said in *Carpenter*. Rather, the Third Circuit merely affirmed the district court's order granting summary judgment to the defendant, because ***in that particular case***, the "undisputed facts ... with all reasonable inferences ... drawn in Plaintiffs' favor, leads to the conclusion that Plaintiffs are independent contractors as a matter of law." *Carpenter*, 2024

---

[5] Plaintiffs acknowledge that in *Verma*, the Third Circuit held that where "genuine issues of fact concerning the relevant economic relations may preclude a trial court from drawing a conclusion as a matter of law on the 'employee' or 'independent contractor' issue," such cases "go to trial, with the jury resolving it through either special interrogatories or by deciding the classification issue." Plaintiffs' Brief, ECF 344-1, at 37. Plaintiffs' attempt to dismiss this holding as a "suggestion" and "mere dicta" (*id.*) cannot withstand scrutiny.

WL 2103257, at *2. In contrast, in this case the Third Circuit already found that there were a number of material factual disputes that "must go to a fact-finder." *Razak*, 951 F.3d at 145.

In conclusion, Plaintiffs' citation to "forty years of precedent" does not in any way support their assertion that this Court can determine Plaintiffs' status under Rule 52. That precedent confirms only that: (a) parties may consent to a Rule 52 proceeding; and (b) a district court may grant summary judgment in appropriate cases. Here, however, the parties have not consented to a Rule 52 proceeding, and the Third Circuit has already determined that summary judgment is not appropriate. This Court should deny Plaintiffs' motion for judgment under Rule 52 and hold inviolate Defendants' right to a jury trial.[6]

### 4. There was no "advisory jury" and the Supplemental Verdict Form should be disregarded.

Plaintiffs conclude their motion for judgment under Rule 52 by noting that the Court "developed a trial record with an advisory jury." Plaintiffs' Brief, ECF 344-1, at 32. Plaintiffs' argument is misleading and disingenuous. First, absent the parties' consent, an advisory jury is only permitted in "an action not triable of right by a jury." FED.R.CIV.P. 39(c). Here, the parties did not consent to an advisory jury in this action triable of right by a jury. Second, the parties agree that the Supplemental Verdict Form should be disregarded. Indeed, Plaintiffs insist that the Supplemental Verdict Form was "inconclusive and unreliable," and they ask the Court to "disregard the results of the Supplemental Verdict Form ... as unreliable and uninformative."

---

[6] Plaintiffs' decision to *sua sponte* submit proposed findings of fact and conclusions of law (ECF 344-2) is presumptuous and improper, and the Court should strike them for the reasons set forth in Defendants' contemporaneously-filed motion to strike. In the unlikely event that the Court elects to deprive Defendants of their rights under the Seventh Amendment and Rule 38 by converting the jury trial into a Rule 52 proceeding, however, Defendants request an opportunity to submit their own proposed findings of fact and conclusions of law, as well as objections to Plaintiffs' submission, which cannot be reconciled with the overwhelming weight of the trial evidence.

Plaintiffs' Brief, ECF 344-1, at 5 & 28; *see also* Defendants' Brief in Support of Motion for Mistrial, ECF 343-1, at 7-9 (agreeing that the Court should disregard the Supplemental Verdict Form, albeit for different reasons). Plaintiffs' suggestion that this action was tried "with an advisory jury"—as if somehow the Court can use the Supplemental Verdict Form to support a judgment after making additional findings under Rule 52—cannot be reconciled with Plaintiffs' own insistence that the Court ignore the Supplemental Verdict Form because it was inconclusive, unreliable, and uninformative. If the Court were to attempt to treat the jury that was seated on June 10 as an "advisory jury" such that it could "mold" their incomplete Supplemental Verdict Form into a judgment, it would (in the Court's own words) be "walking directly into a Seventh Amendment violation." June 4, 2024 Order, ECF 314, at 33.

**C.      The Court Should Deny Plaintiffs' Motion for Certification of Issues for Interlocutory Appeal Under 28 U.S.C. § 1292(b).**

The last time Plaintiffs asked this Court to certify an issue for interlocutory appeal, the Court expressed its "very firm opinion" against such a procedure, noting that: (a) the Third Circuit is "constantly rejecting" interlocutory appeals; and (b) such an appeal, if taken, "just puts the case on ice" throughout the extended period of briefing, argument, and waiting for a decision. May 1, 2024 Hearing Tr. (excerpts attached hereto as Exhibit A) at 29:10 – 30:10. Unmindful of the Court's preference to bring this dispute to final judgment before allowing an appeal, Plaintiffs once again ask the Court to "put the case on ice" so that they can pursue their ambition to upend well-established precedent regarding the applicable standards and burdens for resolving claims under the FLSA, PMWA, and WPCL. Plaintiffs cannot meet the requirements of 28 U.S.C. § 1292(b), and this Court should once again deny Plaintiffs' request to depart from the ordinary course.

In order to justify seeking an interlocutory appeal under 28 U.S.C. § 1292(b), a party must demonstrate that "(1) the order involves a controlling question of law (2) upon which there is substantial ground for difference of opinion and (3) an immediate appeal may materially advance the ultimate termination of the litigation." *Cartee-Haring v. Cent. Bucks Sch. Dist.*, No. 20-1995, 2022 U.S. Dist. LEXIS 197324, at *4 (E.D. Pa. Oct. 31, 2022) (Baylson, J.); *Zuzel v. Cardinal Health, Inc.*, No. 19-268, 2022 U.S. Dist. LEXIS 245935, at *2 n.1 (E.D. Pa. Aug. 24, 2022) (describing these requirements as "elements" that must be satisfied). In addition, "even if these threshold requirements are satisfied, the decision to certify an appeal rests within the discretion of the district court." *Cartee-Haring*, 2022 U.S. Dist. LEXIS 197324, at *4 (internal citation omitted).

### 1. There are not substantial grounds for difference of opinion on the standards and burdens under the FLSA, PMWA, and WPCL.

Plaintiffs' mere speculation "that the Pennsylvania Supreme Court would likely adopt a more employee-friendly standard [for the PMWA and WPCL], if given the opportunity" does not establish substantial ground for difference of opinion. *See, e.g.*, *Mullen v. Norfolk S. Ry. Co.*, No. 13-6348, 2014 U.S. Dist. LEXIS 78647, at *5 (E.D. Pa. June 9, 2014) (citing *Max Daetwyler Corp. v. Meyer*, 575 F. Supp. 280, 282 (E.D. Pa. 1983) *certified question answered sub nom.*, *Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290 (3d Cir. 1985)) ("Defendant's disagreement with this Court does not warrant an interlocutory appeal") (Baylson, J.). Instead, "a substantial ground for difference of opinion 'must arise out of genuine doubt as to the correct legal standard.'" *In re Powell*, No. 06-4085, 2006 U.S. Dist. LEXIS 80598, at *7 (E.D. Pa. Nov. 2, 2006) (quoting *P. Schoenfeld Asset Management LLC v. Cendant Corp.*, 161 F. Supp.2d 355, 358 (D.N.J. 2001))."To show that there exist substantial grounds for a difference of opinion on an issue, the movant may refer to relevant legal authorities to illustrate this disagreement." *Zuzel*

2022 U.S. Dist. LEXIS 245935, at *2 n.1; *see also Cartee-Haring*, 2022 U.S. Dist. LEXIS 197324, at *8 (moving party (unpersuasively) cited to interpretation of statute it proposed was contradictory to ruling in case).Plaintiffs cite to no authority on point contradicting this Court's holdings as to their purported controlling questions of law. *Mullen*, 2014 U.S. Dist. LEXIS 78647, at *3 (holding substantial grounds for difference does not exist when there are no contrary cases on point); *see also Dockery v. Heretick*, No. 17-4114, 2019 U.S. Dist. LEXIS 129375, at *7 (E.D. Pa. Aug. 1, 2019) ("The Court will not certify the venue decision for interlocutory appeal based on the absence of Third Circuit precedent."). Unsurprisingly, the state of the caselaw with respect to the purported controlling questions of law is consistent and support the Court's at-issue holdings.

> **a.   The 6-factor PMWA test and 10-factor WPCL test are well established.**

As the Court previously and correctly held, all courts evaluating independent contractor status under the PMWA have applied the FLSA's 6-factor economic realities test. *See* June 4, 2024 Opinion and Order, ECF 314, at 14-17; *see also* Defendants' Opposition to Plaintiffs' Motion Regarding Pennsylvania Law, ECF 157. *See*, *e.g.*, *Razak*, 951 F.3d at 142 (applying economic realities test because "Pennsylvania state courts have looked to federal law regarding the FLSA for guidance in applying the PMWA"); *Verma*, 937 F.3d at 229 (same); *Talarico v. Pub. P'ships, LLC*, 837 F. App'x 81, 84 n.1 (3d Cir. 2020) (same); *DeMarco v. FarmaceuticalRX, LLC*, 2023 U.S. Dist. LEXIS 40216, at *6 (W.D. Pa. Mar. 7, 2023) (same); *Pendleton*, 463 F. Supp.3d at 559 n.22 (same); *Crump v. HF3 Constr., Inc.*, 2016 U.S. Dist. LEXIS 164027, at *7 (E.D. Pa. Nov. 29, 2016) (same); *Carr v. Flowers Foods, Inc.*, 2019 WL 2027299, at *13 (E.D. Pa. May 7, 2019) (same).

As the Court also previously held, all courts evaluating independent contractor status under the WPCL have applied a 10-factor test nearly identical to the FLSA's economic realities test. *See* June 4, 2024 Opinion and Order, ECF 314, at 21-27. *See, e.g.*, *Talarico*, 837 F. App'x at 84 n.1 ("Our analysis with respect to the FLSA thus also applies to whether [defendant] is a joint employer under the … Pennsylvania Wage Payment and Collection Law."); *Carpenter*, 2024 WL 2103257, at *2. There are not substantial grounds for difference of opinion on the use of these tests to evaluate Plaintiffs' status as employees or independent contractors.

> **b.      It is well established that Plaintiffs bear the burden of proving that they were Defendants' employees under the FLSA, PWMA, and WPCL.**

Other than Plaintiffs' feeble contentions, there are not substantial grounds for difference of opinion as to which party carries the burden of proof when evaluating independent contractor status under the FLSA, PMWA, or WPCL. Indeed, the Third Circuit already held that Plaintiffs bear the burden of proof. *Razak*, 951 F.3d at 143. Just last month, this Court issued a well-reasoned opinion coming to the same conclusion after exhaustively surveying the applicable precedent. *See* June 4, 2024 Opinion and Order, ECF 314, at 14 (holding that Plaintiffs bore the burden of proving employee status under the FLSA); *id.* at 17-20 (same under the PMWA); *id.* at 21-22 (same under the WPCL).[7]

---

[7] Courts have consistently assigned to plaintiffs the burden of proof in cases challenging their independent contractor classification. As just some examples, *see Braxton v. El Dorado Lounge, Inc.*, No. BPG-15-3661, 2018 WL 4643535 (D. Md.) (Defendants' Status Report in Support of Right to Jury Trial, ECF 189 at Exhibit D); *Torralba v. Little India Grocery, Inc.*, No. 14Civ595, 2016 WL 4409232 (S.D.N.Y.) (ECF 189 at Exhibit F) ("Important Instructions: (1) The plaintiffs have the burden of proof on each question by a 'preponderance of the evidence,'"); *Santiago Pineda v. JTCH Apartments, LLC*, No. 3:13-cv-588, 2015 WL 1387725 (N.D. Tex.) (ECF 189 at Exhibit G) ("Has Plaintiff Mr. Pineda proved by a preponderance of the evidence that he was an employee of Defendant JTCH Apartments LLC during the relevant time period? Answer "Yes" or "No").

Implicitly acknowledging that they will never be able to persuade a unanimous jury that they can meet their burden of proof, Plaintiffs now claim that Defendants bear the burden of proof even under the FLSA. *See* Plaintiffs' Supplemental Proposed Jury Instructions, ECF 316 at 2, citing *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974) ("the 'general rule' is that 'the application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense under which the employer has the burden of proof'"). Plaintiffs' argument conflates a worker's status as an "employee" (a necessary precondition to bringing a claim under the FLSA, PMWA, and WPCL, and a status as to which the plaintiff bears the burden of proof) with an employer's right to invoke an "exemption" to minimum wage or overtime as to a worker who has already been shown to be an "employee" (where exempt status is a matter as to which the defendant bears the burden of proof). Tellingly, Plaintiffs do not cite any authorities for the proposition that an employer bears the burden of disproving employment status under the FLSA.

In short, Plaintiffs failed to demonstrate that there is a substantial ground of difference of opinion regarding the Court's correct rulings as to the applicable standard and burdens in cases under the FLSA, PMWA, and WPCL. This Court must deny Plaintiffs' request for certification of an interlocutory appeal.

### 2.    Immediate appeal would not materially advance the litigation.

Plaintiffs similarly fail to meet their burden in establishing their requested interlocutory appeal would materially advance the litigation. "In determining whether certification will materially advance the ultimate termination of the litigation, a district court is to examine whether an immediate appeal would (1) eliminate the need for trial, (2) eliminate complex issues so as to simplify the trial, or (3) eliminate issues to make discovery easier and less costly." *Orson, Inc. v. Miramax Film Corp.*, 867 F. Supp. 319, 322 (E.D. Pa. 1994). Even in situations where an appellate ruling may materially advance the litigation, interlocutory appeal may still be

inappropriate if it would delay the ultimate termination of the dispute. *See Mullen*, 2014 U.S. Dist. LEXIS 78647, at *5 (considering that "courts have often recognized that an appeal can also delay the ultimate termination of a dispute") (Baylson, J.).

Here, Plaintiffs' requested interlocutory appeal does not eliminate the need for trial, simplify a trial, or eliminate issues to make discovery more efficient. Rather, it would only prolong this odyssey further. May 1, 2024 Hearing Tr. at 29:18-20 (noting an interlocutory appeal "just puts the case on ice, basically, for the period of time the appeal is going to take").

If this Court grants Defendants' motion for judgment as a matter of law (ECF 342) and/or motion for declaration of mistrial and to dismiss (ECF 343), Plaintiffs could take an appeal from the final judgment. On the other hand, if the Court denies Defendants' motions, then the action is already positioned for another retrial. Inserting an interlocutory appeal into these proceedings at this time would do nothing other than significantly delay these proceedings. *See Schulmerich Bells, LLC v. Jeffers Handbell Supply, Inc.*, No. 17-0275, 2017 U.S. Dist. LEXIS 44068, at *6 (E.D. Pa. Mar. 27, 2017) (citing *Orson*, 867 F. Supp. at 322) (finding appeal would not advance litigation because "a trial will most likely occur on the remaining issues in this action regardless of the outcome of any interlocutory appeal").

Even if Plaintiffs could establish the requisite elements for certification of these issues for interlocutory appeal (they cannot), Plaintiffs nonetheless fail to identify any exceptional circumstances warranting immediate appellate intervention. Accordingly, this Court should deny Plaintiffs' request for certification of certain issues for interlocutory appeal.

### D.    The Court Should Deny Plaintiffs' Motion for a New Trial Under Rule 59.

As their final request for relief, Plaintiffs request a new trial. But not just *any* new trial. Plaintiffs request that their third trial be customized more to their liking than the first two. First, Plaintiffs ask the Court to limit the jury's role to determining historical facts, prohibiting the jury

from resolving disputes regarding the inferences that should be drawn from those facts—including how the facts weigh in the overall assessment of the economic realities of the relationship between the parties. Second, Plaintiffs ask the Court to depart from the Eastern District of Pennsylvania's ordinary procedures for selecting a jury to ensure that the jury pool for their third trial includes more individuals from Philadelphia County. Plaintiffs are not entitled to a third trial, and they are certainly not entitled to deprive Defendants of their Seventh Amendment rights or to bypass the Jury Selection and Service Act.

### 1.    Plaintiffs are not entitled to a "third bite at the apple."

As outlined in detail in Defendants' Motion for Mistrial (ECF 343), it is apparent that Plaintiffs cannot meet their burden of proving by a preponderance of the evidence, and to a unanimous jury, that they are Defendants' employees. As this Court previously noted, "there are State Court cases that say that if a plaintiff can't get a jury verdict after two tries, they're out." May 1, 2024 Hearing Tr. at 37:24 – 38:4. While Defendants have not identified any *federal* district court precedent (one way or the other) directly on point on the question of a civil plaintiff's right to an infinite number of jury trials, Defendants respectfully submit that this Court retains the inherent authority to dismiss this action with prejudice due to Plaintiffs' demonstrated inability to persuade a unanimous jury that they can meet their burden of proof. Defendants' Brief in Support of Motion for Mistrial and to Dismiss, ECF 343-1, at 9-17.

Plaintiffs now concede that a hung jury in the second trial was "foreseeable" all along. Plaintiffs' Brief, ECF 344-1, at 26. Indeed, Plaintiffs presented virtually the same case-in-chief in both trials, with the same witnesses providing virtually the same testimony using virtually the same exhibits. Because Plaintiffs' witnesses are now tethered to yet another transcript of their sworn testimony, it is now even more "foreseeable" that in a third trial, Plaintiffs will not be able to persuade a unanimous jury that they have met their burden of proof. Ordering a new trial when

a hung jury is "foreseeable" is condemning the parties and the Court to continue climbing the Penrose Stairs in perpetuity, walking the same path again and again and going nowhere.

Plaintiffs contend the jury's failure to reach unanimity in two trials should not be construed as a "negative implication" against them. Plaintiffs are wrong. The Supplemental Verdict Form from the first trial overwhelmingly favored Defendants, with six out of the eight jurors voting in favor of Defendants on the ultimate question of Plaintiffs' status as employees or independent contractors. First Trial Supplemental Verdict Form, ECF 269. For each Plaintiff, a clear majority of the jury found that all six of the FLSA/PMWA "economic reality" factors (as well as the "totality of the circumstances" factor) favored independent contractor status. *Id.* With respect to Plaintiffs' WPCL claim, a clear majority of the jury found that eight of the nine factors (and the "totality of the circumstances" factor) favored independent contractor status. *Id.* The second trial's Supplemental Verdict Form (which, unlike the first trial, required unanimity) similarly favored independent contractor status. Although the jury only reached unanimous agreement as to a limited number of "economic reality" factors, they found that five of the factors "somewhat" favored independent contractor status and that nine were neutral (thus favoring Defendants considering that Plaintiffs bore the burden of proof), while finding that only two factors "somewhat" favored employee status. Second Trial Supplemental Verdict Form, ECF 338.

### 2.    Plaintiffs are not entitled to limit the jury's role.

If the Court schedules a third trial, it should unequivocally reject Plaintiffs' proposal to limit the jury's role to determining historical facts. Plaintiffs' Brief, ECF 344-1, at 37-38. As outlined in detail above and as noted throughout this litigation, Defendants are entitled to a trial by jury. *See, e.g.,* Defendants' Status Report in Support of Right to Jury Trial, at ECF 189; Defendants' Objection to Plaintiffs' Advisory Jury Proposal, at ECF 263. Where the claim at

issue presents a mixed question of fact and law, as here, the Court should define the legal standard (*i.e.*, instruct the jury as to the applicable standard), and the jury should find the facts, apply the legal standard, and determine if Plaintiffs met their burden to prove that they were Defendants' employees. *Verma*, 937 F.3d at 229; *cf. McDermott Int'l*, 498 U.S. at 356.

Limiting the jury's role to resolving disputes about historical facts would not only be improper, it would be impractical. Drafting special interrogatories to resolve every single disputed historical fact (*e.g.*, "Did Plaintiff Ali Razak own Luxe Limousine Services, Inc. with his brother?"), for example, would generate hundreds of questions. Asking the jury questions about the various factors that guide the economic realities analysis would not be "susceptible of a categorical or other brief answer," *see* FED.R.CIV.P. 49(a), which limits their usefulness for verdict forms. Many factors, such as "the degree of the alleged employer's right to control the manner in which the work is to be performed," do not allow a "yes / no" answer. Complicating matters further, "neither the presence nor absence of any particular factor is dispositive," and ascertaining Plaintiffs' status will require the jury to weigh the factors and conduct a wholistic assessment of the "circumstances of the whole activity." *Razak*, 951 F.3d at 143; *Verma*, 937 F.3d at 230; *cf.* Final Rule: Employee or Independent Contractor Classification Under the Fair Labor Standards Act, 89 Fed. Reg. 1638, 1669 (Jan. 10, 2024) ("the enumerated economic realities factors are not exhaustive, all relevant facts should be considered, and the focus of the determination should be grounded in the economic realities as opposed to any isolated factors"). Indeed, it is entirely possible that jurors may disagree about certain historical facts or even various factors within the economic realities test, while ultimately agreeing as to the ultimate question; as long as they agree as to the ultimate question, that is sufficient for a verdict to be

returned. It would not be proper to adopt Plaintiffs' suggestion to require the jury to reach

unanimous agreement on historical facts that might guide their assessment of the factors.

###       3.      Plaintiffs are not entitled to shape the composition of the jury pool.

If the Court schedules a third trial, it should unequivocally reject Plaintiffs' proposal to

interfere with the ordinary procedures of the Eastern District of Pennsylvania with respect to the

selection of jurors. Plaintiffs' Brief, ECF 344-1, at 37-38. Plaintiffs' request, like their prior

objection to the jury pool for the second trial (ECF 329), is misguided and without merit.

Plaintiffs do nothing to establish any elements of a *prima face* case under the Jury Selection and

Service Act. *United States v. Weaver*, 267 F.3d 231, 237 (3d Cir. 2001) (party must demonstrate:

(1) the group alleged to be excluded is a "distinctive group" in the community; (2) the

representation of this group in jury venires is not fair and reasonable in relation to the number of

such persons in the community; and (3) the under representation is caused by the "systematic

exclusion of the group in the jury selection process"). *See* Defendants' Response in Opposition

to Plaintiffs' Objection to Jury Pool, ECF 341.

For example, Plaintiffs assert that there was an impermissibly low number of individuals

from Philadelphia County in the past two jury pools. Plaintiffs' Brief, ECF 344-1, at 38.

However, federal courts routinely reject fair cross-section claims based on geography alone. *See,*

*e.g.*, *United States v. Dyer*, 2023 U.S. Dist. LEXIS 23753, at *13-14 (W.D. Okla. Feb. 13, 2023)

(rejecting defendants' Sixth Amendment claims based on jury selection plan's exclusion of

residents of rural counties, partly due to the failure to identify a distinctive group, as "mere

geographical imbalance, absent evidence that an identifiable and cognizable segment of the

community has been systematically excluded or underrepresented by reason of such imbalance,

does not violate the statutory and constitutional requirement that the jury panel represent a fair

cross section of the community"); *see also United States v. Green*, 435 F.3d 1265 (10th Cir.

2006) (concluding that a defendant asserting a fair cross-section claim based on the Northern District of Oklahoma's exclusion from jury service of drivers who live outside of Tulsa county but do not vote had not met the distinct group element partly because "a person's geographic location [does not] place that person in a distinct group"); *United States v. Traficant*, 209 F. Supp.2d 764, 780-82 (N.D. Ohio 2002) ("Federal courts consistently have found that residents of a geographic area are not a distinct, cognizable group based on their place of residence alone." Rather, place of residence is relevant to a fair cross section analysis only to the extent that it serves as a "proxy for another, recognized distinct group."); *United States v. Conant*, 116 F. Supp.2d 1015, 1024 (E.D. Wis. 2000) ("[E]very court that has looked at the question of whether the residents of a geographic area may constitute a 'distinctive' group for Sixth Amendment purposes solely due to the location of their residence has answered negatively.").

This Court should reject Plaintiffs' motion for a new trial where it is "foreseeable" that it will result in a hung trial. The Court should also reject Plaintiffs' request that a third trial is conducted in a way that deprives Defendants of their Seventh Amendment rights and enables Plaintiffs to bypass the requirements of a claim under the Jury Selection and Service Act.

III.   **CONCLUSION**

Plaintiffs are not entitled to any of the relief they request in their omnibus motion for miscellaneous relief (ECF 344). This Court should deny Plaintiffs' motion. Instead, the Court should grant Defendants' motion for judgment as a matter of law (ECF 342) and/or motion for declaration of mistrial and to dismiss (ECF 343).

Dated: July 11, 2024                                Respectfully submitted,

                                                    */s/Robert W. Pritchard*
                                                    Robert W. Pritchard, Bar No. 76979
                                                    rpritchard@littler.com
                                                    LITTLER MENDELSON, P.C.
                                                    625 Liberty Avenue, 26th Floor
                                                    Pittsburgh, PA 15222
                                                    Telephone:   412.201.7600
                                                    Facsimile:   412.456.2377

                                                    Paul C. Lantis, Bar No. 309240
                                                    plantis@littler.com
                                                    LITTLER MENDELSON, P.C.
                                                    Three Parkway
                                                    1601 Cherry Street, Suite 1400
                                                    Philadelphia, PA 19102
                                                    Telephone: 267.402.3073
                                                    Facsimile: 267.402.3131

                                                    Attorneys for Defendants
                                                    UBER TECHNOLOGIES, INC. and
                                                    GEGEN LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of July 2024, Defendants' Response To Plaintiffs' Motion for Judgment Under Rule 50(b), Judgment Under Rule 52(a)(1), Certification for Interlocutory Appeal Under 28 U.S.C. § 1292(b), and for a New Trial Under Rule 59 was filed using the Eastern District of Pennsylvania's ECF system, through which this document is available for viewing and downloading, causing a notice of electronic filing to be served upon all counsel and parties of record.

*/s/Robert W. Pritchard*