**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ALI RAZAK, et al.** | **CIVIL ACTION** |
| **v.** | **NO. 16-573** |
| **UBER TECHNOLOGIES, INC., et al.** | |

<u>**MEMORANDUM RE: POST-TRIAL MOTIONS**</u>

Baylson, J.                                                                July 30, 2024

After nearly nine years of litigation—including this Court's grant of summary judgment, the Third Circuit's subsequent reversal, and two hung juries—this case is no closer to resolution than the day it was filed.  The question presented, whether UberBLACK drivers are properly characterized as employees or independent contractors under the Fair Labor Standards Act and its Pennsylvania law counterparts, is an intractable one.  It has become clear to the Court this "either-or" determination simply does not comport with the nature of the gig economy, at least as it pertains to UberBLACK.

At its core, this case pits the ability of UberBLACK drivers to work "when, where, and for how long" they want against Uber's control over those drivers while working.  While Plaintiffs have twice attempted to convince a jury the latter outweighs the former here, each attempt has led only to deadlock.

In this Court's humble view, providing Plaintiffs with a proverbial third "bite of the apple" would be futile.  A third jury trial would do nothing more than waste precious judicial resources while—in all likelihood—leaving the Parties precisely where we began so many years ago.  Thus, after having carefully considered all possible paths forward, this Court concludes the best course of action is to dismiss this case "pursuant to its inherent authority to manage its docket."  <u>Lee v. Krieg</u>, 227 F. App'x 146, 148 (3d Cir. 2007).

## I.   BACKGROUND

The relevant background is well known to the Parties, so the Court recounts it only briefly.

Plaintiffs are three UberBLACK drivers that operated in the Philadelphia area between 2013 and 2018.  Plaintiffs allege that Uber "misclassified" Plaintiffs and other similarly situated drivers as independent contractors, rather than employees, thus precluding Plaintiffs from certain benefits and compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, the Pennsylvania Minimum Wage Act ("PMWA"), 43 P.S. §§ 333.101-333.115, and the Pennsylvania Wage Payment and Collection Law ("WPCL"), 43 P.S. §§ 260.1-260.45.  ECF 299 at ¶ 1.

In January 2016, Plaintiffs filed this case in the Court of Common Pleas of Philadelphia County.  ECF 1.  Defendants removed to this Court in February 2016, id., after which extensive discovery took place.  Following this Court's denial of a number of pretrial motions, see, e.g., ECF 94, Defendants filed a motion for summary judgment as of January 26, 2018, ECF 114.  In a thirty-eight-page memorandum dated April 11, 2018, this Court granted Defendants' motion.  ECF 124.

The Third Circuit reversed, vacated, and remanded the case, finding there were a number of material factual disputes that prevented summary judgment.  Razak v. Uber Techs., Inc., 951 F.3d 137, 145 (3d Cir.), amended, 979 F.3d 192 (3d Cir. 2020) ("[W]here there are genuine questions of material fact that need resolution, these questions must go to a fact-finder.  This case presents such genuine disputes of material facts").

Following what the Parties reported were extensive but unsuccessful settlement discussions, a trial took place in this Court beginning on March 4, 2024.  ECF 243.  As stipulated by the Parties, that trial was limited to "the threshold liability question of whether the three individual Plaintiffs were Defendants' employees under the FLSA, PMWA, and/or WPCL."  ECF

146.  Likewise, the Parties limited the relevant time period to "only events occurring ... prior to January 11, 2018."  Id.

After a five-day trial, the jury could not unanimously agree on whether Plaintiffs had proved—by a preponderance of the evidence—that Plaintiffs were employees of Defendants.  ECF 269.  Following the jury's report of deadlock on this ultimate issue, the Court decided to submit specific questions to the jury on (1) the six "economic reality" factors that guide the "misclassification" determination under the FLSA and PMWA, as set forth by the Third Circuit in Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376 (3d Cir. 1985), and (2) the ten factors that guide a similar holistic analysis under Pennsylvania's WPCL, as endorsed by the Third Circuit in Williams v. Jani-King of Philadelphia Inc., 837 F.3d 314 (3d Cir. 2016).  Id.

The poll showed that a majority of the jury, on a majority of the questions, favored Uber's position that Plaintiffs had failed to prove that Plaintiffs were employees.  Id.  Yet, two or more jurors concluded that essentially every factor weighed in favor of an employer-employee relationship.  Id.

Both parties moved for post-trial relief under Rule 50.  ECFs 280, 282.  In a twenty-four-page opinion filed on June 4, 2024, this Court denied both motions, explaining that the "convoluted and disputed set of 'historical facts' presented [at trial], along with the extensive universe of possible 'reasonable inferences,' [] could support a reasonable jury finding for either Party here, thus precluding Rule 50 relief for both."  Razak v. Uber Techs., Inc., 2024 WL 2831805, at *17 (E.D. Pa. June 4, 2024) (Baylson, J.) (citations omitted).

A second trial took place beginning on June 10, 2024.  ECF 325.  In all material respects, Plaintiffs' case-in-chief mirrored their efforts from the first trial.  Defendants largely retread their initial strategy too, with one notable exception.  At this second trial, Defendants significantly

increased their focus on the wide-ranging set of local regulations that governed black car drivers in Philadelphia.  See, e.g., ECF 330-3 at 47; ECF 330-4 at 135-145.

Nonetheless, after several days of deliberation, this second jury once again indicated it was deadlocked.  The Court provided the jury with a slightly revised "supplement verdict form," this time requiring juror unanimity as to whether a particular economic reality factor weighed in favor of independent contractor or employee status.  ECF 338.

This second supplemental verdict form proved even less fruitful than the first.  The jury left the vast majority of factors blank, agreeing on only a few.  Id.  Moreover, the factors the jury did mark differed from Plaintiff to Plaintiff, and largely consisted of the jury marking "neutral." Id.

## II.   PENDING MOTIONS AND CONTENTIONS

The Parties have each filed several post-trial motions, which are now pending before this Court.

### A.  Defendants' Outstanding Motions

Defendants move for judgment as a matter of law under Rule 50, arguing that "[n]o reasonable jury could find that Plaintiffs were 'employees' under the FLSA, PMWA, or WPCL, which was the sole issue presented at trial."  ECF 342-1 at 5-6.  In so arguing, Defendants direct this Court to portions of the second trial record indicating that Plaintiffs (1) had complete flexibility over their work schedules, and (2) were free to pursue profitable alternative transportation opportunities.  Id. at 8-14 (record citations omitted).  As noted, Defendants also highlight the various restrictions and requirements imposed on black car drivers by the Philadelphia Parking Authority ("PPA"), arguing that "[m]any of the rules imposed by Uber on Plaintiffs and other drivers were required by law, and thus could not constitute 'control' as a matter of law."  Id. at 10.

Defendants have also separately moved for this Court to "declare a mistrial and, in the exercise of its inherent authority to manage its docket, dismiss this action with prejudice." ECF 343-1 at 2.  As Defendants see it, "[n]ot only have Plaintiffs failed to persuade two different juries that they could meet their burden of proof, but they cannot demonstrate that they could do anything different in a third trial (or a fourth trial, or a fifth trial ...) that would result in a different outcome." Id. at 12.  Within this separate motion, Defendants further request that the Court (1) "memorialize its [prior oral] decision in a written order granting [Defendants'] motion" to dismiss Plaintiffs' newly added claim for declaratory relief,[1] and (2) "disregard the supplemental verdict form and [] not attempt to 'mold' a verdict from the partial results."  ECF 343-1 at 7.

### B.  Plaintiffs' Outstanding Motions

Plaintiff similarly move for relief under Rule 50.  ECF 344.  However, they do so in an omnibus post-trial motion that requests several alternative forms of relief.  Specifically, Plaintiffs request (1) judgment as a matter of law under Rule 50(b); (2) "[a]n order adopting Plaintiffs' [newly] Proposed Findings of Facts and Conclusions of Law [] under Rule 52(a)(1), along with judgment in Plaintiffs' favor under Rule 58";[2] (3) "[a]n order certifying this case [] for

---

[1] The Court notes that, following the first trial but prior to the Court actually issuing its June 4, 2024 opinion, the Court had indicated to the Parties it intended to deny both post-trial motions. Plaintiffs thus filed an intervening Amended Complaint on May 15, 2024.  ECF 299. That Amended Complaint added a sixth cause of action requesting a declaratory judgment that Plaintiffs were employees.   Id. at ¶¶ 153-157.  During the second trial, the Court subsequently explained that "declaratory judgment[s] generally relate to future conduct, not past conduct," ECF 330-2 at 8, and ultimately stated it was "going to grant the defendants' motion to dismiss" because "Uber Black is no longer operative" in Philadelphia, ECF 343-2 at 10.  But the Court never entered a written order to that effect.  As the Court remains convinced that Plaintiffs do not "allege facts from which it appears there is a substantial likelihood that [they] will suffer injury in the future,'" Lattaker v. Rendell, 269 F. App'x. 230, 233 (3d Cir. 2008) (non-precedential) (citations omitted), this Court will dismiss Plaintiffs' newly added cause of action in the Court's Order accompanying this Memorandum.

[2] In addition to filing a response to Plaintiffs' motion, Defendants separately move this Court "to disregard and strike Plaintiffs' proposed findings of fact and conclusions of law" because

interlocutory appeal under 28 U.S.C. § 1292(b)"; or (4) "[a] new trial under Rule 59 . . . that protects Plaintiffs' right to a jury reflecting a fair cross section of this District and that limits the jury's role to determining only historical facts." Id. at 1.

Also pending is Plaintiffs' mid-trial objection to the second jury pool. ECF 329. Here, Plaintiffs contend that because only two potential jurors were from Philadelphia, "[t]he jury pool [was] not a fair or representative cross-section of the community within the District, especially when considering the larger population of Philadelphia and demographics as compared to the suburbs." Id. at 2-3.

### III.    LEGAL STANDARD

Federal Rule of Civil Procedure 50(b) allows a district court to enter judgment as a matter of law, upon renewed motion after a hung jury, "only if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." Trabal v. Wells Fargo Armored Serv. Corp., 269 F.3d 243, 249 (3d Cir. 2001); see also Stewart v. Walbridge, Aldinger Co., 882 F. Supp. 1441, 1443 (D. Del. 1995); Greco v. Nat'l R.R. Passenger Corp., 2005 WL 3591196, at *4 (E.D. Pa. Dec. 30, 2005).

This remedy is to be invoked "sparingly," Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007), as a district court may grant judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find

---

"[e]rroneous filings with no basis in the rules or precedent should be stricken."  ECF 346 at 1 (citing to Weitzner v. Sanofi Pasteur Inc., 909 F. 3d 604, 614 (3d Cir. 2018)).  Defendants argue that (1) "Defendants' right to a jury trial is inviolate;" (2) "Rule 52 applies only in an action tried on the facts without a jury or with an advisory jury;" (3) "there is no Third Circuit precedent supporting Plaintiffs' request for relief under Rule 52;" and (4) "[t]he parties did not consent to an advisory jury in this action triable of right by a jury and the parties agree that the Supplemental Verdict Form should be disregarded."  Id. at 2-3 (internal quotations and citations omitted).

liability," Le Page's, Inc. v. 3M, 324 F.3d 141, 145-46 (3d Cir. 2003) (citation and internal quotation marks omitted). In so doing, the court "may not weigh evidence, determine the credibility of witnesses or substitute its version of the facts for that of the jury." Parkway Garage, Inc. v. City of Philadelphia, 5 F.3d 685, 691-92 (3d Cir. 1993), abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. Of Warrington, 316 F.3d 392 (3d Cir. 2003); see also LePage's, 324 F.3d at 146 ("[R]eview of a jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict."). Likewise, "conflicting evidence which could reasonably lead to inconsistent conclusions will not justify a judgment notwithstanding the verdict . . . . It is the function of the trier of fact alone . . . to evaluate contradictory evidence and to draw inferences therefrom." Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1178 (3d Cir. 1976), cert. denied, 429 U.S. 1053 (1977) (citations omitted). Thus, "[n]ormally, when the evidence is contradictory, a JNOV is inappropriate." Bonjorno v. Kaiser Aluminum & Chemical Corp., 752 F.2d 802, 811 (3d Cir. 1984).

IV.   **DISCUSSION**

   **A.  This Court's "Inherent Authority" Enables it to Dismiss This Case**

      i.   A District Court's Inherent Authority is Diverse and Far-Reaching

District courts possess an "inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases." Dietz v. Bouldin., 579 U.S. 40, 47 (2016).

Perhaps more importantly, nearly every Court of Appeals—including the Third Circuit—has extended this power to a district court's sua sponte dismissal of frivolous actions. See, e.g., Cintron-Lorenzo v. Departamento de Asuntos del Consumidor, 312 F.3d 522, 525-26 (1st Cir. 2002); Fitzgerald v. First E. Seventh St. Tenants Corp., 221 F.3d 362, 364 (2d Cir. 2000); R & C

Oilfield Servs. LLC v. Am. Wind Transp. Grp. LLC, 45 F.4th 655, 661-62 (3d Cir. 2022); Gibbs v. SCDC, 2022 WL 1467707, at *1 (4th Cir. May 10, 2022); In re Deepwater Horizon, 988 F.3d 192, 197 (5th Cir. 2021); In re Prevot, 59 F.3d 556, 565-66 (6th Cir. 1995); Dorsey v. Varga, 55 F.4th 1094, 1104-05 (7th Cir. 2022); Ferdik v. Bonzelet, 963 F.2d 1258, 1260-61 (9th Cir. 1992); United States v. Schneider, 594 F.3d 1219, 1226 (10th Cir. 2010); Betty K Agencies, Ltd. v. M/V MONADA, 432 F.3d 1333, 1337-38 (11th Cir. 2005).

Most prominently, "a district court, as part of its inherent power to manage its own docket, may dismiss a case sua sponte for any of the reasons prescribed in Fed.R.Civ.P. 41(b)." Cintron-Lorenzo, 312 F.3d at 525-26. Under the plain text of the rule, this power thus extends to a plaintiff's "lack of diligent prosecution," id. and his "failure to comply with a court order." Ferdik, 963 F.2d at 1260.

Importantly though, a district court's dismissal power stretches far beyond these two textual provisions. As the Sixth Circuit has explained, this deeply rooted power flows from "ancient origin in law and equity," In re Prevot, 59 F.3d at 565 (citing Link v. Wabash R.R. Co., 370 U.S. 626, 629-30 (1962)), existing specifically for the purpose of bringing "litigation to a just and equitable conclusion," Eash v. Riggins Trucking Inc., 757 F.2d 557, 561 (3d Cir. 1985) (citations omitted); but see id. (describing the outer boundaries of the power as "nebulous" and "shadowy").

Perhaps unsurprisingly then, the breadth and diversity of case law on this issue is significant, revealing the far-reaching scope of the power. Indeed, while Rule 41(b) jurisprudence is undoubtedly the most prevalent, dismissals in other contexts abound. For instance, a district court may use its inherent authority to sua sponte dismiss an action "under the ancient doctrine of forum non conveniens." In re Prevot, 59 F.3d at 566; see also Fintech Fund, F.L.P. v. Horne, 836

F. App'x 215, 222-23 (5th Cir. 2020).  A district court may also do so "for lack of jurisdiction," In re Prevot, 59 F.3d at 566, see also United States v. Wright, 913 F.3d 364, 381 (3d Cir. 2019) (Nygaard, J., dissenting), and when a court determines that an action is plainly "frivolous" or "malicious."  Hepburn v. United States, 2024 WL 3287252, at *1-2 (10th Cir. July 3, 2024).

### ii.   District Courts Must Use Caution When Exercising This Power

To be sure, district courts must only exercise this power in "extreme circumstances." Oliva v. Sullivan, 958 F.2d 272, 274 (9th Cir. 1992).  For instance, in the Rule 41(b) context, a district court may exercise its inherent authority to sua sponte dismiss a case "only after [weighing] several factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to the defendants; (4) the public policy favoring disposition of cases on their merits and (5) the availability of less drastic sanctions."  Thompson v. Hous. Auth. of City of Los Angeles, 782 F.2d 829, 831 (9th Cir. 1986).

Likewise, dismissals for frivolousness—without prior notice—are only appropriate where it is "crystal clear that the plaintiff cannot prevail and that amending the complaint would be futile." Green v. Concord Baptist Church, 313 F. App'x 335, 336 (1st Cir. 2009) (citing Gonzalez–Gonzalez v. United States, 257 F.3d 31, 37 (1st Cir.2001)); see also Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3, 7 (1st Cir. 2007).

### iii.   The Power Extends to Cases Where, as Here, Further Proceedings are Futile

Ultimately though, nothing about these types of limitations undermine the existence or overall sweep of a district court's inherent power.  To the contrary, the case law makes clear that a district court may dismiss an action where further proceedings are "futile" and where it is "beyond all hope" that a plaintiff might eventually succeed.  Green, 313 F. App'x at 336; see also

Jackson v. U.S. Bankr. Ct., 350 F. App'x 621, 624 (3d Cir. 2009); Campbell v. Wilkinson, 988 F.3d 798, 802 (5th Cir. 2021).

Accordingly, the question becomes whether a district court's inherent authority to dismiss extends to the situation this Court now faces. More precisely, this Court must ask whether a district court has the inherent authority to dismiss an action where, as here, futility flows not from the frivolousness of the core allegations in the complaint or a plaintiff's failure to prosecute, but instead from an obvious stalemate.

After due consideration, the Court concludes its inherent power so extends. Any other outcome would be administratively and economically untenable. Simply put, a district court must have some mechanism to end the infinite loop this Court currently confronts. Without such a mechanism, no upper bound exists as to the number of retrials to which Plaintiffs are entitled here. Each "retrial would . . . inevitably lead[] to questions about whether Plaintiffs are then entitled to a fourth bite at the apple (or a fifth, or a sixth, ...)." ECF 343 at 12.

In this Court's view, no single litigant has the right to continuously monopolize a district court's docket in this manner. See, e.g., Gulf Oil Co. v. Bill's Farm Center, Inc., 449 F.2d 778, 779 (8th Cir. 1971); Coghlan v. Starkey, 852 F.2d 806, 815 n.17 (5th Cir. 1988). And because no other clear mechanism exists to avoid such monopolization, the undersigned is persuaded that a district court's well-established authority to "manage [its] own docket" is the ideal tool to do so. Precluding a retrial on futility grounds is not only a "a reasonable response to the problems and needs confronting the court's fair administration of justice," but also does not run "contrary to any express grant of or limitation on the district court's power contained in a rule or statute." Dietz, 579 U.S. at 45. If anything, the very purpose of the power is to dispel cases, like here, that will

"only lead to a waste of judicial resources."  Baker v. Dir., U.S. Parole Comm'n, 916 F.2d 725, 726 (D.C. Cir. 1990).

Admittedly, existing futility jurisprudence focuses on the frivolousness of a complaint, rather than the impasse this Court now faces.  Yet, in this Court's view, the logic applies in equal force.  In each instance, a district court concludes that no future jury will resolve the case in a plaintiff's favor.  See Martinez-Rivera v. Sanchez Ramos, 498 F.3d 3 (1st Cir. 2007); see also Roberts v. Ferman, 826 F.3d 117, 122-24 (3d Cir. 2016) (affirming district court's inherent authority to dismiss a plaintiff's post-trial motion).  And assuming that determination is reasonable—i.e., not an abuse of a judge's discretion—in both instances it makes little sense for a plaintiff to have free reign to continue commanding the resources and attention of a district court.

To be clear, Plaintiffs' prolonged and persistent efforts here have been admirable, to say the least.  Plaintiffs' counsel has skillfully and forcefully litigated this case.  This Court in no way suggests anything to the contrary.

Nonetheless, two separate juries have resoundingly rebuffed Plaintiffs' attempts.[3]  Perhaps more importantly, Plaintiffs "cannot demonstrate that they could do anything different in a third trial (or a fourth trial, or a fifth trial ...) that would result in a different outcome."  ECF 343-1 at 12.  As Defendants succinctly explain, "Plaintiffs presented virtually the same case-in-chief in the second trial as in the first trial, with the same witnesses providing virtually the same testimony using virtually the same exhibits."  Id.  And in view of those similarities, this Court now has "even

---

[3] Of course, Defendants have also failed to unanimously persuade each respective jury.  But this Court, along with the Third Circuit, has repeatedly made clear that "[t]he burden lies with Plaintiffs to prove that they are employees."  Razak, 951 at 143.

less reason to expect that a third trial would have a different outcome than the first two trials, as Plaintiffs are now tethered to yet another transcript of their sworn testimony." Id.

Accordingly, the Court fully expects any future trial to simply be a replay of each past attempt.  That, in turn, forces the Court to further conclude that any such future proceedings here would be entirely "futile" and thus a waste of resources for all parties involved.  Green, 313 F. App'x at 336.  Not because the next jury will definitively side with Defendants, but instead because it is "crystal clear" that—despite the herculean efforts of Plaintiffs' counsel—the next jury will not side with Plaintiffs.  Id.  In other words, we are, at best, in store for another hung jury.

iv.     The Court Has Considered All Possible Paths Forward

The Court recognizes that dismissing this case on futility grounds may be construed as a "drastic" measure.  But it does not reach this decision lightly. To the contrary, the Court so concludes only after (1) considering all possible paths forward, and (2) weighing the limitations on a district court's inherent authority, as set forth in other legal contexts.

As the Court sees it, there are essentially two strands of constraints guiding a district court's use of its inherent authority.  First are the factors to be considered when sua sponte dismissing a case under Rule 41(b).  Second is the standard for sua sponte dismissal on futility grounds— namely that it must be "crystal clear that the plaintiff cannot prevail and that [further proceedings] would be futile." Green, 313 F. App'x at 336.  While this case, of course, does not require sua sponte dismissal because Defendants have actually moved for such relief, the principles underlying these existing constraints serve as useful guideposts for our novel situation.

The Rule 41(b) analysis, for instance, calls for a Court to consider potentially "less drastic" alternatives to dismissal.  Thompson, 782 F.2d at 831.  The Court has undoubtedly done so here.

Indeed, the Court has not only <u>considered</u> every possible alternative to resolve this case; it has actually <u>attempted</u> those alternatives to no avail.

As just one example, Plaintiffs' latest post-trial motion asks this Court to adopt "Plaintiffs' Proposed Findings of Facts and Conclusions of Law." ECF 344 at 1. The proposal itself is not unreasonable, as it at least theoretically presents a path to resolving this case without another trial. Importantly though, Plaintiffs' request—in addition to perhaps serving as an admission that another trial here would be fruitless[4]—ignores that this Court went through a very similar exercise with the Parties before the first trial.

Under the Court's supervision, the Parties traded several drafts of proposed "stipulated facts" that, if agreed upon, might have enabled this Court to forgo the first trial entirely. <u>See, e.g.</u>, ECFs 189-190, 194, 224-25. Yet, those comprehensive efforts were in vain. The Parties remained worlds apart throughout the exercise, failing altogether to reach a consensus or to jointly propose a set of undisputed facts.[5] ECF 225. For that reason, any effort to try once more at this late stage would be futile. And that futility, again, means the Court must resort to more "drastic" measures.

Similarly, <u>during</u> each trial, the Court took a number of less forceful actions to avoid the result it now implements. Most notably, the Court pressed and probed each jury beyond the Court's typical practices, doing so in the hopes of reaching a resolution on the merits. Specifically, after learning of the deadlock at each trial, the Court—over the Parties' objections—provided each jury with a non-traditional supplemental questionnaire regarding each individual economic reality factor. As the Court explained to the Parties at trial, the Court's hope in providing these

---

[4] Indeed, in requesting such relief, Plaintiffs expressly note that a "second hung jury was foreseeable." ECF 344-1 at 29.

[5] While the Court encouraged these efforts, this result was not altogether surprising in view of the Third Circuit's comments that "[a]lthough both parties argue that there are no genuine disputes regarding control, the facts adduced show otherwise." <u>Razak</u>, 951 F.3d at 146.

supplemental verdict sheets—in addition to potentially spurring a jury decision on the ultimate

issue—was that the jury's more granular answers might have enabled the Court to glean sufficient

insights so as to "mold" a verdict.  ECF 275 at 252-54; see also McSparran v. Hanigan, 225 F.

Supp. 628, 643-44 (E.D. Pa. 1963), aff'd sub nom. McSparran v. Subers, 356 F.2d 983 (3d Cir.

1966).

Again, to no avail.  Each "supplemental verdict form" was plagued by both incompleteness

and potentially contradictory answers.  ECFs 269, 338.  Tellingly, at the second trial, this Court

instructed the jury to mark a factor only if the jury was unanimous as to their views on that factor's

weight.  ECF 338.  The jury left the vast majority of the factors—including the "highly relevant"

right-to-control factor—blank for each Plaintiff.  The pervasiveness of this indecision not only

precluded the Court from fashioning a verdict, it has also reinforced the notion that a third trial

will lead to the same outcome.

Likewise, during this second trial, the Court went so far as to permit the jury to ask

questions of individual witnesses, again in the hopes this procedure would provide the jury with

added clarity.  See, e.g., United States v. Hernandez, 176 F.3d 719, 723 n.2 (3d Cir. 1999).  But

here too, this extraordinary step did nothing to resolve the ensuing deadlock.

> v.    The Remaining Considerations Favor Dismissal

Three of the four remaining Rule 41(b) factors—i.e., "(1) the public's interest in

expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of

prejudice to the defendants," Thompson, 782 F.2d at 831—also weigh in favor of dismissal here.

After nearly nine years of litigation, both the public and Defendants deserve finality.  While

UberBLACK no longer operates in Philadelphia—again, precluding Plaintiffs' request for

declaratory relief here—Uber (and potentially other litigants) eagerly await a resolution.  Were

this case to continue indefinitely, Uber would remain in limbo as to how it must conduct its affairs, both in Philadelphia and elsewhere.  The prospect of that indeterminate limbo not only favors expeditious resolution, but also makes clear the Court's decision today does not prejudice Defendants (to the extent this factor is applicable at all here).

Docket management also clearly favors dismissal.  The Court has devoted significant time and attention to this case over the past eight-plus years, necessarily at the expense of other litigants. As this case now presents the prospect of an endless loop of deadlocked juries, swift resolution is warranted.

To be sure, the final remaining Rule 41(b) factor—"public policy favoring disposition of cases on their merits," id.—cuts the other way.  As just noted, however, the value of that factor is somewhat illusory here, as the Court remains convinced that only deadlock will ensue.

Thus, in sum, this situation appears to be the perfect amalgamation of the different instances where district courts have typically exercised their inherent authority to dismiss an action.  The intractable impasse renders all further proceedings futile (and thus wasteful), which in turn undermines the notion that other "less drastic" measure might aid in the resolution of this case.

Accordingly, the Court draws on its inherent authority to dismiss this case with prejudice. In so ruling, the Court recognizes the novel nature of its decision, and therefore welcomes and expects the Third Circuit's review and guidance.  If nothing else, this case presents the Third Circuit with an opportunity to explore the outer boundaries of a district court's inherent power, and perhaps to fashion a test regarding the futility of endless civil retrials.  Cf United States v. Wright, 913 F.3d 364, 367 (3d Cir. 2019) (requiring a third trial in the criminal context, but noting that "[m]ost cases concerning a court's inherent authority [to dismiss an action] have arisen in the

civil context"); see also id. at 387 (McKee, J., concurring in the judgment) (noting that "a District Court can step in at some point and bar a retrial" and that "there could come a point where successive prosecutions become so onerous and burdensome that additional trials rise to the level of a Due Process violation which a trial court is clearly empowered to prevent").

### B. Defendants' Rule 50(b) Motion

To that end, although this Court remains steadfast that any further proceedings here would be futile, in the alternative, the Court grants Defendants' motion for relief under Rule 50(b). See ECF 342.

In so doing, the Court recognizes that it previously rejected such relief for both Parties following the first trial. Razak, 2024 WL 2831805, at *1.

The Court's views regarding Plaintiffs' latest motion remain unchanged. As already noted, Plaintiffs' case-in-chief was essentially identical at both trials. That interchangeability, in turn, precludes Plaintiffs' Rule 50 motion for the same reasons this Court already articulated in its prior opinion. See id. at *14-17.

Defendants' two efforts do not suffer from the same flaw. At the second trial, Defendants spent significantly more time highlighting the comprehensive set of requirements that local regulators—such as the PPA—imposed on black car drivers. See e.g., ECF 330-2 at 10 (arguing "nearly all of the [requirements] that [Plaintiffs] referenced align with the requirements of the Philadelphia Parking Authority."); see also ECF 330-3 at 47; ECF 330-4 at 135-145

With the benefit of further consideration, the Court now concludes it may have underestimated the import of those PPA requirements during (and following) the first trial.

As the Department of Labor has made clear, "[a]ctions taken by the potential employer for the sole purpose of complying with a specific, applicable Federal, State, Tribal, or local law or

regulation are not indicative of control" for the purposes of a misclassification claim. 29 C.F.R. § 795.110(b)(4). Upon further reflection and a thorough re-review of the second trial record, the Court is now hard-pressed to find an example of a requirement imposed by Uber that was not already required by the PPA in some form.

For instance, at both trials, Plaintiffs highlighted a long list of "infractions" within an internal Uber presentation that, if committed, might result in discipline. ECF 277 at 35; ECF 330-4 at 8. The Court credited this list in previously denying Defendants' Rule 50 motion. Razak, 2024 WL 2831805, at *16. Yet, Defendants' focus on the breadth of PPA requirements at the second trial has made clear the vast majority of Uber's internal "infractions" were in fact already covered under PPA rules.[6]

Moreover, upon revisiting the "additional" requirements imposed by Uber that this Court previously credited, id., the Court is no longer convinced they reflect the type of "control" relevant to the economic reality inquiry. As one such example, the Court previously credited Uber's secondary background check. Id. In hindsight, however, this sort of ex-ante, perfunctory requirement had little effect on the reality of the Parties' working relationship. It was merely a prerequisite for Plaintiffs to "get in the door" at Uber, rather than an actual form of control that may have influenced Plaintiffs' conduct while working.[7]

---

[6] Further, to the extent any daylight does exist, those difference are marginal. For example, Uber's list of "infractions" list out several specific instances of poor driver etiquette. While the PPA's rules matched a few of those infractions verbatim, the PPA's rules also clearly articulated a blanket requirement as to the etiquette and respect drivers owed to all passengers. ECF 342-1 at 10-11.

[7] A similar sentiment applies to Uber's potentially more stringent vehicle requirements, which this Court previously credited. Id. While Uber's list of appropriate black cars may have been slightly more selective than what the PPA required, that selectivity has little bearing on Uber's right to control Plaintiffs. True, one might argue that this additional requirement provided Uber with additional ammo to deactivate a driver. Yet, the Court fails to see how requiring a Plaintiff to drive a slightly nicer vehicle actually bears on the ultimate inquiry as to whether a Plaintiff was actually "in business for himself."

Accordingly, in conducting its Rule 50 analysis, the Court must set aside many of the working condition requirements that Uber conveyed to drivers.  That is not because the Court wishes to "weigh the evidence" itself.  It is instead because these regulations are impermissible considerations when assessing a defendants' "right to control" under the economic reality test.  While the Court previously viewed these requirement as "internal" Uber restrictions, they were in actuality Uber's attempts to comply with local law.

And because this Court must remove the vast majority of "Uber's" quality control measures from the economic reality equation, the calculus changes significantly.  While this Court had previously framed the reasonableness of the jury's deadlock here as flowing from the tension between "(1) the worker flexibility inherent to app-based ridesharing platforms, and (2) those platform's attempts at quality control and standardization," Razak, 2024 WL 2831805, at *15, the Court is no longer convinced that was correct.  The pervasiveness of PPA requirements—as highlighted by Defendants at the second trial—entirely undercuts the relevance of this latter prong.  As such, a proper read of the record here is instead that (1) Plaintiffs had complete autonomy over their schedules, and (2) the PPA, rather than Uber, set the most of rules governing Plaintiffs' working environment.  With that set of facts, the Court is not at all convinced a reasonable jury could find for Plaintiffs.

And although there are, of course, several other factors that might affect a jury's economic reality determination, this "highly relevant" right-to-control factor is at the core of this case.  Moreover, even if this Court were to look to those other factors, several undisputed facts nonetheless counsel in favor of this Court taking the case away from the jury.

On "opportunity for profit or loss," Plaintiffs do not dispute that each individual Plaintiff could and did seek alternative transportation opportunities to enhance their profits.  ECF 342-1 at

13 (citing to relevant portions of record).  Although Plaintiffs contest the degree and extent of Uber's pushback to those arrangements, Plaintiffs do not challenge the fact that (1) each individual Plaintiff engaged in such opportunities, and (2) Plaintiffs often did so during, or in close proximity, to being online on the Uber app.  See ECF 349 at 9-11, 16 (noting that "Plaintiffs could have, and occasionally did, perform rides outside of Uber").

On "investment in equipment or materials," Plaintiffs do not dispute they owned the vehicles they used for providing UberBLACK rides, and that Plaintiffs could use those same vehicles in pursuit of non-Uber related business.  See id. at 12-13, 16.

On "degree of permanence," Plaintiffs do not dispute they could work as much or as little as desired, and this flexibility extended to Plaintiffs' right to take long hiatuses without providing notice to Uber (and without consequence upon return).  See id. at 15; see also ECF 330-5 at 11-13, 118, 248.

On "special skills," Plaintiffs routinely stressed at trial that the introduction of UberX to the Philadelphia market undermined the ability of UberBLACK drivers to succeed.  ECF 343-1 at 13.  In highlighting that fact, however, Plaintiffs have seemingly implicitly admitted the skills necessary to be an UberBLACK driver were differentiated from those skills necessary to be an UberX driver.  So while the Third Circuit has indicated there may be a "presumption that driving is not a special skill," Razak, 951 F.3d at 147, Plaintiffs' own trial strategy casts significant doubt on the notion that being a UberBLACK requires nothing more than "driving."

In sum, these undisputed facts—when colored by the Court's revised conclusions regarding the "right to control" factor—only further cement the notion that no reasonable jury could find for Plaintiffs here.[8]  As such, in the event this Court's primary ruling as to futility does not withstand

---

[8] In so concluding, the Court notes that on "integrality," the record remains sufficiently mixed as to whether Uber is (1) a technology company that supports drivers' transportation businesses or

scrutiny on appeal, the Court alternatively concludes that Defendants are entitled to relief under Rule 50(b).

### C.  Remaining Outstanding Motions

In view of the Court's foregoing rulings, it briefly addresses the Parties' remaining requests for relief.

On Plaintiffs' objections to the jury pool at the second trial, Defendants are correct that a successful prima facie claim would require Plaintiffs to show "the group alleged to be excluded is a 'distinctive group' in the community," but that Philadelphia County residents do not constitute a "distinctive group."  ECF 341 at 2.  Without more, "a person's geographic location [does not] place that person in a distinct group."  United States v. Green, 435 F.3d 1265, 1272 (10th Cir. 2006).

On Plaintiffs' request for this Court to resolve this case under Rules 52 and 58, this Court has repeatedly held that—absent Defendants' waiver or a joint stipulation as to material facts— Defendants are "entitled to a jury trial here under the Seventh Amendment."  Razak, 2024 WL 2831805, at *17.  Because Defendants have remained steadfast in asserting their right to a jury trial, here too, Plaintiffs' request for relief fails.

On Defendants' motion to dismiss Plaintiffs' newly added cause of action for declaratory relief, the Court reiterates that because UberBLACK no longer exists in Philadelphia, Plaintiffs cannot "allege facts from which it appears there is a substantial likelihood that [they] will suffer injury in the future.'"  Lattaker, 269 F. App'x. at 233.

---

(2) a transportation company that uses drivers, such that a reasonable jury could not rely on this factor alone to accurately capture the economic realities of the relationship.

On Plaintiffs' request for interlocutory appeal, although the Court's ruling today will ultimately enable the Parties to immediately seek appellate review, it is simply not due to Plaintiffs' asserted bases for interlocutory review.  This Court has squarely and repeatedly rejected Plaintiffs' contentions that Pennsylvania law requires different misclassification tests than those used here. Razak, 2024 WL 2831805, at *8-14.[9]  Likewise, the Court has repeatedly made clear that Rule 52 does not present a viable path to resolution here, as, again, Defendants possess the right to a jury trial.  Id. at 17.  Simply because Plaintiffs continue to argue the opposite does not mean they have a right to interlocutory review.

Lastly, Plaintiffs' request for a new trial fails for the same reasons the Court has inherent authority to dismiss this case.  Because this Court concludes that any new trial would result in deadlock, it would be futile and wasteful to grant Plaintiffs' request here.

## V.    CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' motion for a mistrial and its corresponding request for this Court to exercise its inherent authority to manage its docket by dismissing this action with prejudice.  In the alternative, this Court **GRANTS** Defendants' motion for post-trial relief under Rule 50(b).  Accordingly, this case is **DISMISSED WITH PREJUDICE**.  An appropriate **ORDER** follows.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 16\16-573 Razak v Uber Technologies\16cv573 memorandum 7.30.24.docx

---

[9] Moreover, the Court notes that while Plaintiffs have long requested this Court look to California law to guide this Court's misclassification analysis, the California Supreme Court recently upheld a law expressly articulating that "a driver for an app-based transportation or delivery company, such as Uber Technologies, Inc. (Uber), Lyft, Inc. (Lyft), or DoorDash, Inc., is an independent contractor and not an employee of the company . . ." under circumstances clearly met here. Castellanos v. State, 2024 WL 3530208, at *1 (Cal. July 25, 2024).